No. 25-1442

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

---

KYLE FELLERS; ANTHONY FOOTE; NICOLE FOOTE; ELDON RASH,

*Plaintiffs - Appellants,*

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities other; BOW SCHOOL DISTRICT,

*Defendants - Appellees,*

PHILIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity,

*Defendants.*

---

Appeal from an Order of the United States District Court for the District of New Hampshire, The Hon. Steven J. McAuliffe (Dist. Ct. No. 1:24-cv-311-SM-AJ)

---

# APPELLANTS' OPENING BRIEF

---

Richard J. Lehmann
LEHMANN MAJOR LIST, PLLC
Concord, NH 03301
603-731-5435
rick@nhlawyer.com

Endel Kolde
Brett R. Nolan
Nathan Ristuccia
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

Attorneys for Appellants

## DISCLOSURE STATEMENT

Kyle Fellers, Eldon Rash, Anthony Foote and Nicole Foote are natural persons with no parent corporations or stockholders.

TABLE OF CONTENTS

DISCLOSURE STATEMENT .......... ii

TABLE OF AUTHORITIES .......... vii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD .......... xv

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

A. Bow School District's restrictions on spectators' speech at school sporting events .......... 2

B. A district court partially enjoins New Hampshire's state law protecting girls' sports .......... 4

C. Some parents decide to silently protest in favor of protecting girls' sports .......... 4

D. A parent emails Bow schools calling for swift action against "hate or disrespect" .......... 5

E. Bow officials censor the silent protest at the September 17 game .......... 5

F. Bow officials ask police to remove Fellers from the sidelines for criticizing officials .......... 7

G. Marcy Kelley issues no-trespass orders against Fellers and Foote .......... 8

H. The TRO hearing .......... 9

I. Plaintiffs are prevented from engaging in future symbolic speech by Bow's restriction .......... 9

J. The Preliminary Injunction Hearing .......... 10

K. The district court denies Plaintiffs' motion for a preliminary injunction .......... 12

SUMMARY OF ARGUMENT .......... 13

ARGUMENT........................................................................14

I. STANDARD OF REVIEW........................................................14

II. PLAINTIFFS' CLAIMS SUCCEED ON THE MERITS ....................15

A. School officials have the burden of establishing that their speech restrictions are constitutional........15

B. The district's blanket ban on adults displaying the XX wristband is unconstitutional viewpoint discrimination ............................................18

1. School sporting events open to the public are limited public fora where viewpoint discrimination is illegal ....................................18

2. Bow allows other passive sociopolitical commentary at its sporting events .....................20

3. Allowing messages officials deem "inclusionary" but not "exclusionary" is textbook viewpoint discrimination .....................22

4. The district's decision to ban speech because it is offensive is viewpoint discrimination..........24

5. Bow officials disagree with Plaintiffs' viewpoint ..........................................................26

6. Bow officials would censor the XX message even if no transgender student were present.....28

7. Bow School District's unwritten policy regarding what is "inclusionary" or "exclusionary" speech provides for excessive enforcement discretion.......................................29

C. The district court erred when it extended *Tinker* and *L.M.* to adult speech in a limited public forum ..............................................................31

1. Tinker and L.M. apply to student speech, not adult speech .......................................................32

2. Tinker and L.M. are not forum-analysis cases because they are limited to student speech .......35

3. Tinker and L.M. have no application to adult speech in limited public fora ............................... 36

D. The district court lacked record evidence that the XX wristbands would likely injure any transgender student ................................................ 39

1. The district court's finding that the XX wristbands "can reasonably be understood as directly assaulting those who identify as transgender women" was clear error .................. 39

2. No testimony established that any transgender student was likely to be injured by the XX-wristbands' passive message ............ 40

3. The district court improperly relied on findings of fact about transgender students in other courts' orders ........................................ 44

4. The district court improperly outsourced its duty to review speech restrictions to school officials ............................................................ 48

E. The district court's novel "effects based" theory of speech regulation is a major departure from legal precedent .......................................................... 49

1. Effects-based legal theories that apply to the regulation of adult entertainment establishments have no application to passive sociopolitical commentary ...................... 49

2. Governments may not restrict speech because it elicits a negative audience reaction............................................................ 51

III. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS ......................................................................... 54

A. Plaintiffs are suffering irreparable harm because they have been banned from displaying XX wristbands at all Bow extracurricular events ......................................................................... 54

B. The balance of the equities and the public interest favor the enforcement of First Amendment rights in a limited public forum............55

CONCLUSION............55

CERTIFICATE OF COMPLIANCE............57

ADDENDUM TABLE OF CONTENTS............A-i

TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) .......................................................... 25

*Am. Freedom Def. Initiative v. King County,*
904 F.3d 1126 (9th Cir. 2018) .......................................................... 56

*Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.,*
781 F.3d 571 (1st Cir. 2015) .......................................................... 23

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .......................................................... 15, 16, 18

*Bachellar v. Maryland*,
397 U.S. 564 (1970) .......................................................... 59

*Barbosa v. Hyland*,
No. 11-11997-JGD, 2013 U.S. Dist. LEXIS 169657 (D. Mass. Dec. 2, 2013) .......................................................... 46

*Barr v. Lafon*,
538 F.3d 554 (6th Cir. 2008) .......................................................... 38

*Bd. of Airport Comm'rs v. Jews for Jesus,*
482 U.S. 569 (1987) .......................................................... 32

*Bethel Sch. Dist. v. Fraser,*
478 U.S. 675 (1986) .......................................................... 37

*Bible Believers v. Wayne Cty.*,
805 F.3d 228 (6th Cir. 2015) .......................................................... 59

*Bl(a)ck Tea Soc'y v. City of Bos.,*
378 F.3d 8 (1st Cir. 2004) .......................................................... 63

*Boos v. Barry*,
485 U.S. 312 (1988) .......................................................... 58

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) .......... 45

*Casey v. City of Newport*,
308 F.3d 106 (1st Cir. 2002) .......... 16

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
561 U.S. 661 (2010) .......... 18

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) .......... 57, 58

*Ctr. for Investigative Reporting v. SEPTA*,
975 F.3d 300 (3d Cir. 2020) .......... 33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 48

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) .......... 38

*Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018) .......... 50

*Doe v. Mills*,
16 F.4th 20 (1st Cir. 2021) .......... 64

*Doucette v. Jacobs*,
No. 15-13193-JGD, 2022 U.S. Dist. LEXIS 122603 (D. Mass. July 12, 2022) .......... 46

*Eknes-Tucker v. Governor*,
114 F.4th 1241 (11th Cir. 2024) .......... 53

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) .......... passim

*Hansen v. Watkins Glen Cent. Sch. Dist.*,
832 F. App'x 709 (2d Cir. 2020) .......... 20

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) .................................................... 36, 37, 39

*Hess v. Indiana,*
414 U.S. 105 (1973) .................................................... 45

*Hopper v. City of Pasco*,
241 F.3d 1067 (9th Cir. 2001) .................................................... 33

*Hurley v. Irish-American Gay*,
515 U.S. 557 (1995) .................................................... 15, 17

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .................................................... 25

*Int'l Soc'y for Krishna Consciousness v. Lee,*
505 U.S. 672 (1992) .................................................... 19

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,*
146 F.3d 66 (2d Cir. 1998) .................................................... 51

*J.S. v. Blue Mt. Sch. Dist.*,
650 F.3d 915 (3d Cir. 2011) .................................................... 38

*Janus v. AFSCME, Council 31,*
585 U.S. 878 (2018) .................................................... 17

*Johnson v. Perry*,
859 F.3d 156 (2d Cir. 2017) .................................................... 20

*K.C. v. Individual Members of the Med. Licensing Bd.,*
121 F.4th 604 (7th Cir. 2024) .................................................... 52

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) .................................................... 16, 18

*Kristoffersson v. Port Jefferson Union Free Sch. Dist.*,
No. 23-7232-cv, 2024 U.S. App. LEXIS 17098 (2d Cir. July 12, 2024) .................................................... 40

*L.M. v. Town of Middleborough,*
103 F.4th 854, 860 (1st Cir. 2024) ....................................passim

*Lakewood v. Plain Dealer Pub. Co.,*
486 U.S. 750 (1988)....................................................................32

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021).........................................................35, 37, 49

*Matal v. Tam*,
582 U.S. 218 (2017)....................................................................26

*McBreairty v. Sch. Bd. of RSU22*,
616 F. Supp. 3d 79 (D. Me. 2022) ..............................................16

*McCoy v. Town of Pittsfield*,
59 F.4th 497 (1st Cir. 2023).......................................................21

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................................................................21

*McElhaney v. Williams*,
81 F.4th 550 (6th Cir. 2023) ..................................................38, 43

*McGuire v. Reilly*,
386 F.3d 45, 62 (1st Cir. 2004) ...................................................24

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024 ........................................................59

*Milward v. Acuity Specialty Prod. Grp., Inc.,*
639 F.3d 11 (1st Cir. 2011) .........................................................47

*Minn. Voters All. v. Mansky,*
585 U.S. 1 (2018)........................................................................32

*Nadherny v. Roseland Prop. Co.,*
390 F.3d 44 (1st Cir. 2004) .........................................................51

*Norris v. Cape Elizabeth Sch. Dist.*,
969 F.3d 12 (1st Cir. 2020) ...................................................... 14, 16, 18

*OSU Student All. v. Ray,*
699 F.3d 1053 (9th Cir. 2012)...............................................................33

*R. A. V. v. St. Paul*,
505 U.S. 377 (1992)...............................................................................31

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) ...................................................... 23, 41, 58

*Roman Catholic Diocese v. Cuomo,*
592 U.S. 14 (2020)..................................................................................63

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995)................................................................. 20, 23, 25

*Seattle Mideast Awareness Campaign v. King County,*
781 F.3d 489 (9th Cir. 2015)..................................................................60

*Showtime Entm't, LLC v. Town of Mendon,*
769 F.3d 61 (1st Cir. 2014) ....................................................................57

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
699 F.3d 1 (1st Cir. 2012) ............................................................. 14, 64

*Snyder v. Phelps*,
562 U.S. 443 (2011)................................................................. 26, 27, 45

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ..............................................................40

*State v. Gorham*,
55 N.H. 152 (1875) ................................................................................44

*Terminiello v. Chicago*,
337 U.S. 1 (1949)....................................................................................45

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ....................................................passim

*Tirrell v. Edelblut*,
748 F. Supp. 3d 19 (D.N.H. 2024)..................................... 4, 50, 51, 55

*United States v. Bayes*,
210 F.3d 64 (1st Cir. 2000) ..................................................44

*United States v. Bello*,
94 F.3d 18, 23 (1st Cir. 1999) ..............................................50

*United States v. Playboy Entm't Group, Inc.*,
529 U.S. 803 (2000)...............................................................15

*United States v. Skrmetti*,
No. 23-477, 605 U. S. ____ (June 18, 2025) .................................52, 53

*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995)...............................................................37

*Wandering Dago, Inc. v. Desisto*,
879 F.3d 20 (2d Cir. 2018) ....................................................42

*Westfield High Sch. L.I.F.E. Club v. City of Westfield*,
249 F. Supp. 2d 98 (D. Mass. 2003 .........................................64

*Worthley v. Sch. Comm. of Gloucester*,
652 F. Supp. 3d 204 (D. Mass. 2023)...........................................16, 20

**Statutes**

28 U.S.C. § 1291 ...........................................................................1, 27

28 U.S.C. § 1331 ...........................................................................1

42 U.S.C. § 1983 ...........................................................................1

## Other Authorities


ADVOCATES FOR TRANS EQUALITY, *Supporting the Transgender People in Your Life: A Guide to Being a Good Ally,* https://perma.cc/5KLG-FHHP ........................................................................ 27

Austin Johnson, *Transnormativity: A New Concept and Its Validation through Documentary Film About Transgender Men,* Sociological Inquiry (2016), https://bit.ly/4jI3tiL ........................................ 46

Florence Ashley, *Genderfucking as a Critical Legal Methodology,* 69 McGill L.J. 177 (2024) ........................................................................ 46

Jay Richards, *Heritage Commentary: What is Gender Ideology?* (July 7, 2023), https://perma.cc/2AZ4-V9BP ........................................ 27

Jojanneke van der Toorn et al., *Not Quite Over the Rainbow: The Unrelenting and Insidious Nature of Heteronormative Ideology,* 34 Current Op. Behav. Sci (2020), https://bit.ly/3SNwGxB .................... 27

Kathy McCormack, *2 transgender New Hampshire girls can play on girls sports teams during lawsuit, a judge rules,* AP (Sept. 10, 2024), https://bit.ly/4jDKcyC ........................................................................ 43

NIH-National Human Genome Research Institute, *Sex Chromosome,* https://perma.cc/J8LD-JKZN ........................................................ 5

SEXUAL MEDICINE SOCIETY OF NORTH AMERICA, *What does it mean to be Gender Fluid?* (March 28, 2023), https://perma.cc/6CV4-L2DM ....... 47

THE HUMAN RIGHTS CAMPAIGN, *Be an Ally – Support Trans Equality,* https://perma.cc/68TY-92S3 ........................................................ 27

THE TREVOR PROJECT, *Understanding Gender Identities & Pronouns* https://bit.ly/4e0d3Mr (last visited June 10, 2025) ............................ 26


## Rules


Fed. R. Evid. 201(b) ........................................................................ 44

Fed. R. Evid. 602 .......................................................................... 41

Fed. R. Evid. 701 .......................................................................... 42

Fed. R. Evid. 701(c) ...................................................................... 41

Fed. R. Evid. 702 .......................................................................... 42

Fed. R. Evid. 801 .......................................................................... 41

Fed. R. Evid. 802 .......................................................................... 41

Fed. R. Evid. 805 .......................................................................... 41

## Reasons Why Oral Argument Should be Heard

This case raises important issues regarding the First Amendment civil right to passively express social and political commentary in public fora, free from official censorship or retaliation. The district court took the novel step of applying the *Tinker* standard to adult speech, contrary to *Tinker*'s express language and the holdings of other circuits. In so doing, the district court ignored obvious viewpoint discrimination and articulated a new theory of effects-based speech regulation.

## Jurisdictional Statement

The district court had subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this dispute arises under the United States Constitution and 42 U.S.C. § 1983.

Plaintiffs appeal from the district court's interlocutory order denying their motion for preliminary injunction, which the court entered on April 14. Plaintiffs timely filed their notice of appeal on May 2, 2025. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1).

## Statement of Issues

1. Does a blanket ban on so-called "exclusionary" speech by adults at school events open to the public discriminate against speech based on its content and viewpoint?

2. Do public school officials illegally discriminate against speech based on viewpoint by banning adult spectators at school sporting events from wearing XX-wristbands conveying an "exclusionary" message, when those same officials permit adult spectators to display a Pride Flag because the message is "inclusionary?"

3. Is the First Amendment's protection of speech by adult spectators in a limited public forum, such as a public-school extracurricular sporting event, subject to the same legal test for the protection of

student speech in schools set forth in *Tinker v. Des Moines* and its progeny?

4. Can the passive display of an XX-wristband by parents watching a school sporting event in which a trans-identified student is playing "reasonably be understood as directly assaulting those who identify as transgender women?"

5. Did the district court correctly find that the XX-wristbands' message would be likely to injure transgender students when the record lacks evidence of such phenomena?

6. Did the district court err by denying plaintiffs' motion for a preliminary injunction?

## Statement of the Case

### A. Bow School District's restrictions on spectators' speech at school sporting events

Bow School District ("Bow" or "the district") enforces multiple policies that restrict the speech of spectators at sporting events and other extracurricular activities. *See, e.g.*, App.157, 162-163. Policy KFA requires "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event" and forbids people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing] . . . any other person" or "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function." App.129. Similarly,

the Bow High School Athletics Handbook states that "[p]oor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands." App.131. As Bow High School's Athletic Director Mike Desilets told parents in an email sent September 16, 2024, school officials understand these policies to prohibit "any inappropriate signs, references, language or anything else" at school sporting events, although "some differing opinions . . . is perfectly fine." App.130, 157.

Superintendent Marcy Kelley later testified that Bow schools have a "practice" of allowing spectators to express "inclusionary" messages at sporting events, but not "trans-exclusionary" or "anti-trans" messages such as "XX" on a pink wristband. Add.10; App.525, 560-561. Principal Fisk also testified that officials would not allow "hateful symbols" such as "XX" on a pink background to be displayed anywhere on school grounds or at school events, but he acknowledged that visitors are allowed to display other sociopolitical messages such as Pride Flags.[1] App.637-639.

[1] On October 1, 2024, the day after this lawsuit was filed, Bow School District enacted a new policy governing all future "protests and other free speech exercises" by campus visitors "on any school District properties." App.145-146, 164. Protests and other free speech exercises at school events were limited to a designated protest area or they "may be deemed as disruptive and result in the game being suspended." App.145. Bow officials later rescinded this restriction, and it is not currently in place. App.569.

### B. A district court partially enjoins New Hampshire's state law protecting girls' sports

In the summer of 2024, New Hampshire enacted a law that limits participation in interscholastic girls' sports teams to biological females. A district court preliminarily enjoined the state from enforcing that law on September 10, 2024. *See Tirrell v. Edelblut,* 748 F. Supp. 3d 19 (D.N.H. 2024); Add.2-3. One week later—on September 17, 2024—Bow High School's girls' varsity soccer team was scheduled to play a home game against the team from the Plymouth Regional High School, which has a biologically male player—one of the plaintiffs in *Tirrell v. Edelblut*. App.103, 117-118.

### C. Some parents decide to silently protest in favor of protecting girls' sports

Parents of some Bow players—including Plaintiffs Kyle Fellers, Anthony "Andy" Foote, and Nicole Foote—believe that allowing biological males to play girls' and women's sports destroys fair competition, puts female athletes at risk for physical and mental injury, and undermines women's social progress. *See, e.g.*, Add.16; App.88, 103-106, 117-118. Kyle Fellers and Andy Foote decided to express their support for reserving girls' and women's sports to females by attending the September 17 soccer game and wearing pink breast-cancer awareness wristbands, customized with two black Xs added

(symbolizing the female chromosomes),[2] in silent protest on the sidelines. *See* App.89-90, 104-105, 133.

### D. A parent emails Bow schools calling for swift action against "hate or disrespect"

Unbeknownst to Plaintiffs, another parent, Shannon Farr, had emailed Mike Desilets, a school athletic official, on September 11, to tip him off that some sort of protest might occur and express her opinion that "I don't feel the soccer field is a place for hate or disrespect[.]" App.156, 262. She also asked for offending "community members" to be "dealt with swiftly." *Id.* As a result of Farr's email, school officials surveilled parents' social media and were on hand at the game, with police back-up. Add.6-7; App.157, 161, 163, 169, 519-523.

### E. Bow officials censor the silent protest at the September 17 game

On September 17, 2024, Fellers and the Footes attended the varsity girls' soccer game, which occurred on public property at the Bow High School soccer field. App.90, 106, 119, 147. During the first half, Andy Foote distributed pink wristbands to around half a dozen spectators, telling them to not put the bands on until halftime. App.106-107, 119-

[2] "Humans and most other mammals have two sex chromosomes, X and Y, that in combination determine the sex of an individual. Females have two X chromosomes in their cells, while males have one X and one Y." NIH-National Human Genome Research Institute, *Sex Chromosome,* https://perma.cc/J8LD-JKZN.

120, 158. At halftime, Fellers and Andy Foote put on their XX wristbands and placed a poster of Riley Gaines—an accomplished collegiate athlete who advocates reserving girls' and women's sports to females—on the windshield of Foote's Jeep. App.90, 107, 158.

For the first ten minutes of the second half, the two men watched the game from the sidelines, without disruption or commotion. App.90-91, 107. If not for the actions of school officials, most people at the game likely would never have noticed the silent protest because Fellers, Foote, and the other protestors did not shout, chant, march, or waive signs on the sidelines. Add.19; App.90-91, 107, 125, 586.

Approximately ten minutes into the second half, school officials—including Desilets and Bow High School Principal Matt Fisk—approached Foote and Fellers to tell them that they could not protest and had to either remove the wristband or leave the game. *See, e.g.*, App.158, 167. Both men initially refused to remove their wristband but eventually gave in and removed their bands. Add.20; App.91-92, 108.

Eldon Rash—Feller's former father-in-law—did not initially know anything about the silent protest. App.125-126, 501-502. But he learned what was happening because of the commotion the school officials created. *Id.* In response, he placed Fellers' wristband around his own wrist to demonstrate his support both for women's sports and for the freedom to express one's beliefs without harassment. App.92, 125-126. Desilets, Fisk, and Steve Rossetti (a game referee) pressured Rash to

remove the wristband, delaying the game and threatening to cancel it if he did not comply. *See, e.g.*, Add.20-21; App.109, 127, 158-159.

After school officials intervened, Shannon Farr's husband (David Farr) and some other parents on the sidelines also vocally disapproved of the wristband protest, telling Plaintiffs to "write a letter to someone," "take it off," and stop "hurting the girls." App.255 (8:18-9:25), 428-429, 507. Much of the interaction between Rash, Fellers, Rossetti, and the school officials was recorded by Lt. Phillip Lamy of the Bow Police Department on his body camera. App.170, 255-256.

### F. Bow officials ask police to remove Fellers from the sidelines for criticizing officials

Fellers criticized the school officials' treatment of Rash, calling Desilets "a coward" without "a backbone" and comparing the officials to "a bunch of Nazis." *See* App.159, 167, 169, 255 (2:40-55, 4:06-17, 4:24-28). Desilets then gestured to Lt. Lamy to "launch" Fellers. App.255 (4:15-18), 339. Lt. Lamy to told Fellers "you're removed from the game"—an order that Fellers obeyed by leaving the field immediately and going to his car. App.92, 159, 169, 255 (4:18-24), 339. Rash eventually removed the wristband. Add.21; App.127, 167. After Rossetti, Desilets, and Fisk—who were meeting on the field at the time—learned this from another school official via walkie-talkie, they allowed the game to resume. App.109, 127, 618.

After the game ended, Fellers stood beside his car in the parking lot and held a poster reading "Protect Women's Sports for Female Athletes." App.90, 93, 256, 343. Following Defendant Desilets' instruction, Lt. Lamy approached Fellers and told him to leave school grounds immediately, without waiting to pick up his family. App.93, 159, 170, 256. They argued back and forth for a while, and Lt. Lamy eventually allowed Fellers to wait for his family, without further incident, but Fellers did put away his sign. App.93, 109, 170, 256.

### G. Marcy Kelley issues no-trespass orders against Fellers and Foote

A few days after the game, Fellers and Andy Foote both received "No Trespass Orders" prohibiting them for a time "from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds." App.135-139. In the orders, and a public statement, Defendant Kelley stated that Fellers' and Foote's silent protest violated Policy KFA and the Bow High School Athletics Handbook. App.134-139. Kelley later changed aspects of Fellers' No Trespass Order (which extended for the entire fall sports season) but did not alter Fellers's ban from attending extracurricular events. *See* App.142-144.

### H. The TRO hearing

On September 30, 2024, Plaintiffs filed this lawsuit. App.80. At a hearing on October 8, the district court denied Plaintiffs' motion for a temporary restraining order against Defendants' policies restricting protests on school grounds but ordered Defendants to allow Fellers to attend soccer games if he did not protest at games, advocate his position at games, interact with coaches, or violate school rules or sportsmanship expectations. Add.24; App.248-249. The district court did not explain the basis for its order allowing Fellers to attend the soccer matches, but it stated that the speech issues in the case were "a jump ball." App.248.

### I. Plaintiffs are prevented from engaging in future symbolic speech by Bow's restriction

Plaintiffs intend to and would silently protest on the sidelines of Bow School District sporting events and extracurriculars, by wearing wristbands, distributing wristbands, or holding signs in the parking lot. *See, e.g.*, App.97-98, 113-114, 122, 389. Although the 2024-2025 school year has ended, Plaintiffs intend to wear the XX wristbands at future Bow events, including girls' soccer games, swim meets, basketball games, ski meets, and lacrosse games, over various seasons and even if their own children are not competing—if they could do so without facing negative consequences from school officials. *See, e.g.*, App.98, 128, 656, 658, 662-665. Plaintiffs find it frustrating and degrading that

Defendants prohibit them from expressing their viewpoint about girls' and women's sports at Bow School District events, while other residents are allowed to promote their viewpoints and opinions on school property. App.98-99, 114-115, 123. Plaintiffs reasonably expect, however, that without judicial relief, any future protests featuring XX wristbands at Bow School District events will violate Defendants' policies and put Plaintiffs in danger of arrest, game suspension, game cancellation, or renewed no trespass orders. App.98, 112-114, 128, 656-658.

### J. The Preliminary Injunction Hearing

On November 21-22, 2024, the district court held an evidentiary hearing on Plaintiffs' motion for preliminary injunction. Add.2; App.10. The court heard testimony from Plaintiffs Kyle Fellers, Anthony Foote, and Eldon Rash; Bow school officials Marcy Kelley, Matt Fisk, and Mike Desilets; and soccer referee Steve Rossetti. App.264, 357, 495, 611.[3]

The hearing testimony generally tracked declarations filed by both Plaintiffs and Bow officials, although additional details were provided, and Bow officials testified about their reasons for restricting display of the XX wristbands on the sidelines and "protect women's sports" signs in the parking lot. *See, e.g., generally,* App.524-531, 633-639. Lt. Lamy's

[3] Lt. Philip Lamy and referee Steve Rossetti were initially defendants in this case but were later dismissed by stipulation of the parties. App.7, 12.

police body-cam video depicting some of the events on the sidelines was also presented. App.255-256, 335, 351.[4]

As to the XX message, Marcy Kelley testified that she viewed the message as "anti-trans" and "trans-exclusionary," and Matt Fisk called it a "hateful symbol." App.524, 550, 639. Although Kelley agreed that, as far as she knew, none of the plaintiffs said anything to the transgender player on the Plymouth team, she opined that the timing of the silent protest amounted to "targeting" that player. App.556, 559. But Kelley also confirmed that Bow schools would enforce its restriction of the XX-message at future school sporting events, regardless of whether a transgender student or player was present or not. App.560:13-561:22; Add.22 n.4.

She also testified that she would probably allow someone to wear a shirt with a Pride Flag to a school event because the message was "inclusionary." App.561:14-23. In fact, people attending sporting events and other extracurricular activities on Bow School District property regularly wear apparel or display bumper-stickers supporting political and social causes, such as the Progress Pride Flag or messages about global warming. *See, e.g.*, App.99, 123, 257-261, 561, 637.

After the presentation of the evidence, Plaintiffs' counsel orally renewed the motion for a TRO to allow Plaintiffs to wear the XX

---

[4] A compact disc containing this body-camera footage is attached to the paper-copy appendix. App.255-256.

wristbands at future sporting events. App.645. The Court again denied the motion for TRO. App.652-653. The Court encouraged the parties to submit their post-trial briefs "earlier" than scheduled, indicating that it would "decide it just as soon as I get briefs." App.645, 654.

### K. The district court denies Plaintiffs' motion for a preliminary injunction

The parties completed all post-trial briefing by December 17. App.12. On February 26, 2025, after two months had passed without any ruling, Plaintiffs filed a motion to expedite the decision, App.12, including additional declarations about their intent to wear the XX wristbands at future Bow sporting events, and asked the court to rule by April 14, the first game-day of the spring sports season. App.656-666. Plaintiffs informed the court that they would consider a failure to rule by that date, nearly four months from the completion of briefing, as a constructive denial of their preliminary injunction motion. *See* Add.45; App.12.

The district court denied Plaintiffs' motion for preliminary injunction on April 14. Add.45. The court reasoned the XX-message "could be barred as reasonably interpreted in context to convey a harassing, demeaning message likely to have a serious negative psychological impact on students who identify as transgender," Add.34, and that Bow officials acted in a viewpoint-neutral manner because their restriction was "effects based." Add.41. Plaintiffs remain unable to wear the XX

wristbands to school sporting events, as they would like to do. App.98, 128, 656, 658, 662-665.

## SUMMARY OF ARGUMENT

A cardinal rule of First Amendment doctrine is that the government may not favor some viewpoints over others in a forum open to citizen speech. Bow school officials violate this rule by banning adult spectators from silently protesting against biological males competing in girls' sports by wearing XX wristbands on the sidelines, or displaying signs in a parking lot, while allowing other spectators to display Pride Flags or "inclusionary" sociopolitical messages at those same events and in the same places. In a limited public forum like a school sporting event, such restrictions amount to textbook viewpoint discrimination.

The district court erred when it denied the motion for a preliminary injunction by approving of viewpoint discrimination. Bow officials admitted that they censored the XX wristbands because they disagreed with the message, associated it with Riley Gaines, and perceived it to be "anti-trans," "trans-exclusionary," and "hateful." The court further erred by treating adult speech as student speech, improperly extending *Tinker's* analysis to adult citizens. The court also expanded the secondary effects exception in direct contravention of binding authority by applying it to the direct effects of speech. Finally, the court erred when it found that the XX message was psychologically harmful to

transgender students, even though the record was devoid of such evidence.

## Argument

When assessing a motion for preliminary injunction, a district court must consider: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm; (3) whether the balance of equities favors the injunction; and (4) whether the injunction is in the public interest. *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). Accordingly, this brief focuses on that factor.

### I. Standard of Review

This Court reviews the district court's denial of a preliminary injunction for abuse of discretion, but reviews the district court's findings of fact for clear error and its conclusions of law de novo. *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 21-22 (1st Cir. 2020). Mixed questions of law and fact are also reviewed de novo. *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 32 (1st Cir. 2008); *Sullivan v. City of Augusta*, 511 F.3d 16, 24-25 (1st Cir. 2007).

Moreover, because First Amendment interests are implicated, this Court has an obligation to independently review the factual record to

ensure that the district court's judgment does not unlawfully intrude on free speech. *L.M. v. Town of Middleborough*, 103 F.4th 854, 866 (1st Cir. 2024). Thus, the district court's factual findings pertaining to Plaintiffs' First Amendment rights are not entitled to deference. *Hurley v. Irish-American Gay*, 515 U.S. 557, 567-68 (1995).

## II. Plaintiffs' claims succeed on the merits

### A. School officials have the burden of establishing that their speech restrictions are constitutional

Whenever a government restricts speech, it bears the burden of showing that its restriction is constitutional. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) ("[T]he Government bears the burden of proof on the ultimate question of COPA's constitutionality . . . "); *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 816 (2000); *see also L.M.,* 103 F.4th at 866 (schools bear burden when restricting student speech).

Once the plaintiff shows that state action infringes his speech rights, the burden shifts to the government to justify its restrictions. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). That means the plaintiff "must be deemed likely to prevail" unless the state can meet its burden. *Ashcroft,* 542 U.S. at 666. Thus, the government defendant

"must demonstrate a likelihood that the restrictions on [the plaintiff's] speech were justified." *Norris,* 969 F.3d 25.[5]

There's no question that Plaintiffs engage in protected speech by wearing their XX wristbands. "Expression need not include words to qualify for First Amendment protection." *Casey v. City of Newport*, 308 F.3d 106, 110 (1st Cir. 2002). Passive symbolic speech has long enjoyed First Amendment protection, even in the absence of a "narrow, succinctly articulable message." *Hurley,* 515 U.S. at 569. Thus, the First Amendment protects refusing to salute the flag, wearing an armband to protest the Vietnam War, displaying a red flag, or marching in a Nazi uniform. *Id.* (collecting cases) (internal citations omitted). And sociopolitical commentary on issues such as "gender identity" "occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913-14 (2018) (cleaned up).

Plaintiffs easily meet their initial burden of showing that Defendants' ban on wearing XX wristbands restricts protected speech. The messages that Plaintiffs intended to express with the wristbands included: (1) support for women and women's sports; (2) that women's

[5] Numerous courts in this Circuit have applied this burden shifting framework to First Amendment claims in the preliminary injunction context. *See, e.g.*, *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023); *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 89 (D. Me. 2022).

sports should be reserved for biological women; and (3) protesting against government decisions allowing biological males to play in girls' sports. *See, e.g.*, App.89-90, 104-105, 126. And even Defendants concede that they have banned the XX wristbands because of the message they convey. App.560-561, 571, 638-639.

In fact, despite later referring to Plaintiffs' wristbands as "conduct" that is unprotected by the First Amendment, the district court repeatedly described the messages conveyed by the XX wristbands, *see, e.g.,* Add.37-39, and referred to the XX wristbands as "speech," "symbolic speech," and "adult speech." *See, e.g.*, Add.1, 40.[6]

The burden thus shifts to the school district, and its officials, to show that the ban was (at least) likely to be constitutional. *Kennedy*, 597 U.S. at 524; *Norris*, 969 F.3d at 25. The default presumption is that plaintiffs will likely prevail, *Ashcroft*, 542 U.S. at 666, and the government must show its speech restriction is permissible under the relevant forum analysis.

---

[6] But—incongruently—the district court also referred to the display of the wristbands as "conduct" that did not enjoy First Amendment protection. Add.40-41. While wearing the wristbands may be conduct, it is also symbolic speech. *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 505-06 (1969) ("the wearing of armbands . . . [i]s closely akin to 'pure speech' which . . . is entitled to comprehensive protection under the First Amendment").

### B. The district's blanket ban on adults displaying the XX wristband is unconstitutional viewpoint discrimination

Forum analysis provides the analytical framework for assessing speech restrictions on government property. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 (2010); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001); *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678-79 (1992).

#### *1. School sporting events open to the public are limited public fora where viewpoint discrimination is illegal*

The forum at issue in this case includes the sidelines, parking lot, and comparable spectators' areas at Bow School District sporting events open to the public. While the events giving rise to this case mostly took place on the sidelines of a September 17, 2024 girls' varsity soccer game, the Plaintiffs have indicated that they would like to wear the XX wristbands at other Bow sports events throughout the school year, including girls' swim meets, basketball games, and lacrosse games.[7] App.98, 128, 656, 658, 662-665. The school district asserts that its policy also applies at away games. App.129, 135, 138, 196-197.

---

[7] While the district court made much of the "context" of the September 17 game, which featured a well-known trans athlete, the district's top official testified that that the speech restriction would be enforced at other events, regardless of whether any trans individual was present. App.560:13-561:22; *see also* App.295, 298-299.

The parties and the district court agreed that the relevant forum qualified as a limited public forum, although the district court was somewhat imprecise in defining it as "the Bow soccer field and its immediate environs[.]" Add.28.[8] Other courts have similarly concluded that school sporting events are limited public fora. *Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017) ("With respect to interschool basketball games, we think it clear that the Capital Prep gymnasium during such games was a limited public forum"); *Hansen v. Watkins Glen Cent. Sch. Dist.*, 832 F. App'x 709, 712 (2d Cir. 2020); *Worthley*, 652 F. Supp. at 212 ("Worthley's challenge . . . concerns events at GHS when it is otherwise open to the public and at least a limited public forum").

In a limited public forum, the government may restrict speech content—such as reserving the forum for certain groups or topics—so long as those restrictions are reasonable, related to the purposes of the forum—and viewpoint neutral. *Good News Club*, 533 U.S. at 106-07; *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995). The parties and the district court agree on this test but differ on its application.

[8] For example, Plaintiffs do not assert that the student-athletes on the soccer field are in a limited public forum, or at least not one that compares to the forum for audience members, on the sidelines.

*2. Bow allows other passive sociopolitical commentary at its sporting events*

"A restriction that targets speech is content-based if it applies to particular speech because of the topic discussed or the idea or message expressed and viewpoint-based if it targets not subject matter, but particular views taken by speakers on a subject" *McCoy v. Town of Pittsfield*, 59 F.4th 497, 505-06 (1st Cir. 2023) (cleaned up). A speech restriction is similarly content based where it requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (cleaned up). Bow officials do allow passive sociopolitical speech at their sporting events, but not if it expresses Plaintiffs' views.

The parties agree that the district allows spectators to express themselves about the game while at the game. Common experience similarly tells us that parents typically cheer and express support for their kids' athletic endeavors, and that doing so is an accepted norm at public schools throughout the country.

Spectators at Bow events are also generally permitted to wear buttons or clothing expressing passive sociopolitical messages; and cars bearing political decals or bumper-stickers, as well as signs in support of sports teams, are generally allowed on school property. App.99, 123, 574, 637; Add.23 n.5. Cars parked on school property have displayed the

Progress Pride Flag, Thin-Blue Line Flag, a Pride Flag in the shape of New Hampshire, and a Harris-Walz political campaign sticker. App. 257-261.

Defendant Kelley admitted Progress Pride Flag and other political bumper-stickers are permitted. App.574. Likewise, Kelley testified that someone wearing a Pride Flag t-shirt would probably be allowed to attend a district event, because the message is "inclusionary." App.561:14-23.

Principal Fisk similarly acknowledged that cars with Pride Flags, Trump flags, or political bumper-stickers may be parked on school property. App.637:13-18; *see also* App.632 (referring to the Don't Tread of Me flag as a "symbol[] he could use"). Neither the topics of sociopolitical opinions in general, nor transgender rights specifically, are off-limits to spectators at Bow events. The XX wristbands thus express a view on a permitted topic.

But the viewpoint expressed is the problem. Bow officials are conscious of the XX wristband's message and conclude that it expresses a view that they find unacceptable: that transgender women (biological males) should not be allowed to compete in girls' sports.

### *3. Allowing messages officials deem "inclusionary" but not "exclusionary" is textbook viewpoint discrimination*

In a limited public forum, restricting a viewpoint on an otherwise permissible subject is impermissible viewpoint discrimination. *Good News Club,* 533 U.S. at 111-12. "Viewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. Such discrimination is presumptively unconstitutional. *Id.* at 828, 830. "The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 586 (1st Cir. 2015) (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004)). "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

Marcy Kelley repeatedly testified that she restricted the XX wristbands because of the message they conveyed—a message she described as "trans-exclusionary," "exclusionary," and "anti-trans." App.524:17-24, 525:18-526:4; 550:12-24; 556:12-14. According to Kelley, "XX is a pretty well-known anti-trans symbol . . . XX equals real women. I view that as exclusionary." App.524:17-24. Similarly, Principal Fisk testified that he views the wristbands "as an anti-trans

symbol." App.633:11-15. At the same time, Kelley testified that she would probably allow a spectator to wear a Pride Flag t-shirt because "it's inclusionary." App.561:21.

On this record, it is obvious that Bow School District officials restricted Plaintiffs' speech because they were concerned with the "trans-exclusionary" message conveyed. Indeed, they are proud that they did so.

Moreover, district officials also prefer "inclusionary" messages over "exclusionary" messages, which is why someone wearing a Pride Flag shirt would be allowed at school events, but someone wearing an XX wristband is not. Preferring one view on trans-athletes' participation in girls' sports over another is paradigmatic viewpoint discrimination. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger,* 515 U.S. at 831. Bow officials openly and explicitly excluded the view expressed by "XX" because of its message.

The district court plainly erred in holding that the district acted in a viewpoint-neutral manner or had not "disfavored plaintiffs' position on that issue[.]" Add.41-42. Such a conclusion is flatly contradicted by the Bow officials' testimony. They are not even trying to hide it.

#### 4. *The district's decision to ban speech because it is offensive is viewpoint discrimination*

Part of the prohibition on viewpoint discrimination is the proposition that officials may not restrict speech because they or others might deem the speech offensive. "It is not the role of the State or its officials to prescribe what shall be offensive." *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) (cleaned up). Officials thus engage in viewpoint discrimination when they disfavor "ideas that offend." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (cleaned up). Doing so is often a proxy for "conventional moral standards"—in this case the "inclusionary" messages preferred by school officials. *See id.* at 394 ("[T]he statute . . . distinguishes between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation").

Demeaning speech is protected speech. *Matal v. Tam*, 582 U.S. 218, 243, 246 (2017) (plurality opinion); *id.* at 249 (Kennedy, J., concurring) (agreeing the plurality that prohibiting "demean[ing]" speech is viewpoint discrimination). The Supreme Court has repeatedly recognized that when it comes to sociopolitical expression in public spaces, Americans "must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 458

(2011) (cleaned up). Even near a gay veterans' funeral, members of the Westboro Baptist Church were held to have engaged in protected speech when they quietly picketed with provocative messages including: "God Hates Fags," "Semper Fi Fags" and "America is Doomed." *Id.* at 454, 457. "Simply put, the church members had the right to be where they were." *Id.* at 457. "The record confirms that any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself." *Id.*

The wristbands' XX message—and the two signs in the parking lot urging officials to "Protect Women's Sports" present as comparatively understated. Neither involve name calling or foul language.

Yet Fisk testified that he deemed the XX-message to be "offensive" and "hateful" and Marcy Kelley testified that she personally disagreed with it. App.526:3-8, 639:10-18; *see also* App.637:9-12 ("If I saw something offensive, I would take action on it, yes"). Fisk considers a pink field with black XX on it to be a "hateful symbol" that is inappropriate to be displayed anywhere on Bow School District property or at school events. App.639:10-18. Describing it as a "hateful symbol" and "anti-trans" is meant to express deep opprobrium and offense and to justify their censorship. But those feelings, however fervent and sincere, do not overrule *Snyder*.

Kelley also testified that she associated it with Riley Gaines's advocacy, specifically with the "blanket statement" that there should be "no trans female participation in female sports" and that she disagreed with that statement. App.528:4-9. Kelley justified censoring the XX message because of its association with Gaines. App.524:20-24, 526:9-527:8.[9] But an identity-based speech restriction is often a proxy for viewpoint discrimination. *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content").

### *5. Bow officials disagree with Plaintiffs' viewpoint*

Beyond deeming the XX-wristbands "offensive," Bow officials also admit to disagreeing with Plaintiffs' message. While they are free to have their own views, their requirement that others conform to those views in a limited public forum violates the law. When they restrict the XX message they make an ideological judgment about what people may say about gender, as it relates to girls' sports.[10]

---

[9] The district court similarly focused on Riley Gaines's use of the XX message, going so far as to independently research and quote text from her website—evidence that was not presented by Defendants—but was injected sua sponte. Add.8-9.

[10] The concepts of "gender" and "gender norms" are widely understood to be ideological. *See, e.g.,* THE TREVOR PROJECT, *Understanding Gender Identities & Pronouns* https://bit.ly/4e0d3Mr (last visited June 10, 2025) ("Gender is a social construct, an idea created by people to explain the

Kelley testified that she disagreed with people who "don't want to do what they consider to be lying about biological sex by calling somebody a woman who they don't personally believe is a woman." App.530:11-18. And she also testified that she disagreed that all "female trans athletes are dangerous" and "result in a lack of fairness." App.531:3-7.

That Kelley and Fisk would oppose Plaintiffs' views conforms with their self-identification as "trans allies." App.528:13-14, 634:9-10. A "trans ally" is a non-trans person who acts to support trans-identifying individuals through words or actions. *See, e.g.,* THE HUMAN RIGHTS CAMPAIGN, *Be an Ally – Support Trans Equality,* https://perma.cc/68TY-92S3 (discussing proper pronoun and "neo-pronoun" use, avoiding "microaggressions," and making spaces trans-affirming); ADVOCATES FOR TRANS EQUALITY, *Supporting the Transgender People in Your Life: A Guide to Being a Good Ally,* https://perma.cc/5KLG-FHHP (allies should be outspoken, push for inclusivity, and craft transgender-inclusive policies). Being an ally means supporting the proposition that an individual's gender identity is determined by their personal sense of what their gender is and that those feelings should be affirmed.

---

world around them."); Jojanneke van der Toorn et al., *Not Quite Over the Rainbow: The Unrelenting and Insidious Nature of Heteronormative Ideology,* 34 Current Op. Behav. Sci 160-65 (2020), https://bit.ly/3SNwGxB; *Heteronormativity & Cisnormativity*, LGBTQ+ PRIMARY HUB, https://perma.cc/S6F7-2EYV; Jay Richards, *Heritage Commentary: What is Gender Ideology?* (July 7, 2023), https://perma.cc/2AZ4-V9BP.

Being an ally also means opposing Plaintiffs' views about the immutability of sex, *see* App.88, 102-103, 117-118. Their own ideological preferences thus provide a motive for Kelley and Fisk to use their official power to create a trans-inclusive space at the Bow soccer field and other school events.

*6. Bow officials would censor the XX message even if no transgender student were present*

Despite all the talk about the "context" of this special soccer game with a trans-athlete and litigant on the field, Bow's speech restriction exists independent of that particular context. The restriction applies to all Bow extracurricular events, regardless of who is present. While the nuances of the September 17 game make for interesting background reading, those details ultimately didn't matter to Bow's censors—only the viewpoint expressed did. The big tell is that the restriction applies whether a transgender student is present or not. App.560:13-561:13.

> Q. At any specific future sporting event it wouldn't matter whether a trans student was actually there. You would still enforce the practice of not allowing the pink wristband with XX on it; is that correct?
>
> A. Correct.

App.561:9-13.

It was thus error for the district court to conclude that "the record does not suggest that the School District favored or disfavored plaintiffs'

position on that issue . . .” or that the decision was viewpoint neutral. Add.41-42. Bow officials explicitly considered the meaning of the XX message when they suppressed it. The XX is so offensive and “hurtful,” see Add.42; App.571, that they would restrict the message even if no trans student were even present to be offended by it. This is precisely the type of viewpoint-motivated censorship our courts have consistently abjured. “The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed.” *R. A. V. v. St. Paul*, 505 U.S. 377, 382 (1992) (cleaned up).

#### 7. *Bow School District’s unwritten policy regarding what is “inclusionary” or “exclusionary” speech provides for excessive enforcement discretion*

Bow officials’ policy and practice of allowing commentary that is “inclusionary,” but not commentary that is “exclusionary” invites discriminatory enforcement because it allows officials to use their subjective judgment about what belongs in either category. Officials’ “discretion must be guided by objective, workable standards.” *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21 (2018). Without such standards, an official’s “own politics may shape his views on what counts as [excludable].” *Id.* at 22. That unfettered discretion invites abuse is self-evident. *Bd. of Airport Comm’rs v. Jews for Jesus*, 482 U.S. 569, 576 (1987) (“The line between airport-related speech and nonairport-related

speech is, at best, murky"). "Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988); *see also Ctr. for Investigative Reporting v. SEPTA,* 975 F.3d 300, 316-17 (3d Cir. 2020) (absence of guidelines cabining discretion allowed transit agency's general counsel's own politics to shape what counts as political); *OSU Student All. v. Ray,* 699 F.3d 1053, 1064, 1066-67 (9th Cir. 2012) (unwritten, standardless policy failed to cabin official discretion and invited discriminatory enforcement); *Hopper v. City of Pasco*, 241 F.3d 1067, 1079 (9th Cir. 2001) ("A ban on 'controversial art' may all too easily lend itself to viewpoint discrimination, a practice forbidden even in limited public fora").

Bow's Policy KFA governing "Public Conduct on School Property" does not mention the concepts of "inclusionary" or "exclusionary." App.129. Superintendent Kelley described the applicable speech restriction as a "practice" of the district, rather than a "policy." App.561:2-13. Neither she, nor any other defendant, identified written or other objective criteria for judging what is "inclusionary" versus what is "exclusionary." Bow's "practice" restricting speech at its sports events thus invites officials to make subjective decisions influenced by their own political biases.

It is ironic that Plaintiffs' views about reserving girls' sports for biological girls—a proposition that enjoys widespread support in New Hampshire and throughout the country and is enshrined in New Hampshire state law, Add.2-3—would have their views excluded from a public space in the name of "inclusion." Bow officials' act of excluding Plaintiffs' speech illustrates that "inclusivity" is a political judgment, with the views of "trans allies," progressive parents, and left-leaning school administrators taking precedence over the views of parents with traditional or science-based views of the sex binary. "Inclusion" as practiced by Bow officials means exclusion. This provides a separate basis to enjoin Bow's speech restriction.

### C. The district court erred when it extended *Tinker* and *L.M.* to adult speech in a limited public forum

Bow school officials cannot justify their viewpoint discrimination by appealing to *Tinker* and *L.M*, because those are student-speech cases, not adult-speech cases. Neither *Tinker* nor *L.M.* allow the government to restrict adult speech in a limited public forum.

As a result, the district court made new law by extending *Tinker* and *L.M.* to the adult Plaintiffs, effectively treating them like students. The First Amendment does not permit school officials to infantilize adults in this way.

### 1. *Tinker and L.M. apply to student speech, not adult speech*

*Tinker* is an exception to the protection the First Amendment ordinarily provides to adults. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187-191 (2021). It applies when a student "utter[s] the kind of pure speech to which, *were she an adult,* the First Amendment would provide strong protection." *Id.* at 191 (emphasis added). But neither the Supreme Court nor the circuit courts have been shy about explaining *Tinker's* limited scope: it applies to *student* speech in the school context. *See Mahanoy*, 594 U.S. at 188-89.

Start with *Tinker*. The Supreme Court framed the "problem" as arising "where *students* in the exercise of First Amendment rights collide with the rules of the school authorities." 393 U.S. at 507 (emphasis added). The Court focused on student speech throughout the opinion. It discussed a "*student's* right" of expression "in the cafeteria, or on the playing field, or on the campus during the authorized hours." *Id.* at 512-13 (emphasis added). It explained that officials cannot forbid "the expression by *any student* of [a political message] anywhere on school property" without "a showing that the *students*' activities would materially and substantially disrupt the work and discipline of the school." *Id.* at 513 (emphasis added). It distinguished a student's protected speech from "conduct by the *student* [that] materially disrupts classwork." *Id.* And it concluded that a rule banning student opposition

to the Vietnam War  would "obvious[ly] . . . violate the constitutional rights *of students*." *Id.* (emphasis added). Every part of the Supreme Court's reasoning in *Tinker* is about student speech.

Justice Stewart's oft-quoted concurrence emphasizes this point. He explained that "the First Amendment rights of children" are not "co-extensive with those of adults" because "a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id.* at 515 (Stewart, J., concurring); *cf. L.M.*, 103 F.4th at 881 (quoting Stewart's concurrence approvingly). In other words, *Tinker*'s exception exists only because "the First Amendment rights *of students* in the public schools are not automatically coextensive with the rights of adults in other settings." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotations omitted) (emphasis added).

Later Supreme Court cases reiterated *Tinker*'s focus on student speech in the school environment, explaining the unique relationship that arises when schools stand in loco parentis over minors. *See, e.g.*, *Mahanoy*, 594 U.S. 180, at 189; *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995). "[T]he question that [the Supreme Court] addressed in *Tinker*" was only "whether the First Amendment requires a school to tolerate particular *student* speech." *Hazelwood*, 484 U.S. at 270 (emphasis added). "[T]he State's power over schoolchildren . . . is

custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia*, 515 U.S. at 655.

In contrast, "[t]he First Amendment guarantees wide freedom in matters of adult public discourse," so "the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point" even though this same usage could be prohibited to "children in a public school." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986); *see also Mahanoy*, 594 U.S. at 191.

As a result, other courts have repeatedly (and correctly) held that *Tinker*'s analysis does not apply to adult speech. *See, e.g., McElhaney v. Williams*, 81 F.4th 550, 558-59 (6th Cir. 2023) ("Parents, however, have a different relationship to school activities than do students"); *Barr v. Lafon*, 538 F.3d 554, 573, 576 (6th Cir. 2008); *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 938, 940 (3d Cir. 2011) (Smith, J. concurring); *DeJohn v. Temple Univ.*, 537 F.3d 301, 315, 318 (3d Cir. 2008).

In *McElhaney*, for instance, the Sixth Circuit held that parents have a clearly established right to criticize school officials and their decisions regarding student athletics, although students themselves (under *Tinker*) may lack such a right. 81 F.4th at 554, 557-58. Thus, it was unconstitutional for a school to ban a parent from attending sporting events open to the public on the basis of the content—let alone the viewpoint—of that parent's adult speech. *Id.* at 555, 559.

### 2. *Tinker and L.M. are not forum-analysis cases because they are limited to student speech*

By applying *Tinker* and *L.M.* here, the district court overrode the required forum analysis and substituted its own policy judgment, which aligns with that of school officials. But the Supreme Court itself held that that when a school creates a forum for speech, it is forum analysis, "rather than our decision in *Tinker*, that governs this case." *Hazelwood*, 484 U.S. at 270.

The district court overlooked that even *L.M.* grounded its decision to apply *Tinker*'s framework on the difference between student and adult speech. It "recognized, post-*Tinker*, that '[it] does not follow . . . that simply because the use of an offensive form of expression *may not be prohibited to adults* making what the speaker considers a political point, the same latitude must be permitted to children in a public school.'" *See L.M.*, 103 F.4th at 878 (citing *Fraser* and *Tinker*) (emphasis added). In other words, this Court started by distinguishing between adult speech that cannot be banned—from student speech that (sometimes) can be. Thus, although *L.M.* allowed the school to ban some "demeaning" messages when they are "reasonably forecasted to poison the education environment" and "lead to symptoms . . . of substantial disruption," its holding was limited to when those messages are "expressed . . . *by students at school*." *Id.* at 873-74 (internal quotation marks omitted) (emphasis added).

### 3. *Tinker and L.M. have no application to adult speech in limited public fora*

That's why *L.M.* never even engaged in forum analysis—it did not need to engage in such analysis because the rules for student speech in school are not the same as the rules for adult speech in any forum.[11] Forum analysis provides the rules for adult speech on government property.[12] And *Tinker*—which *L.M.* applied—is an exception to those rules.

Consider how this Court addressed viewpoint neutrality to see this point more clearly. The plaintiffs in *L.M.* argued that the school "unconstitutionally discriminate[d] in viewpoint between 'negative' and 'positive' messages." *L.M.*, 103 F.4th at 886 n.11. This Court rejected that argument because it "[did] not read *Tinker* or any other Supreme

---

[11] For example, *L.M.* explained that in a public forum, "an adult Christian can tell the Jew he is going to hell, or the adult Jew can tell the Christian he is not one of God's chosen," but "the overly zealous Christian or Jewish child in an elementary school" can be restricted from saying "the same thing to his classmate." *Id.* at 871 n.5 (cleaned up).

[12] Some courts hold that schools must satisfy both *Tinker* and the forum-analysis rules when regulating student speech. *See, e.g.*, *Kristoffersson v. Port Jefferson Union Free Sch. Dist.*, No. 23-7232-cv, 2024 U.S. App. LEXIS 17098, at *8 (2d Cir. July 12, 2024); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022). The First Circuit has so far not adopted this approach, holding that "student-speech" regulations do not necessarily require viewpoint neutrality. *L.M.*, 103 F.4th at 886 n.11. While Plaintiffs would support extending the viewpoint-neutrality rule to student speech, they urge that forum-analysis (and not *Tinker)* should apply to the adult speech here.

Court or federal court *student-speech* decision to require 'positive messages' be prohibited if a 'negative' message is regulable because it materially disrupts or invades others' rights." *Id.* (emphasis added).

But in a limited public forum involving adult speech, treating positive messages and negative messages differently, is unconstitutional. *Good News Club*, 533 U.S. at 106-07, 111 (excluding school club because of its religious perspective on teaching morals and character development was viewpoint discrimination); *Ridley,* 390 F.3d at 88-89 (publishing transit ads that reinforced drug-law compliance but not those questioning existing laws admits to viewpoint discrimination); *Marshall v. Amuso,* 571 F. Supp. 3d 412, 422 (E.D. Pa. 2021) (viewpoint discrimination exists where positive or supportive comments are allowed, but negative or critical comments are not). The difference in *L.M.* is that those rules do not apply to "student-speech." *L.M.*, 103 F.4th at 886 n.11. But this case is about adult speech, so the bar against viewpoint discrimination applies.

And it is not as if applying the ordinary forum rules would leave schools without any means to prevent harassment or disruption at school events. The government can prohibit discriminatory conduct and unprotected categories of speech like fighting words without banning speech because of the viewpoint expressed. *See Wandering Dago, Inc. v. Desisto*, 879 F.3d 20, 32-33 (2d Cir. 2018). And the government can impose content- and even speaker-based restrictions in a limited public

forum as well. *See Good News Club*, 533 U.S. at 106-07. But if the government invites the public to its property, it cannot regulate speech based on the viewpoint of the message, including the XX wristband that school officials personally find "offensive," "hateful," "demeaning," and "trans-exclusionary." Likewise, when the government allows Progress Pride Flag bumper-stickers in the parking lot, it must allow messages from a different viewpoint—like "Protect Women's Sports"—in those same spaces.

Neither Defendants nor the district court cited any case applying *Tinker* or *L.M.* to adult speech in a limited public forum. The reason for that is simple—no such case existed . . . until now. "[T]he 'disruption' standard applicable to student speech has not been applied to run-of-the-mill adult speech targeting school officials." *McElhaney*, 81 F.4th at 558. The district court's extension of *Tinker* to adult speech constitutes an extreme outlier.

Yet the district court provided virtually no reason for reaching such an outlier conclusion. It simply declared *L.M.* to be "both relevant and instructive," explaining that *L.M.*'s holding "fully describes the kind of demeaning, bullying message that can be constitutionally regulated in a public school setting"[13] without accounting for the different nature of

[13] Plaintiffs also disagree that the XX message is the functional equivalent of "there are only two genders." One can believe in more than two genders without supporting biological males (transgender females) competing against biological girls.

adult speakers or reconciling the doctrinally distinct line of cases. Add.33. Indeed, the district court's entire rationale for deciding that schools can regulate adult speech the same as student speech was to summarily assert that "[o]f course it can." Add.40. This ipse dixit holding erodes important First Amendment rights and amounts to legal error.

### D. The district court lacked record evidence that the XX wristbands would likely injure any transgender student

#### *1. The district court's finding that the XX wristbands "can reasonably be understood as directly assaulting those who identify as transgender women" was clear error*

The district court's holding that the "message generally ascribed to the XX symbol . . . can reasonably understood as *directly assaulting* those who identify as transgender women" is per se unreasonable and without basis in the factual record. Add.37 (emphasis added).

A quick look at what qualifies as criminal assault illustrates the court's error. New Hampshire state law defines the crime of "simple assault" as causing "bodily injury or unprivileged contact to another." N.H. Rev. Stat. Ann. § 631:2-a. At common law, assault included putting another in reasonable apprehension of bodily harm. *See, e.g., United States v. Bayes*, 210 F.3d 64, 68 (1st Cir. 2000); *State v. Gorham*, 55 N.H. 152, 163 (1875). There was no physical touching here, and

Plaintiffs directed no words at any student. No reasonable person would think that passively displaying an "XX" wristband on the sidelines of a soccer game would create a fear of physical injury.

Moreover, it is well-established that officials may not censor words because some people find them hurtful. *Snyder,* 562 U.S. at 460-61; *cf.* Add.42 (Bow policy prohibits "demeaning, hurtful" speech). "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. Chicago*, 337 U.S. 1, 4-5 (1949). Even speech advocating violence is protected unless it incites imminent lawless action. *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969); *see also Hess v. Indiana,* 414 U.S. 105, 108-09 (1973). In contrast, the XX wristband expresses an idea, but does not advocate for lawless action, whether imminent or otherwise.

#### *2. No testimony established that any transgender student was likely to be injured by the XX-wristbands' passive message*

The record is also devoid of evidence of psychological harm to any transgender student due to expression of the XX message. Claims of psychological injury generally require expert testimony. *See, e.g., Doucette v. Jacobs,* No. 15-13193-JGD, 2022 U.S. Dist. LEXIS 122603, at *70 (D. Mass. July 12, 2022) (medical causation is a matter beyond the common knowledge of the ordinary layman); *Barbosa v. Hyland*, No.

11-11997-JGD, 2013 U.S. Dist. LEXIS 169657, at *83 (D. Mass. Dec. 2, 2013) (expert testimony needed to establish psychological harm from incident).

No transgender student testified that they were harmed by the XX message (or even saw it), and no medical or mental-health expert offered an opinion that the XX message was psychologically harmful to a specific trans student or all transgender students. Principal Fisk testified about his own experience counseling trans students about their struggles in general, but he did not link that experience specifically to the XX message. App.630:10-631:7.

Mike Desilets claimed that Plymouth's coach told him that Plymouth's transgender player would be "devastated" if he learned that the game was stopped due to a protest related to his presence. Add.21, 35-36 n.7; App.159. Neither the Plymouth coach nor the transgender student testified at the hearing, so this alleged statement amounted to hearsay, if not double hearsay. *See* Fed. R. Evid. 801, 802, 805. Moreover, the alleged statement itself was speculative and offered little more than a lay opinion about the effect of the game stoppage and wristband protest. Fed. R. Evid. 602 ("A witness may testify only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"), 701(c) (lay opinions may not be

"based on scientific, technical, or other specialized knowledge"), 701-702 (setting forth criteria for expert testimony).[14]

We do not know anything about the basis of the Plymouth's coach's opinion, his alleged expertise, or whether either related to the XX message specifically.[15] As a result, it was clear error for the district court to rely on this inadmissible evidence as a basis to deny Plaintiffs' motion. There is no evidence in the record that the XX message displayed at the September 17 game harmed any student psychologically or would do so in the future.

Even still, transgender students presumably know that many other Americans disagree with them on the issue of gender identity and are not so fragile as to become psychologically injured due to mere disagreement, expressed passively on a wristband. *See* App.638:17-639:9. Indeed, the particular trans student who was present at the September 17 game has sued the state of New Hampshire under his own name, testified before the state Senate about transgender issues, and allowed himself to be photographed for numerous articles appearing in the corporate media. App.117-118, 253, 498-499; *see, e.g.,*

---

[14] Moreover, the district court must exercise its gatekeeping function before admitting expert testimony. *Milward v. Acuity Specialty Prod. Grp., Inc.,* 639 F.3d 11, 14 (1st Cir. 2011) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)).

[15] Taking the coach's hearsay at face value, it implies that neither the coach nor the athlete had seen the wristband. *See* App.159 ("if [the student] learned . . . would be devastated").

Kathy McCormack, *2 transgender New Hampshire girls can play on girls sports teams during lawsuit, a judge rules,* AP (Sept. 10, 2024), https://bit.ly/4jDKcyC.

He is obviously aware that people disagree about whether he should be allowed to compete with biological girls. And even if he were not, part of living in a pluralistic society is learning to tolerate a certain amount of disagreement. "America's public schools are the nurseries of democracy" which "only works if we protect 'the marketplace of ideas.'" *Mahanoy*, 594 U.S. at 190. "Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* Yet Superintendent Kelley testified that the school believed it needed to protect this student from "hurt feelings" from encountering an "anti-trans message." App.571:5-10.

Transgender high-school students, competing in school athletics or attending such games as spectators where members of the public are present, do not need to be protected from parents quietly wearing XX wristbands, or signs in the parking lot asking to "Protect Women's Sports." In fact, it is a necessary learning experience for such students to navigate the presence of adults and others who disagree with them.

### 3. *The district court improperly relied on findings of fact about transgender students in other courts' orders*

The district court also improperly sought to backfill the evidentiary gap by borrowing preliminary findings from other cases involving other parties. Add.2-4 (summarizing "Prior Litigation" in *Tirrell v. Edelblut,* including factual findings before another judge, uncontested in that case); *see also* Add.38 (citing *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-29 (3d Cir. 2018) regarding alleged exacerbation of gender dysphoria). But none of the parties to this case were parties, or in privity with parties, in either *Tirrell* or *Boyertown*, which makes those findings presumptively inapplicable here.

Nor are medical diagnoses, treatment recommendations, and factual findings from other cases subject to judicial notice. *See* Fed. R. Evid. 201(b); *United States v. Bello,* 194 F.3d 18, 23 (1st Cir. 1999) (facts must exist in the unaided memory of the populace); *Nadherny v. Roseland Prop. Co.,* 390 F.3d 44, 51-52 (1st Cir. 2004) (factfinding in other cases cannot be subject to judicial notice); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70-71 (2d Cir. 1998) (a court may not take judicial notice of document filed in another court for the truth of the matters asserted in the litigation).

Even more astonishing is that the district court initially invited Defendants to seek judicial notice of adjudicative facts from *Tirrell v. Edelblut*, see App.243, 245, triggering a motion in limine from

Defendants to that effect, which Plaintiffs opposed. Dist. Ct. ECF No. 39 (Def.' Mot.); Dist. Ct. ECF No. 50 (Pls.' Resp.); App.8-9. The district court then denied judicial notice of the contested adjudicative facts, including facts regarding the treatability and risks of gender dysphoria and treatment recommendations pertaining toward a particular transgender student. Dist. Ct. ECF No. 51 (order) at 5-8; App.9.

But the district court later disregarded its own order denying judicial notice and relied on the excluded adjudicative facts anyway. Add.4 (describing treatment prescription).[16] This highly unusual maneuver was error, and there was no record evidence to support district court's findings that the XX wristbands conveyed "a harassing, demeaning message likely to have a serious negative psychological impact on students who identify as transgender." Add.34.

The superficial nature of the district court's findings is further illustrated by its finding that gender identity is an "immutable characteristic" worthy of special legal protection. Add.34. Other courts have found that gender identity is changeable and therefore not immutable. *K.C. v. Individual Members of the Med. Licensing Bd.*, 121 F.4th 604, 620 n.3 (7th Cir. 2024) ("The incongruence between sex and

---

[16] This judicial notice is especially problematic in light of the Supreme Court's acknowledgement that the proper standard of treatment for gender dysphoria remains scientifically debated. *United States v. Skrmetti*, No. 23-477, 605 U. S. ____, slip op. at 2-3 (June 18, 2025); *id.* at 12-15 (Thomas, J., concurring).

gender identity, essential to transgender status, is fundamentally different than an immutable characteristic determined at birth. Indeed, some transgender adolescents realize in adulthood that their gender identity and sex are actually congruent"); *Eknes-Tucker v. Governor*, 114 F.4th 1241, 1265 (11th Cir. 2024) (Lagoa, J., concurring) ("Unlike race, sex, or national origin, transgender status is not an immutable characteristic determined solely by the accident of birth") (cleaned up); *L.W. v. Skrmetti*, 83 F.4th 460, 487 (6th Cir. 2023) ("transgender identity is not definitively ascertainable at the moment of birth . . . It is not necessarily immutable, as the stories of detransitioners indicate") (internal quotation marks omitted), *aff'd*, 605 U. S. ____, slip op. (June 18, 2025).

Indeed, the district court's assumption that transgender status is a fixed, stable category is likely mistaken and amounts to what some call "transnormativity."[17] *See* Florence Ashley, *Genderfucking as a Critical Legal Methodology,* 69 McGill L.J. 177, 198 (2024) (noting that gender markers are limiting "for those who object to having their gender marker decided at birth, and for those who adopt different gender roles

---

[17] Transnormativity posits that there are only certain ways to be transgender. *See, e.g.,* Austin Johnson, *Transnormativity: A New Concept and Its Validation through Documentary Film About Transgender Men,* Sociological Inquiry 1, 2 (2016), https://bit.ly/4jI3tiL ("Transnormativity . . . is a hegemonic ideology that structures transgender experience . . . into a hierarchy of legitimacy that is dependent upon a binary medical model[.]").

at different times or across different contexts—such as some genderfluid people"). "Transnormativity is no more a monolith than dominant ideologies of gender; different people draw different lines at different times." *Id.* at 196.

Contrary to the district court's conclusion, it is more probable that many transgender people themselves believe that gender identity is mutable.[18] Had the parties addressed this issue with evidence—rather than it coming up through the district court's own independent factfinding—the adversarial process might have prevented such errors.

It is also curious that the district court saw fit to review the specific findings in the *Tirrell v. Edelblut* decision on a preliminary injunction and universalize those. Even if those findings were admissible in this case as to the September 17 scenario, there is no basis to conclude that they would apply to different transgender students at future events. It

---

[18] By assuming immutability, some might even say that the district court's language "demeans" the gender fluid, the Two-Spirit, or anyone whose gender identity is not fixed. *See, e.g.,* SEXUAL MEDICINE SOCIETY OF NORTH AMERICA, *What does it mean to be Gender Fluid?* (March 28, 2023), https://perma.cc/6CV4-L2DM ("To be gender fluid means that a person's gender identity may change or shift over time or from day to day. This person may identify as male at times and female at other times. They may also identify as a combination of genders or as having no gender"). On the other hand, perhaps it would be better to just let people quietly express their views instead of creating new "immutable characteristics" as a basis to censor speech about an issue on which Americans (including transgender Americans) have a wide variety of opinions.

is not as if plaintiffs are requesting an injunction for an event that has already occurred—they want to quietly express their views at future school sporting events, including ones at which the transgender plaintiff from *Tirrell v. Edelblut* is not present and at which no transgender person might be present.

#### *4. The district court improperly outsourced its duty to review speech restrictions to school officials*

The district court also granted excessive deference to school officials when it held that there "appears to be *no basis* in this record upon which to substitute this court's judgment for the School District's with respect to whether the wristbands, in the context of women's and girls' sports, carried those demeaning assertions." Add.34 (emphasis added); *see also* Add.35-37 (discussing deference to school officials' assessment of the meaning of the XX wristbands, even though the court found Plaintiffs' intended meaning "plausibly inoffensive").

But in a limited public forum, it is the court that must determine whether content restrictions are reasonable and viewpoint neutral. "The standards that *we apply* to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." *Good News Club,* 533 U.S. at 106 (emphasis added); *see also Am. Freedom Def. Initiative v. King County,* 904 F.3d 1126, 1134 (9th Cir. 2018) (court must independently

review record without deference to officials restricting speech in a limited public forum). While officials may enjoy a degree of deference when they restrict student speech in the school context, that deference does not apply when they censor adult speech in limited public forums. The district court's excessive deference would allow school officials to censor virtually any adult speech that they believed might cause a student anxiety because of its sociopolitical viewpoint.

### E. The district court's novel "effects based" theory of speech regulation is a major departure from legal precedent

The district court also erred as a matter of law when it held that Bow officials' restriction was "effects based," not viewpoint based. Add.41. Censoring a message because it is unkind, offensive, or hurtful in its effect on some listeners is the epitome of viewpoint discrimination. Calling that "effects based" is not a permissible way to elide this long-standing prohibition.

#### *1. Effects-based legal theories that apply to the regulation of adult entertainment establishments have no application to passive sociopolitical commentary*

In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), "the Supreme Court crystallized its approach to zoning regulations affecting adult-entertainment businesses." *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 72 (1st Cir. 2014). The court allowed for different

zoning treatment for such businesses to be deemed content neutral, because the zoning was designed to "combat the undesirable secondary effects of such businesses" such as neighborhood blight, rather than be based on disapproval of the adult-entertainment business's expression. *City of Renton,* 475 U.S. at 49, 51-52; *Showtime Entm't, LLC,* 769 F.3d at 72. But this is another exception to the usual rule.

The Supreme Court has limited the secondary-effects doctrine to the adult-entertainment-business zoning context. "Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*." *Boos v. Barry*, 485 U.S. 312, 321 (1988). The court went on to stress that the secondary effects exception would be unavailable if "the ordinance there was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies[.]" *Id.*

The district court applied precisely this type of improper conception of the secondary-effects doctrine when it justified censoring the XX wristbands "given the negative and demeaning messaging." Add.41. "Demeaning messages of the sort described . . . are likely even more damaging to vulnerable students when delivered by adults attending the event." Add.39. But the prevention of "psychological damage" is a direct impact, not a secondary-effect available to justify a speech

restriction. *Boos,* 485 U.S. at 321. *Boos* forecloses the district court's "effects based" rationale.

Here it bears mentioning that the district court went so far as to suggest that Bow officials not only could censor the wristbands—they "were duty bound" to censor them. Add.39. But the Supreme Court "has been particularly leery of justifications for quashing speech to adults that rest on the purported protection of children." *Ridley,* 390 F.3d at 86 (collecting cases). That concern is particularly salient here where (1) there is a paucity of evidence of actual harm to any minor, and (2) officials openly admit to censoring the message because they disagree with its sociopolitical viewpoint. It is rather the reverse: Bow officials had a duty to tolerate dissent and refrain from censoring a silent protest, one that few people probably would have even noticed if officials had not overreacted.

#### *2. Governments may not restrict speech because it elicits a negative audience reaction*

The "First Amendment does not countenance a heckler's veto." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015). The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers[.]" *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) (cleaned up). "The prototypical heckler's veto case is one in which the government silences *particular* speech or a *particular* speaker due to an anticipated disorderly or violent reaction of

the audience." *Meinecke v. City of Seattle*, 99 F.4th 514, 522 (9th Cir. 2024) (cleaned up).

And heckler's veto concerns are relevant to a limited public forum. *Seattle Mideast Awareness Campaign v. King County ("SeaMAC")*, 781 F.3d 489, 502 (9th Cir. 2015). A claimed fear of a negative audience reaction can be used as pretext for viewpoint discrimination where those fears "are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed." *Id.* at 502-03. Thus, in the transit-ad forum dispute at issue in *SeaMAC,* county officials were found not to have discriminated based on viewpoint when they rejected warring ads "from opposing sides of the Israeli-Palestinian conflict" in a forum whose primary purpose was generating ad revenue. *Id.* at 498, 503.

Bow officials, on the other hand, suppress only one side of the transgender-athletes-in-sports debate. They ban the XX message from Bow's limited public forum because it is "trans-exclusionary," while allowing "inclusionary" speech like Pride Flags. App.525, 561, 650. Thus, Bow officials do exactly what the *SeaMAC* court said would be evidence of viewpoint discrimination in a limited public forum.

Moreover, their concerns about negative audience reaction are (and were) thin and speculative. There were no riots triggered on the field, and the brief interruption of the September 17 game occurred because officials insisted that the XX wristbands be removed, not because

students or other parents opposed them. Add.19; App.90-91, 107, 109, 125, 127, 158-159. There is no evidence any student or spectator even noticed the XX wristbands prior to officials intervening. App.511, 559, 586. Nor was there evidence of parents "heckling" any player or a male parent wearing a dress to the September 17 game, as Shannon Farr had suggested in her pre-game email to Bow officials. *Cf.* App.262, 419.

Farr's email denouncing other parents bears further scrutiny because it set in motion the events that led to Bow officials suppressing the XX wristbands and "Protect Women's Sports" signs by drawing officials' attention to the possibility of a protest of some sort. *See* App.156 (referencing email from parent "informing" athletic director discussing parent protest). The timing, content, and sequence of Ms. Farr's email posit that Bow officials acted on it by adopting Farr's view that the game could devolve into "hatred or disrespect." *Compare* App.262, *with* App.639 (Fisk testimony describing XX on pink field as a "hateful symbol"). Farr's "concerns" became the officials' concerns. *See* App.262. Her email called for the school not to "tolerate" any "unpleasantries" and for protesting parents to be "dealt with swiftly." App.262.

Subsequent events show that Bow officials heeded her admonition. Practically speaking, Ms. Farr successfully lobbied officials to intervene and censor opinions on an "extremely sensitive subject" that were not "aligned" with her own. *See* App.262. While Ms. Farr's views

conveniently do align with those of Bow's officials, the officials' use of state power to silence the viewpoints that are not "aligned" with Farr operationalized her heckler's veto and is further evidence of viewpoint discrimination.

## III. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS

### A. Plaintiffs are suffering irreparable harm because they have been banned from displaying XX wristbands at all Bow extracurricular events

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted); *Bl(a)ck Tea Soc'y v. City of Bos.,* 378 F.3d 8, 15 (1st Cir. 2004) ("A burden on protected speech always causes some degree of irreparable harm"). Defendants have testified that their policies and practice prohibit Plaintiffs from silently expressing their message because it is "hateful" and "trans-exclusionary" and that they will enforce these policies at upcoming district events, regardless of whether a trans player was competing or in the audience. Plaintiffs have been unable to express their message for more than nine months and will remain unable to speak for the indefinite future.

### B. The balance of the equities and the public interest favor the enforcement of First Amendment rights in a limited public forum

"When the Government is the opposing party," courts "merge" the "balancing of the equities and analysis of the public interest together." *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (cleaned up). "First Amendment rights are not private rights . . . so much as they are rights of the general public." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003) (citation omitted). "To deprive plaintiffs of the right to speak will therefore have the concomitant effect of depriving the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Sindicato*, 699 F.3d at 15 (internal quotation marks omitted). Put simply, it is not in the public interest to violate the First Amendment. Defendants have no legitimate government interest in suppressing Plaintiffs' passively expressed XX message or the public's right to perceive that message.

## CONCLUSION

Plaintiffs respectfully request that this Court reverse the district court's denial of their motion for preliminary injunction.

Respectfully submitted,

Richard Lehman (1054400)
LEHMANN MAJOR LIST, PLLC
6 Garvins Falls Road
Concord, NH 03301
603-731-5435
rick@nhlawyer.com

Dated: June 18, 2025

*s/Endel Kolde*
Endel Kolde (1216389)
Brett R. Nolan (1208861)
Nathan Ristuccia[19] (1216360)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

[19] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with FED. R. APP. P. 32, that this brief is set in 14-point Century Schoolbook, a proportionately spaced serif font, and as calculated by Microsoft Word (from a continuously updated Office 365 subscription), considering the appropriate exclusions, contains 12,337 words.

Dated: June 18, 2025

*s/Endel Kolde*

ADDENDUM TABLE OF CONTENTS


| ECF No. | Document Description | Page No. |
|---|---|---|
| 80 | Order Denying Plaintiff's Motion for Preliminary Injunction | Add.1 |

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Kyle Fellers; Anthony Foote;
Nicole Foote; and Eldon Rash,
Plaintiffs

v.

Case No. 24-cv-311-SM-AJ
Opinion No. 2025 DNH 050

Marcy Kelley, Superintendent
of SAU 67; Michael Desilets,
Athletic Director of Bow High School;
Matt Fisk, Principal of Bow High School;
and Bow School District,
Defendants

**O R D E R**

This case presents an increasingly common, and commonly difficult constitutional problem: When may public school authorities limit symbolic speech during school athletic contests to protect students from perceived harm? When protected rights clash, as they do here — when opposing sides each have a point, but compromise proves elusive — courts must strike the balance and explain why, under the particular circumstances presented, the law directs that one right must give way to another.

Pending before the court is plaintiffs' Motion for Preliminary Injunction (document no. 14). Among other things, plaintiffs seek an order preventing defendants from enforcing

any Bow High School ("BHS") policies that might prevent plaintiffs from attending BHS extracurricular events and:

> non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a pink wristband on the sidelines or displaying a sign in the parking lot.

Plaintiffs' Proposed Preliminary Injunction Order (document no. 14-2) at 2-3. On November 21 and 22, 2024, the court held an evidentiary hearing, at which the parties presented evidence and argument in support of their respective positions. Later, the parties supplemented their argument with legal memoranda.

For the reasons discussed below, plaintiffs' Motion for Preliminary Injunction (document no. 14) is denied.

## Factual Background

A. Prior Litigation.

In July of 2024, New Hampshire enacted House Bill 1205, entitled "an act relative to women's sports." See N.H. Rev. Stat. Ann. 193:41-42. That act became effective on August 18, 2024. Generally speaking, it prevents transgender girls from playing on girls'/women's public school athletic teams. It provides: "An interscholastic sport activity or club athletic

team sponsored by a public school or a private school whose students or teams compete against a public school must be expressly designated as one of the following based on the biological sex at birth of intended participants: (1) Males, men, or boys; (2) Females, women, or girls; or (3) Coed or mixed." RSA 193:41 II(a). It further provides that, "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." Id. at II(b). And, for purposes of the Act, the sex of the student athletes shall be determined by the biological sex at birth. Id. at III.

Shortly after the Act's passage, it was challenged by two transgender girls and their parents, on grounds that it violated their equal protection rights under the federal constitution, as well as provisions of Title IX. See Tirrell v. Edelblut, No. 24-cv-251-LM-TSM, 2024 WL 4132435, 2024 DNH 073 (Sept. 10, 2024). Following extensive briefing and an evidentiary hearing, this court (McCafferty, J.) concluded that the plaintiffs were likely to prevail on the merits of their claims and issued a preliminary injunction blocking enforcement of the statute. Specifically, the court enjoined the defendants (including the Commissioner of the New Hampshire Department of Education) from enforcing the provisions of the Act against plaintiffs and required defendants to permit plaintiffs "to try out for,

practice with, compete with, and play on school sports teams designated for girls on the same terms and conditions as other girls." Id. at *20.

One of the plaintiffs in that litigation, Parker Tirrell, is a transgender girl and a sophomore at Plymouth Regional High School. She has been diagnosed with gender dysphoria. As found in Tirrell, "Parker began taking medications to block male puberty in May 2023, toward the end of her eighth-grade year. She began female hormone therapy in December 2023 while in ninth grade. Her treatment has caused her to develop physiological changes associated with female puberty. She will not undergo male puberty. According to the uncontested factual record in this case, there is no medical justification to preclude Parker from participating in girls' sports." Id. at *3. The court also concluded that:

> Playing on a boys' team is not a realistic option for Parker. Parker's providers have prescribed treatment requiring her to live and participate in the world as a girl. Playing on a boys' soccer team would likely have adverse impacts on Parker's mental health and would exacerbate symptoms of gender dysphoria. According to Parker's mother, Parker would be devastated if she is not allowed to play on her soccer team solely because she is transgender.

Id.

B. Events Leading up to the Game between BHS and Plymouth.

Not surprisingly, the decision in Tirrell was and continues to be controversial. The parents of a few students on the BHS girls' soccer team were concerned that their daughters would be competing against a team on which a biological boy would be playing. Indeed, they also were aware that such a match was upcoming. In the days leading up to that match, BHS administrators learned that some Bow parents had discussed the possibility of conducting a protest of some sort when the team from Plymouth (the team on which Parker Tirrell played) came to Bow. "The plans discussed reportedly included wearing dresses to the game, buying anti-trans gear, making signs, and generally heckling and intimidating the player." Affidavit of Michael Desilets, BHS Athletic Director (document no. 22-1) at para. 3. See also Defendants' Hearing Exhibit F, Email from Shannon Farr (parent of a girl on the BHS soccer team) to Mike Desilets dated September 11, 2024 (six days before the game).[1]

[1] In her email to Athletic Director Desilets, Shannon Farr wrote, "I am writing because I have concerns about statements other team parents have been making regarding both the trans-female player from Plymouth and their potential plans as to how they want to handle the game on the 17th. Today, in Laconia (while in earshot of other Bow families, Laconia families, children, grandparents, friends, etc.) several Bow parents discussed wearing dresses to the [Plymouth] game, buying anti-trans warm-up shirts for the Bow players, making signs in protest of trans athletes, and generally planning on how they

Although plaintiffs claim that school administrators refused to meet with them or consider their concerns, that is not entirely correct. On September 13, Nicole Foote (one of the plaintiffs in this case and the mother of a player on the BHS team) met with Athletic Director Desilets, "to complain about the competitive unfairness and injury risk to female athletes inherent in allowing biological males [to] participate in women's sports." Second Amended Complaint (document no. 52) at para. 21. Desilets informed Foote that the federal court's preliminary injunction prevented him from doing anything to preclude Parker from playing in the game. Id.

Defendant Marcy Kelley is the Superintendent of Schools for SAU 67, which includes the Bow School District. At the preliminary injunction hearing, she testified that she first learned of the potential for a protest/disruption at the soccer match when she received a copy of Shannon Farr's email. Kelley was also aware of various Facebook posts made by one of the plaintiffs, Andy Foote (father of one of the BHS team members).

---

can heckle and intimidate this player. I understand this is an extremely sensitive subject and I know many don't have opinions aligned with mine. However, I don't feel the soccer field is a place for hatred or disrespect and based on the comments I've seen on Facebook and have overheard at several games, I have concerns of what this game could devolve into." (emphasis supplied).

In one such post, which was made four days before the match against Plymouth, Foote wrote:

> On September 17, 2024, the BHS XX Lady Falcons soccer team will be required to face a team that includes a biological male on the roster.
>
> * * *
>
> Biological males have no place in women's sports. We need to protect the integrity and safety of female athletics.
>
> Please come out to support our XX Lady Falcons and show your solidarity with our girls' teams as they face this challenge.

Plaintiffs' Hearing Exhibit 5.

A few days before the game, another plaintiff, Kyle Fellers, purchased a large number of pink wristbands and gave them to Foote. Using a black magic marker, Foote adorned each with some sort of symbol: either "XX," or the female gender symbol ("♀") or "NAD" (which Foote said meant "not a dude"). He uploaded a picture of roughly 30 of those modified pink wristbands in another Facebook post. See Photograph of Wrist Bands (document no. 22-3).[2] In this case, only the wristbands with the "XX" symbol are at issue.

---

[2] Mike Desilets, the BHS athletic director, testified that he and Matt Fisk, the Principal of Bow High School, saw that photograph and Foote's Facebook post on the morning of the game. Desilets Affidavit (document no. 22-1) at para. 8.

C. The "XX" Symbol in Context.

Superintendent Kelley testified that the "XX" symbol displayed on Foote's wristbands – in a context such as this – conveys a well-understood anti-trans message. She noted that Riley Gaines actively uses the "XX" symbol in her social media posts, her clothing line, and speaking engagements in support of her own campaign to prevent transgender athletes from participating in women's sports. Hearing Transcript, Day Two, Morning Session, at 31-32. Plaintiffs — particularly Andy Foote and Kyle Fellers — often reference Riley Gaines in their social media posts and on their signs/posters. Gaines is a former collegiate athlete best known for having lost an NCAA swimming competition to a transgender competitor. She has become a celebrity who advocates excluding trans athletes from women's sports. She operates the "Riley Gaines Center" and has, among other things, written a book on the topic of transgender athletes in women's sports. See rileygainescenter.org ("My team of Ambassadors and I are building a movement of students, athletes, and concerned citizens who are fed up with the attack on our freedoms and rights – and who dare to defy the dangerous gender ideology that's spreading rampant and unchecked throughout society."). Gaines also sells a line of clothing advocating the "protection of women's sports" — a phrase often used by plaintiffs — and the exclusion of trans athletes from

exclusively female competitions. Her clothing line includes t-shirts and hats with statements like, "XX ≠ XY," "**BOY**cott," "Save Women's Sports," and "you cannot defend what you cannot define."

Kelley testified that she has seen Gaines' advertisements for speaking engagements, visited Gaines' websites, and seen her social media postings. Kelley said she is aware that both Gaines and, in context, the "XX" symbol, are understood to stand for the broad proposition that transgender athletes should be completely banned from competing in women's sports because they are not women. Kelley also noted that the "XX" symbol was used during the recent summer Olympics to convey an "anti-trans" message in the wake of controversy involving two transgender female Olympic boxers. See generally Hearing Transcript, Day Two, Morning Session, at 33-35.[3]

---

[3] More than a month before the Plymouth game, Fellers sent an email to Superintendent Kelley (and a number of others), in which he made reference to the Olympic boxing controversy.

> For those of you still living under a rock or in denial about the ramification of biological boys playing in girls' sports, here is exhibit A on your delusional fantasies.
>
> Angela Carini, an Olympic Woman Boxer from Italy surrendered to a mentally ill man in the boxing ring. Surrendering her dream of an Olympic Gold. She was left crying in pain and in shame as she admitted after the bout that she had never been hit as hard as the 46 seconds she lasted in the ring with this maniac. This happened on the

When asked why she would prevent a parent from wearing the "XX" wristbands to a BHS extracurricular event but might allow someone to wear a "pride" symbol on an article of clothing, Kelley testified that, in contrast to the "XX" symbol, the pride symbol conveys a message of inclusion and does not target or harass any specific student. Hearing Transcript, Day Two, Morning Session, at 68.

D. Defendants' Preparations for the Game.

Shortly before the game, Superintendent Kelley spoke with a member of the school board, who expressed concern for the safety and well-being of the Plymouth players in general and Parker Tirrell in particular. Kelley testified that Foote's Facebook post of September 13 could be interpreted as a "call to come out" to this particular game and rally around the position that only biological females should participate in girls' sports. Hearing Transcript, Day Two, Morning Session (document no. 66) at 41. See also Id. at 54-55 ("There was sort of this call to action that happened via social media and it was picked up by

> same day the Biden/Harris administrations rewrites Title IX to appease a mentally ill cult.
>
> For those of you in support of this madness, I hope you feel proud of yourselves.

Defendants' Hearing Exhibit E.

other known [anti-transgender] folks, and so I was concerned that we also may have people there who we don't know, who are not parents, and what that might lead to . . . The concern was how many people. Asking people to come to our game, are we going to be able to handle that as a school.").

The "problematic piece" of Foote's proposed demonstration/ protest, Kelley said, was that it might be directed specifically at the transgender student on the opposing team. Hearing Transcript, Day Two, Morning Session, at 39. Based upon Foote's Facebook posts, Kelley (and other administrators) believed the protest was "about targeting a trans player." Id. at 29-30. Targeting or demeaning or harassing any player is not tolerated from anyone attending a BHS athletic event and it is specifically prohibited by both the BHS Athletics Handbook, as well as the Bow School Board Policy on "Public Conduct on School Property".

The Bow High School Athletics Handbook (provided to all students athletes and their parents) states that:

> It is the expectation of every fan to maintain a positive attitude, to treat players, coaches and officials with respect, and to cheer for their team as opposed to cheering against the other team. Fans are not to use the names or numbers of opposing teams, nor

> should they be trying to directly communicate [with] or distract other players.

Exhibit C to Second Amended Complaint (document no. 52-3) (emphasis in original). As relevant to this proceeding, the Bow School Board Policy on "Public Conduct on School Property" provides, in part, that:

> For purposes of this policy, "school property" means any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private.
>
> The School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event. No person on school property or at a school event shall:
>
>> Injure, threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person;
>>
>> Violate any Federal or New Hampshire law, or town or county ordinance;
>>
>> Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner);
>>
>> Violate other District policies or regulations, or an authorized District employee's directive.
>
> Any person who violates this policy or any other acceptable standard of behavior may be ordered to leave school grounds. Law enforcement officials may be contacted at the discretion of the supervising District employee if such employee believes it necessary.

Exhibit A to Second Amended Complaint (document no. 52-1). See also Defendants' Hearing Exhibit D, Bow School District Policy – Title IX Prohibition of Sex Discrimination and Sex-Based Harassment: Policy and Grievance Procedure.

In short, Superintendent Kelley testified that a combination of factors – including Foote's emails and social media postings; the photographs of the many "XX" pink wristbands that Foote had prepared for the protest; plaintiffs' use of photographs of Riley Gaines and their repeated references to her; the timing of plaintiffs' protest; and the email from Shannon Farr about a demonstration and possible heckling and intimidation of an opposing player by Bow parents – caused her to be concerned that plaintiffs' protest/demonstration would likely single out a specific transgender player on the Plymouth team with a demeaning message attacking her presence on the field based upon her biological gender at birth and/or her gender identity.

When asked about plaintiffs' opinions surrounding trans players and girls sports, Kelley said she was not troubled by their opinions, but very much concerned about protecting an individual student from being the target of any protest. She also noted the School District's obligations under Title IX and

the New Hampshire Law Against Discrimination to protect students from bullying, discrimination, and harassment, particularly as it relates to sex and gender. And, she reiterated that the public's attendance at school events is conditioned upon their compliance with those anti-discrimination laws as well as Bow's policies regulating school activities. Hearing Transcript, Day Two, Morning Session, at 68. Finally, Superintendent Kelley pointed out that she simply did not know what to expect on game day, but to prevent any potential disruption, additional faculty members and an officer from the Bow Police Department were asked to come to the game.

In a further effort to avoid any sort of disturbance and to prevent any BHS parents from specifically targeting the transgender player on the Plymouth team, BHS Athletic Director Mike Desilets sent an email to the parents of girls on the Bow team on the evening before the game. In it, he wrote:

> Good evening soccer families-
>
> Please read the following attached messaging regarding Bow High School's status as a member of the NHIAA as well as some information from our Athletics Handbook regarding sportsmanship and sideline behavior.
>
> I understand that there are some differing opinions regarding tomorrow's game, and <u>that is perfectly fine</u>. Please understand that <u>any inappropriate signs, references, language or anything else present at the game will not be tolerated</u>. This is a contest between

> high school student-athletes and should be treated as such.
>
> Thank you in advance for your attention to this important matter.

Exhibit B to Plaintiffs' Original Complaint (document no. 1-2) (emphasis supplied). Attached to that email were excerpts from the NHIAA rules, as well as the BHS policy on sportsmanship.

Early the following morning (game day), plaintiff Andy Foote responded to Desilets' email with one of his own. In it, Foote wrote:

> Is this all you have to say about this game? You've proven yourselves weak, ineffective, and completely out of touch with real leadership.
>
> This isn't "just another game" - not by a long shot. None of you had a single conversation with our team. None. You ignored us, and now you expect us to just go along with this?
>
> I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males — who are stronger, faster, and more physically dominant — compete against women. And you don't sit around waiting for someone to get hurt before you take action.

Exhibit 1 to Affidavit of Michael Desilets (document no. 22-2) (emphasis supplied). *See also* Hearing Transcript, Day One, Afternoon Session, at 96 (Foote testifying that he understood

that someone reading his email might get the impression that he planned to do something at the game).

It is plain why Foote and the other plaintiffs saw this as something other than "just another game" and chose this particular match to stage their protest. A transgender girl was going to be playing for the Plymouth team and in plaintiffs' mind she embodied everything that plaintiffs feared (e.g., injuries, lost opportunities for biological girls to play on interscholastic teams, missed opportunities to win championships, etc.). Plaintiffs opposed Parker's presence on the Plymouth team and her participation in the upcoming match, and they decided to protest against both – that is, to "protest males, biological males, in women's sports." Testimony of Eldon Rash, Hearing Transcript, Day Two, Morning Session, at 9.

Parenthetically, the court notes that during the hearing, plaintiffs (with the exception of Eldon Rash) and their counsel almost studiously avoided the term "protest" to describe their behavior, choosing instead to characterize it as merely a "passive statement of support for women's athletics." But, as Foote necessarily conceded, the <u>way</u> they were "supporting women's sports" was by symbolically communicating their opposition to transgender players competing on girls' teams,

necessarily including the specific student athlete on the Plymouth team. Hearing Transcript, Day One, Afternoon Session, at 126-31. Moreover, as Rash repeatedly made clear during his testimony, plaintiffs understood that this was, indeed, a "protest" against a particular transgender girl participating in this particular girls' soccer match and, more broadly, a protest against any transgender girls or women participating in women's athletics in general. See Hearing Transcript, Day Two, Morning Session, at 9 and 10. See also Plaintiffs' Proposed Preliminary Injunction Order (document no. 14-2) at 2-3 (seeking to prohibit defendants from interfering with plaintiffs "protesting against allowing biological boys playing in girls' and women's sports" at BHS extracurricular events) (emphasis supplied).

It probably also bears noting that no one was under the mistaken impression that plaintiffs wore the modified pink wristbands to show support for the battle against breast cancer - a cause that also relies on pink symbols to communicate relevant messaging - despite Fellers' initial claim when confronted by school officials. The evidence of record strongly supports the conclusion that the message conveyed by the XX wristbands, as reasonably understood by Bow School officials (and no doubt many others who witnessed the protest), was in essence: "Parker Tirrell does not belong; she should not be

allowed to play soccer for the Plymouth girls' team because she is not a girl, she is a biological boy; her "gender identity" as a girl is false and invalid; and she is neither accepted nor acceptable as a female student athlete participating in high school girls' soccer, nor is any other transgender girl."

E. The BHS Match Against Plymouth.

The plaintiffs, Kyle Fellers, Andy Foote, Nicole Foote, and Eldon Rash, all attended the match between Bow High School and Plymouth Regional High School on September 17, 2024, at the BHS soccer fields. Soon after the match began, Andy Foote distributed the pink wristbands adorned with the "XX" symbols to his wife and about half a dozen other spectators. He told them not to put the bands on until halftime. When asked why he didn't wear the wristband earlier in the match, Foote testified that he understood wearing it would likely provoke a response from school administrators and he didn't want to miss the first half of the match. Hearing Transcript, Day One, Afternoon Session, at 102, 132. That is, in light of Desilets' email from the night before, Foote "suspected something would happen" if he and the other plaintiffs decided to display the wristbands. Id. at 132.

Nevertheless, at halftime, Foote and Fellers met in the parking lot and put on the wristbands. Foote also placed a poster featuring a picture of Riley Gaines that read "Save Women's Sports" (or something to that effect) on his Jeep. The men then returned to their seats on the sidelines of the field. They did not shout, chant, or otherwise call attention to themselves or their message. Each simply displayed the pink wristbands with the symbol "XX" written on it with a black magic marker. It is unclear what Foote was wearing, but Fellers wore a short-sleeved shirt and his wristband was plainly visible. See, e.g., Hearing Transcript, Day One, Afternoon Session, at 25.

About 10 minutes into the second half, school officials noticed that several spectators were wearing the pink wristbands. Athletic Director Mike Desilets approached Fellers, whispered in his ear, told him that he was not allowed to wear the wristband, and said that Fellers had to either remove it or leave the game. Hearing Transcript, Day One, Afternoon Session, at 25. Fellers initially resisted, denying that it had anything to do with transgender athletes participating in women's sports and insisting, implausibly, that the pink band was simply to show support for the fight against breast cancer. Id. at 27-28. At some point, Principal Matt Fisk and Lieutenant Lamy of the

Bow Police Department arrived and notified both Foote and Fellers that they had to either remove the wristbands or leave the game. After a few minutes of heated discussion and protestation from Fellers and Foote, both men eventually acquiesced. Eldon Rash — Feller's former father-in-law — approached the group to see what was causing the commotion. After hearing Fellers' explanation of the situation, Rash took Fellers' wristband from him, put it on his own wrist, and refused to remove it.

Meanwhile, the head referee, former defendant Steve Rossetti, saw the disturbance on the sidelines, decided to stop the match, and directed the coaches to bring their players to their respective benches. Desilets met with Rosetti at midfield, explained what was going on, and asked Rossetti to give him a bit of time to try to resolve the issues on the sideline. At that point, it seems that both Fellers and Foote had removed their wristbands, but Rash was refusing to do so. The confrontation on the sidelines between various plaintiffs and Athletic Director Desilets, Principal Fisk, and Lieutenant Lamy continued. Eventually, Desilets asked Lieutenant Lamy to remove Fellers from the game. Desilets returned to midfield where he explained to Rossetti that Rash was refusing to remove his wristband. Desilets also told the Plymouth coach what was

going on. In response, the coach reportedly told Desilets that if Parker Tirrell learned that the game had been stopped because of a protest related to her presence at the game, she would be "devastated."

Rossetti (the referee) grew impatient with the lingering delay, walked to the sideline, and told Rash that if he refused to remove the wristband, he would stop the match. Rossetti apparently had no advance knowledge of plaintiffs' protest, was unaware of what caused the disruption on the sideline, and did not know what the pink wristbands symbolized or why they were problematic – he simply wanted the disturbance to stop so he could restart the match. Rash continued to refuse to remove the wristband. Some fans on the sidelines began shouting at him and urged Rash to remove his wristband so the match could resume. Eventually, Rash acquiesced, removed the wristband and, after a delay of roughly 10-15 minutes, the match resumed.

When asked why school officials demanded that plaintiffs remove the wristbands, Superintendent Kelley testified that:

> We asked them to remove them because we believe that those are anti-trans symbols and they were targeting a player on the other team. I believe they were targeting a student on the other team. [The plaintiffs] planned and decided to do this on the one

> time that we were playing the team that had a trans student on it. I think the timing is telling.

Hearing Transcript, Day Two, Morning Session, at 63-4. See also Id. at 67 ("they were displaying an anti-trans message on the one day. It's not supporting women's sports. It's targeted at the one day and that one student."); id. at 81 ("The only time those signs came out was when we played a game against Plymouth which includes the trans player. At no other game. No other time. This was organized and targeted."); id. at 78 (Kelley's testimony that she didn't want Parker Tirrell (or, presumably, any other transgender student who might have been at the game) to see those anti-trans symbols and "feel like she doesn't belong. That it's wrong her being trans."). See generally Testimony of Anthony Foote, Hearing Transcript, Day One, Afternoon Session, at 128 (when asked whether he wore the wristband around town or anywhere other than the game against Plymouth, Foote said, "The time we're wearing it now is a chance where it actually applies.").[4]

---

[4] When asked if plaintiffs would be prohibited from wearing the pink "XX" wristbands at future Bow sporting events even if Parker Tirrell were not present, Kelley said they would. She explained, "It's not a policy [of the Bow School District]. It would be our practice, knowing what that symbol means and knowing that we have trans students and staff within our buildings." Hearing Transcript, Day Two, Morning Session, at 68.

In the parking lot, after the game had ended, Fellers stood by his car holding a poster that said "Protect Women's Sports for Female Athletes" and featured a picture of Riley Gaines. School officials were concerned that Fellers had intentionally positioned himself so the girls on the Plymouth team bus — Parker Tirrell, in particular — would see his display as the bus exited school property. Lieutenant Lamy approached Fellers and told him that school officials had expelled him from the property, he was not allowed to remain on school grounds, and he needed to leave. Again, Fellers objected and refused to comply, telling Lamy he was not going to leave, he was allowed to display his poster on school grounds, and Lamy would have to arrest him. Eventually, however, Fellers acquiesced and left the property.[5]

In the wake of the Plymouth match, both Fellers and Foote received "No Trespass" orders for having violated various

[5] Superintendent Kelley testified that no political signs or banners or flags of any sort are permitted in the school parking lot (only signs in support of the sports teams). Nor was any type of protest or demonstration permitted. She also stated that, like the wristbands, plaintiffs' signs were problematic because she believed they were targeting a specific student on the Plymouth team, noting that the signs had not been present at any other game. Hearing Transcript, Day Two, Morning Session, at 80-82.

provisions of the school's policy governing public conduct on school property. Foote was banned from school property and after-school events for one week. That ban has since expired. Fellers' received a similar order, but it barred him from school property and events (with some exceptions) for one year, due at least in part to his significant role in causing the disturbance that required police intervention as well as his repeated refusals to obey police commands to vacate the property. At the temporary restraining order hearing on October 8, 2024, however, the court entered a limited order allowing Fellers to attend his daughter's soccer matches for the rest of the season while plaintiffs' request for injunctive relief was under advisement. The court did, however, ban him from wearing the pink wristbands.

**Preliminary Injunction Standard**

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" Starbucks Corp. v. McKinney, 602 U.S. 339, 345-46 (2024) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

in the public interest." Dist. 4 Lodge of the Intl. Assn. of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo, 40 F.4th 36, 39 (1st Cir. 2022) (quoting Winter, 555 U.S. at 20).

"[T]hese four elements are not of equal prominence in the preliminary injunction calculus." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020). "The most important is whether the movant has demonstrated a likelihood of success on the merits — an element that" our Court of Appeals has "described as the 'sine qua non' of the preliminary injunction inquiry. Id. (quoting Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18-19 (1st Cir. 2020)). "If the movant cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Ryan, 974 F.3d at 18 (internal quotations omitted). This is particularly true in the context of the First Amendment. See Sindicato Puertorriqueño de Trabajadores v. Fortuña, 699 F.3d 1, 10-11 (1st Cir. 2012) ("In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis."). Thus, "to secure preliminary injunctive relief," plaintiffs must "establish a strong likelihood that they will ultimately prevail on the merits of their First Amendment claim." Am. Freedom Def. Initiative v. Massachusetts

Bay Transp. Auth., 781 F.3d 571, 578 (1st Cir. 2015) (internal quotations omitted).

**Applicable Law and Analysis**

The First Amendment to the United States Constitution prohibits any law "abridging the freedom of speech."[6] U.S. Const. amend. I. Our Constitution's protections of freedom of expression are "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484 (1957). "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. ACLU, 535 U.S. 564, 573 (2002) (citations and internal punctuation omitted). "However, this principle, like other First Amendment principles, is not absolute." Id. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981).

[6] The First Amendment applies to state and local governments through the Fourteenth Amendment. New York Times Co. v. Sullivan, 376 U.S. 254, 277 (1964).

When analyzing a claim asserting a violation of the First Amendment, courts generally employ a three-step analysis. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985). First, the court must determine whether plaintiffs' conduct is speech protected by the First Amendment. Id. Second, the court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Id. And, third, the court must "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Id.

The parties here agree that plaintiffs' conduct in displaying the symbolic wristbands and exhibiting signs qualifies as speech protected by the First Amendment. With respect to the relevant forum, courts have generally concluded that school-sponsored events, like high school soccer matches, constitute a "limited public forum." For example, the Court of Appeals for the Second Circuit addressed the forum question in a case involving a high school basketball game, concluding that:

> With respect to interschool basketball games, we think it clear that the Capital Prep gymnasium during such games was a limited public forum.
>
> While the invitation to parents and other spectators to attend basketball games would not constitute an

> invitation to anyone to disrupt the game or intermissions with speeches about his or her views on school policy generally, or political issues, or other subjects not related to the sporting event, persons attending the game are expected to engage in expressive activity, chanting and cheering for whichever team they favor. Indeed, they are encouraged to do so; many schools even have at the games groups of students whose function is to lead the audience in boisterous expressions of encouragement and partisanship.

Johnson v. Perry, 859 F.3d 156, 175 (2d Cir. 2017). Here, the parties seem to agree that the Bow soccer field and its immediate environs qualify as a limited public forum under the control of the School District. The court agrees as well.

In a limited public forum, the government's restrictions on speech "must be reasonable in light of the purpose served by the forum" and "must not discriminate against speech on the basis of viewpoint." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (2001) (citations and internal punctuation omitted).

A. Reasonable Restrictions on Speech.

"In a limited public forum, the reasonableness analysis turns on the particular purpose and characteristics of the forum and the extent to which the restrictions on speech are 'reasonably related' to maintaining the environment the

government intended to create in that forum." Tyler v. City of Kingston, 74 F.4th 57, 63 (2d Cir. 2023) (citations omitted).

Ideally, high school athletics serve as an extension of the classroom, where students practice problem-solving skills and resilience, work collectively with their teammates towards a shared goal, and learn how to win and lose with dignity and grace. Of course, spectators play an important role in high school athletics, helping to foster community spirit and unity, and providing support for the athletes competing. But, at their core, interscholastic sports are, of course, "scholastic," intended and created for students. And, as the Supreme Court has emphasized, schools "enjoy a significant measure of authority over the type of officially recognized activities in which their students participate." Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 686–87 (2010) (citation omitted).

Given the nature of the soccer field and its immediately surrounding environs as a limited public forum, and "the educational context" in which this dispute arises, "First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment." Id. at 685. Any assessment of the reasonableness of the School District's speech

restrictions must, of course, take those characteristics into account. "The Supreme Court has long held that schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" Doe v. Hopkinton Pub. Sch., 19 F.4th 493, 505 (1st Cir. 2021) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 513 (1969)).

Recently, our Court of Appeals exhaustively examined the "vexing question of when (if ever) public-school students' First Amendment rights must give way to school administrators' authority to regulate speech that (though expressed passively, silently, and without mentioning any specific students) assertedly demeans characteristics of personal identity, such as race, sex, religion, or sexual orientation." L.M. v. Town of Middleborough, Massachusetts, 103 F.4th 854, 860 (1st Cir. 2024). In L.M., the plaintiff, a middle school student, wore a t-shirt to school that read "There Are Only Two Genders." He was told by school administrators that he could not wear the shirt at school because "multiple members of the [school's] LGBTQ+ population" "would be [negatively] impacted by the t-shirt's message," and his wearing of the shirt could "potentially disrupt classes." Id. at 861-62. Because school administrators understood L.M.'s message as one that targeted

"students of a protected class; namely in the area of gender identity," they determined that the message was "likely to be considered discriminatory, harassing and/or bullying . . . by suggesting that [others'] sexual orientation, gender identity or expression does not exist or is invalid." Id. at 862.

L.M. filed suit, alleging that, by barring him from wearing the shirt, the school had violated his free speech rights under the First Amendment. Our Court of Appeals noted that:

> courts appear to have converged on the shared understanding — most fully articulated in Nuxoll [ex rel. Nuxoll v. Indian Prairie Sch. Dist., 523 F.3d 668 (7th Cir. 2008)] — that school officials may bar passive and silently expressed messages by students at school that target no specific student if:
>
> > (1) the expression is reasonably interpreted to demean one of those characteristics of personal identity, given the common understanding that such characteristics are "unalterable or otherwise deeply rooted" and that demeaning them "strike[s] a person at the core of his being," Nuxoll, 523 F.3d at 671; cf. Saxe [v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 (3d Cir. 2001)] (noting the especially incendiary nature of "disparaging comment[s] directed at an individual's sex, race, or some other personal characteristic" (emphasis added)); and
> >
> > (2) the demeaning message is reasonably forecasted to "poison the educational atmosphere" due to its serious negative psychological impact on students with the demeaned characteristic and thereby lead to "symptoms of a sick school — symptoms therefore of substantial disruption," Nuxoll, 523 F.3d at 674, 676.

> Our review of these rulings persuades us that Tinker permits public-school authorities to regulate such expression when they can make the two showings described above. We agree that those showings suffice to ensure that speech is being barred only for reasons Tinker permits and not merely because it is "offensive" in the way that a controversial opinion always may be.

L.M., 103 F.4th at 873-74. The court went on, noting that school authorities were not "required to prove that unless the speech at issue is forbidden serious consequences will in fact ensue," since "that could rarely be proved." Id. at 874. Instead, "[it] is enough for the school to present facts which might reasonably lead school officials to forecast substantial disruption." Id. (emphasis supplied; internal quotation omitted). Finally, the court noted that:

> the special characteristics of the school environment warrant affording school officials the ability to respond to the way speech demeaning other students' unalterable or otherwise deeply rooted personal characteristics can poison the school atmosphere. . . . Part of a public school's mission must be to teach students of differing races, creeds and colors to engage each other in civil terms rather than in terms of debate highly offensive or highly threatening to others.

Id. at 878 (citations and internal punctuation omitted).

With those principles in mind, the appellate court found reasonable the school's assessment that "the message in this

school context would so negatively affect the psychology of young students with the demeaned gender identities that it would poison the educational atmosphere and so result in declines in those students' academic performance and increases in their absences from school," creating "symptoms of a sick school and therefore of substantial disruption," Id. at 882 (internal quotations omitted) (cleaned up).

While L.M. is, as plaintiffs' counsel has repeatedly stressed, a student speech case that does not involve the different speech rights accorded to adult invitees to high school soccer matches, it is nevertheless both relevant and instructive. It fully describes the kind of demeaning, bullying message that can be constitutionally regulated in a public school setting.

Plaintiffs say that the only message meant to be communicated by their pink wristbands marked with "XX" was that they opposed transgender girls or women participating in girls' or women's sporting events. They argue, as the plaintiff in L.M. essentially argued, that the Bow School District could not reasonably conclude that their symbolic wristbands communicated a message demeaning the gender identities of transgender students in general or Parker Tirrell in particular, nor could

the School District reasonably conclude that their message was specifically aimed at Parker. The court disagrees.

As in L.M. and given the evidence of record, the Bow School District, in the context described in testimony by Superintendent Kelley and others, reasonably interpreted the pink XX wristbands to be sending, in substance, the same message described in L.M. with respect to the "only two genders" shirt. That is, the School District understood that in the broad context of opposition to transgender girls' participation in girls' sports, the symbolic message included a demeaning and harassing assertion – an assertion of inauthenticity, falsity and nonexistence with respect to some students' core and immutable characteristics (i.e., their gender identities). And, it seems evident that had the symbols been worn by students in school or during school activities, they could be barred as reasonably interpreted in context to convey a harassing, demeaning message likely to have a serious negative psychological impact on students who identify as transgender.

There appears to be no basis in this record upon which to substitute this court's judgment for the School District's with respect to whether the wristbands, in the context of women's and girls' sports, carried those demeaning assertions. The evidence

presented fully supports the School District's conclusions relative to the full impact of the symbols and posters displayed by plaintiffs. It is, of course, as L.M. notes, the reasonable understanding of the School District, and not the subjective intent of the protesting invitees, that determines whether messaging would likely be understood as demeaning to particular students:

> L.M. does not dispute, however, that the message expresses the view that students with different "beliefs about the nature of [their] existence" are wrong.
>
> Consistent with that acknowledgement, the District Court determined the message is reasonably understood to be an assertion, however sincerely believed, that individuals who do not identify as either male or female have no gender with which they may identify, as male and female are their only options. As the District Court put it, the message "may communicate that only two gender identities — male and female — are valid, and any others are invalid or nonexistent.
>
> We agree with the District Court and so cannot say the message, on its face, shows [the school] acted unreasonably in concluding that the Shirt ["only two genders"] would be understood . . . to demean the identity of transgender and gender non-conforming NMS students. Cf. Nuxoll, 523 F.3d at 671 ("For most people these are major components of their personal identity — none more so than a sexual orientation that deviates from the norm. Such comments can strike a person to the core of his being.") (citations omitted)

L.M., 103 F.4th at 880.[7]

---

[7] It appears that, like the School District defendants, the coach of the Plymouth soccer team also interpreted the

To be fair, plaintiffs say they did not mean to "target" or harass Parker Tirrell during the soccer match. They argue that they simply oppose transgender girls playing on girls' sports teams, based upon reasonable concerns related to unfair competition, risk of injury, and lost opportunities for their daughters to succeed. The XX wristbands, they contend, were meant to communicate that limited viewpoint on a controversial issue of some public interest, and no more. Plaintiffs also correctly point out that many people agree with their position (witness the New Hampshire legislation barring transgender participation) or at least agree that some system that is capable of allowing transgender participation but also mitigates the risk of injury and potential physical dominance should be developed (as both Superintendent Kelly and Mr. Foote seemed to agree).

Critically, however, plaintiffs' subjective intent and the narrow, plausibly inoffensive, meaning they ascribe to the symbols used are not controlling. Context is everything. The

---

plaintiffs' wristbands to target transgender girls, and Parker Tirrell specifically. It bears repeating that the coach told Athletic Director Desilets that if Parker Tirrell learned that the game had been stopped because of a protest related to her presence at the game, she would be "devastated."

evidence of record amply supports the School District's view that the XX symbol on a pink background is well known among those interested in the transgender sports issue, and it is associated with other meanings that are far more offensive than those ascribed by plaintiffs. That is to say, school authorities are not obligated to ignore the broader and perhaps more prevalent meanings generally ascribed to the symbol for the purpose of assessing its demeaning and harassing character when aimed at (or put on display before) transgender students in the context of interscholastic athletics.

The message generally ascribed to the XX symbol, in a context such as that presented here, can reasonably be understood as directly assaulting those who identify as transgender women. Beyond "I oppose your participation," the message can reasonably be understood to include assertions that there are "only two genders," and those who identify as something other than male or female are wrong and their gender identities are false, inauthentic, nonexistent, and not entitled to respect. Because gender identities are characteristics of personal identity that are "unalterable or otherwise deeply rooted," the demeaning of which "strikes a person at the core of his being," Nuxoll, 523 F.3d at 671, and because Bow school authorities reasonably interpreted the symbols used by

plaintiffs, in context, as conveying a demeaning and harassing message, they properly interceded to protect students from injuries likely to be suffered. Cf., Doe by & through Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 528–29 (3d Cir. 2018) ("The Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors. We have similarly found that the government has a compelling interest in protecting and caring for children in various contexts. Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior. When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated — indeed, it can be life threatening.").

While plaintiffs may very well have never intended to communicate a demeaning or harassing message directed at Parker Tirrell or any other transgender students, the symbols and posters they displayed were fully capable of conveying such a message. And, that broader messaging is what the school authorities reasonably understood and appropriately tried to prevent. Perhaps more accurately — that is what the record evidence shows at this stage.

Having reasonably determined that the wristband symbols would likely be understood as demeaning, harassing, and psychologically injurious - potentially in severe ways - to both any transgender students attending the soccer game, and specifically Parker Tirrell, school authorities were duty bound to protect those students from the harassment, intimidation, and anxiety likely to follow:

> First, there is the demeaning nature of the message. To be sure there is a spectrum of messages that are demeaning of characteristics of race, sex, religion, sexual orientation, and so gender identity as well. It is hard to see how it would be unreasonable to forecast the disruptive impact of messages at the most demeaning end of that spectrum, given their tendency to poison the educational atmosphere. See Nuxoll, 523 F.3d at 624 ("Imagine the psychological effects if plaintiff wore a t-shirt on which was written 'blacks have lower IQs than whites' or 'a woman's place is in the home.'"); Saxe, 240 F.3d at 206, 217 (reasoning that "disparaging comments" about other students' personal characteristics may "create a 'hostile environment'" and thus be restricted if there is a threshold showing of severity or pervasiveness.").

L.M., 103 F.4th at 881. Demeaning messages of the sort described, delivered during a school-sponsored event, are likely even more damaging to vulnerable students when delivered by adults attending the event.

It is correct to note, as plaintiffs do, that their own free speech rights are not limited to the same degree as a

student's. The question then becomes whether the School District can manage its athletic events and its athletic fields and facilities — that is, its limited public forum — in a manner that protects its students from adult speech that can reasonably be seen to target a specific student participating in the event (as well as other similar gender-identifying students) by invited adult spectators, when that speech demeans, harasses, intimidates, and bullies. The answer is straightforward: Of course it can. Indeed, school authorities are obligated to do so.

The opinion in LM makes plain that the displaying of a symbolic expressive message that is reasonably understood to demean the gender identity of a specific transgender high school athlete (or transgender students generally), can be regarded by school authorities as targeting, harassing, intimidating, bullying, and abusive of those students. Such symbolic speech is entirely inconsistent with the school's pedagogical goals and undermines the core values sought to be instilled by interscholastic athletics. Speech of that sort can be restricted in a government-sponsored limited public forum such as the Bow soccer fields. Stated slightly differently, in the context presented, adult invitees attending a high school

athletic event do not enjoy a First Amendment protected right to engage in such conduct.

B. Viewpoint Neutrality.

Plaintiffs also argue that the restriction on their symbolic speech is constitutionally impermissible because it amounts to "viewpoint" discrimination. That argument is consistent with neither the evidence of record nor the applicable law.

To be sure, government restrictions on speech in a limited public forum "must not discriminate against speech on the basis of viewpoint." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (2001) (quotation omitted). But, restricting the wearing of symbolic wristbands and the displaying of posters conveying a similar message, given the negative and demeaning messaging the School District reasonably understood them to convey, is not viewpoint based. It is effects based. It is also entirely consistent with the lawful (and viewpoint neutral) rules and guidelines imposed on all attendees at BHS athletic events.

As the Athletic Director made clear in his email to the student athletes' parents, different opinions with respect to

transgender sports participation were "perfectly fine." And as Superintendent Marcy Kelley, testified, the issue of transgender girls playing in girls' sports is a decidedly nuanced one (involving numerous considerations, such as players' size, strength, height, speed, individual liberties, fair competition, etc.). Indeed, many reasonable people of good faith fully agree with plaintiffs' articulated viewpoint, as they limit it.

Critically, however, the evidence of record does not suggest that the School District favored or disfavored plaintiffs' position on that issue or any other position spectators might have with regard to that controversial matter of ongoing public interest — that is, whether and, if so, to what extent, transgender athletes should participate in girls' sports. The School District <u>did</u>, however, have a position with respect to adult parents targeting a visiting student athlete at a school soccer match with demeaning, hurtful, and harassing speech based on her gender identification. The School District reasonably prohibited <u>any</u> speech constituting harassment of, or that demeaned the transgender athlete, or any other student for that matter - whatever the cause, or idea, or policy underlying that harassment and intimidating conduct. That plaintiffs' expressive conduct on one side of an issue of public concern ran afoul of the School District's established, viewpoint neutral

regulations does not mean that plaintiffs were the victims of viewpoint discrimination. As the Supreme Court has noted, "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Christian Legal Soc., 561 U.S. at 695 (internal quotations omitted) (cleaned up). That is the case here with respect to the challenged rules and regulations of the Bow High School.

The evidence of record shows that it was not the plaintiffs' viewpoint (as they have described it) that posed a problem. That is to say, the evidence persuasively demonstrates that the School District did not act because plaintiffs communicated an opinion opposing transgender players participating in girls' sports. Instead, the School District took action because it reasonably concluded that plaintiffs communicated a symbolic message (however quietly and passively) that was demeaning, harassing, and harmful to, and targeted at, a specific transgender player as well as other transgender students. That does not constitute unlawful viewpoint discrimination.

**Conclusion**

The Bow athletic fields and adjacent areas constitute a limited public forum. The School District's rules and regulations governing conduct within that forum and at issue here are reasonable, viewpoint neutral, and consistent with the schools' pedagogical goals. In the context presented, the School District defendants reasonably determined that the symbols used by plaintiffs conveyed a message that targeted a specific transgender student on the visiting team (as well as any transgender students present at the game) and demeaned a core immutable characteristic of their personal identity – that is gender and gender identity. And, having reasonably concluded that such a message might "poison the educational atmosphere" sought to be fostered at school-sponsored athletic events and cause potentially serious harm to the participating transgender athlete as well as other transgender students, defendants reasonably and lawfully regulated plaintiffs' speech.

Although plaintiffs do not concede the contextually demeaning or harassing nature of their symbolic messaging, at this point the evidence of record amply supports the School District's view. The broader and more demeaning/harassing message the School District understood plaintiffs' "XX" symbols to convey was, in context, entirely reasonable. As noted

earlier, symbols can carry meaning well beyond what the speaker may intend to proclaim or advocate. Plaintiffs are, of course, free to display their symbols and signage in any public forum available for such purposes. But they may not do so at Bow High School-sponsored activities in contravention of the reasonable restrictions imposed by the School District.

For the forgoing reasons, as well as those articulated in defendants' legal memoranda (documents no. 22 and 73), plaintiffs' have failed to demonstrate a likelihood of success on the merits of their claims. Consequently, their Motion for Preliminary Injunction (**document no. 14**) is necessarily denied.

If appropriate, the parties should advise the clerk within fourteen (14) days if they wish to supplement the evidentiary record or submit supplemental briefing in advance of a ruling on plaintiffs' request for permanent injunctive relief.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

April 14, 2025

cc: Counsel of Record