No. 25-1442

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

---

KYLE FELLERS; ANTHONY FOOTE; NICOLE FOOTE; ELDON RASH,

*Plaintiffs - Appellants,*

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities other; BOW SCHOOL DISTRICT,

*Defendants - Appellees,*

PHILIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity,

*Defendants.*

---

Appeal from an Order of the United States District Court
for the District of New Hampshire, The Hon. Steven J. McAuliffe
(Dist. Ct. No. 1:24-cv-311-SM-AJ)

---

APPENDIX

---


Richard J. Lehmann
LEHMANN MAJOR LIST, PLLC
Concord, NH 03301
603-731-5435
rick@nhlawyer.com

Endel Kolde
Brett R. Nolan
Nathan Ristuccia
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

Attorneys for Appellants

## APPENDIX TABLE OF CONTENTS


| ECF No. | Document Description | Page No. |
|---|---|---|
| | District Court Docket Report, as of May 27, 2025 | App.1 |
| 52 | Second Amended Complaint | App.14 |
| 1 | Original Complaint | App.54 |
| 14-2 | Plaintiffs' Proposed Orders | App.81 |
| 14-3 | Declaration of Kyle Fellers | App.87 |
| 14-4 | Declaration of Anthony Foote | App.101 |
| 14-5 | Declaration of Nicole Foote | App.116 |
| 14-6 | Declaration of Eldon Rash | App.124 |
| 14-7 | Pls.' Exhibit A – Policy KFA | App.129 |
| 14-8 | Pls.' Exhibit B – Desilets' September 16 Email | App.130 |
| 14-9 | Pls.' Exhibit C – Excerpts from Athletics Handbook and NHIAA Policies | App.131 |
| 14-10 | Pls.' Exhibit D – Photograph of Pink XX Wristband | App.132 |
| 14-11 | Pls.' Exhibit E – Foote's September 13 Facebook Post | App.133 |
| 14-12 | Pls.' Exhibit F – Kelley's Statement on September 17 Incident | App.134 |
| 14-13 | Pls.' Exhibit G – Foote's No Trespass Order | App.135 |
| 14-14 | Pls.' Exhibit H – Fellers' No Trespass Order | App.138 |

| | | |
|---|---|---|
| 14-15 | Pls.' Exhibit I – Addendum of Fellers' No Trespass Order | App.142 |
| 14-16 | Pls.' Exhibit J – Second Addendum of Fellers' No Trespass Order | App.144 |
| 14-17 | Pls.' Exhibit K – Kelley Email on Designated Protest Area | App.145 |
| 14-18 | Pls.' Exhibit L – Notice of Designated Protest Area | App.146 |
| 14-19 | Pls.' Exhibit M – Map of Soccer Field | App.147 |
| 14-20 | Pls.' Exhibit N – Kelley's Email Correspondence with Lamy | App.148 |
| 14-21 | Pls.' Exhibit O – Bow P.D. Call Record | App.152 |
| 14-22 | Pls.' Exhibit P – Photographs from Designated Protest Zone | App.154 |
| 14-23 | Pls.' Exhibit Q – Photographs from Sidelines | App.155 |
| 22-1 | Declaration of Michael Desilets | App.156 |
| 22-2 | Defs.' Exhibit 1 – Foote's September 17 Email | App.160 |
| 22-3 | Defs.' Exhibit 2 – Photograph of Wristband Pile | App.161 |
| 22-4 | Declaration of Marcy Kelley | App.162 |
| 22-5 | Policy KFA | App.165 |
| 22-6 | Declaration of Matt Fisk | App.166 |
| 22-7 | Declaration of Philip Lamy | App.169 |
| 24 | Complete Transcript of October 8, 2024 Motion Hearing [transcript pages 1-80] | App.171 |
| 63 | Pls.' List of Exhibits for November 21-22 Evidentiary Hearing | App.251 |

| | | |
|---|---|---|
| | Slipsheet for Pls.' Hearing Exhibit 20 – Police Body Camera Footage from Side Lines | App.255 |
| | Slipsheet for Pls.' Hearing Exhibit 21 – Police Body Camera Footage from Parking Lot | App.256 |
| | Pls.' Hearing Exhibit 25 – Photo of Progress Pride Flag in Bow High School Music Room | App.257 |
| | Pls.' Hearing Exhibit 27 – Photo of Gray Car with Political Bumper Stickers | App.259 |
| | Pls.' Hearing Exhibit 28 – Photo of Black Car with Political Bumper Stickers | App.260 |
| | Pls.' Hearing Exhibit 29 – Photo of Blue Car with Political Bumper Stickers | App.261 |
| | Defs.' Hearing Exhibit F – Shannon Farr Email | App.262 |
| 67 | Complete Transcript of November 21-22, 2024 Evidentiary Hearing – Day One, Morning Session [transcript pages 1-93] | App.263 |
| 65 | Complete Transcript of November 21-22, 2024 Evidentiary Hearing – Day One, Afternoon Session [transcript pages 1-138] | App.356 |
| 66 | Complete Transcript of November 21-22, 2024 Evidentiary Hearing – Day Two, Morning Session [transcript pages 1-115] | App.494 |
| 72 | Complete Transcript of November 21-22, 2024 Evidentiary Hearing – Day Two, Afternoon Session [transcript pages 1-47] | App.609 |

| | | |
|---|---|---|
| 79-1 | Second Declaration of Nicole Foote | App.656 |
| 79-2 | Pls.’ Exhibit R – Varsity Girls’ Lacrosse Schedule | App.659 |
| 79-3 | Pls.’ Exhibit S – Middle School Girls’ Lacrosse Schedule | App.661 |
| 79-4 | Second Declaration of Anthony Foote | App.662 |
| 79-5 | Second Declaration of Kyle Fellers | App.664 |
| 82 | Plaintiffs’ Notice of Appeal of Ruling on Preliminary Injunction | App.667 |
| 83 | Appellate Cover Sheet | App.669 |

# U.S. District Court
# District of New Hampshire (Concord)
# CIVIL DOCKET FOR CASE #: 1:24−cv−00311−SM−AJ

Fellers et al v. SAU 67, Superintendent et al
Assigned to: Judge Steven J. McAuliffe
Referred to: US Magistrate Judge Andrea K Johnstone
Case in other court: First Circuit Court of Appeals, 25−01442
Cause: 42:1983 Civil Rights Act

Date Filed: 09/30/2024
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Kyle Fellers** represented by

**Endel Kolde**
Institute for Free Speech
1150 Connecticut Ave NW
Suite 801
Washington, DC 20036
202−301−1664
Email: dkolde@ifs.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brett Robert Nolan**
Institute for Free Speech
1150 Connecticut Ave NW
Suite 801
Washington, DC 20036
202−301−3300
Email: bnolan@ifs.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan John Ristuccia**
Institute for Free Speech
1150 Connecticut Ave NW
Suite 801
Washington, DC 20036
202−301−1215
Email: nristuccia@ifs.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Lehmann**
Lehmann Major List PLLC
6 Garvins Falls Road
Concord, NH 03301
603−731−5435
Fax: 720−995−9156
Email: rick@nhlawyer.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Foote** represented by

**Endel Kolde**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brett Robert Nolan**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Nathan John Ristuccia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Lehmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nicole Foote** represented by **Endel Kolde**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brett Robert Nolan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan John Ristuccia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Lehmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eldon Rash** represented by **Endel Kolde**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brett Robert Nolan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan John Ristuccia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Lehmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SAU 67, Superintendent**
*Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities*
*other*
Marcy Kelley

represented by **Brian J.S. Cullen**
Cullen Collimore Shirley PLLC
37 Technology Way
Suite 3W2
Nashua, NH 03060
603−881−5500

Email: bcullen@cullencollimore.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Shirley**
Cullen Collimore Shirley PLLC
37 Technology Way
Suite 3W2
Nashua, NH 03060
603−881−5500
Fax: 603−881−5507
Email: jshirley@cullencollimore.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bow High School, Athletic Director**
*Athletic Director, Bow High School, in his official and individual capacities*
*other*
Michael Desilets

represented by **Brian J.S. Cullen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Shirley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bow High School, Principal**
*Principal, Bow High School, in his official and individual capacities*
*other*
Matt Fisk

represented by **Brian J.S. Cullen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Shirley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Philip Lamy**
*Lieutenant, Bow Police Department, in his individual capacity*
*TERMINATED: 10/18/2024*

represented by **Eric Alexander Maher**
Donahue Tucker & Ciandella PLLC
16 Acadia Ln
PO Box 630
Exeter, NH 03833
603 778−0686
Fax: 603 772−4454
Email: emaher@dtclawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steve Rossetti**
*soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity*
*TERMINATED: 01/06/2025*

represented by **Dennis T. Ducharme**
Ducharme Resolutions PLLC
20 Market St, Ste 206
Manchester, NH 03101
603−935−7292
Email: dennis@ducharmeresolutions.com
*TERMINATED: 01/06/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bow School District**

represented by **Brian J.S. Cullen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Shirley**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/30/2024 | 1 | NEW CASE/ COMPLAINT Filing fee $ 405, receipt number ANHDC−2557222 filed by Nicole Foote, Anthony Foote, Kyle Fellers, Eldon Rash. (Attachments: # 1 Exhibit Ex. A Policy KFA, # 2 Exhibit Ex. B Desilets Email, # 3 Exhibit Ex. C Extracts from Handbook and NHIAA, # 4 Exhibit Ex. D Photo of Wristband, # 5 Exhibit Ex. E Facebook post, # 6 Exhibit Ex. F Kelley Stmt, # 7 Exhibit Ex. G Foote No Trespass Order, # 8 Exhibit Ex. H Fellers No Trespass Order, # 9 Exhibit Ex. I Addendum, # 10 Exhibit Ex. J Second Addendum, # 11 Civil Cover Sheet Civil Cover Sheet)(Lehmann, Richard) (Additional attachment(s) added on 9/30/2024: # 12 Summonses) (mc). (Entered: 09/30/2024) |
| 09/30/2024 | 2 | MOTION for Nathan Ristuccia to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC−2557251.) filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 10/15/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Nathan Ristuccia)(Lehmann, Richard) (Entered: 09/30/2024) |
| 09/30/2024 | 3 | MOTION for Brett R. Nolan to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC−2557256.) filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 10/15/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) (Additional attachment(s) added on 9/30/2024: # 1 Declaration) (mc). (Entered: 09/30/2024) |
| 09/30/2024 | 4 | MOTION for Endel Kolde to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC−2557263.) filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 10/15/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Endel Kolde)(Lehmann, Richard) (Entered: 09/30/2024) |
| 09/30/2024 | | Case assigned to Judge Steven J. McAuliffe and US Magistrate Judge Andrea K Johnstone. The case designation is: 1:24−cv−311−SM−AJ. Please show this number with the judge designation on all future pleadings. (mc) (Entered: 09/30/2024) |
| 09/30/2024 | | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click HERE. (mc) (Entered: 09/30/2024) |
| 09/30/2024 | 5 | Summonses issued electronically as to Bow High School, Athletic Director, Bow High School, Principal, Bow School District, Philip Lamy, Steve Rossetti, SAU 67, Superintendent. **NOTICE: Counsel shall print and serve the summonses and all attachments in accordance with Fed. R. Civ. P. 4.** (Attachments: # 1 Notice ECF)(mc) (Entered: 09/30/2024) |
| 09/30/2024 | 6 | Summons issued electronically as to SAU 67, Superintendent. **NOTICE: Counsel shall print and serve the summons and all attachments in accordance with Fed. R. Civ. P. 4.** (Attachments: # 1 Notice ECF)(mc) (Entered: 09/30/2024) |
| 10/04/2024 | 7 | Return of Service Executed as to SAU 67, Superintendent by All Plaintiffs. Served/Mailed on 9/30/2024. Answer Follow Up on 10/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 8 | Return of Service Executed as to Bow High School, Principal by All Plaintiffs. Served/Mailed on 9/30/2024. Answer Follow Up on 10/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and |

| | | |
|---|---|---|
| | | FRCrP 45(c).(Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 9 | **FILED IN ERROR − See doc. no. 13.** Return of Service Executed as to Philip Lamy by All Plaintiffs. Served/Mailed on 9/30/2024. Answer Follow Up on 10/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) Modified on 10/4/2024 to add: filed in error text (lw). (Entered: 10/04/2024) |
| 10/04/2024 | 10 | Return of Service Executed as to Bow High School, Athletic Director by All Plaintiffs. Served/Mailed on 9/30/2024. Answer Follow Up on 10/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 11 | Return of Service Executed as to Steve Rossetti by All Plaintiffs. Served/Mailed on 10/1/2024. Answer Follow Up on 10/22/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 12 | Return of Service Executed as to Bow School District by All Plaintiffs. Served/Mailed on 9/30/2024. Answer Follow Up on 10/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 13 | Return of Service Executed as to Philip Lamy by All Plaintiffs. Served/Mailed on 10/1/2024. Answer Follow Up on 10/22/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 14 | Emergency MOTION for Temporary Restraining Order and Preliminary Injunction filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. **HEARING REQUESTED.**Follow up on Objection on 10/18/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Memo in Support of TRO/PI, # 2 Proposed Order Proposed Orders for TRO and PI, # 3 Exhibit (Affidavit) Declaration of Kyle Fellers, # 4 Exhibit (Affidavit) Declaration of Andy Foote, # 5 Exhibit (Affidavit) Declaration of Nicole Foote, # 6 Exhibit (Affidavit) Declaration of Eldon Rash, # 7 Exhibit Ex A BSD Policy KFA, # 8 Exhibit Ex B Desilets Email, # 9 Exhibit Ex C Extracts from Handbook and NHIAA Policies, # 10 Exhibit Ex D Photo of wristband, # 11 Exhibit Ex E Facebook Post, # 12 Exhibit Ex F Kelley Statement, # 13 Exhibit Ex G Foote No Trespass Order (Redacted), # 14 Exhibit Ex H Fellers No Trespass Order (Redacted), # 15 Exhibit Ex I Fellers Addendum No Trespass Order (Redacted), # 16 Exhibit Ex J Fellers Second Addendum No Trespass (Redacted), # 17 Exhibit Ex K Kelley Email on Designated Protest Area, # 18 Exhibit Ex L Notice of Designated Protest Area, # 19 Exhibit Ex M Bow Soccer Field Map, # 20 Exhibit Ex N RTK email string with District and Lamy, # 21 Exhibit Ex O Police call log, # 22 Exhibit Ex P Photo from protest area to field, # 23 Exhibit Ex Q Photo from sideline to protest area)(Lehmann, Richard) Modified on 11/6/2024 to add: preliminary injunction text (lw). (Entered: 10/04/2024) |
| 10/04/2024 | 15 | Addendum/ to 14 Emergency MOTION for Temporary Restraining Order *Memo of Law* by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. (Lehmann, Richard) (Entered: 10/04/2024) |
| 10/04/2024 | 16 | NOTICE of Attorney Appearance by Brian J.S. Cullen on behalf of Bow High School, Athletic Director, Bow High School, Principal, Bow School District, SAU 67, Superintendent Attorney Brian J.S. Cullen added to party Bow High School, Athletic Director(pty:dft), Attorney Brian J.S. Cullen added to party Bow High School, Principal(pty:dft), Attorney Brian J.S. Cullen added to party Bow School District(pty:dft), Attorney Brian J.S. Cullen added to party SAU 67, Superintendent(pty:dft).(Cullen, Brian) (Entered: 10/04/2024) |
| 10/04/2024 | 17 | NOTICE of Attorney Appearance by Jonathan M. Shirley on behalf of Bow High School, Athletic Director, Bow High School, Principal, Bow School District, SAU 67, Superintendent Attorney Jonathan M. Shirley added to party Bow High School, Athletic Director(pty:dft), Attorney Jonathan M. Shirley added to party Bow High School, Principal(pty:dft), Attorney Jonathan M. Shirley added to party Bow School District(pty:dft), Attorney Jonathan M. Shirley added to party SAU 67, |

| | | |
|---|---|---|
| | | Superintendent(pty:dft).(Shirley, Jonathan) (Entered: 10/04/2024) |
| 10/04/2024 | 18 | NOTICE of Notice of Intent to File Objection *to Motion for TRO* by Bow School District.(Cullen, Brian) (Entered: 10/04/2024) |
| 10/04/2024 | | **ENDORSED ORDER granting 2 Motion to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by US Magistrate Judge Andrea K Johnstone.**<br><br>The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e−filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(mc)<br><br>(Entered: 10/07/2024) |
| 10/04/2024 | | **ENDORSED ORDER granting 3 Motion to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by US Magistrate Judge Andrea K Johnstone.**<br><br>The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e−filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(mc)<br><br>(Entered: 10/07/2024) |
| 10/04/2024 | | **ENDORSED ORDER granting 4 Motion to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by US Magistrate Judge Andrea K Johnstone.**<br><br>The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e−filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(mc)<br><br>(Entered: 10/07/2024) |
| 10/07/2024 | 19 | NOTICE of Attorney Appearance by Nathan John Ristuccia on behalf of Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash Attorney Nathan John Ristuccia added to party Kyle Fellers(pty:pla), Attorney Nathan John Ristuccia added to party Anthony Foote(pty:pla), Attorney Nathan John Ristuccia added to party Nicole Foote(pty:pla), Attorney Nathan John Ristuccia added to party Eldon Rash(pty:pla).(Ristuccia, Nathan) (Entered: 10/07/2024) |
| 10/07/2024 | 20 | NOTICE of Attorney Appearance by Endel Kolde on behalf of Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash Attorney Endel Kolde added to party Kyle Fellers(pty:pla), Attorney Endel Kolde added to party Anthony Foote(pty:pla), Attorney Endel Kolde added to party Nicole Foote(pty:pla), Attorney Endel Kolde added to party Eldon Rash(pty:pla).(Kolde, Endel) (Entered: 10/07/2024) |
| 10/07/2024 | | NOTICE OF HEARING re: 14 Emergency MOTION for Temporary Restraining Order. Motion Hearing set for 10/8/2024 02:30 PM before Judge Steven J. McAuliffe.(lw) (Entered: 10/07/2024) |
| 10/07/2024 | 21 | NOTICE of Attorney Appearance by Brett Robert Nolan on behalf of Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash Attorney Brett Robert Nolan added to party Kyle Fellers(pty:pla), Attorney Brett Robert Nolan added to party Anthony Foote(pty:pla), Attorney Brett Robert Nolan added to party Nicole Foote(pty:pla), Attorney Brett Robert Nolan added to party Eldon Rash(pty:pla).(Nolan, Brett) (Entered: 10/07/2024) |

| | | |
|---|---|---|
| 10/07/2024 | 22 | OBJECTION to 14 Emergency MOTION for Temporary Restraining Order filed by Bow School District. Follow up on Reply on 10/15/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit 1 − Desilets Declaration, # 2 Exhibit A − Declaration of Desilets, # 3 Exhibit B − Declaration of Desilets, # 4 Exhibit 2 − Kelley Declaration, # 5 Exhibit A − Declaration of Kelley, # 6 Exhibit 3 − Fisk Declaration, # 7 Exhibit 4 − Lamy Declaration)(Cullen, Brian) (Entered: 10/07/2024) |
| 10/08/2024 | 23 | NOTICE of Attorney Appearance by Eric Alexander Maher on behalf of Philip Lamy Attorney Eric Alexander Maher added to party Philip Lamy(pty:dft).(Maher, Eric) (Entered: 10/08/2024) |
| 10/08/2024 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe. MOTION HEARING held on 10/8/2024 re: 14 Emergency MOTION for Temporary Restraining Order. Hearing on Preliminary Injunction to be scheduled. Orders to issue. (Court Reporter: Jan−Marie Glaze) (Pltfs Atty: Endel Kolde, Nathan Ristuccia, Richard Lehmann) (Defts Atty: Brian Cullen, Jonathan Shirley, Eric Maher)(Total Hearing Time: 1 hr. 25 min.) (lw) (Entered: 10/08/2024) |
| 10/08/2024 | | **ENDORSED ORDER re: 14 Emergency MOTION for Temporary Restraining Order.** ***Text of Order: Denied, for the reasons discussed on the hearing record, specifically plaintiffs' failure to meet its burden to establish likelihood of success on the merits.*** **So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 10/08/2024) |
| 10/08/2024 | | **ENDORSED ORDER −** ***Text of Order: Defendants shall produce relevant body camera footage as part of the discovery in this matter, related to interactions with plaintiffs on September 17, 2024.*** **So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 10/08/2024) |
| 10/09/2024 | | NOTICE of Hearing. Evidentiary Hearing set for 11/21/2024 and 11/22/2024 09:30 AM before Judge Steven J. McAuliffe.(lw) (Entered: 10/09/2024) |
| 10/15/2024 | 24 | TRANSCRIPT of Proceedings for Motion Hearing held on October 8, 2024. Court Reporter: Jan−Marie Glaze, Telephone # 603 225−1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90−day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/5/2024. Redacted Transcript Follow Up 11/15/2024. Release of Transcript Restriction set for 1/13/2025.(lw) (Entered: 10/15/2024) |
| 10/17/2024 | 25 | MOTION Correct TRO docket text *to reflect actual order partially granting restraining order* filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 10/31/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Kolde, Endel) (Entered: 10/17/2024) |
| 10/17/2024 | 26 | MOTION EXPEDITED request to set hearing−related deadlines for Nov. 21−22 prelim. inj. hearing and hearing on the merits filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 10/31/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Kolde, Endel) (Entered: 10/17/2024) |
| 10/18/2024 | 27 | ///NOTICE of Voluntary Dismissal as to Phillip Lamy by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash(Kolde, Endel) (Entered: 10/18/2024) |
| 10/18/2024 | 28 | OBJECTION to 14 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Bow School District. Follow up on Reply on 10/25/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Cullen, Brian) (Entered: 10/18/2024) |

| | | |
|---|---|---|
| 10/21/2024 | 29 | **REPLACED − See doc. no. 34.** ANSWER to Complaint filed by Steve Rossetti.(Ducharme, Dennis) Modified on 10/23/2024 to add: replaced text (lw). (Entered: 10/21/2024) |
| 10/21/2024 | 30 | ANSWER to 1 Complaint − New Case,, with jury demand filed by Bow School District.(Cullen, Brian) (Entered: 10/21/2024) |
| 10/21/2024 | 31 | *Michael Desilet's* ANSWER to 1 Complaint − New Case,, with jury demand filed by Bow High School, Athletic Director.(Cullen, Brian) (Entered: 10/21/2024) |
| 10/21/2024 | 32 | *Marcy Kelley's* ANSWER to 1 Complaint − New Case,, with jury demand filed by SAU 67, Superintendent.(Cullen, Brian) (Entered: 10/21/2024) |
| 10/21/2024 | 33 | *Matthew Fisk's* ANSWER to 1 Complaint − New Case,, with jury demand filed by Bow High School, Principal.(Cullen, Brian) (Entered: 10/21/2024) |
| 10/22/2024 | 34 | *Signed Answer To correct filing error* ANSWER to Complaint filed by Steve Rossetti.(Ducharme, Dennis) (Entered: 10/22/2024) |
| 10/22/2024 | 35 | AMENDED COMPLAINT against Bow High School, Athletic Director, Bow High School, Principal, Bow School District, Steve Rossetti, SAU 67, Superintendent *(and not against former def. Phillip Lamy)* filed by Nicole Foote, Anthony Foote, Kyle Fellers, Eldon Rash. (Attachments: # 1 Exhibit A: Policy KFA, # 2 Exhibit B: Desilets email, # 3 Exhibit C: Extracts from handbook and policy, # 4 Exhibit D: Wristband photo, # 5 Exhibit E: Facebook post, # 6 Exhibit F: Kelley statement, # 7 Exhibit G: Foote no−trespass order, # 8 Exhibit H: Fellers no−trespass order, # 9 Exhibit I: 1st addendum, # 10 Exhibit J: 2nd addendum)(Kolde, Endel) (Entered: 10/22/2024) |
| 10/23/2024 | | **ENDORSED ORDER granting in part and denying in part 25 Motion Correct TRO docket text to reflect actual order partially granting restraining order. *Text of Order: Granted in part. The motion as filed was denied. The court's oral order is best understood as a separate order. But, no matter, the effect is clear to counsel for all parties as noted by them on the record.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 10/23/2024) |
| 10/25/2024 | 36 | RESPONSE to Motion re 26 MOTION EXPEDITED request to set hearing−related deadlines for Nov. 21−22 prelim. inj. hearing and hearing on the merits filed by Bow School District. (Cullen, Brian) (Entered: 10/25/2024) |
| 10/25/2024 | 37 | REPLY to Objection to Motion re 14 Emergency MOTION for Temporary Restraining Order *and Motion for Preliminary Injunction* filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. Surreply due by 10/30/2024. (Kolde, Endel) (Entered: 10/25/2024) |
| 11/01/2024 | 38 | MOTION in Limine to Present Proof First filed by Bow School District.Follow up on Objection on 11/15/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Cullen, Brian) (Entered: 11/01/2024) |
| 11/01/2024 | 39 | MOTION in Limine to Take Judicial Notice of Findings in Tirrell v. Edelblut filed by Bow School District.Follow up on Objection on 11/15/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Cullen, Brian) (Entered: 11/01/2024) |
| 11/04/2024 | 40 | ANSWER to 35 Amended Complaint,, with jury demand filed by Steve Rossetti.(Ducharme, Dennis) (Entered: 11/04/2024) |
| 11/04/2024 | 41 | NOTICE of Defendant Rossetti's Notice of no position on requests for imjunctive relief by Steve Rossetti.(Ducharme, Dennis) (Entered: 11/04/2024) |
| 11/04/2024 | 42 | ANSWER to 35 Amended Complaint,, with jury demand filed by Bow School District.(Cullen, Brian) (Entered: 11/04/2024) |
| 11/04/2024 | 43 | ANSWER to 35 Amended Complaint,, with jury demand filed by Bow High School, Athletic Director.(Cullen, Brian) (Entered: 11/04/2024) |
| 11/04/2024 | 44 | ANSWER to 35 Amended Complaint,, with jury demand filed by Bow High School, Principal.(Cullen, Brian) (Entered: 11/04/2024) |

| | | |
|---|---|---|
| 11/04/2024 | 45 | ANSWER to 35 Amended Complaint,, with jury demand filed by SAU 67, Superintendent.(Cullen, Brian) (Entered: 11/04/2024) |
| 11/04/2024 | 46 | MOTION in Limine to Preserve Defendants' Jury Trial Right filed by Bow School District.Follow up on Objection on 11/18/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Shirley, Jonathan) (Entered: 11/04/2024) |
| 11/06/2024 | 47 | **ORDER granting in part and denying in part 26 Motion EXPEDITED request to set hearing−related deadlines for Nov. 21−22 prelim. inj. hearing and hearing on the merits. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/06/2024) |
| 11/07/2024 | 48 | Assented to MOTION to Amend *Complaint to Eliminate Compensatory Damages* filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. (Attachments: # 1 Exhibit A: Second Amended Complaint, # 2 Exhibit B: Redline of Second Am. Complaint)(Kolde, Endel) (Entered: 11/07/2024) |
| 11/08/2024 | 49 | MOTION Expedited Motion to Reinstate Hearing on the Merits *due to absence of jury triable issues* filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 11/22/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Kolde, Endel) (Entered: 11/08/2024) |
| 11/09/2024 | 50 | RESPONSE to Motion re 39 MOTION in Limine to Take Judicial Notice of Findings in Tirrell v. Edelblut filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. (Kolde, Endel) (Entered: 11/09/2024) |
| 11/13/2024 | 51 | **ORDER granting 38 Motion in Limine to Present Proof First; denying 39 Motion in Limine to Take Judicial Notice of Findings in Tirrell v. Edelblut; denying as moot 46 Motion in Limine to Preserve Defendants' Jury Trial Right; granting 48 Assented to Motion to Amend Complaint to Eliminate Compensatory Damages; denying 49 Motion Expedited Motion to Reinstate Hearing on the Merits due to absence of jury triable issues. *At the conclusion of the motion hearing on November 21−22, the court will consult with counsel to set a pretrial schedule, including a date for a bench trial. See Rule 16.* So Ordered by Judge Steven J. McAuliffe. Second Amended Complaint due by 11/18/2024.(lw)** (Entered: 11/13/2024) |
| 11/14/2024 | 52 | SECOND AMENDED COMPLAINT against Bow High School, Athletic Director, Bow High School, Principal, Bow School District, Steve Rossetti, SAU 67, Superintendent *(Second Amended Complaint)* filed by Nicole Foote, Anthony Foote, Kyle Fellers, Eldon Rash. (Attachments: # 1 Exhibit A: Policy KFA, # 2 Exhibit B: Desilets email, # 3 Exhibit C: Handbook extracts, # 4 Exhibit D: Wristband photo, # 5 Exhibit E: Facebook post, # 6 Exhibit F: Kelley statement, # 7 Exhibit G: Foote NTO, # 8 Exhibit H: Fellers NTO, # 9 Exhibit I: 1st addendum, # 10 Exhibit J: 2d addendum)(Kolde, Endel) Modified on 11/14/2024 to add: "second" text (lw). (Entered: 11/14/2024) |
| 11/14/2024 | 53 | MOTION for Reconsideration re 51 Order on Motion in Limine,,,,,,,, Order on Motion to Amend,,, Order on Motion for Miscellaneous Relief,, *(requesting the Court to reinstate the original order of proof as it had originally ordered)* filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 11/29/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Kolde, Endel) (Entered: 11/14/2024) |
| 11/14/2024 | 54 | Final Witness List *For 11/21 and 22 Hearing* by Steve Rossetti. (Ducharme, Dennis) (Entered: 11/14/2024) |
| 11/14/2024 | | **ENDORSED ORDER granting in part and denying in part 53 Motion for Reconsideration re: 51 Order on Motions. *Text of Order: The court granted defendants' motion in limine to present proof on the First Amendment issue at the hearing to be held next week before plaintiffs' presentation because defendants will bear the burden to justify restrictions on plaintiffs' speech. As the court noted, plaintiffs had not then objected to the reverse order of proof. Plaintiffs now object and ask the court to reconsider allowing defendants to proceed first on that issue. The order of proof will be addressed and decided at the hearing, if necessary, after the parties' presentations on the question of mootness. Plaintiffs' motion for reconsideration (doc. no. 53) is granted in part and denied in part as provided in this*** |

| | | |
|---|---|---|
| | | ***order.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/15/2024) |
| 11/15/2024 | 55 | Final Witness List by Bow School District, SAU 67, Superintendent, Bow High School, Athletic Director, Bow High School, Principal. (Cullen, Brian) (Entered: 11/15/2024) |
| 11/15/2024 | 56 | Final Witness List *for Nov. 21−22 Hearing (Plaintiffs)* by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. (Kolde, Endel) (Entered: 11/15/2024) |
| 11/18/2024 | 57 | Defendant's Revised List of Exhibits by Bow School District, SAU 67, Superintendent, Bow High School, Athletic Director, Bow High School, Principal(Cullen, Brian) (Entered: 11/18/2024) |
| 11/18/2024 | 58 | Plaintiff's Exhibit List for Nov. 21−22 Hearing by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash(Kolde, Endel) (Entered: 11/18/2024) |
| 11/18/2024 | 59 | BRIEF/MEMORANDUM *(Prehearing) of Bow School District* by Bow School District(Shirley, Jonathan) (Entered: 11/18/2024) |
| 11/18/2024 | 60 | BRIEF/MEMORANDUM *Plaintiffs' Pre−Hearing Brief* by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash(Kolde, Endel) (Entered: 11/18/2024) |
| 11/21/2024 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe. EVIDENTIARY HEARING held on 11/21/2024 re: Preliminary Injunction. Witnesses Appearing: Kyle Fellers, Anthony Foote. (Court Reporter: Liza Dubois − AM Session; Susan Bateman − PM Session) (Pltfs Atty: Endel Kolde, Nathan Ristuccia, Richard Lehmann) (Defts Atty: Brian Cullen, Jonathan Shirley, Dennis Ducharme)(Total Hearing Time: 4 hrs. 52 min.) (lw) (Entered: 11/22/2024) |
| 11/22/2024 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe. EVIDENTIARY HEARING held on 11/22/2024 re: Preliminary Injunction. Witnesses Appearing: Eldon Rash, Marcy Kelley, Michael Desilets, Steve Rossetti, Matthew Fisk. (Court Reporter: Susan Bateman − AM Session; Brenda Hancock − PM Session) (Pltfs Atty: Endel Kolde, Nathan Ristuccia, Richard Lehmann) (Defts Atty: Brian Cullen, Jonathan Shirley, Dennis Ducharme)(Total Hearing Time: 3 hrs. 15 min.) (lw) (Entered: 11/22/2024) |
| 11/22/2024 | | ORAL RENEWED MOTION for Temporary Restraining Order filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.(lw) (Entered: 11/22/2024) |
| 11/22/2024 | | **ORAL ORDER denying [] Oral Renewed Motion for Temporary Restraining Order. So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/22/2024) |
| 11/22/2024 | 61 | Final Witness List re: Evidentiary Hearing on Preliminary Injunction Motion by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. (lw) (Entered: 11/22/2024) |
| 11/22/2024 | 62 | Final Witness List by Bow School District, SAU 67, Superintendent, Bow High School, Athletic Director, Bow High School, Principal. (lw) (Entered: 11/22/2024) |
| 11/22/2024 | 63 | Final Exhibit List re: Evidentiary Hearing on Preliminary Injunction Motion by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash. (lw) (Entered: 11/22/2024) |
| 11/22/2024 | 64 | Final Exhibit List re: Evidentiary Hearing on Preliminary Injunction Motion by Bow School District, SAU 67, Superintendent, Bow High School, Athletic Director, Bow High School, Principal. (lw) (Entered: 11/22/2024) |
| 12/02/2024 | 65 | TRANSCRIPT of Proceedings for Evidentiary Hearing − Day 1 held on November 21, 2024. Court Reporter: Susan Bateman − PM Session, Telephone # 603 225−1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90−day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** |

| | | |
|---|---|---|
| | | Redaction Request Follow Up 12/23/2024. Redacted Transcript Follow Up 1/2/2025. Release of Transcript Restriction set for 3/3/2025.(lw) (Entered: 12/02/2024) |
| 12/02/2024 | 66 | TRANSCRIPT of Proceedings for Evidentiary Hearing − Day 2 held on November 22, 2024. Court Reporter: Susan Bateman − AM Session, Telephone # 603 225−1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90−day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/23/2024. Redacted Transcript Follow Up 1/2/2025. Release of Transcript Restriction set for 3/3/2025.(lw) (Entered: 12/02/2024) |
| 12/02/2024 | 67 | TRANSCRIPT of Proceedings for Evidentiary Hearing − Day 1 held on November 21, 2024. Court Reporter: Liza Dubois − AM Session, Telephone # 603 225−1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90−day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/23/2024. Redacted Transcript Follow Up 1/2/2025. Release of Transcript Restriction set for 3/3/2025.(lw) (Entered: 12/02/2024) |
| 12/02/2024 | 68 | ANSWER to 52 Amended Complaint,, with jury demand filed by Bow School District.(Cullen, Brian) (Entered: 12/02/2024) |
| 12/02/2024 | 69 | ANSWER to 52 Amended Complaint,, with jury demand filed by Bow High School, Athletic Director.(Cullen, Brian) (Entered: 12/02/2024) |
| 12/02/2024 | 70 | ANSWER to 52 Amended Complaint,, with jury demand filed by Bow High School, Principal.(Cullen, Brian) (Entered: 12/02/2024) |
| 12/02/2024 | 71 | ANSWER to 52 Amended Complaint,, with jury demand filed by SAU 67, Superintendent.(Cullen, Brian) (Entered: 12/02/2024) |
| 12/02/2024 | 72 | TRANSCRIPT of Proceedings for Evidentiary Hearing − Day 2 held on November 22, 2024. Court Reporter: Brenda Hancock − PM Session, Telephone # 603 225−1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90−day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/23/2024. Redacted Transcript Follow Up 1/2/2025. Release of Transcript Restriction set for 3/3/2025.(lw) (Entered: 12/02/2024) |
| 12/13/2024 | 73 | BRIEF/MEMORANDUM *Closing Brief on Plaintiff's Request for a Preliminary Injunction* by Bow School District(Shirley, Jonathan) (Entered: 12/13/2024) |

| | | |
|---|---|---|
| 12/13/2024 | 74 | BRIEF/MEMORANDUM *Plaintiffs' Post−Hearing Brief In Support of Preliminary Injunction* by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash(Kolde, Endel) (Entered: 12/13/2024) |
| 12/16/2024 | 75 | BRIEF/MEMORANDUM *Plaintiffs' Reply to Def. Post−Hearing Brief re Preliminary Injunction* by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash(Kolde, Endel) (Entered: 12/16/2024) |
| 12/17/2024 | 76 | Assented to MOTION to Extend Time to File a reply to Plaintiffs' Post Hearing Brief filed by Bow School District. (Attachments: # 1 Exhibit 1 − Bow SD's Reply to Plaintiffs' Post−Hearing Brief)(Cullen, Brian) (Entered: 12/17/2024) |
| 12/29/2024 | | **ENDORSED ORDER granting 76 Assented to Motion to Extend Time to File a reply to Plaintiffs' Post Hearing Brief. *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 12/30/2024) |
| 01/03/2025 | 77 | ///STIPULATION of Dismissal as to as to Defendant Steve Rossetti only by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash(Kolde, Endel) (Entered: 01/03/2025) |
| 01/06/2025 | | **ENDORSED ORDER re: 77 Stipulation of Dismissal as to as to Defendant Steve Rossetti only. *Text of Order: Stipulation approved; case dismissed as to defendant Rossetti.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 01/06/2025) |
| 01/30/2025 | | **ENDORSED ORDER. *Text of Order: Defendants moved for an extension of time to file a reply and appended the proposed reply but failed to seek leave to file the reply. Doc. no. 76. The court granted extra time. End. Or. 12/29/2024. To date defendants have neither filed the reply nor sought leave to file the reply. Assuming that omission is an oversight, the court grants defendants leave to file the reply. Within 3 days, counsel shall electronically refile the reply attached to the motion for an extension of time, using the appropriate event in CMECF.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 01/30/2025) |
| 01/30/2025 | 78 | BRIEF/MEMORANDUM re 74 Brief *Reply to post−hearing brief* by Bow School District(Cullen, Brian) (Entered: 01/30/2025) |
| 02/26/2025 | 79 | MOTION to Expedite Decision on Plaintiffs' motion for preliminary injunction *by no later than April 14, 2025* filed by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.Follow up on Objection on 3/12/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) : 2d Nicole Foote declaration, # 2 Exhibit R: HS lacrosse schedule, # 3 Exhibit S: MS lacrosse schedule, # 4 Exhibit (Affidavit) : 2d Anthony Foote declaration, # 5 Exhibit (Affidavit) : 2d Kyle Fellers declaration, # 6 Proposed Order)(Kolde, Endel) (Entered: 02/26/2025) |
| 04/14/2025 | 80 | **ORDER re: 14 Emergency MOTION for Temporary Restraining Order and Preliminary Injunction. *For the forgoing reasons, as well as those articulated in defendants' legal memoranda (documents no. 22 and 73), plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims. Consequently, their Motion for Preliminary Injunction (document no. 14) is necessarily denied. If appropriate, the parties should advise the clerk within fourteen (14) days if they wish to supplement the evidentiary record or submit supplemental briefing in advance of a ruling on plaintiffs' request for permanent injunctive relief. So Ordered by Judge Steven J. McAuliffe.(lw)*** (Entered: 04/14/2025) |
| 04/14/2025 | | **ENDORSED ORDER granting 79 Motion to Expedite Decision on Plaintiffs' motion for preliminary injunction by no later than April 14, 2025. *Text of Order: Granted; order issued today.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 04/14/2025) |
| 04/14/2025 | 81 | NOTICE of Plaintiffs on Permanent Injunction as directed by Dkt. 80 *(no supplementation needed)* by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.(Kolde, Endel) (Entered: 04/14/2025) |
| 05/02/2025 | 82 | NOTICE OF INTERLOCUTORY APPEAL as to 80 Order,, by Kyle Fellers, Anthony Foote, Nicole Foote, Eldon Rash.(Filing fee $ 605, receipt number ANHDC−2631107.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit |

| | | |
|---|---|---|
| | | website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.] (Ristuccia, Nathan) (Entered: 05/02/2025) |
| 05/05/2025 | 83 | Appeal Cover Sheet as to 82 Notice of Interlocutory Appeal, filed by Nicole Foote, Eldon Rash, Anthony Foote, Kyle Fellers. (lw) (Entered: 05/05/2025) |
| 05/05/2025 | 84 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 80 through 84, re 82 Notice of Interlocutory Appeal.(lw) (Entered: 05/05/2025) |
| 05/05/2025 | | Appellate Case Number: First Circuit Court of Appeals 25−1442 re: 82 Notice of Interlocutory Appeal, filed by Nicole Foote, Eldon Rash, Anthony Foote, Kyle Fellers.(lw) (Entered: 05/05/2025) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT;<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

# SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

## INTRODUCTION

Public schools are charged with educating children about America's basic civic values, its Constitution, and the fundamental rights it guarantees. But when an opportunity arose to teach students about how important the First Amendment is to American liberty, Bow School District officials did the opposite—acting as though the First Amendment does not apply in public school buildings, on school grounds, at playing fields, or even during off-campus extracurricular activities. According to these officials, Bow School District property is a First Amendment free zone, from

which they can banish parents who speak in ways the government dislikes. And that's exactly what they did.

When several parents and a grandfather decided to wear pink wristbands at their children's soccer game in support of protecting women's sports for biologically female athletes, school officials threatened to have them arrested for trespass and nearly forced their children to forfeit the game. They conspired with a soccer referee to intimidate parents, enforce the school's unconstitutional rules, and prevent anyone from exercising their rights to speech, petition, and assembly. Following that game, the school banned those who dared to take a stand from not just future games, but from all other school property as well.

But public-school facilities are not private property. As the Supreme Court held over fifty years ago, the Constitution protects the rights of all "persons"—parents and students alike—to express their opinions, even on controversial subjects "in school as well as out of school," "in the cafeteria, or on the playing field, or on the campus." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 511, 512-13 (1969). And Bow School District's ban on demonstrations criticizing the decision to allow biological boys to play girls' soccer—cloaked in the language of "disruption" and "harassment"—is unconstitutional viewpoint discrimination.

The First Amendment does not allow state-operated schools to become "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. Plaintiffs are entitled to relief securing their fundamental rights to free expression, petition, and assembly.

## THE PARTIES

1. Plaintiff Kyle Fellers is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint.

2. Plaintiff Anthony "Andy" Foote is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint.

3. Plaintiff Nicole Foote is a natural person and a citizen of New Hampshire and the United States. She resides in Bow and has resided in Bow during all times relevant to her past actions mentioned in this complaint.

4. Plaintiff Eldon Rash is a natural person and a citizen of New Hampshire and the United States. He resides in Bedford and has resided in Bedford during all times relevant to his past actions mentioned in this complaint.

5. Defendant Marcy Kelley is the Superintendent of Schools of State Administrative Unit 67, which is made up of the Bow and Dunbarton School Districts, and has held that position during all times relevant to the events in this complaint. She is sued in her official and individual capacities.

6. Defendant Michael Desilets is the Athletic Director of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

7. Defendant Matt Fisk is the principal of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

8. Defendant Steve Rossetti is a soccer referee with the New Hampshire Interscholastic Athletic Association (NHIAA) and has held that position during all times relevant to the events in this complaint. He is sued in his individual capacity.

9. Defendant Bow School District is a New Hampshire school district and part of School Administrative Unit 67 (Bow & Dunbarton School Districts).

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because this action presents questions of federal law and challenges Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

11. Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and are occurring in this judicial district and because Defendants all reside in this district.

## STATEMENT OF FACTS

### *Bow School District Policies on Speech at Extracurricular Events*

12. Bow School District, the public school district in the town of Bow, New Hampshire, has a school board policy (Policy KFA) on "Public Conduct at School Property." This policy regulates the behavior of "all individuals on school property

or at a school event" in "any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private."

13. Exhibit A is a true and correct copy of Policy KFA. The policy is also available on Bow School Board's website at https://sites.google.com/a/bownet.org/bow-school-board/policies_1.

14. Although entitled a policy on "conduct," Policy KFA regulates speech as well as conduct. Policy KFA states that "[t]he School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." The policy mandates, among other things, that no person shall "1. Injure, threaten, harass, or intimidate . . . any other person" or "7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner)."

15. Bow School District enforces Policy KFA by ordering alleged violators to leave school grounds, by contacting law enforcement, and by issuing "No Trespass" letters.

16. Bow High School's Athletics Handbook also regulates the speech and conduct of spectators at Bow High School games. The Handbook states that "[p]oor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands." It also tells spectators to avoid certain kinds of speech such as "cheering *against* the team," "us[ing] the names or numbers of opposing teams," or "trying to directly communicate" with players.

17. As a member of the NHIAA, Bow High School annually commits itself to follow all guidelines and policies set forth by the NHIAA. Failure to comply with NHIAA guidelines can, among other things, cause Bow High School to forfeit games or become ineligible to compete in post-season tournaments.

18. Under the 2024 NHIAA Soccer Policies and Procedures, "[a]ll teams must complete their entire schedule submitted to the NHIAA" and an NHIAA committee determines "if [scheduled] games not played will be considered a forfeit(s) or a no game(s)."

*The September 17 Soccer Game*

19. On September 10, 2024, this Court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to biological females. *See Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024).

20. One of the plaintiffs in *Tirrell v. Edelblut* is a biological male who plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's soccer team was scheduled to play the Plymouth Regional team on September 17, 2024.

21. On or about September 13, Nicole Foote, the mother of a player on the Bow High School girls' soccer team, met in person with Bow High School's Athletic Director, Mike Desilets, to complain about the competitive unfairness and injury risk to female athletes inherent in allowing biological males participate in women's

sports. Desilets told Nicole that the court decision prevented the school district from doing anything about the situation.

22. On September 16, the evening before the game, Desilets emailed soccer families, warning them that "Bow High School's status as a member of the NHIAA" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets also claimed that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

23. Exhibit B is a true and correct copy of Desilets' email.

24. Desilets attached to his email a document containing relevant extracts from the Athletics Handbook and the 2024 NHIAA Soccer Policies and Procedures.

25. Exhibit C is a true and correct copy of this extracts document.

26. People attending soccer games and other extracurricular activities on Bow School District property regularly wear apparel showing support for political and social causes, such as shirts supporting political candidates, displaying the Pride Flag, or expressing messages about global warming.

27. Two parents whose daughters play on the girls' soccer team, Kyle Fellers and Anthony "Andy" Foote (Nicole's husband), decided to attend the game and silently express their opinion about the importance of reserving women's sports for biological females. They agreed to wear pink wristbands, purchased off Amazon.

28. As purchased, these wristbands were the type of pink bands that athletes often wear to raise awareness about breast cancer and had no writing on them. The night before the game, Andy Foote decorated their wristbands with two black Xs, symbolizing the female chromosomes.

29. Exhibit D is a true and correct photograph of one of these wristbands.

30. Andy Foote posted on Facebook that night, stating that he would be attending the September 17 game to show solidarity with the girls' team.

31. Exhibit E is a true and correct photograph of this Facebook post.

32. Foote's and Fellers' daughters asked if any of their teammates wanted to wear a wristband in support of women's sports. But, since they could not get full support from the team, no one on the team wore wristbands.

*Events at the September 17 Soccer Game*

33. On September 17, Fellers, Andy Foote, and Nicole Foote attended Bow High School's varsity girls' soccer game, along with other family members. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus.

34. None of these parents wore a wristband during the first half. Andy Foote distributed wristbands to his wife (who did not put it on) and to around half a dozen other spectators who requested one—although Foote told them not to put the bands on until the second half. Fellers and the Footes watched the first half with other parents and cheered for the teams. They did not shout, chant, march, or waive signs about biological males competing in women's sports.

35. At halftime, Andy Foote went to the parking lot and put a sign of Riley Gaines on his Jeep's windshield. Both he and Fellers wore pink wristbands featuring two black Xs at the sidelines at the beginning of the second half.

36. For the first ten minutes of the second half, the two men continued to watch the game without incident or disruption. They did not shout, chant, march, or waive signs about biological males competing in women's sports. Beyond these wristbands, nothing indicated that any of the parents were protesting.

37. Approximately ten minutes into the second half, Athletic Director Desilets approached Andy Foote to tell him that he was not allowed to protest at the game and had to take off the wristband. Foote objected, citing the First Amendment. But when Desilets persisted, Foote removed the wristband.

38. Desilets then told Fellers that he was not allowed to protest at the game and had to take off the wristband. When Fellers refused to obey, Desilets walked a short distance away to speak with Principal Matt Fisk and Bow Police Lieutenant Phil Lamy. Fisk then approached and repeated that Fellers had to remove the wristband or leave the game. After heated words, Fellers again refused.

39. At the direction of Bow School District officials, Lt. Lamy then told Fellers that he had to either leave the game or remove the wristband. According to Lamy, the First Amendment did not apply as Fellers was on "private property." The interaction between Fellers and the school officials and police officer grew heated. Lamy wore a body camera, which he eventually activated to record some of the interaction.

40. Fellers finally removed his wristband but continued to hold it in his hand.

41. Eldon Rash, Feller's former father-in-law (his ex-wife's stepfather) observed some of the commotion caused by officials and asked what was happening. Rash and Fellers did not attend the game together, and Rash was until that point unaware of the wristband demonstration.

42. After Fellers explained the situation, Rash took the wristband from Fellers' hand and put it around his own wrist. Fisk and Desilets then pressured Rash into leaving the game or taking off the wristband. Andy Foote filmed some of this interaction on his cellphone camera.

43. Fellers voiced his opposition to Defendants' censorship by accusing them of harassment, invoking the U.S. Constitution, and drawing an analogy to Germany in the 1930's and 1940's. Fellers proceeded to call Desilets a "coward" for not standing up form women's sports, causing Desilets to jerk his thumb at Lamy for Fellers to be sent off, and Lamy immediately follows Desilets's instruction, ordering Fellers to leave the game, while Fisk stood nearby.

44. After Lamy told Fellers to leave the game, Fellers immediately left to go to his car. Other than moving his car to obtain a better view of the game from the parking lot, he remained by his car for the rest of the game. As he was leaving the sidelines, Fellers expressed his opinion that the officials present were "a bunch of Nazis." Fisk, Desilets, and Lamy were within earshot.

45. After Lamy told Fellers to leave the game, he asked Fisk whether Fisk wants Eldon Rash "gone too?" Fisk responded affirmatively, if Rash "doesn't take it off," referring to the pink wristband marked with XX.

46. During this time, Fisk also repeatedly stood next to a seated Rash, instructing Rash to remove the wristband and at least once threatening that "if this game doesn't continue it's going to have an adverse impact on your granddaughter."

47. Steve Rossetti, the head referee, stopped play and told both teams to return to their benches. According to Rossetti, he stopped the game because the soccer players could overhear "you guys arguing" about "the First Amendment thing." The game did not restart for about 15 minutes. Speaking to the spectators on the sidelines, Rossetti stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if the wristbands were not all removed. Rossetti said that Rash had "no right to embarrass the kids" and that if he did not take the wristband off "the game is over." Speaking directly to Rash, Rosetti repeatedly said "just take it off."

48. Rash eventually did take off the wristband and put it on his lap. Shortly thereafter, Ben Forbes, another school official, walked past the parents' sideline, turned and directly observed Rash, who was sitting, facing the soccer pitch. As Forbes walked back toward the sidelines, he used a hand-held radio to inform "Mike" (Desilets) that "he took it off."

49. During this time that Forbes was surveilling Rash and his removal of the wristband, Rossetti, Desilets, Fisk, and at least one other person, had an on-field

meeting. They did not allow the game to resume play until after Forbes radioed Desilets that Rash had taken off the wristband.

50. The game eventually concluded without further incident.

51. During the stoppage of play other parents on the sidelines vocally expressed opposition to Plaintiffs passively wearing wristbands, advocating that Plaintiffs remove the wristbands, "write a letter to someone," "take it off," and "stop hurting the girls" while Fisk and Desilets were within earshot. None of the parents expressing opposition to Plaintiffs' speech were asked to stop speaking, threatened with removal from the game, threatened with arrest, or trespassed from future games or school property.

52. The Bow School District has also allowed pro-trans and pro-LGBTQ+ viewpoints to be promoted on school property in other ways. For example, at least as recently as June 2024, a large Progress Pride flag was displayed prominently in the music room at Bow High School, where it was visible to students, staff, and visitors.

53. The following image is a fair and accurate illustration of the Progress Pride flag displayed in the music room, bearing the same colors and design:



54. The Progress Pride flag was designed to be more inclusive than the legacy Rainbow flag by adding black, brown, and white stripes to represent communities of color, transgender individuals, and those living with HIV/AIDS. The original Pride flag, also known as the Rainbow flag, does not explicitly represent these communities.

55. The Progress Pride flag features a chevron shape along the hoist (left side or top) with the added stripes, whereas the traditional Pride flag has a horizontal stripe design. The chevron shape is meant to symbolize forward movement and progress, while also acknowledging that there is still work to be done.

56. The Progress Pride flag's design and colors are intended to bring attention to the struggles and contributions of marginalized communities within the LGBTQ+

movement, whereas the traditional Pride flag is often seen as a symbol of unity and celebration for the entire LGBTQ+ community.

57. The Progress Pride flag was developed in 2018 by non-binary American artist and designer Daniel Quasar (who uses xe/xyr pronouns). Based on the iconic rainbow flag from 1978, the redesign celebrates the diversity of the LGBTQ+ community and calls for a more inclusive society.

58. Displaying the Progress Pride flag amounts to passive sociopolitical commentary on the issue of transgender inclusion and women's sex-based rights, similar to wearing a pink wristband with the letters XX, although from a different viewpoint. In addition to representing a different viewpoint, the Progress Pride flag displayed in the Bow High School music room also was much larger, more prominent, and more visible than Plaintiffs' wristbands. No one was trespassed, disciplined, or excluded from Bow High School for displaying the Progress Pride flag on school property, including in the music room.

*Events in the Parking Lot after the Game*

59. Fellers watched the rest of the game from his car, in the parking lot next to the soccer field, although he moved parking spots to get a better view. Once the game ended, Fellers stood by his car, holding a hand-written poster reading "Protect Women's Sports for Female Athletes" over his head. The same poster had been displayed on his parked car during the game.

60. Fellers has observed other vehicles parked at Bow School facilities bearing bumpers stickers and political and social messages, including expressing support for

political candidates, displaying a rainbow flag in the shape of New Hampshire, and the pro-liberty motto "Live Free or Die."

61. As the spectators and teams left to go to their vehicles, some expressed support for Fellers' message while others criticized him. Rossetti, the referee who had threatened to cancel the game and make Bow forfeit, expressed his own opinion that "this is not the time or place" for Fellers's expression of opinion, called Fellers a "f***ing a**hole" and told him that his daughter would hate him. No one prevented Rossetti from engaging in sociopolitical commentary on school property, or from expressing his disagreement with Fellers's views.

62. After being instructed to do so by Desilets, Lamy approached Fellers and demanded to know why he had not already left the grounds. Fellers replied that he had only been told to leave the soccer game—not the parking lot, a fact later confirmed by the bodycam video. Nonetheless, Lamy insisted that Fellers immediately leave all school property.

63. Fellers informed Lamy that he still had to pick up his children and sister. Lamy said that the children and sister could walk. A second Bow police officer, Sergeant Robert Welch, and Andy Foote both then arrived and de-escalated the situation. Lamy did not arrest Fellers and ultimately allowed Fellers to collect his family members before leaving the school property.

*The No Trespass Orders*

64. On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the previous night. According to Kelley, "late in the

game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"—presumably referring to Desilets' email.

65. Exhibit F is a true and correct copy of Kelley's statement.

66. Kelley attached to her statement Policy KFA and the same document of extracts from NHIAA's Soccer Policies and from the Bow High School Athletics Handbook that Desilets had sent two days before. *See* Exs. A and C.

67. On September 19, Andy Foote received a "No Trespass Order" in the mail from Superintendent Kelley. This Order stated that Foote was "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until further notice.

68. According to the Order, the reason for Foote's ban is that "prior to and during the soccer game" he "brought and distributed pink armbands to parents and other attendees to protest" and "participated and led the protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

69. The Order stated that Foote's behavior violated Policy KFA's requirement "that attendees at sporting events and extracurricular activities demonstrate mutual respect, civility, and orderly conduct," as well as Policy KFA's prohibition of

"threatening, harassing, or intimidating . . . any other person" and of conduct that shall "impede, delay, disrupt, or otherwise interfere with any school activity."

70. Although the Order was originally only in effect "through September 23, 2024," Kelley noted that the Order "will be extended for the duration of the fall sports seasons" if Foote did anything to violate it and that it "may potentially be extended until the end of the season" even if Foote obeyed.

71. Exhibit G is a true and correct copy of the document the No Trespass Order that Foote received.

72. On September 20, Kyle Fellers received a "No Trespass Order" in the mail from Superintendent Kelley. This order is essentially identical to Foote's order, with two main differences.

73. First, the Order gives a different reason for Fellers' ban: that Fellers had "led a protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

74. Second, Fellers' order is in effect "for the remainder of the fall sports season" and "may also be extended until the end of the school year" if violated.

75. Exhibit H is a true and correct copy of the No Trespass Order that Fellers received.

76. On September 25, Fellers received an "Addendum" to the No Trespass Order in the mail from Superintendent Kelley. The Addendum clarified that the original Order did not prevent Fellers entering school grounds "for the limited

purpose of participating in middle school parent pick-up" as well as for various administrative purposes such as voting or school board meetings. Notably absent from the list of permitted purposes, however, were games, sports practices, extracurricular activities, drop-off, and high school pick-up.

77. Exhibit I is a true and correct copy of the Addendum.

78. After Fellers emailed Kelley about the difficulties that the trespass order caused him in transporting his kids to and from school, Kelley sent him a second Addendum on September 26. The Second Addendum added pick-up and drop-off from both the middle school and high school to the list of permitted reasons to enter school grounds. However, the Second Addendum expressly stated that Fellers remains prohibited from picking up and dropping off his child for high school soccer events. And, implicitly, Fellers remains prohibited from entering school grounds for cross county drop-off or pick-up, and for any other games, sports practices, and extracurricular activities.

79. Exhibit J is a true and correct copy of the Second Addendum.

80. After the filing of this lawsuit, Defendants Kelley, Desilets, and Fisk all submitted declarations detailing that Plaintiffs, and especially Kyle Fellers, were subjected to adverse actions by officials because of their speech, including Fellers's criticism of school officials.

81. Marcy Kelly declared, under penalty of perjury, that Fellers received a longer no-trespass order in part because of "abuse of school administrators" and his "prolonged refusal to remove his wristband." Dkt. 22-4 at 3.

82. Michael Desilets declared, under penalty of perjury, that he asked Lamy to remove Fellers from the game after Fellers "told Fisk and/or me that he should be supporting women and called them cowards." Dkt. 22-1 at 4. Shortly thereafter, Desilets saw Fellers holding a sign in the parking lot and asked Lamy to instruct Fellers to leave the premises. *Id.*

83. Matthew Fisk similarly declared, under penalty of perjury, that after "Fellers again called one or both of us cowards, Desilets asked Lt. Lamy to remove Fellers from the area." Dkt. 22-6 at 3.

*The Designated Protest Area*

84. On October 1, the day after this lawsuit was filed, Superintendent Kelley sent an email informing parents that future protests at school events must occur in a designated protest area or they "may be deemed as disruptive and result in the game being suspended." Kelley stated that Bow School District "want[s] to be able to continue to have spectators at our games for the rest of the season," suggesting that all spectators may be banned if people disobey this new regulation concerning the designated protest area. Kelley attached a Notice of a Designated Protest Area.

85. Ex. K is a true and correct copy of Kelley's email on the protest area.

86. According to the Notice, the Designated Protest Area is the sole location "on any school District properties" where "campus visitors" may engage in "protests and other free speech exercises." This Designated Protest Area is marked off and located in front of the soccer scoreboard—located beside the parking lot, about 50 yards further from the soccer field than where parents normally sit—and is only

open "for 30 minutes before and 30 minutes after" girls' soccer games. There is "no designated area for protest outside of this timeframe" and "[t]his is the only designated area for any visitors to engage in protests on any school District properties." No more than 50 people may gather in the designated area. Violating the new regulation regarding the Designated Protest Area "will result in removal from District property."

87. Ex. L is a true and correct copy of the Notice of a Designated Protest Area.

*The Immediate Impact of Defendants' Actions on Plaintiffs*

88. Andy Foote obeyed the No Trespass Order through its expiration on September 23, 2024. As a result, he could not attend Bow High School's homecoming game on September 20, in which his daughter played, the football homecoming game, or his youngest daughter's soccer game on September 23.

89. After the No Trespass Order expired, Andy and Nicole Foote attended the soccer game on September 24. They wore pink wristbands to the game, but because of their long-sleeved shirts, they do not believe these wristbands were visible or easy to see. Many other people, including a large group from the nationally known organization Moms for Liberty, were protesting at the game by wearing pink wristbands. No disruption or incident occurred.

90. Immediately before the start of the September 24 game, the Bow High School varsity girls' squad wore bright pink warm-up jerseys on the field. The warm-up jerseys were similar in color to the Plaintiffs' pink wristbands. No

disruption occurred, although at later games some of the players opted not to wear the pink warm-up jerseys, while others did.

91. Fellers also obeyed the No Trespass Order after receiving it, through this Court's partial grant of a temporary restraining order on October 8, 2024, allowing Fellers to return to soccer games and pick up his daughter from practice, although not yet protest. This was difficult and inconvenient, as Fellers has two children in Bow School District schools. He was forced to arrange for other people to shuttle his children to and from school and their extracurricular activities.

92. On September 25, for example, Fellers could not attend his son's cross country meet and had to arrange for family members to pick his son up at school and drive him two towns away to attend the away meet.

93. Likewise, Fellers could not attend Bow High School's homecoming game on September 20, in which his daughter played.

94. Fellers' children also both have late afternoon sports practices. As a result, they must be picked up when the school buses are not operating. Fellers has been forced to let his daughter drive his car.

*The Continuing Impact of Defendants' Actions on Plaintiffs*

95. If Bow School District permitted them to do so, Plaintiffs would continue attending sporting events and other extracurricular events, on and off school grounds, throughout not only the fall sports season but throughout the current school year and the years to come. If permitted, Plaintiffs would silently protest on

the sidelines near the field of play in support of women's sports at some of these events, including by wearing pink wristbands of the sort that Defendants forbid.

96. If permitted, Fellers would come onto school property to drop off or pick up his children from practices, games, concerts, and other events. He believes, however, that such action would lead to his arrest and prosecution for criminal trespass. He also fears such action would also cause Defendants to extend the No Trespass Order until the end of the school year. *See* Exhibit H. Until this Court's order on October 8, 2024, Fellers was unable to enter school property for soccer-related reasons, even if he did not protest in any way.

97. If permitted, Fellers would attend each of the remaining soccer games on the schedule through October 25 and any playoff games, as well as swim meets, cross country meets, and other sporting events or extracurricular activities, this year and in future years. He would also silently protest at each of the remaining soccer games, as well as other events, in defense of women's sports, by wearing a pink wristband, by distributing wristbands, or by holding signs in the parking lot. He would protest near the field of play, rather than in the Designated Protest Area. He believes, however, that these actions would all violate the No Trespass Order, lead to his arrest or imposition of a new or extended order, and potentially cause Bow High School sports teams to forfeit games or impair their chances of making the playoffs.

98. If permitted, Fellers would also silently protest at each of these soccer games, as well as swim meets, cross country meets, and other sporting events or

extracurriculars against Bow School District's violation of the First Amendment. He believes, however, that this would violate the No Trespass Order and the school's policy against protesting in defense of women's sports, lead to his arrest or imposition of a new or extended order, and potentially cause Bow School District sports teams to forfeit games or impair their chances of making the playoffs.

99. Once his current No Trespass Order expires, Fellers wishes to begin visibly but silently protesting at sporting events or other extracurricular activities. He would protest near the field of play, rather than in the Designated Protest Area. He reasonably believes, however, that such action will cause Bow School District to take out another No Trespass Order because it violates Bow School District's policy against protesting in defense of women's sports. As a result, even when the present Order expires, Fellers intends to avoid silently protesting so long as Bow School District enforces its policy against protesting in defense of women's sports.

100. Andy Foote intends to attend sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season and the school year, including each of the remaining soccer games on the schedule through October 25 and any playoff games, as well as sporting events and other extracurricular events in future years.

101. If permitted, Andy Foote would visibly but silently protest at some of these events, including each of the remaining soccer games on the schedule through October 25 and any playoff games, in defense of women's sports, by wearing a wristband on the sidelines, by distributing wristbands, or by holding signs in the

parking lot. He believes, however, that protesting in a silent but visible way during this and future school years could potentially cause Bow School District to take out a new No Trespass Order against him, perhaps lasting through the end of the season as the original No Trespass Order threatened. As a result, he is only willing to show his support for girls' and women's sports in more subtle ways or in circumstances where he is not likely to be singled out, as he did at the September 24 game.

102. Andy Foote also worries that protesting in a silent but visible way during this and future school years could potentially cause Bow School District sports teams to forfeit games and be ineligible for the playoffs, as the referee stated.

103. Andy Foote feels that forcing him to express my viewpoint and opinions from a designated protest area relegates him and people who agree with him to second class status and is designed to make it sounds like their views are too dangerous to be seen or heard by other parents or high school students. Indeed, the designated protest area does not afford Foote an ample alternative means of communicating his message. If permitted, he would protest at the sidelines, not from the designated protest area.

104. Nicole Foote intends to attend sporting events and other extracurricular events, on and off school grounds, not only throughout the fall sports season but throughout the school year and future school years, including each of the remaining soccer games on the schedule through October 25 and any playoff games.

105. If permitted, Nicole Foote would visibly but silently protest at some of these events, including each of the remaining soccer games on the schedule through October 25 and any playoff games, in defense of women's sports, by openly wearing a pink wristband with the letters XX visible on it in black ink. Nicole Foote believes, however, that for the foreseeable future during this and future school years, protesting in a silent but visible way would cause Defendants to take out a No Trespass Order against her, as they did with her husband. As a result, Nicole Foote is only willing to show her support for girls' and women's sports in more subtle ways, as she did at the games on September 20, September 23, and September 24.

106. Rash intends to attend several of the remaining soccer games on the schedule, as well as swim meets, cross country meets, and other events that his grandchildren are competing in. If permitted, he would silently protest the government's decision to allow biological boys and men to play girls' and women's sports and to prohibit parents and others from non-disruptively demonstrating about this issue on school property by wearing a pink wristband at future extracurricular events. He believes, however, that doing so would violate Bow School District policy and that Bow School District would take out a No Trespass Order against him as well.

107. Plaintiffs find it frustrating and degrading to have their viewpoints, and even presence, prohibited by Bow School District, especially when they see other spectators being allowed to promote their viewpoints and opinions at school events, even at sporting events on the sidelines, near the field of play.

108. Unless this Court grants relief, Plaintiffs expect to be unable to express their views on women's sports on Bow School District property or at any Bow School District sports or extracurricular events, whether home or away.

COUNT ONE
VIEWPOINT DISCRIMINATION
AS-APPLIED CHALLENGE TO SCHOOL POLICIES
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

109. Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

110. Plaintiffs have a First Amendment right to access public school sporting events and other extracurricular activities, which are open to the public, including Bow High School soccer games. Plaintiffs also have a First Amendment right to speak in both a limited public forum and a nonpublic forum, free from viewpoint discrimination.

111. During school hours, a public school is typically a nonpublic forum, but it becomes a public forum if opened to the public by policy or practice. *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988)); *see also Pitta v. Medeiros*, No. 22-11641-FDS, 2023 U.S. Dist. LEXIS 87864, at *16 (D. Mass. May 19, 2023); *Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020). When a school holds an event that is otherwise open to public, it is "at least a limited public forum." *Worthley*, 652 F. Supp. 3d at 212. Bow High School has a policy and practice of allowing parents and other spectators to watch sporting events and other extracurriculars.

112. Under the First Amendment, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to

express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "[I]n a limited public forum, government '[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 806 (1985)). Likewise, access to a nonpublic forum can only be restricted "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 97 (1st Cir. 2004) (cleaned up).

113. Defendants have relied on four policies to prevent Plaintiffs from expressing their views on school property:

(1) the KFA policy requiring "mutual respect, civility, and orderly conduct" on school property;

(2) the KFA policy prohibiting people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing]" any person on school property;

(3) the KFA policy prohibiting people from "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function"; and

(4) the Bow High School Athletics Handbook policy governing "sportsmanship and sideline behavior."

114. These four policies, both together and separately, unconstitutionally discriminate based on viewpoint when applied to prohibit attendees at an extracurricular event from expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys or men playing in girls' and women's sports or in favor of women's sports, by silently wearing a wristband or displaying a sign in the parking lot.

115. Defendants also unlawfully apply their policies to prevent Plaintiffs and other spectators from voicing opposition to censorship or criticizing school officials using sharp or provocative language, including mentioning the Constitution or First Amendment, accusing the officials of harassment, comparing the school officials to Nazi officials who censored speech in the 1930s and 1940s, or calling officials "cowards" for failing to support girls' sports.

116. The right to criticize government officials is safely within the "protected speech zone" and off-limits to government regulation. *McElhaney v. Williams,* 81 F.4th 550, 557 (6th Cir. 2023). Terming speech "harassing" because it criticizes school officials is viewpoint discrimination. *Ison v. Madison Local Sch. Dist. Bd. of Educ.,* 3 F.4th 887, 895 (6th Cir. 2021). "Restrictions that bar offensive or otherwise unwelcome speech are impermissible, regardless of the forum in which the government seeks to impose them." *Moms for Liberty v. Brevard Pub. Sch.*, No. 23-10656, 2024 U.S. App. LEXIS 25394, at *17-18 (11th Cir. Oct. 8, 2024); *see also Mama Bears of Forsyth Cnty. v. McCall,* 642 F. Supp. 3d 1338, 1350 (N.D. Ga. 2022) (respectfulness requirement impermissibly targets speech that is critical of school

board); *Marshall v. Amuso,* 571 F. Supp. 3d 412, 422 (E.D. Pa. 2021) (allowing speakers to praise but not criticize a school board member is viewpoint discrimination).

117. Defendants do not prohibit attendees at extracurricular events from expressing all viewpoints on political or social issues, by, for example, allowing individuals to wear apparel showing support for politicians and other causes. Parents who opposed Plaintiffs' views, and agreed with the schools officials that Plaintiffs should remove the pink wristbands, were allowed to express their opinions on the sidelines and shout their opinions at Plaintiffs, without any adverse consequences. By singling out those opposed to biological boys playing in girls' and women's sports, advocated in favor of women's sex-based rights, and criticized school officials, Defendants have applied their policies in a way that discriminates based on viewpoint in violation of the First Amendment.

118. By enforcing these policies against Plaintiffs to prohibit them from wearing their wristbands or displaying their signs in the parking lot in support of girl's and women's sports, and against the inclusion of biological males in such sports, and preventing Plaintiffs from resisting censorship or criticizing school officials, Defendants under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against

continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

### COUNT TWO
### UNREASONABLE RESTRICTION
### AS-APPLIED CHALLENGE TO SCHOOL POLICIES
### U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

119. Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

120. In addition to being viewpoint discriminatory, Defendants' restrictions on sociopolitical commentary related to girls sporting events taking place on the sidelines of girls sporting event is unreasonable, lacks sufficient implementation guidance, and is not reasonably related the purposes of the limited public forum.

121. It is unreasonable for Defendants to restrict silent protest in the form of wearing pink wristbands on the parents' sidelines at a girls' soccer game or at any other Bow School District sporting event, or to restrict such expressive activity to the time and place of the Designated Protest Area.

122. It is also unreasonable for Defendants to prevent parents or visitors from passively displaying sociopolitical messages related to girls' sports on their automobiles parked in the parking lot at Bow School district sporting event.

123. By unreasonably restricting passive sociopolitical commentary about girls' sports at girls' sporting events, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and,

therefore, are entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

### COUNT THREE
### CONSPIRACY TO VIOLATE FIRST AMENDMENT RIGHTS
### U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

124. Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

125. A civil rights conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages. *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Conspiracy is a matter of inference, which can be shown through direct or circumstantial evidence of an agreement among Defendants to inflict harm upon Plaintiffs. *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).

126. Both before and during Plaintiffs' September 17 silent demonstration, Defendants consulted with each other and agreed to take overt acts together to prevent Plaintiffs' demonstration by threatening to direct police to arrest Plaintiffs, expel them from events open to the public, stop Plaintiffs' children and the other members of the girls' soccer team from playing, or force the team to forfeit its game. These threats were both intended to and did have the effect of causing Plaintiffs to stop demonstrating on the sidelines, thus abridging their federally secured rights.

127. For example, during the game, Fisk and Desilets told Rossetti that Eldon Rash was refusing to remove his wristband. Defendant Rossetti then used his authority as referee to threaten to abandon the game, which would have caused the Bow team to forfeit their playoff spot, unless Rash removed his wristband.

128. Rossetti also objected to Plaintiffs talking about the "First Amendment."

129. Rossetti conferred with Defendants Fisk and Desilets and did not allow the game to resume until after a school employee radioed Desilets that Rash had removed the wristband. This is evidence that Rossetti participated in the agreement to stop Plaintiffs from wearing the pink wristbands as a social and political statement.

130. Defendants continue to conspire to deprive Plaintiffs of their rights by enforcing No Trespass Orders against them and threatening to extend or renew such Orders if Plaintiffs protest again.

131. By conspiring to unlawfully prohibit Plaintiffs from silently demonstrating in support of girls' and women's sports, and against the inclusion of biological males in such sports, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of

Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

### COUNT FOUR
### FIRST AMENDMENT RETALIATION
### U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

132. Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

133. Defendants commit First Amendment retaliation when they act in a way that would deter a reasonably hardy individual from exercising constitutional rights. *Barton v. Clancy,* 632 F.3d 9, 29 (1st Cir. 2011). A plaintiff makes out a prima facia claim for retaliation, if a plaintiff shows that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action. *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). The burden then shifts to the defendants, who are liable unless defendants can prove that they would have reached the same decision even in the absence of the protected conduct. *Id.*

134. Defendants retaliated against Plaintiffs for pure speech when they prohibited Plaintiffs from silently but visibly protesting at the September 17 soccer game, by threatening to expel them from events open to the public, stop Plaintiffs' children and the other members of the girls' soccer team from playing, or force the team to forfeit its game, if Plaintiffs did not stop speaking.

135. Eldon Rash was told he needed to remove the wristband or his granddaughter's soccer game would be forfeit, forcing the veteran to choose between his First Amendment rights and love for his family.

136. Defendants further retaliated against Plaintiffs for speech by threatening to arrest two Plaintiffs for trespassing if they attended soccer games or entering school grounds for specific periods of time, as punishment for Plaintiffs' protest at the September 17 game.

137. Defendants also retaliated against Plaintiffs Foote and Fellers for verbally resisting the officials' censorship, criticizing school officials for restricting their speech rights, and asserting that school officials were harassing them; and also for invoking the Constitution, comparing the officials to Nazis, and calling them cowards for failing to protect female student-athletes.

138. Defendant Kelley specifically listed Fellers's exercise of this right to speak critically of school officials as reason for imposing a longer no-trespass order on him.

139. Defendant Kelley also created a Designated Protest Area, designed to discourage parents from expressing their views on sociopolitical issues related to girls' sports by banishing them to an area located away from the sidelines or primary spectator area of the sporting event.

140. These threats and punitive measures were both intended to and did have the effect of causing Plaintiffs to stop speaking on the sidelines or criticizing officials, thus abridging their federally secured rights.

141. By unlawfully retaliating Plaintiffs for silently demonstrating in support of girls' and women's sports, and against the inclusion of biological males in such sports, for resisting censorship, and for criticizing school district officials, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FIVE
OVERBREADTH
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

142. Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

143. Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks and citations omitted) (emphasis original).

144. Defendants' Designated Protest Area policy and practices empower school officials to restrict all non-disruptive protests and other free speech exercises to a small zone, unreasonably restricted in time and space. Defendants deem all protests and other free speech exercises outside this designated area to be disruptive by definition and are empowered to suspend school events and remove people exercising their First Amendment freedoms from school property as a result. Defendants' Designated Protest Area policy and practices violate the First Amendment right of free speech on its face because they are substantially overbroad, sweeping in vast amounts of protected non-disruptive political expression and other free speech exercises.

145. By enforcing the Notice of Designated Protest Area against non-disruptive protests and other free speech exercises, Defendants, under color of law, deprive Plaintiffs of their right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Orders preliminarily and permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:
   a. Enforcing those parts of Policy KFA – Public Conduct on School Property that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;
   b. Enforcing the Bow High School's Athletics Handbook to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;
   c. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as suppress

non-disruptive expression of political or social views based on audience reaction or a heckler's veto.

d. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as to prevent all sociopolitical commentary related to girls' sports by adults attending girls' sporting events.

e. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as to prevent Plaintiffs from criticizing school officials in provocative terms for censoring Plaintiffs' viewpoints or not supporting women's sports.

f. Enforcing the No Trespass Orders issued against Fellers and Foote on September 19, 2024.

g. Enforcing the Notice of Designated Protest Area to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints, or any sociopolitical viewpoints related to girls' sports, outside of the protest area.

h. Otherwise retaliating against Plaintiffs for resisting censorship or criticizing school officials.

2. Declaratory relief consistent with the injunction, to the effect that:

a. Those parts of Policy KFA that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or

intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" violate the First Amendment and Fourteenth Amendment when applied to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot.

b. The Bow High School's Athletics Handbook violates the First Amendment and Fourteenth Amendment when applied to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot, or from criticizing school officials for censoring speech or not supporting women's sports.

c. Imposing or extending the no-trespass order against Kyle Feller because he criticized school officials in provocative terms for censoring Plaintiffs' viewpoints, or not supporting women's sports, violates the First Amendment and Fourteenth Amendment.

d. The Notice of Designated Protest Area violates the First Amendment and Fourteenth Amendment when applied to prevent attendees at an

extracurricular event from non-disruptively expressing disfavored viewpoints related to girls' sports outside the protest area.

3. An award of nominal damages of one dollar total to each Plaintiff, jointly and severally from all individual capacity defendants and the Bow School District;
4. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and
5. Any other relief as the Court deems just and appropriate.

Dated: Nov. 7, 2024

Respectfully submitted,

*/s/ Endel Kolde*
Endel Kolde*
DC Bar No. 1782129
Brett Nolan*
DC Bar No. 90014964
Nathan Ristuccia*[1]
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
202.301.3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

By: */s/ Richard J. Lehmann*
Richard J. Lehmann
New Hampshire Bar No. 9339
LEHMANN MAJOR LIST, PLLC
6 Garvins Falls Rd,
Concord, NH 03301
603.731.5435
rick@nhlawyer.com

* Pro hac vice

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,

Plaintiffs,

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT;

Defendants.

Case No.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

INTRODUCTION

Public schools are charged with educating children about America's basic civic values, its Constitution, and the fundamental rights it guarantees. But when an opportunity arose to teach students about how important the First Amendment is to American liberty, Bow School District officials did the opposite—acting as though

the First Amendment does not apply in public school buildings, on school grounds, at playing fields, or even during off-campus extracurricular activities. According to these officials, Bow School District property is a First Amendment free zone, from which they can banish parents who speak in ways the government dislikes. And that's exactly what they did.

When several parents and a grandfather decided to wear pink wristbands at their children's soccer game in support of protecting women's sports for biologically female athletes, school officials threatened to have them arrested for trespass and nearly forced their children to forfeit the game. They conspired with a local police officer and soccer referee to intimidate parents, enforce the school's unconstitutional rules, and prevent anyone from exercising their rights to speech, petition, and assembly. Following that game, the school banned those who dared to take a stand from not just future games, but from all other school property as well.

But public-school facilities are not private property. As the Supreme Court held over fifty years ago, the Constitution protects the rights of all "persons"—parents and students alike—to express their opinions, even on controversial subjects "in school as well as out of school," "in the cafeteria, or on the playing field, or on the campus." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 511, 512-13 (1969). And Bow School District's ban on demonstrations criticizing the decision to allow biological boys to play girls' soccer—cloaked in the language of "disruption" and "harassment"—is unconstitutional viewpoint discrimination.

The First Amendment does not allow state-operated schools to become "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. Plaintiffs are entitled to relief securing their fundamental rights to free expression, petition, and assembly.

## THE PARTIES

1. Plaintiff Kyle Fellers is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint.

2. Plaintiff Anthony "Andy" Foote is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint

3. Plaintiff Nicole Foote is a natural person and a citizen of New Hampshire and the United States. She resides in Bow and has resided in Bow during all times relevant to her past actions mentioned in this complaint

4. Plaintiff Eldon Rash is a natural person and a citizen of New Hampshire and the United States. He resides in Bedford and has resided in Bedford during all times relevant to his past actions mentioned in this complaint

5. Defendant Marcy Kelley is the Superintendent of Schools of State Administrative Unit 67, which is made up of the Bow and Dunbarton School Districts, and has held that position during all times relevant to the events in this complaint. She is sued in her official and individual capacities.

6. Defendant Michael Desilets is the Athletic Director of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

7. Defendant Matt Fisk is the principal of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

8. Defendant Phillip Lamy is a Lieutenant in the Bow Police Department and has held that position during all times relevant to the events in this complaint. He is sued in his individual capacity.

9. Defendant Steve Rossetti is a soccer referee with the New Hampshire Interscholastic Athletic Association (NHIAA) and has held that position during all times relevant to the events in this complaint. He is sued in his individual capacity.

10. Defendant Bow School District is a New Hampshire school district and part of School Administrative Unit 67 (Bow & Dunbarton School Districts).

## Jurisdiction and Venue

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because this action presents questions of federal law and challenges Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

12. Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and

are occurring in this judicial district and because Defendants all reside in this district.

## Statement of Facts

### *Bow School District Policies on Speech at Extracurricular Events*

13. Bow School District, the public school district in the town of Bow, New Hampshire, has a school board policy (Policy KFA) on "Public Conduct at School Property." This policy regulates the behavior of "all individuals on school property or at a school event" in "any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private."

14. Exhibit A is a true and correct copy of Policy KFA. The policy is also available on Bow School Board's website at https://sites.google.com/a/bownet.org/bow-school-board/policies_1.

15. Although entitled a policy on "conduct," Policy KFA regulates speech as well as conduct. Policy KFA states that "[t]he School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." The policy mandates, among other things, that no person shall "1. Injure, threaten, harass, or intimidate . . . any other person" or "7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner)."

16. Bow School District enforces Policy KFA by ordering alleged violators to leave school grounds, by contacting law enforcement, and by issuing "No Trespass" letters.

17. Bow High School's Athletics Handbook also regulates the speech and conduct of spectators at Bow High School games. The Handbook states that "[p]oor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands." It also tells spectators to avoid certain kinds of speech such as "cheering *against* the team," "us[ing] the names or numbers of opposing teams," or "trying to directly communicate" with players.

18. As a member of the NHIAA, Bow High School annually commits itself to follow all guidelines and policies set forth by the NHIAA. Failure to comply with NHIAA guidelines can, among other things, cause Bow High School to forfeit games or become ineligible to compete in post-season tournaments.

19. Under the 2024 NHIAA Soccer Policies and Procedures, "[a]ll teams must complete their entire schedule submitted to the NHIAA" and an NHIAA committee determines "if [scheduled] games not played will be considered a forfeit(s) or a no game(s)."

*The September 17 Soccer Game*

20. On September 10, 2024, this Court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to biological females. *See Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024).

21. One of the plaintiffs in *Tirrell v. Edelblut* is a biological male who plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's

soccer team was scheduled to play the Plymouth Regional team on September 17, 2024.

22. On or about September 13, Nicole Foote, the mother of a player on the Bow High School girls' soccer team, met in person with Bow High School's Athletic Director, Mike Desilets, to complain about the competitive unfairness and injury risk to female athletes inherent in allowing biological males participate in women's sports. Desilets told Nicole that the court decision prevented the school district from doing anything about the situation.

23. On September 16, the evening before the game, Desilets emailed soccer families, warning them that "Bow High School's status as a member of the NHIAA" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets also claimed that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

24. Exhibit B is a true and correct copy of Desilets' email.

25. Desilets attached to his email a document containing relevant extracts from the Athletics Handbook and the 2024 NHIAA Soccer Policies and Procedures.

26. Exhibit C is a true and correct copy of this extracts document.

27. People attending soccer games and other extracurricular activities on Bow School District property regularly wear apparel showing support for political and

social causes, such as shirts supporting political candidates, displaying the Pride Flag, or expressing messages about global warming.

28. Two parents whose daughters play on the girls' soccer team, Kyle Fellers and Anthony "Andy" Foote (Nicole's husband), decided to attend the game and silently express their opinion about the importance of reserving women's sports for biological females. They agreed to wear pink wristbands, purchased off Amazon.

29. As purchased, these wristbands were the type of pink bands that athletes often wear to raise awareness about breast cancer and had no writing on them. The night before the game, Andy Foote decorated their wristbands with two black Xs, symbolizing the female chromosomes.

30. Exhibit D is a true and correct photograph of one of these wristbands.

31. Andy Foote posted on Facebook that night, stating that he would be attending the September 17 game to show solidarity with the girls' team.

32. Exhibit E is a true and correct photograph of this Facebook post.

33. Foote's and Fellers' daughters asked if any of their teammates wanted to wear a wristband in support women's sports. But, since they could not get the full support from the team, no one on the team wore wristbands.

*Events at the September 17 Soccer Game*

34. On September 17, Fellers, Andy Foote, and Nicole Foote attended Bow High School's varsity girls' soccer game, along with other family members. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus.

35. None of these parents wore a wristband during the first half. Andy Foote distributed wristbands to his wife (who did not put it on) and to around half a dozen other spectators who requested one—although Foote told them not to put the bands on until the second half. Fellers and the Footes watched the first half with other parents and cheered for the teams. They did not shout, chant, march, or waive signs about the biological males competing in women's sports.

36. At halftime, Andy Foote went to the parking lot and put a sign of Riley Gaines on his Jeep's windshield. Both he and Fellers wore the pink wristbands at the sidelines at the beginning of the second half.

37. For the first ten minutes of the second half, the two men continued to watch the game without incident or disruption. They did not shout, chant, march, or waive signs about the biological males competing in women's sports. Beyond these wristbands, nothing indicated that any of the parents were protesting.

38. Approximately ten minutes into the second half, Athletic Director Desilets approached Andy Foote to tell him that he was not allowed to protest at the game and had to take off the wristband. Foote objected, citing the First Amendment. But when Desilets persisted, Foote removed the wristband.

39. Desilets then told Fellers that he was not allowed to protest at the game and had to take off the wristband. When Fellers refused to obey, Desilets walked a short distance away to speak with Principal Matt Fisk and Bow Police Lieutenant Phil Lamy. Fisk then approached and repeated that Fellers had to remove the wristband or leave the game. After heated words, Fellers again refused.

40. Lt. Lamy then told Fellers that he had to either leave the game or remove the wristband. According to Lamy, the First Amendment did not apply as Fellers was on private property. The interaction between Fellers and the school officials and police officer grew heated. Lamy wore a body camera, which should have recorded this interaction.

41. Fellers finally removed his wristband but continued to hold it in his hand.

42. Eldon Rash, Feller's former father-in-law (his ex-wife's stepfather) observed some of the commotion caused by officials and asked what was happening. Rash and Fellers did not attend the game together, and Rash was until that point unaware of the wristband demonstration.

43. After Fellers explained the situation, Rash took the wristband from Fellers' hand and put it around his own wrist. Fisk and Desilets then pressured Rash into leaving the game or taking off the wristband. Andy Foote filmed some of this interaction on his cellphone camera. Fellers eventually left to go to his car, where he remained for the rest of the game.

44. Steve Rossetti, the head referee, stopped play and told both teams to return to their benches. According to Rossetti, he stopped the game because the soccer players could overhear "you guys arguing" about "the First Amendment thing." The game did not restart for about 15 minutes. Speaking to the spectators on the sidelines, Rossetti stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if the wristbands were not all removed. Rossetti said that Rash had "no right to embarrass the kids" and that if he did not take the

wristband off "the game is over." Rash did take off the wristband and put it on his lap.

45. Eventually, Rossetti, Desilets, Fisk, and at least one other person, had an on-field meeting and decided to resume play. The game continued without further incident.

*Events in the Parking Lot after the Game*

46. Fellers watched the rest of the game from his car, in the parking lot next to the soccer field. Once the game ended, Fellers stood by his car, holding a hand-written poster reading "Protect Women's Sports for Female Athletes" over his head. The same poster had been displayed on his parked car during the game.

47. Fellers has observed other vehicles parked at Bow School facilities bearing bumpers stickers and political and social messages, including expressing support for political candidates and the pro-liberty motto "Live Free or Die."

48. As the spectators and teams left to go to their vehicles, some expressed support for Fellers' message while others criticized him. Rossetti, the referee who had threatened to cancel the game and make Bow forfeit, called Fellers a "f***ing a**hole" and told him that his daughter would hate him.

49. Lamy approached Fellers and demanded to know why he had not already left the grounds. Fellers replied that he only been told to leave the soccer game—not the parking lot. Nonetheless, Lamy insisted that Fellers immediately leave all school property.

50. Because Fellers still had to pick up his children and sister—who had attended the game—he refused to leave without them. Lamy said that the children and sister could walk. A second Bow police officer, Sergeant Robert Welch, and Andy Foote both then arrived and de-escalated the situation. Fellers was not arrested.

*The No Trespass Orders*

51. On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the night before. According to Kelley, "late in the game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"—presumably referring to Desilets' email.

52. Exhibit F is a true and correct copy of Kelley's statement.

53. Kelley attached to her statement Policy KFA and the same document of extracts from NHIAA's Soccer Policies and from the Bow High School Athletics Handbook that Desilets had sent two days before. *See* Exs. A and C.

54. On September 19, Andy Foote received a "No Trespass Order" in the mail from Superintendent Kelley. This Order stated that Foote was "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until further notice.

55. According to the Order, the reason for Foote's ban is that "prior to and during the soccer game" he "brought and distributed pink armbands to parents and other attendees to protest" and "participated and led the protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

56. The Order stated that Foote's behavior violated Policy KFA's requirement "that attendees at sporting events and extracurricular activities demonstrate mutual respect, civility, and orderly conduct," as well as Policy KFA's prohibition of "threatening, harassing, or intimidating . . . any other person" and of conduct that shall "impede, delay, disrupt, or otherwise interfere with any school activity."

57. Although the Order was originally only in effect "through September 23, 2024," Kelley noted that the Order "will be extended for the duration of the fall sports seasons" if Foote did anything to violate it and that it "may potentially be extended until the end of the season" even if Foote obeyed.

58. Exhibit G is a true and correct copy of the document the No Trespass Order that Foote received.

59. On September 20, Kyle Fellers received a "No Trespass Order" in the mail from Superintendent Kelley. This order is essentially identical to Foote's order, with two main differences.

60. First, the Order gives a different reason for Fellers' ban: that Fellers had "led a protest . . . [which] was designed to and had the effect of intimidating,

threatening, harassing, and discouraging" a student on the other team from playing.

61. Second, Fellers' order is in effect "for the remainder of the fall sports season" and "may also be extended until the end of the school year" if violated.

62. Exhibit H is a true and correct copy of the No Trespass Order that Fellers received.

63. On September 25, Fellers received an "Addendum" to the No Trespass Order in the mail from Superintendent Kelley. The Addendum clarified that the original Order did not prevent Fellers entering school grounds "for the limited purpose of participating in middle school parent pick-up" as well as for various administrative purposes such as voting or school board meetings. Notably absent from the list of permitted purposes, however, were games, sports practices, extracurricular activities, drop-off, and high school pick-up.

64. Exhibit I is a true and correct copy of the Addendum.

65. After Fellers emailed Kelley about the difficulties that the trespass order caused him in transporting his kids to and from school, Kelley sent him a second Addendum on September 26. The Second Addendum added pick-up and drop-off from both the middle school and high school to the list of permitted reasons to enter school grounds. However, the Second Addendum expressly stated that Fellers remains prohibited from picking up and dropping off his child for high school soccer events. And, implicitly, Fellers remains prohibited from entering school grounds for

cross county drop-off or pick-up, and for any other games, sports practices, and extracurricular activities.

66. Exhibit J is a true and correct copy of the Second Addendum.

*The Immediate Impact of Defendants' Actions on Plaintiffs*

67. Andy Foote obeyed the No Trespass Order through its expiration on September 23, 2024. As a result, he could not attend Bow High School's homecoming game on September 20, in which his daughter played, the football homecoming game, or his youngest daughter's soccer game on September 23.

68. After the No Trespass Order expired, Andy and Nicole Foote attended the soccer game on September 24. They wore pink wristbands to the game, but because of their long-sleeved shirts, they do not believe these wristbands were visible or easy to see. Many other people, including a large group from the nationally known organization Moms for Liberty, were protesting at the game by wearing pink wristbands. No disruption or incident occurred.

69. Fellers has also obeyed the No Trespass Order since receiving it. This has been difficult and inconvenient, as Fellers has two children in Bow School District schools. He has been forced to arrange for other people to shuttle his children to and from school and their extracurricular activities.

70. On September 25, for example, Fellers could not attend his son's cross country meet and had to arrange for family members to pick his son up at school and drive him two towns away to attend the away meet.

71. Likewise, Fellers could not attend Bow High School's homecoming game on September 20, in which his daughter played.

72. Fellers' children also both have late afternoon sports practices. As a result, they must be picked up when the school buses are not operating. Fellers has been forced to let his daughter drive his car.

*The Continuing Impact of Defendants' Actions on Plaintiffs*

73. If Bow School District permitted them to do so, Plaintiffs would continue attending sporting events and other extracurricular events, on and off school grounds, throughout not only the fall sports season but throughout the current school year and the years to come. If permitted, Plaintiffs would silently protest in support of women's sports at some of these events, including by wearing pink wristbands of the sort that Defendants forbid.

74. If permitted, Fellers would come onto school property to drop off or pick up his children from practices, games, concerts, and other events. He believes, however, that such action would lead to his arrest and prosecution for criminal trespass. He also fears such action would also cause Defendants to extend the No Trespass Order until the end of the school year. *See* Exhibit H.

75. If permitted, Fellers would attend each of the remaining soccer games on the schedule through October 25 and any playoff games, as well as swim meets, cross country meets, and other sporting events or extracurricular activities, this year and in future years. He would also silently protest at each of the remaining soccer games, as well as other events, in defense of women's sports, by wearing a

pink wristband, by distributing wristbands, or by holding signs in the parking lot. He believes, however, that these actions would all violate the No Trespass Order, lead to his arrest, and potentially cause Bow High School sports teams to forfeit games or impair their chances of making the playoffs.

76. If permitted, Fellers would also silently protest at each of these soccer games, as well as swim meets, cross country meets, and other sporting events or extracurriculars against Bow School District and Bow Police Department's violation of the First Amendment. He believes, however, that this would violate the No Trespass Order and the school's policy against protesting in defense of women's sports, lead to his arrest, and potentially cause Bow School District sports teams to forfeit games or impair their chances of making the playoffs.

77. Once his current No Trespass Order expires, Fellers wishes to begin visibly but silently protesting at sporting events or other extracurricular activities. He reasonably believes, however, that such action will cause Bow School District to take out another No Trespass Order because it violates Bow School District's policy against protesting in defense of women's sports. As a result, even when the present Order expires, Fellers intends to avoid silently protesting so long as Bow School District enforces its policy against protesting in defense of women's sports.

78. Andy Foote intends to attend sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season and the school year, including the upcoming soccer games on October 1, October 5, October 8,

October 15, October 18 and October 25 and any playoff games, as well as sporting events and other extracurricular events in future years.

79. If permitted, Andy Foote would visibly but silently protest at some of these events, including the soccer games scheduled on October 1, October 5, October 8, October 15, October 18 and October 25 and any playoff games, in defense of women's sports, by wearing a wristband on the sidelines, by distributing wristbands, or by holding signs in the parking lot. He believes, however, that protesting in a silent but visible way during this and future school years could potentially cause Bow School District to take out a new No Trespass Order against him, perhaps lasting through the end of the season as the original No Trespass Order threatened. As a result, he is only willing to show his support for girls' and women's supports in more subtle ways or in circumstances where he is not likely to be singled out, as he did at the September 24 game.

80. Andy Foote also worries that protesting in a silent but visible way during this and future school years could potentially cause Bow School District sports teams to forfeit games and be ineligible for the playoffs, as the referee stated.

81. Nicole Foote intends to attend sporting events and other extracurricular events, on and off school grounds, not only throughout the fall sports season but throughout the school year and future school years, including the upcoming soccer games on October 1, October 5, October 8, October 15, October 18 and October 25 and any playoff games.

82. If permitted, Nicole Foote would visibly but silently protest at some of these events, including the soccer games scheduled on October 1, October 5, October 8, October 15, October 18 and October 25 and any playoff games, in defense of women's sports, by openly wearing a pink wristband with the letters XX visible on it in black ink. Nicole Foote believes, however, that for the foreseeable future during this and future school years, protesting in a silent but visible way would cause Defendants to take out a No Trespass Order against her, as they did with her husband. As a result, Nicole Foote is only willing to show her support for girls' and women's sports in more subtle ways, as she did at the games on September 20, September 23, and September 24.

83. Rash intends to attend several of the remaining soccer games on the schedule, as well as swim meets, cross country meets, and other events that his grandchildren are competing in. If permitted, he would silently protest the government's decision to allow biological boys and men to play girls' and women's sports and to prohibit parents and others from non-disruptively demonstrating about this issue on school property by wearing a pink wristband at future extracurricular events. He believes, however, that doing so would violate Bow School District policy and that Bow School District would take out a No Trespass Order against him as well.

84. Plaintiffs find it frustrating and degrading to have their viewpoints, and even presence, prohibited by Bow School District, especially when they see other spectators being allowed to promote their viewpoints and opinions at school events.

85. Unless this Court grants relief, Plaintiffs expect to be unable to express their views on women's sports on Bow School District property or at any Bow School District sports or extracurricular events, whether home or away.

COUNT ONE
VIEWPOINT DISCRIMINATION
AS-APPLIED CHALLENGE TO SCHOOL POLICIES
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

86. Plaintiffs reallege and incorporate by reference paragraphs 1 through 85.

87. Plaintiffs have a First Amendment right to access public school sporting events and other extracurricular activities, which are open to the public, including Bow High School soccer games. Plaintiffs also have a First Amendment right to speak in both a limited public forum and a nonpublic forum, free from viewpoint discrimination.

88. During school hours, a public school is typically a nonpublic forum, but it becomes a public forum if opened to the public by policy or practice. *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988)); *see also Pitta v. Medeiros*, No. 22-11641-FDS, 2023 U.S. Dist. LEXIS 87864, at *16 (D. Mass. May 19, 2023); *Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020). When a school holds an event that is otherwise open to public, it is "at least a limited public forum." *Worthley*, 652 F. Supp. 3d at 212. Bow High School has a policy and practice of allowing parents and other spectators to watch sporting events and other extracurriculars.

89. Under the First Amendment, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to

express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "[I]n a limited public forum, government '[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 806 (1985)). Likewise, access to a nonpublic forum can only be restricted "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 97 (1st Cir. 2004) (cleaned up).

90. Defendants have relied on four policies to prevent Plaintiffs from expressing their views on school property:

(1) the KFA policy requiring "mutual respect, civility, and orderly conduct" on school property;

(2) the KFA policy prohibiting people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing]" any person on school property;

(3) the KFA policy prohibiting people from "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function"; and

(4) the Bow High School Athletics Handbook policy governing "sportsmanship and sideline behavior."

91. These four policies, both together and separately, unconstitutionally discriminate based on viewpoint when applied to prohibit attendees at an extracurricular event from expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys or men playing in girls' and women's sports, by silently wearing a wristband or displaying a sign in the parking lot.

92. Defendants do not prohibit attendees at extracurricular events from expressing all viewpoints on political or social issues, allowing individuals to wear apparel showing support for politicians and other causes. By singling out those opposed to biological boys playing in girls' and women's sports, Defendants have applied their policies in a way that discriminates based on viewpoint in violation of the First Amendment.

93. By enforcing these policies against Plaintiffs to prohibit them from wearing their wristbands or displaying their signs in the parking lot in support of girl's and women's sports, and against the inclusion of biological males in such sports, Defendants under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to compensatory or nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants'

unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
CONSPIRACY TO VIOLATE FIRST AMENDMENT RIGHTS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

94. Plaintiffs reallege and incorporate by reference paragraphs 1 through 85.

95. A civil rights conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages. *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Conspiracy is a matter of inference, which can be shown through direct or circumstantial evidence of an agreement among Defendants to inflict harm upon Plaintiffs. *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).

96. Both before and during Plaintiffs' September 17 silent demonstration, Defendants consulted with each other and agreed to take overt acts together to prevent Plaintiffs' demonstration by threatening to arrest Plaintiffs, expel them from events open to the public, stop Plaintiffs' children and the other members of the girls' soccer team from playing, or force the team to forfeit its game. These threats were both intended to and did have the effect of causing Plaintiffs to stop demonstrating on the sidelines, thus abridging their federally secured rights.

97. For example, during the game, Defendant Rossetti used his authority as referee to threaten to abandon the game, which would have caused the Bow team to

forfeit their playoff spot, unless Defendants removed their wristbands. After Plaintiff Rash removed his wristband, Rossetti conferred with Defendants Fisk and Desilets, before allowing the game to resume. This is evidence that Rossetti participated in the agreement to stop Plaintiffs from wearing the pink wristbands as a social and political statement.

98. Defendants continue to conspire to deprive Plaintiffs of their rights by enforcing No Trespass Orders against them and threatening to extend or renew such Orders if Plaintiffs protest again.

99. By conspiring to unlawfully prohibit Plaintiffs from silently demonstrating in support of girls' and women's sports, and against the inclusion of biological males in such sports, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to compensatory or nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Orders preliminarily and permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:
    a. Enforcing those parts of Policy KFA – Public Conduct on School Property that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;
    b. Enforcing the Bow High School's Athletics Handbook to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;
    c. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as suppress

non-disruptive expression of political or social views based on audience reaction or a heckler's veto.

d. Enforcing the No Trespass Orders issued against Fellers and Foote on September 19, 2024.

2. Declaratory relief consistent with the injunction, to the effect that:

a. Those parts of Policy KFA that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" violate the First Amendment and Fourteenth Amendment when applied to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot; and

b. The Bow High School's Athletics Handbook violates the First Amendment and Fourteenth Amendment when applied to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports,

by silently wearing a wristband on the sidelines or displaying a sign in the parking lot.

3. An award of compensatory damages to each Plaintiff for the extra costs and inconvenience that each Plaintiff incurred complying with the No Trespass Orders;
4. An award of nominal damages from each Defendant to each Plaintiff in the amount of $17.91;
5. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and
6. Any other relief as the Court deems just and appropriate.

Dated: September 30, 2024

Respectfully submitted,

By: */s/ Richard J. Lehmann*

Richard J. Lehmann
New Hampshire Bar No. 9339
LEHMANN MAJOR LIST, PLLC
6 Garvins Falls Rd,
Concord, NH 03301
603.731.5435
rick@nhlawyer.com

Endel Kolde*
DC Bar No. 1782129
Brett Nolan*
DC Bar No. 90014964
Nathan Ristuccia*[1]
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
202.301.3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

* Application pro hac vice to be filed

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT.<br><br>Defendants. | Case No. 1:24-cv-00311-SM-AJ |

TEMPORARY RESTRAINING ORDER

BEFORE THE COURT is Plaintiffs' Motion for Temporary Restraining Order. The Court finds that Plaintiffs are likely to succeed on their claims that Defendants violated their First Amendment rights, and they face immediate irreparable harm from Defendants prohibiting them from exercising their First Amendment rights at the upcoming soccer game on October 8, 2024, at 6:45 PM, as well as the remaining Bow High School girls' varsity soccer games during the fall 2024 season. *See Roman*

*Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020). IT IS THEREFORE ORDERED that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are temporarily restrained from:

a. Preventing Plaintiffs from attending upcoming Bow High School girls' varsity soccer games, including the away game on October 8, 2024, at 6:45 PM and the next home game on October 11, 2024 at 4:00 PM.

b. Enforcing the No Trespass Order issued against Kyle Fellers on September 19, 2024, which covers both home and away games.

c. Enforcing those parts of Policy KFA – Public Conduct on School Property that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a pink wristband on the sidelines or displaying a sign in the parking lot;

d. Enforcing the Bow High School's Athletics Handbook to prevent attendees at an extracurricular event from non-disruptively expressing

disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a pink wristband on the sidelines or displaying a sign in the parking lot;

e. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as suppress non-disruptive expression of political or social views based on audience reaction or a heckler's veto.

This order shall remain in effect until at least ______ unless this Court takes further action on Plaintiffs' request for a preliminary injunction.

SO ORDERED on October __, 2024, at ____: ____ AM / PM.

______________________________
Steven J. McAuliffe
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT.<br><br>Defendants. | Case No. 1:24-cv-00311-SM-AJ |

ORDER

BEFORE THE COURT is Plaintiffs' Motion for Preliminary Injunction. The Court, having considered the motion on file and all arguments of counsel, hereby finds that Plaintiffs' Motion for Preliminary Injunction is well-taken and should be GRANTED. Plaintiffs are likely to succeed on their claims that Defendants violated their First Amendment rights and are experiencing irreparable harm.

IT IS THEREFORE ORDERED that pending final judgment, Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are preliminarily enjoined from:

a. Preventing Plaintiffs from attending upcoming any Bow High School girls' varsity soccer games, including both home and away games or preventing Plaintiffs from silently wearing pink wristbands on the sidelines of such games.

b. Enforcing the No Trespass Order issued against Kyle Fellers on September 19, 2024, which covers both home and away games.

c. Enforcing those parts of Policy KFA – Public Conduct on School Property that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a pink wristband on the sidelines or displaying a sign in the parking lot;

d. Enforcing the Bow High School's Athletics Handbook to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a pink wristband on the sidelines or displaying a sign in the parking lot;

e. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as suppress non-disruptive expression of political or social views based on audience reaction or a heckler's veto.

SO ORDERED.

This ______ day of ______, 2024.

______________________________
Steven J. McAuliffe
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,

Plaintiffs,

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT.

Defendants.

Case No. 1:24-cv-00311-SM-AJ

DECLARATION OF KYLE FELLERS

I, Kyle Fellers, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire. I have two children who attend public schools in the Bow School District, within State Administrative Unit 67. My daughter is a senior at Bow High School, and my son is an eighth grader at Bow Memorial School.

KF

2. My daughter plays on the Bow High School varsity girls' soccer team and swims for the Bow High School varsity girls' swim team.

3. As a single father, I am heavily involved in my children's schooling and extracurricular activities. I attend games regularly and often must drive my children to practices, games, and other events.

4. I am a proponent of restricting girls' and women's sports teams to biological girls and women. I believe that allowing males to play girls' and women's sports undermines fair competition, puts female athletes at risk for physical and mental injury, and undermines much of the social progress that women have made over the last fifty years.

5. I do not believe in gender ideology, that is, the belief that that people can change their gender or biological sex based on how they feel about their own sex or gender. I understand that some people disagree with me and that is fine. The First Amendment protects their right to disagree with me too.

6. On or about September 13, 2024, *The Bow Times*, a free local newspaper, published a letter to the editor I wrote in which I criticized the recent decision in *Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024). In this decision, the federal court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to females. My letter to the editor criticized this decision as unscientific and harmful to the progress women have made towards equality.

KF

7. I am aware that Parker Tirrell, a male and one of the plaintiffs in *Tirrell v. Edelblut*, plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's soccer team was scheduled to play the Plymouth team on September 17, 2024. Prior to the game on September 17, I did not know Parker's name, although I did know that a male played for Plymouth Regional.

8. On September 16, the evening before the game, Bow High School's Athletic Director Mike Desilets emailed all soccer families, warning them that "Bow High School's status as a member of the [New Hampshire Interscholastic Athletic Association]" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets claimed, however, that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

9. Although I am a father of a soccer player, I do not seem to have received Desilets' email, for whatever reason. After the soccer game, however, other parents made me aware of its contents and eventually forwarded me a copy.

10. Andy Foote and I decided to silently express our opinion about the importance of reserving women's sports for females at the game. We agreed to wear pink wristbands that I had purchased off Amazon.

11. The wristbands I purchased were pink and had no writing on them: the kind that athletes often wear to raise awareness about breast cancer. However,

KF

after we bought them, Andy Foote decorated our wristbands with two black Xs, symbolizing the female chromosomes.

12. Exhibit D is a true and correct photograph of one of these wristbands.

13. Because Foote's daughter is the captain of the team, I gave the wristbands to Foote on the night of September 16. My daughter and Foote's daughter asked the team if any players wanted to wear a wristband in support girls' and women's sports. The next day, however, my daughter informed me that the soccer team had decided not to wear the wristbands.

14. On September 17, I attended Bow High School's varsity girls' soccer game, with my children and sister. I did not have any wristbands with me when I arrived at the field, as Foote was bringing them. I did, however, have a poster that said, "Protect Women's Sports for Female Athletes." But I left the poster inside my car in the parking lot when I arrived at the game.

15. The soccer game occurred at Bow High School's soccer field, which is public property and part of the public high school's campus.

16. I stood on the parents' sidelines, close to mid-field, and watched the first half of the game with other parents. My in-laws (Eldon Rash and his wife) were sitting in lawn chairs in front of me, so we talked, between play, about financial investments. I cheered for both teams but did not shout, chant, march, or waive signs about biological males playing girls' and women's sports during the game.

17. At halftime, I went back to my car and met with Foote. We put our pink wristbands on and returned to the sidelines.

KF

18. For the first ten minutes of the second half, I watched the game without incident or disruption. Foote and I did not shout, chant, march, or waive signs about biological boys and men playing girls' and women's sports. Beyond our wristbands, nothing indicated that we were protesting at all.

19. Ten minutes into the second half, Athletic Director Mike Desilets approached me from behind and whispered that I needed to remove the wristband because protests are not allowed. At first, I thought he was joking. I only realized he was not when he repeated himself. I refused to take my wristband off.

20. Desilets walked about 10 feet away to where Principal Matt Fisk and Bow Police Lieutenant Phil Lamy were standing and spoke with them. A little later, Fisk approached me and told me to remove the wristband or leave the game. After heated words with the principal, I again refused to remove my wristband.

21. Prior to Desilets and Fisk confronting me about removing the wristband, I was quietly wearing it on the sidelines. I did not shout any political slogans, talk about the First Amendment, verbalize my opinions about women's sports, or direct any comments toward Parker Tirrell. All I did was wear a pink wristband. If Desilets and Fisk had just left me alone, there would not have been a verbal confrontation. They were the ones who came up to me.

22. Lt. Lamy then came up to me, told me that I was being recorded on his body camera, and told me to either remove the wristband or leave the game. He implied that if I disobeyed, he would arrest me for trespassing. I objected that I was

KF

exercising my First Amendment rights. Lamy asserted that the First Amendment did not apply as I was on private property.

23. At this point, I decided to remove the wristband, although I continued to hold it in my hand.

24. Eldon Rash, my daughter's grandfather (my ex-wife's stepfather), heard some of the commotion. Rash came up to me to find out what the commotion was about. Rash and I did not attend the game together, and, up until then, I had not spoken to him about the wristband protest.

25. I explained the situation to Rash and said that I had to not wear the wristband or I would be kicked out of the game. Rash took the wristband that I had been wearing from my hand and put it around his own wrist.

26. Principal Fisk and Director Desilets then began to pester Rash into leaving the game or taking off the wristband. My former father-in-law is in his 80s and has significant health problems, so I worried about his safety.

27. Steve Rossetti, the head referee, then came over. He stopped the game and told both teams to return to their benches. The game did not restart for about 15 minutes.

28. To prevent the situation from escalating further, I left the field and returned to my car in the parking lot. I watched the rest of the game from my car. I am aware that, after I left, Rossetti stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if the wristbands were not removed.

KF

29. After the game, I stood by my car in the parking lot next to the soccer field, holding my "Protect Women's Sports" poster over my head while the spectators and teams were leaving to go to their vehicles.

30. Many, but not all, of the people leaving the game expressed support for my message, including one of the opposing players on the Plymouth team. But when Steve Rossetti, the head referee, came out to his car (which was parked near mine), he called me a "f***ing a**hole" and told me that my daughter would hate me.

31. Lt. Lamy approached me in the parking lot, stood very close to me, and loudly demanded to know why I was still there. He claimed that he had told me to leave the grounds. I reminded the officer that I had only been told to leave the soccer game—not the parking lot. Nonetheless, Lt. Lamy insisted that I had to get off school property.

32. I refused and explained to Lt. Lamy that my children and sister (who has special needs) were still at the school and needed me to drive them home. My children's mother was at work and could not drive them. Lt. Lamy told me that my children and sister could walk. A second Bow police officer, Sergeant Robert Welch, and Andy Foote both then arrived and sought to de-escalate the situation, so I was never arrested.

33. I left without my children. Instead, my other sister drove my children and my special needs sister home.

34. On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the night before. According to Kelley, "late in the



KF

game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"—presumably referring to Desilets' email.

35. Exhibit F is a true and correct copy of Kelley's statement.

36. Kelley attached to her statement the Bow School Board's policy KFA on "Public Conduct on School Property."

37. Exhibit A is a true and correct copy of Policy KFA.

38. Kelley attached to her statement a document containing quotations from the New Hampshire Interscholastic Athletic Association's policies and from the Bow High School Athletics Handbook.

39. Exhibit C is a true and correct copy of the document that Kelley attached.

40. On September 20, I received a "No Trespass Order" in the mail from Superintendent Kelley, which is in effect "for the remainder of the fall sports season" and "may also be extended until the end of the school year."

41. The fall soccer season ends around November 1, depending on whether the team makes the playoffs or not.

42. The No Trespass Order states that I am "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until further notice. According to the



KF

Order, the reason for my ban is that I "led a protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

43. Exhibit H is a true and correct copy of my No Trespass Order.

44. On September 25, Kelley sent me an "Addendum" to the No Trespass Order, clarifying that the order did not prevent me from entering school grounds "for the limited purpose of participating in middle school parent pick-up" as well as for various administrative purposes such as voting or school board meetings. Games, sports practices, extracurricular activities, drop-off, and high school pick-up all were not included in the list of permitted purposes.

45. Exhibit I is a true and correct copy of the Addendum that I received.

46. After I emailed Kelley about the difficulties that I was having getting my children to school because of the No Trespass Order, Kelley sent a second Addendum on September 26. The Second Addendum added pick-up and drop-off from both the middle school and high school to the list of permitted reasons to enter school grounds. However, the Second Addendum expressly stated that pick-up and drop-off for soccer remained prohibited. And, implicitly, entering school grounds for soccer games, cross county meets, concerts, and other extracurricular activities, remained forbidden.

47. Exhibit J is a true and correct copy of the Second Addendum

48. Although it is difficult for me, with two children in Bow School District schools, I have obeyed the No Trespass Order and its Addenda since receiving it.



KF

This has forced me to arrange for other people to shuttle my children to and from school and their extracurricular activities.

49. My daughter does not have her own car and is an inexperienced driver. For safety reasons, I do not want her driving herself and my son with my car alone, in rush hour traffic.

50. On September 25, 2024, for example, I could not attend my son's cross country meet and had to arrange for family members to pick him up at school and drive him two towns away to attend the meet. This was an away meet that did not even occur on Bow School District property.

51. My son has early morning violin practice at the middle school before the school bus arrives. Before the No Trespass Order, I drove him to practice and attended his concerts. My son is also captain of the cross country team, which competes in the fall sports season. Because of the No Trespass Order, I have not been able to attend his meets. In the spring, he plays on a community baseball team that sometimes practices on the middle school's field. Not only have I historically driven him to practice but I have coached the baseball team for approximately the past five years. Now, because of the No Trespass Order, I am unable to do these things and potentially will remain unable to do them for the entire school year.

52. My daughter practices with the soccer team until 5:30pm each day. She does not have a car of her own. When her mother is working, my daughter does not have a ride home after her soccer practice. Because I can no longer drive her, I have been forced to let her drive my car. In the winter, she will compete on the varsity



KF

swim team which practices offsite at a YMCA in Concord. I would previously pick her up in the evening from these practices. Now, because of the No Trespass Order, I am unable to do any of these things and potentially will remain unable to do them for the entire school year.

53. If Defendants permitted me, I would continue attending sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season and the school year as a whole.

54. If permitted, I would come onto school property to drop off or pick up my children from practices, games, concerts, and other events. I believe, however, that if I did, I would be arrested and prosecuted for criminal trespass. This would also cause the No Trespass Order to be extended until the end of the school year. *See* Exhibit H.

55. If permitted, I would attend each of the remaining soccer games on the schedule, as well as swim meets, cross country meets, and other sporting events or extracurriculars. I would also silently protest on the sidelines at each of the remaining soccer games, as well as other events for the foreseeable future during this and future school years, in defense of girls' and women's sports, by wearing a wristband, by distributing wristbands, or by holding signs. I do not intend to sit in a designated protest area but to protest by wearing a wristband silently and visibly near the field of play as before. I believe, however, that these would all violate the No Trespass Order (and Defendants' policy against protesting in defense of girls'

ICF

and women's sports), lead to my arrest, and potentially cause Bow High School sports teams to forfeit games.

56. If permitted, I would also silently protest on the sidelines at each of the remaining soccer games, as well as swim meets, cross country meets, and other sporting events or extracurriculars for the foreseeable future during this and future school years, against Defendants' violation of the First Amendment, by wearing a wristband on the parents' sidelines, by distributing wristbands on the parents' sidelines, or by holding signs in the parking lot. I believe, however, that this would violate the No Trespass Order (and Defendants' policy against protesting in defense of girls' and women's sports), lead to my arrest, and potentially cause Bow School District sports teams to forfeit games.

57. Whenever my current No Trespass Order expires, I wish to begin silently protesting on the sidelines at sporting events or other extracurricular activities again. I do not intend to sit in a designated protest area but to protest by wearing a wristband silently and visibly near the field of play as before. I reasonably believe, however, that doing so will cause Defendants to take out another No Trespass Order against me because it violates Defendants' policy against protesting in defense of girls' and women's sports. As a result, even when the present order expires, I intend to avoid protesting so long as Defendants enforce the policy against protesting in defense of girls' and women's sports.

58. I find it frustrating and degrading to have my viewpoint, and even presence, prohibited by my children's school district and its officials, especially



KF

when I see other spectators being allowed to promote their viewpoints and opinions at school events. When I visited Bow High School property in the past for concerts, games, sports banquets, and other events in the past, I have seen, for instance, Pride Flags and global climate change posters displayed.

59. After we filed this lawsuit, I learned from an official email that the Bow Schools were designating an area by the scoreboard as the only area where parents can protest in any form, before and after the girls' soccer games. That location is far away from the parents' sidelines, and I do not want to have my right to wear a pink wristband in support of women's sports be restricted to that location or those times.

60. On September 20, 2024, I sent a right-to-know (RTK) request to the Bow Police Department. On October 1, 2024, in response to my RTK request, the Bow Police sent me an email thread between the Bow schools officials and Lt. Lamy and a police call log list Lt. Lamy's description of the interactions with me and Eldon Rash at the September 17 soccer game. The Bow PD refused to give me a copy of the body camera video of my interactions between Lt. Lamy and me.

61. Exhibit N is a true and correct copy of the email string between school officials and Lt. Lamy that was produced to me by the Bow PD. The discussion is in it is about the September 17 soccer game.

62. Exhibit O is a true and correct copy of the police call log from the September 17 soccer game produced to me by Bow PD. I disagree that I was being disruptive—it was the officials that started a verbal confrontation by insisting that

KF

I remove my wristband. But the call log accurately describes that the referee stopped the game until Eldon removed the pink wristband.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2024.

Kyle Fellers

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; ; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT,<br><br>Defendants. | : | Case No. 1:24-cv-00311-SM-AJ |

DECLARATION OF ANTHONY C. FOOTE

I, Anthony C. Foote, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire, with my wife Nicole and children. I have two daughters who attend public schools in Bow School District, a part of State Administrative Unit 67.

2. My oldest daughter is a senior and the captain of the Bow High School varsity girls' soccer team.

3. I am heavily involved in my children's schooling and extracurricular activities. I attend games regularly and often must drive my children to practices, games, and other events. Bow High School and the district are short bus drivers, and they usually do not charter buses to bring the soccer team to away games, so the players' parents must sign up to drive the team. I am often one of the drivers.

4. I am an avid proponent of restricting girls' and women's sports teams to people who were born female. I believe that allowing males to play girls' and women's sports harms fair competition, puts female athletes as risk for physical and mental injury, and undermines much of the social progress that women have made over the past fifty years. Every male allowed to play in female sports takes a spot from a female, causing women to lose their dignity, their self-worth, opportunities, awards, recognition, scholarships, self-esteem, achievements, records, safe places/spaces, and their overall health and well-being.

5. I reject gender ideology, that is, I do not believe people can change their biological sex based on their own feelings about their sex or gender. We are children of God, made in his image and should embrace the beauty of his design.

6. I am aware that in a recent decision, *Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024), a federal court preliminarily enjoined the New Hampshire Department of Education from

enforcing a state law that limited participation in interscholastic girls' sports teams to females.

7. I am aware that Parker Tirrell, a male and one of the plaintiffs in *Tirrell v. Edelblut*, plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's soccer team played the Plymouth team on September 17, 2024.

8. I have no issues with Parker Tirrell. Tirrell has, accordingly to public reports, been on male puberty blockers for over a year, and he may not be the largest player currently on Plymouth's team.

9. However, because of the recent court decision. I became more aware of the injustice that is undermining girls' and women's sports across the country. I fear that the participation of players like Tirrell will serve as a precedent to force girls to compete with male athletes who have been through male puberty and have a great biological advantage over female athletes. Girls in other states such as Massachusetts have been injured competing against larger male athletes, and I worry that the recent court decision will lead to that occurring in New Hampshire and across the nation.

10. On or about September 13, my wife Nicole met in person with Bow High School's Athletic Director, Mike Desilets, to attempt to address this issue about the upcoming game against Plymouth, with those in school leadership positions who she believed could impact the outcome. Desilets told her both in person and later by email that the court decision prevented the school district from doing anything.

After she explained what he said to me, I knew it was now up to us. I needed to take a leadership role in addressing the situation.

11. On September 16, the evening before the game, Desilets emailed all soccer families, including me, warning them that "Bow High School's status as a member of the [New Hampshire Interscholastic Athletic Association]" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets claimed, however, that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

12. Exhibit B is a true and correct copy of Desilets' email.

13. Desilets attached to his email a document containing relevant extracts from the Athletics Handbook and the 2024 NHIAA Soccer Policies and Procedures.

14. Exhibit C is a true and correct copy of this extracts document.

15. My wife and I received Desilets' email. I responded to Desilets with an email saying that Bow School District's leadership is "weak, ineffective, and completely out of touch" and needs to "[s]tand up for women" and "[p]rotect our daughters before someone else gets hurt."

16. Kyle Fellers and I had discussed options to address our concerns. Kyle suggested pink wristbands, as a way of taking a stand for the importance of reserving girls' and women's sports for females. So, we agreed to wear pink wristbands that Fellers had purchased off Amazon.

17. These wristbands were the pink bands that athletes often wear to raise awareness about breast cancer and had no writing on them. Breast cancer awareness is an issue that is near and dear to my heart, and something I feel strongly about. I lost my mother when I was 15 years old, when she was only 43. I also lost my sister to the disease in 2005, when she was 33. I view the issue of protecting girls' and women's sports as related, as breast cancer is a disease that predominantly affects women, and the recent debate about separating sports by biological sex is one that also predominantly affects women.

18. A few days before the game, Kyle dropped off the wristbands at my house. I initially tried to get my daughter to have the team wear them as a symbol of support for women's sports. My daughter told me she could not get full support from the team and was afraid that it would divide them. This further convinced me that parents must take the lead in defending girls' and women's sports.

19. The night before the game, I decorated our wristbands with two black Xs, symbolizing the female chromosomes. I also decorated some wristbands with other symbols, including the widely used female pictogram of a circle with a cross underneath. The wristbands that Fellers and I wore at the September 17 soccer game both had double Xs. I kept the wristbands overnight and brought them to the game.

20. Exhibit D is a true and correct photograph of one of these wristbands, decorated with the double Xs.

21. I posted on Facebook that night to encourage people "to protect the integrity and safety of female athletics" and to "come out to support our XX Lady Falcons and show your solidarity with our girls' team." In the post, I warned that that the recent court decision "is setting a dangerous precedent" but emphasized that "it's not the athlete's (i.e., Tirrell's) fault" but the fault of "the legal system, the school board, and school administration."

22. Exhibit E is a true and correct copy of this Facebook post.

23. On September 17, I attended Bow High School's varsity girls' soccer game, with my wife. I arrived about 45 minutes before the game and brought the wristbands and our chairs to mid field in preparation for the game.

24. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus.

25. When I arrived at the field, I observed that Bow High School's Superintendent, the principal, the athletic director, and other coaches and employees were at the game, as well as on-duty members of the Bow Police Department. I have never seen such a group of authority figures at a regular season girls soccer game.

26. I sat down on the parents' sideline, close to mid-field and watched the first half of the game with other parents. That line is set back a few feet from the sideline (also called a touchline in soccer) demarcating the outer edge of the playing area of the field (or pitch) and allows the soccer players to complete throw-ins without tripping or colliding with parents or spectators. I did not shout, chant,

march, or waive signs about biological men playing girls' and women's sports during the game. I also did not direct any comments or words at Parker Tirrell during the game.

27. During the first half of the game, I quietly handed out pink wristbands to my wife, her parents, and to approximately half a dozen other spectators who I knew to be in support of our position. I told these people not to put them on until after halftime. I stored the wristbands that I had not given out in a plastic grocery store bag at my chair, where they were not visible.

28. Then at halftime, I went back to my Jeep and placed a poster of collegiate swimmer and political activist Riley Gaines on the windshield. I also met with Fellers. After the second half began, Fellers and I put on our pink wristbands and returned to the parents' sidelines.

29. For the first ten minutes of the second half, nothing more occurred. I watched the game without incident or disruption. Fellers and I did not shout, chant, march, or waive signs about biological men playing girls' and women's sports. We did not say anything to Parker Tirrell. Beyond our wristbands, nothing indicated that we were protesting at all.

30. Approximately ten minutes into the second half, Athletic Director Mike Desilets approached me and said that I was not allowed to protest and had to take off the wristband. I responded that I was just supporting my daughter and women's sports. He responded that he knew what we were doing because he saw my

Facebook post. I said that it is my right to sit peacefully and express myself in solidarity for women's sports.

31. When it was clear that Desilets would not leave me alone, I took the wristband off and threw it on the ground.

32. Shortly after, Desilets made his way through the crowd looking for more pink wristbands. The next thing I heard was Fellers' voice. I assume Desilets told Fellers the same thing, because Fellers was refusing to remove the wristband and saying loudly that he had a First Amendment right to wear the wristband. Desilets, Principal Matt Fisk, Bow Police Lieutenant Phillip Lamy, and a couple of other people seemed to be pressuring Fellers to remove the wristband. At one point, I heard Lamy insist that the soccer field was private property, but someone in the crowd yelled out that it was public property.

33. Prior to Desilets going around asking parents to remove the wristbands Kyle had been quietly watching the game from the parents' sidelines. Based on what I observed. Fellers only became vocal when the school official confronted him about the wristband. If Desilets had just left him alone, probably none of this would have happened.

34. The interaction between Fellers and the school officials and police officer was more heated than mine. I am not exactly sure how it happened, but somehow Feller's father-in-law, Eldon Rash, became involved in the dispute. I overheard his interaction, occasionally participated from afar, and filmed over eight minutes of it on my cellphone camera.

35. At one point, Steve Rossetti, the head referee, came over as if scripted. He stopped the game and told both teams to return to their benches. According to Rossetti, he stopped the game because the soccer players could overhear "you guys arguing" about "the First Amendment thing." The game did not restart for about 15 minutes.

36. Under visible duress Fellers took his wristband off and went to his car. Desilets, Fisk, Rossetti, and others met at center field, to discuss what to do. Earlier Rossetti had stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if everyone did not remove their wristbands. Rossetti said that Rash had "no right to embarrass the kids" and that if he did not take the wristband off "the game is over."

37. Eventually, the referee and school officials decided to resume play, so the girls came back onto the field. I did not know at the time if Rash removed his band before the game restarted or if he still had it on. The game continued without further incident.

38. After the game ended, I turned and saw that Fellers and Lt. Lamy were arguing in the parking lot. Fellers' daughter, my daughter, and my wife were all extremely upset, so I decided things had to stop. I dropped what I was holding and ran off the field to where Fellers and Lamy were. I approached Lamy to ask if he could just leave Fellers alone, as the game was over, and everyone was leaving. Another officer had joined me in trying to address the issues. Begrudgingly, Lt. Lamy listened to us and walked away.

39. On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the night before. According to Kelley, "late in the game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"—presumably referring to Desilets' email.

40. Exhibit F is a true and correct copy of Kelley's statement.

41. Kelley attached to her statement the Bow School Board's policy KFA on "Public Conduct on School Property."

42. Exhibit A is a true and correct copy of Policy KFA.

43. Kelley also attached to her statement the same document of extracts from NHIAA's Soccer Policies and from the Bow High School Athletics Handbook that Desilets had sent two days before. *See* Ex. C.

44. On September 19, I received a hand delivered, by the Bow Police Department, a "No Trespass Order" from Superintendent Kelley, which was in effect "through September 23, 2024." If I do anything to violate the order, I would be arrested and it "will be extended for the duration of the fall sports seasons," and it "may potentially be extended until the end of the season" even if I obey the order.

45. The No Trespass Order states that I am "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-

curricular event, on or off school grounds" until further notice. According to the Order, the reason for my ban is that "prior to and during the soccer game" I "brought and distributed pink armbands to parents and other attendees to protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

46. Exhibit G is a true and correct copy of the document the No Trespass Order that I received.

47. I obeyed the No Trespass Order through its expiration on September 23, 2024. As a result, I was not able to attend Bow High School's Girls Soccer homecoming game on September 20, which my daughter played in, The homecoming Football game, or my younger daughter's middle school soccer game on September 23. I was also not able drop my younger daughter off at school on Friday, September 20 and Monday, September 23.

48. After the No Trespass Order expired, my wife and I attended the soccer game on September 24, 2024. I wore a pink wristband at this game, but I was wearing a long sleeve shirt, so I do not believe the wristband was visible or easy to see. I was concerned about the blowback from the school and parents for wearing a wristband. However, after many other people, including a large group from the nationally recognized group, Moms for Liberty, showed up in support, I felt more comfortable and less concerned that the school would act against so many. The Moms for Liberty protest included chanting (as well as signs and wristbands) and

was considerably more boisterous than the protest I participated in at the September 17 game. Nonetheless, no disruption or incident occurred.

49. My wife and I also attended the soccer game on September 27, 2024. This was an away game, so it did not take place on Bow School District property. I did not wear a wristband at this game.

50. On October 1, the day after this lawsuit was filed, Superintendent Kelley sent an email informing parents that future protests at school events must occur in a designated protest area. Protestors who protest outside this area "may be deemed as disruptive and result in the game being suspended." Kelley suggested that the school may not "continue to have spectators at our games" if this new regulation is not obeyed. Kelley attached a notice containing the new regulation.

51. Exhibit K is a true and correct copy of Kelley's email about the new designated protest area.

52. The Notice of Designated Protest Area states that "campus visitors" who wish to engage in "protests and other free speech exercises" must do so in a marked-off designated area. The Notice states that this area is located "in front of the scoreboard on the soccer field" and is only open "for 30 minutes before and 30 minutes after" girls' soccer games. There is "no designated area for protest outside of this timeframe" and "[t]his is the only designated area for any visitors to engage in protests on any school District properties." Violating the regulation "will result in removal from District property."

53. Exhibit L is a true and correct copy of the Notice of Designated Protest Area.

54. The scoreboard on the soccer field is located around 50 yards further from the soccer fields than the area on the parents' sidelines where we usually sit on camp chairs and where I sat on September 17. The scoreboard is beside the parking lot and the view from there would be obstructed by all the spectators sitting or standing on the sidelines. Similarly, if someone were to silently protest by wearing pink wristbands beside the scoreboard, other parents, spectators, game officials, coaches, or players would not easily be able to observe this silent protest. To me, the school's new designated protest area is designed to stifle our ability to express our views on women's sports by putting us in an area where few people could observe us or our wristbands and also restricting when we can wear the wristbands.

55. Exhibit M is a true and correct map of the Bow High School soccer field and the adjacent parking lot with annotations showing the parents' sidelines, the new designated protest area, and the approximate locations of my car and Kyle Fellers car in the parking lot during and after the September 17 game.

56. I intend to attend sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season, the school year, and future school years, including the upcoming soccer games on October 5, October 8, and October 11.

57. I would silently but visibly protest on the sidelines at some of these events, including the soccer games scheduled on October 5, October 8, and October

11, in defense of girls' and women's sports, by wearing a pink wristband on the parents' sidelines during the game, by distributing wristbands, or by holding signs in the parking lot. I believe, however, that for the foreseeable future during this and future school years, protesting in a visible way could cause Defendants to remove me from school property and to take out a new No Trespass Order against me, perhaps lasting through the end of the season as the original No Trespass Order threatened. As a result, I am only willing to show my support for girls' and women's sports in more subtle ways or in circumstances where I am not worried about being singled out, as I did at the September 24 game.

58. I also worry that protesting on the sidelines in a silent but visible way by wearing a pink wristband during this and future school years could potentially cause Bow School District sports teams to forfeit games, have games suspended, and become ineligible for the playoffs. In fact, the new designated protest area announcement suggests that future games could be suspended if officials decide parents are not doing what they want. Ms. Kelley wrote in her Oct. 1 email: "Please note, if protestors refuse to comply that may be deemed as disruptive and result in the game being suspended." (see also Ex. K).

59. I find it frustrating and degrading to have my viewpoint, and even presence, prohibited by Defendants, especially when I see other spectators being allowed to promote their viewpoints and opinions at school events, by, for instance, displaying pride flags and similar LGBTQ messages on signs or clothing.

60. I feel that forcing me to express my viewpoint and opinions from a designated protest area relegates me and people who agree with me to second class status and is designed to make it sounds like my views are too dangerous to be seen or heard by other parents or high school students.

61. Exhibit P is a true and correct photographic image depicting the view from the new designated protest toward the soccer field. The soccer goals can be seen in the distance and there are some items on the field indicating where the sideline is located. I took this photo.

62. Exhibit Q is a true and correct photographic image depicting the view from the parents' sideline back toward the scoreboard and the new designated protest area at the Bow High School soccer field. In the foreground is a new sign posting the school district's Oct. 1 protest rules, which is consistent with the content of Exhibit L. This sign warns parents not to protest on the sidelines. The cones near the scoreboard mark the boundaries of the new designated protest area. I took this photo.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2024

A C Foote

Anthony C. Foote

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, ELDON RASH, and NICOLE FOOTE,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT,<br><br>Defendants. | Case No. 1:24-cv-311 |

DECLARATION OF NICOLE FOOTE

I, Nicole Foote, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire, with my husband Anthony and our two daughters. Both of my daughters attend public schools in the Bow School District.

2. My oldest daughter is a senior and the captain of the Bow High School varsity girls' soccer team.

3. Along with my husband, I am heavily involved in my children's schooling and extracurricular activities. I attend games regularly and often must drive my children to practices, games, and other events. Bow High School usually does not charter buses to bring the soccer team to away games, so the players' parents must sign up to drive the team. I am often one of the drivers.

4. I am a proponent of restricting women's sports teams to people who were born biological women. I believe that allowing biological males to play women's sports undermines fair competition, puts biologically female athletes at risk for physical and mental injury, and undermines much of the social progress that women have made over the past fifty years.

5. I do not believe people can change their biological sex based on their own feelings about their sex or gender. I realize that some people disagree with me about that issue, and that is fine. The First Amendment protects their right to do so.

6. I am aware that in a recent decision, *Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024), a federal court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to biological females. I attended the hearing in this case that led to the court issuing that decision.

7. I am aware that Parker Tirrell, a biological male and one of the plaintiffs in *Tirrell v. Edelblut*, plays on the Plymouth Regional High School girls' varsity

soccer team. Bow High School's soccer team was scheduled to play the Plymouth team on September 17, 2024.

8. I have no issues with Parker Tirrell. Tirrell has, according to public reports, been on male puberty blockers for over a year, and he is not the largest player on Plymouth's team. I do not think it is likely that my daughter will be hurt playing against him. Tirrell played for Plymouth Regional during last year's soccer season too, and I did not protest at Plymouth Regional's game against Bow High School that year.

9. This year is different, however, because of the recent court decision. I fear that the participation of players who are biological males, but who believe they are women (or trans females) will serve as a precedent to force girls to compete with male athletes who have been through male puberty and have a great biological advantage over female athletes. Girls in other states have been injured competing against larger male athletes, and I worry that the recent court decision will lead to that occurring in New Hampshire. I also do not believe it is fair to biological females to have to compete with male athletes, who are bigger, faster, and stronger than many females.

10. On or about September 13, 2024, I contacted Bow High School's Athletic Director, Mike Desilets, to complain about the situation. We had a respectful discussion about my concerns with having biological boys playing against biological girls, but Desilets told me that the court decision prevented the school district from

doing anything. After our meeting, Desilets emailed me to communicate a similar message.

11. On September 16, the evening before the game, Desilets emailed all soccer families, including me, warning them that "Bow High School's status as a member of the [New Hampshire Interscholastic Athletic Association]" "and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets claimed, however, that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

12. My husband and I received Desilets' email. My husband responded to Desilets with an email saying that Bow School District's leadership is "weak, ineffective, and completely out of touch" and needs to "Stand up for women" and "Protect our daughters before someone gets hurt." I was copied on that email.

13. On September 17, I attended Bow High School's varsity girls' soccer game with my husband. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus. We sat down close to mid-field and watched the first half of the game with the other attendees.

14. My husband brought several pink wristbands to the game, decorated with two Xs to symbolize the female chromosomes. He gave me one of the wristbands, which I put in my pocket.

15. During the first half, I observed that Bow High School's principal, its athletic director, police officers, and other school administrators were at the game—which is not normal at a regular season soccer game. I suspected that the officials were there because of the issue over biological boys playing girls' soccer, and they had some kind of plan to prevent people from speaking about biological boys playing in girls' sports. This made me very nervous and uncomfortable, so I left the wristband in my pocket. I am not aware of anyone wearing a wristband during the first half of the game.

16. During the second half of the game, my husband put on his wristband. I did not put my wristband on because the presence of the school administrators and the police officers made me uncomfortable. I was worried about what might happen if I wore the wristband.

17. I was present when Desilets told my husband he was not allowed to protest by wearing the wristband. I also watched Desilets, Principal Matt Fisk, and Lieutenant Phillip Lamy confront Kyle Fellers about wearing the wristband. After Fellers left, I watched Desilets, Fisk, and the referee pressure Fellers' father-in-law, Eldon Rash, about the same thing. All of these confrontations made me even more nervous about wearing the wristband that night and so I did not put a wristband on. I would have put on the wristband if it wasn't for the actions of the school administrators, the police officer, and the referee to attempt to intimidate Kyle Fellers, my husband, and Eldon Rash.

18. There was no commotion or disruption of the game, until Desilets, Fisk, and Lamy began confronting my husband and Fellers about their wristbands. Most people at the game—players and spectators—would probably not have noticed the wristbands, if school officials had not made a big deal about it.

19. On September 19, 2024, I learned that Bow School District took out a No Trespass Order against my husband, which prohibited him "from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletics fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until September 23, 2024.

20. The No Trespass Order disrupted my family's life beyond causing my husband to miss some of our daughter's games. Because of my work obligations, my husband is typically responsible for taking our kids to school in the morning. But the No Trespass Order did not include any exceptions to allow him to enter school property for this reason, and our oldest daughter had to make a trip to the middle school while the No Trespass Order was in effect. These restrictions on my husband's movements created inconvenience for me and my family.

21. I attended the soccer games on Friday, September 20, 2024, and Tuesday, September 24, 2024, both of which took place at Bow High School. I took my pink wristband to both games and wore it underneath my long sleeves. I do not believe it was visible or easy to see. I also attended a game at the middle school on that Monday, September 23, 2024, for our youngest daughter, that Andy couldn't attend, and I wore my wristband under a sweatshirt, where I do not believe it was visible.

22. I wore the wristband because I wanted to support my husband after Bow School District banned him from school property. But I remained nervous about wearing it openly and did not want to draw attention to myself. I was worried about getting banned from school property if I openly displayed the wristband in a highly visible way while attending the games.

23. I intend to attend sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season, the school year as a whole, and future school years, including the upcoming soccer games on October 5, October 8, and October 11.

24. I would silently protest on the sidelines at some of these events, including the soccer games scheduled on October 5, October 8, October 11, October 15, October 18 and October 25 and any playoff games, in defense of girls' and women's sports, by openly wearing a pink wristband with the letters XX visible on it in black ink. I believe, however, that for the foreseeable future during this and future school years, protesting in a highly visible way could cause Defendants to take out a No Trespass Order against me, as they did with my husband. As a result, I am only willing to show my support for girls' and women's sports in more subtle ways, as I did at the September 20 and September 24 games.

25. I also worry that protesting on the sidelines in a highly visible way during this and future school years could potentially cause Bow School District sports teams to forfeit games, have games suspended, and become ineligible for the playoffs.

26. I find it frustrating and degrading that Bow School District has prohibited me from expressing my viewpoint, especially when I have seen other individuals promote their own viewpoints and opinions at school events and on school property. I have seen, for example, people wearing clothing at sporting events displaying the Pride flag or support for LGBTQ rights. I have seen people wearing clothing during sporting events supporting politicians, like Kamala Harris and Donald Trump. I have not observed or heard that Bow School District has prohibited any of these other people from expressing their views on school property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2024.

Nicole Foote

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT;<br><br>Defendants. | Case No. 1:24-cv-311 |

DECLARATION OF ELDON L. RASH

I, Eldon Rash, declare the following based on my personal knowledge:

1. I live in Bedford, New Hampshire. I am 80 years old, and my granddaughter is a senior at Bow High School, where she plays on the varsity girls' soccer team and swims for the varsity girls' swim team.

2. I believe that girls' and women's sports teams should be restricted to people who were born female. I believe that allowing males to play women's sports undermines fair competition and puts female athletes at risk for physical and mental injury. I support the recently enacted state law that limits participation in interscholastic girls' sports teams to females.

3. On September 17, I attended Bow High School's varsity girls' soccer game with my wife. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus. I sat down close to mid-field and watched the first half of the game with the other attendees.

4. At the time, I was not aware of the controversy over Bow School District forbidding people who attend the game from protesting in support of girls' and women's sports. Nor was I aware that some parents had purchased pink wristbands to wear at the game to protest the decision to allow males to play against females.

5. During the second half of the game, I heard commotion behind me. I turned around and saw Kyle Fellers, who is my granddaughter's father. I asked him what was going on, and he explained that some people were harassing him about his pink wristband, which he had taken off when I turned around.

6. There was no commotion or disruption of the game until people began confronting Fellers and other spectators about wearing wristbands. Most people at the game would probably not have noticed the wristbands—just as I did not notice them—if school officials had simply ignored the wristbands.

7. I asked Kyle what the issue with the wristband was about, and he explained that he was wearing it to demonstrate against boys and men playing in girls' and women's sports. Although I did not know anything about the protest before hearing Kyle explain it to me at the soccer field, I agreed with Kyle and the other parents that men should not be playing in women's sports. I also did not like that people were harassing Kyle for expressing his views by wearing a pink wristband. I told Kyle to give me his wristband, and I put it on.

8. I wore the pink wristband because I agreed with Kyle's view about girls' and women's sports. But I also wore it to protest against the people intimidating and harassing others for simply wearing a wristband and expressing their beliefs.

9. I continued watching the soccer game while wearing the pink wristband. At the time, I did not even realize the wristband had two Xs on it, and I'm not sure how visible those Xs were. It looked just like a breast cancer awareness band to me. I did not shout or chant about biological men playing in women's sports or do anything else to disrupt the game while wearing the wristband.

10. After several minutes, Principal Matt Fisk came over and told me to take the wristband off. Fisk did not introduce himself, and I did not know that he was the principal or anyone associated with the school. I told him I would not take the wristband off. He said this was private property, and he told me to take it off three or four more times. Each time I said no.

11. Athletic Director Mike Desilets then came over. He also did not introduce himself, and I did not know who he was. He did not speak to me but stood with Fisk.

12. Fisk told me they were shutting the game down. I do not like people trying to intimidate me, so I told him to go ahead. The game then stopped for several minutes. During this time, Fisk continued to tell me to take the wristband off and I refused. The referee, Steve Rossetti, also told me to take the wristband off. After a while, they threatened to cancel the game for good.

13. Several people in the crowd yelled at me while the game had stopped, telling me to take the wristband off. My wife, who was not involved in any of this but was sitting next to me, started to get upset. I could tell this was traumatic for her, as well as potentially for my granddaughter, so I decided to take the wristband off and set it in my lap. The two Xs were not visible, but the wristband remained visible in my lap. The game started back again.

14. My wife and I eventually left. Before doing so, several other individuals came up to us and said they respected what we were doing. I had no altercations with anyone who had a different viewpoint, other than having had some people yelling at me to take the wristband off so the game could start back.

15. I am aware that after the game, Kyle and another parent, Anthony Foote, received a No Trespass Order banning them from school property because they wore pink wristbands to the soccer game.

16. I attend soccer games and other extracurricular events at Bow High School regularly. I intend to attend several of the remaining soccer games on the schedule, as well as swim meets, cross country meets, and other events for the foreseeable future during this year and in future years. I am against the decision to allow boys and men to play girls' and women's sports, and I am also against how Bow School District has prohibited parents and others from protesting against this decision on school property. I would like to silently protest these decisions at future extracurricular events by wearing a pink wristband on the sidelines. I believe, however, that doing so would violate Bow School District policy, and I worry that Defendants would take out a No Trespass Order against me as well.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2024.

Eldon L. Rash
Eldon L. Rash

**Exhibit A**

| BOW SCHOOL BOARD POLICY | KFA |
|---|---|

# PUBLIC CONDUCT ON SCHOOL PROPERTY

For purposes of this policy, "school property" means any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private.

The School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event. No person on school property or at a school event shall:

1. Injure, threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person;
2. Damage, or threaten to damage, another's property;
3. Damage or deface School District property;
4. Violate any Federal or New Hampshire law, or town or county ordinance;
5. Smoke or otherwise use tobacco products;
6. Consume, possess, distribute, or be under the influence of alcoholic beverages or illegal drugs, or possess dangerous devices or weapons;
7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner);
8. Enter upon any portion of school premises at any time for purposes other than those that are lawful and authorized by the School Board;
9. Operate a motor vehicle in violation of an authorized District employee's directive or posted road signs.
10. Violate other District policies or regulations, or an authorized District employee's directive.
11. Possess a weapon. For the purpose of this policy a "weapon" includes but is not limited to: sling shot, metallic knuckles, billies, knives, electric defense weapons (as defined in RSA 159:20), aerosol self-defense spray weapons (as defined in RSA 159:20), and martial arts weapons (as defined in RSA 159:24). Weapons under control of law enforcement personnel are permitted.

Any person who violates this policy or any other acceptable standard of behavior may be ordered to leave school grounds. Law enforcement officials may be contacted at the discretion of the supervising District employee if such employee believes it necessary.

Additionally, the District reserves the right to issue "no trespass" letters to any person whose conduct violates this policy, acceptable standards of conduct, or creates a disruption to the School District's educational purpose.

***Legal References:***
*RSA 193:11, Disturbance*
*RSA 635:2, Criminal Trespass*

Reviewed and approved by the Bow School Board
@ its Meeting of ___________________________

**Exhibit B**

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Monday, September 16, 2024 6:30 PM
**To:** Michael Desilets <mdesilets@bownet.org>
**Subject:** Tuesday 9/17

Good evening soccer families-

Please read the following attached messaging regarding Bow High School's status as a member of the NHIAA as well as some information from our Athletics Handbook regarding sportsmanship and sideline behavior. I understand that there are some differing opinions regarding tomorrow's game, and that is perfectly fine. Please understand that any inappropriate signs, references, language or anything else present at the game will not be tolerated. This is a contest between high school student-athletes and should be treated as such.

Thank you in advance for your attention to this important matter.

BHS Administration

--

BOW Falcons
MIKE DESILETS, CMAA
BOW HIGH SCHOOL
ATHLETIC ADMINISTRATOR | NHADA PAST PRESIDENT
NIAAA SPORTS FACILITIES COMMITTEE CHAIR
https://athletics.bownet.org/ (603) 228-2210 @bow_falcons

**Exhibit C**

Bow High School is an active member of the NHIAA, we sign an annual agreement to join form for all 34 of our Varsity teams. In doing so, we agree to follow all guidelines and policies set forth by the NHIAA and their handbook as well as those set by the National Federation of High Schools, which establishes rules of competition for all sports. These are our governing bodies. We always have and will continue to follow the guidelines from the NHIAA to remain in compliance and eligible for post-season tournaments. We will play the schedule that we have, as it is. The teams that we play against are also in compliance with the NHIAA and we will trust that anyone on their rosters set to play against us are all eligible, just as they trust in us. We will play against whatever NHIAA compliant team is on the other sideline, as scheduled.

From page 4 of the 2024 NHIAA Soccer Policies and Procedures:

3. **COMPLETED SCHEDULE AND FORFEIT:**
   All teams must complete their entire schedule submitted to the NHIAA. Any scheduled game(s) not played must be reported (in writing by both schools) to the NHIAA prior to the date of NHIAA pairings with an explanation. The committee will determine if games not played will be considered a forfeit(s) or a no game(s). A team CANNOT forfeit a game to the other team under any circumstances.

From the BHS Athletics Handbook:

Sportsmanship

Bow High School is a community that is dedicated to good sportsmanship, positive ethics, and integrity in its students, athletes, and fans. Poor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands. BHS takes value in the Sportsmanship Ratings given through the NHIAA and will maintain a positive environment for every contest.

It is the expectation of every fan to maintain a positive attitude, to treat players, coaches and officials with respect, and to cheer *for* their team as opposed to cheering *against* the other team. Fans are not to use the names or numbers of opposing teams, nor should they be trying to directly communicate or distract other players. Coaches should be encouraging good play from everyone and treating opposing teams and officials with respect. They should maintain professionalism in all that they do. Players must always be respectful of everyone involved in the contest. Unsportsmanlike behaviors that lead to penalties, fouls or ejections will not be tolerated and undoubtedly will result in additional penalties from the school. School sponsored activities take place for the student-athletes and school community as a whole. Strive to maintain positivity and not make it about anything or anyone else.

**Exhibit D**



**Exhibit E**

**Anthony C Foote**
13 September at 12:44 ·

On September 17, 2024, the BHS XX Lady Falcons soccer team will be required to face a team that includes a biological male on the roster. Despite Governor Chris Sununu's stance on protecting female athletes, the Federal Court has failed to enforce this decision, leaving our girls vulnerable.

While it's not the athlete's fault—who I believe is a victim of child abuse due to the administration of Medroxyprogesterone acetate (Depo-Provera)—the failure to uphold the Governor's decision by the legal system, the school board, and school administration is setting a dangerous precedent for women's sports.

Biological males have no place in women's sports. We need to protect the integrity and safety of female athletics.

Please come out to support our XX Lady Falcons and show your solidarity with our girls' team as they face this challenge.
















Karolyn Domini, Michael Trefethen and 2 others 13 comments 2 shares

Like Comment Share

View more comments

**Exhibit F**

Statement from the Superintendent 9/18/24 (From Marcy Kelley)

From: Bow High School Notifications (notifications@getalma.com)

To: kylefellers@yahoo.com

Date: Wednesday, September 18, 2024 at 01:18 PM EDT

Statement by Marcy Kelley, SAU 67 Superintendent

September 18, 2024

Good Afternoon,

I am writing to inform you about an incident that took place at Tuesday night's girls varsity soccer game at Bow High School against Plymouth High School.

Unfortunately, late in the game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place on the home side of the field. This conduct did not abide by our public conduct on school property policy. We reminded all soccer families of these expectations, by email, in advance of Tuesday's game.

Bow Police were present at the game and responded accordingly. In accordance with this policy, our administration will also take steps to address the matter.

One of our core values in Bow & Dunbarton School Districts is "Learning is our Focus." This core value extends beyond the walls of our classroom and in everything we do, even on the soccer field.

The topic of protest is a matter under federal court review in New Hampshire. Bow High School is not a party in this legal matter. The NHIAA sets the rules for all of our high school sports, and we will abide by them—or our athletes will face sanctions.

If you have any questions or concerns about the expectations for conduct from our students, athletes, and fans, you can read the Public Conduct on School Property policy **here**. I welcome any constructive questions and feedback you have about this policy or NHIAA Compliance.NHIAA Compliance.pdf

Marcy Kelley

---

This message was sent to you by Alma on behalf of Bow High School

**Exhibit G**

SAU 67

School Administrative Unit 67
Bow and Dunbarton, New Hampshire School Districts
55 Falcon Way
Bow, NH 03304-4219

**Ms. Marcy Kelley** Superintendent of Schools | **Mr. Duane C. Ford** Business Administrator | **Ms. Jessica Brown** Director of Student Services | **Mr. Owen Harrington** Director of Curriculum

By Hand Delivery and Certified Mail

NO TRESPASS ORDER

September 19, 2024

Anthony Foote
Redacted: home address
Bow, NH 03304

Dear Mr. Foote:

I am writing to inform you that you are hereby prohibited from entering the buildings, grounds, and property of the Bow School District, including but not limited to all school administrative office buildings, parking lots, and athletic fields, until further notice. You are also prohibited from attending any Bow School District athletic or extra-curricular event, on or off school grounds.

The reason for this action is your conduct during the girls varsity soccer game on Tuesday, September 17, 2024. Specifically, prior to and during the soccer game you brought and distributed pink armbands to parents and other attendees to protest the participation of a transgender female student on the other team. You participated and led the protest, which was designed to and had the effect of intimidating, threatening, harassing, and discouraging that student from playing.

School Board policy KFA requires that attendees at sporting events and extracurricular activities demonstrate mutual respect, civility, and orderly conduct. The policy prohibits any person from threatening, harassing, or intimidating any staff member, sports official or coach, or any other person. The policy also states that no person shall "impede, delay, disrupt, or otherwise interfere with any school activity." The District had to obtain additional police presence to ensure order. The District had to order you to remove the armbands and as a result of your "protest" and other actions, play was temporarily stopped.

The District is also required by law to comply with its obligations under Title IX to ensure that any individual participating in school activity, program or event is protected from unlawful discrimination. The Bow School

SAU 67
Inspiring Today • Impacting Tomorrow

School Administrative Unit 67
Bow and Dunbarton, New Hampshire School Districts
55 Falcon Way
Bow, NH 03304-4219

Ms. Marcy Kelley
Superintendent of Schools

Mr. Duane C. Ford
Business Administrator

Ms. Jessica Brown
Director of Student Services

Mr. Owen Harrington
Director of Curriculum

District as well as both state and federal laws prohibit discrimination and harassment on the basis of sex against any employee, student, or individual participating in school programs, activities, or events. Your conduct violated the prohibition against discrimination and harassment, which includes students on other teams.

**This NO TRESPASS Order will remain in effect through September 23, 2024.** If you are found on District property in violation of this order you will be arrested and prosecuted for Criminal Trespass under New Hampshire law, RSA 635:2. (copy attached). If you violate this order, the prohibition will be extended for the duration of the fall sports season and may potentially be extended until the end of the season.

Please direct any questions regarding this Order to my office.

Sincerely,

Marcy Kelley, Superintendent of Schools

Certificate of Service

I HEREBY CERTIFY that I have given in-hand a copy of this notice to

Anthony Foote on the ___________ day of ____________ 2024.

Time: __________ Location of Service ____________________

Served By: ____________________________________________
Print Name & Title Signature

# TITLE LXII
# CRIMINAL CODE

## CHAPTER 635
## UNAUTHORIZED ENTRIES

**Section 635:2**

**635:2 Criminal Trespass. –**

I. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place.

II. Criminal trespass is a misdemeanor for the first offense and a class B felony for any subsequent offense if the person knowingly or recklessly causes damage in excess of $1,500 to the value of the property of another.

III. Criminal trespass is a misdemeanor if:

(a) The trespass takes place in an occupied structure as defined in RSA 635:1, III; or

(b) The person knowingly enters or remains:

(1) In any secured premises;

(2) In any place in defiance of an order to leave or not to enter which was personally communicated to him by the owner or other authorized person;

(3) In any place in defiance of any court order restraining him from entering such place so long as he has been properly notified of such order; or

(4) On any grounds, lands, or parking areas of any state correctional facility or transitional housing unit operated by the department of corrections without prior authorization or without a legitimate purpose associated with department of corrections operations.

IV. All other criminal trespass is a violation.

V. In this section, "secured premises" means any place which is posted in a manner prescribed by law or in a manner reasonably likely to come to the attention of intruders, or which is fenced or otherwise enclosed in a manner designed to exclude intruders.

VI. In this section, "property," "property of another," and "value" shall be as defined in RSA 637:2, I, IV, and V, respectively.

**Source.** 1971, 518:1. 1979, 377:7. 2005, 125:1. 2010, 239:2, eff. July 1, 2010. 2020, 37:41, eff. Sept. 27, 2020.

**Exhibit H**

SAU 67
Inspiring Today • Impacting Tomorrow

**School Administrative Unit 67**
**Bow and Dunbarton, New Hampshire School Districts**
55 Falcon Way
Bow, NH 03304-4219

| Ms. Marcy Kelley | Mr. Duane C. Ford | Ms. Jessica Brown | Mr. Owen Harrington |
|---|---|---|---|
| Superintendent of Schools | Business Administrator | Director of Student Services | Director of Curriculum |


By Hand Delivery and Certified Mail

NO TRESPASS ORDER

September 19, 2024

Kyle Fellers
Redacted: home address
Bow, NH 03304

Dear Mr. Fellers:

I am writing to inform you that you are hereby prohibited from entering the buildings, grounds, and property of the Bow School District, including but not limited to all school administrative office buildings, parking lots, and athletic fields, until further notice. You are also prohibited from attending any Bow School District athletic or extra-curricular event, on or off school grounds.

The reason for this action is your conduct during the girls varsity soccer game on Tuesday, September 17, 2024. Specifically, prior during the soccer game you led a protest regarding the participation of a transgender female student on the other team. The protest was designed to and had the effect of intimidating, threatening, harassing, and discouraging that student as well as any other students from playing.

School Board policy KFA requires that attendees at sporting events and extracurricular activities demonstrate mutual respect, civility, and orderly conduct. The policy prohibits any person from threatening, harassing, or intimidating any staff member, sports official or coach, or any other person. The policy also states that no person shall "impede, delay, disrupt, or otherwise interfere with any school activity." The District had to obtain additional police presence to ensure order. The District had to order you to leave the fields during the game, and as a result of your "protest" and other actions, play was temporarily stopped. Upon leaving the paying field, you proceeded to the parking lot and continued to waive a large sign in protest to the participation of the student from the other team. Police intervention was required as a result of your actions.

SAU 67
Inspiring Today • Impacting Tomorrow

**School Administrative Unit 67**
**Bow and Dunbarton, New Hampshire School Districts**
55 Falcon Way
Bow, NH 03304-4219

| **Ms. Marcy Kelley** | **Mr. Duane C. Ford** | **Ms. Jessica Brown** | **Mr. Owen Harrington** |
|---|---|---|---|
| Superintendent of Schools | Business Administrator | Director of Student Services | Director of Curriculum |

The District is required by law to comply with its obligations under Title IX to ensure that any individual participating in school activity, program or event is protected from unlawful discrimination. The Bow School District as well as both state and federal laws prohibit discrimination and harassment on the basis of sex against any employee, student, or individual participating in school programs, activities, or events. Your conduct violated the prohibition against discrimination and harassment, which includes students on other teams.

**This NO TRESPASS Order will remain in effect for the remainder of the fall sports season.** If you are found on District property in violation of this order you will be arrested and prosecuted for Criminal Trespass under New Hampshire law, RSA 635:2. (copy attached). If you violate this order, the prohibition may also be extended until the end of the school year.

Please direct any questions regarding this Order to my office.

Sincerely,

Marcy Kelley, Superintendent of Schools

Certificate of Service

I HEREBY CERTIFY that I have given in-hand a copy of this notice to

Kyle Fellers on the ___________day of _____________ 2024.

Time: __________ Location of Service ____________________

Served By: ____________________________________________
Print Name & Title Signature

# TITLE LXII
# CRIMINAL CODE

# CHAPTER 635
# UNAUTHORIZED ENTRIES

**Section 635:2**

**635:2 Criminal Trespass.** –

I. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place.

II. Criminal trespass is a misdemeanor for the first offense and a class B felony for any subsequent offense if the person knowingly or recklessly causes damage in excess of $1,500 to the value of the property of another.

III. Criminal trespass is a misdemeanor if:

(a) The trespass takes place in an occupied structure as defined in RSA 635:1, III; or

(b) The person knowingly enters or remains:

(1) In any secured premises;

(2) In any place in defiance of an order to leave or not to enter which was personally communicated to him by the owner or other authorized person;

(3) In any place in defiance of any court order restraining him from entering such place so long as he has been properly notified of such order; or

(4) On any grounds, lands, or parking areas of any state correctional facility or transitional housing unit operated by the department of corrections without prior authorization or without a legitimate purpose associated with department of corrections operations.

IV. All other criminal trespass is a violation.

V. In this section, "secured premises" means any place which is posted in a manner prescribed by law or in a manner reasonably likely to come to the attention of intruders, or which is fenced or otherwise enclosed in a manner designed to exclude intruders.

VI. In this section, "property," "property of another," and "value" shall be as defined in RSA 637:2, I, IV, and V, respectively.

**Source.** 1971, 518:1. 1979, 377:7. 2005, 125:1. 2010, 239:2, eff. July 1, 2010. 2020, 37:41, eff. Sept. 27, 2020.

**Exhibit I**

SAU 67
Inspiring Today • Impacting Tomorrow

**School Administrative Unit 67**
**Bow and Dunbarton, New Hampshire School Districts**
55 Falcon Way
Bow, NH 03304-4219

**Ms. Marcy Kelley**
**Superintendent of Schools**

**Mr. Duane C. Ford**
**Business Administrator**

**Ms. Jessica Brown**
**Director of Student Services**

**Mr. Owen Harrington**
**Director of Curriculum**

**<u>Via Email and Certified Mail</u>**

**<u>NO TRESPASS ORDER – Addendum</u>**

**September 25, 2024**

Kyle Fellers
Redacted: home address
Bow, NH 03304

Dear Mr. Fellers:

I am writing regarding the No Trespass Order issued on Wednesday, September 18, 2024, to clarify that the prohibition on entering the buildings, grounds, and property of the Bow School District **does not apply to Bow School Board meetings or public hearings, nor does it apply to attendance at School District budget hearings, School District annual or special meetings, or to voting/elections which take place on School District property. This prohibition also does not restrict your ability to be on school grounds for the limited purpose of participating in middle school parent pick-up, open houses or parent/teacher meetings at your student's school.**

This NO TRESPASS Order will remain in effect **for the remainder of the fall sports season.** If you believe other exceptions should apply, please reach out to me directly. I will review this Order in 2 weeks to determine if the basis for the Order remains or if a change in your actions justifies rescinding the Order.

If you enter District property in violation of this order you will be arrested and prosecuted for Criminal Trespass under New Hampshire law, RSA 635:2. (copy attached). If you violate this order, the prohibition may also be extended until the end of the school year. A copy of the original Order and this Addendum have been provided to the Bow Police.

Please direct any questions regarding this Order to my office.

Sincerely,

Marcy Kelley, Superintendent of Schools

# TITLE LXII
# CRIMINAL CODE

# CHAPTER 635
# UNAUTHORIZED ENTRIES

**Section 635:2**

**635:2 Criminal Trespass. –**

I. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place.

II. Criminal trespass is a misdemeanor for the first offense and a class B felony for any subsequent offense if the person knowingly or recklessly causes damage in excess of $1,500 to the value of the property of another.

III. Criminal trespass is a misdemeanor if:

(a) The trespass takes place in an occupied structure as defined in RSA 635:1, III; or

(b) The person knowingly enters or remains:

(1) In any secured premises;

(2) In any place in defiance of an order to leave or not to enter which was personally communicated to him by the owner or other authorized person;

(3) In any place in defiance of any court order restraining him from entering such place so long as he has been properly notified of such order; or

(4) On any grounds, lands, or parking areas of any state correctional facility or transitional housing unit operated by the department of corrections without prior authorization or without a legitimate purpose associated with department of corrections operations.

IV. All other criminal trespass is a violation.

V. In this section, "secured premises" means any place which is posted in a manner prescribed by law or in a manner reasonably likely to come to the attention of intruders, or which is fenced or otherwise enclosed in a manner designed to exclude intruders.

VI. In this section, "property," "property of another," and "value" shall be as defined in RSA 637:2, I, IV, and V, respectively.

**Source.** 1971, 518:1. 1979, 377:7. 2005, 125:1. 2010, 239:2, eff. July 1, 2010. 2020, 37:41, eff. Sept. 27, 2020.

**Exhibit J**

SAU 67
Inspiring Today • Impacting Tomorrow

**School Administrative Unit 67**
**Bow and Dunbarton, New Hampshire School Districts**
55 Falcon Way
Bow, NH 03304-4219

**Ms. Marcy Kelley** — Superintendent of Schools
**Mr. Duane C. Ford** — Business Administrator
**Ms. Jessica Brown** — Director of Student Services
**Mr. Owen Harrington** — Director of Curriculum

**Via Email and Certified Mail**

**NO TRESPASS ORDER – Addendum**

**September 26, 2024**

Kyle Fellers
Redacted: home address
Bow, NH 03304

Dear Mr. Fellers:

I am writing regarding the No Trespass Order issued on Wednesday, September 18, 2024, to clarify that the prohibition on entering the buildings, grounds, and property of the Bow School District **does not apply to Bow School Board meetings or public hearings, nor does it apply to attendance at School District budget hearings, School District annual or special meetings, or to voting/elections which take place on School District property. This prohibition also does not restrict your ability to be on school grounds for the limited purpose of participating in middle school parent pick-up and drop-off, high school pick-up and drop-off that is not related to girls soccer, open houses or parent/teacher meetings at your student's school.**

This NO TRESPASS Order will remain in effect **for the remainder of the fall sports season.** If you believe other exceptions should apply, please reach out to me directly. I will review this Order in 2 weeks to determine if the basis for the Order remains or if a change in your actions justifies rescinding the Order.

If you enter District property in violation of this order you will be arrested and prosecuted for Criminal Trespass under New Hampshire law, RSA 635:2. (copy attached). If you violate this order, the prohibition may also be extended until the end of the school year. A copy of the original Order and this Addendum have been provided to the Bow Police.

Please direct any questions regarding this Order to my office.

Sincerely,

Marcy Kelley, Superintendent of Schools

Gmail

Anthony Foote <anthony.c.foote@gmail.com>

## Notice of Designated Protest Area

**Marcy Kelley** <mkelley@bownet.org> Tue, Oct 1, 2024 at 10:33 AM
To: Marcy Kelley <mkelley@bownet.org>
Bcc: anthony.c.foote@gmail.com

Good Morning,

Attached you will find a Notice of a Designated Protest Area. This is in an effort to limit distraction and keep the focus and attention on our student-athletes.

Please note, if protestors refuse to comply that may be deemed as disruptive and result in the game being suspended. If you or somebody you know will be coming to protest, please share this message and share your support for these players by asking that they comply with protesting in the designated area.

We want to be able to continue to have spectators at our games for the rest of the season.

Thank you for your support of these outstanding student-athletes.

Let's Go Falcons!

Marcy Kelley

--
Marcy Kelley
Superintendent of Schools
SAU 67, Bow & Dunbarton School Districts
55 Falcon Way Bow, NH 03304
(603) 224-4728 EXT 201

SAU 67

**notice of Designated Protest area.pdf**
57K

**Exhibit L**

## NOTICE of DESIGNATED PROTEST AREA

Good Afternoon Spectators and Visitors to the Bow School District:

In an effort to keep the focus on our student-athletes, we have created a designated area for protests and other free speech exercises, and we will direct any campus visitors who wish to engage in such activities to do so in the designated area.

The designated area will be in front of the scoreboard on the soccer field and will be marked. This area will allow parents and visitors who wish to protest to continue to view the BHS Girls Soccer Game. Use of the designated area is subject to the following restrictions:

- The designated area will be open for 30 minutes before and 30 minutes after the home BHS Girls Soccer game at Bow High School. There will be no designated area for protest outside of this timeframe.
- The designated area may not exceed 50 people.
- Users of the designated area may not obstruct or restrict the free movement of persons or vehicles on any part of District property, including the entry to or exit from District rights of way and/or parking lots.
- Users of the designated area may not threaten or endanger the safety of any person on District property.
- Users of the designated area may not use sound amplification.
- Users of the designated area may not install signage in the ground or cause damage to District property.

This is the only designated area for any visitors to engage in protests on any school District properties. Visitors to school property are subject to Board Policies, including KFA, KF-R, KH, and KHB. Violations to this regulation will result in removal from District property.




**Bow High School Soccer Field**

**Exhibit M**

**Exhibit N**

Outlook

## Re: meet

**From** Marcy Kelley <mkelley@bownet.org>
**Date** Sat 9/14/2024 12:29 PM
**To** Phil Lamy <plamy@bownhpd.gov>
**Cc** Michael Desilets <mdesilets@bownet.org>; Matt Fisk <mfisk@bownet.org>

Thank you, we appreciate it!

Marcy Kelley
Superintendent of Schools
SAU 67, Bow & Dunbarton School Districts
55 Falcon Way Bow, NH 03304
(603) 224-4728 EXT 201
SAU 67

On Sat, Sep 14, 2024 at 11:40 AM Phil Lamy <plamy@bownhpd.gov> wrote:

I will be there Tuesday 9/17 at 3:00 pm for the girls soccer game.

Phil

Lieutenant Phil Lamy
Lieutenant | Bow Police Department
7 Knox Road (physical)
10 Grandview Road (mailing)
Bow, NH 03304
603.228.0511 dispatch
603.223-3950 non-emergency
603.223-3952 direct
603.228.2452 fax
cid:image001.jpg@01D3834B.936C98F0

**This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by law. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited and may be subject to criminal prosecution. If you have received this e-mail in error, please immediately notify me by telephone at 603-223-3950**

**All E-mails are for Official Town Business only and privacy should not be assumed. E-mails are public documents unless subject matter is protected by State or Federal Laws.**

***LAW ENFORCEMENT SENSITIVE: Please note that if an Email I send is marked LAW ENFORCEMENT SENSITIVE and YOU are not a member of LAW ENFORCEMENT - YOU MAY NOT VIEW THAT PARTICULAR EMAIL***

---

**From:** Phil Lamy <plamy@bownhpd.gov>
**Sent:** Friday, September 13, 2024 6:11 AM
**To:** Marcy Kelley <mkelley@bownet.org>; Michael Desilets <mdesilets@bownet.org>; Matt Fisk <mfisk@bownet.org>
**Subject:** Re: meet

I will be over at noon

Thank you
Phil

Lieutenant Phil Lamy
Lieutenant | Bow Police Department
7 Knox Road (physical)
10 Grandview Road (mailing)
Bow, NH 03304
603.228.0511 dispatch
603.223-3950 non-emergency
603.223-3952 direct
603.228.2452 fax

**This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by law. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited and may be subject to criminal prosecution. If you have received this e-mail in error, please immediately notify me by telephone at 603-223-3950**

**All E-mails are for Official Town Business only and privacy should not be assumed. E-mails are public documents unless subject matter is protected by State or Federal Laws.**

***LAW ENFORCEMENT SENSITIVE: Please note that if an Email I send is marked LAW ENFORCEMENT SENSITIVE and YOU are not a member of LAW ENFORCEMENT - YOU MAY NOT VIEW THAT PARTICULAR EMAIL***

---

**From:** Marcy Kelley <mkelley@bownet.org>
**Sent:** Thursday, September 12, 2024 6:31 PM
**To:** Phil Lamy <plamy@bownhpd.gov>; Michael Desilets <mdesilets@bownet.org>; Matt Fisk <mfisk@bownet.org>
**Subject:** Re: meet

Hi Phil,

Thanks for getting back to me. How would noon work for you tomorrow? I've copied Matt Fisk and Mike Desilets here as well.

Marcy

On Thu, Sep 12, 2024 at 3:54 PM Phil Lamy <plamy@bownhpd.gov> wrote:

Good afternoon,

We had a crimeline event today. I will be in the office. I can come see you in the morning let me know what time works for you.

Best Phil

Lieutenant Phil Lamy
Accreditation Manager
Bow Police Department
7 Knox Road Bow, NH 03304
603 223-3952

Get Outlook for iOS

---

**From:** Marcy Kelley <mkelley@bownet.org>
**Sent:** Thursday, September 12, 2024 8:28:56 AM
**To:** Phil Lamy <plamy@bownhpd.gov>
**Subject:** meet

Hi Lt. Lamy,

I know that Chief Miller is not in today or tomorrow (I think). I'm wondering if you would have time to meet today with our Athletic Director, BHS Principal and myself to discuss a girls soccer game next week where we would like extra support. Our opponent has an openly trans-female player and we have caught wind that our families are going to protest in some way.

If you have time, that would be great.

Marcy

--
Marcy Kelley
Superintendent of Schools
SAU 67, Bow & Dunbarton School Districts
55 Falcon Way Bow, NH 03304
(603) 224-4728 EXT 201

--

Marcy Kelley
Superintendent of Schools
SAU 67, Bow & Dunbarton School Districts
55 Falcon Way Bow, NH 03304
(603) 224-4728 EXT 201

**For Date: 09/17/2024 - Tuesday**

| Call Number | Time | Call Reason | Action | Priority | Duplicate |
|---|---|---|---|---|---|
| 24-59898 | 1745 | Initiated - DISTURBANCE | Services Rendered | 1 | |

Call Taker: BOWPTL - LAMY, PHILIP
Call Source: Initiated
Location/Address: [350 502] BOW HIGH SCHOOL - 55 FALCON WAY
Initiated By: 352 - LAMY, PHILIP
Party Entered By: 09/20/2024 1506 BOWPTL - LAMY, PHILIP
Involved Party: FELLERS, KYLE [redacted]
Unit: 352 LAMY, PHILIP
Arvd-17:45:00 Clrd-09/20/2024 @ 15:07:55
Narrative: **09/20/2024 1506 LAMY, PHILIP**

Girls Soccer Game on Detail. School Admin removed parent from game for being disruptive. Ref stopped game until elderly male remove pink arm band. Male removed from game Kyle Feller of Bow.

1823 hours after game Feller still in parking lot holding up blue sign asked to leave property. Spoken to and left.

**Exhibit O**

**For Date: 09/17/2024 - Tuesday**

| Call Number | Time | Call Reason | Action | Priority | Duplicate |
|---|---|---|---|---|---|
| **24-59119** | **1610** | **Phone - POLICE INFORMATION CALL** | **OFFICER CALLED VIA PHONE** | **3** | |

Call Taker: MCAES - SAUERHEBER, AMANDA
Call Source: Telephone
Location/Address: [350 350] BOW POLICE DEPARTMENT - 7 KNOX RD
Party Entered By: 09/17/2024 1613 MCAES - SAUERHEBER, AMANDA
Calling Party: [redacted]
Unit: BOWMDT2 HANDY, HARRY
Disp-16:13:06 Clrd-19:33:51
Narrative: **09/17/2024 1614 SAUERHEBER, AMANDA**
[redacted] ADVISED [redacted] MOM TOLDER [redacted] ABOUT A FACEBOOK POST [redacted] SAW AROUND 3 THIS AFTERNOON WHERE IT SAID NAZIS ARE COMING TO THE SOCCER GAME TODAY IN BOW AGAINST PLYMOUTH. [redacted] ADVISED THERE IS A TRANS PLAYER ON THE TEAM AND [redacted] IS PRETTY SURE WHAT THE POST IS ABOUT. THE POST HAS BEEN TAKEN DOWN AND [redacted] ADVISED [redacted] KNOWS THE MOM OF THE TRANS STUDENT AND ASKED IF [redacted] SHOULD CALL HER TO LET HER KNOW WHAT IS GOING ON...I ADVISED TO WAIT UNTIL [redacted] HEARS FROM AN OFFICER BEFORE MAKING PHONE CALLS...ADV 358



**Exhibit P**

**Exhibit Q**



UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kyle Fellers, Anthony Foote, Nicole Foote, and Eldon Rash,<br><br>Plaintiffs,<br><br>v.<br><br>Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District, Phillip Lamy & Steve Rossetti,<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

**DECLARATION OF MICHAEL DESILETS**

I, Michael Desilets, state as follows:

1. I am over the age of 18 and am of sound mind.

2. I am currently the Athletic Director of the Bow High School. In that capacity, I was aware of the passage of the law regarding transgender players in women's school sports and also the legal challenge to it brought by Plymouth soccer player Parker Tirrell. I also learned that the federal court had issued rulings allowing the player to participate in games this season.

3. On September 11, 2024, a parent of a Bow High School ("BHS") student contacted me, informing me that she had heard several Bow parents discussing protesting the decision when Parker's Plymouth team was scheduled to play Bow on September 17, 2024. The plans discussed reportedly included wearing dresses to the game, buying anti-trans gear, making signs, and generally heckling and intimidating the player.

4. Nicole Foote had previously contacted me seeking to talk about the possibility of a trans player being involved in the Plymouth soccer program. In advance of the Plymouth game I

reached out to and met with Nicole Foote to hear her concerns about the upcoming game.

5. In addition, on September 16, 2024, I emailed the soccer team parents to remind them of the rules that apply to those attending school sporting events.

6. I wrote, "I understand that there are some differing opinions regarding tomorrow's game, and that is perfectly fine. Please understand that any inappropriate signs, references, language or anything else present at the game will not be tolerated." I attached to my email a summary of the District's obligation under the New Hampshire Interscholastic Athletic Associate ("NHIAA") to follow NHIAA guidelines and policies, which include a commitment to play the teams on their schedule and a prohibition on forfeiting games. I also included language from the BHS Athletics Handbook, which provides: "It is the expectation of every fan to maintain a positive attitude, to treat players, coaches and officials with respect" and to "[s]trive to maintain positivity and not make it about anything or anyone else."

7. Anthony Foote responded by email to me at 7:55 AM the next morning (September 17, 2024 – the day of the game). Foote stated: "I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males – who are stronger, faster, and more physically dominant – compete against women. And you don't sit around waiting for someone to get hurt before you take action." He added, "I'm sick of your cowardice and your pandering" and warned, "Stand up for women, for real women, or get out of the way." A true and accurate copy of this email (with some recipient addresses redacted for privacy) is attached hereto as Exhibit A.

8. Subsequently, Matthew Fisk and I observed photographs of wristbands that Foote posted on social media.

9. These included not only those adorned with the "XX" shared with the Court but

others that were marked with a female gender symbol and some bearing the term "NAD" – shorthand for "gonad." A true and accurate copy of this photograph is attached hereto as Exhibit B.

10. On the afternoon of September 17 Anthony Foote arrived at the game early with a bag. He stood at the midfield sideline, where he was began handing wristbands out to adults as they arrived for the game. He attempted to do this discreetly.

11. After the first half ended, Foote went to his Jeep and put a poster of Riley Gaines, an outspoken critic of trans participation in women's sports, on the windshield facing the field. When Foote returned he and Fellers put the wristbands on and stayed prominently at the sideline.

12. I approached Foote and advised him that he could not protest at the game and instructed him to take off the wristbands. Foote initially refused, challenging the basis for the request. Foote eventually removed the wristband and threw it at my feet. Foote was not ejected and stayed through the remainder of the game.

13. I then approached Fellers and asked him to remove his wristband. Fellers refused to do so. Principal Fisk then asked Fellers to remove the wristband also. Fellers still initially refused but eventually complied.

14. Fellers was not told to leave the game at that time. However, Fellers and Rash continued to argue about the wristband and Rash refused to take it off.

15. During this time, referee Steve Rossetti stopped the game. I approached Rossetti, who asked what was going on. I explained the situation and asked for time to try to reason with Rash.

16. I returned to the sideline where I continued to wait for Rash to comply. Fellers continued to argue with me, Fisk, and Lt. Lamy, seeking at one point to bring other spectators into

the confrontation, while Rash refused to remove the wristband. Fellers later told Fisk and/or me that he should be supporting women and called them cowards. I then asked Lt. Lamy to remove Fellers from the game. Fellers left the sidelines at that point. Rash, however, persisted in his refusal to remove his wristband.

17. Fisk and I informed Rossetti of Rash's insistence on wearing the wristband. I also informed the Plymouth coach on the field of the circumstances. The coach stated that if Parker learned the issue stopping the game was about her she would be devastated. Rosetti then came to the sideline and informed Rash that the behavior had disturbed the game causing him to stop play and that Rash needed to remove the wristband. Rash ignored him. He later did remove the wristband and the game resumed.

18. I soon learned that Fellers had not left the school grounds but had gone to his car, which was now parked near the field and roadway. He was holding a sign above his head. I asked Lt. Lamy to instruct Fellers to leave the premises.

19. The BHS fall sports calendar was set and released to the public in the summer. Plaintiffs were thus aware of – or at least had available to them – the dates of each game the Bow girls soccer team would be playing throughout the regular season. Those included not only the game against Plymouth on September 17, 2024, but games on September 20, 24, and October 1, 5, and the upcoming game on October 8, 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2024

/s/ Michael Desilets
Michael Desilets

---

**Anthony Foote** <anthony.c.foote@gmail.com> Tue, Sep 17, 2024 at 7:28 AM
To: Mike Desilets <mdesilets@bownet.org>, Nicole Foote <nicky75@comcast.net>, [redacted]
Kyle <kylefellers@yahoo.com>[redacted]

Is this all you have to say about this game? You've proven yourselves weak, ineffective, and completely out of touch with real leadership.

This isn't "just another game"—not by a long shot. None of you had a single conversation with our team. None. You ignored us, and now you expect us to just go along with this?

I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males—who are stronger, faster, and more physically dominant—compete against women. And you don't sit around waiting for someone to get hurt before you take action.
Look at Reilly Gaines. Look at the Massachusetts basketball team, or the field hockey player who ended up with a fractured skull and missing teeth. Look at our own US women's national soccer team, humiliated by a group of 15-year-old boys. How many more examples do you need before you wake up?

I'm sick of your cowardice and your pandering. You'd rather be "woke" than do what's right. Where's your courage? Where's your integrity? Stand up for women, for real women, or get out of the way. Protect our daughters before someone else gets hurt.

It's no wonder this school has dropped to 19th in the state. You've lost sight of what matters, and we're all paying the price.

[Quoted text hidden]

---


Highlights
THE INCOGNITO ISSUE
Make Invisible
SPIES IN NATURE
NAD
NAD
NAD

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kyle Fellers, Anthony Foote,
Nicole Foote, and Eldon Rash,

Plaintiffs,

v.

Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District, Phillip Lamy & Steve Rossetti,

Defendants.

Case No. 1:24-cv-311-SM-AJ

**DECLARATION OF MARCY KELLEY**

I, Marcy Kelley, state as follows:

1. I am over the age of 18 and am of sound mind.

2. I am the Superintendent of Schools for SAU 67, which includes the Bow School District ("the District").

3. In the summer and early fall I was aware of the passage of House Bill 1205 concerning the participation of trans-girls in girls' sports in New Hampshire and legal challenges that had been brought against the law. I also learned that some parents of Bow students had discussed protesting the participation by a Plymouth Regional High School student at a game to be played at Bow High School on September 17, 2024.

4. The District has a policy addressing conduct on school grounds entitled "Public Conduct on School Property" ("Policy KFA"). The policy conveys that the District expects "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." It also prohibits visitors to school property from engaging in conduct that would

"threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person" or "delay, disrupt, or otherwise interfere with any school activity." The policy forbids persons from violating other school policies or regulations or the directive of a authorized District employee and puts visitors on notice that violation of the policy could lead to being ordered to leave school grounds and the issuance of a "no trespass" order.

5. The plans discussed by the various parents at the previous game would violate the policy.

6. School administrators, including Principal Matthew Fisk, Athletic Director Michael Desilets, and I discussed the information received by Desilets and considered how to protect the visiting student from harassment. Because we did not know exactly what to expect from the parents, I also advised the local police of our concerns and asked if they could have an officer in the area. Lt. Philip Lamy later informed the school that he would come to the school for the game.

7. I was on school grounds on September 17 and was in communication with Fisk and Desilets. I was informed that some parents had worn wristbands and were told to remove them. I also was told that Kyle Fellers had been instructed to leave the field.

8. I observed Fellers move his car to a more prominent position by the roadway. There, he removed a handwritten sign from his car reading "Protect Women Sports for Female Athletes" and held it above his head. He was situated in an area where his sign would be visible to the Plymouth bus as it left the school with the Plymouth team on board. I asked Desilets to instruct Lt. Lamy that Fellers was to be told to leave school property.

9. I reviewed the overall events with Desilets and Fisk after the game.

10. I issued no trespass orders to Anthony Foote and Fellers. I based the Foote No Trespass order on the fact that he had been expressly reminded of the school policy on civility and

had nevertheless organized and participated in a protest and behavior that targeted a specific opposing player, here 15-year-old Parker Tirrell. Feller received a longer No Trespass Order – the remainder of the soccer season – because of his abuse of school administrators, his prolonged refusal to remove his wristband, his refusal to follow the directions of Lt. Lamy, and his targeting of 15-year-old Parker Tirrell both at the game and in the parking lot.

11. Foote, through counsel, notified me that he intended to challenge the No Trespass order before it expired but subsequently notified her that he would not be doing so. Fellers communicated with me several times about the impact of the No Trespass order on his ability to pick up and drop off his children and attend events. Based on those discussions, I twice amended the order to permit Fellers to attend school and activities unrelated to soccer. Neither Fellers nor Foote approached me about additional requests prior to the filing of this suit. By Foote's admission, he has been attending games since his No Trespass order expired.

12. After the September 17 game, the District designated an area by the field where those who wished to protest the administration – not players – could gather. The area was just in front of the scoreboard from which the games can be viewed. Protesters can gather there from 30 minutes before a game until 30 minutes after the game. Protesters are still obligated to follow the applicable school policies, including policy KFA. I circulated notice of the designated area to the soccer families.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2024

/s/ Marcy Kelley
Marcy Kelley

**BOW SCHOOL BOARD POLICY** **KFA**

# PUBLIC CONDUCT ON SCHOOL PROPERTY

For purposes of this policy, "school property" means any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private.

The School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event. No person on school property or at a school event shall:

1. Injure, threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person;
2. Damage, or threaten to damage, another's property;
3. Damage or deface School District property;
4. Violate any Federal or New Hampshire law, or town or county ordinance;
5. Smoke or otherwise use tobacco products;
6. Consume, possess, distribute, or be under the influence of alcoholic beverages or illegal drugs, or possess dangerous devices or weapons;
7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner);
8. Enter upon any portion of school premises at any time for purposes other than those that are lawful and authorized by the School Board;
9. Operate a motor vehicle in violation of an authorized District employee's directive or posted road signs.
10. Violate other District policies or regulations, or an authorized District employee's directive.
11. Possess a weapon. For the purpose of this policy a "weapon" includes but is not limited to: sling shot, metallic knuckles, billies, knives, electric defense weapons (as defined in RSA 159:20), aerosol self-defense spray weapons (as defined in RSA 159:20), and martial arts weapons (as defined in RSA 159:24). Weapons under control of law enforcement personnel are permitted.

Any person who violates this policy or any other acceptable standard of behavior may be ordered to leave school grounds. Law enforcement officials may be contacted at the discretion of the supervising District employee if such employee believes it necessary.

Additionally, the District reserves the right to issue "no trespass" letters to any person whose conduct violates this policy, acceptable standards of conduct, or creates a disruption to the School District's educational purpose.

***Legal References:***

*RSA 193:11, Disturbance*
*RSA 635:2, Criminal Trespass*

Reviewed and approved by the Bow School Board
@ its Meeting of ___________________________

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kyle Fellers, Anthony Foote, Nicole Foote, and Eldon Rash,<br><br>Plaintiffs,<br><br>v.<br><br>Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District, Phillip Lamy & Steve Rossetti,<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

**DECLARATION OF MATTHEW FISK**

I, Matthew Fisk, state as follows:

1. I am over the age of 18 and am of sound mind.

2. I am the Principal of the Bow High School.

3. In the summer and early fall of this year, I became aware that some parents of Bow students were planning to protest the participation of a Plymouth Regional High School student in an upcoming game at Bow.

4. One of these parents was Anthony Foote. Athletic Director Michael Desilets and I observed photographs of wristbands that Foote posted on social media. They included wristbands with various markings such as "XX," "NAD" and the women's gender symbol.

5. I attended the game between Bow High School and Plymouth Regional High School on September 17, 2024.

6. Anthony Foote arrived at the game early and stood at the midfield sideline, where he was handing wristbands to adults as they arrived for the game. He attempted to do this

discreetly, apparently recognizing that his actions would violate school standards.

7. After half-time I saw that Foote was wearing a wristband similar to those he had posted online. Desilets requested that he take it off, which he initially refused to do. After several requests and some argument from Foote, he removed the wristband.

8. I also noticed that Kyle Fellers was wearing a similar wristband. Desilets asked him to remove the wristband and Fellers refused to do so. I then approached Fellers and likewise instructed him to remove the wristband or leave the game. Fellers repeatedly and loudly challenged this instruction calling us "Nazis." Fellers' tone was elevated and angry. Fellers removed the wristband, only to pass it to Eldon Rash. Fellers was not asked to leave the game at that time.

9. Rash was sitting in a chair approximately fifteen feet from the playing field. I saw that he was now wearing the wristband and directed him to remove it, which he repeatedly refused to do. Fellers began arguing with Desilets and me on the sideline right behind Rash.

10. Bow Police Lieutenant Philip Lamy came over to where we were engaged with Fellers and Rash. Fellers continued to argue with Desilets, Fisk, and Lt. Lamy, seeking at one point to bring other spectators into the confrontation, while Rash refused to remove the wristband. At one point, Fellers claimed the wristband was to "protest breast cancer." After Fellers again called one or both of us cowards, Desilets asked Lt. Lamy to remove Fellers from the area. Fellers then left the sidelines.

11. As this was happening, referee Steve Rosetti stopped the game. Desilets and I informed Rossetti of Rash's insistence on wearing the wristband. Rosetti then came to the sideline and informed Rash that the behavior had disturbed the game causing him to stop play and that Rash needed to remove the wristband. Rash ignored him. In fact, he only eventually removed the

wristband when other spectators beseeched him to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2024

/s/ Matthew Fisk
Matthew Fisk

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kyle Fellers, Anthony Foote,<br>Nicole Foote, and Eldon Rash,<br><br>Plaintiffs,<br><br>v.<br><br>Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District, Phillip Lamy & Steve Rossetti,<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

**DECLARATION OF PHILIP LAMY**

I, Philip Lamy, state as follows:

1. I am over the age of 18 and am of sound mind.

2. I am currently a Lieutenant with the Bow Police Department, where I have been employed as a police officer since 2009.

3. At the request of the Bow School District, I performed a detail at the Bow High School on September 17, 2024.

4. While there, after half-time, I observed Michael Desilets and Bow Principal Matthew Fisk in a discussion with two men I understand to be Kyle Fellers and Eldon Rash.

5. I approached the men. As I stood by, Fellers continued to argue with Desilets, Fisk, and now me that Rash did not have to remove a wristband he apparently was wearing, citing the First Amendment and comparing the situation to Germany in the 1930’s and 1940’s. After an extended discussion, Desilets asked me to remove Fellers from the game. Fellers then left the immediate area.

6. I was later informed by Desilets that Fellers was at the parking lot by his car holding up some sort of sign. Desilets asked me to instruct him to leave the area.

7. I approached Fellers in the parking lot and directed him to leave. I was neither particularly close to Fellers nor did I raise my voice.

8. Despite my repeated instructions to leave the premises, Fellers refused to do so. In fact, Fellers tried to provoke me into arresting him. I chose not to do so. After Fellers put his sign away I left the scene.

9. This entire interaction with Fellers and Rash at the sideline was captured on my body-worn camera, as was my subsequent interaction with Fellers in the parking lot.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2024

/s/ Philip Lamy
Philip Lamy

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH, Plaintiffs, v. MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT, Defendants. | Case No. 1:24-cv-311-SM-AJ<br>October 8, 2024 |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE STEVEN J. McAULIFFE
UNITED STATES DISTRICT JUDGE

APPEARANCES

FOR THE PLAINTIFFS:

ENDEL KOLDE
NATHAN JOHN RISTUCCIA
Institute for Free Speech
1150 Connecticut Avenue NW, Suite 801
Washington, D.C.  20036

RICHARD J. LEHMANN
Lehmann Major List, PLLC
6 Garvins Falls Road
Concord, New Hampshire  03301

FOR DEFENDANTS KELLEY, DESILETS, FISK, ROSSETTI, BOW SCHOOL DISTRICT:

BRIAN J.S. CULLEN
JONATHAN M. SHIRLEY
Cullen Collimore Shirley
37 Technology Way, Suite 3W2
Nashua, New Hampshire  03060

FOR DEFENDANT LAMY:

ERIC A. MAHER
Donahue Tucker and Ciandella, PLLC
83 Clinton Street
Concord,  NH 03301

OCTOBER 8, 2024

AFTERNOON SESSION

THE CLERK: The Court is in session and has for consideration a motion hearing in the matter of Kyle Fellers, et al. vs. SAU 67 Superintendent, et al. Case No. 24-cv-311-SM.

THE COURT: How do you pronounce your name, Mr. Kolde?

MR. KOLDE: Endel Kolde or Kolde; Kolde is fine.

THE COURT: What do you prefer?

MR. KOLDE: Kolde is fine, Your Honor; it's easier.

THE COURT: But what do you prefer?

MR. KOLDE: Kolde a little bit.

THE COURT: Kolde?

MR. KOLDE: Yeah.

THE COURT: Okay. Mr. Kolde, it's your motion.

MR. KOLDE: Thank you, Your Honor. And before I begin, I just want to introduce my clients that are in the courtroom. We've got Nicole Foote, Andy Foote, Kyle Fellers, and Eldon Rash.

May it please the Court. A lot of ink has been spilled about *Tinker* and with good reasons.

THE COURT: Not enough. Do you think *Tinker* applies? I don't think it does.

MR. KOLDE: Well, I think I agree with you. I think in some ways it does, and in other ways it does not. The similarities are somewhat obvious, at least on the surface.

THE COURT: Well, it's not student speech, right?

MR. KOLDE: I agree with that.

THE COURT: All right. So...

MR. KOLDE: I think that matters. Both do involve passive silent protest by wearing a piece of cloth on the wrist, color symbolizing viewpoint, black in *Tinker*; pink for women's sports in our case.

The *Tinker* armbands also had a peace symbol on them, and some of our wristbands had the symbol XX for female chromosomes. Both involve a contentious social and political issue that divides Americans, and in both cases there was fear of possible disruption but no evidence of actual disruption. Both cases involve an overreaction by school officials.

But as I think this Court's question pointed out, this case is -- our case is fundamentally stronger than the plaintiffs in *Tinker* in ways the defendants have largely ignored. Our plaintiffs are adults, not

students. And unlike the students in *Tinker*, they are not speaking in the classroom or a hallway during school hours. They are speaking in a limited public forum after school.

And, you know, we didn't really get the benefit of their briefing until yesterday, but they don't engage with this issue, and we didn't have time to reply, but if the Court wants a case on the notion that adults have more rights than students, there's the *Mcelhaney* case --

THE COURT: I would say different.

MR. KOLDE: Different?

THE COURT: Different rights.

MR. KOLDE: Yes.

THE COURT: Yeah.

MR. KOLDE: 81 F. 4th 550 at 558.

THE COURT: No, I'm familiar with *Mcelhaney*.

MR. KOLDE: Okay. Very good, Your Honor.

So First Amendment cases rise and fall, ordinarily on forum analysis. As the Court knows, we start with, What is the forum? This is an after-school sporting event, a limited public forum. Clear case law cited in our brief supports that. They don't really talk about forum analysis, but even the *Foote* case, no relation to our Footes, says that sporting events, school sporting

events are a limited public forum. That's important.

Limited public forums are not subject to the same kind of balancing test that in-school student speech is. In a limited public forum, the government can have reasonable content-based restrictions if they are related to the purposes of the forum and viewpoint neutral. They must be viewpoint neutral. Defendants have essentially done no forum analysis. They've treated my clients like students, but they're adults.

Importantly, Defendants all but admit they were engaging in viewpoint discrimination. The whole point of their free speech crackdown was to prevent my clients from expressing their views about reserving women's sports for biological women. Everyone in this courtroom knows that if my clients had worn rainbow wristbands to celebrate trans inclusion or blue and white wristbands to support Ukrainian resistance to Russian aggression, nothing would have happened.

They have no argument that what they did was viewpoint neutral. And in a limited public forum, what they did is per se illegal. There is no viewpoint discrimination allowed. In a classroom, schools are allowed to engage in some viewpoint discrimination. For example, you cannot promote drugs or substance abuse.

Here, my clients wanted to quietly express their views about women's sports at a women's sporting event. Their speech was not off topic. It was just her own point of view that the defendants wanted to prevent from being expressed, and they are open about it. They describe my clients like criminals, furtively distributing wristbands like drugs or contraband, or pamphlets denouncing the monarchy or taxation without representation. And they treated the pink wristbands as beyond the pale because of their viewpoint.

What is also interesting is that defendants appear to concede that there was no actual disruption until school officials began confronting my clients and forcing them to remove their wristbands. Understandably, my clients didn't like being told that they couldn't wear the wristbands, and they voiced their opposition to it.

Americans don't have to be nice to government officials, especially when their rights are being violated. It is the birthright of all Americans to talk back to the government. That's why we have the First Amendment. Our country was founded on people who were literally committing treason to found the United States.

Now, there are numerous cases that stand for the

proposition that Americans can speak disrespectfully to government officials. I've litigated some of them: *Mama Bears of Forsyth County* --

THE COURT: Do you think -- is it your contention that the protest, such as it was, was aimed at who? Because, as I understand the context, which is *Everly* --

MR. KOLDE: Yeah.

THE COURT: -- there's nothing the school district could do about transgender girls playing on girls' teams. There was a Federal Court injunction, and the particular plaintiff in that case was an actual player at that event.

What was the -- you said criticizing officials, but who was it aimed at, the Court?

MR. KOLDE: Okay. I think there's a fair clarification. So the wristbands are -- themselves, are an expression of support for women's sports. They are also an expression of opposition to including biological men in women's sports. They were not directed at any particular player on the other team, and there's no evidence that it was directed at Parker Tirrell, for example. There's been no evidence submitted by Defendants in this case.

THE COURT: What's your position? It would

be, Yes, there's a lot more -- there's a lot more leeway to criticize government officials --

MR. KOLDE: I'm sorry, Your Honor, I'm having a tough time hearing the Court with the background noise.

THE COURT: Oh, it's all right. It's a kid; it's not a problem.

There's a lot more leeway, as I read the case law, for an adult to criticize government officials than, certainly, to criticize a student engaged in a school activity. We agree with that. You can't harass a kid during a school --

MR. KOLDE: We agree, you can't harass a kid during school.

THE COURT: You can, however, you have great leeway of criticizing government officials.

MR. KOLDE: Yes, and I think --

THE COURT: Now -- I'm not finished.

MR. KOLDE: Oh, yeah. Fair enough.

THE COURT: So we agree there.

MR. KOLDE: Yeah.

THE COURT: So then the question is: What is your view of what the protests consist of? Protests in space? In other words, I'm just broadcasting to the universe that this is our view, or is it aimed at

somebody?

MR. KOLDE: So a couple things, Your Honor. There's no evidence it was aimed at anybody in particular.

THE COURT: That is your position.

MR. KOLDE: That is our position.

THE COURT: Not aimed in the anyone in particular.

MR. KOLDE: Not aimed at anyone in particular. It was merely an expression of how they felt about it.

THE COURT: Okay. Fair enough.

MR. KOLDE: It was aimed at the community in general. It was aimed at the community in general, including other parents who were present. It could be aimed at school officials who were present.

THE COURT: Semi-persuasive advocatory.

MR. KOLDE: I would say it's a passive expression of support for women's sports and for opposition --

THE COURT: The point being, garner support for my view. I want garnered support among those who have input for our view.

MR. KOLDE: Yes. And we disagree with --

THE COURT: Advocatory in a way.

MR. KOLDE: We disagree with the Court's ruling in the *Tirrell* case, which will certainly be appealed, and may not be the last word on the New Hampshire state law.

THE COURT: Courts don't care.

MR. KOLDE: Yeah, right.

THE COURT: But what I'm trying -- so that's your position. So here's the real question: In context, doesn't the factual record have to be developed before I, or a jury, could determine whether that's the case?

MR. KOLDE: I don't think they --

THE COURT: It wasn't directed at the other player. I'm going to guess and say the school district takes a different view of that.

MR. KOLDE: They have not said anything to that effect, Your Honor, and if you look at their declarations, there's no evidence anything was directed to the other player.

THE COURT: Okay. Well, we'll see. Supposing they do, doesn't that factual issue have to be developed and resolved?

MR. KOLDE: We would argue that --

THE COURT: Because you've agreed you can't direct that kind of protest at a kid.

MR. KOLDE: It depends on what it is, Your Honor. It depends on what the conduct is. If it's harassing -- and I'm using the definition of harassment that is in the *Doe vs. Portland Public Schools*, 701 F. Supp 3d 18 at 36.

THE COURT: You're familiar with the *L.M.* case, I assume?

MR. KOLDE: Of course.

THE COURT: Judge Barron there talks about demeaning speech towards an immutable characteristic of someone's personal identity, that sort of thing. Wouldn't this fall into that category, if it were directed at the student?

MR. KOLDE: Well, first of all, you could argue about whether it's an immutable characteristic or not, and, you know, we can get into gender ideology and feelings about gender and feelings about biological sex, you know, which is -- and queer theory which underlies a lot of trans ideology. We don't need to get into that.

THE COURT: That makes -- requires even more factual development.

MR. KOLDE: So *L.M.* is in a school setting, and we all agree, and I think the Court would agree, that the school officials have a lot more leeway to

regulate student speech in a school setting. This is adult speech in a limited public forum, and there's no evidence in any of their declarations that any speech was directed at Parker Tirrell.

If we look at the facts, Parker Tirrell didn't even know what was going on. The -- when Rossetti, the referee, stopped play -- if you look at their declarations, they're talking about, you know, What's going on? Why is play being stopped? Well, they won't take the wristbands off. This had nothing to do with Parker Tirrell expressing any concerns or feeling that comments were directed at Parker. Parker didn't even know what was going on. And nothing in their declarations indicates that Parker did know.

They do talk about a concern that other types of potentially harassing behavior was going to occur at that game that did not occur. They talk about rumors. They talk about hearsay. They don't say who said them or where they got the information about people wearing dresses. Didn't happen. About people shouting things.

THE COURT: Before we stray too far, I think I agree with you that this -- *Tinker* is not the analytical approach to take in this case. It's limited public forum --

MR. KOLDE: Correct.

THE COURT: -- analysis.

But doesn't *Tinker* inform us as to the nature and scope of the school district's duty with respect to students engaged in school activities?

MR. KOLDE: If they're in the classroom, yes.

THE COURT: Well, no. They're under school supervision in all kinds of extracurricular activities on school property; for example, athletics. They're still -- they're still under school supervision and direction, aren't they? The only difference being that now is you have adult invitees into the limited public forum, but their duty to the students doesn't change; it doesn't become less because they're playing soccer than they are in drama club or something, or does it? You think it does?

MR. KOLDE: Well, I think it depends on what you're saying, Your Honor. I'm coming at it from the plaintiffs' --

THE COURT: Well, *Tinker* says, Look, schools are different because educators have a responsibility to mold and direct and educate children and protect them. That's why they can limit speech, to a greater extent. An adult is different. An adult in a limited public forum is different, different rights, but the duty to the students translates to the limited public

forum.

MR. KOLDE: Well, I don't think you can use the duty to the students as --

THE COURT: Duty to protect.

MR. KOLDE: But protect from what? Harmful ideas?

THE COURT: Harassment, intimidation, threats, disruption.

MR. KOLDE: There are no facts supporting that.

THE COURT: I know that. We're talking about law here; we're not talking this case.

MR. KOLDE: I mean, in theory, if somebody is --

THE COURT: I'm trying to find out what -- do we have a ground for agreement that *Tinker* sets the standard for a school's obligation towards students. It doesn't -- I agree with you, I think; it doesn't dictate the analysis for determining the extent of adult rights attending an event.

MR. KOLDE: I don't think *Tinker* sets the standard. I think *Tinker* provides some persuasive authority in this case because, in *Tinker*, you had a similar concern about potential disruption that never occurred. I would point the Court to Footnote 3 in

*Tinker* where there was a discussion about concern, for example, that other students would respond by wearing different color wristbands or armbands, as if that were a big deal.

THE COURT: Your argument is, they couldn't restrict the symbols in *Tinker*; they sure as heck can't restrict the symbols in the limited public forum.

MR. KOLDE: You got it, Your Honor.

THE COURT: But in my mind, it raises a question that says, Well, to what degree can the school limit the public -- the semi- -- the limited public forum? What restrictions on speech can they impose? And that might turn on, What's their aim? What's their goal? What authority, what duty are they vindicating in imposing an instruction? And you seem to be saying, No, no, that doesn't have anything to do with it.

MR. KOLDE: Well, I didn't say that. Two-part answer, Your Honor. Number one, inherent in the proposition that my clients were engaging in a passive, quiet protest by wearing wristbands is that they were not directing harassing comments at any particular player. So I think -- I think that's very important.

Might there be a different situation if my clients had directed comments at Parker Tirrell or any

particular player? Yeah, this would be a different case. But there is no evidence of that in this case. And I think it's very important, all the things they have said, they have not pointed to one act of a particular comment being directed, derogatory comment, being directed at Parker Tirrell specifically. It's not in their declarations. They talk about things they were worried about that might happen but did not happen, and that's not good enough to censor speech.

I think another thing where the Court may have misunderstood me earlier is that we didn't learn until we got their declarations and responsive filings is part of what seems to be motivating them here is that they are upset that our clients talked back to them when they asked them to remove the wristbands. And they seem to be particularly upset that Kyle Fellers said that they were acting like Nazis.

And this is what I was talking about specifically, about talking back to officials, Your Honor. Okay? They got mad because my clients didn't comply right away. And, particularly, Kyle Fellers talked to them and called them Nazis, which he is entirely entitled to do.

And this is my point in citing *Marshall vs. Amuso*, my case, 571 F. Supp. 3d 412 at 422. That's a

Pennsylvania case, also school boards; *Mama Bears of Forsythe County*, also my case, school boards case, 642 F. Supp. 3rd 1338, 1350. That one is the Northern District of Georgia. Not my case but a very important case, *Ison*, 6th Circuit, 3 F. 4th 887 at 895. All cases where school board officials got upset because parents were criticizing them in ways they didn't like, and they overreacted by censoring speech. That does seem to be playing a role here. That was my point.

The wristbands are, in part, directed at the school officials but not specifically. They don't have their names on them. My clients weren't waving them in their faces. They are directed at the community at large. Many people that were at that event had no idea my clients were wearing the wristbands or what they stood for. There only was any attention drawn to them, almost like the Streisand effect, when Defendant officials came over and singled them out and made them remove the wristbands. If they would have just left my clients alone, there wouldn't have been any problem. Likely Parker Tirrell wouldn't have even know that people were wearing these wristbands because, guess what, people wear pink wristbands all the time for different reasons -- breast cancer awareness or just because they want to wear a wristband.

THE COURT: The record suggests one of your clients held up a sign, I can't remember what it said, but a sign about this issue aimed at the opposing school bus when it was leaving. Does that change anything? That's not a passive wristband.

MR. KOLDE: I would say our focus is on the wristband, Your Honor.

THE COURT: I know. My focus at the moment is on the sign. Does that change anything?

MR. KOLDE: So -- I don't think so because the sign didn't say anything --

THE COURT: Clearly, it was directed at students.

MR. KOLDE: It was out in the parking lot. There's no evidence the students saw it. There was a --

THE COURT: I thought he was holding it up at the bus as it left.

MR. KOLDE: That's what they thought would happen, but the bus wasn't going by; and, you know, my client, if he were to testify, would say, I moved my car so I could watch my daughter's soccer game. I couldn't see it where my car was parked before. By the way, I had the sign in my windshield during the entire first half. It was a positive message about women's

sports. It said nothing about Parker. It said nothing specifically about trans people or trans athletes.

THE COURT: What did it say?

MR. KOLDE: I would have to look at the declaration to get the exact language of it. Give me a moment, Your Honor.

"Protect women's sports for female athletes." It's a handwritten poster. That's it. And he would testify the reason he held it up was because he had been excluded from the game and forced to remove the wristband which, obviously, he didn't like and was upset about to the point that he called the school officials Nazis, which they didn't like and almost led to them arresting him. And by the way, I understand why people wouldn't want to be called Nazis, but Americans have a First Amendment right to say that to government officials.

So -- and let's look at what their response has been post this event. They've created this no-protest zone, or this protest zone, and presumably outside of the protest zone no free speech activity of any kind is allowed. Presumably, my client if he were to come back to soccer games, and he's not, which is why we're here, could go to the scoreboard area now, the designated protest area, and hold up his sign. He would actually

be closer to the field than he would have been -- than he was on that day. So, really, their argument doesn't really make any sense. Again, there's no evidence that Parker --

THE COURT: Do you agree that this -- it turns on a limited public forum analysis, and that, it seems to me at the moment, turns on the extent to which adult speech can be limited in that forum; and that, it seems to me, turns on the extent of the scope of the school district's obligation or authority to protect children. Isn't that how the analysis would go?

MR. KOLDE: Not in any case I've ever seen, Your Honor. Not in any case I've ever seen. In a limited public forum, there is no viewpoint discrimination.

THE COURT: No. No. Assuming it's content, not viewpoint; it's no --

MR. KOLDE: What would that be, Your Honor?

THE COURT: I agree it's hard -- well, no protest of any kind with respect to transgender athletes playing on school teams.

MR. KOLDE: That's viewpoint. That's obviously viewpoint.

THE COURT: No, it's content. No. No viewpoint. Not for. Not against. No demonstrations

at our school event.

MR. KOLDE: But the record is that people have worn Pride pins and have been observed wearing pro-LGBT messages on school grounds. So, I mean, clearly, positive messages are allowed, and we all know this wouldn't have happened if somebody was wearing a Pride pin.

THE COURT: I understand that this was a specific restriction tied to the context of the current events; it wasn't -- it wasn't generalized. It was --

MR. KOLDE: I would disagree, Your Honor. And I would say that it's clear here that the defendants retaliated against my clients for expressing their speech rights and for talking back to them when they were asked to remove the wristbands. Parker Tirrell --

THE COURT: What evidence is there that they opposed the viewpoint? I mean, I think there's a note or something that was sent to all the parents by the athletic director. I agree it wasn't very clear. It wasn't very effective perhaps, but it had something to the effect of, Hey, different viewpoints are perfectly fine, just don't -- as I read it, just don't bring any demonstration to an activity related to this subject. It's all inferential. It refers to that game, but I

think we agree, in context, we understand that game was about transgender girls participating in girls' sports, right? Everybody understood that.

MR. KOLDE: May I answer the question, Your Honor, or...?

THE COURT: Yeah.

MR. KOLDE: Okay. So I would say there's a number of pieces of evidence that show that it was viewpoint discrimination.

THE COURT: No, no, no. The last question. We all understand and agree, do we not, that the context was this game was significant in that it was a transgender girl playing on a girls' sports team and they were playing in Bow on Tuesday or whatever.

MR. KOLDE: That was part of the context and that made the --

THE COURT: So I'm trying to, in other words, set a context for the athletic director's e-mail he sent to everybody. When he said, You can have a different view, either side, that's what he was talking about.

MR. KOLDE: Yeah, but that's not how they acted.

THE COURT: Okay. But do we agree that's what he was talking about?

MR. KOLDE: That you can have a different view? No, I think that he didn't mean it because --

THE COURT: No. No. You're missing the point.

MR. KOLDE: Okay. I'm missing the point.

THE COURT: Try again. Do we agree that when he wrote that -- I agree, unspecific, perhaps not effective -- memo to all the parents, when he said, You can have different viewpoints on this and that's okay, do we agree that what he's talking about is transgender girls playing on girls' sports teams?

MR. KOLDE: Probably. Probably.

THE COURT: Okay. Good. That's all I was trying to get.

MR. KOLDE: Okay. Good. But you asked me what is the evidence that this is viewpoint discriminatory.

THE COURT: Right.

MR. KOLDE: There's several pieces. One, it starts with the e-mail sent by Marcy Kelley several days ahead of time when they say, "We've caught wind of a protest, and we want extra support." So they caught wind of a protest and they understand people are going to express opposition to the inclusion of biological males in female sports. All right? So that's a

viewpoint. Clearly, it's a viewpoint. It's viewpoint based. It's only because this one trans player is going to be present there.

In the actual no trespass notices that were issued by Marcy Kelley, there is a reference to the speech activities of my clients, which shows that it was the -- their protest, their silent protest, which was the problem. "The reason for this action is your conduct during the girls' varsity soccer game on Tuesday, September 17th, specifically prior to and during the soccer game, you brought and distributed pink armbands to parents and other attendees to protest the participation of a transgender female on the other team."

That is absolutely viewpoint. I mean, they put it in writing on an official document. It's in both of the no trespass orders. It's just -- is refutable. And they are proud of it, Your Honor. They think they're right, and they have the right to do this. And you know what? People can disagree, and they can have their view, but my clients have a right to passively express their views on this issue in a way that did not interfere with the game and did not impinge on Parker Tirrell's rights, or anyone else's rights there, because it was an open, public forum.

This is viewpoint discrimination. It's automatically --

THE COURT: I tend to agree with you and then -- your comment raises, again, that specter of doesn't this factual record require development, and don't factual findings have to be made as to exactly what you described? Was that, in fact, the case, or was it in fact --

MR. KOLDE: Not for a TRO and not given that they actually don't dispute that this was viewpoint based. They haven't disputed that and, like I said, they're proud of it, and they said, This is why we did it.

I want to address just one other issue because it's part of the posture of why we're here on the TRO, Your Honor. There's limited time left in the season. Some of my clients have already lost the right to be present at numerous games -- in Kyle Fellers' case, five games, to support his daughter. There are five games left in the regular season, including one tonight. Please note that the no trespass order is extraterritorial; it applies to away games also, so he would be risking arrest or extension of that order if he goes to the away game.

THE COURT: How does that work? How does the

Bow School District prohibit attendance at a Winnacunnet School District game?

MR. KOLDE: They may have interlocal agreements. I don't know. "You are also prohibited from attending any Bow School District athletic or extracurricular event on or off school grounds." It applies to away games. That's what they said. And I could not, in good conscience, advise my client to go and get arrested.

THE COURT: Right.

MR. KOLDE: Okay? So there's a game tonight. There's four more games after this, and, potentially, there's playoffs. So we need short-term relief to allow him to go back to the games. He does want to express his views through passive, silent protests by wearing the pink wristbands. That's the most important part. You know, he would like to also display signs in the parking lot, but the wristbands are the most important part and being able to display them on sidelines.

And here's what I think is very important. There is no evidence in the record, and that's because there isn't evidence to that effect, that there are going to be any trans players at any of these games. Okay? Plymouth is not on the schedule. Parker Tirrell --

THE COURT: Just so I have your position because I'm writing now --

MR. KOLDE: Yeah?

THE COURT: -- your position is, your client seeks an injunction that would -- or a restraining order that would permit him to not only attend these games but to protest in support of, or against, the inclusion of transgender girls on girls' sports teams.

MR. KOLDE: Yes, and to protest in support of women's sports. There's multiple messages. Part of it is, we want to celebrate women's sports; and part of that celebration is, we don't want, you know, biological men included in competing in women's sports --

THE COURT: Right. Okay.

MR. KOLDE: -- but passively, by wearing the pink wristband.

Importantly, if this is about protecting Parker Tirrell, Parker Tirrell is not going to be there. Parker Tirrell is not going to be at any of the games that are going to be on the schedule. Not tonight. Not at the end of the week. Not through the end of the season. Plymouth is not on the schedule. No evidence that any trans player is going to be there.

So if their real goal was to protect Parker

Tirrell, that is not met by excluding my client Kyle Fellers or by preventing my other clients from passively expressing their viewpoint by displaying their pink wristband. It does show to me, however, and I would urge the Court to take note of this, that this is punitive, and that is shown by the tone and the actions of Marcy Kelley specifically.

She all but admits this in her declaration. She uses very paternalistic language almost like my clients are children in one of her classes. The gist of her response is, Speech has consequences. We told you not to express your views. You didn't listen to us. We saw your pink wristbands, and even though nobody else knew what was going on, we swooped in, asked you nicely to take them off, and then you said mean things to us. You accused us of violating First Amendment rights, and you called us members of a foreign political party not known for tolerating dissent.

History, Your Honor, does not always repeat itself, but it does sometimes rhyme. It rhymes here. We are not in New Zealand or Continental Europe. Americans are allowed to engage in speech that government officials disagree with. We're allowed to criticize government officials specifically including in ways that are unkind.

Let's engage in a thought experiment. If their speech crackdown was really about protecting Parker Tirrell, why is Kyle Fellers banned from attending soccer games in which Parker Tirrell is not playing in? This is retaliation, First Amendment retaliation.

We all know the reason. Marcy Kelley is sending a message: If you cross me, there will be consequences. I'll punish you by keeping you from being able to watch your kid or even picking up your kid. My client can't even pick up his daughter from soccer practice. What does that have to do with protecting Parker Tirrell? Parker Tirrell is not at the Bow High School soccer practice.

THE COURT: Was that not modified?

MR. KOLDE: No.

The day after we filed this lawsuit, they also doubled down on their speech restrictions by appointing a designated protest area by the scoreboard and away from the sidelines. It's wholly unnecessary for a silent protest wearing wristbands. Also doesn't make any sense. Let's say that somebody wanted to protest in favor of trans rights by wearing a Pride flag pin to a girls' cross-country event on the sidelines -- which, by the way, we would defend their right to do that -- can't do it under this policy. If you want to do that

at a cross-country event, silently express support for trans rights, you have to go to the designated protest area by the soccer field, and you can only do it before and after a girls' soccer game, not during the cross-country event or maybe a swimming event or some other sport. It's clearly targeted at my clients. Just the whole zone is viewpoint discriminatory.

If you want to express your support for the Harris/Walz ticket or Kelly Ayotte for Governor by wearing a t-shirt, you can only do it in the designated protest area. You can't wear it anywhere on school property, and you can only do it during girls' -- or right before and after girls' soccer games. Makes no sense.

Also, look at the e-mail from Marcy Kelley transmitting the notice, Your Honor. She threatens to suspend soccer games if parents don't comply. She even suggests spectators will be banned altogether, no spectators, even in the complete absence of any other disruption, holding the parents' First Amendment rights hostage to their wish to support their own kids on the athletic field. Why is that? Because she wants to control their speech. The creation of the designated protest area itself is evidence of viewpoint discrimination, as if we needed any more.

So I have focused on our request for relief already. We want both the ability for Kyle Fellers to return to the soccer games and to pick his daughter up from soccer practice. We also, in particular, wanted the right to silently and passively protest by wearing the pink wristbands and also by displaying signs in the parking lot.

The second component here is that my clients are self-censored, Your Honor. They have been deprived of their right to silently and passively express their support for women's sports. That harm is ongoing, being the right to speak is, per se, irreparable harm. Any reasonable person under these circumstances would not want to risk getting banned or arrested or cause any Bow soccer team to forfeit a playoff spot because Marcy Kelley is unhappy with parents who were expressing a viewpoint that she disagrees with.

I think I want to close, Your Honor, by just pointing out the definition of harassment in the *Doe vs. Portland Public Schools,* that's the 701 F. Supp 3rd 18 at 36, District of Maine case, fairly recent. It quotes from the Merriam-Webster dictionary definition. "Harassment" means to annoy persistently, to create an unpleasant or hostile situation for, especially by invited and unwelcome verbal or physical contact. Goes

on to Black's Law Dictionary likewise defines "harassment" as words, conduct or action, usually repeated or persistent; that being directed at a specific person, annoys, alarms or causes substantial emotional distress to that person and serves no legitimate purpose.

There is no evidence of any of that in this case. Even they admit that. They talk about speculation about disruption that they feared might happen. They don't actually provide any evidence of disruption; that it actually happened, and any evidence that Parker Tirrell even knew what was going on when my clients were passively expressing their viewpoint on these issues.

If the Court doesn't have any further questions, I'll --

THE COURT: Just a few, and I probably will later, but whatever the result on the TRO, you know, you included a claim for minor compensatory and nominal damages and so on. That's a jury issue. What I propose is, whatever the result on the TRO, maybe an expedited evidentiary hearing on a preliminary injunction, combine the permanent injunction with the preliminary, do it quickly and get it done. But that would -- you would still have those claims for monetary

damages on there. One -- go ahead.

MR. KOLDE: Your Honor.

THE COURT: I won't confuse it.

MR. KOLDE: I do a lot of these; this is my job. Usually, if there's preliminary injunction, not always, but usually people work things out and they resolve it, and we have resolved some cases of minor compensatory damages. My clients have been inconvenienced by this. That's why we put it in there. We're not talking about large dollar amounts.

THE COURT: No. No. I know, but it's procedurally a nit. So I'm proposing that whatever the result on the TRO, we have a preliminary injunction hearing reasonably quickly, whenever it's convenient, have an evidentiary hearing, combine the permanent injunction hearing with the preliminary and get it done.

MR. KOLDE: We're good with that.

THE COURT: You're good with that? Okay. Good. Darn it. I forgot the second one. Let's see.

Oh, you have the police officer --

MR. KOLDE: Lamy.

THE COURT: -- and the NHIAA official, which is fascinating, legally interesting to me probably not to everybody else, but, you know, the NHIAA in New

Hampshire is a quasi-state agency with their own defined contours. So I'm not sure how qualified immunity applies or doesn't apply to the soccer official. I'm inclined to think it probably does apply. Do we need to get into any of that? I mean, the police officer -- qualified immunity definitely applies to the police officer; we have to litigate that.

MR. KOLDE: Eventually, we would have to get into qualified immunity, Your Honor. I mean, our concern is --

THE COURT: It definitely applies to the Board.

MR. KOLDE: We would argue that there's --

THE COURT: No, I mean, you're talking about $17.

MR. KOLDE: 17.95.

THE COURT: Yeah, it doesn't affect the injunctive relief; it just affects the $17.60 or whatever.

MR. KOLDE: That's right.

THE COURT: Yeah. Keep that in mind. Your clients probably -- maybe they don't care about the expense, but you probably don't want to spend that kind of money to litigate that issue.

MR. KOLDE: Well, we do deal with qualified immunity all the time. My clients are represented pro bono; we represent all of our clients pro bono. So we are a donor-supported organization.

THE COURT: Please don't tell me you're talking about litigating qualified immunity for $17.

MR. KOLDE: Well, right now, that's our claim, Your Honor. But we think that people -- we think that people ought to know that there is no --

THE COURT: But it doesn't affect the injunctive relief.

MR. KOLDE: It does not affect injunctive relief at all. Qualified immunity has no effect on injunctive -- declaratory relief.

THE COURT: It's only the $17.

MR. KOLDE: Yeah. And, look. If we get -- our main focus is on --

THE COURT: How about if I give you the $17?

MR. KOLDE: If they write us a check for $17 --

THE COURT: No, I'll do it.

MR. KOLDE: We don't want it from you, Your Honor.

THE COURT: It's the hearing.

MR. KOLDE: We would like the injunction.

THE COURT: Okay.

MR. KOLDE: We would like the injunction. That matters to us the most, we can see about the other claims if we get the injunction.

THE COURT: Thank you, Mr. Kolde. And if you have rebuttal, I'll allow that.

MR. KOLDE: Thank you, Your Honor.

THE COURT: All right. Mr. Cullen.

MR. CULLEN: Thank you, Your Honor. I'm here with Superintendent Marcy Kelley, and my colleague, John Shirley. And I think you said at the very beginning of this that context matters, and I think context does matter here.

THE COURT: Well, let's start out, if you don't mind, both of you rely heavily in your briefing in *Tinker*. I don't think it's a *Tinker* analysis, is it? It's a limited public forum analysis.

MR. CULLEN: I think the way you explained it is the right steps -- that you look first at limited public forum, and then you look to *Tinker* to see, and most importantly now the *L.M. vs. Middleborough* case to determine within that limited forum step what the school can do and can't do. So I think you're right in that it informs the Court as to the propriety of what they were doing, and that's where the context here

really does matter.

Here, the context is, you know, noticeably absent protest the plaintiff's papers -- and, incidentally, I was kind of looking over --

THE COURT: Sorry. I apologize. It's my habit to interrupt --

MR. CULLEN: It's your court.

THE COURT: -- and I apologize.

All right. So we're in agreement, both parties are in agreement, that it's not a *Tinker* analysis; it's a limited public forum analysis. Right?

MR. CULLEN: Yes, I believe that's true.

THE COURT: Okay. Let's go.

MR. CULLEN: Here, I think still the facts matter. And a little aside, I noted that it sounded like Plaintiff, it sounded like he was reading from my client's declaration, but he was not. I don't know where all that stuff came in that Marcy Kelley admitting that she's out to get kids and -- you know, I don't know where -- I trust that the Court understood that that was sort of a riff, and not actually text.

THE COURT: I took it as argument.

MR. CULLEN: Yeah. So -- but going back to the context, as this Court is aware the *Tirrell* decision came out on the preliminary injunction on the

10th. On the 11th, Mr. Desilets specifically has attested that he heard that there was talk at the last game that there was going to be a protest that could even involve, you know, potentially heckling and other things. And so for them to say this has nothing to do with the trans athlete; this has everything to do -- is farcical. But even on the morning of -- and this is Desilets' Exhibit A, which is Document 22-2, Your Honor. Anthony Foote, the plaintiff, writes -- and this is in the second paragraph, "This isn't just another game, not by a long shot. None of you had a single conversation with our team. None. You ignored us, and now you expect us to go along with this." That was noticeably absent from the plaintiff's discussion of the events where he tried to suggest to you that this was nothing -- this wasn't just another game -- that this was just another game; this was just something they just wanted to come out and protest. So I think it's important that that is the context. This is at 7:28 a.m. that morning, and that is in the shadow of the prior information that they had about the possibility of the protest.

So I think when it comes down to the actual actions on the 17th, what the school did was entirely -- was entirely appropriate and even compelled

in order to protect a trans student; in this case, a player on the other side.

THE COURT: Protect them from what?

MR. CULLEN: Well, protect them from harassment and disruption of their -- of their educational development.

THE COURT: And how is wearing a pink tennis wristband with two Xs on it harassing?

MR. CULLEN: So there's two aspects to this, first of all, Your Honor, for me to answer that. First of all, let's just take a look at these wristbands if we can because they're not just pink XX wristbands; they're wristbands with the word "NAD" written on them. It's interesting that they constantly refer to these as just pink wristbands, but they're not. These are clearly anti-trans messages.

The other thing is that -- at least on the 17th --

THE COURT: Are they understood -- again, another factual issue. Are they understood as anti-trans, whatever that might mean, as opposed to transgender girls should not be playing on girls' sports teams?

MR. CULLEN: As you say, I think that probably needs further development. I know that the plaintiff was concerned that he only got our papers

yesterday afternoon, neglecting to point out that he only filed his TRO Friday afternoon himself.

THE COURT: I mean, I would be curious to know, what's the common understanding and interpretation of that? We can all put our own on it, but what is the common understanding and interpretation of those symbols?

MR. CULLEN: My understanding is that the "NAD" is that it is short for gonad, and that's not a supportive -- that's not a term that's put out there to support female soccer players.

The XX, I think, has been used in the past --

THE COURT: You know, one person's support is another person's challenge. So that's not helpful.

The question is: What is it that the school district is trying to control here? What -- what is it? It's clearly speech, right? Colored speech. What is the basis for suppressing that speech?

MR. CULLEN: It's the same as the First Circuit outlined in the *L.M.* case; it is the protection of a protected class against the -- and this is where *Tinker* does play, because it talks about, and illustrates for us, that there are limitations that can be there where either there's going to be a disruption or where it's going to collide with the interest of

others, and this is where it collides -- it certainly collides with the interest of others. *L.M.* obviously took the disruption path and said you don't need to have a physical disruption; you don't have to have mayhem on the sidelines. It disrupts the students' educational progress. We cited the -- didn't have a lot of time, but we cited one CDC study that talked about how LGBTQ students have higher rates of depression.

THE COURT: Again, I mean no criticism when I suggest these aren't factually or legally developed sufficiently, because these are very nuanced in my view and complicated issues.

Surely, it is not harmful to a transgender student playing on a girls' team to know that there are a group of people out there -- they don't hate transgender, they're not bigoted in that sense, but for reasons of sports challenge concepts or whatever, they don't think that a transgender girl should be playing on a girls' team. That's not an illegitimate point of view. It's not an inherently bigoted point of view or hateful point of view, is it? There are a lot of experts that agree with that.

MR. CULLEN: I don't see how it's any significantly -- how it has any difference from the

"there are only two genders." I'm sure the plaintiffs in that case made the exact argument that you're suggesting. And the First Circuit said, no --

THE COURT: You don't see a difference there? I see a difference there.

MR. CULLEN: Well, I think --

THE COURT: There are only two genders, you're not a real person to the extent that you claim to be this or that, as opposed to biological males shouldn't be playing on girls' teams for reasons of muscle, strengths, speed, whatever, whatever. I mean, is that -- is that harmful to a student to know that there's a group out there that thinks that? Is that harassing? Is that intimidating? Is that threatening in some way?

MR. CULLEN: I think it has no place on the sideline of a game --

THE COURT: That's a different state. That doesn't count. You can't suppress free speech based upon the fact that you think it's inappropriate.

MR. CULLEN: But the location matters as well.

THE COURT: Well, that's why I asked the question. What's the extent of the district's power to limit speech? It has to be legitimately related to

some cognizable problem, right?

MR. CULLEN: Right.

THE COURT: What is it? What's the problem, and what is it that you're limiting it for?

MR. CULLEN: The cognizable problem in this case is exactly what was laid out in the *Middleborough* case. It's students' ability to develop, students' ability to learn, the difficulty that students face when they suffer harassment. That's what *Middleborough* said. I've seen -- that case was further along than this one, and there was a lot more opportunity to develop some of those issues, but that's -- you know, that's the same issue that *Middleborough* the First Circuit said was a legitimate concern for the school, and that they could legitimately want to protect that.

THE COURT: What's the extent -- I'm having a hard time identifying the extent of the limitation put on the speech. What was the limitation?

MR. CULLEN: The limitation was that they couldn't come out and protest with their -- they couldn't come out and protest on the sidelines of the game.

THE COURT: Where does that come from? I've looked at Mr. Desilets' e-mail and the attachment and the school's policy, and I don't see anything there

that's that specific.

MR. CULLEN: Well, I think when they specifically said -- well, they went up and asked them to stop, so --

THE COURT: No. No. But the school district says, You're wearing these bands; you can't wear the bands. You've been put on -- you've even been put on notice that you can't wear the bands. So I look at the record and say, Okay, where's that? So I ask you: Where's that?

MR. CULLEN: I don't think there's anything in the record and I don't think there will be anything in the record that says that the Footes or Mr. Fellers were specifically on notice that they couldn't wear these armbands, but they were --

THE COURT: Okay. So back up a step of generality. You can't protest.

MR. CULLEN: Right.

THE COURT: Protest what? Protest transgender girls playing on girls' teams, because I don't see that?

MR. CULLEN: Yeah. You can't come to this game and bring your protest to this game. It doesn't have to be that; it --

THE COURT: Where does it say that? Where is

that noticed? In other words, point to the authority that you're using to say you can't do that.

MR. CULLEN: If the school had already came up with a policy that night and wrote it, it wouldn't make any difference. The fact is they said, you can't protest and then they went up and they informed Foote and Fellers, like, look, you gotta take off the bands. That's the notice. They could have taken off the bands then; they didn't.

THE COURT: I know. I guess I'm looking for the -- one of the issues of that, I think the principal issue in this case is, what's the extent of the school district's authority to limit speech at a school soccer game? What's the extent of it? And where does it -- where are they pointing to say this violates this policy? It can't just be arbitrary, right? It can't just be the school board member walking around saying, I don't like that; take it off. Can't be that.

MR. CULLEN: I think -- it can't be that, but, Your Honor, at the time of the game, if the person comes up and tells you, you gotta remove something, that's not the time to get into an argument on the sideline with the people. The time to do that is to go back --

THE COURT: That may be. But that begs the

question: Do you have the right to have that armband on?

MR. CULLEN: I don't think you do have a right to have that armband.

THE COURT: Why?

MR. CULLEN: Because it's clearly out there, and they admit as much in their papers and, in fact, the plaintiffs' counsel admitted as much that this is not just supportive; it's also against trans. It's a symbol --

THE COURT: Is it okay to be for transgender girls playing on girls' teams? Is it correct for Mr. Kolde to argue that if it was an LGBTQ-supportive wristband, that would be okay; nobody would have said, "Take it off."

MR. CULLEN: We wouldn't allow to have protests one way or the other on this issue.

THE COURT: Okay. That's a different argument. Where do I find that? Where is it that I can look at your policies and say, This is viewpoint neutral? This is content -- this is just no demonstrations, no protests? Where?

MR. CULLEN: This is where Plaintiffs want to sidetrack, and I understand where the Court is going with this. But you can have bans -- and we regularly

do have bans -- on, like, the no-gender shirt, two gender shirts, or things that are against other minorities, like, based on race or religion or other things, and we have those. And we don't have -- we can't necessarily identify every single thing before it happens. You have to let the -- you have to let the schools decide, within the context of our school, how does this impact our students? The school has trans students; it's not just Parker Tirrell here.

THE COURT: In an evidentiary hearing, can you make a proffer as to what the school authorities would testify to with respect to this particular -- these particular bans?

MR. CULLEN: I'm not sure what you're asking, Your Honor.

THE COURT: Why does this ban transgress the school policy? What school policy does it transgress and in what way?

MR. CULLEN: I believe that the school would attest that this violates the school policy against discriminating against students, and that this discriminates against trans students who, we understand by this Court's ruling, to be a protected group.

THE COURT: So it is viewpoint?

MR. CULLEN: I think every case that comes

down to protecting a protected class has a viewpoint aspect to it because that's -- those are the people who are being attacked, but we would not let -- we would not let students come to the game and hold up big signs and say, you know, "trans rights are human rights" or things like that. This is not the forum for that. It is a limited public forum, and it's open for the purpose of letting invitees come in and watch the game.

THE COURT: That's kind of what I was getting at. Would the proffer of testimony be that you wouldn't have allowed that either?

MR. CULLEN: Wouldn't have allowed the signs?

THE COURT: Yeah. Supporting transgender rights --

MR. CULLEN: Yes, Your Honor. That is it. We would not allow that either. This is not -- this is not a public forum.

THE COURT: How would you justify that?

MR. CULLEN: For the same reason.

THE COURT: That wouldn't be harassing; that would be something else.

MR. CULLEN: That would be that this public forum was open for one purpose, and that's to come out and watch the game and see your kids play, and that's why people can come to the games and that's what they

can do. This isn't the place to argue about the budget. This isn't the place to argue about other things. This is the place that's open for one purpose. And that's what the cases say on limited public forum; that we have to focus on, what is the public forum open for. If it's a school board meeting, it's open to discuss school issues. If it's a soccer game, it's not the place to have those.

THE COURT: Okay. Is -- was that silent protest, if you will, within or without the scope of the activity?

MR. CULLEN: It's without the scope of the activity.

THE COURT: Why is that?

MR. CULLEN: Because the whole purpose was to target this one student and they admit as much.

THE COURT: You agree that's a factual issue as well?

MR. CULLEN: Sure.

THE COURT: They say it wasn't; you say it was. What's the evidence that it was?

MR. CULLEN: I think the evidence is right here. This is -- you know, you ignored us; now you expect us to just go along with this. I'm leader, and a real leader doesn't stand by while players are thrown

in harm's way. Stand up for women, for real women, or get out of the way. I mean, that's where it comes from. Plus the Facebook posts that I think are already in the record as well. I mean, this is --

THE COURT: But isn't that -- isn't that issue-oriented? I don't see it -- what's the argument that it's targeted to this particular player? In other words, the school district's position, I assume, is, Look, we have a duty to protect this player, and this was an assault on this player; this was some sort of intimidation or harassment of that player.

MR. CULLEN: I guess I would ask if the words, "This isn't just another game," don't have anything to do with the fact that Parker Tirrell is playing in that game, what do they mean?

THE COURT: I'm missing the point.

MR. CULLEN: I think it's --

THE COURT: Their position is, we are against, in principle, transgender girls playing on girls' teams. Your position is, no, you were there to harass and intimidate a particular player and students in general with this sort of anti-transgender identity-challenging protest.

MR. CULLEN: Yeah. And that's the exact type of thing that the courts regularly let administrators

make those determinations.

THE COURT: Well, they do in student contexts, but I haven't found a single case, any case, where an adult invitee to an open, public forum was told that they couldn't express a passive political view. I haven't found one.

MR. CULLEN: Right. Well, I would suggest, Your Honor, that students -- you had mentioned the rights are different. I would say that students arguably would have more rights because they're compelled to be in school from 8 a.m. to 3 p.m.; the parents don't have to be there.

THE COURT: Their rights to free speech are more limited, not less limited.

MR. CULLEN: Sorry?

THE COURT: Their rights to free speech, students, are more limited.

MR. CULLEN: Within the school building. But here, the parents are people who have been invited in; they're invitees for a limit purpose, and they're invitees to a limited purpose forum. They can speak all they want. They can go across the street. They can go -- Nicole Foote came in and met with Mike Desilets before the game. They have lots of opportunities to express their opinion. This forum was

not opened for them to express anti-trans or anti-Black or pro-trans. It's just not open for those purposes.

THE COURT: I haven't seen that in the policies that I've seen or the athletic manual, the excerpts that I've seen, or in the affidavits that I've seen.

MR. CULLEN: Right.

THE COURT: I've seen -- I've seen restrictions based upon harassment, intimidation, threats, even bad sportsmanship, I guess, but I haven't seen that. Where would that -- I know what you're saying is it's just inherently everyone understands it.

MR. CULLEN: No. Your Honor, I don't think you're asking them to go back and think to the beginning of school, What are the possible things that can come up this year?

THE COURT: No. I'm asking, if you made an evidentiary proffer, I'm asking what the evidence would be and who determined that wearing pink -- these pink wristbands represented speech that was outside the scope of the activity, the purpose for which the forum was being used? Who decided that, and why would they decide that? How did they decide that? It's viewpoint neutral. It's gotta be viewpoint neutral.

MR. CULLEN: I'm not 100 percent sure that's

accurate, Your Honor, because there's lots of things that we limit people from doing because it's hate speech. You can -- that's just -- you know, we limit hate speech.

THE COURT: Well, I thought we covered that already. I do not think, as a matter of social-legal policy, that transgender girls should participate on girls' high school sports teams. That's not hate speech.

MR. CULLEN: I'm not suggesting it is. What I'm suggesting to you, Your Honor, is there are certain types of speech that you could always argue is really just a viewpoint, but we still don't allow it. We don't allow people to yell at the referees about, you know, their calls. We don't allow them to call the referees names. We don't -- that's -- we just don't allow that sort of conduct. We don't allow conduct that's targeted at individuals, whether we think of this as harassment, which I think it is. And also keep in mind, of course, that on that day in particular, the school doesn't have to wait to see whether the other things that have been predicted are going to come to pass, and then the damage is done. They see this happening -- but going back to your question: When was the policy made? The school isn't going to be able to

predict what the next thing to happen is. Each year something new comes up -- but, but, but -- sorry. I apologize.

THE COURT: Yeah. But legally your answer has to be something like, we have the authority to limit speech in this limited public forum on grounds that... has to be that. And, by the way, it's viewpoint neutral.

MR. CULLEN: Right. I think it's the night before or a couple days before, I think maybe the 13th, when Mr. Foote posts his picture of the variety of wristbands. And, you know, in the context of hearing that there's going to be some sort of protest that could include heckling, yeah, they come to an agreement that, We're not going to allow this. And then they go to the game and they wait, and when they see the wristbands they're like, Okay. Second half apparently that's when the protest is going to be, and they correctly shut it down, again, because this is not the forum for that. They had other forums. They used other forums to convey their messages. This is just not the forum.

THE COURT: Do you contend it was disruptive?

MR. CULLEN: I would say that under *L.M.*, it -- no. The silent was not disruptive as to

disrupting the game. It wasn't physically disruptive. But under the *L.M.-Middleborough* case, this type of message is disruptive to a student's development, and the First Circuit said that is a category of disruption that the Court should be considering. We don't have to have a melee on the sideline to characterize something as disruptive, according to the First Circuit. I didn't make it up.

THE COURT: Okay. Once again, I think -- I mean, Mr. Kolde agrees, I think, that if this protest was aimed at that student, or trans students in general, that would be a problem, but it wasn't.

You say context says it was. We're not here. We have bare evidentiary proffers. Doesn't that require a factual, complete developed record? Isn't that the turning point pretty much?

MR. CULLEN: Yeah. If we need to have that, then we should schedule something, ideally, not this week since I just canceled my flight to Ireland last night so I could be here today, but maybe early next week.

THE COURT: I was going to let you decide between counsel when it's convenient for you. But that's what's troubling me. I don't think you can make these decisions without a factually developed record.

MR. CULLEN: There's certainly -- there's no reason that this had to be teed up on a Friday afternoon for a Tuesday afternoon hearing. There was time. In the plaintiffs' case in *Tirrell*, they filed a motion, and they filed a TRO, and they filed it all together. As the plaintiffs say, there have been, you know, nearly a half a dozen games since these -- since the trespass orders went into effect. So I agree with you. We may need a further hearing.

THE COURT: I'm taking a wild guess, but you would oppose -- you would oppose a limited TRO allowing the plaintiffs to attend games wearing the pink wristbands?

MR. CULLEN: I would, Your Honor, but I want to also carve out --

THE COURT: Just I'm --

MR. CULLEN: I apologize.

THE COURT: Mr. Kolde, your position is pretty hard: They're not going to go to the games without the wristbands?

MR. KOLDE: Well, Mr. Foote and Mrs. Foote have been going to the games but not wearing the wristbands because they don't want to have another no trespass.

THE COURT: Well, they're expired, right?

MR. KOLDE: Yes. But they're not wearing them out in the open; they're wearing them under clothing.

THE COURT: So they have a choice. But Mr. Fellers does not have a choice.

MR. KOLDE: He does not have a choice. He wants to both go, and he also wants to express his right quietly.

THE COURT: Okay. But I guess they're not going to agree they can go wearing the wristband.

MR. CULLEN: Absolutely not, and that's because of his conduct after this. If he just complied and put his thing away, or if he had just protested in the way that Mr. Foote did, but he left the game. He went out, he held up a sign. He says he could see the game from where he was watching it, so he said, I went back and I moved my car to a position where I could watch the game, so the people in the game could see him out there holding up his sign as well, presumably. And on top of it, the police officers went -- and this is in the record. The police officer went and asked him to leave, and he didn't.

So I think Mr. Fellers, you know, has made his own bed here. He could have complied with all of the things, and then he would be going to the games with

Mr. Foote, but he didn't. And, again, this is where, I think in *Hendrickson*, this Court -- in fact, I believe it was you, Your Honor -- specifically recognized that, you know, Courts have to be -- have to give some deference to the administrators on how they're going to sanction people; otherwise, you're more than welcome to come to the game tonight and make these decisions yourself, Your Honor.

THE COURT: That was something else I wanted to -- as I read the record, there's no dispute the trespass order to Mr. Fellers is based upon more than wearing the wristband and refusing to take it off; it's the subsequent conduct, right?

MR. CULLEN: Yes.

THE COURT: In evidence is going to be that the body cam footage from the officers?

MR. CULLEN: Yes, Your Honor. Now, if the Court permits us to use the body cam, and I would love to, I just -- there's a statute that restricts our ability that's not subject to 91(a). We can't just willy-nilly turn it over, but with a court order, we can certainly produce it to the Court and to counsel.

THE COURT: I don't know if the issue is contested. Is it contested that the trespass order is not just a function of the speech; it's a function of

the conduct after the speech?

MR. KOLDE: We would say it's all about the speech, Your Honor. They're calling it conduct, but they didn't like the speech. Everything he did was speech.

THE COURT: That may be true, but you still can't refuse the lawful directive of a police officer to leave, and you can't be disorderly and all that, in an enhanced --

MR. KOLDE: Holding up a sign quietly is --

THE COURT: No. No. Refusing to leave, creating a commotion, being disorderly, disrupting the game.

MR. KOLDE: It's absurd.

THE COURT: That you have a First Amendment right to wear a wristband is not a license to misbehave thereafter because somebody wrongfully tells you to take it off. You still can't misbehave.

MR. KOLDE: Misbehave by what; by staying there?

THE COURT: Disorderly conduct, refusing the order of a police officer.

MR. KOLDE: He called the school officials Nazis and said his First Amendment rights were being violated.

THE COURT: I don't think that's a problem.

MR. KOLDE: What's wrong with that?

THE COURT: I don't think that's a problem, but I think it might be a problem if you behave in a loud, boisterous, disruptive way that disrupts the activity for which the property is being used, and refusing -- if the police officer told him to leave the property, it's a problem if he didn't leave.

MR. KOLDE: He did leave. He did leave.

THE COURT: I don't know. I'm just here reading your papers, which I find kind of insufficient.

MR. KOLDE: He loudly said, "You're violating my First Amendment rights."

THE COURT: No. No. No. You're saying he didn't leave; they say he did leave. I don't know whether he left or not. That's an evidentiary matter that's going to have to be developed. Right? But if, in fact, he disobeyed the order of a police officer to leave, that they wrongfully told him to remove the wristband doesn't excuse that subsequent conduct, right? And, therefore, that subsequent conduct, it's not excused, would justify a longer no trespass order, right?

MR. KOLDE: I'm not sure about that, Your Honor.

THE COURT: Well, I'm sure about that. I just don't know what the facts are.

MR. KOLDE: So -- yeah, I mean -- I have some things to say when he's done, but he has the floor, I'll sit down.

MR. CULLEN: I'm happy to give up the desk. On the irreparable harm, I noted that the plaintiffs --

THE COURT: Well, suppression of free speech rights is irreparable harm, so no issue there. It's -- the question is, likelihood of success on the merits, it seems to me.

And, you know, this is no criticism -- seriously, it's no criticism because this is all an accelerated process, but the briefs simply don't address the proper legal standard to be applied here. I think we agreed between the parties here that it's not *Tinker*. You can waste a lot of time on *Tinker*. It's limited public forum analysis. There's a Sixth Circuit case by the way, if you care, on it that lays it out pretty well, I think. It hasn't been widely adopted, but it's pretty persuasive.

That then turns to, Well, are you likely to succeed on the merits? I don't know, because it is a limited public forum as you agree, Mr. Kolde, and that means they can limit the speech to the activity

involved that isn't viewpoint discriminatory.

You say it's viewpoint discriminatory; they say it's not; it's student protected. Not many people discuss the *L.M.* case in too much detail, but *L.M.* does suggest that protecting the personal identity of students who are vulnerable, particularly students, is a legitimate obligation of the school district. Title 9 suggests that the school district is obligated to prevent harassment of students particularly engaged in student activity.

Was this wearing of the band a protest within the context with a lot of extra meaning? Don't know. Was the ability of the school district sufficient to require removal of it? Don't know. Requires a factual determination based on evidence. These proffers, insufficient; factual development, insufficient; legal development, insufficient. Again, not a criticism.

So I'm not prepared -- I can't -- at best, I would say it's a push. Is your case illegitimate? Of course not. Do you have merit? I think you do. Does the school district have merit? I think they do. It's going to depend on the evidence, I think, and it's going to depend on the factual findings.

So I think I'm going to deny the TRO for that reason, failure to establish likelihood of success on

the merits for all the reasons I've just articulated. So I think we need to schedule a preliminary injunction hearing, an evidentiary hearing. I'm going to combine the permanent injunction hearing with the preliminary injunction hearing. Whatever is convenient for you. You might talk, by the way. Counsel, you might talk. Maybe Mr. Fellers would like to go see his daughter play at soccer without wearing the wristband.

MR. KOLDE: Your Honor, I did actually have a few things I had wanted to say in response, but the Court's ruled.

THE COURT: I'm sorry. You did. You did.

MR. KOLDE: Can I just make my record on these things?

THE COURT: Oh, sure, of course. I'm sorry.

MR. KOLDE: Look, Your Honor --

THE COURT: But, you know, it might help if you just address the points that I'm concerned about, the lack of factual development and legal development.

MR. KOLDE: Okay. Well, Your Honor, I would say on the key facts, the parties actually agree on a lot of the key facts.

THE COURT: They do.

MR. KOLDE: You know, they changed the subject, which is what good defense attorneys do. I

used to be a defense attorney myself defending the Government. And we cited the correct standard, which is it's a limited public forum. Okay? They have doubled down on viewpoint discrimination. They have said it's specifically the viewpoint that's being represented. There's per se illegal. There's no factual development that needs to be made on that. They have admitted to engaging in viewpoint discrimination. They haven't really responded to that, Your Honor.

THE COURT: Well, their argument is that under *L.M.* case, it's a legitimate -- and maybe the duty of the school district to protect vulnerable students from harassment, intimidation in the nature of challenging the characteristics that are associated with their personal identity; that that creates a lot of harm. Read the *L.M.* trial.

MR. KOLDE: I've read the *L.M.* case.

THE COURT: Yeah. That's their theory -- it's student protection.

MR. KOLDE: That's a *Tinker*-based case analysis. *L.M.* is a *Tinker* care. 100 percent, it's a *Tinker* case.

THE COURT: It is a *Tinker* case, but *Tinker* does seem to establish the nature of the school-student

relationship that requires the school board's action to protect.

MR. KOLDE: Yeah, but my clients are not students, Your Honor, and that's the whole point of our argument, and the Court understands that. Your Honor came out at the beginning and said, I don't think *Tinker* applies. If *Tinker* doesn't apply --

THE COURT: Analysis. The *Tinker* analysis does not apply.

MR. KOLDE: -- then *L.M.* doesn't apply either. *L.M.* is a *Tinker* analysis. It's all over that opinion. They clearly follow *Tinker* in that case. I happen to disagree with the result there. I hope SCOTUS flips it. We'll see. Ser --

THE COURT: I'm relying on it more. Their defense is, We have -- we have the ability and right to limit a public forum discussion to germane topics, and this is not a germane topic. And not only is it not a germane topic, it's a topic that can likely inflict harm on vulnerable students, therefore, we exercise our right in our forum to prohibit it. That's what they're saying.

The legal analysis of that claim: Insufficiently litigated, insufficiently briefed, so you need to brief it. Factual development, I don't know if that was

their reason. I don't know if this was -- posed a risk of that. You argue that, you know, it didn't pose any risk of such a thing. I don't know. We'll have to have an evidentiary hearing, and those issues will have to be resolved.

MR. KOLDE: Okay, Your Honor. I mean, I guess I had some other things to say, but I kind of feel like the writing is on the wall. Do you want to hear from me on those things?

THE COURT: Sure. No, I would. It's helpful.

MR. KOLDE: So I think on Foote -- actually, let me change the feed here. All right.

So I think addressing the Court's question about, you know, who was this directed at. My client, about four days before the September 17th game, did have a Facebook post. And he explains his view -- and this is just speaking for him, not necessarily the other plaintiffs, that, you know, despite Governor Sununu's stance on protecting female athletes, the Federal Court has failed to enforce this decision leaving our girls vulnerable. While it's not the athletes' fault -- skipping ahead -- the failure to uphold the governor's decision by the legal system, the school board and school administration is setting a dangerous precedent

for women's sports.

They're allowed to express that opinion. It's directed at all of those public bodies which they're allowed to direct their speech at. There's clearly nothing directed here specifically at Parker Tirrell or any other trans student.

These armbands -- and this is somewhat a scurrilous tactic by the defendants to put up these armbands. The evidence, and the parties agree on this, is that pink armbands -- wristbands, rather, with XX were worn. The "NAD" comment, that, by the way, means "Not a Dude." I would argue there's nothing offensive about it, but nobody wore a "NAD" wristband. Okay? There's just no evidence of that in the record. So they're reaching and grasping here, trying to find some evidence of something that looks iffy or, you know, crass. How can wearing a pink wristband with the female chromosomes be offensive?

THE COURT: Harmful to students engaged in a student activity.

MR. KOLDE: It's ridiculous.

THE COURT: Transgender -- well *L.M.* -- the Court of Appeals in *L.M.* didn't think it was ridiculous. They thought it was harmful. It was a t-shirt. XX, there's only XX or something?

MR. KOLDE: No. It said "there's two genders."

THE COURT: "Only two genders," that's right. And then crossed out the only two genders and just put XX and put "censored." Yeah. The Court of Appeals said, Yeah, that's bad; the school district gets to regulate that.

MR. KOLDE: In the school context by a school context.

THE COURT: You took the words right out of my mouth.

MR. KOLDE: Correct.

THE COURT: And this is an adult case and the rights are more extensive, but the question is, of course, how more extensive? How far out does it go? Do we reach a point where, first, you have to decide whether what your clients were wearing falls into the category of the XX t-shirt in *L.M.*, and then you have to decide whether or not that falls short of where an adult's free speech rights begin or whether it eclipses the adult's free speech rights in a limited forum. Right? These are nuanced questions; these aren't easy questions.

MR. KOLDE: Not when there's viewpoint discrimination, Your Honor.

THE COURT: Well --

MR. KOLDE: They haven't even made a content-based argument.

THE COURT: My viewpoint is Black kids should not play on high school football teams in New Hampshire. That's my position; that's my viewpoint. You can't prohibit me from attending a high school football game with a sign, holding up, that says Blacks are inferior and shouldn't be playing on high school football teams in New Hampshire. Yes, they can. Can't they?

MR. KOLDE: That wasn't this case.

THE COURT: Can the school board not say, Yeah, you don't get to do that at our football games?

MR. KOLDE: That's not our case.

THE COURT: I know.

MR. KOLDE: They might be able to say that.

THE COURT: Of course, it's not your case. You know how we reason; we reason from the ends.

Do we agree that's not appropriate, and that can be controlled?

MR. KOLDE: Probably.

THE COURT: I hope we agree that can be controlled.

MR. KOLDE: It would depend on all the facts

of the case.

THE COURT: And it's being controlled in the interest of protecting students.

MR. KOLDE: So, Your Honor, I don't want to get into the facts any further at this point. I see the Court has made up its mind for today, but I think it would be helpful to us to tentatively set the preliminary injunction hearing, and maybe there to be some amongst the parties of what the Court's expectations are for the development of the factual record. Are you wanting live testimony?

THE COURT: Well, now, you know, I am really hesitant after all these decades to tell counsel how to try their own case because that inevitably falls back on me, He didn't tell me I shoulda whatever. So I don't do that.

We're going to combine the permanent injunction hearing with the preliminary injunction hearing, so it will be a trial on the permanent injunction.

MR. KOLDE: Yeah.

THE COURT: It's your burden, I'm sure you understand, Mr. Cullen, your burden to justify the limitation you placed on the speech. I expect to hear evidence on context, on intent, on effect, on purpose, on what the limitations were and where they come from

and who decided, and whether or not it actually makes sense in the real world. And I expect thorough legal briefing on this notion of how far does the *Tinker* obligations and duties of protecting students go in terms of the limited public forum where adults are expressing speech. How far does that go? How far can you go in keeping adults from saying things that students, say, couldn't say? How far? How far does the *L.M.* XX on the t-shirt ruling -- how far does that apply to an adult speaking?

MR. KOLDE: Not at all.

THE COURT: Well, I would like to see something other than your personal opinion. I would like to see some legal authorities. I would like to see it thoroughly discussed and briefed. Any -- you should get together. I don't think I need you to reproduce all the experts about the harm related to transgender students from "XX only" t-shirts unless you insist, I guess, because the First Circuit has already sort of discussed that and accepted it, I think. You may want to -- are you going to put them to the proof to show the vulnerability of the kid and what the risks of harm --

MR. KOLDE: For wearing a pink wristband with XX on it? Yeah. We don't concede that's harmful in

any way.

THE COURT: Again, that's why I don't like to tell you how to try your own case. If you don't -- I guess, I don't know what you're going to do. You can present evidence to that effect, I guess. I think I can take judicial notice of it, I'm not sure, based on the First Circuit's opinion. Maybe I can.

MR. KOLDE: Your Honor, so there's another issue which counsel alluded to. We asked for the body-cam video. It was denied under an RTK exception. But, you know, counsel indicated they would comply with all, you know, discovery orders of the Court. Clearly, counsel for the defense has seen the body-cam video; it's referred to in the declarations. We would like it. We think it's relevant, but without an order from the Court, I don't think they're going to give it to us under their interpretation of state law. I don't think it's really beneficial to litigate this in state court, and I'm not planning to. So we would like the Court to direct --

THE COURT: It's plainly relevant. Don't you think? It's relevant to you.

MR. CULLEN: Yeah. I don't have an objection to it. I just don't want to violate the State statute, so if the Court orders it to be produced as part of

discovery in this case --

THE COURT: So ordered. I think it's particularly relevant to the length and extent of the no trespass order.

MR. KOLDE: Your Honor, I don't want -- because my clients' rights are continuing to, you know be impacted here. We would like to have an early as possible NPI combined NPI hearing on the merits as we can. I understand counsel's schedule. I also have a lot going on. The Court, I'm sure has a lot going on.

THE COURT: No, actually, I'm pretty flexible. Senior status.

MR. KOLDE: Can we pick a date and shoot for that?

THE COURT: Absolutely.

MR. KOLDE: Can we do that and set that here?

THE COURT: I expect you're going to need at least a couple days, right?

MR. CULLEN: A couple days? I'd think we'd need more than that, Your Honor. You've listed a fairly intense list of things.

MR. KOLDE: For the hearing length?

MR. CULLEN: Oh, I apologize. I thought you meant a couple days before it's to happen.

THE COURT: No. No. A couple days of

hearing time.

MR. CULLEN: I apologize, Your Honor. Yes, I misunderstood that. I assume there's four or five witnesses there. We've got two or three --

MR. KOLDE: All my clients will want to testify.

THE COURT: So, three, four? Eight, ten total?

MR. CULLEN: Certainly, not more than ten, unless we can reach an agreement on the expert issue, I suppose.

THE COURT: Yeah. Look into judicial notice of the fact. I don't know. The circuit seemed to, yeah. I'm not sure what they do now, whether they accepted the evidence or whether they just say it was enough to --

MR. KOLDE: If they want to make us a proffer, we'll take it under consideration, Your Honor. It's real hard for me to evaluate on the fly.

THE COURT: Yeah. It basically is transgender students are particularly vulnerable, and harassment causes particularly serious long-time injury. That's what it is.

MR. KOLDE: Can we pick a date?

MR. CULLEN: We can certainly try. Actually,

you know, the -- Superintendent Kelley is not allowed to bring her phone in --

THE COURT: I'm sorry. What?

MR. CULLEN: The superintendent can't bring her phone in, so she doesn't have her calendar.

THE COURT: She can bring her phone in.

MR. CULLEN: She couldn't do it today. So we can't really necessarily pick an exact date. Perhaps if the Court gives us a sense of it, we can work it out with the clerk.

THE COURT: I'm flexible. I'm happy to do it as soon as you can arrange to do it.

MR. KOLDE: Can we do that today?

THE COURT: Sure.

MR. CULLEN: I don't know if we can do it today. It depends on --

THE COURT: You can do it today. Get together with the deputy clerk.

MR. KOLDE: November day or are we doing October, later in October?

MR. CULLEN: November day. Sometime in November.

THE COURT: Fine.

MR. CULLEN: Thank you.

MR. KOLDE: And, Your Honor --

THE COURT: We'll make it work.

MR. KOLDE: Would the Court be willing to just enter a limited order to allow Mr. Fellers to go back to the games, even without wearing a wristband for now, just so he can watch through the end of the season?

THE COURT: If you're asking me for a temporary restraining order with respect to his attending games without protesting on this issue --

MR. KOLDE: Yes.

THE COURT: -- I don't have a problem with that. Do you have a problem with entering that order?

MR. CULLEN: I do, Your Honor, because --

THE COURT: He's not going to wear a wristband.

MR. CULLEN: I know, but it was his comment after the fact that --

THE COURT: It may turn out to be illegal.

MR. CULLEN: It may. It may, Your Honor.

THE COURT: Take the win.

MR. CULLEN: How about this, Your Honor: There's a senior game coming up on the 17th, or the 18th. Why don't we allow him to go there without the games (sic) to celebrate his kid?

THE COURT: Listen, tell you what. I'm not

willing -- I think this is a push in terms of the evidence. The factual development is a push. Legally, I think it's nuanced, and it's a jump ball. That's the way I look at it. So you haven't met your burden in showing likelihood of success on the merits, in my view. However, he could win, and it could turn out that what you've done in terms of the trespass is not sustainable. So in an effort to balance the equities somewhat, I will enter a restraining order allowing Mr. Fellers to attend his child's soccer games for the rest of the season.

MR. KOLDE: Can he pick her up from practice too, Your Honor?

THE COURT: Is there a problem with that?

MR. CULLEN: I think it's a matter of not having him have interactions with the coach, Your Honor.

THE COURT: He can pick up his child from soccer practices, no interaction with the coaches, no speaking, proselytizing, advocating, protesting, speech making. None of that. And he can attend his daughter's games for the rest of the season. No protesting, no violation of any of the rules and expectations of good sportsmanship promulgated by the school, and then we'll see on the merits how this works

out. All right?

MR. KOLDE: Understood. Will the Court enter an order, or do you need us to submit an order on that?

THE COURT: Counsel understand my order?

MR. CULLEN: I understand what you've asked.

THE COURT: This is New Hampshire. Thank you. We're adjourned. Get together with the deputy clerk and arrange a schedule.

MR. KOLDE: We'll do it.

(Hearing concluded.)

CERTIFICATE

I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court Reporter for the United States District Court for the District of New Hampshire, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

______________________________
JAN-MARIE GLAZE
COURT REPORTER

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br>Plaintiffs,<br>v.<br>MARCEY KELLEY, *et al.*,<br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

**PLAINTIFFS' EXHIBIT LIST**

| | | |
|---|---|---|
| 1. Plaintiffs' Ex. A (Dkt. 14-7): Policy KFA | Agreed | –11/21/24 |
| 2. Plaintiffs' Ex. B (Dkt. 14-8): Desilets Email re September 17 game | Agreed | – 11/21/24 |
| 3. Plaintiffs' Ex. C (Dkt. 14-9): Extracts from Handbook and NHIAA Policies | Agreed | |
| 4. Plaintiffs' Ex. D (Dkt. 14-10): Photo of Wristband | Agreed | –11/21/24 |
| 5. Plaintiffs' Ex. E (Dkt. 14-11): Foote Facebook Post | Agreed | – 11/21/24 |
| 6. Plaintiffs' Ex. F (Dkt. 14-12): Statement from Superintendent Kelley | Agreed | |
| 7. Plaintiffs' Ex. G (Dkt. 14-13): Foote No Trespass Order | Agreed | |
| 8. Plaintiffs' Ex. H (Dkt. 14-14): Fellers No Trespass Order | Agreed | –11/21/24 |
| 9. Plaintiffs' Ex. I (Dkt. 14-15): First Addendum to Fellers Order | Agreed | |
| 10. Plaintiffs' Ex. J (Dkt. 14-16): Second Addendum to Fellers Order | Agreed | |

| | | |
|---|---|---|
| 11. Plaintiffs' Ex. K (Dkt. 14-17): Kelley Email re Designated Protest Area | ID only | |
| 12. Plaintiffs' Ex. L (Dkt. 14-18): Notice of Designated Protest Area | ID only | |
| 13. Plaintiffs' Ex. M (Dkt. 14-19): Map of Soccer Field and Parking Lot | ~~ID only~~ | -11/21/24 |
| 14. Plaintiffs' Ex. N (Dkt. 14-20): Emails between Kelley and Lt. Lamy | Agreed | -11/22/24 |
| 15. Plaintiffs' Ex. O (Dkt. 14-21): Bow Police Department Call Record | ~~ID~~ only | |
| 16. Plaintiffs' Ex. P (Dkt. 14-22): Photo of Field from Designated Protest Area | ID only | |
| 17. Plaintiffs' Ex. Q (Dkt. 14-23): Photo of Designated Area from Sidelines | ID only | |
| 18. Defendants' Ex. A (Dkt. 22-2): Foote Email on September 17 game | Agreed | -11/21/24 |
| 19. Defendants' Ex. B (Dkt. 22-3): Photo of Wristbands Pile | Agreed | -11/21/24 |
| 20. First Bow Police Bodycam Video from sidelines of Sept. 17 game | Agreed | -11/21/24 |
| 21. Second Bow Police Bodycam Video from parking lot of Sept. 17 game. | Agreed | -11/21/24 |
| 22. Andy Foote cell-phone video from sidelines of Sept. 17 game (IMG_7819) | Agreed | |
| 23. Photo of Bow girls' varsity soccer team wearing pink warm up jerseys | Agreed | |
| 24. Photo of Bow HS cheerleaders wearing pink tops on school track | Agreed | |

| | |
|---|---|
| 25. Photo of Progress Pride Flag in Bow HS music room from social media (faces redacted) | Agreed |
| 26. Photo of Pride Flag in Bow HS music room | Agreed |
| 27. Photo of gray car with political bumper stickers parked on Bow SD property | Agreed |
| 28. Photo of black car with political bumper stickers and personalized plate parked on Bow SD property | Agreed |
| 29. Photo of blue car with political bumper stickers parked on Bow SD property | Agreed |
| 30. Photo of silver car with political bumper stickers parked on Bow SD property | Agreed |
| 31. Senate Education Committee Report with summary of Parker Tirrell's testimony re trans issues | ~~ID~~ only |
| 32. Sept. 17 morning email from Fisk to Desilets (with copy to Kelley) | Agreed |
| 33. Sept. 19 Kelley email re enforcement of NTOs against Fellers and Foote | Agreed |
| 34. Sept. 20 email between Kelley and Chief Miller about homecoming game | Agreed |

35. Email from Nicole Foote to School Admin. re: Title 9 lawsuit — 11/22/24

Dated: November 18, 2024

*/s/ Endel Kolde*
Endel Kolde*
DC Bar No. 1782129
Brett Nolan*
DC Bar No. 90014964

By: */s/ Richard J. Lehmann*
Richard J. Lehmann
New Hampshire Bar No. 9339
LEHMANN MAJOR LIST, PLLC
6 Garvins Falls Rd,

Nathan Ristuccia*[1]
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
202.301.3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

Concord, NH 03301
603.731.5435
rick@nhlawyer.com

* Pro hac vice

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

**PLACEHOLDER FOR**

**PLAINTIFFS' HEARING EXHIBIT NO. 20**

# Bow Police body camera footage

Recorded by Lt. Philip Lamy, on the sidelines during the September 17, 2024 soccer game.

Admitted into evidence by the district court with the agreement of all parties at the November 21, 2024, evidentiary hearing and viewed by the district court during that hearing. *See* App.304:10-16, 335:3-16.

Submitted to the United States Court of Appeals for the First Circuit as an MP4 file on a compact disc attached to the paper copies of the appendix. Please play that CD to view this evidence.

Placeholder for

Plaintiffs' Hearing Exhibit No. 21

# Bow Police body camera footage

Recorded by Lt. Philip Lamy, in the parking lot, after the September 17, 2024 soccer game.

Admitted into evidence by the district court with the agreement of all parties at the November 21, 2024, evidentiary hearing and viewed by the district court during that hearing. *See* App.304:10-16, 351:17-24.

Submitted to the United States Court of Appeals for the First Circuit as an MP4 file on a compact disc attached to the paper copies of the appendix. Please play that CD to view this evidence.

12:05
◂ Chrome

BHS_PERFORMING...
**Posts**

Follow



PLAINTIFF'S
EXHIBIT
25
1:24-cv-311
PENGAD 800-631-6989

80

Liked by **jaden.g20** and **others**

**bhs_performingarts** We wrapped up our last day with Seniors in band last Thursday with senior... more

June 4, 2023




PLAINTIFF'S EXHIBIT
27
1:24-cv-34
PENGAD 800-631-6989


BOYGIRL
PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
28
1:24-cv-311




PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
29
1:24-cv-36

DEFENDANT'S EXHIBIT
F
1:24-CV-31-SM-AJ

---------- Forwarded message ---------
From: **Shannon Farr** [redacted]
Date: Wed, Sep 11, 2024, 9:06 PM
Subject: Concerned Parent - Plymouth Game (Girls' Soccer)
To: Mike Desilets <mdesilets@bownet.org>

Hi Mike,

For the last three years, I've enjoyed watching my daughter and her teammates play on the varsity soccer team - and am in the midst of my daughter's fourth and final season. I've loved supporting and cheering these girls and will miss it when it's all done.

I am writing because I have concerns about statements other team parents have been making regarding both the trans-female player from Plymouth and their potential plans as to how they want to handle the game on the 17th.

Today, in Laconia (while in earshot of other Bow families, Laconia families, children, grandparents, friends, etc. several Bow parents discussed wearing dresses to the game, buying anti-trans warm-up shirts for the Bow players, making signs in protest of trans athletes, and generally planning on how they can heckle and intimidate this player.

I understand this is an extremely sensitive subject and I know many don't have opinions aligned with mine. However, I don't feel the soccer field is a place for hatred or disrespect and based on the comments I've seen on Facebook and have overheard at several games, I have concerns of what this game could devolve into. I truly hope that any community members who are showing less than the best sportsmanship and courtesy towards the other team will be dealt with swiftly.

ANY spitefulness or unpleasantries tolerated will not only set a precedent for this behavior by adults, but also be a really poor example for our student athletes.

Thank you for all your hard work and the best of luck for the rest of the season (for all sports) ahead!

Best,

Shannon Farr

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * * *

KYLE FELLERS, ET AL

Plaintiffs,

v.

MARCY KELLEY, ET AL

Defendants.

* * * * * * * * * * * * * * * * * * * *

1:24-cv-311-SM-AJ
November 21, 2024
9:42 a.m.

TRANSCRIPT OF EVIDENTIARY HEARING
MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

Appearances:

| | |
|---|---|
| For the Plaintiffs: | Endel Kolde, Esq.<br>Brett Robert Nolan, Esq.<br>Nathan John Ristuccia, Esq.<br>Institute for Free Speech<br><br>Richard J. Lehmann, Esq.<br>Lehmann Major List, PLLC |
| For the Defendant, SAU 67: | Brian J.S. Cullen, Esq.<br>Jonathan M. Shirley, Esq.<br>Cullin Collimore Shirley, PLLC |
| For the Defendant, Steve Rossetti: | Dennis T. Ducharme, Esq.<br>Ducharme Resolutions, PLLC |
| Court Reporter: | Liza W. Dubois, RMR, CRR<br>Official Court Reporter<br>U.S. District Court<br>55 Pleasant Street<br>Concord, New Hampshire 03301<br>(603) 225-1442 |

# I N D E X


| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kyle Fellers | | | | |
| By Mr. Kolde | 43 | | | |

| EXHIBITS: | FOR ID | ADMITTED |
|---|---|---|
| Plaintiff's Exhibit 13 | | 59 |

P R O C E E D I N G S

THE CLERK: The court is in session and has for consideration an evidentiary hearing in the matter of Kyle Fellers, et al, vs. SAU 67 Superintendent, et al, civil case number 24-cv-311-SM.

THE COURT: Okay. Good morning, Mr. Kolde. Good to see you again.

MR. KOLDE: Good morning.

THE COURT: All right. Let's start. Why isn't it moot?

MR. KOLDE: Okay.

THE COURT: Not -- not the whole case, obviously, but the motion for -- for preliminary injunction.

MR. KOLDE: Good morning, your Honor. May it please the Court.

The Court has before it a live controversy about preliminary injunctive relief because this case isn't just about wearing wristbands at soccer games or displaying signs in the parking lot at soccer games. My clients want to silently express their views in support of women's sports at other sporting events and extracurricular events, and they've so stated since the outset of this case. Their declarations reflect that.

I'll give the Court some examples of games that are imminent -- of sporting events that are imminent: Girls

varsity basketball games, girls' ski team events, girls' swim team events, boys' hockey events, and at least a middle school band winter concert.  These games will be happening in -- some of them, of these events, will be happening in December, so just a few weeks away, and some in January and beyond.  I can give the Court specific dates if you want.

In addition, some of the children of my plaintiffs will likely participate in girls' lacrosse.  That is a spring sport, but that is going to be -- they're going to have tryouts in February with practices starting in March.

They've said that they want to wear these wristbands at more than just soccer events in their declarations.  They said also at other sporting events, they gave some specifics in their declarations and at least three of the declarations refer to other extracurricular activities.

I think it's important for the Court to also just take note with regard to the mootness issue that policy KFA, which is at the heart of the defendant's censorship regime, applies on or off school property.

And if I could just call that up real quick.

And this has been marked as Plaintiff's 1, your Honor.  And we don't need to go through the whole policy right now, but right here in the very lead paragraph it says:  For purposes of this policy, school property means any buildings, vehicles, property, land, or facilities used for school

purposes or school-sponsored events, whether public or private.

So it doesn't even need to take place on Bow School District-owned property. It could be property that they have rented or leased --

THE COURT: Yeah, implied is that they have possessory use and control over the property for school events. That makes it a limited public forum, doesn't it?

MR. KOLDE: I agree with you.

THE COURT: You know, it occurs to me that -- not to interrupt you, but it's an interruption.

It occurs to me that there's not -- I don't -- there's not a lot of actual disagreement between the parties here. But let's explore that.

The plaintiffs -- you do not disagree, you agree, that a school district, a school board, does have the authority to limit speech in a limited public forum, a school-controlled limited public forum, for the purpose of protecting children participating in sports from harassment, intimidation, targeting, degrading, dehumanizing speech, right?

MR. KOLDE: To some degree, yes, your Honor. I think that --

THE COURT: Okay. All right. Let's --

MR. KOLDE: -- it depends on the facts.

THE COURT: Let's work in steps. Yeah, I know. I know you hate to concede the time of day, but let's work in

steps.

Okay. And that's proper. That's a correct concession.

MR. KOLDE: Qualified concession, your Honor. Depends on the facts.

THE COURT: Correct. Correct qualified concession.

Your position is that's not what happened here. Our clients were not targeting, intimidating, harassing, whatever; didn't intend to, didn't actually do it, didn't pose a reasonable threat of it.

That's your position. Right?

MR. KOLDE: (Nods head.)

THE COURT: The school board's position is that's what we acted to prevent. We think you did. We agree we can't limit free speech broadly -- we can't limit passive, undisturbing, nonthreatening speech -- but we didn't try to.

So there's a factual dispute here, right, about what you did and what you -- what your clients did and what they intended to do and there's a flip-side factual dispute of what the school board did or tried to do and why, right?

It's not so much a legal disagreement. It's a factual disagreement.

MR. KOLDE: You know, I respectfully disagree, your Honor. I don't think --

THE COURT: Okay. Why? Tell me why.

MR. KOLDE: The facts aren't even close. The --

THE COURT: Well, no, don't argue it. Tell me why it's not a factual dispute and it's just a legal dispute.

MR. KOLDE: Because they don't dispute that all my clients did was wear pink wristbands with XX on them. Okay? All the other stuff is window dressing and distraction. That's all my clients did.

And if you watch the video, which we're prepared to play, it completely backs up my clients' version of events. It absolutely shows that nothing was going on until the officials decided to confront my clients. There was absolutely no behavior or messaging targeted at any of the players on the field. The players likely didn't even know what was going on.

THE COURT: That's just the long -- that's just a long-winded way of saying we disagree that that was our action, our intent, or the natural risk of our action or intent. That's all you're arguing.

MR. KOLDE: No, we're arguing that there was no harassment. And I --

THE COURT: Yes, of course. You're saying as a factual matter, we didn't harass. Our actions didn't have a tendency to harass, our actions were not in the realm of regulatable conduct because we didn't mean to, we didn't actually, and this doesn't constitute. That's all you're saying, as a factual matter.

MR. KOLDE: Well --

THE COURT: They're going to get up and say the absolute opposite: Given the background, given the emails, given the social media, given the warning, that's exactly what you intended to do.

MR. KOLDE: May I show the Court one thing from their -- their --

THE COURT: No, I'm not going to resolve that factual issue right now. I'm just saying --

MR. KOLDE: Yeah.

THE COURT: -- isn't that what we have here, a factual dispute, not a -- a legal dispute? You agree --

MR. KOLDE: I disagree that there's actually a factual dispute. It is a -- it's about -- I think most of the facts are agreed; it's the conclusions to be drawn from the facts.

They call what my clients did -- I don't think there's actually a dispute about what my clients did. Those are the facts. They call it harassment. We don't call it harassment.

THE COURT: Or they call -- or they don't. They may not. They may actually just say, no, it may not have gotten to that level, but we get to regulate speech to -- so it doesn't get to that level.

MR. KOLDE: That's a legal --

THE COURT: We don't have --

MR. KOLDE: That's a legal question, not a factual question, your Honor. That is not a -- that is not a factual dispute.

THE COURT: But it's not a disagreement about First Amendment law. It's a --

MR. KOLDE: It absolutely is a disagreement about First Amendment law.

Could you please pull up their overreaching and breath-taking statement in their prehearing memo, which is really -- when I read it, my jaw just dropped.

This is from page 13 of their prehearing memo just filed a few days ago. They make this statement, which is an error of law, and truly surprising.

Quote: The district is justified in treating plaintiffs' wristbands and signs at soccer games and the parking lot as targeting the school's transgender and gender-nonconforming student population generally for harassment and intimidation irrespective of whether those students are playing on the field, attending the games as a spectator, or present at the games at all.

This is absolutely legal dispute. And it --

THE COURT: It sounds a lot like what *J.M.* stood for.

MR. KOLDE: *J.M.* is a different case. It's about

regulating student speech --

THE COURT: I know.

MR. KOLDE: -- in the classroom.

THE COURT: But that's the concept in *J.M.*, right? You're saying it doesn't translate to adults, but that's the concept in *J.M.*

MR. KOLDE: I just think *J.M.* is a different case.

THE COURT: Where is that, do you know?

MR. KOLDE: I'm sorry?

THE COURT: Where does that stand?

MR. KOLDE: Sur-petition's been filed. It's a good sur-petition I hope they grant but, you know, the Supreme Court doesn't take enough cases, unfortunately.

THE COURT: Do you know when it was filed?

MR. KOLDE: My expert's here.

THE COURT: I'm not going to hold you to it. Just roughly.

MR. NOLAN: The response --

MR. KOLDE: Go ahead, Brett. Why don't you --

MR. NOLAN: The response to the sur-petition has been waived and so it's pending whether the Court will call for a response or not. The sur-petition was filed, I think, about 60 days ago.

THE COURT: Oh, good. Okay. So that's, you know --

MR. KOLDE: It's in the pipeline, yeah.

THE COURT: Okay. All right.

MR. KOLDE: So, in any event, I mean, we -- you know, legally -- ultimately, I think this is more a legal dispute than it is a factual dispute and, you know, to -- to summarize, I think, where some of the legal disagreement is in this case, I think the Court and plaintiffs agree that these sporting events are a limited public fora. The law is clear on that.

The defense seems to nod -- have a nod towards, yeah, they might be limited public fora, but then they keep trying to come back and argue, no, they're nonpublic fora. However, nonpublic fora have the same legal test as limited public fora: Got to be viewpoint-neutral, you've got to have reasonable content-based restrictions, you can't have viewpoint discrimination.

And then what they do through the back door, and his is where I think there's some sleight of hand and really inaccurate legal argumentation going on, is that they try to treat my clients like students and bring in *L.M.* through the back door. They want to do that, and I understand why they would want to do that.

But my -- as this Court has recognized and I think you -- you know, the Court understands this, my clients are adults in a limited public forum and this Court has stated previously at the hearing, and this is a correct statement of

law and I don't think there's any -- any authority that I know of to the contrary, that adults enjoy more rights than students to speak, including in limited public fora.

And so they have taken, actually, the opposite position and they've done it repeatedly, including in their prehearing memo, that they want to say that, no, this is only about the students, these events are about the students, and, actually, my clients have less rights even than students.

That's simply not true. That is a legal dispute. But that -- that explains a lot about why they treated my clients the way they did. They treated my clients like a student wearing this wristband in the classroom. And while I personally would defend a student's right to wear this wristband in the classroom, I would agree with the Court that that is a different forum or a different situation and a different legal test and would be analyzed under *Tinker* and in this circuit under *L.M.* as long as *L.M.* remains, you know, good authority.

So --

THE COURT: That -- that you can regulate student conduct doesn't follow that you cannot regulate an adult conduct -- adult's conduct. And sometimes the conduct that you prohibit a student from engaging in in school is also prohibited -- prohibitable by an adult at an extracurricular activity, right?

MR. KOLDE: Perhaps if you're speaking in generalities, your Honor, but this is not conduct. This is speech.

THE COURT: Because you've already agreed --

MR. KOLDE: Yeah.

THE COURT: -- yes, if my clients had organized, gotten together, shown up at a school extracurricular event and on a limited public forum for the purpose of targeting and harassing a transgender student-athlete while playing, you would agree that speech can be restricted.

You've -- I think you've already agreed to that, right?

MR. KOLDE: I -- I think that it --

THE COURT: I'm an adult and I get to target transgender students while engaged in school activities. That's a silly proposition and you don't advance that, right?

MR. KOLDE: I guess I'm not exactly following --

THE COURT: Yes, if your clients had gotten together and if it could be shown that they said, look, we don't want that trans girl playing on a girls' team, competing in high school girls' soccer, and we're going to show up and make her feel uncomfortable and hopefully get her to quit, you would agree that speech, for that purpose, would be subject to legitimate regulation under the First Amendment, right?

MR. KOLDE: If -- if they engaged in --

THE COURT: Take --

MR. KOLDE: -- actual --

THE COURT: -- take my -- take my -- take my presentation of assumed facts as correct and don't tell me I -- I want to change the facts and then it isn't.

Take my presentation of facts. Would you not agree that speech is regulatable?

MR. KOLDE: It -- it might be, your Honor.

THE COURT: Might be?

MR. KOLDE: Yes. Your Honor --

THE COURT: You think the First Amendment allows adults to show up at school activities and harass a student while playing?

MR. KOLDE: May I argue, your Honor?

THE COURT: No. Take my facts and admit the obvious --

MR. KOLDE: Yes.

THE COURT: -- yes, the school can regulate such conduct, and we'll back off from there.

MR. KOLDE: If -- if there was actual harassment, yes.

THE COURT: Taking -- take my facts as I give them to you. You're a lawyer. You can assume facts for purposes of the argument.

MR. KOLDE: The facts are conclusory legal

conclusions, so --

THE COURT: Take my facts as correct and answer the question.

MR. KOLDE: By doing what, your Honor? By doing what, specifically?

THE COURT: By telling me, yes, I agree, that type of speech can be regulated.

MR. KOLDE: What harassment, though? What is the harassment? What is --

THE COURT: Targeting a transgender student.

MR. KOLDE: What does that mean? What does that mean, targeting?

THE COURT: Yelling at her, waving a sign, you don't belong, transgender student. That stuff.

MR. KOLDE: Naming the student by name?

THE COURT: No. Transgender students out, that kind of sign.

You're telling me that can't be regulated?

MR. KOLDE: On the sidelines?

THE COURT: Yes. On the grounds, on the -- in the limited forum.

MR. KOLDE: That would be a harder case. I probably wouldn't take that case.

THE COURT: Well, you know, concession is good for the soul sometimes.

MR. KOLDE: Yeah.

THE COURT: Yeah.

MR. KOLDE: Well, Judge, I want to make clear --

THE COURT: If you won't concede the obvious, then --

MR. KOLDE: Judge --

THE COURT: -- I'm going to find it difficult to follow you in the rest of your --

MR. KOLDE: Well, I understand that the Court is trying to get us to concede certain parts of our case, but --

THE COURT: No, I'm trying to get you to concede the obvious so we can move back from it.

MR. KOLDE: Well, it's less than obvious to me, your Honor, and you'll have to forgive me because the Court is using conclusory terms that the defendants have used without --

THE COURT: No, I'm using facts that establish harassment. Whatever facts in your mind would establish harassment of a student while engaged in extracurricular activities, do you not concede that kind of behavior can be regulated?

MR. KOLDE: May I --

THE COURT: And the answer is no.

Move on to another topic.

MR. KOLDE: Okay. If I may make the statement then, your Honor, I would say that if -- if one of my clients had

stood on the sidelines and said --

THE COURT: No, you're changing the facts. You're changing --

MR. KOLDE: -- Parker, get out of here, then, yes, that would have been --

THE COURT: Don't change the facts.

MR. KOLDE: Okay.

THE COURT: Do you not concede that the school has the power under the First Amendment to regulate harassing speech aimed at discouraging a transgender student from participating in girls' sports?

MR. KOLDE: Under a limited public forum standard, yes.

THE COURT: Yes, of course.

MR. KOLDE: Yes.

THE COURT: That's the standard that applies.

MR. KOLDE: Sure, if it's -- if we're talking limited public forum, yes, your Honor.

THE COURT: Yes. Yes.

MR. KOLDE: But I want to emphasize ours is an as-applied challenge, not a facial challenge.

THE COURT: Well --

MR. KOLDE: The facts do matter, and the facts are largely agreed that did not occur in this case.

THE COURT: The facts are probably not largely

agreed and the contention is that's exactly what happened. So --

MR. KOLDE: Well, that's how they've characterized it --

THE COURT: Of course.

MR. KOLDE: -- but they have not said our clients did anything other than wearing the wristbands. If the Court reads, as we have, the declarations very carefully, they don't actually allege that my clients at any point yelled at Parker or held up signs on the sidelines that have content like that.

THE COURT: No, no.

MR. KOLDE: And the video supports what my clients have been saying.

THE COURT: The point isn't to conclusorily find what your clients did at this hearing. The point here, for me anyway, is to try to figure out whether or not what we have here is a factual, not a legal, dispute.

MR. KOLDE: It's a legal dispute, your Honor.

THE COURT: Okay.

MR. KOLDE: There are -- the facts, I think, are largely agreed. It is -- it is a legal dispute, including what conclusions are to be drawn from the facts. We call this legal, passive speech.

THE COURT: Okay. What's --

MR. KOLDE: They call it harassment.

THE COURT: What's the uncontroverted evidence with respect to the school board's or the school -- I'm not sure, is it the school district or the town, both?

MR. CULLEN: The district, your Honor.

THE COURT: The district.

What's the school -- what's the evidence of the school district's intent and purpose? What's the evidence of the school district's actual directive? What's the evidence of the school district's -- you have a conspiracy claim, who conspired in what way, saying what, doing what, meaning what? Where is all that?

MR. KOLDE: That's a --

THE COURT: That's uncontroverted.

MR. KOLDE: -- compound question, your Honor.

THE COURT: Where is all that?

MR. KOLDE: Which question would you like me to answer first?

THE COURT: Yeah, where is all that?

MR. KOLDE: Which part?

THE COURT: The uncontroverted evidence that shows all that. You say it's not controverted.

MR. KOLDE: What they did, which is sensor my client, is uncontroverted.

Could I have the notes --

THE COURT: No, no. I think you might have missed

my question again.

You allege a conspiracy.

MR. KOLDE: Correct.

THE COURT: Okay. What's the uncontroverted evidence that you rely upon that establishes that two or more people reached an agreement to achieve an unlawful purpose? When did they do it, what did they say, how did they do it, what was the effect?

I think that's controverted. I think they're saying --

MR. KOLDE: The conspiracy may be, your Honor, but the viewpoint discrimination is not.

THE COURT: Okay.

MR. KOLDE: They claim a right to be able to engage in viewpoint discrimination. We don't have to prove every claim in our case at an MPI hearing for it to be -- for us to be entitled to relief.

THE COURT: Exactly.

MR. KOLDE: It's viewpoint discrimination.

THE COURT: That's exactly my point.

MR. KOLDE: Yeah.

THE COURT: You don't have to prove it here, nor could you, because it's disputed.

MR. KOLDE: The conspiracy perhaps, but the viewpoint discrimination, I think it's -- they -- I mean, they

all but admit it, your Honor. They don't call it that, but they keep saying --

THE COURT: No, they call it conduct regulation.

MR. KOLDE: Yeah, which is -- that's a -- that's a conclusion of law and it's --

THE COURT: Okay.

MR. KOLDE: -- a clear error of law.

THE COURT: And so tell me again why -- well, tell me again why the motion for preliminary injunction isn't moot.

MR. KOLDE: Because they still want to be able to do it. If my clients show up to the Bow girls' basketball game wearing this wristband, there's a Bow -- there's a home game against Bishop Brady on December 13th. There's a home game against Souhegan, if I'm pronouncing that right, on December 17th. There's a boys' swim meet coming up in December, December 6th, December 18th -- a Bow swim, sorry, that's girls' swimming. If my clients show up wearing this wristband, as they have stated that they want to do, silently, they face potential sanctions.

Again I'd point the Court to what they state in their prehearing brief. There doesn't need to be a trans player on the field or competing in the pool. There doesn't need to be a trans player in the stands. They don't even need to be present at all. They are saying they will enforce their policy, and their policy says it applies wherever there's a

school event. And they've already shown, your Honor, that they will enforce the policy by the way they treated my clients at the soccer game.

If I may, your Honor, just remind the Court about the contents of the Fellers' no trespass order.

THE COURT: Which is expired.

MR. KOLDE: Which is expired, but it's evidence of how they've handled this in the past. And, by the way, they've said they will do it again. Because look at what they said in their prehearing brief: We don't even need a trans kid there and we're going to enforce this policy.

All right?

So if we could just scroll down a little bit, let's see here, maybe the second page. Yeah, you're right.

Specifically: Prior, during the soccer game, you led a protest regarding the participation of a transgender female student on the team. The protest was designed to and had the effect of intimidating, threatening, harassing, and discouraging that student as well as any other students from playing.

That -- that's what they've shown they're going to consider wearing a pink wristband with XX on it. My clients obviously face the risk of being hit with no trespass orders like this again if they show up at any of the events that I've just listed for the Court.

And I have a longer list. I don't want to take up the Court's time, but there are many other events that my clients want to go to in the next few months and express themselves passively and quietly by wearing these wristbands. They face sanctions if they do that because, according to the Bow School District, just wearing a pink wristband with XX on it is intimidation, threatening, and harassment, which are essentially legal conclusions, your Honor. They are drawing conclusions from the undisputed facts. They have not pointed to any actual evidence that my clients did anything other than wear these pink wristbands.

And if the Court would allow us at some point this morning to play the body cam video from the sidelines, that doesn't show everything that happened, but it shows a big chunk of the interactions. It's very clear that, you know, my clients were engaging in silent speech and what -- the exchange between the school officials and my client Kyle Fellers shows that no one was harassing Parker and no one was harassing any player on the field, and that the disruption was caused -- interruption, rather -- of the game was caused by the officials confronting my clients and asking them to remove the wristbands.

So that's what was going on. This is viewpoint discrimination, your Honor. It's very clear. They're proud of it. They think they're right.

THE COURT: It sounds like you're arguing the merits for a permanent injunction request as opposed to telling me why the motion for a preliminary injunction with respect to these games isn't moot. That's your motion. Your motion is give me a preliminary injunction relative to these games and that -- those --

MR. KOLDE: Our motion said athletic events, your Honor. It did not say soccer games. Our motion was towards athletic events. It's very clear and our clients' declarations very clearly stated they wanted to attend other athletic events and other extracurricular activities, not just soccer events. It is wrong to say that we only asked for it for soccer games. It's simply not true.

THE COURT: All right.

MR. KOLDE: And I can -- do we have the motion?

THE COURT: I have it somewhere here. I'll find it. Unless you have it --

MR. KOLDE: I think he has it handy if you'd just give us ten seconds.

So this is docket 14, you know -- no, this is not -- this is the wrong one.

THE COURT: I have it somewhere.

MR. KOLDE: Oh, yeah. Plaintiffs also request an injunction.

Plaintiffs are likely to succeed on their claim that

defendant's policy prohibits -- prohibiting spectators at school athletic events from silently expressing views about girls' and women's sports by wearing pink wristbands or displaying signs in the parking lot violates the First Amendment.

So this was not limited, our request for relief. This is in our short motion for preliminary injunction, not the memorandum, but the memorandum also makes -- repeatedly makes arguments about the nature of extracurricular events as limited public fora.

You know, the defendants have said, oh, well, you need to supply more facts about the nature of those fora.

Your Honor, the Court and plaintiffs agree on this issue. Defendants are the only ones that appear to disagree. Bow athletic events are limited public fora and to state otherwise is an error of law.

THE COURT: I'm looking at document -- docket number 14-1 filed October 4th.

MR. KOLDE: Yes. There is a reference in there to enjoining enforcement of a policy at extracurricular events on page 2, your Honor.

If you look at -- if the Court looks at page 2, Subsection C: We ask the Court to enjoin enforcing those parts of policy KFA -- and I'm skipping ahead from the quote from policy KFA -- from interfering with any school activities or

function to prevent attendees at any extracurricular event from nondisruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports by silently wearing a pink wristband on the sidelines or displaying a sign in the parking lot.

So this is what we asked for.

THE COURT: That -- doesn't that seem tailored to your specific claim for irreparable injury arising out of the display at this soccer game?

MR. KOLDE: Well, the as-applied relief applies certainly to the wearing of the wristband and -- and the wanting to display signs in the parking lot, but we used extracurricular event for a reason, your Honor, and that's because we didn't want to limit ourselves to the soccer season. Okay?

Defendants play games about mootness all the time and run out the clock.

THE COURT: Oh, it's not running out the clock. Your -- if -- it's not running out the clock.

MR. KOLDE: Well --

THE COURT: Your preliminary injunction claim is preserved. That doesn't go away.

MR. KOLDE: We clearly wanted -- this isn't just about soccer, your Honor, and we clearly --

THE COURT: Well, I agree it may not be, but your request for a preliminary injunction, in my view, related to these events, the actual events, not to some future speculative event in which they may or may not --

MR. KOLDE: That's what a preliminary injunction is for. It's essentially a preenforcement challenge.

THE COURT: Of course.

MR. KOLDE: They've already enforced it against us and we are worried they're going to enforce again. And they've said they will enforce it again, your Honor.

THE COURT: I have a vague familiarity with what it's for.

MR. KOLDE: Yeah.

THE COURT: But you've talked -- you targeted these events and these events are over. And now you have the burden of showing that these events identical or substantially close will arise again in the future.

And you're positing -- it seems to me you're speculating. You're trying to turn this motion into a broad forum future preliminary injunction motion, which I -- I don't think I'm going to allow to you do.

But who knows what the future brings. Who knows how they're going to enforce it, if they're going to enforce it.

MR. KOLDE: Judge, I just couldn't disagree with you more.

THE COURT: I understand.

MR. KOLDE: I think as a matter of mootness -- I mean, this case is not moot.

THE COURT: The case is not moot. That's not --

MR. KOLDE: Neither is the --

THE COURT: -- what we're talking about. We're talking about your motion for preliminary injunction.

MR. KOLDE: If they had come up here and said, we're not going to enforce the policy, we made a mistake, we overreached, this would be a harder call. But they have not said that. They have said, and we've quoted the -- the prehearing memo: We were right to do what we did, we're going to do it again, even if there's no trans player on the team, even if there's no trans player even at the event. We have the right to enforce our policy.

And the language they've used all throughout is that this -- wearing this wristband is harassment and intimidation. It is not.

My clients cannot -- as a practical matter, your Honor, my clients cannot go to any of these events that are happening in a few weeks that they have stated in their original declarations that they filed when we filed our motion for preliminary injunction and TRO, it's in their declarations that they want to wear these wristbands. They can't do that because they're going to face no trespass orders again or

potentially having events forfeited.

So that's the reality. They're self-censoring, with good reason, because they've already been censored before and defendants have said they're going to do it again. That is why this is not moot.

THE COURT: Okay. Anything else on that subject?

MR. KOLDE: I think I'll reserve an opportunity for rebuttal after we hear from the other side, your Honor.

THE COURT: Of course.

All right. Mr. Cullen.

MR. CULLEN: Thank you, your Honor.

Depending on the Court's inclination to ask questions, I'll be a little shorter, I think.

We think it's moot because if we look at 14-2, certainly Section A is moot as it talks about attending soccer games, attending the -- enforcing the no trespass order, as you properly say, is -- the trespass orders are no longer in effect.

The -- there's no protest zone in effect anymore, so that part of the request for relief is --

THE COURT: But what about Mr. Kolde's argument that, look, the reality here is you're going to -- you're going to enforce the same ban at limited public fora, school extracurricular events in the future, in the immediate future.

MR. CULLEN: I think -- I think that's right. If

Mr. Foote or one of the other plaintiffs shows up at the basketball game wearing the same wristbands in the same manner and they want to protest outside the -- I notice we've heard nothing about signs so far, but if they want to protest outside in the parking lot with signs, yeah, they'll be asked to take off the wristbands. And then if they don't comply with the orders, you know, they'll be asked to leave.

THE COURT: Okay. That sounds like it's not moot.

MR. CULLEN: I don't think we need to have a -- a preliminary injunction hearing on this because I think -- I think you have the facts in front of you that you need. But we're here. We have our witnesses ready if you think you need to go forward.

I don't understand the ever-expanding nature of the relief that they're requesting. I certainly don't understand why they would want to wear or feel that their right to wear wristbands to --

THE COURT: Because they say it's not targeting, not harassing, not degrading, not demeaning, not threatening students engaged in extracurricular activities.

MR. CULLEN: I apologize.

THE COURT: That's why.

MR. CULLEN: I didn't -- I didn't quite finish. At the -- I was trying to speak slowly because I have a habit of speaking too quickly sometimes for the reporter.

At a -- at the middle school band concert that's coming up, for instance, they seem to be -- this case started, as you rightly point out, about, you know, soccer games.

The school doesn't have control over the swim meets. They don't host swim meets. That's not really on the table.

The soccer -- the music, that's just come for the first time in the recent papers.

THE COURT: What I'm understanding you're saying, Mr. Kolde's absolutely right, our policy, such as it is, will be enforced as he described.

MR. CULLEN: Yes. I mean, that's -- that's the --

THE COURT: So how is it -- why are you arguing that this motion for temporary restraining order -- I mean for preliminary injunction is moot and we should just move on to a trial on the merits of the permanent injunction request?

MR. CULLEN: I just don't think you need an evidentiary hearing to make this decision. But we're here. We're ready to go, your Honor.

THE COURT: But we do, because you're -- I thought your claim was we -- as I --

MR. CULLEN: As I said --

THE COURT: It's interesting to me that neither side wants to concede the obvious.

MR. CULLEN: Yeah.

THE COURT: You seem to both agree what the law

is --

MR. CULLEN: Right.

THE COURT: -- with respect to a limited public forum, but you both take opposite positions on what the facts are. And you say, we get to regulate this speech --

MR. CULLEN: Correct.

THE COURT: -- because we get to protect children --

MR. CULLEN: Right.

THE COURT: -- engaged in school activities.

MR. CULLEN: Yes.

THE COURT: Right?

MR. CULLEN: Yes.

THE COURT: So it's not a disagreement about what the law -- First Amendment law is. It's a disagreement about what the facts are when you apply that law. You say it's simple, it's straightforward, we're protecting a child, we get to do that. They say it's simple, it's straightforward, we get to passively, in a nonthreatening, intimidating way exercise our First Amendment rights.

MR. CULLEN: Yeah. Then we should go forward, your Honor.

THE COURT: Okay. So you agree that this temporary restraining order -- I mean preliminary injunction request is not moot because you intend to apply it in the same way.

Why isn't your argument we don't know if the conduct

in the future is going to be threatening to a particular student or students in general?

MR. CULLEN: Well, I believe that our view of this -- of policy KFA is that wearing the XX pink wristbands -- not just -- not pink wristbands. They can wear pink wristbands if they want to. Wearing the XX wristbands, we believe that that violates the policy and doesn't comply with our Title IX obligations.

And that's -- that's where the -- you know, that's where the school is.

THE COURT: Without a showing that it's actually detrimental to the psyche or physical well-being of a student?

MR. CULLEN: Well, we think --

THE COURT: Don't you have to show that?

MR. CULLEN: Well, the school -- I mean, I think the school officials are the ones who are there with their students making determinations every day as to sort of what conduct is permissible and how it's going to be --

THE COURT: But it has to be reasonable. It has to be rooted in reality. It has to be consistent with the law. It can't just be, you know, I'm the school board chair, what I say goes. I find that wearing your hair up in a bun is threatening to transgender students. That's our policy, that's our conclusion, good enough. No, that's not good enough. That's irrational.

MR. CULLEN: Right.

THE COURT: You can't be irrational.

MR. CULLEN: I agree.

THE COURT: Okay. So then if that's your policy, don't you as a factual matter have to justify the reasonableness of the decision to show, in fact, it has an intimidating or demeaning or degrading effect and how that works? Don't you have to show that?

MR. CULLEN: Well, we can certainly do that at the permanent injunction hearing and we can do it -- you know, we can introduce facts on that today.

I mean, testimony would be that, you know, this XX symbol has -- is rapidly developing into a symbol that's more than just a pro women's sports, but actually an anti-transgender women in sports symbol and that that has been displayed through the Olympics, through -- through the creation of an XX-XY clothing line, that is that this is developing into a symbol of anti-trans participation in women's sports.

THE COURT: But anti-trans participation in women's sports is a legitimate, debatable, sociopolitical, educational issue.

MR. CULLEN: Absolutely, it is.

THE COURT: Right.

MR. CULLEN: And they can and did bring this to the attention of the administration. You'll hear that Nicole Foote

met with the AD. There are a lot of different places that they can have that opinion and they've never been sanctioned for that. They've expressed that opinion in -- in -- you know, in strongly worded emails, in other forum. That's never been sanctioned.

It's purely a matter of do you get to do this at the sidelines of a game and do you get to -- you know, do we have to turn our parking lots into protest zones where everybody can come in for any reason, you know, not just for this, but for anything, just walking around with signs.

THE COURT: But they can unless there's a legitimate reason to limit the speech in a limited public forum. That's the law. They can.

MR. CULLEN: Well, I know -- I think that the -- I think that's -- that's true as far as the sidelines go, but we're saying, obviously, that this speech is not -- is outside of that. You don't get to do this speech at that event. But -- but the -- let's not lose sight of the --

THE COURT: But the only reason you get to say that is not because of the viewpoint expressed to the position taken on the issue. You only get to say that if there's some detrimental effect that you can show to students. The only defense is we're protecting students, right?

MR. CULLEN: Yes, your Honor.

THE COURT: So you can't just say, well, we don't

like that viewpoint, that anti-trans national develop -- international developing trend to recognize it as such. You can't say that. You've got to say and it adversely affects our students.

MR. CULLEN: Correct.

THE COURT: Right.

Okay. I thought your position was they've -- they've rapidly expanded the scope and reach of the complaint; they've changed the nature of the dispute; we can't possibly go forward with that on the permanent injunction basis because of this expanded claim situation on the amended complaint; and -- and, by the way, the motion for preliminary injunction relief, that's moot because that's over and done and who knows what's going to happen in the future.

But that's not your position, as I'm hearing you this morning.

MR. CULLEN: No.

THE COURT: This morning you're saying, sure, let's go forward on the preliminary injunction.

MR. CULLEN: We can't -- you know, we probably don't have all the facts on, you know, conspiracy to retaliation, the things that you're going to need for the ultimate findings for the trial.

But, yeah, look, I -- as I said, the school's position is if they come to the basketball game with the XX

wristbands, they'd be asked to take them off.

THE COURT: You would enforce the policy against passively wearing XX wristbands at extracurricular events.

MR. CULLEN: Yes. It's the school's belief --

THE COURT: Then I don't -- you're not arguing it's moot then.

MR. CULLEN: I --

THE COURT: You're telling me it's not moot.

MR. CULLEN: I'm telling you the truth, which is that's the way the policy's going to be.

So, yes, if that makes it not moot, then -- then we go forward.

THE COURT: Okay. Good enough. That solves that.

MR. KOLDE: Your Honor, I don't really have anything to say in rebuttal.

THE COURT: No, you're winning now.

MR. KOLDE: Yeah.

THE COURT: You should keep quiet.

Okay. All right then. We'll go forward on the preliminary injunction, understanding that the defendants have agreed that its -- its actions will be the same at future school events.

MR. KOLDE: I think we do agree on that, your Honor.

THE COURT: All right.

MR. KOLDE: May we go first as plaintiffs?

THE COURT: Yes. Yeah, I -- yes, I don't have a problem with that.

MR. KOLDE: All right. Did you want to take a break before we do that?

THE COURT: I do.

MR. KOLDE: And, your Honor, if I could just --

THE COURT: But I think let's try to keep it -- let's understand that -- let's try to keep the evidentiary presentations focused and relevant to the preliminary injunction, understanding I don't want to -- we can't try the permanent injunction with respect to all future conspiracies and activities. You're going to have to have an evidentiary hearing on those issues at some future time.

MR. KOLDE: I understand that, your Honor.

THE COURT: In other words, let's not try the conspiracy and retaliation. Let's try the preliminary injunction hearing.

MR. KOLDE: I read you, your Honor, and I'll, of course, be open to feedback from the Court as we go along. I'm ready to do either, but I have heard the Court in terms of the scope of this hearing.

THE COURT: Well, you know --

MR. KOLDE: Yeah.

THE COURT: -- I'm jumping ahead.

MR. KOLDE: Yeah.

THE COURT: Mr. Cullen's already surprised me once. Maybe he can surprise me again.

Are you prepared to try the preliminary -- the permanent injunction case?

MR. CULLEN: No, your Honor.

THE COURT: Okay. And so let's limit it to the preliminary injunction.

MR. KOLDE: And then one -- one other just request, a personal request.

One of my clients, Eldon Rash, is older and he takes certain medications and sometimes he needs to go to the restroom. And so if that's an issue, I would just ask that he be given -- you know, perhaps when his testimony is happening that we just take a short break --

THE COURT: Anytime.

MR. KOLDE: -- so that he can do that.

Thank you, your Honor.

THE COURT: Anytime. Just let me know.

All right. Let's take a short break, get organized, and when we come back, we'll begin with the plaintiff's presentation.

MR. KOLDE: Thank you, your Honor.

THE CLERK: All rise.

(Recess taken from 10:23 a.m. until 10:45 a.m.)

THE COURT: All right. Mr. Kolde, your evidentiary

presentation is going to be focused on nondisruptive, passive, silent, right?

MR. KOLDE: Yes, your Honor.

THE COURT: Okay. And we can anticipate the defense is going to be messaging, what's the message, is it harmful, could it be harmful, right?

I'm just telling you that because -- in case you want to save us some time, you could probably --

MR. KOLDE: Yes, expedite things.

THE COURT: If you have rebuttal evidence to that contention, maybe you could put that on, too.

MR. KOLDE: Yes.

THE COURT: Okay.

MR. KOLDE: Our plan, your Honor, and I've told Mr. Cullen similar things, is that we intend to call Kyle Fellers and lay out most of the facts of what happened and the background, introduce the body cam video through him and have him explain who some of the people are that are shown on the video that wouldn't be known necessarily to the Court.

So we'll cover a lot of the evidence with him and then there are certain gaps where he has, you know, been excluded from the game because he was sent off that will be covered through the testimony of Andy Foote and then also of Eldon Rash, who was the last person on the sidelines to be wearing a wristband that day.

Ms. Foote is present in court, too, and we were prepared to -- to present her. I think she mostly would corroborate what the others have said and I think in the interest of time and keeping things moving, we're not planning to call her unless something comes up with respect to her that we don't anticipate.

THE COURT: Okay.

MR. KOLDE: We have had an agreement with the other side prior to the hearing between counsel that in the interest of keeping things moving, we would give each other some room on cross-examination if it goes beyond the scope so that we don't have to recall witnesses at different parts of the case and all that.

THE COURT: Great. Super. Appreciate it.

MR. KOLDE: I think it's more efficient. I'm not going to be objecting to things that go beyond the scope and then Mr. Cullen and I talked about, hey, there's some -- to keep things moving, there's some preliminary kind of table-setting foundational stuff with Mr. Fellers, for example. I might lead him a little bit, but when we get to the meat of the case, I'm going to do my best not to lead and he's going to object if I do, and I'll restate my question a different way if that happens. So --

THE COURT: All right. I appreciate that. Let's get to the merits.

All right. Whenever you're ready, you may call your first witness.

MR. KOLDE: And, your Honor, before I call Mr. Fellers, can we officially offer all nondisputed admissible exhibits in this case?

THE COURT: Premarked? Are they --

MR. KOLDE: They are premarked and they're here. I can -- I can list them. There were significant numbers on both our list and their list where --

THE COURT: Yeah. If you would, just read into the record the -- the identification of the exhibits that are agreed to be fully admitted.

MR. KOLDE: I will do that, your Honor.

So agreed on the plaintiff's list are Plaintiff's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 14, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, and 34.

And I do have the defendants' lists here as well.

Oh, unfortunately, it doesn't say on my version which ones are agreed, but I'll trust Mr. Cullen to fill in that.

THE COURT: Mr. Cullen.

MR. CULLEN: If we could do that now, your Honor.

Agreed numbers are -- or letters are Exhibit C, Exhibit D, Exhibit E, Exhibit F, Exhibit G, Exhibit H, Exhibit I, and Exhibit J.

THE COURT: Okay. Great. Thank you.

MR. KOLDE: All right. Plaintiffs call Kyle Fellers.

Do you need a refill on your water?

THE COURT: There's water up here, I think.

THE CLERK: Please remain standing and raise your right hand.

**KYLE FELLERS**, having been first duly sworn, testified as follows:

THE CLERK: Thank you. Please be seated.

And please state your full name for the record.

THE WITNESS: It's Kyle Fellers.

DIRECT EXAMINATION

BY MR. KOLDE:

Q. Mr. Fellers, you live in Bow, New Hampshire; is that correct?

A. Correct.

Q. And you have two school-aged children that are attending the Bow public schools?

A. Yes.

Q. And what are their ages and sexes?

A. 17 and 13, a boy and a girl.

Q. Okay. And the girl is 17?

A. Yup.

Q. Okay. And, I'm sorry, your boy is how old again?

A. He's 13 now.
Q. Okay. And is he still in middle school?
A. He is.
Q. All right. And do they participate in extracurricular events through the Bow public schools?
A. Yes, that's correct.
Q. Okay. And can you kind of break it down for us by boy or girl and --
A. Yup.
Q. -- which events do they participate in?
A. Yeah. So my daughter participates in the Bow soccer team, she competes with the Bow swim team, and she's on a traveling team as well but outside of Bow's district.
And then my son is on the cross-country team, Bow cross-country, which is a fall sport. He's going to be skiing next year, but he's too young this year, so -- and then he will compete in baseball during the spring.
Q. Do you attend any other Bow sports events even if you don't have your own kids competing in the events?
A. Yes.
Q. Could you give us some examples of the types of events that you've in the past gone to?
A. Yup. I've -- I've attended girls' and boys' basketball games. I go to the hockey games. I go to the Everett Arena, watch Concord and Bow compete usually.

I've gone to the baseball games in the spring. I coach baseball in the spring and sometimes we have to use Bow facilities.

And then my son is part of the band, so we go to concerts and stuff like that.

Q. And it's fair to say that at least some of the activities you just listed occur at Bow School District facilities; is that correct?

A. That is correct.

Q. And the facility -- and the events that you've just discussed, do you intend to attend some of those events in the near future, including in the next month or two?

A. That is correct.

Q. Okay. Just to give a couple of specific events that came up during the argument as an offer of proof earlier today, do you intend to go to the Bow girls' basketball home game against Bishop Brady High School at Bow on December 13th, 2024?

A. That is correct.

Q. And do you intend to attend the Bow girls' basketball game, home game, against Souhegan on December 17th, 2024?

A. That is correct.

Q. All right. And there are several other games later in the schedule in January that are girls' basketball games that are home games that you also intend to attend; is that

correct?
A. Yeah.
Q. And then your daughter swims for Bow; is that correct?
A. Yup.
Q. And the Bow -- Bow doesn't have its own pool, but it leases space from the YMCA in Concord; is that correct?
A. Yes, that's correct.
Q. Okay. And you intend to attend some of your daughter's swim meets; is that correct?
A. That's my plan.
Q. Including at least two swim meets that are scheduled to occur in December of 2024; is that correct?
A. Yup.
Q. And if I could just have you say yes --
A. Yes, I'm sorry.
Q. -- instead of yup. I understand what you're saying, but it's easier for the court reporter if you use yes or no.
All right. It's fair to say that you have strongly held beliefs about the inclusion of biological boys or men in women's or girls' sports; is that fair to say, Mr. Fellers?
A. That is fair to say.
Q. Could you, you know, without -- without writing a novel, could you kind of summarize what your view is on that, your sociopolitical view on that issue?

A. Yeah, I -- I don't believe that biological boys should be competing against women in women's sports. I think it's a competitive disadvantage for that to occur and there are safety issues.

Q. Do you have a problem with people being trans outside of the athletic context when they're trying to compete against people in the sex that they are identifying with?

A. No, I have no -- no problem.

Q. It's fair to say that you were aware of a state law that had been passed in New Hampshire that was supposed to reserve girls' high school athletics for biological girls only; is that true?

A. That is true.

Q. And, again, without going into the details of the case, you were aware in the summer and early fall that that was subject to some litigation; is that correct?

A. That is correct.

Q. And it's fair to say that you were aware that -- that another court -- another judge in this courthouse had issued an injunction -- I'm trying to avoid using too much legalese -- essentially an order suspending the application of that law, at least with respect to several players that claim to be transgender and wanted to compete in girls' soccer; is that correct?

A. It's my understanding the court injunction allowed

two biological boys to compete against girls in women's sports, yes.

Q. Okay. And one of those boys was playing for the Plymouth girls' soccer team; is that correct?

A. That is correct.

Q. All right. And the Plymouth soccer team was on the schedule against the Bow High School girls' varsity team; is that right?

A. Repeat the question again.

Q. Yeah. The Plymouth team was scheduled to play the Bow girls; is that right?

A. That is correct, yup.

Q. And your daughter, at the time, was playing for the Bow girls' varsity team; is that right?

A. Yes.

Q. What did you think about that?

A. I was upset about it. I didn't think it was -- was right.

Q. Okay. At that time did you, yourself, personally email any school district officials?

A. I did. I -- I emailed our school board and the superintendent.

Q. All right. What did you say? And I'm just asking to paraphrase. You don't have to, like, recite the email from memory. If opposing counsel wants to get into it, he'll cross

you on that. But ...

A. Yeah. Actually, I might have just emailed them regarding the Olympic event. I'm not sure if I did email them about the court case.

Q. I think that's fair.

And so the Olympic email occurred in August, a little bit -- a month or two before this issue with the Plymouth player came up; is that fair?

A. That's fair, yup.

Q. All right. And, again, without going into a lot of detail, just so the Court understands, what was it about the Olympics, the gist of it, that you emailed some Bow school officials about in about August of 2024?

A. I just -- I expressed my frustration regarding a biological man physically assaulting a woman and destroying her Olympic dreams.

Q. Was this the Algerian boxer that beat up the Italian female boxer?

A. That is correct.

Q. All right. Did you receive a response from any of the Bow High School officials?

A. I don't recall receiving a response from the superintendent or the school board.

Q. Did you make a decision to express your opinion about supporting women's sports and about reserving women's

sports for biological women at the September 17th varsity girls' soccer game, Plymouth High School versus Bow High School?

A. Yes, I -- I wore a pink wristband.

Q. Okay. Give us a little bit of background on how it came to be that you wore a pink wristband. Whose idea was it, where did the wristbands come from, how did they get decorated?

So let's start with whose idea was it to get the pink wristbands.

A. Well, I had a conversation with my daughter about it and, you know, based on our conversation, I thought it would be good to support her as well as women's sports. And so I researched on Amazon and I found the pink wristbands online and I ordered them.

MR. KOLDE: Okay. And if we could just have a -- the exhibit that's already been admitted into evidence shows a picture of the pink wristband. That's Plaintiff's 4.

Display it briefly.

And if we could scroll down to show the wristband on the screen.

Q. Is that -- is that a wristband with the XX added later?

A. Yeah, that is the wristband, but -- yeah, as you indicated, the XX was added later.

Q. Did you add the XX?

A. I did not.
Q. Okay. And I have a wristband in my hand here. I'm not going to enter it into evidence, but there are -- you can see there's a -- there's a white ribbon sewn into it.
A. Yeah.
Q. Did that come with the original wristband?
A. It did.
Q. And what does that symbolize, to your understanding?
A. It symbolizes, in my opinion, just supporting women and their causes and their health.
Q. Is it consistent with your view that these -- you ordered breast cancer awareness wristbands off of Amazon?
A. Yes.
Q. All right. So you get these wristbands. What do you do with them?
A. Well, once I got them, I had another conversation with my daughter. And I -- I thought it was -- would be an appropriate idea to speak to -- that she would speak to the captain of the soccer team and have a -- a discussion with the team to determine if the team would want to wear them during the game.
Q. Did the team decide to wear the wristbands, from what you understand?
A. They did not.
Q. Okay. So the team decides not to wear the

wristbands. What did you do with the wristbands?

A. Well, I -- I had -- I had given the wristbands to Andy Foote, because his daughter is the captain of the team. So I figured that the captain of the team and my daughter could utilize them at that point and have a conversation with the -- the rest of the team about it. So at that point, once I found out that they weren't going to wear them, I didn't have the wristbands at that point.

Q. So they were out of your possession?

A. They were out of my possession.

Q. All right. Did you ask Andy to put the XX chromosomes on there?

A. I did not.

Q. Okay. Did you ask Andy or anyone else to put the Greek female symbol, you know, the mirror symbol, on any of the wristbands?

A. I did not.

Q. And what about NAD, did you ask them to put that on?

A. I didn't know what that meant. I did not.

Q. Okay. You have some understanding now, but you only learned about it due to this lawsuit; is that correct?

A. I found out after the fact, yes.

Q. All right. And do you have any reason to believe that the -- did you have any reason to believe prior to the September 17th soccer game that the XX was some kind of a hate

symbol?

A. No.

Q. Did you have any plan to show up to the soccer game on September 17th and harass the trans player that you had been told would be playing for Plymouth that day?

A. Absolutely not.

Q. Did you have any plans to heckle the trans player that you had been told would be playing for Plymouth that day?

A. No.

Q. Did you have any plans to wear a dress to mock the player?

A. No.

Q. Did you have any plans to bring a sign to the sidelines of the game?

A. I did.

Q. Well --

A. I planned on bringing a sign in my car.

Q. Okay. So you brought a sign in your car, but not to the sidelines.

A. Not to the sidelines.

Q. All right. What did that sign say?

A. It said Protect Women's Sports for Female Athletes.

Q. All right. Did it say anything else?

A. No.

Q. Who made the sign?

A. Me and my daughter did the night before.
Q. Okay. Did the sign -- and just so we're clear on the record, did the sign come to the sidelines at the Bow soccer field?
A. It did not.
Q. Okay. So it stayed in or on your car or with you by your car?
A. It was -- it was in my car when I was at the game.
Q. Okay. And we'll get to this later. At one point you were in the parking lot, you took the sign out and you held it over your head in the parking lot, correct?
A. That is correct.
Q. While you were standing by your own car?
A. While I was standing in -- by my own car, after the game had ended.
Q. Okay. Did you know who the trans player was? I mean, you know his name because he's the lead plaintiff in the lawsuit, right? You know it's Parker Tirrell.
A. Well, I know now. I don't necessarily remember if I knew his name before the game or at the game, but I did not know who he was or what he looked like.
Q. Could you recognize him?
A. No.
Q. Did you see him on the field that day?
A. I assume so, because he was playing in the game,

but, again, I couldn't pick him out of a lineup.

Q. And you're not sure; is that right?

A. That's correct.

Q. Okay. Did you ever talk to the trans player that day?

A. No.

Q. Did you say anything to the trans player that day?

A. Nope. Nope.

Q. All right. Did you yourself arrive with the wristbands on September 17th at the field?

A. I did not. I did not show up at the game with the wristband on.

Q. Okay. How'd the first half go?

A. Uneventful.

Q. Typical game?

A. Typical game. Bow was up, leading in the game, by halftime.

Q. How many -- I know a regulation adult game is 45 minutes per side. What's the length of the -- of the half for high school girls' varsity, approximately, if you know?

A. I'm more of a football fan, but I think it's 40 minutes. I might be wrong. It might be 45 minutes.

Q. All right. Maybe we can cover that with Andy Foote's testimony.

So the first 40 minutes or 45 minutes, there's --

there's no event. You're not wearing your wristband?
A. That's correct.
Q. Where's the sign in the parking lot at this point?
A. It's in my car, haphazardly on the -- my dashboard of my -- of my car.
Q. So it is visible to a passerby in the parking lot, but not particularly prominently displayed; is that fair?
A. Yeah, it's not prominently displayed. I didn't have any tape to tape it to the windshield, so it was dangling off the dashboard.
Q. You didn't come that prepared?
A. I didn't come that prepared, no.
Q. All right. You weren't trying to conceal the sign, but you also weren't doing a particularly good job of displaying the sign?
A. That is correct.
Q. All right. And that's during the first half, correct?
A. Yes.
Q. All right. Then there's halftime, 10 minutes, 15 minutes, something like that?
A. Yup.
Q. All right. What happens during the halftime?
A. Well, at halftime I realized I didn't have my cell phone. I left it in my car. So I started walking towards my

car. And that's when Andy, you know, reached out to me and basically at that point, I believe, handed me the wristband.

Q. And that's one of the XX wristbands?

A. That's correct.

Q. All right. Were you expecting to get a wristband from him?

A. I wasn't.

Q. Okay. Did you have a problem with the wristband he handed you?

A. No.

Q. Okay. And I want to be clear. It's an XX wristband, not an NAD wristband, not a Greek symbol for female wristband, correct?

A. That's correct.

Q. XX wristband.

What did you do with the wristband?

A. I just put it on.

Q. Was the wristband on your arm or on your wrist?

A. It was on my wrist.

Q. All right. And we'll see it in the video, but were you wearing a short-sleeve, long-sleeve shirt?

A. I was wearing a short-sleeve shirt.

Q. So it's fair to say that this hot pink wristband was visible on your wrist, correct?

A. That is correct.

Q. And what did you do with the sign?

A. I went -- I went to my car at that point and I tried to attempt to prop it up a little better, but I didn't really have a whole lot of luck, so ...

Q. All right. So still sort of --

A. And I grabbed my cell phone.

Q. And you grabbed your cell phone, which you had forgotten?

A. Yeah.

Q. Okay. And then you get the wristband from Andy and you go to the -- go back to the sidelines?

A. Yes.

Q. Okay. And if we could just have the map of the Bow soccer field real quick, just for orientation.

And this has been marked for ID only at this point. It's Plaintiff's 13.

MR. CULLEN: Actually, I think this one's in for all purposes.

MR. KOLDE: Oh, it is? Okay. Good.

THE COURT: I don't have it marked, no.

MR. KOLDE: I do have it as ID only, but I'll take the --

THE COURT: No objection?

MR. CULLEN: No objection. Sorry.

THE COURT: The ID may be stricken on 13.

(Plaintiffs' Exhibit 13 admitted.)

MR. KOLDE: I'll offer 13, your Honor, and I understand the Court's admitted it.

THE COURT: I did.

MR. KOLDE: Okay. Very good. Thank you, your Honor.

Q. Showing you what's been marked as 13, maybe we can zoom a little bit on the green part. We don't need the white part.

I'll represent to you that this is a -- a -- zoom out a little maybe.

This is a Google Maps overhead shot, satellite shot, of the Bow High School soccer field and it has some annotations on it. Does that seem accurate to you?

A. Yes.

Q. Are you familiar with the Bow High School soccer field?

A. Yup. Yes.

Q. All right. And it looks like, actually, there's some lacrosse goals on the field right there. Is that in the -- true?

A. Yeah, the -- they're not there when there's a soccer game going on.

Q. Right. Do you see where the goal area is annotated there, correct?

A. Yes.

Q. And then there's a marking for the parents' sidelines; is that correct?

A. Yes.

Q. And then there's another sidelines or touchline. The soccer nerds would say touchline. That's the actual edge of the field, correct?

A. Yes.

Q. And then give me your best estimate of the distance between the touchline at the edge of the soccer field and the actual parents' sidelines, where the parents are allowed to sit or stand.

A. Maybe seven to eight feet.

Q. Okay. And is it fair to say that that space there is to give the assistant referees a chance to move back and forth for the offsides calls and for the players to be able to do their throw-ins and the like?

A. Yes, that's correct.

Q. All right. And also fair to say that you and the other parents on both teams were on the parents' sidelines, not on the actual touchline; is that correct?

A. That is correct.

Q. All right. So -- and then can you just gesture for the -- if we could just show the parking lot here. I don't know that my laser pointer is picking up on this. It doesn't

matter.

Can you pull it down? No, down. Okay. Over.

So the foot parking is up at the top. Where were you parked at that time, Kyle?

A. I was actually parked over in this area. I was on the lawn --

Q. Okay.

A. -- because I got there late.

Q. And later you moved your car, right?

A. Yeah, later I moved. After I got thrown out of the game, I moved it down in this area.

Q. Where it's marked now, Fellers parking --

A. Yeah.

Q. -- that's later on.

Okay. All right. When you're coming back to the sidelines, it doesn't matter exactly where you were, but can you show the Court where, approximately, on the sidelines you were positioned when you were wearing the wristbands.

A. All right. So this is the half -- halfway line right here, and I was -- I was in this vicinity. I was standing behind Eldon, who was sitting in a lawn chair with his wife.

Q. Okay. So you're at about the midfield line on the parents' sidelines as shown on that map; is that --

A. That is correct.

Q. -- fair?
And Eldon is your father-in-law or former father-in-law; is that correct?
A. That is correct.
Q. All right. And what's his age, approximately?
A. I believe upper 70s, lower 80s.
Q. Okay. Fair enough. And he was seated in one of those portable camp chairs, a lawn chair that you carry around with you?
A. That is correct.
Q. All right. He's on the parents' sidelines?
A. He is.
Q. And is anyone with him?
A. His wife.
Q. All right. Were you seated yourself?
A. I was not. I was standing right behind them.
Q. Okay. At that point was Eldon wearing a wristband? At that point, when you first got back to the sidelines.
A. No, he was not wearing a wristband.
Q. And had you talked to him about the pink wristbands at all?
A. I had not had a chance to discuss it with him.
Q. All right. So what are you doing when you first arrive back at the sidelines wearing the wristband and the second half resumes? Kind of describe for us what's going on.

A. So the second half resumes. Teams are out on the field. They're playing soccer. I would say roughly ten minutes goes by in the game.
Q. Okay. Up until that point, did you do anything to gesture with the wristband?
A. No.
Q. Did you say anything to any of the players on the field?
A. No.
Q. Did you go, hey, look at my wristband?
A. No.
Q. Okay. Did any of the players seem to notice your wristband?
A. No.
Q. Okay. So what happens ten minutes in?
A. Well, ten minutes into the game, I'm standing there watching the game and I felt a presence behind me. And that presence whispered into my ear that I need to take off the wristband, there's no protests allowed.
Q. Okay. Who's that presence?
A. Well, when I turned, it was Mike -- I always mistake his last name.
Q. Let's just say Desilets.
A. Desilets.
Q. But I think it might be Desilets in French, but

we'll go Desilets.
A. Yes, it was Mike Desilets, the AD.
Q. And for the Court's edification or just as a reminder, what did -- what -- the AD is what?
A. Athletic director.
Q. All right. So he's an official with athletic program responsibilities from the Bow School District; is that correct?
A. That is correct.
Q. All right. And you know him?
A. I don't know him personally, but I know of him.
Q. Had you been talking to him that day, to your recollection, up to that point?
A. No.
Q. Okay. Well, what did you think when he came up to you?
A. Well, I thought it might have been a little bit of a joke, so I kind of chuckled a little bit and I asked if he was serious.
Q. And what did he say?
A. He said, yes, I need you to take it off because it's a protest and protests is not allowed.
Q. How did you respond to that?
A. I again chuckled, thinking that he was just pulling my leg.

Q. I want to toggle over to an email that Mike Desilets sent some of the soccer families prior to the September 17th game.

2, Plaintiff's 2, which has been admitted already, I'll just read it into the record real quick:

Good evening, soccer families. Please read the following attached messaging regarding Bow High School's status as a member of the NHIAA as well as some information from our athletics handbook regarding sportsmanship and sideline behavior.

I understand that there are some differing opinions regarding tomorrow's game and that is perfectly fine. Please understand that any inappropriate signs, references, language, or anything else present at the game will not be tolerated. This is a contest between high school student-athletes and should be treated as such.

Thank you in advance for your attention to this matter. Signed, BHS administration.

I won't read the attachments, but there are some attachments in there.

Did I read that accurately, Mr. Fellers?

A. Yes, although I did not receive this email.

Q. Okay. You're answering the next question.

Did you receive this email, which is dated September 16th, the day before the soccer game?

A. I did not.
Q. Okay. You have seen this email after September 17th; is that correct?
A. That is correct. I -- so I was cc'd on a reply to this email.
Q. Stop. Just answer my question.
A. Okay.
Q. I want to focus your attention on the sentence that says please understand that any inappropriate signs, references, language or anything else present at the game will not be tolerated.
Having reread that today, do you think that the pink wristband with XX, the black XX on it that you wore on the sidelines silently that day, was any of these things, inappropriate?
A. No.
Q. An inappropriate sign, an inappropriate language, or an inappropriate anything?
A. I don't believe inappropriate is a proper description of a wristband.
MR. KOLDE: Okay. All right. So let's toggle back to the -- you can leave that up. Actually, let's toggle back to the soccer field.
Had you noticed the police officer there at that point?

A. He might have been standing behind Mike and Matt Fisk at that point.

Q. Okay. Had you seen Mike at other soccer games?

A. Yeah.

Q. Okay. How about Fisk, did he come to some soccer games?

A. I can't -- I can't recall him being present at a game, but that doesn't mean he wasn't.

Q. Do you recall police in body armor with a sidearm coming to other soccer games?

A. No.

Q. All right. Did you notice any other school officials present at that soccer game that you weren't used to seeing at soccer games?

A. Yes.

Q. Could you just give us a summary description of what you're talking about?

A. Well, I noticed that some coaches from other sports were there and some of them had walkie-talkies and -- but I didn't necessarily notice it until after I was confronted at that point to remove the wristband.

Q. Okay. Let's go back to your conversation with Mike Desilets. You were telling us that he came up behind you and said you need to take off the wristband. You thought he was joking and then essentially says, no, I'm not joking.

What happens next with regard to you wearing the wristband and your interaction with Mike Desilets?

A. Well, I initially refused to remove the wristband and I said that I was utilizing my First Amendment right or something in that regard.

Q. And what did Desilets say about that?

A. I don't -- I don't recall him saying anything at that point because there was banter from a couple other people, you know, Matt and the police officer, stuff like that.

Q. And this part isn't recorded in the body cam video; is that correct?

A. That is correct.

Q. It is not recorded?

A. It's not correct -- it's not recorded.

Q. I'm trying to avoid the double negative and it's my fault --

A. Yeah.

Q. -- but I just want the record to be clear.

Do you eventually take the wristband off?

A. I do eventually take it off and I held it in my hand.

Q. Okay. Is there -- to the best of your recollection, and recognizing that we don't have video of this part of the interaction, was there anything in particular that anyone said that caused you to finally take it off?

A. Well, the threatening of the girls having to forfeit the game and then forfeiting their playoff chances.
Q. You didn't want that to happen?
A. I didn't want that to happen.
Q. Okay. Do you recall who said that?
A. I -- I believe it might have been Matt Fisk, but it could have been Matt -- Mike as well.
Q. Okay. And at this point is Lamy, Lieutenant Lamy, part of the conversation or is he just sort of hovering nearby?
A. Yeah. I mean, he's -- he's definitely getting involved in the conversation, yes.
Q. Okay. Do you have any recollection about what he was saying before the body cam video was turned on? And it's okay if you don't, but ...
A. No, I -- I can't say with certainty.
Q. All right. And the reason I'm asking you about this is because this is what we don't have video for.
A. Sure.
Q. All right?
So you -- you took off the wristband and you're holding it in your hand. Did they ask you to put the wristband away while you're holding it in your hand?
A. No.
Q. Okay. And what happened with the wristband you had been wearing but that you took off and you were holding in your

hand?

A. Well, at that point, my in-laws, who, again, were seated -- seated in front of me but facing away from me, my mother-in-law turned her head and asked, very upset, like, Kyle, what is -- what is happening, why are they harassing you.

Q. And what did you tell her?

A. I -- I leaned towards them and, you know, quietly told them that I was -- they were harassing me because of this pink wristband.

Q. Okay. What happened next?

A. Well, they were incredulous. They were like, well, why -- why are they harassing you over this wristband. Or maybe they might have asked, is -- they're harassing you over that wristband. And I showed them and I go, yes, they're harassing me, they're telling me I either have to leave the game or take this off.

Q. What happened with the wristband that was in your hand?

A. Well, at that point, Eldon took it from me and he put it on.

Q. Okay. Had you asked him to do that?

A. I did not.

Q. Did you offer it to him?

A. I did not.

Q. But you didn't resist him when he took it from you?

A. I did not.
Q. Okay. Did he stand up or was he just sitting down?
A. He was just sitting down on his lawn chair.
Q. Okay. So at that point, your pink wristband with XX on it has migrated to Eldon's wrist and Eldon is sitting down at the parents' sidelines in his camp chair facing the field; is that correct?
A. That is correct.
Q. All right. And we're -- I think we're getting very close to running the video here, the body cam video, but up until the point that Mike Desilets came up to you to ask you to remove the wristband, had you talked to anybody about the wristband on the sidelines of the soccer field that day?
A. No.
Q. Okay. After Eldon puts on the wristband, what happens? Do the -- do the officials let it go?
A. No. Essentially, Matt Fisk went right up to Eldon and started demanding that he take the wristband off or leave the game.
Q. All right. So you've got Matt Fisk standing behind Eldon?
A. Well, I would say he was standing over Eldon. He was on Eldon's right.
Q. Okay. And Matt Fisk is directing Eldon to take the wristband off; is that correct?

A. That is correct.
Q. All right. How does this make you feel?
A. Well, it's -- it's upsetting that he is harassing a grandfather who is there just to watch his granddaughter play soccer.
Q. What did you think about what was happening?
A. Well, I -- I guess I didn't like it.
Q. Did you express that opinion to the officials that were present at the field who had asked you to remove your wristband and were demanding that Eldon also remove the wristband?
A. Yeah, I -- I told them that this was ridiculous and that we weren't doing anything, we were just standing here.
Q. Okay. It's fair to say that some further words were exchanged between you and the officials and that led to Mike Desilets instructing Lamy to send you off from the game; is that correct?
A. Yes.
Q. All right.
A. I think -- I think once I may have called Mike or all of them cowards for doing this --
Q. All right.
A. -- that they should be supporting women's sports.
Q. And since the filing of this lawsuit, you've seen and listened to Lieutenant Lamy's body cam video; is that

correct?

A. That is correct.

MR. KOLDE: All right. So at this point I will play the video, with the Court's permission, it's already been admitted, with the audio.

THE COURT: All right.

MR. KOLDE: And at some points, your Honor, I may just pause to ask Mr. Fellers to indicate who's who.

THE COURT: That's fine. Uh-huh.

MR. KOLDE: All right. I would note to the Court that Lamy does not turn on the audio until several seconds in. We're just going to let it run, just so you see the context.

All right. And the volume's on? Yes? Okay. Thank you.

So this is Plaintiff's 20 that's playing.

(Video recording played.)

Q. Who's the lady in the purple shirt on the left, Mr. Fellers?

A. That -- that's my special needs sister Courtney.

Q. Okay. Does she understand what's going on?

A. She does not. She's pretty -- getting pretty upset.

Q. And who's the gentleman in the blue shirt with the white mesh trucker baseball cap on?

A. That is Matt Fisk.

MR. KOLDE: All right. And we'll respool the audio

in a second.

MR. CULLEN: I think you actually had him describe himself.

MR. KOLDE: I did?

MR. CULLEN: Yes.

Q. That was you, right?

A. What's that? I missed that.

Q. I'm sorry. I wasn't listening to you.

Is that you right in the middle there?

A. Oh, yes. My back is to the audience.

Q. You're wearing the white baseball cap?

A. Yes, that's me.

Q. Okay. And who's on the right there with the Adidas shirt on?

A. That is Matt Fisk, the principal.

Q. Okay. He's got the blue shirt with the three white stripes?

A. Yes.

Q. And for the Court's edification, can you just point to the screen behind you and say who's you, who's Matt Fisk, who's Courtney?

A. Yeah. So this is me, this is Matt Fisk, and this is my special needs sister Courtney.

Q. All right. Can you see Eldon in this particular view?

A. You can't. Eldon's basically sitting in this chair and this is his wife.
Q. Okay. Eldon's wife is wearing the blue -- light blue baseball cap; is that right?
A. That is correct.
Q. All right. So at this point, just to place this in the timeline, at this point you were no longer wearing the pink wristband, but Eldon is wearing the pink wristband; is that correct?
A. That is correct. I believe so.
MR. KOLDE: Okay. So let's start with the audio again.
(Video recording playing.)
Q. That's Mike Desilets in the white shirt walking out there?
A. That is correct.
Q. And the whistle is the referee interrupting the game; is that correct?
A. That is correct.
Q. So right now, Mike Desilets and the referee are out on the field; is that correct?
A. Yes.
Q. You are not able to hear what they're saying?
A. That is correct.
MR. KOLDE: Pause it.

Q. Who was the individual that just said, we know what you're doing, just take it off?
A. That is an individual -- Coach Forbes, I believe his last name is.
Q. Ben Forbes?
A. Ben Forbes.
Q. And he's a Bow official also, a Bow employee also?
A. Yeah, he's a Bow school employee. He's a coach. I don't know if he's a teacher.
Q. Okay. But he was standing with the group there next to Lamy and Fisk?
A. Yes.
Q. All right. Did you know what he meant when he said, it has XX on it, we know what you're doing?
A. I -- I -- I'm not going to speculate on what he was saying.
Q. All right. Did you -- did you understand XX to be some kind of hate symbol?
A. No.
MR. KOLDE: Okay. All right. Play the video.
(Video recording played.)
MR. KOLDE: Pause it, please.
Q. All right. So you were removed from the game.
That's Lieutenant Lamy, correct?
A. Correct.

Q. Did he say -- I mean, it's sort of obvious at this point, but he says you're removed from the game, not you're removed from the property, correct?
A. That is correct. That's what I heard.
Q. All right. In the video -- and I'll ask my cocounsel to spool it back 20 seconds or so -- there is an individual in a white top that you identified earlier as Mike Desilets and he gestures with his thumb to Lamy, like, out of here. Is that an accurate statement?
A. That's accurate.
Q. All right. Who were you calling a coward at that point?
A. Well, in that -- I think I -- I guess I was meaning everybody who was forcing us out or removing the wristband was a coward, but I guess -- listening to what I said, I guess I was directing it towards Mike.
Q. Okay. And you say the wristband is about supporting women's sports.
A. I did.
Q. There is somebody in the background who can be heard down the sidelines saying, what, it's about supporting women's sports. Do you know who that was?
A. I don't know.
Q. Okay.
A. I can speculate, but ...

Q. Okay. And then looking at the field, it looks like during this point the game is not going on; is that correct?

A. That is correct.

Q. Where are the players for Plymouth and Bow at that point?

A. They're on the opposite side of the field.

Q. Okay. So there -- is it fair to say that they are an entire field length plus the seven, eight feet of the sideline buffer away from you all at that point?

A. That is correct.

MR. KOLDE: Okay. Let's play that tape again.

(Video recording played.)

MR. KOLDE: Objection. Can we pause for a second?

Q. So it's fair to say at this point you're away from the sidelines, correct?

A. That is correct. I went to the parking lot.

Q. And you did not return to the sidelines on that day; is that correct?

A. I do not.

Q. Okay. And I'm going to continue playing the videotape and may ask you to identify who some people are. You know, the videotape's already in evidence, but just so we can kind of complete that part of the story.

You go to your car. What do you do?

A. Well, I go in my car and I sit in my driver's seat

and watch from afar of what's going on.

Q. Do you move your car at any point?

A. At that point I -- I haven't moved it, but I eventually do.

Q. Okay. What causes you to move the car?

A. Well, there was a parking spot that opened up that would give me a clearer view of the game, so I ended up moving my car to that so I could watch the game from my car --

Q. All right.

A. -- and watch the rest of it.

Q. Did you believe that being ejected from the game meant you couldn't be in the parking lot?

A. I did not believe that.

Q. Okay. Is that why you stayed?

A. I'm sorry?

Q. Is that why you stayed in the parking lot?

A. Yes. And also my daughter and my 13-year-old son and my special needs sister was still there and they needed a ride home.

Q. Was the plan, the original plan, for you to give them a ride home after the game?

A. That is correct.

Q. All right. And your special needs sister is the individual in the purple shirt who's sort of wandering around in the middle of all this?

A. Yes.
Q. All right. Did you end up giving them a ride home?
A. I did not.
Q. Okay. And why is that?
A. Well, as you'll see later, I was being harassed by Officer Lamy in the parking lot and it caused both my children to have a meltdown on the field. And my other sister stepped up to the plate and, without discussing it with me or arranging it with me, she ended up taking my children and my other sister home instead.
Q. But that was not the original plan?
A. That was not the original plan.
Q. All right.
A. It was out of her way to do that.
Q. Did you move your car so that you would be in a position to target, harass, or talk to the trans-identifying player on the Plymouth team?
A. No.
Q. Did you know where the bus was going to drive?
A. I didn't know where the bus was at that point.
Q. Okay. And as we'll see in the video, the second video, in a few minutes, you did take the sign out of your car at one point?
A. I did. I waited for the game to go -- to finish and as people were leaving, I got out of my car and I held the sign

up. I wasn't waving it. I held it up above my head.

Q. Did you yell anything?

A. I did not.

Q. Okay. And, again, just as a reminder, what -- what was the gist of what the sign said?

A. It said Protect Women's Sports for Female Athletes.

Q. All right. Why'd you hold it up?

A. I want to support women's sports and I believed what was going on was a travesty.

Q. Did you want to express yourself?

A. Yes.

MR. KOLDE: All right. Let's go back and finish up this video so everybody has seen it at least once.

If we could resume, please.

(Video recording played.)

MR. KOLDE: Pause it for a second.

Q. All right. So we can hear sort of faintly Eldon talking with Matt Fisk; is that correct?

A. That's correct.

Q. He's the principal?

A. He is.

Q. All right. And Eldon will testify later and I don't want to spend a lot of time on this, but is what you're able to hear from what Eldon's saying consistent with what you testified to earlier, that there was no interruption until the

officials came over and asked you to remove the wristband?
A. That is correct.
Q. Okay. And who are Mike Desilets and Matt Fisk going out onto the field to talk with?
A. He's going out to talk to the two game officials.
Q. And one of them is Mike Rossetti?
A. Mike or Steve?
Q. Steve, you're right.
A. Steve, yeah.
MR. KOLDE: All right. And let's resume.
(Video recording played.)
MR. KOLDE: Please pause it for a second.
Q. Mr. Fellers, who's the gentleman in the green referee's jersey coming up to -- facing Eldon right now with the soccer ball tucked in the crook of his arm?
A. I believe that's Steve Rossetti. I think that's how you pronounce his name.
Q. Okay. And you've seen him referee games before?
A. I have.
MR. KOLDE: All right. Play the video, please.
(Video recording played.)
Q. Who's saying just take it off, the girls are going to lose the game? Do you know these people or is this more of an Andy Foote thing?
A. I -- I believe there are other -- they're other

parents who are sympathetic to trans issues.

Q. All right. We're going to -- if you recognize any of the particular voices, let me know. Otherwise, I'll cover that with Andy Foote in a couple of minutes.

Let's go ahead and roll the tape.

(Video recording played.)

MR. KOLDE: Pause it for a second.

A. I find it ironic that --

MR. CULLEN: Objection, your Honor.

Q. No commentary. You can only say if you identify any of the speakers.

A. Yeah.

THE COURT: Sustained.

Q. All right. Do you recognize who the bossy voice was saying, take it off, the insistent command voice who was commanding you to take it off or commanding Eldon to take it off?

A. I -- I do not. I -- it's speculation.

Q. Was that -- was that Karen McFadden (sic)?

MR. CULLEN: Objection. He said he didn't know.

THE COURT: Sustained.

MR. KOLDE: All right. I'll cover that with Andy. Colleen McFadden, excuse me.

All right. Let's finish the tape.

(Video recording played.)

MR. KOLDE: Pause it.
Q. All right. Who's the guy in the blue shirt with the white baseball cap who's walking up from next to Lamy and looking at Eldon right now?
A. The guy with the blue shirt who's looking around and doesn't see where the wristband is is Coach Forbes.
Q. Okay. So that's Ben Forbes and he's now looking, correct?
A. He's looking for a wristband that supposedly disrupted the game.
Q. Okay. Just answer the question. Okay?
Go ahead and play.
(Video recording played.)
Q. You're not a lip-reader, are you?
A. I'm sorry?
Q. You're not a lip-reader, are you?
A. I am not a lip-reader.
MR. KOLDE: All right. So this part is silent and we'll just let the tape run out for completeness. There's less than a minute left. And then we'll talk about what happened in the parking lot in the second body cam video. And I think we're done with the videos, your Honor.
(Video recording played.)
Q. So at this point where Eldon has, according to the video, taken off --

Pause it.

I know you weren't present at the field here, but just for sake of the narration, what's going on in the field at this point from what you can see in the video?

MR. CULLEN: Well, your Honor, I don't think we need the witness to testify to what we can see, so I'd object.

THE COURT: You were not there at the time?

THE WITNESS: I was not there --

THE COURT: Okay.

THE WITNESS: -- at the time.

THE COURT: Sustained.

MR. KOLDE: Okay. Fine. We'll roll the tape.

(Video recording played.)

Q. Fair to say you watched the remainder of the second half, 23 minutes or so, from your car; is that correct?

A. That is correct.

Q. All right. And then after the game finished, you got out of your car and silently held up the sign; is that correct?

A. Yeah. I leaned on the front bumper of my car and held up the sign.

Q. All right. And at some point, Lieutenant Lamy comes out to confront you in the parking lot after the game; is that correct?

A. That is correct.

Q. All right. We'll watch the video in a second and I don't need you to give us a detailed play-by-play, but just to set the table, what's the gist of the interaction? What does he allow you to do and what happened? And then we'll watch the video of that.

A. Well, he initially told me I needed to get out of -- get off the property, that I was thrown off the property. I told him I was thrown out of the game. And then he mentioned that I have to put the sign away or leave. And we had some back-and-forth and another police officer arrived and helped deescalate the process at that point.

Q. Did you explain to Lieutenant Lamy that you had planned to give your children, minor children, and your special needs sister a ride home?

A. I did.

Q. All right. Did you and he argue or negotiate about that?

A. We did.

Q. All right. Did -- did Lieutenant Lamy ultimately allow you to stay in the parking lot if you put the sign away?

A. He eventually did, yes. I put the sign away pretty -- you know, and then -- but then he still insisted that I should leave after I put the sign away because he told me, put the sign away or leave. I put the sign away, then he changed his tune and said I had to leave.

I said, I'm not leaving my children and my special needs sister behind and he said that they can walk. And I said that that's -- I'm not letting them walk. And we went back and forth and then the other -- the Sergeant Welch showed up and he helped kind of deescalate. And then Andy Foote came over and helped deescalate things and Lamy ending up letting me go and just walked away.

Q. And at the end of the video, he says, you can stay and --

A. He said that, yeah. He said I could stay and take my kids home.

Q. And you had some interactions with the referee, Rossetti, in the parking lot also; is that correct?

A. I did. This preceded the interaction I had with Officer Lamy.

(Video recording playing.)

Q. Okay. I'm going to need you to -- can somebody silence the sounds or whatever?

Okay. The interactions with Rossetti, when you said, this, what are you talking about? Did Rossetti -- the interactions with Rossetti happen before or after you interacted with Lamy?

A. It happened before my second interaction with Lamy on -- you know --

Q. In the parking lot.

A. The first one was in the field. In the parking lot, yes, I had an interaction with Steve prior to Officer Lamy coming to me at the car.

Q. Okay. So before we roll the video, what did Rossetti say to you in the parking lot?

A. In the parking lot, he -- when there was some people around me, including students, who actually were giving me thumbs up and supporting my message, he screamed, probably from 20 feet away, that I was an -- excuse me my language -- an F-ing A-hole.

Q. Just say the words.

A. You're a fucking asshole.

Q. Did he actually say fucking?

A. Yes.

Q. Okay. What else did he say?

A. And I -- I think I might have said, why, because I'm supporting women's rights? And he said something to the effect, you have no right to do this here, this is not a time and a place. And the other referee was trying to quiet him down because he saw how angry he was. And I asked for their names and they refused to provide me their names.

And Steve ended up jumping in his car, pulled out of the parking spot pretty quickly, not, in my opinion, looking, there was people all around, including children, and then as he's pulling away quickly, he rolls his passenger side window

down and screams out the car that my daughter is going to hate me.

Q. So who's he screaming that at out of the car window?

A. He was screaming it at me.

Q. And then he leaves?

A. And then he just leaves.

Q. And then Lamy comes over?

A. Well, right before that, I had a -- I tried to talk to the other referee, who wanted no -- no part of it and he basically hustled out and got in his car and he took off --

Q. All right.

A. -- and then that's when Lamy showed up.

Q. And we know from the declaration that Mike Desilets filed in this case that he ordered Lamy to come talk to you; is that correct?

A. It's -- it's my understanding.

MR. KOLDE: Okay. So let's roll the video of your interaction with Lamy on the sideline on -- in the parking lot.

And, for the record, this is Plaintiff's Exhibit 21.

May I roll the tape, your Honor?

THE COURT: You may.

(Video recording played.)

MR. KOLDE: All right. That's the end of that video.

Q. Fair to say that ultimately Lieutenant Lamy let you

stay to collect your kids; is that correct?

A. That is correct.

Q. But because your sister had intervened to give them a ride, you didn't need to give them a ride; is that correct?

A. I did not need to give them a ride because my other sister ended up driving them home.

Q. And did you end up leaving the parking lot without any further incident?

A. I -- there was no further incident, but I didn't leave right away. I ended up going to help Eldon and Norene carry their stuff back to their car --

Q. All right.

A. -- which is what I normally do after games.

Q. And did they talk to you about where your kids were?

A. They -- they mentioned at that point that my other sister had grabbed the kids and Courtney and were going home, taking them to my house.

Q. And what did you do after that?

A. Well, I asked Eldon and Norene -- they were visibly upset. I asked them to just come back to my house so we could have a family powwow.

Q. All right. And other than that, what did you do?

A. I just got in my car and drove home.

Q. Okay. And there were no further interactions with Lieutenant Lamy or school officials or any of the players from

Plymouth or anything like that; is that correct?

A. That is correct. Yes.

MR. KOLDE: All right.

THE COURT: All right. It's probably a good time -- it's after noon. We'll break for lunch.

MR. KOLDE: Can I ask him one more question --

THE COURT: Sure.

MR. KOLDE: -- then I think we're probably close to wrapping up with him.

Q. With regard to the future and imminent Bow sports events that you would like to wear the wristband at, are you intending to wear the wristband in the same manner that you had attempted to wear it at this September 17th game?

A. Yes, although I'll be wearing a long-sleeve shirt, I'm sure, in the winter, so -- but, yes, that's --

Q. Okay.

A. -- how I'll do it is just wear it quietly.

Q. It would be visible at the edge of your shirt collar -- sleeve?

A. That's correct.

Q. And would it be your intent to similarly just stand on the sidelines or in the spectators area without saying anything about the wristband?

A. That is correct.

Q. All right. And with regard to the sign that you

would want to display in the parking lot, would it be the same sign that you had that was shown in this video here today?

A. Yes. I mean, I -- I'm probably just going to wear the wristband, but --

Q. Okay.

A. -- I would reserve the right, if I choose to, to have a sign in my car.

Q. Okay. Also a message about protecting women's sports for female athletes?

A. That is correct.

Q. All right. And do you have any intent to wear the wristband or display a sign at any of the future or imminent Bow sporting events in a way that would disrupt the match or target a specific player?

A. I have no intention of disrupting matches or targeting players.

Q. Okay. So a silent statement of your opinion?

A. That is correct.

MR. KOLDE: Okay. Thank you, your Honor.

THE COURT: All right.

MR. KOLDE: We'll take a break.

THE COURT: We'll break for lunch. We'll resume at 1:15.

THE CLERK: All rise.

(Lunch recess taken at 12:11 p.m.)

C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 12/2/24 *<u>/s/ Liza W. Dubois</u>*
LIZA W. DUBOIS, RMR, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * * * *

KYLE FELLERS, et al

v.

MARCY KELLEY, ET AL

* * * * * * * * * * * * * * * * * * * * *

24-cv-311-SM-AJ
November 21, 2024
1:22 p.m.

TRANSCRIPT OF EVIDENTIARY HEARING
DAY ONE - AFTERNOON SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Plaintiffs: Endel Kolde, Esq.
Nathan John Ristuccia, Esq.
Brett Robert Nolan, Esq.
Institute for Free Speech

Richard J. Lehmann, Esq.
Lehmann Major List, PLLC

For the Defendants:

(SAU 67, Superintendent, et al) Brian J.S. Cullen, Esq.
Jonathan M. Shirley, Esq.
Cullen, Collimore, Shirley, PLLC

(Steve Rossetti) Dennis T. Ducharme, Esq.
Ducharme Resolutions, PLLC

Court Reporter: Susan M. Bateman, RPR, CRR
Official Court Reporter
United States District Court
55 Pleasant Street
Concord, NH 03301
(603) 225-1453

# I N D E X


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| KYLE FELLERS: | | | | |
| By Mr. Kolde | 3 | | 44, 133 | |
| By Mr. Cullen | | 8 | | |
| By Mr. Ducharme | | 36 | | |
| ANTHONY FOOTE: | | | | |
| By Mr. Kolde | 45 | | 120 | |
| By Mr. Cullen | | 80 | | |
| By Mr. Ducharme | | 112 | | |

P R O C E E D I N G S

MR. KOLDE: Your Honor, I did talk with opposing counsel over the lunch hour. I realized there was a couple more issues, very brief, that I wanted to talk to Mr. Fellers about.

THE COURT: Of course. Of course.

MR. KOLDE: We're going to move through it rather quickly before cross, if that's all right with the Court.

THE COURT: Of course.

MR. KOLDE: May I proceed, your Honor?

THE COURT: You may.

CONTINUED DIRECT EXAMINATION OF KYLE FELLERS

BY MR. KOLDE:

Q. Mr. Fellers, after the game did you receive any documents from the school district as a result of what happened at the September 17th game?

A. Yes. I received a no trespassing order on I believe Friday.

Q. Was that a day or two after the game?

A. A few days. I think the game was Tuesday.

Q. And how did you receive that no trespass order?

A. I had a message on my voicemail. I wasn't in town at the time. When I got into town, I went to the police station and was served.

Q. So the police served you with a no trespass order?

A. That's correct.
Q. And which police station did that occur at?
A. The Bow Police Department.
Q. Okay. And I'm going to show you -- we won't go through it line by line, but I'll show you what's been admitted as Plaintiffs' Exhibit No. 8.
MR. KOLDE: If we could minimize it a little bit so we could see more of the document.
Q. Are you able to read that or is that too fine-grained for you?
A. Yeah, I can read it.
Q. All right. Is that the no trespass order that you received on September 19th at the Bow PD?
A. That is correct.
Q. All right. And you don't have to go through it line by line or give a legalistic answer, but give the gist of what this no trespass order was ordering you not to do.
Do you need to take a moment to read it?
A. I mean, as far as my interpretation or understanding, I was not allowed to come on any of the Bow district schools grounds, preventing me from dropping off my children, picking them up, which I do regularly, picking them up from practice, attending games. Essentially to stay away from the school district and any away games. Stuff like that.
Q. Okay. And in the second paragraph it states, "The

protest was designed to and had the effect of intimidating, threatening, harassing, and discouraging that student as well as other students from playing."

Did you see that in the no trespass order when you received it from the Bow PD?

A. Yes.

Q. Did you agree or disagree with that statement?

A. Well, I wholeheartedly disagreed that I was threatening, harassing, bullying, intimidating, discouraging anybody.

Q. And, again, just to keep things moving, can you summarize for the Court how this no trespass order impacted your life with regard to supporting your kids and your daughter specifically?

A. Uh-huh. Well, I mean, I have custody half the time with my kids, and I'm pretty active with them.

So I'm pretty flexible as far as my work. I usually drop them off in the morning at the middle school as well as the high school, and then I usually pick up -- I can pick them up if my son doesn't take the school bus, and I usually have to pick up my daughter after soccer practice which usually ends around 5:30.

My son also ran cross-country. He was --

Q. Kyle, too much information.

How did this impact you?

A. I mean, it just threw a wrench in the gears as far as the ability to get the kids to school and get them home.
Q. So you couldn't pick up your daughter from soccer practice, yes?
A. That's correct.
Q. You couldn't go to watch the games, correct?
A. That's correct.
Q. And at least initially you couldn't even pick up your son from school?
A. That's correct.
Q. All right. And, again, without going into details, did Marcy Kelley -- prior to the court hearing that we had on October 8th, did Marcy Kelley issue some addenda that changed some of the conditions of the no trespass order?
A. Yeah. I e-mailed her to explain that I was going to have that --
Q. Just answer the question.
Did she change it with addenda?
A. Yes.
Q. Don't answer the next question, please.
A. Okay.
Q. Listen to the question and answer the question.
Did she change it with addenda?
A. She did.
Q. All right. And did that allow you to at least pick

up your son?

A. It did.

Q. Okay. But you still could not pick up your daughter from soccer practice?

A. I still could not.

Q. And until the Court's order on October 8th, you still could not go to the soccer games, correct?

A. That's correct.

Q. And those are both activities that you had wanted to engage in, correct?

A. That I --

Q. You had wanted to do both of those things?

A. Yes. Absolutely.

Q. All right. I think this is close to the last question, if not the last question.

Are you worried that if you engage in the same kind of silent, nondisruptive protest by wearing the pink wristband to one of the upcoming Bow athletic events in December or January, that you are at risk for receiving a similar no trespass order from the Bow School District?

A. Absolutely, yes.

Q. All right. And is that threat keeping you from wearing the pink wristband to those events unless and until the Court gives you legal protection to do so?

A. Yes.

MR. KOLDE: No further questions at this time, your Honor.

THE COURT: All right. Thank you, Mr. Kolde.

Mr. Cullen.

MR. CULLEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CULLEN:

Q. Good afternoon, Mr. Fellers.

I'll be considerably shorter, I hope, than your counsel.

So you got a no trespass order and you went to Superintendent Kelley on two different occasions asking her to modify that order, correct?

A. Yeah. Maybe -- yeah, two times sounds about right.

Q. And she in fact modified it both times, right?

A. Yes.

Q. Okay. Now, you were aware back in the spring of this year, of 2024, that the U.S. Department of Education had issued updates on Title IX, correct?

MR. KOLDE: Objection to the extent it calls for a legal conclusion.

MR. CULLEN: Well, I don't think I'm asking for conclusions.

THE COURT: Sustained. He's a fact witness. He's not a legal witness.

MR. CULLEN: I'm not asking -- I'm just asking if he's aware that there was a modification issued. I'm not asking him to interpret what it was, your Honor.

MR. KOLDE: I don't think he even knows what it is, but he can answer if he does.

THE COURT: All right. Overruled.

Go ahead.

Q. Do you know if there were modifications proposed to Title IX by the Department of Education?

A. I might have heard something on the news about it. I'm not sure exactly what those modifications are.

Q. Sure. I tell you what, why don't we pull up Exhibit E, please.

Do you recognize this document, sir?

A. Yes.

Q. And it's an e-mail from you, isn't it?

A. Yes, it is.

Q. It's an e-mail dated August 1, 2024, right?

A. That is correct.

Q. The very day that the Department of Education's modifications to Title IX were going to come into place, right?

A. I'm not aware if that was the date or not.

Q. And you wrote -- well, look at the end of the -- we'll go through it, but the end of the second paragraph, does

that not say, "This happened on the same day the Biden-Harris Administration rewrites Title IX to appease a mentally ill cult."

MR. CULLEN: Would you highlight that for him, please?

A. So your question was the date of my e-mail, I believe?

Q. I asked you -- yeah, I asked you if the date of your e-mail was the same date that the Title IX was changed. I think you were suggesting that you didn't realize that the Title IX had changed at all, if I'm not wrong.

Did I misinterpret that?

A. I guess -- did this happen on the day of the boxing event or did this happen on the day of my e-mail?

Q. I guess I was under the impression you were trying to suggest to the Court that you were unaware of any changes to Title IX. Is that not -- did I misinterpret that?

MR. KOLDE: Objection. Misstates prior testimony.

THE COURT: Overruled.

Q. You can answer.

A. I guess -- can you ask the question again?

Q. Yeah. I was under the impression that you were suggesting to this Court that you were unaware that Title IX had been updated or modified by the Department of Education.

THE COURT: I think he said he was unsure if it was

on that date, but whatever.

MR. CULLEN: Okay.

A. I guess I meant to say I'm not aware of the exact changes of what happened on Title IX.

Q. Okay. But it was your opinion that it had been changed and rewritten by the Biden Administration, right?

A. Yes.

Q. Okay. And that was done to "appease," your words, "a mentally ill cult," right?

A. That is correct. Those are my words.

Q. And that's not consistent with your earlier testimony in this court that you have no concerns about gender issues at all outside of the playing field, right?

MR. KOLDE: Objection. Misstates prior testimony.

THE COURT: Overruled. There's no jury. It's me.

Q. So you can answer the question.

MR. KOLDE: You may answer.

THE COURT: I don't know what's wrong with my screen.

A. What's the question again?

THE COURT: There's no question pending.

MR. CULLEN: Well, there was a question. There was an objection, and it was overruled. So the question --

MR. KOLDE: I think the Judge is trying to see the exhibit.

MR. CULLEN: I apologize.
MR. KOLDE: Give him a second.
MR. CULLEN: Oh, no, no. I thought you were looking for the transcript of this.
THE COURT: I was. I don't know what's going on with this monitor.
All right. Go ahead.
MR. CULLEN: I can give you a copy of it.
Oh, it looks like it's back up.
THE COURT: Yeah, it is for now.
Do you have a copy?
MR. CULLEN: Yeah.
THE COURT: Thanks.
Thank you. I appreciate it.
Q. So I think the question was, to the extent that you -- you had testified earlier in this matter, didn't you, that outside of this women's sports arena you didn't have any concerns about transgender people, right?
A. I do not have any concerns about transgender people.
Q. And yet on August 1st you referred to the changes as being made to appease a mentally ill cult?
A. Yes.
Q. Who's that?
A. A cult in my mind is a group of individuals who

squash any type of dissent on their beliefs. And whether -- if someone agrees that they're transgender, I have the right to believe that they're still the biological sex they were born with.

Q. So can I take that to mean that when you referred to a mentally ill cult, you were talking about people who promoted views on transgender on which you disagreed?

A. I would be more apt to say it's more of the folks who try to squash other people's opinion or speech regarding their belief system.

Q. Okay. That's what you meant when you wrote it in this e-mail?

A. Yeah.

Q. And at the beginning of the e-mail you write, "For those who are still living under a rock or in denial about the ramification of biological boys playing girls sports, here is Exhibit A on your delusional fantasies," right?

A. That is correct.

Q. And, by the way, you mentioned, I think, that you didn't receive any response to this, correct?

A. I'm pretty sure I didn't get a response.

Q. You didn't get sanctioned for it in any way?

A. No. I just didn't get a response.

Q. Didn't get a no trespass order?

A. No.

Q. Didn't get a rebuke of any sort, did you?
A. No.
Q. It sounds like you try to get to most of these girls' soccer games because your daughter plays for the team?
A. I'm sorry?
Q. It sounds as though you go to most of the girls' varsity soccer games?
A. I try to go to as many as I can, yeah.
Q. Did you go to the away game in Laconia that Bow played in?
A. I did not go to that game.
MR. CULLEN: Stacy, could you pull up Exhibit F, please, Defendants' Exhibit F? And if you could just blow it up a little bit for all of us. Especially me. Just scan down a little just so the witness can see the top of it, if you would.
Q. The e-mail here, which has been admitted as a full exhibit, indicates a message sent by a parent to Mike Desilets. It says: Subject matter, concerned parent-Plymouth game (girls' soccer).
And in the third paragraph it mentions a few things that this woman reports: "Several Bow parents discuss wearing dresses to the game, buying anti-trans warm-up shirts for the Bow players, making signs in protest of trans athletes, and generally planning on how they can heckle and intimidate this

player." Do you see that?

A. I see the paragraph you're referring to, yes.

MR. CULLEN: Can you just highlight that also for us?

Q. Now, you weren't at this Laconia game, but did you hear any comments like this in the buildup to the Plymouth game yourself?

A. I wasn't at the game, and I did not hear any of this type of discussion on the lead-up to the Plymouth game.

Q. Are there any of the items mentioned by this parent that you would agree would be inappropriate on the sidelines of a girls' varsity soccer game?

MR. KOLDE: Your Honor, I just object insofar as it calls for a legal conclusion. If it's just asking for him to speak as a lay person, we don't have any objection.

THE COURT: All right.

Q. Just as a lay person in your opinion.

A. You're asking me if any of these are appropriate?

Q. Are any of these inappropriate to take place at the sideline?

Let me start with Bow parents, presumably males, wearing dresses to the game. Would that be in your view something that would be okay?

A. No. I never did that. So I wouldn't recommend someone else doing it.

Q. Right. And I'm not suggesting that you did, sir.
How about buying anti-trans warm-up shirts for the Bow players?
A. What exactly is an anti-trans warm-up shirt?
Q. How about making signs to protest trans athletes?
A. Is that what's mentioned in this letter?
Q. I believe that's on the bottom of that paragraph, "making signs in protest of trans athletes." It's in front of you right there.
A. I guess if the signs are -- well, I don't know. I guess I don't have a problem with making signs as long as it's in good taste.
Q. And how about planning to heckle and intimidate the player, would you agree that that wouldn't be appropriate?
A. Absolutely not.
Q. And you would agree I hope -- but I'll ask, I guess. You would agree, wouldn't you, that if there was a concern that adults were going to come to the game and potentially heckle and intimidate the player, calling the police to come to the game would be a good idea, right?
A. I don't know if I agree with that.
Q. You go to football games, right? American football?
A. I haven't been to a Bow football game.
Q. Okay. There's a lot of police presence in

Foxborough, though, right?

A. I've never been to a Foxborough football game, I assume there is, but I've never seen a police officer at a girls' soccer game.

Q. So you don't necessarily have an opinion as to whether or not it would be appropriate to call the police to come to a game in which there is a suggestion that parents might show up and heckle and intimidate a transgender player for the other side?

MR. KOLDE: Objection. Misstates prior testimony.

THE COURT: Overruled. You don't contest the fact that it's inappropriate under the First Amendment to heckle or target a child engaged in extracurricular activities, right?

MR. KOLDE: No. I just don't like opposing counsel putting words in my client's mouth.

THE COURT: Well, that's cross-examination. If they don't fit, you just spit them out.

A. I don't believe anybody should intimidate anybody. I am a free speech absolutist, but I still think that you should be respectful to anybody.

Q. Okay. And with respect to the September 17th game, you knew then that Parker Tirrell was going to be potentially playing for the other side, correct?

A. Yes.

Q. Okay. And you went to the game, and for the first

half at least you were on the sidelines?
A. Yes.
Q. Seven to eight feet off the field from your testimony I think, right?
A. Yes.
Q. And during that first half it sounds like you couldn't identify that Parker Tirrell was even on the field?
A. I wasn't looking, no.
Q. You weren't looking?
A. I wasn't looking to try to identify anybody. I was just there to watch the game.
Q. But certainly Tirrell didn't stand out in any way that caught your attention?
A. Not at all.
Q. Okay. You mentioned I think that you were the one who purchased the wristbands?
A. I did.
Q. And you purchased them with a -- when you purchased them, did they already have the pink ribbon on one side of them?
A. Yes.
Q. When you wore your wristband at the beginning of the second half of that game, was the pink ribbon the part that you were displaying on your wrist or was it the XX that you were displaying?

A. I can't remember if the Xs were just over that or if it was on the opposite side. I'm not a hundred percent sure.

MR. CULLEN: Stacy, can you pull up Exhibit 4? Plaintiffs' Exhibit 4. I'm sorry.

Q. Is this your arm or is this somebody else's?

A. It's not my arm.

Q. Okay. On this particular band, you can see that the XX is not imprinted over the symbol?

A. That's correct.

Q. Does that refresh your recollection in any way as to where it was on yours?

A. I don't think this was my wristband, no.

MR. CULLEN: Why don't we go to Exhibit 19. I think that's the pile of wristbands.

Q. At the very top of this pile you can see one wristband bearing the pink ribbon that you mentioned?

A. Yes.

Q. And on every other one all you see is the symbols XX or NAD or the female fertility symbol?

A. Yes. But the pink ribbon could be on the opposite side.

Q. Oh, I don't disagree. You said all these bands had a pink ribbon on them?

A. Yes.

Q. You just seemed uncertain as to whether the XX was imprinted over the ribbon or whether they were on opposite sides.

Now having looked at this, do you agree with me that they're on the opposite sides?

A. I believe your question was, was the pink ribbon exposed, and I wasn't sure because it could have been on the opposite side of the Xs.

Q. Right. And to the extent then that I was unclear, you don't disagree that one side of these would have been the XXs or other symbols and the other side would have been the ribbon?

A. That's possible.

Q. Okay. And you mentioned the Olympics in your e-mail of August 1, 2024, the one you sent to Ms. Kelley and the board?

A. Yes, the Olympics.

Q. Yeah. The Olympics in Paris, right?

A. Yes. The women's boxing competition.

Q. In particular?

A. Right.

Q. And in particular you remember at those Olympics, and starting at those Olympics, that several female boxers started using an X symbol during the Olympics, right?

A. I don't recall that.

Q. Do you recall people running through the stadiums with XX flags?

A. I didn't watch the Olympics that closely.

Q. Okay. And you haven't seen that since then?

A. No.

MR. CULLEN: Stacy, can you go to Plaintiffs' Exhibit 2, please?

Q. I believe you testified that this didn't go directly to you, correct?

A. That is correct. A bunch of these e-mails do not go to me.

Q. And do you know why that is?

A. I have no idea. There's e-mails that they sent to us parents about busing transportation, and I don't get them. The mother of my children usually has to forward them to me.

Q. Okay. But you did see this e-mail when Andy Foote responded to it, right?

A. Yes. I was cc'd on it, but I didn't look too carefully at it. It went to my Yahoo e-mail address and I get a ton of spam and junk mail that way, and I don't pay too much attention to my Yahoo address.

Q. And you would agree with me that the e-mail that went out to the families and that was ultimately cc'd to you by Mr. Foote includes the language from Mr. Desilets, "I understand that there's some differing opinions regarding

tomorrow's game."

Do you see that?

MR. CULLEN: Stacy, do you mind highlighting that in the middle?

A. Yes, I see that. "That's perfectly fine."

Q. And that's how he concludes, right? "And that is perfectly fine," correct?

A. Yes.

Q. And he warns that, "Inappropriate signs, references, language, or anything else present at the game will not be tolerated," right?

A. That's the next line, yes.

Q. Now, you didn't know -- at the time you saw this e-mail on the morning of the 17th you didn't even know that the XX wristbands were going to be at the game, right?

A. Can you say that again, please?

Q. Yeah. Sorry. I switched my question halfway through. I apologize.

On the morning of the 17th did you know that Andy Foote was going to bring his bag of wristbands to the game?

A. On the 17th? It's possible. I don't quite remember.

Q. When did Andy tell you that the captains -- or the kids had decided not to wear the wristbands that he had prepared that you had purchased?

A. I don't think he ever told me. I think it was my own daughter that told me that the school basically pressured them not to do it.

Q. That's what she told you?

A. I believe that's what she told me, yes.

Q. Okay. And who did she say said that?

A. I don't recall exactly. I assume it was just school officials.

Q. And with respect to the conversations you had with Mr. Foote that morning -- after he sent his e-mail, did you have conversations with him?

A. I did not.

MR. CULLEN: Could you bring up Andy's e-mail, Exhibit 18? And, again, if you could blow that up a little.

Perfect. Thank you.

Q. This is the e-mail you were talking about that you were cc'd on? I believe you're the second line on the "to"?

A. Yes. I was cc'd on this, yeah.

Q. You mentioned it went to your Yahoo account, and that's you, kylefellers@yahoo.com?

A. Yeah.

Q. After you got this cc, did you have any conversations with Mr. Foote prior to showing up at the game yourself?

A. See, I don't think I actually saw this e-mail till

after the game.

Q. Did you have any conversations on the morning of the 17th with Mr. Foote?

A. I don't believe so. I don't recall.

Q. And just to be clear, I said morning. So how about in the afternoon prior to the game, did you have any conversations with him then?

A. Prior to the game? I don't think so. I was working that day. So I came from work. I picked up my sister.

Q. I'll get to another second question in a second, sir.

At the game in the second half you now had your wristband on, correct?

A. At halftime that's when Andy gave me the wristband, yes.

Q. And at this time you walked back to your car to get your phone, correct?

A. Yep.

Q. Checked your e-mails and things then?

A. No, I didn't. No. Well, cell phone service at the school isn't very good. So I just picked up the phone and checked to see if there were any texts, calls, and I don't recall any.

Q. Okay. When you got back to the game, you've got

your short-sleeve shirt on and your wristband?
A. Yes.
Q. In public view.
And somebody approached you from behind and told you you couldn't have the wristband, right?
A. Yeah. He whispered it in my ear.
Q. And when you turned around -- and whispered it to you in sort of an unobtrusive way, right?
A. Yes.
Q. Didn't make a big scene at that point?
A. At that point he didn't make a big scene, no.
Q. And when you turned around -- you didn't know his last name was Desilets, but you recognized that it was Mike?
A. Yes.
Q. And you knew at that time that he was the athletic director?
A. Yes.
Q. And he told you at that time that the wristband violated policy, right?
A. Well, I don't know if those were his words, but he said it was a protest and there were no protests allowed.
Q. Okay. And at that point at least you understood that the district's position was that this wristband was not going to be permitted at the game, right?
A. At that particular point I thought he was joking

around with me, but eventually I came to my conclusion that, yeah, he was actually serious.

Q. How long passed before you came to that conclusion?

A. Probably like 30 seconds or so.

Q. Okay. So 30 seconds after Mike Desilets tells you that, you know, protests won't be allowed, you come to the conclusion that the intent is you can't wear that wristband?

MR. KOLDE: Objection to just the way that was phrased about whose intent. I'm just concerned it's a vague question, your Honor.

Q. The district did not want you to be wearing the wristband. Thirty seconds after Mike talked to you, you came to that conclusion?

A. Yeah, yeah. It was pretty clear at that point.

Q. And you had an excuse ready, right?

A. I'm sorry?

Q. You had an excuse ready, correct? You told Lieutenant Lamy that the armband is protesting breast cancer, right?

A. I didn't say that initially, no.

At first I was stunned, and then I went to basically saying I'm just following the First Amendment here.

Q. Did you or did you not at some point tell Lieutenant Lamy that the wristband was an armband protesting breast cancer?

A. Yeah.
Q. And that wasn't true, right?
A. Well, when I went to Amazon to buy the wristband, it basically is for breast cancer awareness.
Q. And so is it your position that that was true then, that when you wore the armband you were using it as an intention to, as you said, protest breast cancer?
A. Well, I was wearing it to support women and their causes. In this case it was preventing biological boys to play girls' sports.
Q. Right. Which doesn't have anything to do with breast cancer, does it, sir?
A. Well, it's a women's cause. So, yes, it does.
Q. Well, I mean, you know men can get breast cancer too, right?
A. Yes.
Q. And in any case, you weren't wearing this as part of a breast cancer awareness or breast cancer support wristband that day, right?
A. No. I was wearing it to support women's causes.
Q. Okay. And then you added for Lieutenant Lamy that it's a breast cancer pink wristband, right?
A. I'm sorry?
Q. You added for Lieutenant Lamy that it's a breast cancer pink wristband, right?

A. I don't understand the question. What are you asking?
Q. I'm asking if you told Lieutenant Lamy that it's a breast cancer pink wristband.
A. Yes, I did say that. Yes.
Q. Okay. And that was not really true either, right?
MR. KOLDE: Objection. Asked and answered, your Honor. We've gone over this.
THE COURT: Overruled.
A. I believe it's true that I was supporting women's causes by wearing a pink wristband, yes.
Q. Well, let's go to the parking lot then.
You moved the car so you could see the game, right? And then you didn't hold up the sign during the game, correct?
A. That is correct.
Q. You only pulled out the sign when the game was over, right?
A. That is correct.
Q. And from my recollection of the video, and I'm sure you can correct me if I'm wrong, when Officer Lamy comes up to you, Lieutenant Lamy comes in your direction, you're holding it and looking in his direction at this point, correct?
A. I'm holding it and I'm looking towards him, yes.
Q. And behind him is the visitor's bus, right?
A. I don't know where the bus was. I didn't see it in

the body cam footage.

Q. Okay. But you were there live, right? You don't have to just rely on the footage.

A. I didn't know where it was, to be honest with you. It was nowhere near me.

Q. Didn't notice a big, yellow bus parked just --

A. Where was it parked?

Q. You didn't notice a big, yellow bus parked about 50 yards to your left?

A. I don't recall. Where was it?

Q. I'm asking if you recall it or not.

A. I do not recall that, no.

Q. Okay. The officer told you to leave, right?

A. He --

Q. He told you to leave, right? That's an easy one.

A. Yes. That's when he started coming to me and said I had to leave.

Q. And you refused?

A. Yes, I refused.

Q. Multiple times, right?

A. Well, I was asked to leave the game, and I left the game.

Q. Lieutenant Lamy asked you multiple times to leave the parking lot and the grounds?

A. He also said put away your sign or leave.

Q. All right, sir, just --
THE COURT: You really have to answer. It's not a conversation. You really have to answer the questions.
If your lawyer doesn't like them, he can follow up later.
THE WITNESS: Okay.
Q. Lieutenant Lamy told you multiple times that you were to leave the grounds; isn't that right?
A. Yes. He told me to put away the sign or leave.
Q. And you did not leave the grounds, correct?
A. I did not. I did put the sign away, though.
Q. In fact, at one time you told him that he would have to arrest you, right?
A. I'm sorry. What was that?
Q. At one time you told him he would have to arrest you, correct?
A. Exactly.
Q. You also told him that you were taking the Rashs home. Do you remember that?
A. Yes.
Q. That wasn't true either, was it?
A. That was a misspeak.
Q. It was a misspeak? It was a lie, wasn't it?
A. It was not a lie.
Q. It was to try to explain to Lieutenant Lamy for

your advantage that you needed to stay because your 80-year-old in-laws were present?

A. I believe my exact words were I needed to stay for my children and I needed to care for my in-laws.

Q. No. You didn't say care for, right? You said you were going to give them a ride home. Because he said, oh, you're going to put six people in this car? And you looked the officer straight in the eye and said, yes, I am, right, and that wasn't true?

A. Yes, I did. I did say that. I misspoke in the heat of the moment.

Essentially what I do after every soccer game is I help my in-laws carry their chairs to their car. They suffer from health issues, and I would rather not have them carrying stuff. So I wanted to be there to help them.

Q. That's not what you told Lieutenant Lamy, right? I mean, it's nice now, but that's not what you told him, right?

A. In the heat of the moment I didn't say that, no.

Q. No. What you said was you were giving them a ride home, right?

A. That is correct.

Q. And he challenged that because he knew that wasn't true, right?

A. No, he didn't really challenge that.

Q. He said you're fitting six people into this car?

A. No. I think he said something about why don't your kids just walk home.
Q. That's one of the things he said, and he also said, you're fitting six people into the car, and you said yep?
A. Yes.
Q. Okay. And that was not true. That wasn't a misspeak, right? That was just not true?
A. That's correct.
Q. Okay. It's another lie to the police officer?
A. What's that?
Q. That was another lie to the police officer, right?
A. What was the first lie?
Q. The cancer story you tried to tell him, right?
Tell me this. Lieutenant Lamy also said you could protest, if you wanted, out on White Rock Hill Road, correct?
A. I believe so, yeah.
Q. You know that's the road that runs by the school?
A. That's correct.
Q. And you could also of course -- he didn't say this, but you could go to board meetings and protest there if you wanted to, sort of raise your concerns to the board, get on the agenda, all those things?
A. Yeah. We've done that.
Q. And you could meet with the administrators if you wanted to?

A. Yeah. We've done that.
Q. Okay. You could certainly send scathing e-mails like you did on August 1st, right?
A. Sure.
Q. And none of those things are going to get you into any trouble with the board, right?
A. Well, I think we were targeted based on the behavior of the school officials based on these e-mails and concerns that we've raised.
MR. CULLEN: Could you bring up Exhibit J, please, and if you could just expand the text of this?
That's perfect. Thank you. Thanks, Stacy.
Q. This is an e-mail from you, right, Mr. Fellers?
A. Yes.
Q. Again using your kylefellers@yahoo.com account?
A. That's correct.
Q. And you sent it to Marcy Kelley who you knew to be the superintendent?
A. Yes.
Q. And you complain about one of the officials calling you an F-ing A-hole, correct?
A. That's correct.
Q. And then at the end you write, "Under article f(2)(b) of the NHIAA handbook, this is grounds for suspension if not outright firing."

A. That's correct.
Q. Do you feel that Mr. Rossetti should have been suspended or fired based on the language that he used against you after the game?
A. Against me as well as around other parents and children, yes. I believe it was very inappropriate.
Q. With respect to upcoming events, what's your -- what signs do you intend to bring to the parking lots of say -- you're going to attend a basketball game, correct, in the future? I think you said you were going to go to the Bishop Brady game that's coming up.
A. I would like to, but I haven't been given that permission.
Q. Okay. And if you went to that and the Court were to permit you, you're also asking the Court to allow you to have signs in that area, right?
A. No. I was just looking to wear a pink wristband. I mean, I do reserve the right, if I want, to put a sign in my car.
Q. Okay. And that sign should just be able to say whatever you want it to say?
A. Well, I would use the same sign that I used in the soccer game, protect women's sports for female athletes.
Q. Just that sign?
A. Yeah.

Q. And what about holding it up outside of the car? Are you looking to be able to walk around with it and march it around?

A. Well, I've never done that in the past. Why would I do it now?

Q. I don't know, but I'm asking you now on the stand if that's something you're asking to be able to do.

A. I have no intention of doing that.

Q. Do you think that there should be any limit on how many people can walk around the parking lot with signs?

A. If they're not bothering anybody. I mean, walking around -- you're trying to infer that I walked around with signs. I did not do that.

Q. I understand. I'm just trying to understand the scope of what you're asking this Court to allow you to do in the future.

A. I've said it. I would like to walk around with a pink wristband with two Xs on it.

MR. CULLEN: If I could have a moment, your Honor?

THE COURT: Of course.

(Pause)

MR. CULLEN: Thanks, your Honor. I don't have anything else for Mr. Fellers right now.

THE COURT: All right. Any redirect?

I'm sorry.

MR. DUCHARME: I have some questions, your Honor. I don't know if you want Mr. Kolde to go and then have me go last or have me jump in now.

THE COURT: You know, why don't we go by aligned parties here.

MR. DUCHARME: Thank you.

THE COURT: So why don't you go, Mr. Ducharme. Appreciate it.

CROSS-EXAMINATION

BY MR. DUCHARME:

Q. Mr. Fellers, my name is Dennis Ducharme. I represent Mr. Rossetti.

This exhibit that is up, you said --

THE COURT: I should probably -- I don't know. I don't think this is momentous, but I should mention, I think, Mr. Ducharme and I belong to the same golf club, Concord Country Club, and occasionally we do play against each other in matches.

MR. KOLDE: Do you let him win?

THE COURT: He's not that good.

MR. DUCHARME: I never let him win for much money.

MR. KOLDE: That's fine, your Honor.

Q. Mr. Fellers, you were clearly upset with the exchange with Mr. Rossetti in the parking lot, correct?

A. Yeah. I mean, I was verbally assaulted.

Q. Any different from you calling people Nazis on the sideline? Pretty equal?

A. No. Not even in the ballpark.

Q. No? Okay. So you draw a different line?

A. I totally draw a different line. Especially when you're in front of other children screaming you're a fucking asshole.

Q. Now, you're not suggesting that Mr. Rossetti approached you out of the blue in the parking lot, right? There was an exchange before those words came out, wasn't there?

A. No. I was holding up my sign quietly.

Q. Okay. Now, you wrote an e-mail to the superintendent of schools referring to Mr. Rossetti as one of her officials, right?

A. Well, first I sent an e-mail to NHIAA with the complaint.

Q. Okay.

A. They responded and said this needs to go to the Bow administration. So I just copied and pasted what I sent to NHIAA and sent it to Marcy, here's my e-mail.

Q. You don't really understand the interplay between the NHIAA and its officials and the school districts, do you?

A. I do not.

Q. You don't know who pays who?

A. No.
Q. You don't know who charges who what, correct?
A. I have no idea.
Q. You do know that Mr. Rossetti is not an employee of the Bow School District?
A. I figure he's like a contractor.
Q. And you know he's not a member of the Bow school board, correct?
A. Yes.
Q. You know he doesn't make policy for the Bow School District, correct?
A. Yes.
Q. And as far as what happened that day, if I understand correctly, you and Mr. Foote were both wearing the wristbands at one point in time?
A. At one point, yeah.
Q. Mr. Foote had actually taken his off before the time that the body cam video we saw picks up, right?
A. I wasn't aware of it at the time.
Q. You know that now, though?
A. I know it now.
Q. Okay. And have you heard some heated words between Mr. Foote and school officials?
A. Remembering it, it was to the left of me, and I saw Mike come from that side and go behind me. There was

something going on, but I didn't -- I was too far away to know if it was heated or not.

Q. You were aware of some sort of commotion before he got to you?

A. It wasn't loud enough for me to think it was a commotion. It could have been -- in my mind it could have been just a discussion or a conversation.

Q. There definitely was a commotion between you and Mr. Desilets and Officer Lamy though?

A. There was a pretty -- yeah, a discussion.

Q. Heated words? I think you --

A. Eventually, yeah.

Q. Okay. I think you used those words in the declaration you filed in support of the injunction. That things were heated and there was a commotion.

A. Yeah. I guess that's accurate.

Q. Okay. And all of that happened before Mr. Rossetti stopped the game, correct?

A. Yeah. I would say so.

Q. Do you know anything about how referees are trained to deal with sideline commotions or disturbances?

A. I am not familiar with how sideline commotions are handled by referees.

Q. What they're supposed to do or not do?

A. No. I have no understanding.

Q. Now, in this particular case, and we saw the video this morning, it is Mr. Rossetti who stopped the game, correct?

A. Yes. He stopped the game, and I think he stated that there was a First Amendment discussion that caused him to stop the game.

Q. And he said that fairly deep into the video after a couple of conversations with folks from the school, correct? The Judge has seen it, Mr. Fellers, so if you don't remember it that way, that's fine.

A. Yeah. I clearly remember it wasn't about a pink wristband. It was a First Amendment discussion.

Q. Yeah. And you don't know what he had been told in those conversations out on the field?

A. That's correct.

Q. Okay. The initial complaint in this case was filed before you had seen the body cam video, right?

A. You mean this complaint?

Q. The complaint to bring the lawsuit, filed before you saw the body cam video?

A. I believe so. I'm not a hundred percent.

Q. I think the Judge can take notice of that.

THE COURT: It was.

A. It was. Okay.

Q. You then saw the body cam video?

A. Yes.
Q. Your lawyers filed a substantially longer amended complaint, didn't they?
A. Well, I also saw a Trace video as well. I don't know if you're familiar with that, but Trace is a --
MR. KOLDE: Kyle, answer the question.
THE COURT: Thank you.
A. Can you repeat the question for me?
Q. Sure. After seeing the body cam video --
A. Yes.
Q. -- your lawyers on your behalf filed an amended complaint, correct?
A. Yes.
Q. Both the original complaint and the amended complaint say that Steve Rossetti threatened to forfeit, don't they?
A. I believe so, yes.
Q. You've seen the body cam video, you've seen it today?
A. Yes.
Q. Can you pull it up -- have your lawyers pull it up and show me the place where Steve Rossetti uses the word forfeit?
MR. KOLDE: Your Honor, does the Court want us to show Steve Rossetti's --

THE COURT: It's a personal knowledge question. He either knows or doesn't know.

MR. KOLDE: It sounds like he was asking me to run the video. We're happy to do it.

MR. DUCHARME: That's all right. I'm sorry. It was a little hyperbolic.

Q. He never uses the word forfeit, does he?

A. I was in the parking lot at that point. So the only knowledge I know is what I see in the body cam footage.

Q. Okay. To your memory, does he ever use the word forfeit in the body cam video?

A. I don't recall.

Q. Does that mean he didn't or you don't recall one way or the other?

A. I don't recall. I don't recall.

Q. One way or the other?

A. What's that?

Q. I don't recall is a funny figure of speech. It can mean I don't think it happened or I don't know one way or the other. Which is it you're saying?

A. I guess I don't recall. I don't know what more to say. I don't recall. Let's watch the video footage again, I guess, because that's what you're asking me, right, what was on the video footage?

Q. And if you don't remember that --

A. I don't remember.
Q. Okay. Do you remember in the video somebody saying to Mr. Rash, if you take the wristband off, we can play 23 more minutes of soccer?
A. I do remember that from the video.
Q. And in the video, sometime in that time frame, Mr. Rossetti says, look, take it off, be a nice guy, game's over if you don't, something to that effect? Do you remember that from this morning?
A. Yeah. I mean, I guess so then, yes, he's saying game over, meaning forfeit the game, but --
Q. Well, you don't know that, do you?
A. Well, you just said it's game over. So I guess that means forfeit the game.
Q. That's what you guess, correct?
A. Yes.
Q. Do you know by rule what happens if a game is called with 23 minutes left in the second half and the home team is up? Do you know who wins the game?
A. Well, again, if I think back on the body cam footage, I believe someone -- some individual said that the girls would forfeit their playoff spot.
Q. And that individual was not Steve Rossetti, was it?
A. I don't think it was, no.
Q. Okay. Thank you.

MR. DUCHARME: Those are all my questions, your Honor.

THE WITNESS: Thank you.

THE COURT: Thank you, Mr. Ducharme.

Any redirect, Mr. Kolde?

MR. KOLDE: Just a couple of very brief questions, and I think we can move on to the next witness.

REDIRECT EXAMINATION

BY MR. KOLDE:

Q. During the examination by Mr. --

No, it wasn't actually you. It was Mr. Cullen. I was going to call you the wrong name.

You gave an answer which I think was a double negative. Mr. Cullen had asked you, Mr. Fellers, whether you thought it was appropriate -- whether it was appropriate to -- it was not appropriate to heckle a player on the field, and you said absolutely not, and I just want to make clear that -- is your answer that it is not appropriate to heckle a player on the field?

A. That is correct. It's not.

Q. Okay. All right.

MR. KOLDE: That's all I have for this witness, your Honor.

THE COURT: All right.

Thank you, Mr. Fellers. You may step down. You're

excused as a witness.

And you may call your next witness.

MR. KOLDE: Plaintiffs call Andy Foote.

ANTHONY FOOTE

having been duly sworn, testified as follows:

THE CLERK: Please state your full name for the record.

THE WITNESS: Anthony C. Foote.

This is a different perspective.

THE COURT: It is.

DIRECT EXAMINATION

BY MR. KOLDE:

Q. Mr. Foote, you live in Bow, New Hampshire?
A. Yes, sir, I do.
Q. All right. And do you have kids?
A. I do. Two.
Q. All right. And do they go to the Bow public schools?
A. Yes, they do.
Q. And what are their ages?
A. 12 and 17.
Q. Okay. And do they participate in any sports or other extracurricular activities?
A. Three seasons, yes.
Q. Kind of give us an overview of what sports or

activities that your kids participate in if they are part of the Bow public schools.

A. Yes. Abby has played -- she's currently playing soccer, skiing this season, and lacrosse in the spring. She did previously play basketball but changed sports.

And Molly is doing the same sports right now at the middle school. Except for the skiing. Sorry. Molly is doing soccer, basketball, and lacrosse still.

Q. Do you still go to some basketball games even though your daughter is no longer playing on the Bow varsity girls' basketball team?

A. Yes. The girls -- Abby plays with the seniors that are on the team. We go to support the team and watch the home games.

Q. Did you watch some games last season?

A. Yes, we did.

Q. And is it your intent to watch some home games at Bow this season?

A. It is.

Q. All right. You heard Kyle Fellers testify earlier about some of the home games coming up in December, the December 13th home game against Bishop Brady and the December 17th home game against Souhegan. Are those among the games that you have plans to go to?

A. They are.

Q. And if you were allowed to by the Court, would you want to wear the pink XX wristband that has been at issue in this case to that game to silently protest on the sidelines?

A. I would.

Q. Okay. And if you have an opportunity -- if you had the opportunity to, through protection from the Court, would you want to be able to display the Riley Gaines protect women's sports poster that you had on your car at the September 17th soccer game in the parking lot?

A. I would like to still have that freedom, yes.

Q. Okay. And currently, given what's happened in this case and the no trespass order that we already kind of know about and we've heard a little bit more about it today, are you refraining from doing either of those things, wearing the pink XX wristband silently on the sidelines of a future event or displaying the Riley Gaines poster on your car in the parking lot, because you're afraid you might get sanctioned or have another no trespass order issued by the Bow School District?

A. Yes. I have refrained from those activities.

Q. Okay. And I don't want to necessarily go through, like, every single event that's coming up, but with the ski team -- Bow doesn't have its own ski slope, right?

A. Correct.

Q. But it shares facilities with other schools?

A. (Nods affirmatively).
Q. Is that a yes? You have to answer audibly.
A. I don't know if they share it with schools, but they share ski areas with schools, so yes.
Q. And there are ski meets, essentially competitions?
A. Right.
Q. And my understanding is there is one on -- I can't tell actually by your handwriting whether it's December 19th or December 11th at Bretton Woods?
A. Yes. There's one coming up over the Christmas break I think. Abby mentioned it last night.
Q. All right. And there are a couple of events in early January at Crotched Mountain?
A. Correct.
Q. And it would be your intent to go to those events?
A. Absolutely.
Q. And to wear the pink wristband if you were able to?
A. Yes.
Q. Okay. There's going to be a little bit of overlap in your testimony, but for the most part we're going to cover stuff that maybe Kyle Fellers wasn't able to see as much as you were able to.
It's true that Kyle is the one who bought the wristbands that are at the center of this case; isn't that correct, Mr. Foote?

A. That is correct.

Q. All right. At some point he gave them to you; is that correct?

A. That is correct.

Q. And who made the decision to put the XX on these wristbands?

A. I decorated the wristbands.

Q. Okay. When you say decorated, you don't have to go into a ton of detail, but what did you do to decorate them?

A. There's history in my family with breast cancer, so I felt it was appropriate to make this a women's sports issue and focus on women. So I decorated it with XX for the female chromosome, the Greek symbol for female, and a friend from a club team had suggested another, the NAD, for not a dude.

Q. Not a dude is what NAD stands for?

A. Correct.

Q. Okay. It was not a reference to gonad or anything like that?

A. No.

Q. Okay. And just to be clear on the record, at the September 17th game that we've been talking about did you end up wearing an NAD wristband?

A. No, I did not.

Q. Did anyone else, to your knowledge, end up wearing or displaying an NAD wristband during the game?

A. I do not know of anybody displaying one.
Q. Okay. And what about the Greek symbol for female, the kind of mirror image, did you wear that wristband?
A. No, I did not.
Q. And do you know of anybody else at the game wearing that wristband?
A. I did not see one.
Q. Okay. So you wore an XX wristband?
A. I did.
Q. And that's the same wristband that you gave to Kyle Fellers; is that correct?
A. It is, correct.
Q. Okay. And when you decorated the wristbands, what did you use, electrical tape, something else? How did you decorate them?
A. A fat Sharpie marker.
Q. Okay. And we heard some questioning by Mr. Cullen about, like, the original embroidered breast cancer awareness ribbon. What about all of that -- let's get that out of the way so we don't have to spend a lot of time talking about it. Did you cover them up? Were they still visible on the wristbands?
A. One side had the breast cancer awareness ribbon and the other side had the XX on them.
Q. Okay. So they weren't turned inside out, correct?

A. No.
Q. So if somebody was wearing one of the XX wristbands, part of that wristband would show XX and the other side of the wristband that would be visible either inside or outside of the wrist, depending on how you're wearing it, would show the breast cancer awareness ribbon; is that correct?
A. Yes. Absolutely. I support both of those causes.
Q. And in fact the wristbands displayed a breast cancer awareness ribbon and XX, correct?
A. Correct.
Q. All right. So Mr. Fellers was being accurate when he was saying it was a breast cancer awareness ribbon in part?
A. In part, yes.
Q. Who's Shannon Farr married to?
A. David Farr.
Q. All right. And we don't need to hear a lot about David Farr, but do you disagree with David Farr about politics sometimes?
A. We are on different sides of the table, yes.
Q. Okay. How do you know -- again, without going into a lot of detail, how do you know that you disagree with David Farr about politics?
A. We've interacted on social media and events. He's been around town. His daughter plays on the team with us, and

we've interacted over other town issues. Let's just say we got to know each other, and we both are different in our opinions.

Q. Okay. And when you say social media, do you mean Facebook?

A. Yes.

Q. All right. Is it fair to say that David Farr is a progressive?

A. Absolutely.

Q. All right. And would it be fair to say that you consider yourself more a right of center conservative politically?

A. Conservative, traditional values, yes.

Q. Okay. Who's Shannon Farr?

A. His wife.

Q. Do you have any reason to believe that she's politically aligned with him or not?

A. From her e-mail, I would say yes.

Q. Okay. When you're referring to the e-mail, you're referring to Plaintiffs' Exhibit F?

A. Correct.

Q. It's the e-mail we got as part of this lawsuit?

A. Correct.

Q. I'm sorry. Defendants' Exhibit F.

MR. KOLDE: Why don't we go ahead and call that up,

and go to the third paragraph.

Q. This e-mail is dated September 11th; is that correct, Mr. Foote?

A. That is correct.

Q. So it's about six days before the fateful Plymouth game; is that right?

A. Six days before the 17th game?

Q. Yes.

A. Yes. Correct.

Q. And you can see Ms. Farr discussing an alleged conversation that she overheard at the Laconia game; is that correct?

A. That is correct.

Q. All right. And were you at that Laconia game?

A. I was.

Q. All right. Did you discuss with any of the parents wearing a dress to the upcoming Plymouth game?

A. I did not discuss wearing a dress.

Q. Did you discuss with any of the parents buying so-called anti-trans warm-up shirts, if you know what that means?

A. I did not discuss bringing anti-trans warm-up shirts.

Q. It is true that the Bow girls' varsity soccer team has hot pink warm-up shirts, correct?

A. That's true.
Q. And how long have they had the hot pink warm-up shirts to the best of your knowledge?
A. I'm assuming this season. I don't know exactly, but I'm assuming for this season.
Q. Okay. So that predates the September 17th Plymouth game?
A. Oh, yes.
Q. Okay. And have you seen the girls wear the hot pink warm-up shirts before some of the soccer games in this most recent season?
A. I have.
Q. And you saw them wear them before the September 17th game with Plymouth?
A. I don't know if I remember seeing them before, I don't think I focused on it then, but I do remember seeing it after the game. They had them on.
Q. Okay. So you know for sure you saw them after the game; is that correct?
A. Yes. Correct.
Q. And at the first game after the 17th did all the girls wear them before the game as far as you could tell?
A. As far as I could tell, it was the majority of the shirts. I think that -- depending on -- they looked more pink than they did blue or anything else.

Q. Okay. And that was the first game you were allowed to go to after the order expired?

A. Correct.

Q. To your knowledge, after the September 17th game did some of the girls on the soccer team eventually stop wearing the pink warm-up shirts?

A. Yes.

Q. Okay. And what is your understanding of why that occurred?

MR. CULLEN: Objection, your Honor.

THE COURT: Overruled.

If you know.

A. My understanding was some thought it was inappropriate given the Parker Tirrell situation. There was a division that way.

Q. Okay. So from what you were able to observe from the sidelines, since September 17th have some of the girls on the Bow soccer team continued to wear the hot pink warm-up shirts and some have not worn them?

A. Yeah. For example, my daughter wore them because --

Q. Just answer the question. Listen to the question and answer the question.

I asked you do some wear them and some not wear them?

A. Yes. Some did and some didn't.

Q. Okay. To your knowledge, has the school district done anything to prevent any of the students on the Bow soccer team from expressing their sociopolitical beliefs by either wearing or not wearing the hot pink warm-up shirts after the September 17th game?

MR. CULLEN: Objection, your Honor.

THE COURT: Right. I think you need to lay a better foundation than that.

What suggests that their wearing a warm-up shirt was a sociopolitical issue for girls on the soccer team?

Q. How do you know that some of the girls thought it was a political statement to wear the hot pink warm-up shirts?

MR. CULLEN: Again, objection, your Honor. It's going to be hearsay for sure.

A. Well, I know that some of the families who --

MR. KOLDE: Wait. Just wait.

THE COURT: True, true.

Sustained.

Q. Do you believe that the hot pink shirts are anti-trans warm-up shirts?

A. No.

Q. And why do you say that?

A. My belief, pink is the color associated with females, and it's a pink shirt that they wear for warm-up.

Q. What's a pink out?
A. They do those either at championship games or during the month of October for breast cancer support.
Q. And when you say they, who's the they that you're talking about?
A. Well, I think most teams. I know that the girls did it, but I think the football team also does a pink out, if I'm correct. They all wear pink, and they have parents and fans all wear pink either in support of breast cancer or if it's big games, in the playoffs.
Q. Have you ever seen a pink out happen at any Bow School District facilities?
A. Yes. At the football games.
Q. Have you ever seen Bow Falcon cheerleaders wear pink tops?
A. I have.
Q. Okay. Do you have any idea what Shannon Farr is talking about here about anti-trans warm-up shirts?
A. I don't know what an anti-trans warm-up shirt is.
Q. Okay. You did make a sign to express your support for reserving women's sports for biological women for use on your car in the parking lot at the September 17th game; is that correct?
A. That's correct.
Q. All right. And I don't think we actually have a

copy of it in the record. We didn't have a very good picture of it. So can you tell the Court what was on the sign?

A. It was Riley Gaines. It was a picture of Riley Gaines, and it says save women's sports, and it was an event she was hosting for women's sports. I made a sign out of that. I found it on the web.

Q. Cut and pasted it and blew it up into a sign?

A. Yes.

Q. Who is Riley Gaines in case people here don't know?

A. She's an NCAA swimmer that was competing against a biological male and lost -- or tied, I think, in her championship, and they gave the title to the male over her.

Q. Was that the Leah Thomas controversy?

A. Leah Thomas, yeah. Correct. Sorry.

Q. Leah Thomas is the biological male that won?

A. Correct. Well --

Q. And has Riley Gaines been somebody who's been talking about the issue of biological males competing in women's sports?

A. She's an advocate, yes.

Q. Okay. Did your poster say anything negative about trans players?

A. None of my posters said anything negative about trans players.

Q. All right. Did the poster that you displayed say

anything about any player on any particular girls' soccer team at all?

A. No. None of my posters were referencing soccer, actually.

Q. Did it reference Parker Tirrell?

A. No.

Q. Okay. In this e-mail from Shannon Farr to Mike Desilets she makes a statement, "Generally planning on how they can heckle and intimidate this player."

Did you talk to anyone at the Laconia game about planning to heckle and intimidate Parker Tirrell or any other player at the September 17th game?

A. Absolutely not.

Q. Did you -- after the Laconia game did you form a plan with anyone to attempt to heckle or intimidate Parker Tirrell or any other player on the field at the September 17th game?

A. No.

Q. Were you aware that Shannon Farr had denounced some parents to Mike Desilets with the school district prior to the September 17th game?

A. Reference in the e-mail?

Q. Yes.

A. I had no idea, no.

Q. Okay. When was the first time that you learned

about Shannon Farr's e-mail reporting other parents to the school district?

A. Disclosure I think is what it's called.

Q. Part of this lawsuit?

A. Yes. Disclosure in this lawsuit.

Q. When we got a copy from the other side?

A. Yes.

Q. Okay. All right. Let's fast forward to September 17th.

What was your plan, Andy Foote's plan, on September 17th when you showed up for that game?

A. The day of the game, get there early. Get a good seat on the sideline.

Q. Slow down for our court reporter.

A. I had gotten the armbands from Kyle the night before. I had decorated them, it was either the night before or the morning of, and I was going to bring the armbands and my -- I had some posters of issues with women's sports where women had been hurt by biological boys on the team.

My plan was to sit on the sidelines silently wearing the pink wristband, just as we did, and to possibly display the signs, but I realized at that point I didn't have a way to put them up so I decided to put it in the window of my Jeep, and that was it. Silently on the sidelines. Not to bring anybody out. Not to heckle anyone. Not to harass

anyone. I never did harass anyone. I was there to support Abby, my daughter, a female on a female sports field, a hundred percent.

Q. Did you get Mike Desilets's e-mail that came out on September 16th?

A. I did.

Q. Did you think that you were violating his e-mail by wearing the pink wristband on the sidelines?

A. I didn't consider it a protest. So, no. I admit that until we had discussions I had always considered it support for women and women's sports.

Q. Okay. Were you expecting to be banned?

A. No.

Q. Okay. When you first arrived for the game on September 17th, did you notice anything unusual about the amount of people on the sidelines other than parents?

A. I did.

Q. Describe that for us, please.

A. I've been to four years -- or thirteen years of soccer and four years in -- well, eight years of Bow soccer. And, generally speaking, if I show up 45 minutes early, it's the coach and the team warming up on the field, maybe Mike Desilets on the field setting up, but just a small handful of people there.

This time I noticed Chris from the lacrosse team

was there. Ben Forbes from the baseball team was there. There was Marcy Kelley, Matt Fisk, and Mike obviously, all there on the field together talking at the golf cart.

And also behind that was I noticed a Bow police cruiser which in my time not at a soccer game. I can't even remember if we had one at the championship game this year. I've never seen police force on a soccer field ever. So that was unusual to me.

Q. So police presence was unusual.

Number of school officials was unusual?

A. Absolutely.

Q. Did the school officials have any method of communicating?

A. Oh, yes. They all seemed to have two-way radio communications.

Q. What regular people would call walkie-talkies?

A. Yeah, walkie-talkies. Icoms I guess we used in the military. Yes, they had a radio.

Q. Okay. And did they actually use them?

A. They did.

Q. Okay. Was that unusual?

A. It's a first. I have never seen that at a soccer game in my career at Bow.

Q. You say you saw Marcy Kelley at the sidelines?

A. Initially, yes.

Q. So she was there at the beginning and then not?
A. Apparently. By the time the game had started, there were a lot more people, and I didn't see her. She wasn't part of the folks wandering the sideline during the second half. I don't know where she went, but she was there initially at the golf cart with Mike and the crew, and then -- I don't know if she was doing field hockey at that time, but I think she was the assistant coach so she might have had to have left for that.
Q. Okay. Did she have a walkie-talkie?
A. I don't remember that.
Q. Okay. Did Mike Desilets have one?
A. I believe he must have. I think Mr. Forbes called him on the radio.
Q. During the first half did you notice Parker Tirrell on the field?
A. I did only because my daughter was defending him.
Q. Okay. And did he play?
A. He did.
Q. Did you say anything to Parker?
A. No.
Q. Did you hear any of the other parents say anything to Parker specifically?
A. Nothing other than discussing is that Parker. I mean, there was some discussion who was this boy, transgender

female, who was playing on the team.

Q. All right. Well, I want you to listen carefully to my question because my question was whether they said something to the player, not amongst themselves.

A. Oh, no. Sorry.

Q. So listen carefully to the question.

Did they say anything to the player?

A. Nobody said anything to Parker.

Q. It sounds like you did say there was some discussion amongst the parents on the sideline, is that Parker, something to that effect?

A. Correct.

Q. Okay. But nothing that was heckling?

A. No.

Q. Nothing that was singling Parker out for playing on the field or anything like that?

A. No, no.

Q. Okay. And during the first half you weren't wearing the pink wristband; is that correct?

A. That's correct.

Q. All right. Tell us what happened at halftime.

A. So after the first half we had the break, I got up to walk back to the Jeep to put the Riley Gaines poster in it, and on the way out I saw Kyle walking towards his car, which apparently he was going to get his cell phone. So I gave him

a pink wristband on the way out.

And when we got back after the half was over, I sat down in my chair and had my pink wristband on.

Q. Okay. This is the pink wristband with XX on it?

A. Correct.

Q. All right. And Kyle had one also?

A. Correct.

Q. Had you distributed any of the pink wristbands to any of the other adults present there that day?

A. There was a handful of folks that grabbed a wristband, yes.

Q. And Eldon is a special case, we'll get to Eldon later, but other than you, Kyle, and Eldon, do you know if anyone else was wearing the pink wristband that day?

A. I don't have personal knowledge, no.

Q. Okay. So the first ten minutes of the second half you're watching the game wearing your pink wristband?

A. Uh-huh.

Q. Are you seated or standing?

A. I'm seated.

Q. In a camp chair?

A. Yeah, in a camp chair.

Q. On the parent sideline that we saw before?

A. At the 50-yard line. Actually, at the 50 yard line. I was right next to it on the sideline.

Q. Okay. Who's with you?
A. Steve Gallier was on my right. My father-in-law, my wife, my mother-in-law, my wife's aunts.
Q. All right. Did you say anything to anyone on the field about your wristband?
A. No.
Q. Did you --
A. On the field of play or on the field?
Q. On the field of play.
A. No. Definitely not, no. I mean, actually I didn't say anything to anybody about the wristband.
Q. Okay. You're just quietly wearing your wristband?
A. Absolutely. Yes.
Q. All right. Were you ever approached by a school official during the second half about your wristband?
A. Yes.
Q. Approximately when did that happen?
A. I know Kyle had said ten minutes. It was somewhere around that time frame. It wasn't far into the beginning of the second half when Mike Desilets came up and said you're going to have to remove the wristband.
Q. Did he face you? Did he come up behind you? How did that happen?
A. He came up on my left quietly and said something, you need to remove the wristband.

Q. What did you say to him?
A. I think my first word was really, and he said -- I think his response was, yes, you need to remove it. I go, a pink wristband, Mike? He says, yes, I know what you're doing. It's a pink wristband. He says, you're going to have to take it off or you have to leave the game.
Q. What were you doing?
A. Sitting in my chair watching the game.
Q. Were you surprised?
A. Yes, in a way, but no. I mean, I guess no.
Q. Did you express some frustration to Mike Desilets?
A. In a sense of, yes, I was being quiet and peaceful on the sidelines and not making any scene and basically nobody knew what we were doing, I was surprised, and I did express some concern to Mike Desilets about it.
Q. Did you end up removing the wristband?
A. I did.
Q. Okay. What did you do with it?
A. I threw it on the ground in front of him.
Q. Did Mike Desilets do anything to remove the dangerous, harassing, pink wristband from the ground when you threw it on the ground?
A. No. He left it there and walked away.
Q. Was it still visible?
A. Oh, yes. Right in front of me.

Q. What did you do with the wristband?
A. I picked it up and put it on my vuvuzela.
Q. All right. For people who don't know soccer lore, a vuvuzela is a trumpet-like instrument that is from South Africa that is used at soccer matches to celebrate one or the other side; is that correct?
A. Right.
Q. Some people think they're actually kind of obnoxious, right?
A. Yes. Very.
Q. But for you that's a good thing, right?
A. For me personally. I love it.
Q. So it's kind of like a trumpet or a bugle?
A. It's a small horn device that makes a lot of noise.
Q. You bring your vuvuzela to Bow High School girls' games, right?
A. Every soccer game.
Q. You've done it before?
A. For years.
Q. And now that you're allowed back or were allowed back for the rest of the season, you brought your vuvuzela also?
A. Yes.
Q. How often do you trumpet or play your vuvuzela?
A. Sometimes not as often as I like, but every time

the girls score I will use it. I don't blow it just all the time. Only when they score a goal.

Q. All right. Have you ever been stopped by school officials from blowing the vuvuzela to celebrate a Bow goal?

A. Actually, yes.

Q. Oh, my goodness.

A. Yes.

Q. That's another lawsuit. No.

A. There was a game -- the game we played against Weare this year, it was part of the initial starting up announcement.

Q. For the most part, are you able to play it?

A. I have been, yeah. It has never been an issue.

Q. And the referees don't have an issue with it?

A. Not at the high school. No, they haven't.

Q. All right. So this supposedly trans-exclusionary, harassing wristband that was pink with the XX, you did what with it? After you were forced to remove it and picked it off the ground, what did you do with it?

A. So a vuvuzela is just a long, skinny horn, and you could slide it easily over the mouthpiece end. I slid it over down towards the larger bell and left it on the vuvuzela.

Q. All right. For the remainder of the second half was the supposedly harassing, trans-exclusionary pink XX wristband visible on your vuvuzela on the sidelines?

A. Yes.
Q. Do you recall whether you played your vuvuzela at all?
A. I think they scored a couple goals in the half, second half, so yes.
Q. Okay. And did any official ask you to remove the wristbands?
A. No.
Q. Would you have preferred to have worn the wristband on your wrists?
A. Yes.
Q. Was that your intention?
A. My intention was to wear it on my wrist, yes.
Q. Okay. To your recollection did the trans identifying player for Plymouth, Parker, did he play in the second half?
A. As far as I remember, Parker played most of the game.
Q. Okay. Do you have any recollection that Parker left the game or left the game early or didn't play or anything like that?
A. Not that I could tell.
Q. All right. Did you use the vuvuzela with the wristband in any way to try to gesture at Parker or communicate with Parker during the second half?

A. No. Not at all.

Q. Did Steve Rossetti walk over to you and ask you to remove the wristband from the vuvuzela?

A. No.

Q. Okay. Did you see some of the interaction between the school officials and Kyle Fellers that resulted in Kyle being sent off by Desilets and Lamy?

A. Yes, I did. I saw it. I think it was about the time Kyle said something about the First Amendment. I overheard that off to my right.

Q. Okay. At that time were you aware that Kyle had removed the wristband and that Eldon Rash had taken the wristband and put it on?

A. When I initially saw it, I thought Kyle still had the wristband on. I didn't know anything had happened. I didn't realize until seeing the body cam footage that there was much more that I had missed, actually.

Q. Okay. Give us a best estimate for how far you were away from where the interactions were happening between the school officials and Kyle when, you know, when this was going on.

A. 25 or 30 feet, I guess.

Q. On the body cam footage in the background do you hear somebody saying it's supporting women's sports? Do you know who was saying that?

A. Well, I said it once.
Q. Okay.
A. It's just a pink wristband. And I think my father-in-law said something else, too, but there was a few people talking.
Q. Okay. Why were you saying that?
A. Because it was a pink wristband supporting women's sports.
Q. Okay. Were you able to overhear Steve Rossetti when he came to the sidelines -- stopped the game and game to the sidelines?
A. I was. I was filming it.
Q. Okay. You have your own homemade video, and that's in evidence; is that correct?
A. It is.
Q. All right. It shows the events from your perspective 30 feet away, correct?
A. Correct.
Q. All right. So it captures some of the detail but not as close-up as the body cam footage; is that correct?
A. Correct.
Q. All right. And we're not going to watch it here today unless Mr. Cullen wants to run it. In the interests of time, it's in the record, you know, I don't think we need to go through all the details of it, but at the end of that

video, your own video, you kind of said, oh, Eldon didn't take it off, at least somebody has got balls around here, or something like that; is that right?

A. That's correct.

Q. Okay. Later did you find out that you were wrong about that?

A. I did.

Q. Okay. And that Eldon had taken it off?

A. Yes. Correct.

Q. All right. We'll leave that for testimony from Eldon later on.

Do you recall that when Rossetti -- well, when the game was stopped and Eldon was seated wearing the wristband, a bunch of other parents started yelling, take it off, you're hurting the girls, write a letter to somebody, things like that?

A. Yes. I remember two people specifically.

Q. Okay. Who were the two people specifically that you remember from your own memory?

A. So the lady on the left is Clem Madden's wife, Colleen Madden.

Q. Slow down.

Colleen Madden?

A. Colleen Madden. She was the one closest to the field. I think she is that one that said write a letter. She

is the one that said write a letter. I know she is.

Q. Was she the one that said take it off and sort of ordering people around?

A. The loud, very heated, yes. That was Colleen on the left.

And to the right was David Farr, Shannon's husband, who said you're only hurting the girls.

Q. So David Farr is the progressive person that you know from the Bow community?

A. Correct.

Q. And it's his wife that sent the e-mail reporting the other Bow parents to the Bow School District; is that correct?

A. That's correct.

Q. All right. And he was allowed to say that Eldon should take the wristband off, correct?

A. Correct.

Q. And did you hear those same voices on the videotape when we were listening to it earlier?

A. You can see Colleen on the tape actually, and on my video you can see Dave Farr.

Q. Okay. But specifically, you know, there are times when we hear audio in there, Kyle wasn't exactly sure who was who. Did you recognize the voices yourself?

A. I did.

MR. KOLDE: All right.

Your Honor, does the Court want us to go through that and identify specific voices?

THE COURT: No.

MR. KOLDE: Okay. I'll take my cue from the Court.

Q. After Eldon -- you later learned Eldon took off the wristband. Was the game allowed to resume?

A. It was. Apparently that was the call from Ben Forbes. He said "it's off" to Mike, and that's when the game -- you could see in the video when the girls started going back on the field.

Q. All right. It looks like there were two different conferences between Rossetti and the school officials on the field; is that correct?

A. I believe there was two times they went and talked, yes.

Q. All right. The first time Desilets goes out to talk to Rossetti; is that right?

A. Correct.

Q. Does Fisk go out? Do you remember?

A. No, I think it was just Mike alone on the first one, and then the second one I remember -- it's in the video, yeah, and you saw it.

Q. And then Rossetti comes out and says the wristband is coming off or the game is over?

A. Yes. There was a discussion from Mr. Rossetti.

Q. Okay. And then Rossetti says, take it off, just take it off, and then he ends up walking off again?

A. His assistant coach escorted him away, yes.

Q. All right. Assistant referee?

A. Referee. I'm sorry. Correct. Sorry.

Q. All right. And Eldon is still resisting taking off the wristband, and then the officials go back out on the field, school officials and Rossetti, and I guess one of the assistant referees; is that correct?

A. Right.

Q. And at that point the game is still suspended. Rossetti is out on the field, Fisk is out on the field, Mike Desilets is out on the field, correct?

A. Correct.

Q. Do you know what they're talking about?

A. I do not.

Q. All right. And at that point in the video we see Ben Forbes go over, look at Eldon, and radio to Mike "he took it off." Is that correct?

A. That is correct.

Q. And does that comport with what you were able to observe albeit from 30 feet away?

A. Yes. And it's on my video.

Q. All right. After that point was there any

disruption in the game?
A. After the call from Ben Forbes?
Q. Yeah. After Rossetti ended the suspension of the game and allowed the game to proceed with the agreement of the school officials, did --
MR. CULLEN: Objection, your Honor.
Adding in "with the agreement of the school officials." There's been no testimony about it. I've tried to be pretty liberal with letting the --
THE COURT: Sustained. It's not relevant.
Q. After the game was allowed to resume, Mr. Foote, did anything else happen that was unusual?
A. No. The game played out without interruption. I mean, a standard soccer game with standard soccer issues.
Q. All right. Rossetti didn't stop the game for any other reason --
A. No.
Q. -- having to do with your speech?
A. No.
Q. And no school official approached you after that about removing the wristband from your vuvuzela?
A. No.
Q. Okay. What did you observe after the game in the parking lot?
A. In the parking lot only, I walked up -- there's a

little bit of history because Kyle's daughter came up and broke down what was going on, and I walked up to the parking lot going -- I've known Lieutenant Lamy for a few years for other situations in town, and I went up to say to those guys if there's nothing going on, basically, can you please just let this go for now, as we've seen in the video, just to defuse it. If Kyle wasn't getting arrested or if the game was over, could we stop because it was affecting his family.

Q. Did that seem to help?

A. Phil seemed to -- yeah, at that point I don't know if he was ready to --

Q. Don't speculate. Just talk about what you observed.

A. Yeah, when I saw it -- I mean, it seemed like Phil was ready to say, all right, I've got it, we're good, the game's over, I'll go home.

Yes, it seemed to help.

Q. Okay. You shook his hand at the beginning. Why did you shake his hand?

A. Because I know Phil. I've known him for four years.

Q. Okay. After the game was over, did you receive any documentation from the Bow School District?

A. I did.

Q. About when did that happen relative to the game?

A. I believe it was Thursday after the game. Thursday evening.
Q. What happened?
A. The Bow Police Department showed up at my front door.
Q. And what did they do?
A. They gave me a no trespass order.
Q. All right. And we're not going to go through it line by line, but if we could just briefly have you identify the order that's already in evidence, and it is the Plaintiffs' Exhibit No. 7.
THE COURT: If you do it briefly. I'm familiar with it.
Q. Is this the no trespass order that you got?
A. That is.
Q. All right. And it kept you from attending some of the soccer games for the upcoming not quite week?
A. Correct.
Q. How many games did you miss as a result?
A. One varsity game, one middle school game, and I wasn't able to go to the homecoming football game.
Q. All right. And you would have gone if you had had the opportunity, correct?
A. I would have.
Q. And would you have worn the pink wristband if you

had had the opportunity to?

A. If I could have.

Q. Yes. And the same thing with regard to the other soccer games in the season that you weren't able to wear the pink wristband, correct?

A. Right.

Q. You would have if you could have?

A. Correct.

Q. And you would like to wear the same pink wristband in the upcoming games, Bow basketball, ski team; is that correct?

A. Absolutely.

MR. KOLDE: Okay. Let me just check to see if I left anything out. I think we're good.

(Pause)

Nothing further at this time, your Honor.

THE COURT: All right. Why don't we take our mid afternoon break now. Ten or fifteen minutes.

(RECESS)

THE COURT: All right. Mr. Cullen.

MR. CULLEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CULLEN:

Q. Mr. Foote, you had indicated I think on your direct that you were not -- it's probably better to ask you the

questions that are for you than for your wife.

A. Probably.

Q. You had indicated that your intent at this game was not to target Parker Tirrell, correct?

A. Correct.

Q. And that your only purpose in going to this game was to express your support for female athletes, right?

A. For my daughter. Female athletes, yes.

Q. Your daughter and the rest of the Bow team?

A. What's that?

Q. Your daughter and the rest of the Bow team?

A. Yes.

Q. Now, you -- is it fair to say that you supported the passage of HB 1205, the bill that would have restricted Parker and others from playing on girls' teams?

A. The one that Governor Sununu passed?

Q. Correct.

THE COURT: The legislature passed.

THE WITNESS: The legislation.

THE COURT: He signed it.

THE WITNESS: Correct. Sorry.

Q. And you knew this summer that it was being challenged by Parker Tirrell and another student, right, that HB --

A. Summer of -- sorry.

Q. I'm sorry. You knew in the summer of 2024, this past summer, that HB 1205 was being challenged by two students in this very court?

A. I think I knew about the two instances. My wife attended the court whenever the court hearings were. I think September 11th was one, and there was one prior to that.

Q. There was one in August, right?

A. I don't know the date, but they were the two -- last two hearings, yes, that's when I became aware of it.

Q. And after that occurred you sent a note to the girls' varsity soccer coach, correct?

A. I did send an e-mail to -- sorry. I don't know if that was in reference to the house bill, I don't think.

Q. But just in the summer, August 23rd, in particular, you sent an e-mail to the soccer coach, correct?

A. I did.

Q. And that was a Mr. Vogt?

A. Jay. Head coach.

Q. Jay Vogt, head coach.

And in that e-mail you went through all the other countries and their positions -- not all the other countries, but a number of other countries and their positions on when male-born athletes could play in women's sports, right? Do you remember that?

A. I referenced other countries, how they were dealing

with it, yes.
Q. And you told Mr. Vogt, "No one other than the United States transgender mob supports boys playing on girls' sports teams," right?
A. Is that what the e-mail says?
Q. If you don't remember, we can --
MR. CULLEN: Can you bring up that e-mail?
Q. Just to refresh your recollection, if you turn over to -- first of all, you can look at this for yourself. It's not marked as an exhibit.
MR. CULLEN: If you can turn to the second page just so that Mr. Foote can see.
Q. After the big, long paragraph, "No one other than the United States transgender mob supports boys playing on girls' sports teams," that's something you said to Mr. Vogt?
A. That's in my e-mail, yes.
Q. And you told Vogt, though, that this was not a game that we have to deal with tomorrow, correct?
A. That was -- I think the -- what's the first part of the e-mail say?
Q. Yeah, why don't we go back to the first. Sorry.
Okay. So what you wrote to Mr. Vogt was, "Apparently there was a discussion at BWW's tonight that Pinkerton might have a boy on the team."
BWW is Buffalo Wild Wings?

A. Buffalo Wild Wings, yes.
So the girls were at Buffalo Wild Wings, and Abby came home and said that somebody had brought up --
Q. Hold on. I don't want to hear the hearsay part of it. I just want to ask the questions.
A. Oh. So --
THE COURT: Just answer the question.
A. Yeah. Sorry. Go ahead. I apologize.
Q. I will do my best to actually get the question out. I apologize.
A. Yes, sir.
Q. You write in the second paragraph to Mr. Vogt, "Apparently the boy was the one from Plymouth, so that's not a game we need to deal with tomorrow."
A. Address. Yes.
Q. Okay. And you knew already that Plymouth was on the schedule?
A. I did.
Q. And you knew that it wasn't coming up until sometime in September?
A. Correct.
Q. Okay. And after you sent this e-mail on the 23rd, the regular season began, right?
A. Yes.
Q. And the girls' varsity team for Bow played a bunch

of games in August and September before the Plymouth game, right?

A. They did play some games, yes.

Q. Well, they played -- you go to most of the games it sounds like.

A. I try to go to all of them.

Q. So did you go to the game against Kingswood?

A. I think that's the one I missed.

Did I go to Kingswood?

Q. How about Lebanon?

We don't get a lifeline. You can't ask your wife.

A. No. I'm thinking. It's not a lifeline. I'm trying to think.

Q. Okay.

A. I couldn't tell you off the top of my head. I know Keene, Coe-Brown. There were two games. There were some games I had to work that I think conflicted. I couldn't make it.

Q. Looking at this schedule, it looks as though you had regular scheduled games against Kingswood, Lebanon, and Keene all prior to the Plymouth game.

Did you go to any of those?

A. I don't recall. Yeah. Sorry. I can't tell you off the top of my head.

Q. The Laconia game wasn't the first game you went to

all season, right?

A. I think we played Keene -- who did we play before -- does anybody have the schedule?

THE COURT: It doesn't matter.

THE WITNESS: Okay.

Q. You went to at least some other games before Plymouth and Laconia, right?

A. Yes.

Q. Okay. I mean, your daughter was the captain of the team, right?

A. Yes.

Q. And you try to go to all the games?

A. To the best of my ability, yes.

Q. So the odds of you having missed the first three games of the season seems pretty low, right?

A. It does.

Q. Okay. And you didn't bring any XX wristbands to any of those games, right?

A. No.

Q. You didn't take any effort to display your support for women's sports at any of those games, right?

A. No.

Q. And you didn't bring any signs to put on your car at any of those games, correct?

A. No.

Q. And that's true of the Laconia game, too, right? You didn't bring any wristbands to the Laconia game, right?
A. No.
Q. You didn't bring any positive pro-women sports messages to the Laconia game, correct?
A. Correct.
Q. You didn't bring your Riley Gaines poster to the Laconia game?
A. Correct.
Q. The Plymouth game was the first one where you decide to bring your poster and your wristband to, correct?
A. Correct.
Q. Okay. Now, on September 10th -- are you aware that that's the date that the Court confirmed its ruling, its prior ruling that Parker Tirrell could play for Plymouth for the duration of the season?
A. Yes.
Q. Okay. And I think you mentioned in fact that your wife had attended that hearing herself?
A. Correct.
Q. And you went to the Laconia game. I think you told your attorney that you were not -- you didn't make any of these comments that were mentioned in the Farr e-mail, correct?
A. Not the specific comments in that e-mail, no.

Q. Okay. What comments did you make?

A. I talked about the hearing. We were waiting to let the system work the process.

Q. And at that stage the system had worked the process, right?

A. Well, we were hoping that the judge's ruling would go in favor of House Bill 1205, but it didn't.

Q. All right. And you knew that -- at the time of the Laconia game you already knew that that's the way it had gone, right?

A. I think it came -- did it come out that day? I think I found out on the 11th.

Q. And with respect to the things that were reported by Ms. Farr, just cutting to the chase, you would agree I think that heckling or intimidating the player from the other side would not be something that would be appropriate.

A. Absolutely not.

Q. You posted on Facebook on September 13th --

MR. CULLEN: Can we bring this up, Stacy, Plaintiffs' Exhibit 5?

Q. You posted on September 13th, if I'm reading it correctly at the top, it's a little faint, about the upcoming game, correct?

A. Correct.

Q. Okay. And one of the things that you wrote was,

"Despite Governor Chris Sununu's stance on protecting female athletes, the federal court has failed to enforce this decision, leaving our girls vulnerable," correct?

A. That's correct.

Q. And you go on to say that it's not the athlete's fault, right?

A. Correct.

Q. And that you believe the athlete is a victim of child abuse, correct?

A. Correct. That's what it says.

Q. And then you went on to say, "The failure to uphold the governor's decision by the legal system, the school board and the school administration is setting a dangerous precedent for women's sports," correct?

A. Correct.

Q. Was it your position at that time that the school board and the school administration should not have followed this court's order and allowed Parker Tirrell to play?

A. My consideration on this is that the leadership failed, and that is part of the leadership. From the governor's office to the coach on the field.

Q. But was it your position that the school board and the school administration should not have followed this court order and should not have allowed Parker Tirrell to play?

A. I honestly didn't consider it at that time.

Q. Okay. You got Mike Desilets's e-mail the night before the game, right?
A. I did.
Q. Okay. At this time had you already made up your armbands?
A. I had the armbands, but I hadn't done anything to them.
Q. And then -- so after you got this note --
MR. CULLEN: And if we could just pull up Exhibit 2, please, Plaintiffs' Exhibit 2.
Q. Now, you were on the distribution list for this?
A. Correct.
Q. And you saw Mike writing that he understood there were differing opinions and that that was fine?
A. Correct. Yes.
Q. Okay. And you also got the message -- you also read the part that said, "Please understand that any inappropriate signs, references, language, or anything else present at the game would not be tolerated," correct?
A. I didn't really catch the anything else present, that didn't sink in as part of it, but I did see inappropriate signs and references and language. I did see that.
Q. Well, you wrote a fairly lengthy response to this e-mail, didn't you?
A. I did.

Q. Okay. Are you saying now, though, that you didn't read the e-mail in full?
A. I didn't catch the anything else present. It didn't sink in. The more I read that, I can see more maybe, but it's an e-mail. It takes time to digest and interpret it. At that point I didn't even think of anything.
Q. Well, you digested and interpreted it by the next morning, right?
A. Say that again.
Q. You digested it and interpreted it by the next morning, didn't you?
A. As in the e-mail that was sent?
Q. Yeah. You interpreted and digested this e-mail from Mr. Desilets sent to you -- received by you September 16th? By the next morning, the morning of the 17th, you had digested this?
A. I don't think these two were -- it was a separate e-mail. I wasn't referencing this alone.
Q. Didn't you respond specifically to this e-mail and attach it?
A. I may have replied to that e-mail, but it wasn't in response to that e-mail.
Q. Okay. Well, you replied to this e-mail because -- you already heard Mr. Fellers say that's the only reason he knew about this e-mail, right, because it was attached to

yours?

A. I cc'd Kyle on it. That doesn't mean I was writing responding to his e-mail. I was writing an e-mail back about the issue I have with the whole situation, not just Mike's e-mail about the game.

If you read my e-mail, it doesn't even -- I don't think I reference it.

MR. CULLEN: Well, why don't we bring that e-mail up then, Stacy, if you would.

If you could just drop it down a little bit so we can see who it goes to at least at the beginning? Thank you.

Q. So this is an e-mail from you to Mr. Desilets?

A. Correct.

Q. Copied to your wife and to Kyle Fellers, among others?

A. Yes.

Q. The others are other people on the -- other parents on the team, right?

A. I assume so, yeah. I don't know exactly.

Q. I mean, this is your e-mail?

A. It is my e-mail. I just -- I don't remember exactly who it went to. It's probably other parents that share like views.

Q. And you understood -- you heard Mr. Fellers testify that this was attached to your -- that Mr. Desilets's e-mail

of September 16th was attached to your e-mail, right? That's how he learned about it?

A. Right.

Q. You do not have any reason to dispute that, right?

A. No.

Q. And what you say in here is, "Is this all you have to say about this game?" That's your very first line, right?

A. Yeah. Correct.

Q. Does that help refresh your recollection as to whether you're responding to Mike's e-mail?

MR. CULLEN: Can you highlight that, please?

A. So, yeah, it's there. I understand it. I saw that. That doesn't mean that I'm just responding to the single e-mail. My wife had two conversations with him. We've had -- I e-mailed Jay Vogt. That was a question. We've talked about this. I've talked to my daughter about it. There's been multiple discussions. This just happens to be the last one that comes out.

Q. I just want to make sure I'm clear, because I thought you were saying earlier that you didn't really digest Mike's e-mail and you never even really realized that it said other types of inappropriate behavior would not be allowed.

A. It's in there. I see it.

Q. Okay. And then you continue, "You've proven yourselves weak, ineffective, and completely out of touch with

real leadership," right?

A. Correct.

Q. Okay. And then you say: This isn't "just another game." Not by a long shot.

A. Absolutely.

Q. And that's how you felt about the Plymouth game, right?

A. Do you understand the context of that?

Q. I'm asking -- that's how you felt about the game, didn't you?

A. I felt that it was more than just another game, yes.

Q. So when you said earlier that your protest wasn't anything to do with protesting transgenders or anything like that, this was the first time that you actually decided you were going to go to a game and bring something, some material to the game, a sign and the wristbands?

A. No. That's not what that means.

Q. But that's what it says, right, is that: This isn't just another game. Not by a long shot.

A. That doesn't have anything to do with wearing wristbands.

Q. Okay. And after you -- at this stage you had already prepared the wristbands, right?

A. This was sent the morning of -- it was right around

the same time. Actually, you know what, I think I wrote this and then did the wristbands, to be honest. I know that the -- I know my disposition. I mentioned it. I think the timing was off. I think I did the wristbands after this e-mail, actually.

Q. Okay.

A. To clarify the record.

Q. So after this e-mail and after receiving the message from Mike Desilets, that's when you decided to mark up the bag of wristbands that you had received from Mr. Fellers?

A. So in the timeline of events, I wrote the e-mail, Kyle dropped off the wristbands, I think I read his e-mail, I responded to the e-mail, and then I put the Xs on the pink wristbands. Yes, that's the correct order of events.

Q. And you continue in the e-mail, "You ignored us, and now you expect us to just go along with this," don't you?

A. Does is it say that? I think it does. Where are you referencing?

Q. The same paragraph.

A. Oh. It does say that, yes.

Q. And you continue, "I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males who are stronger, faster, and more physically dominant compete against women, and you don't sit around waiting for someone to get hurt before you

take action."

A. Yes.

Q. You can certainly understand how someone receiving this e-mail would consider that you were not going to stand around at the game, correct?

MR. KOLDE: Objection. Calls for speculation.

THE COURT: Overruled. It's what he sees.

A. Ask the question again, please.

Q. You can understand how somebody reading this e-mail would get the impression that you were not going to just sit around waiting for somebody to get hurt at the following game, you were going to do something, right?

A. I would have thought he would call me and ask what's going on.

Q. That wasn't my question.

A. Oh. Well, that's what I was -- you asked what I thought.

Q. I said you would understand how somebody reading this e-mail could get the impression that you planned to do something at the game.

A. I suppose.

Q. Just suppose?

A. If I was the leader, I would actually seek out more clarification, but I don't know.

Q. No. If you were a leader, you wouldn't stand by

while their players were thrown into harm's way. That's what you told them.

A. I would try to address it with the people that are in charge.

Q. And you reference Riley Gaines here, right, in the very next sentence?

A. "Look at Riley Gaines," yes.

Q. And you knew of Riley Gaines here. You had already posted about her on your Facebook page, right, or on a Facebook page?

A. Uh-huh.

Q. Was that a Facebook page or was it -- was it yours or was it the Bow Common Sense page?

A. I don't know. Can you pull it up again?

Q. Sure.

MR. CULLEN: Stacy, can you just switch over real quickly to Plaintiffs' 5?

Q. Are you able to tell from this if this is posted on your Facebook page or if this is on the Common Sense page?

A. It looks like my page, but I don't know. Usually it says on it. So I couldn't tell you.

MR. CULLEN: Stacy, if we can go back to Exhibit 2, please? I'm sorry. You were right. Exhibit 18. Thank you.

Q. And Riley Gaines, among other things, has been using this XX symbol herself to promote the idea that only

biologically females belong in women's sports, right?
A. I don't know.
Q. You don't know that?
A. I didn't know she had XXs, no.
Q. You continue on in the second to the last paragraph, "I'm sick of your cowardice and your pandering. You would rather be woke than do what's right. Where's your courage? Where's your integrity. Stand up for women, for real women, or get out of the way."
Do you see that?
A. A hundred percent.
Q. And that's what you sent on the morning of the game?
A. September 17th at 7:28, yes.
Q. And this is the day that you decide you're going to go and bring the wristbands for the first time to the game?
A. This is not the first time we talked about wristbands, no.
Q. Okay. When else did you talk about wristbands?
A. When Kyle bought them. When he delivered them. When I asked Abby to see if the team would wear them.
Q. But during this week, the week of the game, right?
A. Well, this all happened within the week of the game.
Q. Because you were responding to this Court's

decision that had confirmed that Parker was going to play in that game, right?

A. No. I was responding because of the last court decision that they were going to allow Parker to play, yes.

Q. And up until that time you hadn't done anything to support women's sports visually at any game?

A. I never had a reason to.

Q. Right. Because the only reason you had this day was because you knew Parker Tirrell was going to be on the playing field?

A. I knew that my daughter could be potentially hurt someday. My younger daughter could potentially be hurt at some point.

Q. But you didn't expect her to be physically hurt in this game, right?

A. I don't know.

Q. I mean, your wife had attended the hearings.

A. I don't know. That's speculation. I couldn't tell you. We had a slide tackle happen, and a girl went out for the rest of the season.

Q. That can happen even when you're just playing against another female-born female athlete?

A. Oh, yeah. Absolutely.

Q. But beyond that, you didn't have any particular reason to be concerned about Parker Tirrell, right?

A. In what context?
Q. In the context of this game. You already --
THE COURT: You knew she was small.
MR. CULLEN: Thank you.
A. Oh, I don't know. I didn't even -- I really honestly didn't know what size she was. I didn't know what size Parker was.
Q. But your wife had gone to the hearing so she knew, right?
A. I don't know if my wife saw Parker, what size Parker is.
Q. So you go to this game on this particular day and you bring these wristbands with you, correct?
A. Correct.
Q. You originally asked the players to wear them -- or asked your daughter to ask the players to wear them?
A. I asked her to see if the team would wear them, yes.
Q. Okay. And then you brought them and you brought them in like a shopping bag or a Market Basket bag or something?
A. Yep. Exactly.
Q. Okay. And you -- actually, you came to the game at 2:30 that day, didn't you?
A. It was 45 minutes before it started I think is what

I said.

Q. It was an hour and a half, though, wasn't it? You were one of the first people at the game?

A. I was there early, yes.

Q. And you got a prime parking space over on the far right side of the field?

A. I was one of the only people there. I think Clem Madden was another one that was there at the same time-ish.

Q. And you set up your chairs, right, at the center of the field? Hey, first come, first served. You might as well get the best spot.

A. It's the best seat in the house. You might as well get it.

Q. I'm not faulting you for that.

And you brought your -- you didn't put your Riley Gaines sign on at that time, did you?

A. No.

Q. You didn't put that on till halftime, right?

A. Correct.

Q. And you didn't -- you handed out the wristbands to whoever wanted to take them at the beginning of the game, right?

A. I handed out a couple, I don't know, six or so. I don't know the exact number.

Q. And basically you just kind of showed them the bag

and said they could reach in and grab one?
A. No. I didn't really have the bag open. It was just sitting next to me. And people came by and if they wanted one, I would give them one. I think the only one I really gave one to was my father-in-law and Kyle.
Q. Okay. So you had the bag open and people could just come up. So they knew you had the wristbands then?
A. Some people did, yes.
Q. Because you had communicated to them at some point that, hey, I'm going to have these wristbands at the game. If you want one, grab one.
A. I don't think I ever said that. I think I said -- I don't think I ever said I'm going to have wristbands, to pass them out. Maybe I did. If it's in a Facebook post, I guess, but I don't remember saying that.
Q. And you didn't put your wristband on at the beginning of the game, right?
A. I did not.
Q. And that's because you knew that it was going to contravene policy KFA, right?
A. I don't know about that. I just didn't want to miss the first half of the game.
Q. You didn't want to miss it because you knew that you could miss the game if you wore the wristband, right?
A. I had suspected that something would happen, yes.

Q. Yeah, you knew this -- in fact, your wife didn't even wear one of the wristbands at the game, right?

A. No. She had one, but she didn't wear it.

Q. Okay. And you didn't put yours on until halftime because you knew that there could be an issue with you wearing this?

A. I suppose you could look at it that way.

Q. And that's the same reason why you didn't put the Riley Gaines poster on your Jeep until halftime, right?

A. That's because -- yes, that's what I thought would work.

Q. Yeah. You were concerned that if you put it on too early, Mr. Desilets or someone else would come and tell you that you can't do that, right?

A. Yes.

Q. It was not really a big surprise to you when Mr. Desilets came over and said, hey, Andy, you can't wear that, right?

A. I wouldn't say it wasn't a surprise, but I didn't know who was going to come over. I mean, we had the superintendent at the field. We had the principal at the field. We had Desilets at the field. We had Bow PD.

Q. And the school you said never communicated with you after getting this e-mail about what your plan was, right?

A. The school didn't ever communicate on any of my

e-mails.

Q. And you certainly didn't tell the school, hey, we're going to wear these wristbands but nothing more, we're just going to silently wear the wristbands, right?

A. I don't think anything in your -- we failed at communicating. Let's put it that way.

Q. So the question was you never told the school, hey, this is the limit of our protest. We're going to come out this day, we're going to wear these, but we're not going to chant, we're not going to heckle, we're not going to protest, we're not going to do any of those things, right?

A. Not in that case, no.

Q. Okay. And they had good reason to be concerned that you in particular might take this a little bit further, right?

MR. KOLDE: Objection. Calls for speculation.

A. No.

THE COURT: Overruled.

A. No.

Q. Well, for one thing, you had already sent them an e-mail saying that a real leader doesn't stand by, right?

A. Yes. It's right there.

Q. And for another thing, you had tried to get into a Gay-Straight Alliance meeting the year before, right, a student meeting?

A. Do we want the full context of that?
Q. Is that true? You tried to get into a Gay-Straight Alliance meeting, right?
A. I did not try to get into a Gay-Straight Alliance. I tried to request what is a Gay-Straight Alliance. There's a bigger history there. I don't know how far you want to go. I was curious --
Q. If your counsel wants to, he can go into that.
THE COURT: You're talking over each other.
MR. KOLDE: Andy, listen to the question and answer the question. Nothing else.
THE COURT: Mr. Kolde, I'll handle that. That's my job. Thanks for the help, though.
Go ahead, Mr. Cullen.
Q. You were asking about the Gay-Straight Alliance?
A. Yes.
Q. And at one stage you wanted to get into the meeting and Sergeant Handy had to actually stop you from going into the school to the meeting, right?
A. No. No, that never happened.
Q. And in fact you posted online the identity of one of the kids in the Gay-Straight Alliance, right?
A. If she spoke at a book review and then she was one of the individuals in the public forum for a school board meeting, I may have mentioned her. If she was in the club, I

don't know.
Q. So, again, the school district had a reason to be concerned that your protest might go beyond simply having wristbands and silently sitting by the game, right?
A. I don't -- no, I disagree.
Q. And you as you said yourself, a real leader doesn't stand around -- sorry -- doesn't stand by while their players are thrown into harm's way, right?
A. I tried from August until September to get someone to have a conversation.
Q. And in fact a real leader makes sure that you protect the students on the field before things get out of hand and that student is heckled or intimidated or otherwise, right?
A. Well, I think as a parent, you defend your daughter and your family and you try to protect them from harm's way. Whether Parker Tirrell was going to be the problem or some other transgender player, the point is there's a precedent set, and we were trying to protect -- I was trying to protect my girls in some way. Because I have another one five years from now that could be in the same situation, and I don't know what the scenario is going to be.
Q. You were familiar with the XX symbol being used at the Paris Olympics or not?
A. I didn't watch the Olympics after the opening

ceremonies.

Q. All right. And you don't know which other parents may or may not have worn the wristbands?

A. I do not.

Q. And you don't know which wristbands they took because they just reached into the bag and grabbed them, right?

A. It was random.

Q. So it could have been the XX or it could have been the NAD?

A. It could have been any of the three symbols.

Q. Okay. And when Mr. Desilets did come up and tell you that you needed to take off the wristband, you already understood why because you were at least half expecting this to happen, right?

A. I guess with the information you've seen here, yeah, there was some understanding of something.

Q. And you missed the next game, but you were back for the game on September 24th, right?

A. Was that the Coe-Brown game?

Q. Well, I think of it as the Moms for Liberty game.

A. Oh, I'm sorry, yes. The Moms for Liberty, yes. Correct.

Q. And a whole bunch of people came to that game, right?

A. Correct.
Q. And they sat right up behind the parents at the game, right, or stood really?
A. They were a few feet behind the line, the parents' line.
Q. 35 to 50 people?
A. Approximately.
Q. None of whom had kids in the game?
A. Maybe not in that particular game, no.
Q. Okay.
A. I don't know for all the people who were there. I don't know if they had a niece or a nephew. I know my aunts were there with them.
Q. Yeah. I mean, there were too many people for you to even know who all of them were, right?
A. I wouldn't say that. There was a significant amount of people, yes.
Q. You posed for some selfies with them?
A. I did take a picture that they requested, yes. One picture.
Q. Incidentally, you don't have any actual suspicion that if you went to the game wearing just a pink wristband with the breast cancer ribbon on it, that you would be told to take that off, right?
A. I don't know.

Q. And you don't have any real concern that if you wore just a pink jersey or pink socks or dressed head to toe in pink, that somebody from the district would come over and tell you you can't do that, right?
A. I don't know. If it was another transgender game going on and you wore all pink, I don't know how they would react.
Q. I mean, you understand that the issue here is your XX symbols, not the color?
A. You mean the female -- biological female XX is an issue?
Q. I'm saying you understand that that's the issue the district has, not the color pink?
A. No. I had no idea.
Q. So this is the first time you're learning that that could be a possibility?
A. This court case has been presenting it, yes.
Q. I mean, because you took pictures of -- or you found pictures of the cheerleaders wearing pink, and you have no reason to think any of them were in trouble for wearing pink, right?
A. I didn't, but I saw the picture.
Q. And similar with the band?
A. There's a picture of the band?
Q. You submitted an exhibit that is a picture of band

people wearing pink I think.

A. I don't remember that one.

Q. Your counsel submitted as exhibits in their exhibits here a series of photographs of cars in the parking lot. Did you look at those?

A. I did.

Q. One of them has a license plate that says boy girl?

A. It did.

Q. That's a relative of yours, right?

A. By marriage.

Q. I couldn't -- I'm not sure if I was able to get Mr. Fellers to answer this or not, but is it your contention that --

A. I say by marriage, but it's a very distant -- I mean, we don't spend Thanksgivings together.

Q. You're staying as far away from this person as possible. I understood --

A. No. Just in context, I didn't want you to think that we have Christmas dinners or anything. We are distant relatives.

MR. KOLDE: Objection. Nonresponsive. Move to strike the witness's nonresponsive answer.

THE COURT: Well, granted. It's totally irrelevant.

MR. KOLDE: Just answer the question.

THE WITNESS: Yes.

THE COURT: Mr. Kolde, I'll handle it.

MR. KOLDE: I understand, your Honor.

THE COURT: No more interruptions, please.

Q. With respect to this question about what it is you're looking to do with respect to signs, is it your hope to get a ruling from this court that you can walk around the parking lots at any time of the day with whatever political message you want to on a sign that you held above your head?

A. I think it's in line with the First Amendment right. That's what we're fighting for. I think as long as it's within the realm of our legal system for displaying, then it should be allowed.

MR. CULLEN: If I could just have a moment, your Honor?

THE COURT: Of course.

(Pause)

MR. CULLEN: I don't have any other questions.

Thank you, your Honor.

I think Mr. Ducharme might come next.

THE COURT: Mr. Ducharme.

We'll go till 4:30.

MR. DUCHARME: Okay. I will not take anywhere near.

THE COURT: No, I hope.

MR. CULLEN: I wasn't that long.
MR. DUCHARME: Oh, that wasn't what I mean, Mr. Cullen.
THE COURT: Aren't you done?
MR. CULLEN: I am done.
THE COURT: Okay.

CROSS-EXAMINATION

BY MR. DUCHARME:
Q. Mr. Foote, I would like to pick up right where you left off in answering Mr. Cullen's question about the signs.
You're here fighting for your First Amendment rights, correct?
A. What's that?
Q. You are here fighting for your First Amendment rights?
A. Correct.
Q. And you're fighting with the town of Bow about their policies and the way they implement those policies, correct, or the Bow School District I should say?
A. Yes.
Q. And they sent you a no trespass order?
A. Correct.
Q. And they are enforcing the school rules and policies, correct, the policies of the school board and school district?

A. Yes.
Q. And you know that Mr. Rossetti is not an elected, appointed, or employed official of the Bow School District, correct?
A. I don't know the relationship for how they're employed.
Q. Okay. Do you have any basis to say that he is an employee or an official?
A. I mean, he's at a lot of the games.
Q. He's a ref?
A. Yes.
Q. You've seen him at games?
A. Yes.
Q. You've seen him at basketball games?
A. Yes, I think. I don't know. I've seen him at soccer games. I know that.
Q. But, again, to cover quickly what I covered with Mr. Fellers, you don't know the interrelationships between referees and the NHIAA and the school districts, correct?
A. I don't know the financial, if that's what you're asking.
Q. And what this case is about mostly is your very important First Amendment rights, correct?
A. That's why we're here, yes.
Q. Your lawyers have dropped your claim for monetary

damages, correct? I assume you know that.

A. I know they dropped the value, yes.

Q. Well, you know they've dropped the claim for compensatory damages?

A. I mean, we did talk about that, yes.

Q. Okay. I don't want to know what you talked about. You know it happened?

A. Yes.

Q. And that what the vast majority of the time and effort going into this case is about is your hope to get injunctive relief, right?

A. Correct.

Q. You weren't really damaged by what happened on September 17th, were you, by Mr. Rossetti?

MR. KOLDE: Objection insofar as it calls for a legal conclusion, and it does sound legal, your Honor.

THE COURT: I understand the issues. He's damaged if his rights were infringed.

MR. KOLDE: Fair enough.

Q. So you in the complaint have alleged a conspiracy, correct, that includes Mr. Rossetti?

A. In our group, yes.

Q. And you in your declaration filed in support of the request for both a temporary restraining order and this preliminary injunction have said that Mr. Rossetti threatened

a forfeit, correct?

A. The specific words, I would have to look at the video.

Q. I'm not talking about the video. I'm talking about the pleadings filed in this court, including your declaration which is document 14-4 signed under oath.

A. Right.

Q. You recall saying under oath in that declaration, "I declare under penalty of perjury that the foregoing is true and correct," that you heard Steve Rossetti threaten to forfeit the game. You said that, didn't you?

A. I heard him say that Bow could potentially forfeit the game.

Q. You heard him say that?

A. I believe I did.

Q. Is it on the video?

A. I don't know.

Q. You heard him say it, though?

A. You're going to have to stop and lose the game, yeah. There was some insinuation. Whether it was forfeit or -- yeah, that's what I remember.

Q. Did you hear him say the game's over if this disturbance doesn't end?

A. It could have been something like that.

Q. You don't know if game over equals forfeit, do you?

A. We were told up to that point if they didn't play the game, they would forfeit.
Q. By whom?
A. By my daughter. By the coach I had talked to. I don't know. I heard that if they didn't finish the game, they would forfeit it.
Q. I'm sorry. I didn't see the coach or your daughter come over to the sideline.
A. No. This was before just discussing on the field.
Q. You're talking about if they just hadn't showed up to play?
A. There was a lot of discussion about these teams and games and what would happen to them. I don't know the specifics.
Q. Let's focus on the day in question here.
You didn't hear Mr. Rossetti threaten to forfeit the game, did you?
A. I would have to go back and view my video.
Q. Okay. By the time that the body cam video picks up --
A. My video, I'm sorry, not --
Q. Okay. I'm talking about the body cam video.
A. Okay.
Q. By the time that the body cam video picks up, you've already taken your wristband off?

A. Correct.
Q. And you do agree that the interaction between Mr. Desilets and Mr. Fellers was pretty heated, loud?
A. It was a passionate discussion about a topic, yes.
Q. So if, again, your declaration used words like heated and loud, you wouldn't step back from that now, right?
A. It wasn't louder than Colleen Madden's -- it was quieter than her comments, let's put it that way, or quieter than the cheering on the sidelines during the game.
Q. You don't think it stood out at all?
A. Not compared to my vuvuzela or comments, us yelling for the girls, let's go, Bow, no.
Q. You don't really believe that Steve Rossetti shut this game down to stop your protest, do you?
A. Say that again.
Q. I said you don't believe that Steve Rossetti blew the whistle and stopped this game to stop your protest, do you?
A. I don't know.
Q. You don't know, do you?
A. I don't know the facts behind it, but it seemed suspicious.
Q. Yeah, you've alleged it, but you don't know, do you?
A. It would be speculation.

Q. Yeah, it probably is.
A. I'm not in his head.
Q. If he was a really good co-conspirator, he would have come and pulled the wristband off your vuvuzela, wouldn't he, but he didn't do that?
A. I don't understand the question.
Q. Yeah, I didn't think you would.
MR. CULLEN: Vuvuzela.
MR. DUCHARME: Vuvuzela. Excuse me.
A. No, no. I understood that part.
Q. You saw that he reacted to a commotion on the sideline, right?
A. Did he react to the commotion on the sideline before or after that? Yeah.
Q. Weren't you there?
A. I was there, but I don't know. Was it enough to see? I don't know.
Q. Or hear?
A. I mean, if I was watching the game watching for fouls on the field, I don't know if what happened on the sideline was enough to trigger --
Q. Well, to that end, you don't know what referees are trained to do when there is a commotion on the sideline, do you?
A. Well, I'm not a referee, no.

Q. Are you saying to the Court that you think what was going on and shown in the videotape, the body cam tape with Mr. Fellers and Mr. Desilets, was like a nice, friendly, quiet conversation?

A. I think a police officer and four people huddled around one individual would probably indicate something is going on.

Q. A bit of a commotion, right?

A. Well, somebody was creating one, yes.

Q. Yeah. Well, again, whoever was creating it, Mr. Rossetti didn't blow his whistle and come over until after that commotion, correct?

A. I don't know why he blew his whistle or what caused him to.

Q. I didn't ask you if you know why. I asked about when. You were there and you've seen the body cam video. It happened after the commotion, didn't it?

A. There were people on the sidelines, yes.

Q. Do you not understand my question or would you rather just not answer it?

A. I don't know if the commotion caused him to come over. I don't know if there was enough --

Q. I'm asking about the sequence of events.

Isn't it correct that he blew his whistle and got involved after the commotion? A simple question.

A. The discussion with Mr. Fellers, yes.
Q. Okay. From there forward you observed that the officer and Mr. Desilets and Mr. Fisk finished their doings with Mr. Fellers and he left, correct?
A. Kyle was rejected from the game.
Q. But you watched it all happen?
A. We just did, yes.
Q. You watched it that day, too?
A. Yes.
Q. And then the focus became Mr. Rash, correct?
A. Yes.
Q. And then you saw that at the end of that when the large coach whose name I have forgotten -- Mr. Burke, I think.
A. Ben Forbes.
Q. Forbes. Mr. Forbes radioed Mr. Desilets, and that once Mr. Rash's wristband came off Mr. Desilets said, okay, we're going to play?
A. Yes. I assume, yes. He went to Mike and said, Mike, the wristband is off, or something to that effect, yes.
Q. All right. Thank you.
THE COURT: Any redirect?
MR. KOLDE: Very brief, your Honor.

REDIRECT EXAMINATION

BY MR. KOLDE:
Q. Mr. Foote, we met the other day and you saw some

photographs of vehicles with political and other bumper stickers that were -- that you had gathered for us; is that correct?

A. Yes.

Q. All right. And I'll represent to the Court and the parties that we're talking here about the photographs that are agreed admitted Exhibits 27, 28, 29, and 30. It's a gray car with political bumper stickers, a black car with political bumper stickers, a blue car with political bumper stickers, and a silver car with political bumper stickers.

Have you seen those vehicles parked on Bow School District property?

A. I have.

Q. Okay. I don't want to replow all the ground with the e-mail that you sent to Mike Desilets the morning of the game with Plymouth, that is, the morning of September 17, the morning that you also added XX to the wristbands, but what were you hoping to get from -- it's fair to say that you were concerned about what you called a lack of leadership; is that correct?

A. Correct.

Q. What were you hoping to elicit from Mike Desilets or the other Bow officials that you weren't getting that was contributing to your frustration?

A. Not a single person in the administration ever had

any conversation with a parent, with the team, the coaches didn't, nothing had ever happened. This was just like we're just going to play the game the way it is. I wanted to have a discussion.

Q. You wanted to have communication?

A. Yes.

Q. And did Mike Desilets try to communicate with you?

A. No.

Q. Marcy Kelley?

A. No.

Q. Mr. Cullen asked you about people coming and grabbing the wristbands out of the bag.

A. Yes.

Q. And, again, I just want the record to be clear. Did you see anyone on the sidelines at that game on September 17th, any adult, anyone else, wearing one of the NAD wristbands?

A. I did not.

Q. Okay. Mr. Cullen asked you about the signs you want to display, okay, and so language is important.

Are you wanting to display a sign like the Riley Gaines sign that you had displayed on your car on September 17th?

A. Yes. Similar signs to that and the ones that are in the Facebook post.

Q. All right. I need you to be very specific, Mr. Foote, because this is very important.

What do you mean by that?

A. In respect to the signs, I want to be able to post signs that support protecting women in women's sports.

Q. All right. So you're not just asking to be able to display random political messages about other topics?

A. No, no. In this instance, no, not at all.

Q. Okay. And are you asking to display signs that name trans players?

A. That was not my intent. You can see from my signs I didn't even try that. That was not it.

Q. Just answer the question.

A. No.

Q. Okay. Are you asking to display signs that say harassing things about trans players?

A. No.

Q. Okay.

MR. KOLDE: Nothing further, your Honor.

THE COURT: All right. I have a few, if you don't mind.

I have to decide this, and it's a complicated issue. It's nuanced. It's not easy.

I think I understand Mr. Feller's position and your position.

MR. KOLDE: Your Honor, I can barely hear you. I'm sorry, your Honor.

THE COURT: I'm sorry.

I think I understand your position and Mr. Fellers's position to be we oppose people classified at birth as males, boys, from participating on female girls' high school sports teams. That's your view?

THE WITNESS: Yes. Yes. Generally speaking, yes.

THE COURT: And a lot of people hold that view. Obviously, the legislature passed a statute to that effect which the governor signed.

But I'm curious about you say you were not protesting. Now, back when I was young people protested the Vietnam War. If you asked a protester, they might say I'm not protesting the war. I'm supporting peace. I don't see a difference there.

And you're saying I'm not protesting that a transgender student is playing on a girls' team. I'm supporting girls' sports.

Is there a distinction there that you can draw that's meaningful? You're against transgender girls playing on girls' sports teams?

THE WITNESS: I'm against women having to compete against biological males.

THE COURT: Same thing, right? I support women's

sports in that I oppose transgender girls playing on girls' sports teams. Is that fair?

You want to say it's got nothing to do with directing harassment or heckling or denigrating trans girls, it's got to do with supporting girls' sports teams that are biological girls, right?

THE WITNESS: Well, there's a lot more to it, your Honor, and I --

THE COURT: Well, tell me about it then.

THE WITNESS: Well, I don't want to get in too deep.

THE COURT: Get as deep as you like.

THE WITNESS: It comes down to the bottom line of the dignity, the safe places, the awards, the varsity teams. It comes down to girls losing what they fought for. My daughter played for 13 years.

THE COURT: Losing unfairly because of what?

THE WITNESS: Genetically, boys are more stronger, faster, recover faster, and it's just not fair to a girl who's fought her entire life to get to a place of captain on a soccer team to potentially lose that seat because now a boy is on the team who beats them out.

THE COURT: Yeah, so the problem is -- in your position the problem is that transgender girls are on the team or are participating in the sport.

THE WITNESS: Well, there's more to it than that also, sir.

THE COURT: Well, tell me.

THE WITNESS: No one has had a conversation in the entire state of New Hampshire about the issue.

In the military you have standards. You set standards for anything, whether it's passing a PT test, whether it's your height and weight, you have standards on how you would evaluate things.

There is not a single standard other than the fact that Parker Tirrell identifies as a female and now he can play on the team, and that's dangerous. My signs, as you can see, were for protecting women that had been hurt. These were all examples of either a loss of a title or a loss of physical injury, and the only time anything is done is when that happens.

THE COURT: So do you not agree that wearing the pink wristband with the XX was your way of communicating I oppose the transgender girl playing on this girls' sports team?

THE WITNESS: That's one way of looking at it.

THE COURT: Tell me why that is. Because that's the normal way to look at it.

THE WITNESS: Well, I looked at it because I have a daughter on the team who's fought for 13 years, and I'm

supporting her and her accomplishments.

THE COURT: Yes, but you're supporting her by opposing what you think is getting in the way of her fair competition, right?

THE WITNESS: I suppose that's another way to look at it.

THE COURT: Well, I notice that you -- and here's the problem. It's the message. What message is being sent by this protest? What's the message? And I know you probably sincerely think I'm not sending a harassing, demeaning, degrading, exclusionary message. I'm sure you in your mind think I'm just stating my legitimate position on a controversial social political issue, right?

THE WITNESS: Well, I wasn't, like, saying I hate trans. That's for sure.

THE COURT: That's what I mean. You don't think that.

But here's the thing. You don't wear those -- first of all, you haven't really -- you've done it a little bit. Mr. Fellers didn't at all. You refer to Parker Tirrell as he, or you refer to transgender girls playing on these teams as boys. Like you seem to go out of your way to suggest that there's no such thing as a trans girl or you don't accept it, you don't recognize it. Is that part of your position?

THE WITNESS: No. That's just like when you're

learning a new language.

THE COURT: Okay.

THE WITNESS: I'm sorry if I --

THE COURT: All right. So here's the thing. You're wearing this statement of your political issue on this issue just at school activities. Is there any evidence -- do you wear it to Walmart? Do you wear it to work? Do you wear it to church? Do you wear it anywhere else?

THE WITNESS: The time we're wearing it now is a chance where it actually applies.

THE COURT: But the question is do you wear it anywhere else.

THE WITNESS: I do. Yeah, I've had it on my Jeep on the dashboard.

THE COURT: Do you wear it anywhere?

THE WITNESS: Oh, do I personally wear it?

THE COURT: Yeah, other than at the school activities. It seems like it's only school activities.

THE WITNESS: No. I've had it on around Concord.

THE COURT: You have?

THE WITNESS: I have.

THE COURT: What's the audience that you're trying to reach with your protest? What's the audience? Is it the kids playing, is it the teachers and administrators, is it the other parents, or is it the public in general? What is the

audience?

THE WITNESS: Those that support House Bill 1205.

THE COURT: Okay. So you're going to the school events where these issues arise because there's school athletics, and your audience is people that also might support the bill that you support?

THE WITNESS: If I was wearing it outside of a school activity, it would be the other parents that support the same issue.

THE COURT: Your counsel made a point of asking you about the supposedly harassing, trans-exclusionary pink XX wristband. Now, supposedly harassing, that's an effect question, is it harassing in effect. I gather your view is I was certainly not intending to harass a transgender player, right?

THE WITNESS: No. Not at all.

THE COURT: But trans-exclusionary, that is consistent with your protest. That's what you want to have happen, right? You want trans girls not playing on girls' sports.

THE WITNESS: I want an open discussion about how we do it.

THE COURT: So you weren't protesting the fact that trans girls were allowed to play on girls' teams?

THE WITNESS: My honest at the start was a fear

that somebody is going to get hurt.

THE COURT: No, no, no. But the cause of -- your fear of someone getting hurt is because in your view allowing trans girls to play on girls' teams will result in injury.

THE WITNESS: My fear is all the things I've spoken of, yes. At some point there will be some sort of injury, whether it's physical, whether it's mental, whether it's something else.

THE COURT: Sure. So the object of your protest was I don't like the fact that a trans girl is playing on a high school girls' team?

THE WITNESS: Well, the bigger one is I didn't like the fact my daughter was forced to play without even being asked. It was not her choice.

THE COURT: So you weren't protesting the fact that a trans girl was allowed to play on a girls' team?

THE WITNESS: I was supporting my daughter's female sport. I wasn't -- I know you're saying it's not that way.

THE COURT: Well, we went around that circle, but you're supporting her by saying I support you by taking the public position that trans girls should not be allowed to play against you. It's all about the trans girls playing on girls' teams, isn't it?

THE WITNESS: You're not going to -- honestly, if there wasn't a trans girl trying to play on a girls' team, it

wouldn't be an issue. You're right.

THE COURT: All right. The answer is right. That's what you're protesting against.

Okay. So trans-exclusionary, that's not something you walk away from. That's what you want to see and you want that to happen, trans girls excluded.

Pink associated with female is girls, right?

THE WITNESS: Yes.

THE COURT: XX, the female chromosome, right?

THE WITNESS: Yes.

THE COURT: And did it ever occur to you that someone who is trans who's playing on a girls' team might see that XX wristband that's pink under these circumstances as sort of a statement that there are only two genders, boy, girl, you know, female, that there aren't legitimate transgenders, that maybe people who identify as trans are not valid as human beings, you know, that sort of thing? Did it ever occur to you that somebody might see it that way?

THE WITNESS: Honestly, I thought of it as if he's a trans female, then pink might be a color he likes. I don't know. The XX could be taken another way. I don't know.

THE COURT: So you didn't think that way?

THE WITNESS: I didn't. I didn't spend that much time thinking about that, no. That wasn't my concern.

THE COURT: Okay.

THE WITNESS: It was safety. Really it was safety of female and female sports. Everything I've ever said is based upon that.

THE COURT: Okay. And I got the impression -- again, you're entitled to your viewpoint, and a lot of people hold it. Don't take this as criticism. You're entitled to have that viewpoint.

I guess the other -- the last thing I guess I wanted to ask you was from your testimony I got the impression -- I think maybe Mr. Ducharme asked you the questions, or maybe it was Mr. Cullen.

When you went to the game that day, you fully understood that when you pulled those armbands out and put it on, there was likely to be a confrontation or a reaction. I don't mean violent or anything, but you understood the school having issued what it issued, somebody was going to come up and say that's a problem. That's why you didn't put it on till after the first half. That's why you --

THE WITNESS: I won't argue that. I suspected something would happen.

THE COURT: All right. Again, these are complicated issues and nuanced issues, and sometimes a message is sent that you didn't intend, and sometimes that's the issue, not that you were there to specifically harass a particular student or cause mental anxiety or stress or

suffering or anything like that, but sometimes the message you think you're sending might not be the message that's being sent.

All right. Any questions based on mine?

MR. KOLDE: Yes, your Honor.

FURTHER EXAMINATION

BY MR. KOLDE:

Q. Mr. Foote, did the armband, excuse me, the wristband to you have more than one meaning or only one meaning?

A. I'm not sure if I understand the question. One meaning as in I support women's --

Q. You did not intend to harass or intimidate a transgender --

A. Yes, I did not at all.

Q. Listen to my question carefully. Listen, please.

Did the wristband to you that you were wearing --

A. Yes, sir.

Q. -- have only one meaning or did it have more than one meaning?

A. To me it had one meaning.

Q. What was the one meaning?

A. I was supporting women's sports.

Q. Okay. Do you know what it meant to Kyle Fellers?

A. As far as I know, it was the same.

Q. No. Do you know what it meant to Kyle Fellers?
A. No. I don't know exactly what it meant to Kyle Fellers.
MR. KOLDE: All right. Thank you. Nothing further.
THE COURT: Thank you. Any others?
MR. CULLEN: No, your Honor.
MR. DUCHARME: No, your Honor.
THE COURT: All right. It's 4:20. Why don't we stop.
Any possibility we're going to finish evidence tomorrow?
MR. CULLEN: I would hope we would finish tomorrow.
MR. KOLDE: We have one tomorrow.
I mean, we're just doing a PI motion, right, your Honor? Oh, when we're going to finish evidence?
THE COURT: Yeah. How many witnesses?
I'm sorry. You can step down if you would like.
THE WITNESS: Thank you, sir.
MR. KOLDE: We're not going to call Ms. Foote unless something comes up that we don't expect. We're going to call Eldon Rash, and then our direct case will consist of calling Marcy Kelley and Mike Desilets.
THE COURT: Is it Desilets?
MR. KOLDE: Desilets, sorry.

And we're not planning on calling Matt Fisk unless something changes. And we're not entirely sure about Rossetti, but at this point we're still planning on calling him.

So I would expect that we would be done in the morning, mid morning sometime.

THE COURT: Oh, mid morning is fine.

MR. KOLDE: Lawyers are notoriously bad about estimating.

THE COURT: Mr. Cullen, how many witnesses do you have?

MR. CULLEN: So mid morning seems a little ambitious, but really other than the witnesses he's named, that's all, except we might call Matt Fisk if he does not. I don't think -- at this point I don't anticipate anyone else from our list being called.

So, in other words, I would cross-examine my own witnesses after they've been directed by --

THE COURT: Good. And how long do you think? You're saying mid morning is optimistic.

MR. CULLEN: Well, I think I'll be 45 minutes at the most, maybe 45, 35 minutes with Ms. Kelley. Attorney Shirley is going to handle Mr. Desilets, but I would say that's probably a fair estimate.

MR. KOLDE: Double it.

MR. SHIRLEY: I would say 30 minutes.

MR. CULLEN: Yeah, so we're thinking 30 to 45 minutes per witness from our discussion.

THE COURT: Mr. Ducharme?

MR. DUCHARME: Your Honor, there is a tiny chance I would call the head referee, Mr. Murphy, but he would be ten minutes at the most.

THE COURT: Okay.

All the damages claims are gone, right? There's a conspiracy claim.

MR. KOLDE: The nominal damages are still in, your Honor, for past harms.

THE COURT: Conspiracy and retaliation?

MR. KOLDE: Conspiracy and retaliation, and the nub of the case is still viewpoint discrimination.

There is an overbreadth claim, your Honor, that I think we can set to one side at the moment. That is this designated protest area gimmick that they -- in our view a gimmick, they may disagree, that they imposed after we filed the case. They have told me -- counsel has told me, well, we're getting rid of that.

THE COURT: It's in his brief.

MR. KOLDE: It's in his brief, but that's just a representation. There's so far no actual evidence. There's been nothing in writing issued, there's been no e-mail sent

out, you know, indicating that.

And from our standpoint as far as the lawsuit is concerned, that's not moot because that's voluntary cessation and it's just playing games.

But for the preliminary injunction, I think that's -- you know, that's not as important, and we're not planning on focusing on that for the remainder of the hearing.

THE COURT: Okay. Understood.

All right. I'll see you tomorrow morning at 9:30.

(Hearing adjourned at 4:25 p.m.)

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.

Submitted: 12-2-24 /s/ Susan M. Bateman
SUSAN M. BATEMAN, RPR, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| KYLE FELLERS, ET AL | * | |
| | * | 24-cv-311-SM-AJ |
| v. | * | November 22, 2024 |
| | * | 9:38 a.m. |
| MARCY KELLEY, ET AL | * | |

* * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF EVIDENTIARY HEARING
DAY TWO - MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Plaintiffs: Endel Kolde, Esq.
Nathan John Ristuccia, Esq.
Brett Robert Nolan, Esq.
Institute for Free Speech

Richard J. Lehmann, Esq.
Lehmann, Major, List, PLLC

For the Defendants:

(SAU 67, Superintendent, et al) Brian J.S. Cullen, Esq.
Jonathan M. Shirley, Esq.
Cullen, Collimore, Shirley, PLLC

(Steve Rossetti) Dennis T. Ducharme, Esq.
Ducharme Resolutions, PLLC

Court Reporter: Susan M. Bateman, RPR, CRR
Official Court Reporter
United States District Court
55 Pleasant Street
Concord, NH 03301
(603) 225-1453

# I N D E X


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ELDON RASH: | | | | |
| By Mr. Ristuccia | 7 | | | |
| By Mr. Cullen | | 17 | | |
| By Mr. Ducharme | | 20 | | |
| MARCY KELLEY: | | | | |
| By Mr. Kolde | 24 | | 79 | |
| By Mr. Cullen | | 69 | | 82 |
| MIKE DESILETS: | | | | |
| By Mr. Kolde | 83 | | 108 | |
| By Mr. Shirley | | 94 | | |
| By Mr. Ducharme | | 107 | | |

| EXHIBITS: | FOR ID | IN EVD |
|---|---|---|
| Defendants' Exhibit K. | | 3 |
| Plaintiffs' Exhibit No. 15. | | 5 |
| Plaintiffs' Exhibit No. 31. | | 6 |
| Plaintiffs' Exhibit No. 35. | | 51 |

P R O C E E D I N G S

THE CLERK: The Court is in session and has for consideration an evidentiary hearing, day two, in the matter of Kyle Fellers et al. versus SAU 67, Superintendent, et al., civil case number 24-cv-311-SM.

THE COURT: All right. Good morning.

Mr. Kolde, you may call your next witness.

MR. KOLDE: Thank you, your Honor.

We do have a quick preliminary matter to address that Mr. Cullen has asked for, and I'll chime in after that as well.

MR. CULLEN: Just a couple of exhibit issues, your Honor.

We had asked, and plaintiffs' counsel agreed, that we could submit the e-mail that we presented to Mr. Foote at the beginning of his testimony yesterday as Exhibit K for the defense, and it's not objected to.

THE COURT: All right. It's marked K?

MR. CULLEN: It's marked K.

THE COURT: All right. The ID may be stricken on K. Anything else?

(Defendants' Exhibit K Admitted)

MR. KOLDE: Your Honor, there was some discussion about -- may I approach the exhibits over there, your Honor?

THE COURT: Of course. My practice is counsel are

free to move anywhere at any time is fine.

MR. KOLDE: Thank you, your Honor.

So, your Honor -- I'll wait till I get to the microphone. One of the plaintiffs' premarked exhibits for ID only was Exhibit 15. That's a call record, actually two call records we received from the Bow police in response to RTK. Actually, my clients' had sent that prior to the filing of the litigation, and there's agreement that the first call record is relevant and admissible.

We don't know much about the second call record. So the parties have agreed to just withdraw the second page of the call record. It's somebody --

THE COURT: What's it being offered for? Do you know?

MR. KOLDE: Just for a record of what happened and what --

THE COURT: It's not in dispute, right?

MR. KOLDE: Yes. The first record is not. The second one --

THE COURT: No, I mean the facts are not in dispute?

MR. CULLEN: They're not in dispute, but we don't have an objection to 15 at this point.

THE COURT: ID is stricken on 15.

MR. CULLEN: I was objecting to the second page

because it --

THE COURT: What's the objection?

MR. CULLEN: Well, the objection to page 2 is it's a -- it's not related to this at all. We don't know who the caller is. I shouldn't say it's not related to this.

If your Honor were to see it, you would see that it's a call that came in handled by a Harry Handy who's a sergeant at the Bow Police Department. It has to do with a call that came into dispatch. It never got to any of the parties here. I don't see it as having any relevance.

THE COURT: Me either. So what's the problem?

ID may be stricken on 15.

MR. CULLEN: You're going to just let both pieces in? Okay.

THE COURT: It's not going to tip the scales one way or another.

MR. CULLEN: That's fine. If it's easier for you, your Honor, it's fine.

THE COURT: If we spend two, three minutes on every irrelevant issue, we'll be here for weeks, and that's a problem.

(Plaintiffs' Exhibit No. 15 Admitted)

MR. KOLDE: Your Honor, Plaintiffs' 31 is the Senate Education Committee report about the testimony regarding the bill, and I forget the bill number, but it

was -- 1205, the bill that was enjoined about trans players playing in --

THE COURT: 31 is marked for ID?

MR. KOLDE: It's marked for ID, correct, your Honor.

THE COURT: Do you want to offer it as a full exhibit?

MR. KOLDE: We do want to offer it as a full exhibit not for the truth of the matter asserted but just for --

THE COURT: Is there any objection?

MR. CULLEN: There was. That's why it's for ID, your Honor. We object to just 31 pages of hearsay testimony from different people for and against the bill.

THE COURT: Objection overruled. ID may be stricken on 31. I'll take it for what it's worth.

(Plaintiffs' Exhibit No. 31 Admitted)

MR. KOLDE: All right. Thank you, your Honor.

And at this point Nathan Ristuccia is going to take over the next witness, your Honor, and we call Eldon Rash.

THE COURT: All right.

Mr. Ristuccia, whenever you're ready.

ELDON RASH

having been duly sworn, testified as follows:

THE CLERK: Please state your full name for the

record.

THE WITNESS: Eldon Rash.

THE COURT: Whenever you're ready.

DIRECT EXAMINATION

BY MR. RISTUCCIA:

Q. Mr. Rash, where do you live?

A. In Bedford, New Hampshire.

Q. Do any of your family members attend Bow School District schools?

A. Yes. My granddaughter in high school and my grandson in middle school.

Q. And these two grandchildren, are they related to another plaintiff?

A. Yes. Kyle Fellers is our son-in-law -- or former son-in-law, if you will.

Q. Do your grandchildren play any sports on Bow School District teams?

A. Yes. Both of them.

My granddaughter plays soccer and also swim.

My grandson runs cross-country and plays baseball and skiing and stuff.

Q. Are they involved in any other Bow School District extracurricular events?

A. Yeah. They have been in the music program. My granddaughter isn't anymore, but my grandson played violin,

and we go to the spring concerts and things like that.

Q. Do you attend Bow School District games that your grandchildren are playing in?

A. Yes. Mostly home games. Once in a great while away games. Especially playoff games.

Q. Did you attend the September the 17th game at issue?

A. Yes, I did.

Q. Until this September 17th game, were you aware of the issue around transgender athletes in women's sports?

A. I was aware of the controversy nationwide. I was not aware of anything going on at that particular game.

Q. Did you know that some parents would be wearing wristbands at that game?

A. Not at all.

Q. Did you know that any parent would be displaying signs at that game?

A. Not at all.

Q. What did you do when you first arrived at the game?

A. My wife and I, as usual, we find a place relatively close to centerline and take our lawn chairs and sit there and watch the game.

Q. When during the game did you become aware of protests occurring?

A. About ten minutes I guess into the second half.

Q. During the first half and in the first ten minutes of the second half, had there been any disruptions?
A. None at all.
Q. Any shouting?
A. None at all.
Q. Anyone holding signs by the sidelines?
A. Certainly not that I saw.
Q. Did you observe Bow School District officials interacting with Kyle Fellers?
A. Yeah. Mostly from behind me. I didn't see everything, but I heard a commotion at first.
Q. What happened after you heard the commotion?
A. Well, Kyle had kind of, as he sometimes does, put his hands down on our chair and kind of leans on the back of the chair, and I just kind of turned a bit and my wife also asked, we asked what's going on, and --
Q. And what did Kyle tell you?
A. He said these people didn't want him wearing this wristband, and I asked kind of why, and he said it was a protest of males, biological males in women's sports.
Q. How did you respond to that information?
A. I said -- of course it had the breast cancer ribbon, and being the age I am from the '70s and things like that, it was obvious that it was a breast cancer wristband, and so I said what -- why would they do this, and so then I

took it from him and put it on.

Q. At the time you put the wristband on, did you notice two Xs on the wristband?

A. No.

Q. What did you think the message of the wristband was?

A. Well, of course the old-time message was, it was breast cancer, but of course Kyle did say that it was some sort of protest of having biological males on the women's teams.

Q. Why did you put the wristband on?

A. Because it was an innocuous type of a demonstration. If you want to start protests, it's basically just showing that that's their position, and it was like it was an obvious taking away of any speech rights whatsoever.

Q. What did you wish to express by wearing the wristband?

A. Well, of course I'm not particularly in favor of biological males on women's sports. And I like to protect women, whether it's my granddaughter or in general, for fairness as well as safety issues, but my main reason was because I thought they were obviously violating their First Amendment rights.

Q. Why was concern about violation of First Amendment rights important to you?

A. I think that should be important to everyone because that's the foundation of our principles as a nation. Plus the fact that's the only way people learn is from hearing these types of things. People who try to stop that are really trying to stop people from hearing more than they're trying to stop the speech. That's my position on that.
Q. Did the wristband then have one meaning or multiple meanings to you?
A. It has multiple meanings depending on time. If it would have been a couple weeks later, that's breast cancer month. That's why these mixed messages and things, that's why I think there was terrible overreach in this case.
Q. Did you do anything to draw attention to the fact that you were wearing a wristband?
A. Not particularly. I have a little bit of a neck issue so I do lean on the arm of the chair quite a lot and have it up like this. I didn't know there was Xs there, but it was I would say somewhat visible, but I don't know that anybody really saw it other than maybe the referee or something or somebody who obviously were watching, in other words, looking for this type of thing.
Q. Did you shout or point to the wristband?
A. Not at all.
Q. Did anyone come up to speak to you about the band?
A. Yes. Mr. Fisk at first at least came up and said

take it off.

Q. Did you know who Mr. Fisk was at the time?

A. No. I know none of them from Adam.

Q. Did you believe that he was an official or a spectator or something else at the time?

A. I didn't know whether -- what he was for sure. Ordinarily you might assume it could be an official, but from something that was said about that time gave me terrible pause, and that thing that was said kind of behind me was that this is, and to Kyle Fellers, was this is private land, and that's absolutely ridiculous. I could not imagine any school official even saying anything like that.

So I didn't know him.

Q. What did Mr. Fisk say to you?

A. Take it off.

Q. Did he mention any adverse consequences that could happen if you did not take it off?

A. A little bit later on. Because we went through that many times over almost fifteen minutes. Later on he basically said that my granddaughter would have adverse things happen to her. Now, he didn't specify what.

Q. Did you have any sense of what those consequences would be?

A. Well, he did kind of say that they would be forfeiting the game.

Q. What happened to the game itself at the time?
A. Well, it was going on for quite some time there. About halfway through they had a little conference and -- well, they shut it down and had a conference.
Q. And then did anyone else speak to you about the band?
A. Well, Mr. Fisk came back up at that time and went through this whole scenario again, take it off, and I said, no, I see no reason to take it off, and a few other comments back and forth.
Anyway, at the end they walked off and had another conference midfield, and then I guess it was Mr. Rossetti, I didn't know his name at the time, but he walked over very incensed and he says, take it off or we're going to shut the game down. And of course shutting down obviously means that it's going to be forfeited, but he also was really berating me.
Q. Did you say anything back to Mr. Rossetti?
A. Only that, no, I wouldn't take it off. I didn't see reason to take it off.
Q. Did any spectators say anything to you at this time?
A. Not until Mr. Rossetti walked back and they kind of had another conference.
But, anyway, then there were some people off to my

right, a couple of women, if I remember right, were shouting, just take it off, this is about the girls, write a letter, whatever.

Q. Did you eventually remove the wristband?

A. Yeah. I could see this final conference and from what they were saying that they were going to shut it down. When they had left the last time, they said you're shutting it down, and both me and my wife yelled back at them as they were leaving that, no, we weren't shutting anything down. We hadn't done anything. You are shutting it down.

Q. How long total would you say you wore the wristband?

A. I think we were sitting there close to fifteen minutes.

Q. And you took it off because of what had been said to you by Mr. Fisk?

A. Yeah. That was the main thing is that I didn't really have an intention of causing my granddaughter an inability to have playoff games and that kind of thing.

Q. Did you take it off in response to what Mr. Rossetti said to you?

A. Not really. I almost -- because of their attitude, I almost wasn't going to take it off at all, but I thought better of it.

Q. What did you do with the wristband after you

removed it?

A. I placed it on my knee in a very visual place for anybody to see.

Q. Was it still visible then?

A. Yes.

Q. How long did it remain on your knee?

A. Until the game was over. About 20 minutes or so.

Q. And during that time did anyone tell you to put it away?

A. No.

Q. Did anyone tell you to make sure it was not visible?

A. No.

Q. So for approximately 20 minutes it was simply visible on your knee?

A. Yes.

Q. What happened after the game?

A. Well, because of all the uproar, we decided we would just sit there for a while and let people leave or at least a fair number of them and until our granddaughter came across afterwards, but there was a couple of people at least that came up and said, they were really rude to you, we support you, that type of thing. We just thought it would be a good idea to wait, and then we left when my granddaughter came over.

Q. Did any Bow School District officials interact with you after the game?

A. No one interacted with me after the game other than those individuals that said that they supported it.

Q. In the days after the game were you contacted in any way by Bow School District officials?

A. No.

Q. Have you attended any Bow events since September the 17th?

A. Yes. We've attended all of the home games and the playoff games except for the 24th.

Q. Did you protest or wear a wristband to any of those events?

A. No. I had no intention of having any blowback on Kyle, because he had told me afterwards that he had received the order.

Q. Do you intend to go on attending events in the future?

A. Yes.

Q. Would you like to protest at these future events?

A. Absolutely.

Q. What will you do at these events, if you are allowed, in protest?

A. Just wear the wristband. I mean, it's a relatively minor thing. It's only slightly more than I'm a Christian and

wear a cross sometimes or whatever, and so it's just stating your position that you're against biological males, and it really was a made-up symbol anyway as far as I can tell because I've never known about that type of a protest before anywhere else.

Q. Why haven't you worn a wristband at any event since?

A. I didn't want to make any trouble or get an order against us to not attend.

Q. Thank you. That's all for now, Mr. Rash.

THE COURT: Mr. Cullen.

MR. CULLEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CULLEN:

Q. Good morning, Mr. Rash.

A couple things you mentioned on your direct just now. You mentioned that somebody had made a comment that this is private land and that's really what caught your attention.

Do you recall that?

A. Yes.

Q. Okay. And having seen the video yesterday and I'm sure during prep and things, you know that that was not by a school official. That was by Lieutenant Lamy, right?

A. I would assume so. I don't think there was any direct shot of Mr. Lamy, but voice-wise probably.

Q. You certainly don't have any basis to say that it was specifically made by any Bow School District employee, right?

A. Well, my assumption is that they all are presenting this whole case. In other words, they're all together. They're the ones that called him, apparently.

Q. I'm sorry, Mr. Rash. My question was, you don't have any basis to believe that that statement was made by a school district employee.

A. I do not have any direct basis for that, no.

Q. Thank you.

You mentioned also that you didn't -- you never saw the XX symbol on the wristband, right?

A. Not at that time, no.

Q. When did you first see the XX symbol?

A. Actually, it's when we got back to the parking lot and Kyle mentioned it, and of course I wasn't necessarily thinking about biological males at the time and it looked like a --

Q. Sir, I'm sorry. This will go a lot faster if you just answer the question as it is.

When the wristband was on your knee then, obviously it was not XX up, right, or you would have noticed that?

A. Right. It wasn't.

Q. Okay. And you didn't plan to wear the wristband at

events you said, right?
A. For that event?
Q. For that day?
A. No.
Q. Okay. You never got a no trespass order?
A. No.
Q. You didn't miss any games as a result of any actions by the school district?
A. I missed the next game because it was made pretty clear that if Kyle got one and Andy got one, that we could get one at any time.
Q. But you hadn't had one at that time?
A. But, no, we hadn't had one.
Q. And in fact you never got one?
A. No.
Q. And, incidentally, yesterday you heard Mr. Fellers -- on the video you see Mr. Fellers telling the police officer that he's giving you and your wife a ride home.
Do you remember that?
A. Yes, I do.
Q. And that wasn't true, right? You came on your own and you were leaving on your own, right?
A. Well, I understand that in the heat of --
Q. That's not the question, sir.
A. I know, but it was --

Q. Was it right or was it not right?
A. It was not true.
Q. Thank you.
A. Because he was --
MR. CULLEN: I don't have any other questions, your Honor.
THE COURT: All right. Thank you, Mr. Cullen.
Mr. Ducharme.

CROSS-EXAMINATION

BY MR. DUCHARME:
Q. Mr. Rash, it's pretty clear from your testimony that you didn't go to this game planning to be involved in a protest, correct?
A. Right. I didn't have a plan at the beginning.
Q. And I take both from your testimony today and from the declaration that you signed that was filed in the case in support of the motion for injunction that this in great part was almost a reaction on your part to show in essence solidarity with Mr. Fellers because you didn't like the way he was being treated, correct?
A. Well, it was the fact that he was trying to protest or have his position shown, and I felt it was a violation of his rights, yes.
Q. And it was sort of a response to the situation that you made on the fly, correct?

A. Well, pretty much.
Q. Yeah. No question you heard a commotion behind you that led to eventually you making the decision to put the wristband on once you knew what was going on?
A. Yeah. That was the start of it.
Q. Yeah. And there was a commotion?
A. It wasn't a loud commotion because I couldn't hear the words.
Q. Okay. You don't know Mr. Rossetti from a hole in the wall before that day, correct?
A. I vaguely remember him as a referee on a former game, but as far as a name or anything else, no, I had no idea.
Q. And how many times have you watched that body cam video that shows his interaction with you?
A. Maybe three times.
Q. The words you used today are that Mr. Rossetti was incensed and that he was berating you, correct?
A. Yes.
Q. Those are your subjective interpretations, correct?
A. Yes, but pretty obvious.
Q. To you, correct?
A. It would have been to almost anybody, but yes.
Q. Well, we'll let the Judge decide how he sees it.
A. Yes, let the Judge decide.

Q. And last, you told your counsel that your decision to take the wristband off that day was not really in response to what Mr. Rossetti said to you, correct?
A. Only indirectly in that when he said that the game would be over and Mr. Fisk said they could forfeit the game, those two things together is the reason I took it off.
Q. And the -- you are equating to some extent game over and forfeit, correct?
A. Yeah. It seemed obvious to me, and that's why I reacted the way I did.
Q. But you don't know by rule if game over with 23 minutes left equals forfeit, do you?
A. By rule?
Q. By rule.
A. Probably not.
Q. Okay. Thank you.
THE COURT: All right. Any redirect?
MR. RISTUCCIA: No, your Honor.
THE COURT: I have just a few, if you don't mind.
I appreciate your testimony, but you said Kyle Fellers said that the pink wristband display or wearing was some sort of protest of having biological males on women's teams. Is that how you understood the message of the pink wristband?
THE WITNESS: Yes.

THE COURT: All right. And you also said it was an innocuous type of demonstration. Did you understand this was some sort of message of an objection to the transgender player?

THE WITNESS: No.

THE COURT: Okay. What did you understand the message to be?

THE WITNESS: That it was the message of generally that we were against having biological males on women's teams because of safety reasons and the other issues involved with that.

THE COURT: All right. And were you aware that there was a transgender student playing on the opposing team that day?

THE WITNESS: Not specifically. However, when he said the message that it had, I was assuming there was a transgender player somewhere. I had no idea whose team or what.

THE COURT: But on a team as opposed to in the audience?

THE WITNESS: Yeah. Well, I wasn't even positive if it wasn't somebody on the sidelines.

THE COURT: So when you went to the game, you didn't have any idea at this game there would be a transgender student playing?

THE WITNESS: Right.

THE COURT: Okay.

Any questions based on mine?

MR. CULLEN: No, your Honor.

MR. RISTUCCIA: No, your Honor.

THE COURT: I apologize. I keep looking at Mr. Kolde because he's lead counsel.

Thank you, Mr. Rash. Appreciate it. You may step down, and you're excused as a witness.

Mr. Kolde, you may call your next witness.

MR. KOLDE: The plaintiffs call Marcy Kelley.

MARCY KELLEY

having been duly sworn, testified as follows:

THE CLERK: Please state your full name for the record.

THE WITNESS: Marcy Kelley.

DIRECT EXAMINATION

BY MR. KOLDE:

Q. Good morning, Ms. Kelley.

A. Good morning.

Q. Have we met before?

A. I think just here.

Q. Okay. Just so we understand, you're the superintendent of the Bow public schools?

A. I'm the superintendent of SAU 67, which is Bow and

Dunbarton School Districts.

Q. And that makes you essentially the CEO of those schools; would that be fair to say?

A. Yes.

Q. And you answer to the school board; is that correct?

A. We have three school boards, yes.

Q. Okay. And the three school boards are Bow, Dunbarton --

A. And the SAU.

Q. And the SAU. Okay.

And then at Bow High School all the officials essentially have a line of report up to you?

A. I wouldn't say a direct report. Maybe with the exception of Mr. Fisk.

Q. Okay. So Mr. Fisk is a direct report, and the other officials report to Mr. Fisk; is that correct?

A. Correct.

Q. All right. And the only people you report to are the school board; is that correct?

A. Correct.

Q. All right. And is it true that it's the school board's job to implement policy -- excuse me -- to promulgate policy for the school district, but you, as the superintendent, implement that policy?

A. I uphold our policy, correct.
Q. All right. Do you have a role in helping to set policy?
A. I have an advisory role.
Q. How did you first learn that there might be some sort of free speech activity at the September 17th girls' varsity soccer game?
A. I first learned of that via Mr. Fisk and Mr. Desilets upon receipt of Shannon Farr's e-mail.
Q. Did they forward the e-mail to you?
A. I'm not sure if they forwarded it to me, but I definitely saw it.
Q. Did you have any other sources of information that there might be free speech activity at the September 17th game?
A. I had information that there may be a protest at those games via, again, that e-mail and social media that was shared with me.
Q. Okay. And you're using the passive "that was shared with me." So can -- and I'll just unpack this.
What social media are you talking about?
A. Facebook.
Q. Okay. Was that Andy Foote's Facebook post?
A. I believe so.
Q. Did you go find that yourself or did somebody

provide it to you?

A. Once it was shown to me, I was able to find it myself.

Q. Okay. And who showed it to you?

A. Many people. Off the top of my head, I know Clem Madden shared it with me. I know Mike Desilets shared it with me.

Q. All right. And who's Clem Madden?

A. Clem Madden is a parent and a school board member.

Q. Okay. And which school board is he a member of?

A. Dunbarton and the SAU.

Q. Is his wife, Clem Madden's wife, Colleen Madden?

A. Yes.

Q. And she's one of the individuals who's heard assertively telling Eldon Rash to take it off at the soccer game; isn't that correct?

A. Yes.

Q. When did Clem Madden first talk to you about the September 17th soccer game?

A. During the September 17th soccer game.

Q. It wasn't before the soccer game?

A. Oh, about the social media post, yes, but I would say days before.

Q. Within a few days of the --

A. Yeah.

Q. And I know you know what I'm saying, but for the court reporter, can you please let me finish before you answer?
A. Sure.
Q. I know you're not trying to be rude, but it makes her job a lot easier.
A. Yeah.
Q. What did you and -- strike that.
What did Clem Madden express to you about the September 17th soccer game besides making you aware of the social media post?
A. I think it was out of concern, concern of what may happen, concern for the girls' soccer team, the players. He has a player on that team.
Q. All right. Can you explain what the concern was? What was he saying? Why was he concerned?
A. These aren't his words. My interpretation of it is that his concern was that things would get out of hand and that it would have a negative impact on the game and on the players.
Q. Okay. His player is a biological female, right?
A. I believe so, yes.
Q. And she's not trans identifying, is she?
A. I feel a little uncomfortable talking about an underaged person's gender identity.

Q. Okay. I'll let that answer stand.
Can you be more specific about the concerns that Clem Madden, the school board member, had when he came to you other than what you've said here today?
A. I'm not sure how much more I can share other than concern about a protest, about targeting a specific kid on the other team, and what that's doing to the girls' soccer team.
Q. And when you say I'm not sure, are you suggesting that there's some kind of confidentiality between you and Clem Madden?
A. No.
Q. Okay. So did he tell you what he meant by being concerned that things would get out of hand?
A. No. I think the difficulty is in the unknown, not knowing what to expect but knowing that something was happening.
Q. Did Clem Madden express to you that he thought there would be targeting of a trans player?
A. I believe that Clem knew that it was about targeting a trans player.
Q. Did the Facebook post use the word target?
A. No.
Q. Would you agree that that's Clem's interpretation of the Facebook post?
A. Yes.

Q. Was that also your interpretation of the Facebook post?
A. Yes.
Q. Did you reach that interpretation separately from Clem, the board member, coming to you with his concerns or was it planted there by Clem Madden?
A. No. That was my concern. It was our collective concern administratively.
Q. Okay. When you say our collective concern administratively, who are you talking about?
A. Myself, Mr. Fisk, and Mr. Desilets.
Q. And Clem Madden?
A. No.
Q. Okay. And why do you say no?
A. Because he's not an administrator. He's not part of our administrative team.
Q. He's a board member for a different school system, although it's part of SAU 67; is that right?
A. Correct.
Q. Okay. Do you attend to his input more than other parents because he's a board member?
A. No.
Q. How is it that he got an opportunity to express his views about what would be happening at the soccer game but Andy Foote didn't?

MR. CULLEN: Objection. I think it's been established.

THE COURT: Yeah. There's no jury here, it's me, right?

MR. KOLDE: Right, and I'm not suggesting.

THE COURT: Yeah. Sustained. Move on.

MR. KOLDE: Okay.

Q. Was it an in-person conversation?

A. No.

Q. Okay. What was it about Andy Foote's Facebook post that bothered you?

A. The pink armband with XX on it is one thing. I don't think at that time I was aware of signs.

Q. Okay. So you saw a Facebook post with a pink armband with XX on it?

A. Yes.

Q. Okay. And what was it that bothered you about that?

A. XX is a pretty well-known anti-trans symbol.

Q. When you say well-known, what is your source of information for that?

A. A couple. So Riley Gaines actively uses XX in her messaging, in her talks that she does across the country. XX equals real women. I view that as exclusionary.

Q. I couldn't hear what you said because there was a

cough. You view it as exclusionary?
A. Yes.
Q. Okay. And perhaps you could scoot up, if you can, to be a little closer to the microphone. Thank you.
A. Okay.
Q. I didn't mean to interrupt you.
A. Sure. I think many people saw during the Olympics this past summer that XX was used during boxing matches. I believe it was a group called Sex Matters.
And then we often now see female athletes use the XX symbol, something like this, when being photographed or during or after their matches.
Q. When you use language like we, I'm going to ask you to explain who we is.
So perhaps, you know, you might use I, but you testify the way you want.
A. I should have said I.
Q. Okay. Do you have any understanding that XX means the female chromosomes?
A. Yes.
Q. Okay. And you believe that that is trans-exclusionary?
A. In this instance, yes.
Q. And that is why?
A. Because of what I just said. I think we're seeing

now in media, social media especially, and through people who are outwardly anti-trans use that as a symbol for their cause.

Q. So you see the XX as an anti-trans symbol?

A. I do.

Q. Do you disagree with the XX symbol?

A. Used in this capacity, yes.

Q. Okay. Why?

A. Because I believe it's anti-trans.

Q. And can you explain to me a little more why you believe it is anti-trans?

A. Sure. Because we've seen it. When I say we, the conversations that I've had with Mr. Fisk and Mr. Desilets around viewing this as anti-trans is that it is seen in other places. I used the example of the Olympics. I used Riley Gaines who also sells XX merchandise. There's an XX Does Not Equal XY clothing line that is anti-trans.

Q. Has anyone told you that the XX symbol is anti-trans?

A. No.

Q. Have you been to any diversity, equity and inclusion trainings where you've been told that XX is anti-trans?

A. I've been to those sorts of trainings, but we have not talked specifically about XX.

Q. Okay. And what is the basis of your knowledge

about Riley Gaines and her advocacy?
A. I'm not sure I understand your question.
Q. Well, you made some statements about Riley Gaines using XX, and so I'm trying to understand what is your basis for your knowledge about Riley Gaines?
A. She's been very outspoken mostly in regards to swimming and having to -- she opposed a trans female athlete and has been vocal about her distaste for that.
Q. So what I'm trying to understand is do you -- what is your source of information about Riley Gaines's views? Have you gone and looked at her X feed, have you gone and read some material she posted, or something else?
A. Sure. I've seen her advertisements for her speaking engagements. I've seen her X posts. I've been to her website.
Q. Do you disagree with Riley Gaines?
A. I think it's nuanced.
Q. Okay. Explain what you mean by that.
A. What I mean by that is I think that there are many things to consider when it comes to transgender participation in athletics.
Q. So let me ask the question again. I'll ask it a slightly different way.
Do you disagree with some of Riley Gaines's advocacy?

A. Yes.
Q. Could you summarize for us what parts of her advocacy you disagree with?
A. I believe Riley Gaines's advocacy stands for a blanket statement that there should be no trans female participation in female sports.
Q. And you disagree with that viewpoint?
A. I disagree with that viewpoint across the board, yes.
Q. As you're sitting here today, is there any other advocacy point of Riley Gaines's that you disagree with?
A. Not that I'm aware of.
Q. Do you consider yourself a trans ally?
A. Yes.
Q. Do you support gender-affirming care?
MR. CULLEN: Objection, your Honor.
THE COURT: I think he's getting at viewpoint discrimination at some point down the line. So I'll allow it.
A. I'm not sure, Mr. Kolde. That's not something I've considered.
Q. Do you believe it's important to use students' preferred pronouns?
A. I do.
Q. What is deadnaming?
A. I'm sorry?

Q. What is deadnaming?
A. I'm not sure.
Q. Okay. What is misgendering?
A. Misgendering is also a widely known anti-trans term, and I -- yes.
Q. When you say anti-trans term, it's used by the trans community to describe something that other people do that they don't like; is that correct?
A. I'm not sure. I just know --
Q. Go ahead. You just have heard the term?
A. I've heard the term.
Q. Do you yourself have an understanding of what is included under the term misgendering as used by the trans community?
A. I could not share that with you today, no.
Q. Do you think that citizens should be used -- should be forced to use people's preferred pronouns?
A. My role is a superintendent, and at schools I do believe we need to use students' pronouns. Outside of the schools I don't have an opinion.
Q. Okay. So on school grounds you would say, yes, citizens need to use a student's preferred pronouns; is that correct?
A. Yes.
Q. Can you understand why some people don't want

government officials telling them what pronouns to use when they speak?

A. Yes.

Q. Can you understand why some citizens don't want to engage in what they believe is lying about biological sex by calling somebody a woman that they don't personally believe is a woman? Can you understand that?

MR. CULLEN: Objection, your Honor.

THE COURT: Overruled.

A. Can you repeat the question?

Q. Can you understand why some citizens don't want to do what they consider to be lying about biological sex by calling somebody a woman who they personally don't believe is a woman?

A. I understand that there are people who hold that viewpoint.

Q. You disagree with those people?

A. Yes.

Q. Can you understand why my clients are concerned about biological males playing in girls' sports?

A. I understand their concerns.

Q. You understand that there's a concern about safety, yes?

A. They've shared that, yes.

Q. And you understand that there's a concern about

fairness?

A. They've also shared that.

Q. But you disagree with my clients about this issue, correct?

A. I disagree in making a blanket statement that all trans female athletes are dangerous and that all transgender athletes result in a lack of fairness.

Q. Okay. So help me understand that. Is it your view that some athletes, transgender athletes can compete fairly and safely but others can't or something different? And I don't want to misunderstand or misstate your position. I'm just trying to understand what the position is.

A. I think that's pretty close. I guess my -- what I am trying to say is that it is for me -- my personal opinion, not my opinion as superintendent of schools, is that it is nuanced and that there are many factors to consider.

Q. I would like to have you look at Exhibit F, the Shannon Farr e-mail, for a moment.

And you've seen this e-mail before. That was your testimony earlier, correct?

A. Yes.

Q. Did you know Shannon Farr prior to receiving this e-mail?

A. No.

Q. What did you think about the contents of this

e-mail?

A. I was concerned.

Q. And you don't need to read it word for word to us here today, but can you highlight for us what the most concerning aspects were?

A. She begins by saying she overheard parents making statements about the trans female player from Plymouth which --

Q. Can you slow down just a little bit for the court reporter?

A. Sure. Sorry.

Q. Go ahead.

A. About the trans female player from Plymouth and their potential plans, and she went on to say Bow parents discussed wearing dresses to the game, buying anti-trans warm-up shirts, and making signs in protest of trans athletes, and generally trying to heckle the player.

Q. Was there anything specifically in the portion that you read that stood out to you as particularly problematic or was it sort of the whole thing?

A. It's the whole thing. I think the problematic piece is that it's directed at a particular student.

Q. What did you do to investigate the accuracy of the e-mail that Shannon Farr sent you -- or not sent to you, but that she sent to one of your employees who shared it with you,

and that has been marked as Defendants' Exhibit F in this case?

A. I had conversations with Mr. Desilets and with Mr. Fisk, but I myself did not do an investigation.

Q. Did either of those two individuals vouch for the accuracy of Ms. Farr's e-mail or anything like that?

A. I'm not sure we had that conversation.

Q. Did you take -- is it fair to say that neither you nor any of the officials that you mentioned contacted Ms. Farr to find out if her information was accurate?

A. I did not contact Ms. Farr. I'm not sure if Mr. Fisk or Mr. Desilets did.

Q. Let's take a look at that Facebook post that you testified about a moment ago.

MR. KOLDE: Is that your exhibit?

MR. CULLEN: I'm not sure which one you're talking about.

MR. KOLDE: The Facebook post.

Q. Showing you Plaintiffs' Exhibit 5, did you see this particular post before the game?

A. Yes.

Q. Okay. And what is it about this post that concerned you?

A. I think when you pair this post with the XX armbands, it's pretty clear that what they're -- what they

seem to be planning. You can see Riley Gaines is in that photo.

Q. And seeing Riley Gaines concerned you; is that correct?

A. When combined with the XX bands, yes.

Q. Okay. Was there anything in particular about what Mr. Foote posted in the text of this Facebook post that concerned you other than the image of Riley Gaines and the reference to XX?

A. Would you mind scrolling down a little bit in this?

I would say that I had some concern about a call to come out and support the game and obviously highlighting the fact that females -- only biological females should participate.

MR. KOLDE: Can we zero in on the text, please?

Q. Where is that language that you're talking about?

A. He doesn't say that. I believe it's represented by the pictures.

Q. I see. Okay. I'm ready to move on from this exhibit, but I just want to understand.

Was there anything else other than what you've testified about so far -- anything in the text portion up above that bothered you other than what you've said so far?

A. I mean, it's saying that school board, school administration is setting a dangerous precedent. I believe I

take offense to that. Well, offense is a strong word.

Q. It's your word. I believe you.

A. It seems untrue to me.

THE COURT: It doesn't matter what you believe.

Q. You take issue with that?

A. I wouldn't say issue, but it made me wonder because I do feel like it's a little perhaps misinformed.

THE COURT: Is there a dispute about the messaging, is that what you're doing now, or the other thing with viewpoint in the future?

MR. KOLDE: Both, your Honor.

THE COURT: All right. Well, you can move on from the messaging probably.

MR. KOLDE: Got it. Okay.

THE COURT: I don't understand your clients to be disputing that those wristbands with a XX was a message and the message was opposition to transgender students playing on a girls' team. Is there some dispute about that?

MR. KOLDE: No. I'm trying to understand how they understood it, your Honor.

THE COURT: Yeah. Well, I'm interested, too. Not the message. I'm interested in understanding why the restriction and what the restriction was.

MR. KOLDE: Yes, and we're going to --

THE COURT: That's the crux of the case. We should

get to that at some point. It's a day and a half now.
MR. KOLDE: Soon, your Honor. Soon. We're close.
Q. So let's move on from Exhibit 5.
There was a picture -- you mentioned something about an image of a wristband, and I'm going to show you what's been marked as Plaintiffs' 4.
Is this the wristband you're talking about?
A. Yes.
Q. Okay. Did you see that image before the September 17th game?
A. Yes.
Q. Okay. And that image bothered you?
A. Yes.
Q. Because of the XX?
A. Because of the XX and because of the e-mail that we received from Shannon Farr and because of the prior Facebook post that you showed me, we use all of these things in considering how we need to respond, if we do.
MR. KOLDE: If we could look at Plaintiffs' 19, please.
Q. I'm just showing you briefly Exhibit 19. That's an image of a pile of pink wristbands with various messages on them.
You've seen that before in court here, correct?
A. Correct.

Q. What I want to understand is had you actually seen this particular post before the game on September 17th?
A. I believe I have, yeah. Yes.
Q. Okay. Your primary concern was with the XX; is that correct?
A. And the NAD.
Q. Did you know what NAD meant?
A. We -- I interpreted that as short for gonad, but since then you've shared that it's not a dude. Either of which I have a problem with.
Q. Do you have a problem with the female symbol that's been around for hundreds of years that some of these wristbands had?
A. In the way that it's being used, yes. It's being paired with XX and NAD.
Q. But what if it was just worn by somebody without one of the other wristbands?
THE COURT: Well, once again, maybe it will help, but there's no jury. It's the judge that's going to decide this. So questions that seem to imply a symbol taken out of context -- XX in a biology textbook means one thing. We're not talking about XX in a biology textbook. We're talking about it in the context of this dispute, right?
So we're wasting a lot of time suggesting that it might mean something mysteriously innocent. It's either

related to this message, and the message is either restrictable or it's not, right, but you seem to be suggesting that, well, in isolation it doesn't mean anything. So, therefore, it doesn't mean anything.

We're in the context of this dispute.

MR. KOLDE: I'm sorry if I gave you that impression, your Honor. That's not what I'm suggesting.

I am trying to understand what Ms. Kelley, who is a decisionmaker in this case and a defendant, thinks was offensive or problematic.

THE COURT: She's said it about three different ways now. She says the XX in the context that your witnesses said they meant it.

MR. KOLDE: Okay. I got the XX, and I got the NAD.

THE COURT: That's what she's saying.

MR. KOLDE: Well, yeah, but I'm not asking her about that.

THE COURT: Is that what you think?

THE WITNESS: Yes.

THE COURT: Yes. Thank you.

MR. KOLDE: But that's not what I'm asking about.

THE COURT: No, and I'm the decisionmaker and I'm confused what you're asking about, and it sounds like you're asking about, well, XX in a biology text is a pretty innocent and straightforward scientific statement. Why would you be

troubled about that? We're wasting time doing that. That's not why we're here, okay? So stick to the context.

She told you why she was upset with it. Now, did you restrict speech with respect to this? Why did you do it? What were you thinking? What was going on? Who's your audience? You know, the relevant questions under L.M., the relevant questions under Tinker, that's what we need to do. Otherwise, we'll be here till next Thursday.

MR. KOLDE: I thought this wasn't a Tinker case, but --

THE COURT: I know you think that. I think it is. It is. Tinker instructs on the principles. It's not a student and it's not in a school building, but Tinker is relevant, as is L.M.

MR. KOLDE: That's not what you said on October 8th, your Honor.

THE COURT: No, it is relevant. It instructs usefully on the principles to be applied.

MR. KOLDE: I'll leave --

THE COURT: So the better evidence that responds to those nuanced issues.

Q. Let's take a look at Exhibit K that was just admitted into evidence.

MR. KOLDE: I think I'm going to have to use the ELMO for this one, your Honor.

MR. CULLEN: We have a couple hard copies, if you would like.

MR. KOLDE: I have one, but thank you.

Q. This was that e-mail that your counsel introduced from Anthony Foote that was sent around August 23, 2024. I'll just -- not reading it all, you're familiar with this e-mail; is that correct?

A. Correct.

Q. This is Anthony Foote expressing his views about biological males participating in female sports, correct?

A. Correct.

Q. And he's expressing support for Riley Gaines; is that correct?

A. Yes.

Q. All right. And how is it that this -- this e-mail wasn't originally addressed to you, correct?

A. Correct.

Q. How is it it came to you?

A. It was shared with me.

Q. By?

A. I believe it was by Mr. Desilets.

Q. All right. And who's Karen Vogt who's forwarding it?

A. I don't know. If I had to assume, that would be coach Vogt's wife.

Q. I see. And were you concerned about the opinions that my client, Anthony Foote, was expressing in this e-mail from August 23rd?
A. Can you scroll down, please?
Is there a page 2?
Q. There is. Do you want me to go to that?
A. Please.
Q. Okay.
A. I'm not concerned about his opinions. If there was some concern, it would be around the idea of forfeiting games.
Q. Explain what you meant by that.
A. NHIAA requires that we complete all of the games on our schedule, right? So I know that we had a pretty talented group of soccer players and would be worried if we didn't complete our schedule.
Q. Showing you what's been marked -- premarked as Exhibit E, if I could have my colleague pull that up, please.
This is the August e-mail that Kyle Fellers sent to you and several other Bow individuals about the Olympic boxing incident. Do you recall that e-mail?
A. Yes.
Q. You never responded to this e-mail; is that correct?
A. No.
Q. And in this e-mail he refers to the Biden-Harris

Administration's rewrites of Title IX to appease a mentally ill cult; is that correct?

A. Correct.

Q. Did that concern you at all?

A. I think it's a little concerning.

Q. Explain what you mean by that.

A. Mr. Fellers -- this is how he has historically communicated with us. So I think his language in there is concerning.

Q. And what is it that's concerning? The tone?

A. Yes.

Q. Did you take offense at the tone that he took with you?

A. No.

Q. Well, then what are you concerned about?

A. I just think that it is an e-mail -- you ask if I respond to it. I'm not sure what there is to respond to here because it feels like it's sort of a stream of consciousness of his beliefs.

Q. As the superintendent of the Bow schools, do you have a role in implementing -- let me rephrase that -- in being aware of Department of Education guidance?

A. Yes.

Q. And did you have some awareness in your role as a superintendent of the Biden-Harris Administration's rewrite of

the Title IX regulations earlier this year to include gender identity as a protected category?

A. Yes.

Q. All right. And do you have some awareness of Moms for Liberty having a lawsuit in Kansas that enjoined the implementation of those regulations?

A. Yes.

MR. KOLDE: Your Honor -- well, I'll get to this in a moment.

Q. Do you have awareness that my client, Nicole Foote, has joined Moms for Liberty?

A. Yes. I received that e-mail.

Q. And she sent you and several board members an e-mail on November 3, 2024, titled Title IX changes and the lawsuit, a concerned member of Moms for Liberty?

A. Yes.

Q. And I'll show you what's been marked as Exhibit 35.

Actually, I'll switch over to the document camera here.

Is that the top half of that e-mail?

A. Yes.

Q. All right. And we'll just look at it real quick to show that I'm not trying to sneak anything in here.

That's the complete e-mail, right?

A. Yes.

MR. KOLDE: Your Honor, we are offering Plaintiffs' Exhibit 35. I spoke to Mr. Cullen in advance, and they have no objection.

THE COURT: ID may be stricken on 35.

(Plaintiffs' Exhibit No. 35 Admitted)

MR. KOLDE: I'm just going to place it up there, your Honor, so I don't hang onto it.

THE COURT: Sure.

MR. KOLDE: Okay.

Q. I'm going to move on from this topic, but I just want to wrap up with one or two quick questions.

And this question is not in your role -- I'm not asking you for a legal opinion, but in your role as superintendent, do you understand that this prevents the Department of Education from implementing any of the Title IX regs regarding gender identity in the Bow School District while that injunction is in place?

A. Bow schools are not named in that injunction.

Q. So you do not view Bow schools as being bound by that injunction?

A. Not currently. Last I checked there's not a Bow school. There are two schools, two public K-12 schools in New Hampshire, and Bow is not one of them.

Q. So do you feel that there's any effect of the injunction -- in your role as superintendent, do you feel

there's any effect of the injunction on Bow schools?
A. Not currently.
Q. What plan, if any, did you form as a result of the information that you received about the September 17th game that we've been talking about here today?
A. Mr. Desilets, Mr. Fisk, and I met to talk about, one, if we felt like something may happen, and if we did, what steps -- we discussed different ideas around how to handle this.
Q. You don't have to go word for word, but what did you talk about?
A. One of the first things I know I considered is do we shut this off for the public, do we not have people come out of concern that a student was going to be targeted, but we didn't want to do that. We wanted parents to be able to see their children play.
We considered having -- which is ultimately what we did, is meeting with our local law enforcement to seek their support not knowing what we would expect on that day.
Q. Did you determine who you thought would be the source of the protests that you were concerned about?
A. Yes.
Q. And who was that?
A. Mr. Foote.
Q. Did you think that Mr. Fellers might be a problem

also?

A. Based on his e-mail exchange with us.

Q. So is it fair to say that the e-mails that they had sent you before caused you to believe that they might be the source of the protest on September 17th?

A. Yes. And I believe we were correct.

Q. Did you have an opinion at that time prior to the game about any other particular person other than Mr. Foote or Mr. Fellers being the source of the possible protest at the September 17th game?

A. I think one of my other concerns is who else would show up at the game other than our -- the typical parents who show up.

Q. Would it be fair to say that you wanted to keep an eye on Mr. Fellers and Mr. Foote at the game because you believed that they might be the source of problems at that game?

A. I believe we kept an extra eye on the activity of the game happening on the sidelines, yes.

Q. I don't know that you answered my question directly, and I want to make sure that we're communicating clearly.

Did you -- you have testified that you believed Kyle Fellers and Anthony Foote would be a source of problems at the game. So as a result, did you keep an eye on them?

A. They were two of the people we kept an eye on, yes.
Q. But your testimony is you kept an eye on everybody?
A. Yes. I believe we did.
There was sort of this call to action that happened via social media and it was picked up by other known folks, and so I was concerned that we also may have people there who we don't know who are not parents and what that might lead to.
Q. Can you be specific about call to action for the September 17th game? What are you talking about besides the evidence that we've looked at here today?
A. It was picked up by a lot of people and people who are anti-trans, they are admittedly that, to come to this game to support the Bow soccer team.
Q. Can you name any specific names?
A. Ann Marie Banfield.
Q. Okay. And who is she?
A. She's I believe a Bedford resident who is vocal in this area and has been vocal with us.
Q. Do you know what she looks like?
A. I do.
Q. Okay. Did she show up?
A. Not at that game.
Q. Anyone else?
A. There were people there who I was not familiar with, but I may not be familiar with everyone on the team.

Q. Anybody else specific that you haven't named or that you recall?
A. I don't understand your question.
Q. You made a reference to social media activity and people talking on social media. We have certain exhibits in this case, so I'm trying to understand who you're talking about.
A. I believe there was a candidate for office, and I am not going to remember her name. Lily, I'm not sure, but also picked up the XX, the photo of XX.
And so, again, our concerns as a school district is this is generating a lot of talk and the concern would be who was going to show up at this game, and we needed to be prepared for that.
Q. Lily Tang was a congressional candidate who ran against Maggie Goodlander here in New Hampshire; is that correct?
A. Thank you.
Q. You would agree that -- well, I'll state this slightly differently. Is it a problem in your view that a congressional candidate would publicize the symbol XX as part of her campaign?
A. No, that wasn't the concern. The concern was how many people. Asking for people to come to our game, are we going to be able to handle that as a school.

Q. And did that happen prior to the September 17th game or are you conflating that with events post September 17th?

A. I'm not sure.

Q. Okay. You would agree it's possible this might have happened in the wake of the September 17th game; is that right?

A. It could be.

Q. Okay. You rejected the possibility of closing the game to all spectators prior to the September 17th game obviously, right?

A. Yes.

Q. What other plans did you discuss with the group that you mentioned earlier?

A. I mentioned that we reached out to local law enforcement.

Q. Is that the plan that you decided to implement in fact?

A. That was part of the plan. I can't speak to what Mr. Fisk and Mr. Desilets did in addition to that because, again, we each have our roles, but that was part of my plan.

MR. KOLDE: If we could take a look at Plaintiffs' Exhibit 14, please, and if you could scroll down?

Q. You're familiar with this e-mail?

A. Can you make it a little bigger? Thank you.

MR. KOLDE: If we could go to the beginning, which is the last page, actually. All right. The way e-mail threading works, you know, the first e-mail is on the last page.
Q. Do you recall sending that e-mail to Phil Lamy on September 12th?
A. Yes.
Q. In the last sentence you state, "Our opponent has an openly trans female player, and we caught wind that our families are going to protest in some way."
A. Correct.
Q. And it's fair to say that the reason you contacted Lieutenant Lamy is because you were concerned that a protest might take place?
A. I was concerned, duly concerned about a protest, along with a number of people.
Q. I'm asking you about yourself.
And, in particular, you were concerned that somebody might display the pink wristband with the XX symbol on it at the game; is that correct?
A. That was one of my concerns.
Q. Because you view that symbol as trans-exclusionary; is that correct?
A. Correct.
Q. What was the purpose of having a police presence at

that game?

A. The purpose of having police presence at that game was to help us create -- make sure that there was order in the event that it got out of hand.

Q. Was one police officer sufficient for that?

A. At that game, yes, but I didn't know that ahead of time.

Q. Did you share your concerns with Lieutenant Lamy?

A. Yes.

Q. What did you tell him?

A. I shared with him the information that we had.

Q. Did he -- to your knowledge did he do anything to investigate the accuracy of that information?

A. I'm not sure.

Q. What did you ask Matt Fisk or Mike Desilets to do relative to the September 17th game?

A. I didn't ask anything specific. It was I was taking care of this piece, and I know Mr. Fisk and Mr. Desilets had additional plans.

Q. Well, what did you know about that?

A. We were going to have additional presence at the game.

Q. When you say we are going to have additional presence, you mean there's going to be additional school officials at the game?

A. Not necessarily school officials, though there were, but sometimes we have additional teachers who will come and help support games. At football games. At basketball games.

Q. Was that something you asked them to do or was that something they decided?

A. No.

Q. Please let me finish.

A. Sorry.

Q. How many -- I mean, who all was asked to come to the game, or is that a Matt Fisk and Mike Desilets question?

A. I think it's probably better served for them to answer. I know who I saw.

Q. Tell us who you saw.

A. I saw our three what we call BEST teachers, which are physical education teachers.

Q. Okay. And in terms of officials or coaches, who all was at the game?

A. Of course the coaches were. I was there for the first half, Mr. Fisk was there, and Mr. Desilets was there.

Q. Okay. And when you say the coaches, are you talking just about the soccer coaches or somebody else?

A. The coaches of Bow and Plymouth on the other side.

Q. But Ben Forbes was there also?

A. He's one of the physical education teachers I just

spoke about.

Q. I see. Whose idea was it to have walkie-talkies?

A. I can't answer that.

Q. Okay. That wasn't your idea?

A. No.

Q. Did you have a walkie-talkie?

A. I'm not allowed.

Q. Were you there for the second half?

A. I was not on the field for the second half, but I was in a place where I was watching.

Q. I see. And did you have binoculars or some kind of an implement to watch?

A. No.

THE COURT: Is this relevant really?

MR. KOLDE: Well, I want to know what she was able to see on the field.

THE COURT: I'm sure you do, but I don't. I want to know what the evidence is relevant to the legal issues that I'm required to resolve, and where she was and whether she had binoculars is not a tipping point.

It's time for a break. We'll take our midmorning break.

Were you part of this Kansas City v. U.S. Department of Education case you referred to, the injunction?

MR. KOLDE: No, we just --

THE COURT: Do you know if there's been a -- you know that the order says there has to be a notice filed in the record identifying the schools which the members of the plaintiff groups or their members' children attend, suggesting it only relates to those schools.

You mentioned that one of your clients joined Moms for Liberty?

MR. KOLDE: Yes.

THE COURT: Is the point that she joined Moms for Liberty, therefore, her child goes to a school now?

MR. KOLDE: No.

THE COURT: But has a notice been registered with the the kind of --

MR. KOLDE: We'll find out.

THE COURT: Well, it doesn't matter. It's after the fact anyway, right?

MR. KOLDE: After the fact looking backwards, but not going forward, your Honor.

THE COURT: Well, sure, but this is just an injunction against the federal government and law enforcement from enforcing the regulation, and nobody is trying to enforce the regulation, right? Why are we even talking about it?

MR. KOLDE: Because they've marked for ID only several -- a summary and a press release regarding the Title IX regulations and --

THE COURT: We agree Title IX does not trump the First Amendment, right?

MR. CULLEN: Correct.

THE COURT: All right.

Do you agree that's not an issue?

MR. KOLDE: Oh, yeah. I'm just responding to what they're doing.

THE COURT: All right. It's not an issue so let's not spend any more time on that.

The First Amendment controls over Title IX.

MR. KOLDE: Very good, your Honor.

THE COURT: All right. Let's take a midmorning break.

(RECESS)

THE COURT: We have to switch out court reporters at 12:30. So we'll take lunch at 12:30.

It's past midmorning and you're not done with your case. I'm going to start helping you. I know you don't want any help, but I'm going to help you.

We've got to move along. I need evidence on why the restriction on speech was imposed, what the motivating factors were, what the considerations were, what the effects were.

MR. KOLDE: Okay.

THE COURT: I don't need to know about how many

police officers you wanted or needed or could have had. It's got nothing to do with the issues here.

Q. What was the speech restriction that you imposed on the September 17th game?

A. We didn't impose one. Maybe I'm not understanding your question. The September 17th game where they wore the armbands?

Q. Well, the wristbands, but yes.

A. Okay. We asked them to remove them because we believe that those are anti-trans symbols and they were targeting a player on the other team.

Q. And you interpreted those symbols as expressing an anti-trans message; is that fair to say?

A. Yes.

Q. You understood that my clients were expressing themselves by wearing the pink armbands with the XX symbol on them, correct?

A. No. I believe they were targeting a student on the other team.

Q. What makes you say that they were targeting a student on the other team?

A. Because they decided -- they planned and decided to do this on the one time that we were playing the team that had a trans student on it.

Q. So it was the timing?

A. I think the timing is telling.
Q. Do we agree that my clients did nothing on the sidelines that day other than wear the wristbands?
A. No.
Q. Explain what you mean by that.
A. Mr. Foote had a sign on his Jeep. Mr. Fellers held a sign in the direction of the opposing team's bus that would ultimately pass him as they exited.
Q. Did it pass him while they exited?
A. I don't know. That's the route that away teams take to leave our property.
Q. Right. Let's set aside the parking lot for a second, and we'll come back to it. We'll just talk about the sideline behavior.
Do we agree that the concerning First Amendment activity that you're concerned about was my clients, Foote and Fellers, wearing the pink wristband with the XX on it on the sideline?
A. That was part of the concerning behavior, yes.
Q. Okay. When you say part of, what is the other concerning behavior just on the sidelines?
A. The response to being asked to remove them.
Q. And just summarize for us what it was about the response to being asked to remove the pink wristbands that concerned you.

A. That Mr. Fellers -- it took him an extended period of time to comply. That he required police intervention twice.
Q. So it was the time and the fact that Lieutenant Lamy was there?
A. It was the fact that Lieutenant Lamy was not just there but he had to intervene. It is also the way that Mr. Fellers treats our administrators, our school officials, at those games.
Q. Were you -- I don't understand what you mean by treats. Were you concerned about the fact that he compared them to Nazi German officials from the 1930s and '40s?
A. Yes.
Q. You believed it was inappropriate for him to express that opinion?
A. I believe that it causes a disruption in our school environment when folks see our administrators being talked to that way, yes.
Q. Okay. And I don't need to go into detail on this, but is your understanding based on what you observed that day, what people told you after the fact, or the videotape, or all three?
A. I don't -- what is the question?
Q. How do you know what happened on the sidelines?
A. I was there.

THE COURT: Well, I don't know why it's relevant. Why are we talking about this?

MR. KOLDE: Okay. I'll move on.

THE COURT: Mr. Fellers's statements are not part of the case, right?

MR. KOLDE: Well, I think they're part of the case, your Honor.

THE COURT: All right. They're not.

MR. KOLDE: Okay.

THE COURT: Okay. So move on.

MR. KOLDE: All right.

Q. Do you agree that my clients didn't gesture at Parker or any of the other players with the armbands?

A. I'm not aware that they did, no.

Q. So we agree that they did not; is that correct?

We've got some double negatives.

A. I was only there for the first half.

Q. And you would agree -- you don't have any reason to disagree with the testimony that my clients never said anything to Parker, correct?

A. I did not observe and have not been told that they said anything to Parker.

Q. Right. And Parker played the whole game or most of the game?

A. I don't know.

Q. You're not aware that Parker left the game early or anything like that?

A. I'm not aware.

Q. Okay. And just so we're clear, the issue is the wristbands with XX on them and then the comments that my client made to your officials. Other than that, you have no concerns about my clients' activities on the sidelines on September 17th; is that correct?

A. No. I have concerns that they were displaying an anti-trans message on the one day. It's not supporting women's sports. It's targeted at that one day and that one student.

Q. Okay. But it's also fair to say that you consider the pink wristband with XX on it to be an anti-trans message generally, correct?

A. Yes.

Q. All right. And it is true that going forward if my clients showed up to a Bow High School sporting event wearing the pink wristband with XX on it, it would also be considered an anti-trans message, correct?

A. Correct.

Q. And regardless of whether Parker Tirrell or any other trans-identifying player was present to compete or in the audience, my clients would be asked to remove the wristband or leave the location; is that correct?

A. Correct.
Q. And that is the policy of the Bow School District; is that correct?
A. It's not a policy. It would be our practice knowing what that symbol means and knowing that we have trans students and staff within our buildings.
Q. But I want to be clear that -- and I think this was part of the answer. I just want to be clear on it.
At any specific future sporting event it wouldn't matter whether a trans student was actually there. You would still enforce the practice of not allowing the pink wristband with XX on it; is that correct?
A. Correct.
Q. Would it be fair to say if somebody wore a T-shirt, a pink T-shirt with XX on it, that would be treated the same way?
A. Probably.
Q. Okay. And if somebody wore a T-shirt with a Pride flag on it, they would be allowed to attend the event, correct?
A. Probably, because it's inclusionary. It's not harassing. It's not directed at anybody or targeting someone.
MR. KOLDE: Thank you. Nothing further.
THE COURT: Thank you.
Mr. Cullen.

MR. CULLEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CULLEN:

Q. Good morning, superintendent.

A. Good morning.

Q. I just want to clarify a couple questions.

With respect to the XX symbol, your efforts to stop that are strictly specific to the school itself and the fields and the property, right?

A. Correct.

Q. You don't take any actions against parents who use that in e-mails?

A. No.

Q. Okay. And in this case you received e-mails from Mr. Fellers and Mr. Foote in -- or you saw them in August, and we've been over them. You never took any action against them based on those e-mails?

A. No.

Q. And you didn't remove the -- you didn't remove these or ask for these -- sorry. Let me strike that and start over.

You didn't come to the conclusion that the XX wristbands were not appropriate for this game based on your personal views on transgender issues?

A. No.

Q. Okay. And on any given game do you know for a fact whether or not there's a trans-identifying student on your team or the other team?

A. No.

MR. CULLEN: Backing up just a little, your Honor.

MR. KOLDE: Your Honor, I am a little concerned that counsel is leading his own witness. I understand we're trying to move things along, but I --

THE COURT: It's cross-examination. There's no jury. It's me. I'll allow it in the interest of time because now we are way behind what was projected.

MR. KOLDE: I understand.

MR. CULLEN: Thank you, your Honor.

Q. Just briefly, I know you're superintendent now. Could you just let the Court know what's your educational background?

A. In terms of where I went and --

Q. Yeah.

A. So I have a Bachelor's Degree from the University of Rhode Island, my Master's in Education, and my certificate -- I'm sorry. My Master's in Special Education, a Certificate of Advanced Graduate Studies in Educational Leadership.

Q. And where did you get the master's?

A. Plymouth.

Q. And the certificate?
A. Southern New Hampshire University.
Q. Okay. And after college till today, again briefly though, what was your career? What did you do?
A. Primarily my career in education has been in the area of student services.
Q. And when you first joined the SAU, you were director of student services?
A. Correct.
Q. And again, briefly, what does that entail?
A. Special education, 504, McKinney-Vento, English as a Second Language, and Title IX.
Q. I think we're both feeling a little pressure to speak too quickly for the steno.
A. Sorry.
THE COURT: No. Just limit it to relevant -- this is a preliminary injunction hearing. It's not the trial on the merits.
MR. CULLEN: I agree. I think her background is important for you to understand where she's coming from for her decisions. I'll move along, though.
Q. You receive regular training on Title IX?
A. Yes.
Q. And you're familiar also with the state's antidiscrimination statute, 354-A?

A. Yes.

Q. Okay. You understood, of course, at this game on the 17th that Parker Tirrell was going to play?

A. Yes.

Q. And that she identified as a female?

A. Yes.

Q. And we've already been over this, but you've received correspondence from -- or you saw correspondence from Ms. Farr?

A. Yes.

Q. And you've reviewed Facebook posts that included the XX symbol?

A. Yes.

Q. Okay. So what was it about the XX symbol that made you conclude that it was something that should be restricted?

A. Again, I believe that it's an anti-trans symbol that we are seeing in many, many places now.

So I talked about Riley Gaines and how she actively uses XX as an anti-trans message, along with what we saw during the Olympics, and things coming out in terms of, like, clothing being anti-trans.

Q. Okay. And sort of the growth of this anti-trans movement in your experience as a school administrator, when has that really occurred?

A. It hasn't. I mean, in terms of this XX?

Q. No. Just in general. Like six years ago, seven years ago when you started at Bow, was there an anti-trans movement that you were aware of?
A. I mean, in terms -- we had some anti-LBGTQ book challenges.
Q. Okay. But just in general -- I guess what I'm getting to is this is a fairly recent and developing phenomena, correct?
A. Yes.
Q. And as a school administrator, do you try to keep up with what's going on?
A. Yes.
Q. Okay. And do perception of different symbols change over time?
A. Yes.
Q. And as a school administrator, is that something that you follow as part of your job?
A. Yes.
MR. KOLDE: Your Honor, it's Mr. Fellers (sic) testifying at this point, not Ms. Kelley.
I'm concerned about --
THE COURT: I'll allow it.
When you say anti-trans, what exactly do you mean? Do you mean opposition to players classified at birth as males participating on girls' team or do you mean something broader

than that?

THE WITNESS: I mean that.

THE COURT: You mean that. Okay.

Q. So you're really talking about it being a symbol of nonparticipation, an exclusion of assigned male at birth persons from playing in girls' sports?

A. Yes.

Q. There is a policy, KFA, and we've seen that I think already, but maybe we can just bring it up very quickly. It's Plaintiffs' A -- I mean, Plaintiffs' Exhibit 1.

While Stacey is getting that up for us, you're familiar with KFA?

A. Yes.

Q. And do you view that as the terms under which the public is invited to the school to attend events?

A. Yes. These are expectations.

Q. Okay. And is it your view that the public's attendance at events is conditioned on their compliance with this policy?

A. At events and within our building, meetings, et cetera.

Q. And are there parts of this policy that would apply to a protest on school grounds at a sporting event?

A. In my mind one is applicable to it in terms of attempting to harass or intimidate -- it says staff member,

school board member, sports official, coach, or any other person.

Q. And how about number 4?

A. A violation of federal or New Hampshire law. In this case it would be HB 354-A and Title IX.

And then 10, of course, which allows these violations to result in a no trespass order.

Q. Mr. Foote said yesterday in his testimony that after he sent the e-mail on September 17th that included language like weak, ineffective, and out of touch, cowardice and pandering, that nobody reached out to him to ask him to have a meeting; is that fair?

A. Yes.

Q. If he had asked you for a meeting, would you have given him one?

A. Yes.

Q. Are you familiar with Nicole Foote?

A. Yes.

Q. Did she have a meeting with Mike Desilets?

A. Yes.

Q. Would you have extended that same courtesy to Mr. Foote had he asked for it?

A. Yes.

Q. This didn't come up, but just to clarify. At some stage you set up a protest zone?

A. Yes.
Q. And why was that?
A. Following the September 17th game, not the homecoming game, but the one on the 24th, a large number of people showed up at the game. It was at least double, perhaps triple what's normally there. And we were very concerned about our ability to keep that orderly and not disruptive for our students.
And so with -- in consultation with our school council, we set up an area that offered people the ability to do that in that said area but also they could see the game from there.
Q. And there's no protest zone currently?
A. No.
Q. And no plans to have a new protest zone?
A. No.
MR. CULLEN: If I could have a moment, your Honor?
THE COURT: Of course.
(Pause)
Q. And again, Ms. Kelley, with respect to making the determination that the XX symbol was exclusionary, you did your own research on that?
A. Yes.
Q. And you spoke with other people?
A. I spoke with high school administration.

Q. Okay. Thank you very much.
A. Thank you.
Q. There may be more questions. You can't leave yet.
THE COURT: Mr. Ducharme.
MR. DUCHARME: Nothing, your Honor.
THE COURT: I have a couple. Just a couple.
You seem to agree with Mr. Foote that part of the nuanced aspect of this larger issue is perhaps standards should be developed and rules developed and procedures developed for providing different participation by trans students.
THE WITNESS: I do. I think that, again, it's nuanced.
THE COURT: All right. How would the -- how would the protest zone operate to protect a trans child playing on a soccer team?
THE WITNESS: I think it would have been really challenging.
THE COURT: I mean, your goal, I gather, was we think the child was being targeted. We're going to protect the child from the effects of that targeting. We're going to create a protest zone 50 yards away.
How does that protect a child, whereas on the sideline wearing the wristbands doesn't?
THE WITNESS: I think it's further out of view from

students. I think it is, again, less visible. Perhaps you can hear less.

It was our attempt to make the sidelines of our games manageable without having to close down spectators.

THE COURT: Okay. And what exactly were you protecting Parker Tirrell from? What risk? What danger? What injury?

THE WITNESS: An anti-trans message.

THE COURT: Hurt feelings?

THE WITNESS: I guess -- if I may?

THE COURT: Sure. I need to know.

THE WITNESS: In school districts when we suspect that there's some sort of threat that something might happen, we don't wait for it to happen in order to go into action.

If we heard that there were two teams and there was going to be a fight, we don't wait for that to happen to take action, and that's what we did here.

THE COURT: But what is it that you didn't want to wait to have happen, I guess?

THE WITNESS: I didn't want to wait to have her see this and feel like she doesn't belong or that it's wrong her being trans. That's what I didn't want to have happen.

THE COURT: Okay.

Any questions based on mine?

Mr. Kolde.

MR. KOLDE: If I may, your Honor.

REDIRECT EXAMINATION

BY MR. KOLDE:

Q. The no protest zone that you just testified about, that was imposed the day after we filed this lawsuit, correct?

A. I'm not sure.

Q. And the game that you referred to where some other people came to express the pink XX message, that was on September 24th; is that correct?

A. Correct.

Q. And that was a response to what had happened at the September 17th game, correct?

A. We viewed that as a response to the no trespass orders that we gave, and that that was people trying to take action against administration for our decision.

Q. Right. And some people at that next game also wore the forbidden wristband, pink with the XX message, correct?

A. Not at the next game. On the 24th.

Q. On the 24th. I'm sorry. The 24th game?

A. Yes.

Q. All right. But that game wasn't stopped, correct?

A. No. It would have gotten out of hand.

Q. All right. And no one was trespassed because of that game, correct?

A. No.

Q. And there were no incidents at that game, right?
A. Not that I'm aware of.
Q. And it's fair to say your officials didn't intervene at that game like they did on the 17th?
A. Not that I'm aware of.
Q. I'm just about done, but we did set aside the signs in the parking lot, and I just want to understand briefly.
We've all heard testimony about what Mr. Fellers's sign said and what Mr. Foote's sign said, and just please tell us, what is your problem with the contents of the sign, both of those signs. You did say that you found those signs problematic. Tell us why.
A. We don't allow signs at our events. That's actually -- I believe it's in our handbook.
Unless it is, go, Sally, number whatever, we don't allow message, whether it's political messages, whether it's something that's targeted at another student. The signs that we allow at events are specific to that event.
Q. Okay. So no signs at the sidelines, but we agree these were clearly in the parking lot, right?
A. These two signs were in the parking lot.
Q. All right. And you understand that my clients have only asked to display signs in the parking lot, not at the sidelines. You understand that, correct?
A. I don't understand that, actually.

Q. Okay. Would you agree that the school district does allow people in the parking lot at Bow events to express some political messages passively in the form of having a bumper sticker on their car supporting a candidate?
A. Yes.
Q. And there are some vehicles that we've seen that have, like, for example, a Pride Progress flag on it, correct?
A. Yes.
Q. Okay. So what is it about the signs that my clients displayed that is problematic, but it's okay to have those bumper stickers in the parking lot? Not on the sidelines but in the parking lot.
A. Because these signs were targeted at a particular student on the other team. And as far as I know, that student is part of an injunction by this court, and if we were to allow harassment, we are liable.
Q. Okay. Help us understand. Help the Court understand. What was it about my clients' signs that made them harassing or targeting in your opinion?
A. The only time those signs came out was when we played a game against Plymouth which includes the trans player. At no other game. No other time. This was organized and targeted.
Q. So timing is an issue.
Is there anything about the message that the signs

expressed that you found problematic, not just the timing but the message itself, the contents of the message?

A. I can't separate the two.

Q. Okay. But the contents of the message displayed at that time was a problem for you?

A. Yes.

Q. Okay.

MR. KOLDE: I think I'm done.

THE COURT: All right.

MR. CULLEN: Just briefly, your Honor, if you would indulge me.

RECROSS-EXAMINATION

BY MR. CULLEN:

Q. With respect to the parking lot, Ms. Kelley, do you ever allow people to march around your parking lots holding signs above their heads?

A. No.

Q. Regardless of the content of the sign?

A. Regardless.

Q. This isn't a place where political demonstrations are permitted and staged for any issue?

A. No.

Q. Thank you.

THE COURT: All right. Thank you, ma'am. You may step down, and you're excused as a witness.

And you may call your next witness.
MR. KOLDE: I call Mike Desilets.
MICHAEL DESILETS
having been duly sworn, testified as follows:
THE CLERK: Please state your full name for the record.
THE WITNESS: Michael Desilets.
DIRECT EXAMINATION
BY MR. KOLDE:
Q. Mr. Desilets, what do you do for a living?
A. I'm the athletic director of Bow High School.
Q. And you don't have to go into a lot of detail, but what do you do as doing that?
A. Administration of anything athletics and as well as some of the other activities that go on that are considered extracurricular, game management, game planning, scheduling of officials, transportation, compliance, making sure that student athletes are eligible for play, making sure that we stay in line with the NHIAA regulations as a member school.
Q. Who do you report to?
A. Mr. Fisk and Ms. Kelley.
Q. Are you familiar with my clients outside of this lawsuit?
A. Mr. Foote, yes. Mr. Fellers, not so much.
I'm not sure I would have known exactly who he was

visibly, but I've had conversations with Mr. Foote, yes.
Q. And what did those conversations center around or did they have various topics?
A. More just cordial, hello, a handshake. We never really got into much detail on really anything specific.
Q. Did you understand Mr. Foote to be somebody who had strongly held beliefs about women's rights and the issue of biological males playing in women's sports?
A. Certainly through this, but prior to this I certainly know that he had some strong political views.
Q. How did you become aware of that?
A. Just kind of through his actions with things that were going on at school, the signage in his front yard, things like that.
Q. Signage in his front yard, is this the political candidates he supports?
A. Correct.
Q. All right. A Trump supporter?
A. Yes.
Q. How are you aware of that? Are you in his neighborhood?
A. I drive by it on a fairly regular basis. I assumed it was his house. I saw him there before. I've never been there, but I've seen him in the yard.
Q. All right. And he was involved in a book challenge

at the Bow school; is that correct?
A. I believe so, yes.
Q. And is that what you were talking about when you're saying you're aware of his political activities relative to the school?
A. That was part of it, sure. Yes.
Q. And he had sent you an e-mail expressing views about the upcoming game at Bow on September 17th, correct?
A. I believe so.
Q. All right. What did you think about that e-mail?
A. Could you call it up?
Q. Sure.
MR. KOLDE: It is -- it's actually --
MR. CULLEN: I think it's Defendants' 18. I mean Plaintiffs' 18. I apologize.
MR. KOLDE: Yeah.
A. Okay. So what was your question?
Q. What did you think about the opinions he expressed in the e-mail?
A. So this was in response or reply to the e-mail that I had sent to the soccer families, I believe.
What do I think about it? It's fairly strongly worded, insulting I suppose in some ways.
Q. Did you have a problem with the contents of the e-mail?

A. I wouldn't call it a problem. I didn't really, I mean, take it super personally or anything, no.

Q. Did you respond to the e-mail?

A. I did not.

Q. Okay. Did you yourself have any opinion about the New Hampshire state law that was enjoined in the Parker Tirrell matter?

A. What was the first part? Did I have what?

Q. Did you yourself have an opinion about the New Hampshire state law about the inclusion -- about not including biological boys in girls' sports in the state of New Hampshire?

A. No. I wouldn't say I had an opinion about it. At that point that was kind of the determining piece of my job is to follow what the law is telling us to do. So at that point I knew that Parker Tirrell, as well as the student from Pembroke, which is not playing in a fall sport, but I knew that Parker Tirrell was intending to play soccer for Plymouth and Plymouth was on our schedule, and we were going to, as far as I was concerned, play that game.

Q. Did you disagree with any of the political opinions that my client was expressing in this e-mail or otherwise about the issue of including trans-identifying players in girls' sports?

A. I don't necessarily agree that they are stronger,

faster, more physically dominant.

There are certainly instances which, you know, if we look at Riley Gaines, if we look at some of these incidents, sure, but I wouldn't characterize that as every transgender student athlete is physically strong, faster, and more dominant than their opponents.

Q. Is there anything else with regard to the issue of including biological boys in girls' sports that my client expressed that you disagreed with either in this e-mail or in your other interactions with him leading up to this event?

A. No. He can have his opinion, and that's perfectly fine.

Q. Okay. You got the e-mail from Shannon Foote also, right? Not Shannon Foote.

A. Shannon Farr?

Q. Farr, yes. Sorry.

Shannon Farr?

A. Yes.

Q. And you escalated that to Marcy Kelley; is that right?

A. I forwarded it to Marcy Kelley, yes.

Q. All right. Did you know Shannon Farr before that?

A. No. I know that she's a parent of a soccer player, a parent of students in our district. I was more aware of her husband than her.

Q. Okay. And without going into a lot of detail, how are you aware of her husband?
A. Because he coaches our middle school soccer team.
Q. I see. All right. Any other reason to be aware of him other than that?
A. No.
Q. All right. What did you and -- so we heard testimony earlier about Marcy Kelley's planning regarding preparing for this September 17th game. There was a piece of this that she said you'll have to ask Mike and Matt Fisk about it.
So fill that in for us, that gap. What did you and Matt Fisk talk about to prepare for this September 17th game based on the information you had in advance of the game?
A. Was that about additional personnel?
Q. I think, and anything else that you guys had decided to prepare for this particular game.
A. So we had met, you know, on multiple occasions on what the planning would be for it based on the information that we were given as Marcy just testified to.
So we were going to involve police or at least inquire about what they thought that we should do, if they thought they should be present, if they were able to be present, and then I also -- knowing that myself would be there and Mr. Fisk would be there, the Bow Police Department as

well. So then I also went to Mr. Forbes, Ms. Robb, and Mr. Doherty as our other teachers to kind of provide me with additional eyes and ears around the field.

Q. And what were those additional eyes and ears designed to help you with?

A. Just to see or hear anything that may be kind of brewing, for lack of a better term, but for anything that might be happening in terms of a protest, in terms of harassment or intimidation toward anybody on the field.

Q. Would it be fair to say that you were in part concerned about some of the parents wearing pink wristbands with XX on it?

A. Yes, but at that point we weren't aware if those wristbands were even going to be present.

Q. Had you seen them on social media at that point?

A. Yes.

Q. All right. So were they part of your concern?

A. Yes.

Q. Okay. And the XX wristband in particular, did you have a problem with that message?

THE COURT: What message?

MR. KOLDE: The message that is displayed on the wristband. His understanding of the message.

THE COURT: That's in dispute, I assumed.

Are you not disputing this? If you're not

disputing the message, as I think your witness has testified what the message was, why are we talking about this? We need to move on. It doesn't matter what preparations they had in anticipation of some demonstration that didn't occur. We don't need evidence on that.

MR. KOLDE: All right.

Q. Do we agree that nothing happened in the first half of the game -- of the game on September 17th?

A. Yes.

Q. All right. But something happened in the second half?

A. Correct.

Q. Tell us what it was.

THE COURT: Is this the same ground we're going to plow or do you have something different? We've already heard what happened. I don't need six witnesses to tell me what happened unless you've got something new or different.

Make a proffer.

Q. When you --

THE COURT: Make a proffer.

MR. KOLDE: I just want to ask him what he -- I'll skip ahead to this.

THE COURT: I know what you want to do. Make a proffer.

MR. KOLDE: All right. I would like to ask him

what he meant when he said we know what you're doing with the XX.

THE COURT: Okay.

Q. In the video -- we've all seen the video. We've heard the testimony, right?

At some point when people are talking to Eldon Rash and Kyle Fellers and trying to get Eldon to take the wristband off, somebody, it sounded like it might be you, said, it's got XX on it. We know what you're doing. Take the wristband off. I'm paraphrasing here. Do you recall that from the video?

A. I recall it from the video. It was not me that was speaking to Mr. Rash.

Q. All right. Who was it?

A. I believe it was Mr. Forbes.

Q. Did you agree with what Mr. Forbes said?

A. Yes.

Q. Okay. What did you understand that message to be?

A. What message?

Q. When you said, we know what you're doing.

A. Meaning we know that you are wearing that wristband because it has an XX on it, that's an anti-trans message, and we know that you're wearing that because Parker Tirrell is playing on the other team.

Q. Did you think that my clients were trying to get Parker to leave?

A. I don't know what your clients were trying to get her to do.

Q. Do you agree with the testimony and the evidence that we've presented so far in this case that on the sidelines other than wearing the pink wristband with the XX on it, that's the extent of what my clients did?

A. On the sideline, correct, until they were asked to remove them, and there was some dissent in those conversations.

Q. All right. So you have a concern about the dissent that my clients had resisting being told to remove the wristbands; is that correct?

A. Yes.

Q. All right. And the Court doesn't want to hear a lot about that. Just give us bullet points. What is your concern about that?

A. The disrespect in not -- it's not the wordage of the KFA policy, but not respecting what I was asking them to do as a game official. Mr. Foote said, you know, we didn't talk about our initial reaction -- or my initial conversation with Mr. Foote before any video came on. I said, Andy, you've got to take the wristband off. We can't do this today. And his response was, oh, what, this, and he wiped his forehead, it's just a sweatband. And then it became, well, it's just for breast cancer, and then it became the XX thing. So we

kind of went through a progression there of he wasn't going to take it off, he wasn't going to take it off. He did eventually in tossing it on the ground, and then I moved on.

And then the dissent from Mr. Fellers I think was pretty evident on the body cam footage as well.

Q. I want to wrap this up in the interest of time, but was there something -- in your view as an official on the scene enforcing this practice, was there something about the pink wristband with XX on it that made it different if it was being worn on the wrist versus it sitting on the ground or in some other location?

A. The wrist was the only spot that I saw it displayed.

Q. Okay. We agree that my clients didn't talk to Parker, didn't gesture at Parker, or anything like that?

A. I didn't see them do that.

Q. And you did not see anybody wear the NAD wristbands there at the scene; is that correct?

A. Correct.

Q. Did you ask anybody else to remove the wristbands other than my clients in this case?

A. No. There was a gentleman standing next to Mr. Foote that removed it as soon as I asked Andy to as well. I don't know who that was, though.

Q. Okay. In hindsight do you think that maybe this

situation could have been handled a little better by you and the other officials?

A. No.

Q. Okay. Why not just talk to my clients in advance of the game before things became what they did?

A. Well, I did communicate with your clients before the game via e-mail.

MR. KOLDE: Nothing further at this time.

THE COURT: Thank you, Mr. Kolde.

Mr. Shirley.

CROSS-EXAMINATION

BY MR. SHIRLEY:

Q. Mr. Desilets, what time did you arrive to the field on the day of September 17th?

A. Approximately 2:15.

Q. Why were you there at that hour?

A. To get the field set up prior to the teams and spectators arriving.

Q. And at that moment and time when you arrived to the field that day what did you know about the plans of anybody with regard to protests, armbands, what have you? What did you know? What was the plan?

A. I don't know.

Q. You had no idea. You had received an e-mail from a Ms. Farr, correct, several days earlier?

A. Yes.
Q. And we've seen that document. I'm not going to pull it up. I'll just represent to you it describes -- and you read that e-mail at the time you received it, right?
A. Yes.
Q. It talked about several forms of things that were being discussed that she had overheard, right?
A. Right.
Q. And there was the suggestion there was going to be heckling possibly?
A. Yes.
Q. And maybe dressing up as girls?
A. Correct.
Q. Okay. So on the day that you're at the field you know somebody has heard that that's the possible scope of something that's going to happen, but you don't know for sure?
A. Correct.
Q. Okay. Did you see Mr. Foote arrive?
A. I did.
Q. Okay. And he parked where?
A. He parked in kind of a side parking lot behind one of the goals. I don't know if you want to pull up that map.
Q. I'm going to pull up the field exhibit. I'll tell you in just a second. 13.
On the screen you'll see Plaintiffs' Exhibit 13. I

think actually if you touch, you can maybe even mark the screen, but if you would indicate either behind you or on the screen? There you go.
A. Somewhere in one of those spots, yes.
Q. Okay. So that's parking -- where he parked his vehicle?
A. Yes.
Q. And you said at what time was that?
A. I would guess about approximately 2:30.
Q. Okay. And when was the game planned for?
A. 4 o'clock.
Q. So about an hour and a half earlier?
A. Yes.
Q. Okay. And what did he do then? Did he get out of his car?
A. He got out of his car, grabbed what I assumed were a couple camp chairs, and walked to the parent sideline. He typically sits right at the 50-yard line.
Q. Okay. And what were you doing during this time?
A. We were sitting -- myself, Marcy, and Matt, as well as the additional game help, were seated around -- standing around the golf cart, in that area.
Q. Did he attempt to talk to you?
A. No.
Q. Okay. Did he have anything else with him in

addition to the chairs?

A. He did. I don't know if he carried it with the chairs or not, but there was an additional bag, like a Shaw's or a Market Basket bag, a plastic grocery bag that we could tell had something pink inside.

Q. Okay. You had been speaking -- prior to that day you had actually spoken with Mr. Foote's wife; is that right?

A. Correct.

Q. Okay. You met with her in fact?

A. I did.

Q. Okay. And roughly when did that happen?

A. I believe that was on Friday -- I think it was Friday the 13th.

Q. Okay. And what was the purpose of that meeting?

A. She wanted to express her concerns about playing against Plymouth and playing against a transgender soccer player, that should we -- are we considering a forfeit, what are we considering to address this, and things like that.

Q. And what did you say in response?

A. My general response was that if there are girls on our team that don't want to play, they don't have to, they're not going to be forced to, but we are planning to play. Based on the injunction, based on the law, that we're going to play the schedule that's given to us. And I'm assuming that Plymouth is sending a roster of athletes that are in

compliance legally, and that we were going to play. That I wasn't really looking at a forfeit as an option.

Q. Okay. And did she have any response to your response?

A. She disagreed with it.

Q. Okay. That was a meeting that took place after you had received Ms. Farr's e-mail, right? Ms. Farr e-mails you on September 11th?

A. Right.

Q. Yes. And this was the 13th?

A. Yes.

Q. Any discussion by Mrs. Foote about what was being planned the day of the game?

A. No.

Q. Okay. You became aware -- between that meeting with Ms. Foote and the day of the game you had seen images of wristbands, correct?

A. Yes.

Q. And then you also had Ms. Farr's e-mail describing the possibility of things happening?

A. Yes.

Q. And I want to go back then to the day of the game.

When your decision is made that you're going to ask, say, Mr. Foote to remove the wristbands, did you know that that was it, that that's all they wanted to do?

A. No. I had no idea.
Q. Okay. And did you have a concern that if you didn't do something at that point, more would happen?
A. Yes.
Q. Okay. Thank you.
I want to step back just for a second.
School athletics, does that have any educational aspect or component to it?
A. School athletics is a term education-based athletics. So, yes, there is a carryover from the classroom. An extension of the classroom I think is the common phrase that's used. So yes.
Q. In terms of participation, is it mandatory?
A. No.
Q. With regard to what you do on a day-to-day basis as athletic director, do you attend games regularly?
A. I do.
Q. Okay. Do you have occasion to talk to referees?
A. I do.
Q. Do you do it during the game?
A. If needed. Sometimes at halftime.
Q. Do you do it sometimes before the game?
A. Yes.
Q. Do you do it sometimes days before the game?
A. Yes.

Q. What kind of things do you talk to referees about?
A. I mean, it depends on the situation. If there's any special circumstances within the game, if it's our senior night and we're going to use some time before the game to introduce seniors, if there's any sort of special event going on at halftime, if there's a band playing at halftime, if there's weather concerns coming in, if it's a heated game and we've played this team previously and there's a rivalry. Just things that would be helpful for a referee to know going into the game.
Q. How about when you're at games? Do you ever have an occasion to try to patrol the sidelines?
A. Yes.
Q. What kind of things would provoke you to go into the sidelines?
A. Any sort of disruptive behavior, inappropriate language, dissent towards officials or players, things like that.
Q. Okay. And why would you care? Why do you care?
A. Because it's part of my job just to control the sideline. I like to view the game itself. On the field once the game starts, it's the referee's discretion to control that, but I like to be able to control the outside piece of that.
Q. We were looking earlier at, I'm not sure if it was

through you, but through Ms. Kelley, looking at policy KFA. You saw that on the screen just a little earlier this morning, but there's policies as well that govern athletics; is that right?

A. Sure. Yes.

Q. Okay. And what is that generally?

A. Well, there's NHIAA policies, which is our member organization. There's rules within our own athletic handbook.

Q. And what do those rules in the athletic handbook talk to? What do they speak to?

A. Sportsmanship. Generally speaking, sportsmanship, sideline behavior.

MR. SHIRLEY: Would you call up Exhibit I, Stacy?

And this is Exhibit I. It's been introduced already. It's a full exhibit.

Q. Just quickly, this is your e-mail that you sent on September 16th, correct?

A. Yes.

Q. And this was sent to whom?

A. This was sent to the girls' soccer team families.

Q. Okay. And how does that get decided? Like, what's that supposed to look like?

A. We have a platform called Final Forms, which is our registration platform. So parents have to register their student athletes to participate in a sport, and that will

populate e-mail lists of parents, families, student athletes only. There are a number of different filters that I can use, so I chose the parent, e-mail parent feature to that, which is going to send an e-mail to whoever's e-mail address is listed in that registration.

Q. Okay. I may come back to the contents of this e-mail, but I really want to just turn to the second page, if you would.

You're now seeing what was the attachment, correct?

A. Yes.

Q. And what is this document?

A. The top paragraph is essentially information about us being a -- Bow High School being a member school of the NHIAA and that they have a full slate of handbook rules and regulations that we are expected to follow.

Q. And what's the bottom half part of this document?

A. The bottom half is a cut and paste essentially from our BHS Athletics Handbook.

Q. Okay. And so you made this document. You kind of took two pieces and photographed them together -- or copied them together?

A. Yes.

Q. And this was attached to that e-mail. And, again, this business -- what you see from the athletics handbook is a statement about sportsmanship; is that right?

A. Yes.
Q. And when you say that there's policies about how games are played and what's expected of players and fans, it's contained in this statement, right?
A. I believe so.
Q. Okay. And with regard to the business -- you earlier just described that this handbook -- when parents are enrolling their children into a program such as varsity girls' soccer, is there anything about -- do the students have to acknowledge this handbook in some way?
A. Yes.
Q. Okay. And how does that happen?
A. It happens through that registration platform Final Forms where they have to agree to a number of different things. They have to include medical history and things like that. Part of that is essentially a checkbox that they acknowledge that -- that they're acknowledging the handbook.
Q. That this is one of the policies in participating in this activity, correct?
A. Yes.
Q. And parents have to do the same thing, the parents who enroll their children, correct?
A. Yes.
Q. Okay. Do we know if any of the plaintiffs in this case did that?

A. Yes.
Q. Did they enroll their kids in the girls' soccer team for this last fall?
A. They did, yes.
Q. By the way, is this policy available online, the handbook?
A. Yes, it is.
Q. It's on the Bow High School website?
A. Yes.
Q. I'm briefly just going to -- you were there.
Back to the day of the game. It's now halftime. You had not seen anything happen up to the point of halftime, correct?
A. Correct.
Q. Okay. And then the second half begins, and at that point where are you on the field?
THE COURT: Again, I've heard all the evidence.
MR. SHIRLEY: That's fine.
THE COURT: Unless you've got something new or different.
MR. SHIRLEY: There is one more piece, your Honor, a proffer about the very end of the game. It may be just useful to know. So I'll jump to that, if I may.
THE COURT: Thank you.
Q. At the end of the game it concludes, and I'll try

to do this in a -- with respect to the Bow team -- excuse me. I meant to say with respect to the Plymouth team, the game concludes --

MR. SHIRLEY: Can you actually pull up, if you would -- this may be a better way to do it. Just pull up Exhibit 13.

There you go. Thank you.

Q. On the screen of course, Mr. Desilets, is an overview of the field.

Can you indicate, again with your finger, where was the Plymouth bus?

A. Towards the end of the game I had instructed or requested that the bus driver park his bus -- am I just pointing to it again?

Q. If you would rub your finger on the screen.

A. Sort of in this dirt parking lot.

Q. Okay. And is that where the bus was when the game concluded?

A. Yes.

Q. Okay. Did you give any specific direction to the Plymouth team upon exiting what they should do?

A. Once the game ended I went onto the field towards their bench, which was on this far side of the field, and tried to kind of filter or usher them towards their bus. There's a gate in the fence right near where their bus was.

So it was kind of a direct line to their bus.
Q. Can you kind of maybe with a dotted line point us to how you were directing them to leave?
A. Yeah. So if they were gathered on their sideline, they just kind of were going to go this way.
Q. Okay. And was there a reason that you wanted them to do it that way?
A. I just felt like it was a better option than having them kind of dispersed through the crowd that typically is on the other side, other end of the field.
Q. Okay. Did you become aware of where Mr. Fellers was at the end of the game?
A. In that process, I suppose, of kind of ushering them. So when I'm probably in this area here, good game, congratulations, you know, head out this way, good luck the rest of the season, and I got a phone call from Ms. Kelley that said that Mr. Fellers was still at the game or still on the property and he was parked near the road where the bus may travel holding up a sign.
Q. Based on what you now understand, are you able to indicate where you believe Mr. Fellers was?
A. Yes. In that area.
Q. Okay. How does the bus leave if it's going to leave at that point?
A. Well, it depends I guess on the bus driver. I

don't know what their intention was. They had come in along this road. So oftentimes they will also go out the same way they came in. So I don't know which direction they were going to head in. They can certainly go this way as well.

Q. Okay.

MR. SHIRLEY: Thank you, Mr. Desilets.

THE COURT: Thank you, Attorney Shirley.

Mr. Ducharme.

CROSS-EXAMINATION

BY MR. DUCHARME:

Q. Mr. Desilets, what was the score at the time of the stoppage by Mr. Rossetti?

A. I don't know the exact score. I know that we were -- that Bow was winning I would say 2-1 or 3-1 at least, yeah.

Q. If Mr. Rossetti had called the game at that point, what's the effect?

A. I believe that the rule in soccer is if a game is suspended, which typically would happen I guess for weather, certainly not in this case, but the rule states that if a game is suspended in the second half, it is considered final.

Q. Sort of like the sixth inning of a baseball game?

A. Right. Yes.

MR. DUCHARME: Okay. Thank you.

THE COURT: Redirect based on that?

MR. KOLDE: Yes, although it's really cross, your

Honor, but I suppose it's a hostile witness.

THE COURT: No. It's direct. You just get some liberty on direct if it's a hostile witness, which you haven't established, by the way, but I'll accept.

MR. KOLDE: Yes.

REDIRECT-EXAMINATION

BY MR. KOLDE:

Q. Mr. Desilets, you were asked some questions about the referee and the rules of the game.

Did you talk to this referee ahead of the game?

A. Yes.

Q. Okay. And what did you tell him?

A. I sent an e-mail to Steve Rossetti and Ryan Murphy as the officials to let them know that we had been hearing some things of potential disruptions to the game in the form of a protest.

Q. Did you say anything beyond that in the e-mail?

A. Is that part of the -- do we have that e-mail that I can review or am I just going from my memory?

Q. I don't have the e-mail.

A. No, I don't believe so.

Q. So it's fair to say that you had informed Steve Rossetti ahead of time that there might be some kind of issues with speech activities at the September 17th game, correct?

A. Correct.

Q. Did you do anything else other than e-mail him ahead of time? Did you have a conversation with him when he arrived?

A. It's pretty standard for me to welcome officials to the games and just have conversations, yes.

Q. Did the issue of your concerns that there might be some kind of expression of opinions at the game come up in your brief meet-and-greet at the beginning?

A. It may have been reminded. It was nothing extended beyond that initial conversation.

Q. Did Steve Rossetti respond to your e-mail that you had sent before the game?

A. I don't believe so.

Q. Okay. And we all know about the stoppage, and Mr. Ducharme asked you some questions about the stoppage and what the rule is.

We've seen the videotape and some people, and I don't recall if it was you and Mr. Fisk or just Mr. Fisk, were telling Eldon Rash essentially, look, you know, this could end up in a forfeit for your granddaughter, or I believe the exact words were adverse consequences for your granddaughter.

Were you there to hear that?

A. I don't believe so.

Q. Okay. Did you hear anybody, any of the Bow officials talking to Eldon Rash that day telling him

essentially you need to take this off or we're going to have a problem here with a forfeit or something like that?

A. Not a forfeit. I was there when Mr. Fisk initiated the conversation. When the stoppage happened and I went on the field, I think there was further conversation that I wasn't present for.

Q. Were you present when Steve Rossetti walked up and said, the wristband comes off or this game is over?

A. I believe I was talking to the Plymouth coach at that point.

Q. Okay. So you weren't there for that part?

A. Correct.

Q. All right. But you saw it on the video?

A. Yes.

Q. All right. Did you talk to Steve Rossetti on the field during the stoppage?

A. Yes.

Q. Did you ask him to do anything?

A. No.

Q. What did you tell him?

A. He blew the whistle, which stopped it, and that prompted me to walk onto the field to meet with him because, A, I didn't know why he had stopped it. I had an idea, but I don't know what he -- so we discussed, you know, that he had heard there was a commotion. And I said, yeah, I think

that -- I don't know that there's a lot of -- a lot left of it. I said, let's wait a couple minutes to see if we can get this wristband off and resume the game.

Q. Did he follow your direction to wait a few minutes?

A. He did. I originally thought that maybe we would continue the game then, but at that point the teams had already gone back to the sidelines so it didn't make sense to call them back out. So essentially it remained stopped at that point.

Q. Did Mr. Rossetti say anything about what he thought about the wristbands being worn by my clients?

A. No.

Q. Did Rossetti ask you to do anything?

A. Other than let him know, no.

Q. Did you and he discuss a possibility of abandoning the game or stopping the game from that point on because of the wristbands?

A. Not at that point. I think the second conversation that came up.

Q. All right. So tell me about what was discussed in that second conversation relative to abandoning or stopping the game because my clients were wearing the wristbands -- or at this point it was only Eldon Rash.

A. Yeah. That was more along the lines of what do you want to do, we've been delayed here for however long it was,

ten, fifteen minutes, you know, at this point the game would be considered final. How long do we wait? What do you want to do from here?

Q. And what did Rossetti say?

A. That's what Rossetti had said.

Q. Oh. And what did you say?

A. I just kind of continued, you know, I'm going to talk to the coaches, let's see where we're going and give them some information.

Q. I can barely hear you.

A. Talk to the coaches to give them information because they weren't necessarily in the loop of why the stoppage had happened, trying to explain to them, explain to the Plymouth coach that an option was to --

Q. Right. I'm only asking you about Rossetti. So let's focus on Rossetti, all right?

So Rossetti offered to call the game; is that correct?

A. It was presented as an option.

Q. Okay. And he was presenting the option to you; is that correct?

A. Yes.

Q. And what feedback did you give him on that option?

A. Essentially, not yet.

Q. Okay. Wait and see; is that right?

A. Yes.
Q. And that's what you did; is that correct?
A. Yes.
Q. All right. And then eventually my client, Eldon Rash, did take the wristband off and placed it on his knee; is that correct?
A. Correct.
Q. All right. And you learned that through the radio call from Ben Forbes, correct?
A. Yes.
Q. All right. And that was important information to you; is that correct?
A. It was.
Q. And at that point you instructed Steve Rossetti to go ahead and resume the game; is that correct?
A. Yes.
Q. All right.
MR. KOLDE: Nothing further.
THE COURT: Great. Anything else based on that? No? Good.
All right. We'll adjourn for lunch now. Why don't we say 1:15 and try to cut it back just a little bit.
We're going to stop at 4:30 today whatever.
MR. KOLDE: Understood.
THE COURT: I can't imagine there's any evidence

left that we haven't already seen or covered. But if we arrive at 4:30 and you claim there is such evidence, any of you, we'll reschedule it into the future if necessary, but probably what I'll do is limit you to offers of proof to fill in the record as you think best.

Okay. See you at 1:15.

(RECESS)

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.

Submitted: 12-2-24 /s/ Susan M. Bateman ________________
SUSAN M. BATEMAN, RPR, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * *

KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, AND ELDON RASH,

Plaintiffs.

v.

MARCY KELLEY, MICHAEL DESILETS, MATT FISK, BOW SCHOOL DISTRICT, PHILIP LAMY & STEVE ROSSETTI,

Defendants.

* * * * * * * * * * * * * * * * * *

No. 1:24-cv-311-SM-AJ
November 22, 2024
1:20 p.m.

TRANSCRIPT OF EVIDENTIARY HEARING -DAY TWO
AFTERNOON SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Plaintiffs: Endel Kolde, Esq.
Brett Robert Nolan, Esq.
Nathan John Ristuccia, Esq.
Institute for Free Speech

Richard J. Lehmann, Esq.
Lehmann Major List PLLC

For the Defendants: Marcy Kelley, Michael Desilets, Matthew Fisk, Philip Lamy, Bow School District
Brian J.S. Cullen, Esq.
Jonathan M. Shirley, Esq.
Cullen Collimore Shirley PLLC

For the Defendant Steve Rossetti:
Dennis T. Ducharme, Esq.
Ducharme Resolutions PLLC

Court Reporter: Brenda K. Hancock, RMR, CRR
Official Court Reporter
United States District Court
55 Pleasant Street
Concord, NH 03301
(603) 225-1454

I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| STEPHEN ROSSETTI | | | | |
| By Mr. Kolde | 4 | | | |
| By Mr. Ducharme | | 15 | | |
| MATTHEW FISK | | | | |
| By Mr. Shirley | 20 | | | |
| By Mr. Kolde | | 26 | | |

P R O C E E D I N G S

THE CLERK: All rise for the Honorable Court.

THE COURT: Okay. Getting there, right?

MR. KOLDE: Ready to roll, your Honor.

THE COURT: All right.

MR. KOLDE: If I may proceed, your Honor, plaintiffs call Steve Rossetti.

THE COURT: Last witness?

MR. KOLDE: Last witness for us, yes, your Honor. We'll, obviously, want to cross whoever they call.

THE CLERK: If you would remain standing and raise your right hand.

**STEPHEN ROSSETTI**, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK: Thank you. Please be seated, and please state your full name for the record.

THE WITNESS: Stephen Carl Rossetti.

DIRECT EXAMINATION

BY MR. KOLDE:

Q. Mr. Rossetti, we've never met, correct?

A. Yesterday.

Q. Oh. I shook your hand, right? And you live in Bow; is that right?

A. I do.

Q. And you are a soccer referee for youth soccer games,

correct?
A.   Yes.
Q.   When you referee for the Bow High School girls' varsity soccer team, are you there as an employee of the School District, some kind of sporting body, or are you an independent contractor or something else?
A.   As a referee, I'm an independent contractor.
Q.   All right.  But this September 17th game that we've been talking about was an unusual game, is it fair to say?
A.   No.
Q.   Oh.
A.   You're talking about the game, correct?
Q.   I mean, you heard the question.
A.   Okay.  No, it wasn't unusual.
Q.   Is it normal for you to get an email ahead of time from the athletic director at the high school warning you about potential problems that are anticipated at the game?
A.   It is normal.  I get them from all the athletic directors in the state, because I am the assigner for all the games in the state.  So, it is normal to get emails and phone calls.
Q.   For every game?
A.   For a lot of games, when situations come up.
Q.   For the September 17th game you got an email from Desilets; is that correct?
A.   I did.

Q. What did that email say?
A. That they were playing Plymouth, and Plymouth had a transgender player, and they're going to have extra security at the game.
Q. What else did the email say?
A. That's about it. It's all I can remember.
Q. What did that mean to you in terms of the actions you would take?
A. None.
Q. At that point that you received the email from Mike Desilets had you already assigned yourself to the game in question?
A. I did. I already had, yes.
Q. Do you go out of your way to assign yourself to games where you know Parker Tirrell is playing?
A. You know, I didn't know that person's name until yesterday.
Q. Did you have awareness that there was a trans player playing on the Plymouth team prior to September 17th and go out of your way to assign yourself to games where you knew a trans player was playing, regardless of whether you knew the player's name?
A. Okay. I'm sorry. I don't understand the question.
Q. I'm just trying to ask you, do you try to ref the games where you know a trans player is on the field?

A. Do I try to?

Q. Yes.

A. Well, I didn't know there was a trans player, transgender player on the Plymouth team until the Thursday before, when I was at Pembroke reffing the Plymouth game, and someone said, There's a transgender player on the Plymouth team. That's when I knew.

Q. And at that point had you already been assigned or assigned yourself to the September 17th game?

A. I had already been assigned, yes.

Q. Is it fair to say that you knew there might be some kind of an issue that the officials anticipated when you arrived to referee the September 17th game?

A. You know, I wish I had known all the stuff from yesterday, because I wouldn't have refereed that game. All those emails and things that everybody was sending out and the, what do you call it, social media that I don't look at, if I had known all of that prior to I wouldn't have done the game.

Q. Why? Because it's not worth the hassle or some other reason?

A. Not worth any hassle. There's enough hassle reffing the game.

Q. Is it fair to say that you were on the lookout during the game for some kind of a free-speech activity or demonstration on the sidelines?

A. No.
Q. You heard Steve -- Mike Desilets, rather, testify about your conversation with you in the middle of the field earlier, correct?
A. Yes.
Q. All right. It sounds like there were two conversations, one at the beginning of the stoppage and one at the end of the stoppage, correct?
A. Yes.
Q. All right. Is it correct that you discussed with Mike Desilets what to do about whether to resume the game or to abandon the game?
A. Yes.
Q. And is it correct that you provided Mike Desilets options for what you could do?
A. Well, it was two different conversations. In the second one is when we talked about that.
Q. All right. So, let's talk about the first conversation, and we don't need every detail, but basically what was talked about on the first conversation?
A. Well, he came out and mentioned that there was a commotion going on and that one of the people they were trying to get to leave, and that's when I said to the players, Go to your benches.
Q. And that was the conversation you had with him, correct?

A. Yes.
Q. All right. And did you guys talk about anything else at that point? Did he tell you that it was about a pink wristband with XX on it?
A. No, not that I remember.
Q. Had you seen the wristbands at that point?
A. No.
Q. You weren't even aware who was wearing the wristbands, correct?
A. Yes, I was not.
Q. Just making sure, okay, that we understand the answer. You were not aware, correct?
A. Correct.
Q. When you came over to the sideline and began addressing Eldon Rash, you said something to the effect of, Is this the person that's wearing the wristband?
A. You know, that's not really how it happened. Can I tell you how it happened?
Q. Okay.
A. In a conversation with Mike Desilets he said that the first person had left, but there's someone sitting at midfield with a wristband on, and he won't take it off. Now, there had been at least ten minutes go by, and, as a referee, we need to do something to get this game going again, so I walked over and said, as you could see in the clip, Why don't you take the

wristband off, or the game's going to be over.
Q. Did you, yourself, have any understanding of what the meaning of the wristband was that Eldon Rash was wearing?
A. Absolutely not.
Q. Did you have any opinion about the wristband's meaning?
A. Absolutely not.
Q. Then, why did you say, You have no right to embarrass kids like that?
A. I don't remember saying that.
Q. In the second conversation that you had on the field, that's when you gave Mike Desilets options about stopping the game, or abandoning the game, or figuring out what to do; is that correct?
A. Yes. We talked about that, both of us, yeah.
Q. All right. He described the options that you provided, and I just want to hear you say it in your own words. What were the options you provided to Mike Desilets in that second conversation on the field after you had spoken to Mr. Rash and directed him to remove the wristband?
A. I told him that, Where there's 23 minutes left in the game, and in New Hampshire high school soccer it's a legal game, we can just leave, and he said, Why don't we just wait a little bit longer, and within a couple of minutes he got a walkie-talkie and he said to me that the person took his wristband off, so we restarted the game.

Q. Did Mike Desilets tell you in either of the conversations that it was essential for both schools to have that wristband removed before the gameplay was resumed?
A. No.
Q. Then, why did you walk over to ask Eldon Rash or to tell him that the game was over if he didn't remove the wristband?
A. Mike said, We have one person left wearing a wristband, and I wanted to get the game restarted, so I walked over and told him, Why don't you take it off.
Q. I know, but there's no rule against wearing wristbands at youth soccer games, so, Mr. Rossetti, please explain to us, if you didn't know what the wristbands meant --
THE COURT: I understand. There's no jury. No objection is necessary.
Q. -- why did you ask him to remove the wristband? Why did you care?
A. I really didn't care, but it didn't look like the game was going to start unless he took it off. That was my impression.
Q. And the reason the game wasn't going to start was because Mike Desilets asked you not to restart the game until after the wristband was taken off?
A. Mike just said, There's one person still wearing a wristband.
Q. Why did you care?
A. Well, I really don't care, but I wanted to get the game

started, so I went over.
Q. I mean, you were the one deciding whether the game started or not, right, so why did you care whether he was wearing the wristband?
A. Because Mike said, There's one guy still wearing a wristband.
Q. I understand Mike said that. So, were you taking directions from Mike about whether to restart the game, then?
A. No. We were just talking about what was going on.
Q. Okay. So, do you have any explanation for why it mattered to you that Eldon Rash was still wearing a wristband, why that was necessary for him to remove the wristband before you restarted the game? That's what you said, right?
A. Right. I did say that.
Q. Why did you say that?
A. Because it seemed to be that was what Mike Desilets wanted. He wanted it off.
Q. If any of the school officials on the sidelines told my client, Eldon Rash, that the game would be forfeited if it didn't resume and could cost the Bow girls' team a playoff spot, would that have been inaccurate?
A. Yes.
Q. Because of the rule that you explained earlier, that, if you're in the second half and the game is abandoned, it's completed with the score to that point; is that correct?

A. Yes.
Q. When you spoke to Eldon Rash and said something to the effect of, The wristband comes off or this game is over, you said that because you wanted him to remove the wristband; is that correct?
A. I wanted to restart the game.
Q. Yeah, but you said that because you wanted him to remove the wristband so you could restart the game; is that correct?
A. Yes.
Q. You heard testimony about what happened out on the parking lot after the game. Do you think you could have handled any of that a little better?
A. Absolutely.
Q. In what way?
A. Well, first of all, you don't have the whole story of what happened out there. I was provoked, and that's never been brought up.
Q. Okay. I don't think we need to get into a ton of detail on that, but in what way were you provoked to swearing at my client?
A. Okay. My partner and I went walking out towards our car, and I can't believe that there's some guy there holding a sign next to my car, and I'm going, How does he know where my car is? And then I go -- then I realize, No, he doesn't know it's my car; he's just there for some other reason. Oh, was the

Plymouth school bus right there? Yes, it was. So, he's eyeballing us, trying to stare us down, nodding his head at us, and my partner gets into it with him, and I said, Don't talk to that asshole. And then we started to take our shirts off and get ready to leave, and he provoked me into getting into a banter with him, and I ended up saying and called him a fuckin' asshole.
Q. And the reason you called him that is because you disagreed with the pink wristbands with XX on it, correct?
A. You know, I don't even know what those wristbands were until I came here.
Q. And you disagreed with the sign that he was displaying out in the parking lot?
A. I didn't even know what the sign said, but he's holding up a sign. I found out what the sign said here.
Q. Then why did you call him an asshole?
A. You know, just an adjective.
Q. I think I'm almost down here, Mr. Rossetti.
Why, if you didn't care what my client was saying, why did you roll down your window and say to him, Your daughter is going to hate you in 20 years?
A. I did say that.
Q. How come?
A. Because he had provoked me, and I was upset.
Q. His daughter's going to hate her dad because he provoked

some ref?
A. You know, I don't know where it came from, but it came.
MR. KOLDE: Nothing further.
THE COURT: Mr. Cullen, or do you want to go with Mr. Ducharme first? It's your witness or your client.

CROSS-EXAMINATION

BY MR. DUCHARME:
Q. Mr. Rossetti, are you a political person?
A. No.
Q. Are you a social media person?
A. No.
Q. Do you take positions on issues in public?
A. No.
Q. How long have you been a ref?
A. Fifty-three years.
Q. How many sports?
A. Three.
Q. About how many games do you do a year between the three sports you do or have done?
A. About 170.
Q. For 53 years?
A. Mm-hmm.
Q. So, thousands and thousands of games?
A. Mm-hmm.
Q. Okay. Try to say "Yes."

A. Yes. I'm sorry.
Q. That's okay. Real quickly, because I don't think the Court really cares about any of this right now, what's game management?
A. Making sure that the rules are enforced and the players are protected. Oh, game management at a certain field, it's usually the athletic director, and if there's no athletic director they usually have a teacher there taking their place, and if there's neither it's usually the home coach.
Q. And what's the interplay between game management and the on-field or on-court officials?
A. Well, before the game we always check in with game management and ask them how things are and what's going on and, Anything special going to happen today?
Q. And in this case you did get the email?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. And you knew there could be some sort of activity going on?
A. Yes.
Q. Okay. What caught your attention that day? We've seen the video, but what caught your attention?
A. I was on the fan side and going back -- up and down, and I heard a commotion going on, which is hard for me, because I'm

focused on the game, but I heard a commotion that was loud enough for me to look, and in the video you can see that I look, and I saw the police officer being animated with a person, and I'm going -- I went to myself, You know what?  This isn't good for the players.  So, next chance I had, dead ball, I stopped the game, went over to midfield to talk to my partner, and that's when Mike came out and told me what was going on.
Q.   So, that's the lead-up to everything we saw on the bodycam?
A.   Yes.
Q.   And I think you've been pretty clear up until this all sort of blew up you didn't know what these wristbands were all about.
A.   I did not know.
Q.   Did you care what the cause of the commotion with the police officer was?
A.   No.
Q.   Have you had to stop games during your career before because of a commotion in the stands, a fight in the stands?
A.   Yes.
Q.   Is it a frequent thing, a once-in-a-while thing?
A.   Once in a while.
Q.   In terms of the interaction that's been described by Mr. Desilets and that we saw on the video, is how this shook

out with you and him as game management any different than you've had happen at other games?
A. No, not at all. It was good.
Q. And, ultimately, is it fair to say that you're the guy who made the call to stop the game?
A. Yes.
Q. But from thereon you're working, and he wants that wristband off, right?
A. Yes.
Q. Do you care why he wants it off?
A. No.
Q. And you know that the wristband has something to do with the police presence and the commotion?
A. Yes.
Q. Okay. When did you assign yourself this game, this September 17th game?
A. In July.
Q. You're assigning basketball right now?
A. Yes.
Q. What months are you assigning for basketball now?
A. Right now I'm in February.
Q. Mr. Kolde asked you some questions about you picking and choosing and assigning yourself for games with trans athletes in them? Is that --
A. No.

Q. -- anything you've ever thought of doing?
A. No, no.
Q. Why did you assign yourself to this game back in July?
A. Back in July I assigned myself to this game because Bow is a very good team, and in past years Plymouth hasn't been very competitive, and after reffing 53 years doing a less-competitive game is a good thing to do for an old man like me.

MR. DUCHARME: That's all I have, sir.

THE COURT: Mr. Cullen?

MR. SHIRLEY: It will be me, and no questions, your Honor.

MR. CULLEN: I'm sorry, your Honor.

THE COURT: Mr. Shirley, no questions.

No redirect, I assume.

Thank you, sir. You may step down. You're excused as a witness in this case.

(Witness stepped down)

THE COURT: And next witness.

MR. KOLDE: We're done with our part, your Honor.

THE COURT: Excellent.

Mr. Shirley.

MR. SHIRLEY: We're going to call Matt Fisk, your Honor, as our potentially only witness.

THE CLERK: Please remain standing and raise your

right hand.

**MATTHEW FISK**, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK: Thank you. Please be seated. Please state your full name for the record.

THE WITNESS: Matthew Fisk.

DIRECT EXAMINATION

BY MR. SHIRLEY:

Q. No e?

A. No e, just like Carlton.

Q. Would you describe your position with Bow High School?

A. I am the principal of Bow High School.

Q. How long have you been principal?

A. I became principal on July 1st of this year.

Q. And have you been with Bow before that?

A. Yes. For five years I was the assistant principal.

Q. Did you have any role before being assistant principal with Bow?

A. No.

Q. What's your background before that, teacher?

A. Yes. I began my career teaching social studies at Concord High School. I then went to New Hampton school, a prep school in the Lakes Region, where I taught social studies, and then for the last six years of my tenure there I was the academic dean. I also coached both boys' and girls' varsity cross

country.
Q. Where did you grow up?
A. Right here in Concord.
Q. Are there gay students at Bow High School?
A. Yes.
Q. Are there transgender students at Bow High School?
A. Yes.
Q. What is GSA?
A. GSA stands for Gay-Straight Alliance.
Q. What is it?
A. The Gay-Straight Alliance is an extracurricular club that the school offers.
Q. Who attends a Gay-Straight Alliance club meeting?
A. The club is open to any Bow High School student.
Q. Where do the meetings take place?
A. They vary, but this year they're taking place in one of the special education teacher's classrooms.
Q. What time of day?
A. Either before or after school.
Q. Do you have a capacity with respect to that organization?
A. I do.
Q. What is that?
A. For the past two years I've been helping to advise that group.
Q. Can you just fill in what would that -- when you're doing

that job or that role what is called upon? What are you called upon to do?
A. If the students want to watch a film, I help arrange a space for them to be able to do so. We have a club fair at the beginning of the year, so I work with the student leaders in the club to help organize posters, so as part of the fair that we set up outside the school with the other clubs, so they can find interested students, and then handle logistical things that come up.
Q. In your capacity as both principal and assistant principal before that and in this advisory role have you come to understand some of the issues that transgender students struggle with?
A. Yes.
Q. Can you describe to the Court your experiences with that?
A. Sure. We have several transgender students who I have talked with over the tenure at Bow High School. I know that, just like every student struggles, trans students suffer from a higher rate of suicide and depression than other high school students. In direct conversation with some of these kids they've shared heartbreaking stories about some of the things that they've experienced.
MR. KOLDE: Your Honor, I am going to just note an objection that this is hearsay testimony about unidentified students.

THE COURT: Objection overruled.
MR. SHIRLEY: Thank you.
Q. Continue.
A. I can think of one specific student who I've talked with for the entirety of their time at Bow High School who has been hospitalized for self-harm, and a leading cause of that is some of the stress that this child feels from peers and society.
Q. Thank you. Shifting a little bit of the focus now, let's talk just quickly about speech issues that you confront.
A. Yes.
Q. Do you have moments in time where you have to address speech issues in the school setting?
A. Yes.
Q. Can you give me an example of something that would be -- where you've been involved?
A. I mean, a basic one, if I'm walking the halls and I hear a student swear, I'll tend to say, Watch your language.
Q. Yeah.
A. Right.
Q. Any issues about race, sex, gender, any of these issues that you have had to intervene with students on?
A. Yes.
Q. Okay. Confederate flag, perhaps? Is that an issue you've had to be involved in?
A. Yes. Approximately four years ago -- we have gmail as our

email system, and you can have, like, your picture be your background there. One of the students had a Confederate flag, so I'm a social studies teacher, so I brought him into my office and asked him what was the message that he was intending to send. And he said, you know, I'm against -- I'm against government. And so, I talked to him about the symbol for many people has come to have really racist undertones, and so we talked about other symbols he could use, and he decided to change the symbol to the Don't Tread on Me flag.
Q. How about the parking lot? Does any old symbol just come walk into that parking lot or drive into that parking lot? Do you have no concerns about that?
A. Prior to my arriving at Bow High School the principal did deal with a truck that was flying the Confederate flag around the parking lot, and he asked the student to take it down.
Q. There was testimony earlier today about words you spoke to Eldon Rash. I'm now jumping way ahead, right to the September 17th game, in the middle of the game, and we saw some video clips. There's you, in terms of I'm speaking of the video, talking to Mr. Rash, and I believe he testified today that you told him specifically that the game would be forfeited if he did not remove that wristband.
Do you remember that testimony today?
A. I remember it, yes.
Q. Can you describe what you said to Mr. Rash?

A. At various points I said, Sir, could you please remove the wristband that you're wearing. I think I said "please" a number of times. I believe almost every time I addressed him I addressed him as, Sir, could you please remove the wristband. I did hear on the video somebody talk about the game being forfeited. That was not me. I recognize the voice. It wasn't me.
Q. Did you threaten that something bad would happen to his granddaughter if he did not comply to your requests?
A. No.
Q. Let's just quickly, in your words, what is the problem with this wristband or these wristbands on that day?
A. On that day there was a transgender child playing for the Plymouth soccer team. We -- I believe that as an anti-trans symbol, and, as such, did not want to subject the child to intimidation or threats of harm, especially knowing what I do about the challenges that trans kids go through.
Q. Did you have concerns that there was something else that might happen beyond wristbands that day?
A. Yes.
Q. Okay. What basis did you have to believe that anything more than wristbands was afoot?
A. I had also read the same emails that have been shared here. At approximately 1:30 I received a phone call from a parent who basically reiterated the exact same things that were

in the email. So, I had seen emails talking about possible demonstrations, and I received a phone call about a possible demonstration.

MR. SHIRLEY: Thank you.

THE COURT: Thank you, Mr. Shirley.

Why don't we go Mr. Kolde and Mr. Ducharme.

CROSS-EXAMINATION

BY MR. KOLDE:

Q. Mr. Fisk, do you consider yourself to be a trans ally?

A. Yes.

Q. You testified about your experience dealing with students that were transitioning. Were those students medically transitioning, or socially transitioning, or both?

A. Both.

Q. Do you support gender-affirming care in your role as a principal?

A. I have no opinion on that.

Q. I'm sorry. I couldn't hear you.

A. I have no opinion on that. My apologies.

Q. Do you, in your role as advisor to the Gay-Straight Alliance, do you have any knowledge about what the term "misgendering" means?

A. I was familiar with that term prior to my arrival in Bow.

Q. Okay. And what does -- for those -- for the Court's edification, the Court may know, but what does "misgendering"

mean?
A. My understanding is, if a student identifies as male, somebody referring to them as female.
Q. Does that include using the person's dead name? Is that also a form of misgendering?
A. I suppose so, but I think it also depends on the intent.
Q. What is a dead name?
A. A dead name is for a student who has transitioned from one sex to the other oftentimes has a name change, and so that would be using the name that they transitioned from.
Q. Do you believe that it is wrong for citizens to engage in misgendering a trans student?
A. I believe if it's done on purpose, yes.
Q. And my question wasn't whether it was done on purpose. My question is do you believe it's wrong?
THE COURT: Wrong in what sense? Legally wrong, morally wrong, socially wrong, politically wrong? What?
MR. KOLDE: All of the above.
THE COURT: Well, no. It's totally irrelevant.
MR. KOLDE: Well, it goes to his viewpoint in wanting to censor the --
THE COURT: Objection sustained.
Q. Sexual orientation is different than gender identity, right?
A. Correct.

Q. You understand, in your role as an advisor, that there are many gay people who disagree with transitioning, correct?
A. I know that it's a -- yes.
Q. There are some gay people that think that the trans community is preying on confused gay students, correct?
A. Yes.
Q. Do you disagree with that view?
A. Which view, sir?
Q. That view, that some in the trans community prey on confused gay students.
A. I have no problem with prayer.
Q. I misunderstood your answer.
A. I have no problem with prayer.
Q. Prey, prey. No. Prey. That they are --
THE COURT: P-r-e-y.
MR. KOLDE: Yes.
Q. Yes?
A. Oh, oh.
Q. Yeah. I don't think you're pro preying, I hope, in that sense, p-r-e-y.
A. Okay. Thank you for the clarification. I would disagree.
Q. I thought you would.
You talked a little bit about the parking lot, and you testified about a student that was displaying a Confederate flag on their vehicle; is that right?

A. Correct.
Q. And was it a bumper sticker?
A. It was a flag on a pole.
Q. Like, a huge one or one of those little ones that sticks out of your window?
A. Approximately, what's this (indicating), like 3 by 5?
Q. I see. Okay.
A. On a pole.
Q. But you would agree that you don't make an effort to patrol what parents put on their cars normally, do you?
A. If I saw something offensive, I would take action on it, yes.
Q. Okay. You saw some photographs in this case of vehicles parked on Bow School District property with pride flags on them. You don't have a problem with that, correct?
A. No. Neither did I with Trump flags that were also positioned, or Harris bumper stickers, or Kelly Ayotte bumper stickers, or whatever.
Q. All right. So, let's orient it towards the issue in this case. What if tomorrow somebody parked a car with a bright pink bumper sticker and two black Xs on it visible in the Bow High School parking lot. Would you have a problem with that?
A. I would address the issue, and how I would address it would depend on if it were a visitor to our school, if it were a student who parked their car in our parking lot, if it were a

parent. So, context would matter, but, yes, I would address it.
Q. So, if it was a parent, how would you address it?
A. I would give them a phone call and ask them to come in and talk to me and tell them what the symbol had come to represent and ask that they don't come to our school with that displayed on their vehicle.
Q. And why would you do that?
A. Because schools should be places of education, where students are able to learn in an environment in which they're able to take risks, and I don't think you can do that if you are in a parking lot and you're walking into the school and you see signs that you're not wanted, that you don't feel -- that you feel like you should be excluded, that there's something wrong with you. I don't think that's helpful for any student.
Q. Just briefly, I want to explore this, and then I'll be done, I promise. You must realize, Mr. Fisk, that there are millions of Americans that don't believe you can change your sex based on your beliefs about gender. You understand that, correct?
A. Yes.
Q. And you also understand that transgender students must have some awareness that some people disagree on this issue of gender identity and changing your sex and those trans issues, correct?

A. I know that they do, yes.
Q. And you just talked about the Bow schools being a place of learning. Shouldn't you be able to talk about that disagreement, which is very real, without banning the viewpoint or the expression of the viewpoint?
A. Again, I think it matters the context. If we're talking about a legal case, right, if this were a civics classroom, and the cases that have come up, Title IX cases come up, I think it would be entirely appropriate to have that conversation in the course of a classroom. I don't think it's ever appropriate to show symbols that are regarded as hateful in a class, period.
Q. And you regard the pink field with the black XX on it as a hateful symbol; is that correct?
A. Yes.
Q. And you regard it as inappropriate to display anywhere on Bow School District property or at a Bow School District event; is that correct?
A. Correct, sir.
MR. KOLDE: Nothing, your Honor.
THE COURT: All right. Thank you.
Mr. Shirley?
MR. SHIRLEY: Nothing, your Honor.
MR. CULLEN: Nothing, your Honor.
THE COURT: Great. Thank you.
You may step down, Mr. Fisk, and you're excused as a

witness. Appreciate it.

(Witness stepped down)

MR. SHIRLEY: Your Honor, one proffer. We have a -- excuse me -- we have a Mr. Brian Murphy. He's actually the stepson of Mr. Rossetti. He was the other ref. The proffer would be --

THE COURT: I'm not sure what --

MR. SHIRLEY: And that's why we're asking.

THE COURT: What role does Mr. Murphy have in this case? Why is he here?

MR. SHIRLEY: Merely, he would testify to the fact that, when he was exiting from the field to the parking lot, which was near Mr. Rossetti, he witnessed Mr. Fellers --

THE COURT: I'm asking a more fundamental question. Why is he here? Are we with done with Mr. Rossetti? Is there some theory that he conspired with the Bow administrators to make these wristbands be removed because he's anti-anti-trans or something?

MR. KOLDE: Correct, correct.

THE COURT: There's not much to that theory, is there?

MR. KOLDE: No, I think there is, but it may not be relevant, ultimately, for the Court making the decision here, because it's very clear what the Bow School District thinks about it. But, yeah.

THE COURT: We agree it's got nothing to do with the

preliminary injunction.

MR. KOLDE: I didn't say "nothing."

THE COURT: Well, tell me what it does have to do with the preliminary injunction, then.

MR. KOLDE: Well, because I think that it was -- because they utilized him to be able to -- he was following the directives of the Bow School District to get my client --

THE COURT: You understand conspiracy requires an agreement --

MR. KOLDE: Judge, you're not letting me answer.

THE COURT: -- unlawful objective with the specific intent to achieve the unlawful objective. You understand that, right? Right?

MR. KOLDE: I'm sorry, your Honor. I didn't understand the question. Could you repeat it, please?

THE COURT: Yes. I don't understand why Mr. Rossetti is involved in the case, and I thought you said, Well, he does have something to do with the preliminary injunction hearing. What is that, because I don't see it?

MR. KOLDE: I was trying to answer, but you began speaking over me, so if I could answer --

THE COURT: Well, that happens with judges sometimes.

MR. KOLDE: It does.

THE COURT: Lawyers just put up with it. It's part of the deal.

MR. KOLDE: All right.

THE COURT: Okay. They don't complain about it, usually. But go ahead.

MR. KOLDE: Not the first time.

But, in any event, your Honor, the issue is that my clients were censored in this game. Part of the censorship was done directly by the Bow School District officials, and some of that censorship was aided and abetted by Mr. Rossetti, including what we saw happen on the field in the video.

THE COURT: But he has to have a conscious intent to do that, and there's no evidence of that.

MR. KOLDE: He said, You have no right to embarrass kids. He said --

THE COURT: That was afterwards.

MR. KOLDE: No. He said that -- it's on the video, and I understand the Court has only seen the video once so far, but I would encourage the Court later to take another look. On the field, when he's talking to Eldon Rash, he says, You have no right to embarrass kids. That's when he's on the field. Mr. Rossetti testified, I don't remember saying that. He clearly said that, and the reason he said that is because he disagreed with Eldon Rash.

THE COURT: Doesn't this turn -- isn't this a legal issue that turns on the nature of, the limited public nature of the forum and whether or not the person or the persons

operating that forum can restrict speech within that forum and whether or not they did restrict the speech, which they did, and whether or not that restriction is allowed under the First Amendment?

MR. KOLDE: Mostly, yes. We mostly agree with that.

THE COURT: Well, entirely. That's certainly what the preliminary injunction is involved with. That's it, right?

MR. KOLDE: I think the distance --

THE COURT: So, Mr. Rossetti plays no role.

MR. KOLDE: The distance between you and I on this, your Honor, is I would say he plays a small role, you would say he plays no role, but we agree that his role is not large.

THE COURT: Okay. File an appropriate motion at an appropriate time. Mr. Ducharme will deal with it.

MR. DUCHARME: And it has been my intention from my first effort to talk with Mr. Kolde, which he doesn't like to do.

THE COURT: Okay. Well, we'll take care of it that way. We've got to slim this case up to what's relevant and important.

MR. SHIRLEY: Sorry. If I may -- you're gathering your papers -- I do have one small question for the Court.

THE COURT: I thought you were done.

MR. SHIRLEY: Almost, almost. There's just this very narrow issue. There's this question about what happened after

the game breaks and there's Mr. Fellers with his sign. We've asserted that he was facing the bus with what we believe was an intention to show the sign to the exiting Plymouth bus. I have Mr. Brian Murphy here. He is the stepson of Mr. Rossetti. He was the other ref on the field. He will, if put on the stand, would testify that as he was exiting he saw Mr. Fellers facing with his sign in the direction of the bus, which he estimated to be about 30 to 50 feet away, and that that's what he witnessed.

THE COURT: Well, again, as I hear the evidence, Bow doesn't allow the brandishing of signs on its property during extracurricular school events, whatever they say.

MR. SHIRLEY: And it is merely to say what followed after Mr. Murphy's, what he perceived --

THE COURT: No, but my point is, is that part of this case? You can't have a sign. That's not viewpoint discriminatory. That's no-sign discriminatory.

MR. SHIRLEY: And I wasn't sure what's hanging out there with regard to what happened with Mr. Fellers when he's approached by the police, because he's asked to leave. That's that whole second video the Court --

THE COURT: Once again, that has nothing to do with operating a limited public forum and restricting speech within that forum and the purpose for restricting it.

MR. SHIRLEY: And you answered my question, which is,

it doesn't sound like you particularly care to know or have Mr. Murphy go on the stand for that, which is fine.

THE COURT: I'm happy to hear it, if you think it's material evidence, but what is it material to?

MR. SHIRLEY: And I'm going to say I don't think it sounds like it is material, your Honor, so we're not going to call him, and I think at that point we're done.

THE COURT: Did we set a briefing schedule, or did you want to just have oral argument? Did we set it, or did we say we were going to set it?

MR. KOLDE: We did set a briefing schedule, your Honor, and I did have a motion that I wanted to make, preliminarily, if I could, briefly.

THE COURT: Sure.

MR. KOLDE: I believe the post-hearing briefs are due December 13th, I'm welcome to be corrected by any of my co-counsel, that are going to be filed simultaneously --

THE COURT: I'd welcome them earlier, by the way. No requirement, but earlier is good, too.

MR. KOLDE: Yeah, with optional reply briefs due a week later.

One thing we would ask your Honor is to renew our request for a temporary restraining order barring -- pending the Court's ruling on the longer-term preliminary relief, to allow my clients to wear the wristbands at the Bow

extracurricular events that are coming up here in the next few weeks before our briefs or right after our briefs are due and until the PI decision, so it would be very temporary.

Defendants admit that they have banned the wristbands because of their belief that they express anti-trans or trans-exclusionary messages, but they allow trans-inclusionary messages. That's viewpoint discrimination. There's really no argument that it's not. Viewpoint discrimination is prohibited in a limited public forum. We all agree this is a limited public forum. There is no exception to that. Viewpoint discrimination in a limited public forum is per se illegal.

And there's no evidence of disruption or harassment here, especially in future events that are the ones that are coming up, for example, the Bow's girl high school basketball games that we mentioned and some of the other events, especially because there is no evidence that there are any trans players playing at those events. So, we would ask at least for interim relief until this Court can craft what we hope is a more longer-lasting remedy.

MR. SHIRLEY: We object. Taking the second issue first in my mind, at least, your Honor, and this was what -- there's a vagueness problem just with the requested relief. When they say "extracurricular activity," we've heard testimony just now about a GSA club that meets at the school. That's an extracurricular activity, too, and it is -- the concern we have

is to craft an order that would say "all extracurricular activities." We don't want them then showing up at the school door, I have an order that lets me into that GSA meeting so I can wear my wristband and hold my sign. Obviously, I don't think the Court is going in that direction, but that's one of the objections we have to any type of order that says just "extracurricular activity."

THE COURT: The extracurricular activity, that extracurricular activity, as I understand the testimony, meets within the school building.

MR. SHIRLEY: It does.

THE COURT: It is a much more controllable environment than the limited public forum of an athletic event in a field. I assume the basketball games are played in the gym.

MR. SHIRLEY: They are played in the gym.

THE COURT: Within the school building?

MR. SHIRLEY: That is correct. Yes. I was bringing to your attention a vagueness problem, which, at least by the way that they have proposed, their TRO they propose, they have not withdrawn it, originally filed back in October was too loosely written, in our position.

THE COURT: I'm not entirely clear -- I'm looking forward to the briefings. I'm not entirely clear what Bow's position actually is, because is it that, We prohibit the display of those wristbands only on games when a trans player

is participating, or is it broader than that? Because there was an event afterwards that it was no problem, or at least it was allowed, it wasn't enforced.

MR. SHIRLEY: "Allowed," I don't believe that would be -- obviously, we don't have a witness on the stand yet, but I think I can proffer that "allowed" would not be how they would characterize that. There was a very large population --

THE COURT: Suffered. They suffered it.

MR. SHIRLEY: They suffered it. They did not intend to let that happen. It was a group, a large group of people. It happened. It wasn't what they wanted to have happened. They've been struggling with this issue for sure.

I think that their -- yeah. You're asking a question like what is their position? And that's a very good question. Certainly, looking backwards at what happened on the 17th, we've heard testimony about the concerns.

THE COURT: That's all right. You don't have to go into that.

MR. SHIRLEY: Right. Going forward, your Honor --

THE COURT: I hear what you're saying. We didn't allow it; we just didn't take action.

MR. SHIRLEY: Right.

THE COURT: But what's your position with respect to displaying this symbol? I understood it to be this case turns on whether or not the School District was acting on a

reasonable basis to protect a child with respect to immutable characteristics that it is obligated to protect a child from, from injury or -- so you're not going to allow the wristbands.

MR. SHIRLEY: Today, backwards that's a large part of how we explain what has happened. Parker and the presence of Parker on that field, absolutely. Today forward we have now a concern, and you heard that yesterday, when you were surprised by Mr. Cullen's position. We do take the position because we --

THE COURT: You were surprised by Mr. Cullen's position?

MR. SHIRLEY: No, no. You were, sorry to say. You were. I was a little bit, but anyway I wrote that brief, so we were off each other's -- not on the same page there in terms of the mootness question. What I'm getting at, your Honor --

THE COURT: Yes. I was surprised by Mr. Cullen's position on mootness. Yes.

MR. SHIRLEY: What we're talking about, and this is the reason for why his change of position, Mr. Cullen's, yesterday, what I'm talking about right now to you is it would be insincere of us not to tell the Court that, if they show up at a basketball game, if they show up on the sidelines with this wristband, with their signs, we have a problem, and we have a problem with that because we were previously worried about Parker Tirrell. We are now more generally worried about

the trans community at the school and what this message does mean to them, and the way that this message is being received, at least from the administrators, is transgender girls are not allowed on those fields, they don't get to be what they should be allowed to be, which is to be transgender girls and accepted as such, and that's the message that they don't want to have coming forward. And it is in the vein of the L.M. decision in the sense that we can't quite know, necessarily, who's on the sidelines. We actually don't even know who's necessarily going to be on the field, because, although we did have notice of Tirrell, Parker Tirrell being on that field, that's not necessarily going to be the case going forward, we're not going to know who's on the field, necessarily, is transgender or not, and so it is an environment where the school just can't quite know who's going to be harmed. They know it's a message that they don't feel -- they've said inclusive, but we also feel that it borders on a harassment -- it is a message that is exclusionary on the basis of the sex of these transgender students, and it is -- we already heard testimony today that the original intent was to bring these signs to the sidelines, but they had not planned ahead to have something to support the signs on the sidelines, so they went on the cars. That was testimony from yesterday.

One sign, we don't like it, ten signs, not great, a hundred signs, a hundred wristbands, at what point does this

become -- that's the problem they're trying to wrestle with, that's the problem they're wrestling with, and they don't know -- I mean this Court, gracefully, thankfully, is weighing in, because it is a hard question to answer, but they're worried about it, and that's why they're taking the position they don't want to have this happening.

MR. KOLDE: May I just be heard, briefly, your Honor?

THE COURT: Of course, of course.

MR. KOLDE: I want to be clear that we have alleged only that we have a right to do this in a limited public forum. Our view and the case law supports that a limited public forum is a Bow School District event that is open to the public. We are not requesting to show up to a GSA event that is open only to students and staff that is not open to the public. Sporting events are. The case law on this is well established. They have not cited anything that stands for, that, properly read, stands for a different conclusion. They have argued it's a nonpublic forum. It's still the same test as a limited public forum.

And, again, what Mr. Shirley just argued, very heartfelt, and I understand that is the view of his clients, is nevertheless textbook viewpoint discrimination. Legally this case is not at all close. There is no viewpoint discrimination --

THE COURT: It's very close.

MR. KOLDE: No.

THE COURT: I disagree.

MR. KOLDE: I understand, and you're the judge, but this is my role as an advocate. You know, there's no viewpoint discrimination in a limited public forum. In any event, we're just talking about these public sporting events that are open to the public. We are not asking to go on campus.

And I think just, you know, to wrap this up, your Honor, I think the evidence is clear that Bow's position is they can ban these XX wristbands at any Bow High School event that is open to the public. It does not matter whether a trans player is on the field, it does not matter whether they know that a trans player is present in the audience or the spectator's gallery. That's what they've argued in their briefing.

THE COURT: You realize -- I know you know this, because you're an astute scholar of these cases. You know what he's doing is paraphrasing Chief Judge Barron's opinion in L.M. It's not Mr. Shirley's words; he didn't just make those up.

MR. KOLDE: We don't think -- we don't think that -- we don't think that L.M. applies.

THE COURT: I know you don't, but nevertheless there are cases out there that say that.

I'm going to take a minute just -- no. Motion for TRO is denied. You have not shown, nor can you at this point show,

a likelihood of success on the merits warranting a TRO of the breadth and scope that you've argued for.

I'm just going to take a minute. I don't usually do this, and most judges probably don't.

Mr. Foote, Mr. Fellers, Mr. Rash, I want you to understand I do understand your position. I'm afraid these things tend to degenerate into good-guy/bad-guy stuff.

I don't see it as good-guy/bad-guy stuff. I understand your position. You have a legitimate sociopolitical position. You've articulated it. I understand that you sincerely do not believe, and there is no reason you should, that you weren't going there to target Parker Tirrell, or embarrass her, or humiliate her, or drive her off the field or anything like that, so the case doesn't turn on that. I appreciated your testimony. I understand your position. You do have a First Amendment right to hold that position.

However, they are not the bad guys either. They don't have some secret cabal aimed at running around, denying people's First Amendment rights. That's not what it's about. They have an obligation to protect students and protect students from harm, and that means harassment, targeting, degradation, causing psychic harm, causing maybe even resultant physical harm. That's what they're operating from.

So, I want everybody to understand that's not what this case is about. It's not deciding who's a good guy, who's

a bad guy. It turns on whether or not the person operating the limited public forum has the authority under the First Amendment to restrict speech as they've restricted it. That turns on what they could reasonably have thought the message would be received as, okay, so it's not so much your subjective intent in making the message, and that's what we're going to decide. So, I don't want anybody leaving this feeling like it was a won-loss on who's a bad guy, who's a good guy.

And I'm sure you didn't mind being called all those nasty names, Mr. Fellers, because you're a First Amendment absolutist.

Okay. So, we're going to get briefs on these issues. It's legally nuanced. And, contrary to Mr. Kolde's view, my view is it is not an easy case, it's a close case, it's a nuanced case, and it's going to turn a lot on law that maybe in six months is going to be overturned by the Supreme Court. Who knows? So, let's everybody take it in that spirit, and I'll decide it just as soon as I get briefs. Okay?

Thank you. Thank you. Appreciate it.

THE CLERK: All rise.

(WHEREUPON, the proceedings adjourned at 2:22 p.m.)

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR and Official Court Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my knowledge, skill, ability and belief, a true and accurate transcription of the within proceedings.

Date: ___12/2/24______ */s/ Brenda K. Hancock*
Brenda K. Hancock, RMR, CRR
Official Court Reporter

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br>Plaintiffs,<br>v.<br>MARCY KELLEY, *et al.*,<br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

SECOND DECLARATION OF NICOLE FOOTE

I, Nicole Foote, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire, with my husband Anthony and our two daughters. Both daughters attend public schools in Bow School District, a part of State Administrative Unit 67.

2. My oldest daughter is a senior at Bow High School and plays on the varsity girls' lacrosse team during the spring sports season. My younger daughter is a seventh grader at Bow Memorial School (the local middle school) where she will try out to hopefully make the middle school girls' lacrosse team, during the spring sports season.

3. I am heavily involved in my children's schooling and extracurricular activities. I attend games regularly and often must drive my children to practices, games, and other events.

4. I plan on attending sporting events and other extracurricular events, on and off school grounds, throughout the spring sports season, the school year, and future school years.

5. Because my elder daughter is a senior, this year's spring sports season will be my last chance to watch her compete as a Bow School District athlete.

6. I intend to attend both home and away lacrosse games, during the spring season and in future years. The varsity girls' team plays its games at Bow High School, on the same sports field as is used for boy's home soccer games. The middle school team plays on a field at Bow Memorial School.

7. The varsity girls' lacrosse team has its first game of the season on April 14 and its first home game on April 21. For the middle school girls' lacrosse team, the first game will be on April 15 and the first home game on April 22.

8. The final games of both seasons will occur around May 30—depending on whether these teams make the playoffs.

9. The schedules for spring season games are available on the Bow Athletics website (https://bowhighschoolathletics.org/main/). Exhibit R is a true and correct copy of varsity girls' lacrosse team schedule, which was printed from the district's official website. Exhibit S is a true and correct copy of middle school girls' lacrosse team schedule, which was printed from the district's official website

10. If permitted, I would silently but visibly protest on the sidelines in defense of girls' and women's sports at some of these games, by wearing a pink XX wristband on the parents' sidelines during the game. I believe, however, that during this and future school years, protesting in a visible way could cause Defendants to remove me from school property and to take out a No Trespass Order against me,

perhaps lasting through the end of the season as the No Trespass Order that my husband received in September threatened.

11. I also worry that protesting on the sidelines in a silent but visible way by wearing a pink wristband during this and future school years could potentially cause Bow School District sports teams to forfeit games, have games suspended, and become ineligible for the playoffs. As a result of these concerns, I have not been silently protesting even though I would like to.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025

Nicole Foote

Exhibit R

Bow AthleticsGirls Varsity Lacrosse

| | Date & Time | Opponent(s) | Event Title | Facility | Depart Time | Score |
|---|---|---|---|---|---|---|
| Away(A) | 04/14/25 4:00 PM | vs **Concord Christian Academy** | | | | |
| Away(A) | 04/16/25 4:00 PM | vs **Laconia HS** | | | | |
| Away(A) | 04/18/25 4:00 PM | vs **Gilford HS** | | | | |
| Home(H) | 04/21/25 4:00 PM | vs **Hopkinton Middle/High School** | | | | |
| Away(A) | 04/23/25 4:00 PM | vs **St. Thomas Aquinas HS** | | | | |
| Home(H) | 05/05/25 4:00 PM | vs **Kearsarge Regional HS** | | | | |
| Away(A) | 05/09/25 4:00 PM | vs **ConVal HS** | | | | |
| Home(H) | 05/12/25 4:00 PM | vs **Pembroke Academy** | | | | |
| Away(A) | 05/14/25 4:00 PM | vs **Coe-Brown Northwood Academy** | | | | |
| Home(H) | 05/15/25 4:00 PM | vs **Londonderry Athletics** | | | | |
| Home(H) | 05/16/25 4:00 PM | vs **Inter-lakes HS** | | | | |
| Home(H) | 05/19/25 4:00 PM | vs **John Stark Regional HS** | | | | |
| Home(H) | 05/21/25 4:00 PM | vs **Bishop Brady HS** | | | | |
| Away(A) | 05/23/25 4:00 PM | vs **Pelham HS** | | | | |

| | Date & Time | Opponent(s) | Event Title | Facility | Depart Time | Score |
|---|---|---|---|---|---|---|
| Home(H) | 05/30/25 4:00 PM | **vs Milford HS** | | | | |

**Exhibit S**

Bow AthleticsGirls Middle School Lacrosse

| | Date & Time | Opponent(s) | Event Title | Facility | Depart Time | Score |
|---|---|---|---|---|---|---|
| Away(A) | 04/15/25 4:15 PM | **vs Amherst Middle School** | | | 02:50 PM | |
| Away(A) | 04/17/25 5:00 PM | **vs Mountain View Middle School** | | | | |
| Home(H) | 04/22/25 4:00 PM | **vs Hollis Brookline MS** | | | | |
| Away(A) | 04/24/25 4:00 PM | **vs Rundlett Middle School** | | | 03:15 PM | |
| Home(H) | 05/08/25 5:15 PM | **vs Timberlane Regional Schools** | | | | |
| Away(A) | 05/13/25 3:30 PM | **vs Ross A. Lurgio Middle School** | | | 02:35 PM | |
| Home(H) | 05/15/25 5:15 PM | **vs Londonderry Athletics** | | | | |
| Home(H) | 05/20/25 4:00 PM | **vs Milford Middle School** | | | | |

**App.0661**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br>Plaintiffs,<br>v.<br>MARCY KELLEY, *et al.*,<br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

SECOND DECLARATION OF ANTHONY C. FOOTE

I, Anthony C. Foote, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire, with my wife Nicole and children. I have two daughters who attend public schools in Bow School District, a part of State Administrative Unit 67.

2. My oldest daughter is a senior at Bow High School and plays on the varsity girls' lacrosse team during the spring sports season. My younger daughter is a seventh grader at Bow Memorial School (the local middle school) and plans to play on the middle school girls' lacrosse team during the spring sports season.

3. Because my elder daughter is a senior, this year's spring sports season will be my last chance to watch her compete as a Bow School District athlete. I also plan to attend Bow High School games after my daughter graduates, including when she is back home visiting the area.

4. I plan on attending Bow High School varsity girls' lacrosse games and other extracurricular events, on and off Bow High School grounds, throughout the spring sports season, the school year, and future school years.

5. If permitted, I would silently but visibly protest in defense of girls' and women's sports at some of these events, including at some upcoming Bow High School and Memorial School girls' lacrosse games, by wearing a pink XX wristband on the parents' sidelines during the game, by distributing wristbands, or by holding signs in the parking lot. I believe, however, that for the foreseeable future during this and future school years, protesting in a visible way could cause Defendants to remove me from school property and take out a new No Trespass Order against me, perhaps lasting through the end of the season as the original No Trespass Order that I received in September threatened.

6. I also continue to worry that protesting on the sidelines in a silent but visible way by wearing a pink wristband during this and future school years could potentially cause Bow School District sports teams to forfeit games, have games suspended, and become ineligible for the playoffs. This is why I have not been wearing the pink wristband I would like to wear or otherwise silently protesting on school property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25, 2025

AC Foote

Anthony C. Foote

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br>Plaintiffs,<br>v.<br>MARCY KELLEY, *et al.*,<br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

SECOND DECLARATION OF KYLE FELLERS

I, Kyle Fellers, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire. I have two children who attend public schools in the Bow School District, within State Administrative Unit 67.

2. I enjoy watching sporting events and often attend Bow School District sporting events, including games in which neither of my children is playing. I intend to attend Bow School District games and other extracurricular events, on and off school grounds, throughout the spring sports season, the school year, and future school years, even if my own children are not competing in those games.

3. If permitted, I would silently but visibly protest in defense of girls' and women's sports at some of these events, by wearing a pink XX wristband on the parents' sidelines during the game, by distributing wristbands, or by holding signs in the parking lot.

4. During the spring season this year, I intend to attend and protest at one or more games of Bow High School varsity girls' lacrosse team. Because the

daughter of my co-plaintiffs plays on the lacrosse team, I want to show my support for girls' and women's sports by silently protesting at a lacrosse game.

5. Even though my daughter is graduating from Bow High School this year, I intend to attend and silently protest at Bow High School events in future years as well.

6. In the next fall sports season, I intend to attend and silently protest at one or more girls' varsity soccer games, to show my support of girls' and women's sports. This protest would also express my commitment to First Amendment freedoms, by commemorating my expulsion from the September 17 game.

7. Next fall sports season, I also intend to attend and protest at one or more girls' varsity field hockey games, because Bow Superintendent Marcy Kelley is one of the coaches of the field hockey team.

8. If it was allowed, I would also intend to silently protest at Bow School District sporting events in future winter and spring seasons, including at girls' varsity basketball and girls' lacrosse.

9. I believe, however, that for the foreseeable future during this and future school years, protesting in a visible way could cause Defendants to remove me from school property and to take out a new No Trespass Order against me. As a result, I am continuing to refrain from silent protest.

10. I also worry that protesting on the sidelines in a silent but visible way by wearing a pink wristband during this and future school years could potentially

cause Bow School District sports teams to forfeit games, have games suspended, and become ineligible for the playoffs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025

Kyle Fellers

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br>Plaintiffs,<br>v.<br>MARCEY KELLEY, *et al.*,<br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

## PLAINTIFFS' NOTICE OF APPEAL

Plaintiffs now appeal to the U.S. Court of Appeals for the First Circuit from the order of the U.S. District Court for the District of New Hampshire, entered on April 14, 2025, denying Plaintiffs' motion for preliminary injunction.

Defendants and their counsel are receiving notice of this appeal via notice of electronic filing.

Dated: May 2, 2025

Respectfully submitted,

*/s/ Endel Kolde*
Endel Kolde*
DC Bar No. 1782129
Brett Nolan*
DC Bar No. 90014964
Nathan Ristuccia*[1]
Virginia Bar No. 98372
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
202.301.3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

By: */s/ Richard J. Lehmann*
Richard J. Lehmann
New Hampshire Bar No. 9339
LEHMANN MAJOR LIST, PLLC
6 Garvins Falls Rd,
Concord, NH 03301
603.731.5435
rick@nhlawyer.com

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

** Pro hac vice*

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

APPEAL COVER SHEET

1. USDC/NH Case No. 24-cv-311-SM

2. TITLE OF CASE: Kyle Fellers, et al v. SAU 67, Superintendent, et al

3. TYPE OF CASE: Civil

4. NAME OF APPELLANT(S) & COUNSEL FOR APPELLANT(S):
See certified copy of docket (ECF registered users not provided with a copy of docket)

5. NAME OF APPELLEE(S) & COUNSEL FOR APPELLEE(S):
See certified copy of docket (ECF registered users not provided with a copy of docket)

6. NAME OF JUDGE: Judge Steven McAuliffe

7. DATE OF JUDGMENT OR ORDER ON APPEAL: **April 14, 2025**

8. DATE OF NOTICE OF APPEAL: **May 2, 2025**

9. FEE PAID or IFP: NO

10. COURT APPOINTED COUNSEL: NO

11. COURT REPORTER(S): and DATES: 10/08/2024 – Jan-Marie Glaze
11/21/2024 – Liza Dubois (AM), Susan Bateman (PM);
11/22/2024 – Susan Bateman (AM), Brenda Hancock (PM)

12. TRANSCRIPTS ORDERED/ON FILE: YES

13. HEARING/TRIAL EXHIBITS: YES

14. MOTIONS PENDING: NO

15. GUIDELINES CASE:

16. RELATED CASES or CROSS APPEAL:

17. SPECIAL COMMENTS: