No. 25-1442

# United States Court of Appeals
### for the
# First Circuit

KYLE FELLERS, *et al.*,

*Plaintiffs-Appellants,*

v.

MARCY KELLEY, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Hampshire
Honorable Judge Steven J. McAuliffe, Presiding

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF APPELLANTS

MARC RANDAZZA
RANDAZZA LEGAL GROUP
30 Western Avenue
Gloucester, MA 01930

RONALD G. LONDON*
ARLEIGH HELFER
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Suite 340
Washington, D.C. 20003
(215) 717-3473
ronnie.london@thefire.org

*Counsel of Record*

*Attorneys for* Amicus Curiae
*Foundation for Individual Rights and Expression*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

INTEREST OF *AMICUS CURIAE* ............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ....................................................................... 7

I.  The Bow School District's Censorship of Plaintiffs-Appellants' Silent Protest Constitutes Impermissible Viewpoint Discrimination. ............................................... 7

II. The District Court Further Erred by Applying *Tinker* and *L.M.*, Student Speech Cases Inapplicable to Adult Speech, in its Limited Public Forum Analysis. ............................ 11

    A.  *Tinker* and *L.M.* Are Student Speech Cases and Do Not Apply to Adult Speech in Public Forums. ...................... 12

    B.  Even if *L.M.* Somehow Applied to Adult Speech, the District Court Went Far Beyond it By Creating an "Invasion of Rights of Others" Prohibition for Forum Analysis. .................................................. 15

CONCLUSION ..................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ................................................................. 10

*Boos v. Barry,*
    485 U.S. 312 (1988) ................................................................. 10

*Christian Legal Society Chapter of the University of
    California, Hastings College of Law v. Martinez,*
    561 U.S. 661 (2010) ................................................................. 14

*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ....................................................... 6, 17, 18

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001) ................................................................. 4, 8

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ................................................................. 10

*L.M. v. Town of Middleborough,*
    103 F.4th 854 (1st Cir. 2024) ................................... 5, 6, 15, 16

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
    594 U.S. 180 (2021) ........................................................... 12, 13

*Matal v. Tam,*
    582 U.S. 218 (2017) ................................................................. 10

*McCauley v. Univ. of the V.I.,*
    618 F.3d 232 (3d Cir. 2010) .................................................... 12

*Minnesota Voters All. v. Mansky,*
    585 U.S. 1 (2018) ..................................................................... 11

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................. 10

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004)..................................................... 7, 9

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ................................................................. 7

*Saxe v. State College Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001).................................................. 18

*Snyder v. Phelps*,
562 U.S. 443 (2011) ............................................................... 10

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011) ................................................................. 8

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022)............................................... 12

*Terminiello v. Chicago*,
337 U.S. 1 (1949) ................................................................... 10

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................. 8, 9

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ..................................................... 5, 12, 13

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......................................................... 9, 20

## Other Authorities

Alexandria-Monroe High School: Student Punished for
Refusing to Stand Still During the Pledge of Allegiance, FIRE ......... 19

Carrie Robison,
*Hundreds of books removed from Florida public school
libraries based on constitutionally suspect guidance*, FIRE
(May 21, 2024) ...................................................................... 19

*Jackson-Reed High School: School bars student group from
screening documentary critical of Israel*, FIRE.................................... 19

iv

*LAWSUIT: High school student sues after receiving suspension for posting off-campus cat meme*, FIRE (July 19, 2023) ...................... 18

*The Vanguard School: Student Removed From Class for Displaying Gadsden Flag and Pro-Gun Rights Patches on Backpack*, FIRE ................................................................................ 19

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. In lawsuits across the United States, FIRE works to vindicate First Amendment rights without regard to speakers' views. *See, e.g.*, Brief for FIRE as *Amicus Curiae* Supporting Appellants, *Damiano v. Grants Pass Sch. Dist. No. 7*, No. 23-35288, 2025 WL 1691987 (9th Cir. June 17, 2025); Brief for FIRE as *Amicus Curiae* Supporting Appellants, *Wuoti v. Winters*, No. 25-678 (2d Cir. docketed Mar. 24, 2025); Brief for FIRE as *Amicus Curiae* Supporting Appellant, *Berge v. Sch. Committee of Gloucester*, 107 F.4th 33 (1st Cir. 2024); Brief

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. As explained in the accompanying motion for leave to file, *amicus* sought consent of the parties to file this brief. Plaintiffs-Appellants granted consent, but Defendants-Appellees refused it.

for FIRE as *Amicus Curiae* Supporting Petitioners, *Öztürk v. Hyde*, No. 2:25-cv-374 (D. Vt.).

FIRE has a direct interest in this case because if the decision below stands, it will erode First Amendment protections for the political speech of adults and vest school officials with broad power to censor. FIRE files this brief to explain the district court's misunderstanding of the adult Plaintiffs-Appellants' First Amendment rights and its improper extension of recent First Circuit secondary-school precedent to this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents a simple question: Does the First Amendment protect passive, nondisruptive political speech of adults in a public forum? Of course it does. Under longstanding precedent and common sense, the answer is yes. But in ratifying the viewpoint-based removal of parents who silently protested at a high school soccer game, the district court erred. If not corrected by this Court, this faulty reasoning below will permit school districts vast power to police and punish the speech of adults attending events open to the public.

In 2024, parents who support reserving girls' and women's sports to biological female students sought to hold a silent protest at a Bow High

School women's soccer game. They planned to wear pink wristbands on which they had written "XX" to represent female chromosomes. But when school officials learned about it they expressed disapproval of both the plan and the message because, the record shows, they felt the wristbands were offensive. And they expressed particular concern for the effects the protest may have had on a transgender woman student playing for the visiting team.

When the parents donned the wristbands at halftime, there was no evidence they disturbed anyone. They wore the wristbands for about ten minutes without incident before school officials approached the parents on the sidelines and made a show of demanding they remove the wristbands, which they eventually did. There is no evidence that the pink wristbands—as opposed to the school officials' conduct—caused any disruption of the soccer match. There is no evidence that the transgender athlete even saw the wristbands, much less was offended by them.

The district court's rejection of this constitutional challenge to that government action erred in two ways. First, it held the school officials' censorship of the parents' message was not viewpoint discrimination. Yet record evidence shows school officials punished what they perceived as

the protest's "exclusionary" views while allowing "inclusive" messaging. Specifically, they disfavored the wristbands' gender identity message and censored it because they found it offensive, while simultaneously permitting other displays, including those celebrating LBGTQ+ causes. And the school's policies concerning public conduct at school events did not include sufficient standards to guide enforcement, allowing school officials too much latitude to impose their personal political preferences.

Those are textbook hallmarks of viewpoint discrimination. When officials favor some views to others in a limited public forum, the analysis ends, because any ensuing restriction is unconstitutional. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001) ("When a restriction is viewpoint discriminatory, we need not decide whether it is unreasonable in light of the purposes served by the forum"). While the district court reasoned the restriction here rested on the messages' effects rather than the messages themselves, the Supreme Court does not recognize "effects"-based exceptions in the limited public forum analysis.

Second, the district court grafted precedent applicable only to K–12 students in school onto its forum analysis, misapplying it to the speech of adults. Although the court acknowledged this is not a student speech

case, it looked to grade-school precedent originating in *Tinker v. Des Moines Independent Community School District*,[2] which afforded school officials some authority to regulate student speech that substantially causes disruption or invades the rights of others. *Tinker* has no role in analyzing adult speech in a limited public forum.

The district court compounded that error by developing a test adapted from this Court's decision in *L.M. v. Town of Middleborough*,[3] so as to justify censorship of the parents' passive display as demeaning towards a visiting student. But *L.M.* was a student speech case that itself applied a novel theory of disruption that, whatever its merits, has no application here.

Even if *Tinker* did apply—which it doesn't—*L.M.* relied solely on *Tinker*'s "substantial disruption" prong to hold demeaning statements might eventually cause disruption by lowering test scores and causing "symptoms of a sick school," 103 F. 4th at 873–74, while expressly disclaiming reliance on *Tinker*'s "rights of others" prong. *Id.* at 874. Despite this, the district court rested its *L.M.*-based analysis on the

---

[2] 393 U.S. 503 (1969).

[3] 103 F.4th 854 (1st Cir. 2024).

shaky notion that the protest here would invade a visiting athlete's rights by demeaning her, not that it would disrupt school functions. The First Amendment does not permit such speculation in service of censorship, and this unwarranted expansion of *L.M.* allows a heckler's veto by political opponents against adult speech in public forums.

There was neither need nor justification for the district court to further extend *L.M.*'s already-novel theory to adult speech. Had other students or adults actually engaged in what both the School District and district court feared may occur—essentially, discriminatory harassment—school administrators are already empowered to counteract conduct that is "so severe, pervasive, and objectively offensive … that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). This Court should not dilute First Amendment protections by expanding *L.M.*'s novel theories to adult speech.

By condoning Bow High officials' viewpoint discrimination against passive political protest and bastardizing novel student speech principles for application to adult speech, the district court's decision grants school

administrators unchecked authority to censor protected adult expression. This approach is unwarranted and dangerous. To protect First Amendment rights against erosion and abuse, this Court should reverse.

## ARGUMENT

**I.    The Bow School District's Censorship of Plaintiffs-Appellants' Silent Protest Constitutes Impermissible Viewpoint Discrimination.**

The district court erred in its limited public forum analysis, which first and foremost requires courts to consider whether the government discriminated based on viewpoint. Viewpoint discrimination, "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995), reflects a "governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). Here, school officials admitted they were offended by Plaintiffs-Appellants' "exclusionary" advocacy regarding girls' and women's sports. At the same time, they would have allowed passive displays of what they considered positive "inclusive" messages on the subject, such as parents wearing Pride T-shirts on the sidelines and displaying Pride flag bumper stickers on their cars in the parking lot. But the School District "may not burden

the speech of others in order to tilt public debate in a preferred direction" in this manner. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578–79 (2011).

When the government opens a designated public forum, as did Bow High School, it has a limited ability to control speech. While "the State is not required to … allow persons to engage in every type of speech," and "may be justified in reserving its forum for certain groups or … topics," it "must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (citation modified). Overarching the limited public forum analysis is the threshold question of whether the government engaged in viewpoint discrimination. *See id.* at 107. If a court finds viewpoint discrimination, there is no need to "decide whether it is unreasonable in light of the purposes served by the forum." *Id.*

That is just what the school officials were doing here, eliminating an entire viewpoint from a hotly contested debate on a matter of public interest. This is constitutionally impermissible: The government has no power to "prescribe what shall be orthodox." *Texas v. Johnson*, 491 U.S. 397, 415 (1989) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S.

624, 642 (1943)). Further, the parents' message was critical of governmental policy regarding female school sports teams. As this Court has observed, suspicion "that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Ridley*, 390 F.3d at 86.

Superintendent Kelley acted to restrict the parents' passive protest and the display of the wristbands because she did not like their message. *See* Appellants' Br. at 22. However, she would allow someone to wear a Pride flag T-shirt to a soccer game because it promotes an "inclusionary" message, as opposed the "exclusionary" message she attributed to the parents' wristbands. *Id*. at 21, 23. And Principal Fisk found the parents' message to be "offensive." Appellants' Br. at 25.

But viewpoint discrimination based on anticipated offense to others is never permissible. If "there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414. It is not the government's place "to prescribe what shall be offensive." *303 Creative LLC v. Elenis*, 600

U.S. 570, 602 (2023). The First Amendment protects offensive expression because one "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). The Supreme Court has repeatedly affirmed this principle.[4] Censoring speech on the basis that it demeans or offends is unconstitutionally impermissible viewpoint discrimination. *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019). "Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 220 (2017).

Despite the obvious viewpoint discrimination, the district court incorrectly reasoned that the school officials' restriction of the wristbands was not viewpoint-based but "effects based." Add.41. That conclusion is wrong: The Supreme Court has held the emotive impact of speech on a listener is not the kind of effect the First Amendment allows the government to regulate. *R.A.V.*, 505 U.S. at 394 (citing *Boos v. Barry*, 485 U.S. 312, 321, 334 (1988)). And once a court finds viewpoint discrimination,

---

[4] *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 246 (2017) (plurality op.); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992).

the analysis is at its end. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (noting that in designated public forums speech "restrictions based on content must satisfy strict scrutiny, and *those based on viewpoint are prohibited*") (emphasis added).

For all these reasons, the district court should have held Plaintiff-Appellants, as victims of viewpoint discrimination, likely to prevail on the merits of their claims. Allowing the district court's order to stand will erode some of the most fundamental protections of adult free speech while handing school administrators the power to censor messages with which they disagree. This Court should reverse on this basis alone.

## II. The District Court Further Erred by Applying *Tinker* and *L.M.*, Student Speech Cases Inapplicable to Adult Speech, in its Limited Public Forum Analysis.

The district court also erred when it combined analytically distinct doctrines in grafting K–12 student speech cases onto its limited public forum analysis. Doing so, it created new law by applying student speech standards from *Tinker* and *L.M.*—precedents inapplicable to adult speech—to restrict what adults may say in a limited public forum. This Court should reject that digression as unsupported by law and constitutionally unsound.

### A. *Tinker* and *L.M.* Are Student Speech Cases and Do Not Apply to Adult Speech in Public Forums.

*Tinker* famously holds it "can hardly be argued that … students … shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," 393 U.S. 503, 506 (1969), and limits First Amendment protection only for public-school *student* speech that "materially disrupts classwork or involves substantial … invasion of the rights of others." *Id.* at 513. The Supreme Court more recently drove home that point in *Mahanoy Area School District v. B.L. by & through Levy* in noting "B.L. uttered the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection." 594 U.S. 180, 191 (2021). Indeed, insofar as *Tinker* allows any restriction of speech to minors in K–12 schools, and does not apply at all on college campuses populated by adults,[5] it cannot apply to adult non-students in limited public forums.

The Supreme Court's primary and secondary school cases grant administrators this power in significant part because they act *in loco*

---

[5] *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022); *see also McCauley v. Univ. of the V.I.*, 618 F.3d 232, 244–45, 247 (3d Cir. 2010) ("Public universities have significantly less leeway in regulating student speech than public elementary or high schools" because "[c]ollege students today are no longer minors; they are now regarded as adults in almost every phase of community life.").

*parentis* and must be able to maintain order in the educational setting. *Tinker*, 393 U.S. at 507. As the Court recently explained, this interest is absent outside the school setting, which is why schools' ability to restrict speech outside school hours and off campus, where parents have control, is virtually non-existent. *Mahanoy Area Sch. Dist.*, 594 U.S. at 190–91. Nothing in *Tinker* or its progeny suggests its exception to student speech rights applies to adults. Even if it did, it seriously misreads *Tinker* to see it as authorizing censorship based on a government actor's offense taken on behalf of a third party. Creating a new rule that it does—as long as a government official is offended or believes others might be—turns the First Amendment into a speed bump, rather than a barrier to government censorship.

Despite *Tinker*'s circumscribed scope, the district court incorrectly applied its standards beyond students to reach adult speech in its forum analysis. The soccer game may have occurred on school property, but nothing about the dispute here dealt with the classroom context or warranted analysis of the adult parents' protest "in light of the special characteristics of the school environment" as held below. Add.29.

13

The district court's reliance on the Supreme Court's statement in *Christian Legal Society Chapter of the University of California, Hastings College of Law v. Martinez* that schools enjoy "authority over the type of officially recognized activities in which their students participate" was misplaced. Add.29 (quoting 561 U.S. 661, 686–87 (2010)). *Martinez* concerned public university student groups and is both distinguishable and not supportive of applying *Tinker* standards in the forum analysis here. *Martinez* says nothing about limiting speech of parents attending an event in a limited public forum at a public school, and more importantly, did *not* invoke or apply *Tinker*'s substantial disruption or interference with the rights of others prongs to the speech of adults. Instead, it looked to a law school's educational mission as one consideration among many in assessing the constitutionality of a school's requirement that all student groups, prior to recognition and funding, agree to "accept all comers." *Martinez*, 561 U.S. at 668–69, 674.

Worse still, the district court used this misreading of *Martinez* to open the door to adopting this Court's student-speech decision in *L.M.* as instructive in this case, if not determinative. *L.M.* involved a public middle school's discipline of a student who wore a T-shirt that stated "There Are

14

Only Two Genders" to school. *L.M.*, 103 F.4th at 860. Ignoring the differences between this public-forum adult speech case and *L.M.*, the district court here used *L.M.* as an analytical shortcut based on a wish for the cases equivalent. However, a shirt worn by a child during the school day in middle school is not remotely like a passive protest by parents in a public forum. The fact that the two sound in the same subject matter *factually* cannot justify the district court's importation of specialized *legal* principles from student speech cases into its analysis of adult speech in a public forum.

### B. Even if *L.M.* Somehow Applied to Adult Speech, the District Court Went Far Beyond it By Creating an "Invasion of Rights of Others" Prohibition for Forum Analysis.

The court's mistakes grew with each step it took. Not only did it incorrectly import *Tinker* and *L.M.* into forum analysis, but it also expanded *L.M.* contrary to its own terms, given that this Court invoked and extended only *Tinker's* "substantial disruption" prong. In *L.M.*, this Court determined that, under the *Tinker* framework, the student's "Two Genders" T-shirt shirt could be interpreted as demeaning a person's gender identity in a way that strikes "at the core of his being." *Id.* at 873–74. Such effects might, the Court suggested, cause "symptoms of a sick

school" that were "therefore of substantial disruption," which, in turn, allowed prohibiting the shirt on grounds that administrators could "reasonably forecast substantial disruption" under *Tinker*. *Id.* at 874.

Yet the district court did *not* determine here that Bow High School could prohibit adults from wearing pink wristbands because of a threat of substantial disruption. It held the school could view the wristbands as analytically equivalent to L.M.'s T-shirt, but that, more specifically, they conveyed a "harassing, demeaning message likely to have serious negative psychological impact on students who identify as transgender." Add.34. That would, by *L.M.*'s own logic, have to sound in substantial disruption. Were there any doubt, this Court in *L.M.* disavowed reliance on *Tinker*'s "invasion of the rights of others" prong. 103 F.4th at 860, 867.[6]

But the district court instead imported *Tinker*'s "invasion of the rights of others" prong into the forum analysis. Speculating about the injurious effects it believed the wristbands could have, Add.37 ("The message generally ascribed to the XX symbol … can reasonably be

---

[6] While the district court in *L.M.* relied on the "rights of others" prong, this Court affirmed on different grounds, analyzing whether the T-shirt might permit administrators to predict substantial disruption in the school. 103 F.4th at 860, 882.

16

understood as directly assaulting those who identify as transgender women."), the court determined such a message is "likely even more damaging to vulnerable students when delivered by adults attending the event." Add.39. The court thus was not contemplating, as *L.M.* did, whether a passive display creates a "sick school" environment over time that permits administrators to forecast substantial disruption under *Tinker*. Its focus, instead, was solely on whether a passive display to which the government objected would offend a transgender athlete during a soccer game. Add.42.

The district court's foray into the largely unexplored territory of *Tinker*'s "rights of others" prong not only lacks analytical basis, it was unnecessary. If a school has concerns about gender-related speech, the Supreme Court established a standard that operates within the First Amendment to prevent injurious harassment. *See Davis*, 526 U.S. 629. Unlike the district court's modified *L.M.* approach, which hazards undue deference to the subjective fears of administrators, *Davis* provides a test courts have applied without trouble for decades in allowing schools to address conduct "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience,

that the victim students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 631; *accord Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.). There is accordingly no good reason to expand *Tinker* and *L.M.* to adult speech in a limited public forum as the district court did here.

The district court thus erroneously extended *L.M.* beyond its facts and context to create an entirely new doctrine, one that allows schools to circumscribe adult speech in a school-adjacent public forum whenever a passive display may have a subjectively injurious effect on a supposedly vulnerable person. There is no doubt schools will abuse this newfound authority. FIRE's experience fighting censorship in our schools teaches that administrators regularly find creative ways to silence speech they dislike.

For example, school officials in Tennessee suspended a student for his off-campus Instagram posts containing meme images that lampooned his school's principal as overly serious.[7] Florida schools officials removed classic works of literature such as *Anna Karenina*, *Brave New World*, and

---

[7] *LAWSUIT: High school student sues after receiving suspension for posting off-campus cat meme*, FIRE (July 19, 2023), https://perma.cc/MY7S-BD8R.

*For Whom the Bell Tolls* from school libraries under a blanket ban of any works that described "sexual conduct."[8] Another district punished a student for insubordination when he refused to stand still while the school played the Pledge of Allegiance over its public address system.[9] Officials at a public Colorado charter school censored a student for having the unmitigated audacity to display Gadsden flag and firearm rights patches on his backpack.[10] And a public high school in Washington, D.C. barred a student group from screening *The Occupation of the American Mind*, a documentary critical of Israel, at one of its lunchtime club meetings because officials feared "content and individuals associated with the film may provoke strong emotional responses."[11]

---

[8] Carrie Robison, *Hundreds of books removed from Florida public school libraries based on constitutionally suspect guidance*, FIRE (May 21, 2024), https://perma.cc/8J7K-VZXV.

[9] *Alexandria-Monroe High School: Student Punished for Refusing to Stand Still During the Pledge of Allegiance*, FIRE, https://perma.cc/7YDS-H882.

[10] *The Vanguard School: Student Removed From Class for Displaying Gadsden Flag and Pro-Gun Rights Patches on Backpack*, FIRE, https://perma.cc/CE98-BQLF.

[11] *Jackson-Reed High School: School bars student group from screening documentary critical of Israel*, FIRE, https://perma.cc/4Z7X-A8VB.

This Court should "avoid these ends by avoiding these beginnings," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943), by rejecting the application of student speech principles to adult speech that it is subjectively feared will invade someone's rights. To prevent other courts from similarly misreading *L.M.* to create new exceptions to the protections of First Amendment doctrine, this Court should take this opportunity to clarify that its holding is limited to its specific facts and circumstances.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order and remand with instructions to enter Plaintiff-Appellants' requested injunctive relief.

Dated: July 1, 2025

/s/ Ronald G. London
RONALD G. LONDON*
ARLEIGH HELFER
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE,
Suite 340
Washington, D.C. 20003

(215) 717-3473
ronnie.london@thefire.org

MARC RANDAZZA
RANDAZZA LEGAL GROUP
30 Western Avenue
Gloucester, MA 01930

*Counsel of Record*

## Certificate of Compliance With Type-Volume Limit

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 3,967 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Date: July 1, 2025

/s/ Ronald G. London
RONALD G. LONDON
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE,
Suite 340
Washington, D.C. 20003
(215) 717-3473
ronnie.london@thefire.org

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 25, 2025, an electronic copy of the Foundation for Individual Rights and Expression Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: July 1, 2025

/s/ Ronald G. London

RONALD G. LONDON
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE,
Suite 340
Washington, D.C. 20003
(215) 717-3473
ronnie.london@thefire.org