No. 25-1442

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

KYLE FELLERS; ANTHONY FOOTE; NICOLE FOOTE, ELDON RASH,
*Plaintiffs – Appellants*,

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in
her official and individual capacities; MICHAEL DESILETS, Athletic Director,
Bow High School, in his official and individual capacities; MATT FISK, Principal,
Bow High School, in his official and individual capacities; BOW SCHOOL
DISTRICT,
*Defendants – Appellees*,

PHILIP LAMY, Lieutenant, Bow Police Department, in his individual capacity;
STEVE ROSETTI, soccer referee, New Hampshire Interscholastic Athletic
Association, in his individual capacity,
*Defendants*.

---

Appeal from an Order of the United States District Court for the District of New
Hampshire, The Hon. Steven J. McAuliffe
(Dist. Ct. No. 1:24-cv-311-SM-AJ)

---

APPELLEES' BRIEF

---

Brian J.S. Cullen
Jonathan M. Shirley
Cullen Collimore Shirley PLLC
37 Technology Way, Suite 3W2
Nashua, NH 03060
(603) 881-5500
bcullen@cullencollimore.com
jshirley@cullencollimore.com
Attorneys for Appellees

## DISCLOSURE STATEMENT

Defendant Bow School District is a New Hampshire school district formed under Chapter 194 of the New Hampshire Revised Statutes Annotated. It has no parent corporations or stockholders. Defendants Marcy Kelley, Michael Desilets, and Matt Fisk are natural persons with no parent corporations or stockholders.

TABLE OF CONTENTS

DISCLOSURE STATEMENT…………………………………………………….. i

TABLE OF AUTHORITIES………………………………………………….... iv

STATEMENT OF THE ISSUES…………………………………………………...1

STATEMENT OF THE CASE ……………………………………………………2

    A.    New Hampshire House Bill 1205 and *Tirrell v. Edelblut*…….…………2

    B.    The District Learns of a Planned Protest …………………….…….. 4

    C.    Events at the Game ……………………………………….……… 9

    D.    Parking Lot Incident ……………………………….…...…….. 10

    E.    No Trespass Orders ……………………………….……..………11

    F.    District Court Proceedings …………………….………..……..11

SUMMARY OF ARGUMENT …………………………….………..... 13

ARGUMENT ………………………………………………..…………14

    I.    STANDARD OF REVIEW ……………………………..……..14

II.    PLAINTIFFS' SPEECH CLAIMS DO NOT MERIT THE
EXTRAORDINARY EQUITABLE REMEDY OF A
PRELIMINARY INJUNCTION ……………………………….………….15

    A.    Public Schools as Forums for Free Expression……………………..15

    B.    The District's Policies…………………………………………17

    C.    The District's Policies are Viewpoint Neutral and
Reasonable Given the Special Characteristics of the
School Environment and Athletic Competition……………………..18

D.   The Actions Taken by the District were Reasonable
And Viewpoint Neutral……..…………………………………………20

E.   Plaintiffs' Protests Risk Being Equally Disruptive
At Other School Events………..…………………………………………22

F.   The Balance of Equities does not Favor Plaintiffs…………...……...24

III.   THE DISTRICT COURT CORRECTLY DENIED PRELIMINARY
INJUNCTIVE RELIEF TO PLAINTIFFS…………………………………26

A.   The District Court Applied a Limited Public Forum Analysis,
Just Like Plaintiffs Wanted…………………………………………26

B.   The District Court Properly Relied on *Tinker* and *L.M.* as
Part of its Limited Public Forum Analysis …………………………27

C.   The District's Policies Do Not Provide Excessive
Enforcement Discretion to School Officials………………………...31

D.   The District Court Properly Exercised its Judicial
Notice Authority…………………………………………………… 32

E.   The District Court Properly Sustained the District's
Assessment that Plaintiffs' Wristbands Were
Harassing and Demeaning to Transgender Students………………...33

CONCLUSION…………………………………………………………….. 34

CERTIFICATE OF COMPLIANCE...……………………………………36

DEFENDANTS ADDENDUM……………………………………………….DA-i

TABLE OF AUTHORITIES

Cases

*Am. Freedom Def. Initiative v. Mass. Bay Transit Auth.*,
    781 F.3d 571 (1st Cir. 2015); .................................................................... 14,16,31

*Asociacion Puertorriqueña De Profesores Universitarios v. Univ. of P.R.*
    *(In re Fin. Overight & Mgmt. Bd. for P.R.)*, 60 F.4th 9 (1st Cir. 2023) ..................33

*Bd. Of Dirs. Of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987) .................................................................................................19

*Bethel School Dist. No. 403 v. Fraser,*
478 U.S. 675 (1986) .................................................................................................19

*Boy Scouts of Am. v. Wyman*,
335 F.3d 80 (2d Cir. 2003) ......................................................................................19

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ........................................................................................ 16, 25

*E.I. Du Pont De Nemours & Co. v. Cullen*,
791 F.2d 5 (1st Cir. 1986) ........................................................................................32

*Gent v. CUNA Mut. Ins. Soc'y*,
611 F.3d 79, 84 n.5 (1st Cir. 2010) .........................................................................33

*Governor Wentworth Sch. Dist. v. Hendrickson*,
    421 F. Supp. 2d 401 (D.N.H. 2006) ....................................................................21

*Griffin v. Sec'y of Veterans Affairs*,
288 F.3d 1309 (Fed.Cir. 2002) ................................................................................31

*Hazelwood School Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ........................................................................................ 15, 20

*Hurwitz v. Newton Pub. Sch.*, No. CV 17-10231-LTS, 2017
    WL 3008886, at *3 (D. Mass. July 14, 2017) ............................................... 16, 24

*Johnson v. Perry*,
859 F.3d 156 (2d Cir. 2017) ......................................................................................16

*Kutchinski v. Freeland Community School District*,
69 F.4th 350 (6th Cir. 2023)......................................................................................20

*L.M. v. Town of Middleborough*,
103 F.4th 854 (1st Cir. 2024) ...................................................................................20

*Matal v. Tam*,
582 U.S. 218 (2017)...................................................................................................16

*McElhaney v. Williams*,
81 F.4th 550 (6th Cir. 2023)......................................................................................29

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37, 49 (1983)..............................................................................................16

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) .......................................................................................16

*St. Louis Baptist Temple, Inc. v. FDIC*,
605 F.2d 1169 (10th Cir. 1979) .................................................................................32

*Tinker v. Des Moines Independent Comm. Sch. Dist.*,
393 U.S. 503 (1969)............................................................................................ 20, 28

*Tirrell v. Edelblut*,
No. 1:24-cv-251-LM-TSM, 2024 DNH 069 (Aug. 22, 2024)....................................1

*United Food & C.W. 1099 v. City of Sidney*,
359 F.3d 432(6th Cir. 2004) .....................................................................................25

*Wandering Dago, Inc. v. Desisto*,
879 F.3d. 20 (2d Cir. 2018) .......................................................................................19

## STATEMENT OF THE ISSUES

1.     Did the district court correctly decide that school officials may stop Plaintiffs from protesting at school-sponsored events where, in the school officials' reasonable judgment, the protests are directed at a particular student or group of students, and the protests are harassing and demeaning to those students?

STATEMENT OF THE CASE [1]

A.    New Hampshire House Bill 1205 and *Tirrell v. Edelblut*

In July 2024 the New Hampshire legislature enacted House Bill 1205 ("HB 1205"), the general terms of which "prohibit[] transgender girls from participating in girls' school sports." *Tirrell v. Edelblut*, No. 1:24-cv-251-LM-TSM, 2024 DNH 069 (Aug. 22, 2024) ("*Tirrell* TRO Order") at 6. Two high school students, Parker Tirrell and Iris Turmelle, challenged the law's application to them by filing suit in the New Hampshire federal district court. *Id*. Parker, who played soccer on Plymouth Regional High School's (winless) junior varsity team the previous year as a high school freshman, hoped to be able to play the 2024 fall season on the upper team. *See id*. at 5-6. Parker noted in her Complaint that she was just 15 years old and, because of hormone therapy, had not and will not undergo male puberty. *Tirrell v. Edelblut*, ECF 4 at 17. As the New Hampshire district court summarized:

> Sports have always been a big part of Parker's life. She has played in elementary, middle, and high school and in town recreational leagues. Sports are how Parker makes friends and connects with others. While she has participated in a variety of school sports, soccer is her passion. In eighth grade, she played on the girls' soccer and track teams at Plymouth Elementary School. In ninth grade, she played on the girls' soccer team at Plymouth Regional High School. Her high school soccer team is her primary social outlet, both on and off the field. Most of her

---

[1] Given the standard of review for this appeal, Appellees (hereinafter, "the District") provide a statement of the case consistent with their presentation to the district court. The District also adopts and incorporates herein by reference the district court's factual findings from its order of April 14, 2023, which Plaintiffs largely leave unchallenged but for a few glancing criticisms.

> friends are her teammates, and they have given Parker an important source of acceptance, belonging, and emotional support.

*Tirrell* TRO Order at 5 (footnote omitted).

Parker filed simultaneously with her Complaint a motion for temporary restraining order and a motion for preliminary injunction. *Id*. at 6. On August 19, 2024, the district court (McCafferty, J.) orally granted the motion for temporary restraining order, which was followed by a written decision on August 22, 2024. *Id*. at 7. The district court held a further hearing on the motion for preliminary injunction and issued an order granting the injunction on September 10, 2024. *Tirrell v. Edelblut*, 2024 DNH 073 P. The district court noted that Parker's mother attested that Parker would be devastated if she was not permitted to play on the team, which has given her "an important source of acceptance, belonging, and emotional support." *Id*. at 6.

Plaintiffs (other than Eldon Rash) were generally aware of the proposed changes to Title IX regulations, the passage of HB 1205, and the progress of Parker's challenge to the state law. Fellers, for example, wrote to the Superintendent and School Board on August 1, 2024, telling them about an injury at a female boxing match, noting that "[t]his happened on the same day the Biden/Harris administrations [sic] rewrites Title IX to appease a mentally ill crowd." App. 365-66 and Defendants Addendum 8 (hereinafter, "D. Add."). Anthony Foote acknowledged the *Tirrell* TRO Order the day after it was issued, emailing the Bow

3

girls' soccer coach about the future game against Plymouth and asking if they could forfeit a game and still win the championship. D. Add. 16. He noted at the time that the Plymouth game was "not one we have to deal with tomorrow." *Id*. Nicole Foote attended each of the hearings in the *Tirrell* litigation, and met with Bow Athletic Director Mike Desilets on September 13, 2024, to discuss the upcoming game in light of the USDC ruling days before. App. 437, 590-91; D. Add. 15.

### B. The District Learns of a Planned Protest

Not all Plaintiffs were content to meet with administrators to express their views. The day after the *Tirrell* TRO Order, a parent of a Bow High School student told Desilets that she had overheard several Bow parents discussing plans to protest Bow's match against Plymouth – Parker's team – scheduled for September 17, 2024. D. Add. 9. The plans discussed included wearing dresses to the game, buying anti-trans gear, making signs, and generally heckling and intimidating the player. *Id*. Even Plaintiffs agreed that at least the latter would be improper. *See, e.g.*, App. 371 (Fellers); App. 581 (A. Foote). Shortly after, Anthony Foote put out a call on Facebook for people to attend the upcoming game, noting that there would be a "biological male" on the Plymouth roster and the "biological males have no place in women's sports." D. Add. 5. He later posted photos of wrist bands Fellers had purchased, which he had emblazoned with symbols including "XX" and "NAD". D. Add 4, 7.

4

Superintendent Marcy Kelly, Bow Principal Matt Fisk, and Desilets were concerned about the possibility of a protest directed against a student at the game. App. 532.[2]  Kelly holds a bachelor's degree from the University of Rhode Island, a master's degree in special education from Plymouth State University, and a certificate of advanced graduate studies in educational leadership from Southern New Hampshire University.  App. 563-64.  Prior to becoming Superintendent, she was the Director of Student Services.  App. 564.  She received regular training on Title IX and RSA 354-A.  *Id*.  She paid attention to trends and has followed the development of the "XX" symbol, including its use by anti-trans activists at the Olympics and elsewhere.  App. 524-26; 566.  She views the "XX" as a "pretty well-known anti-trans symbol" and exclusionary in the context of women's sports.  App. 524, 556, 566-67.  In her judgment, the symbol is problematic when directed at a student.  App. 565-66.

Fisk served as Bow High School's Assistant Principal for five years before accepting the role of Principal in September 2024.  App. 628.  For the past two years he has been one of the advisors to the Gay Straight Alliance – a student group at the school.  App. 376-77.  The school has several transgender students.  App. 377.  Fisk

---

[2] Their concern was warranted:  Foote had previously been involved in a book challenge during which he had posted the identity of a student member of the school's Gay Straight Alliance ("GSA") after she spoke out at a board meeting. App. 460-61.

is aware that transgender students suffer from a higher rate of depression and suicide than other students. *Id*. One such student known to Fisk has been hospitalized for self-harm, largely stemming from stress the child feels from peers and society. App. 378.

The District considers school athletics to be "an extension of the classroom." App. 592. In accordance, the District has a policy addressing conduct on school grounds entitled "Public Conduct on School Property" ("Policy KFA"). D. Add. 1. The policy states that the District expects "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." *Id*. It also prohibits visitors to school property from engaging in conduct that would "threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person" or "delay, disrupt, or otherwise interfere with any school activity." *Id*. The policy forbids persons from violating other school policies or regulations or the directive of an authorized District employee and puts visitors on notice that violation of the policy could lead to being ordered to leave school grounds and the issuance of a "no trespass" order. *Id*. The District also has an Athletic Handbook that includes expectations that fans will treat players, coaches, and officials with respect, and not attempt to communicate with or distract players. D. Add. 3.

6

Consistent with these policies, on September 16, 2024, Desilets emailed the soccer team parents to remind them of the rules that apply to those attending school sporting events.  D. Add. 2.  He acknowledged "that there are some differing opinions regarding tomorrow's game," and stressed "that is perfectly fine." *Id*.  He advised, however, "that any inappropriate signs, references, language or anything else present at the game will not be tolerated." *Id*.  The administrators testified that they did not act on their personal views on the issue of transgender girls playing on girls' teams.  Kelley noted that the issue was nuanced and that there were many factors to consider in whether male-born athletes should be permitted to play on women's teams.  App. 531.  Desilets did not express any opinion on HB 1205:  "At that point . . . the determining piece of my job [was] to follow what the law is telling us to do."  App. 579.

Anthony Foote responded to Desilets by email at 7:55 AM the next morning (September 17, 2024 – the day of the game).  D. Add. 6.  Foote stated: "I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males – who are stronger, faster, and more physically dominant – compete against women.  And you don't sit around waiting for someone to get hurt before you take action."  *Id*.  He added, "I'm sick of your cowardice and your pandering" and warned, "Stand up for women, for real women, or get out of the way."  *Id*.  Foote copied Fellers on the email.  *Id*.

As it happens, Fellers and Foote had no intention of just "standing by." Fellers had purchased the pink wristbands used in the protest earlier in the week. App. 312-16. He had also prepared a sign the night before to bring to the game. App. 315-16. Foote used a sharpie to make each of them with the "XX" and other symbols or letters. App. 312.

Foote and Fellers both tried to claim that their actions were not intended as a protest against Parker's participation in the game but merely a benign display of support for women's causes generally and, when pushed, women's sports. *See, e.g.*, App. 382 (Fellers); App. 404 (Foote). Their own emails and testimony contradict this assertion. Foote referred to trans-rights proponents as "the transgender mob" and Fellers called them a "mentally ill cult." D. Add. 8, 16. Although Foote and Fellers each knew about the *Tirrell* rulings before the season began, neither brought their "supportive" symbols or signs to any of the soccer games earlier in the season. App. 441-42, 454. Less calculated, perhaps, Rash simply admitted that Fellers told him it was "some sort of a protest of having biological males on the women's teams." App. 503. Foote ultimately conceded that his protest could be viewed as communicating opposition to transgender girls playing on girls' teams consistent with his September 17 email in which he declared "This isn't 'just another game' - not by a long shot." App. 481; D. Add. 6.

8

C.    Events at the Game

Foote came to the game 90 minutes early to secure a parking spot near the field and set up at the midline on the sidelines. App. 455-56, 588-89. He brought with him a bag of his protest armbands and a sign featuring Riley Gaines that he intended to put up by the sideline, too, returning it to his car only because he had forgotten to bring something to stand it up. App. 415, 455-56. Despite this preparation, Foote did not display either the wristband or the sign in the first half of the game because he knew that his plan likely fell outside the scope of conduct permitted on the sidelines. App. 457-58.

Following the end of the first half of the match, Foote went to his Jeep and put a poster of Riley Gaines, an outspoken critic of trans participation in women's sports, on the windshield facing the field. App. 456; *see also* D. Add. 5. He and Fellers then each sported their wristbands and stood prominently at the sideline. App. 318-19 (Fellers), 457 (Foote). Some ten minutes later, Desilets noticed that Foote had put on his protest wristband. He approached Foote and quietly asked him to remove it. App. 421. Desilets used the same approach with Fellers thereafter, whispering to Fellers that he had to take the wristband off because "there's no protests allowed" or "it's a protest and protests is [sic] not allowed." App. 325; *see also* App. 158 ¶12. As Kelly explained, "we asked them to remove [the XX wristbands] because we believe that those are anti-trans symbols and they were

9

targeting a player on the other team." App. 556. Fellers and Foote both acknowledge that they did not immediately comply. App. 380-82.

Rash was sitting in a chair approximately fifteen feet from the playing field. App. 167 ¶ 9. Fisk saw that he was now wearing Fellers wristband and directed him to remove it, which he repeatedly refused to do. *Id*. Fellers, who had not been asked to leave the game, began to interrupt and argue with Desilets and Fisk on the sideline right behind Rash. *Id*. The ensuing events on the sidelines were captured by Lt. Lamy's body camera, which was shown repeatedly at the hearing and introduced as App. 255. Fellers continued to argue with administrators until he was asked to leave, and Rash refused to remove his wristband for some fifteen minutes. *Id*.; *see also* App. 158 ¶¶ 15-16; App. 167 ¶11.

D.    Parking Lot Incident

Fellers, as it happens, went only as far as his car, which he then drove to a more prominent position by the roadway. App. 163 ¶ 8. There, he removed a handwritten sign from his car reading "Protect Women Sports for Female Athletes" and held it above his head. *Id*. Fellers was situated in an area where his sign would be visible to the Plymouth girls' varsity soccer team as they left the school on their bus. *Id*. Learning of this, Desilets asked Lt. Lamy to instruct Fellers to leave the premises. App. 159 ¶ 8. Lt. Lamy approached Fellers in the parking lot and asked him to leave. App. 170 ¶ 7. This interaction was also recorded by Lt. Lamy, which

10

recording was shown to the Court. App. 256. Fellers repeatedly refused Lamy's instructions to leave the area, often lying to the officer in the process. *Id*. Kelly testified that the District never allows people to march around the parking lot holding signs, regardless of the content. App. 575.

      E.     No Trespass Orders

Kelley issued no trespass orders to Anthony Foote and Fellers. App. 135-140. She based the Foote No Trespass order on the fact that he had been expressly reminded of the school policy on civility and had nevertheless organized and participated in a protest and behavior that targeted a specific opposing player, here 15-year-old Parker Tirrell. App. 163-164. Feller received a longer No Trespass Order – the remainder of the soccer season – because of his abuse of school administrators, his prolonged refusal to remove his wristband, his refusal to follow the directions of Lt. Lamy, and his targeting of 15-year-old Parker Tirrell both at the game and in the parking lot. *Id*. The Order was modified twice at Fellers' request. App. 164. Neither Order remains active.

      F.     District Court Proceedings

Plaintiffs filed this action in the New Hampshire federal district court on September 30, 2024, and shortly thereafter moved for a temporary restraining order and preliminary injunction against Defendants. The district court denied Plaintiffs'

TRO request at a hearing on October 8, 2024, and it held an evidentiary hearing on Plaintiffs' preliminary injunction request on November 21 and 22, 2024.  App. 7, 10.

The parties submitted briefings in advance of both hearings that were supported by sworn witness declarations with exhibits.  App. 5, 7, 10.  The evidence presented at the preliminary injunction hearing included witness testimony from Kyle Fellers, Anthony Foote, Eldon Rash, Marcy Kelley, Matt Fisk, Mike Desilets, and Steve Rosetti. The video footage recorded by the body cam of Lieutenant Lamy was also presented at the evidentiary hearing.

The district court denied Plaintiffs' preliminary injunction request in an order dated April 14, 2025.  App. 12.

## SUMMARY OF ARGUMENT

Neither the facts nor the law support Plaintiffs' demand for a preliminary injunction on their speech claims. Plaintiffs do not have an unbounded right to engage in speech at school-sponsored events that, in the District's reasonable judgment, amount to the targeting and intimidation of students.

The district court correctly found that the District's policies governing conduct on school property and during athletic events are reasonable and viewpoint neutral, and that the District enforced its policies appropriately to bar Plaintiffs' protests at school-sponsored events because the District has a special interest in protecting students and the Bow High School educational setting.

The district court's order denying Plaintiffs' motion for a preliminary injunction should be affirmed.

ARGUMENT

## I.   STANDARD OF REVIEW

In reviewing the denial of a preliminary injunction, the standard for evaluating a plaintiff's contentions is abuse of discretion.  *Am. Freedom Defense Initiative v. Mass. Bay Transp. Auth*., 781 F.3d 571, 578 (1st Cir. 2015).  For free speech claims, however, this standard applies only to "issues of judgment and balancing of conflicting factors."  *Id*.  By contrast, findings of fact are reviewed for clear error, and rulings on legal issues are reviewed *de novo*.  *Id*.

To secure preliminary injunctive relief, Plaintiffs must "establish a strong likelihood that they will ultimately prevail on the merits of their First Amendment claims."  *Id*.  While Plaintiffs must also establish other elements – i.e., that they will suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in their favor, and that an injunction is in the public interest – the likelihood of success on the merits is the lynchpin of the preliminary injunction analysis in the First Amendment context.  *Sindicato Puertorriqueno de Trabajadores v. Fortuña*, 699 F.3d 1, 10-11 (1st Cir. 2012).

II.    PLAINTIFFS' SPEECH CLAIMS DO NOT MERIT THE
       EXTRAORDINARY EQUITABLE REMEDY OF A
       PRELIMINARY  INJUNCTION

      A.    Public Schools as Forums for Free Expression

Public schools "do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). "Hence, school facilities may be deemed to be public forums only if school authorities have 'by policy or practice' opened those facilities 'for indiscriminate use by the general public' or by some segment of the public, such as student organizations."  *Id*. (internal quotations and citations omitted).  "If the facilities have instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community."  *Id*.  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."  *Id*.

Moreover, "[i]n the context of the special characteristics of the school environment, … the government [has the power] to prohibit … actions which materially and substantially disrupt the work and discipline of the school."  *Healy v.*

15

*James*, 408 U.S. 169, 189 (1972) (internal quotations omitted). "Associational activities need not be tolerated where they infringe upon reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Id*.

Some courts have labeled the sidelines of school-sponsored events, like basketball games, to be limited public forums. *See Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017). Notably, the terms "limited public forum" and "nonpublic forum" are synonymous, and the standard for a permissible speech restriction is the same: it must be reasonable and viewpoint neutral. *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n. 4 (1st Cir. 2004); *Am. Freedom Def. Initiative v. King County, Washington*, 577 U.S. 1202 (March 7, 2016) (Mem.). This standard "is not a particularly high hurdle," *Ridley*, 390 F.3d at 90, and any restriction "need not be the most reasonable or the only reasonable limitation," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 808 (1985). Thus, while speech restrictions in such forums must be viewpoint neutral, subject matter and speaker-based restrictions may be allowed. *Matal v. Tam*, 582 U.S. 218, 243 (2017); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983) ("Implicit in the concept of a nonpublic forum is the right to make distinctions … on the basis of subject matter and speaker identity.") *Am. Freedom Def. Initiative v. Mass. Bay*

*Transit Auth*., 781 F.3d 571, 578 (1st Cir. 2015); *Hurwitz v. Newton Pub. Sch.*, No. CV 17-10231-LTS, 2017 WL 3008886, at *3 (D. Mass. July 14, 2017).

### B.    The District's Policies

The District's Policy KFA governs public conduct on school property.  App. 129.  The policy applies to any land or facilities "used for school purposes or school-sponsored events, whether public or private."  *Id*.  The policy states that the District "expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event."  The policy further states in relevant part that no person on school property or at a school event shall "[i]njure, threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person;" "[v]iolate any Federal or New Hampshire law;" "[i]mpede, delay, disrupt, or otherwise interfere with any school activity or function;" or "[v]iolate other District policies or regulations, or an authorized District employee's directive." *Id*. at Nos. 1, 4, 7, and 10.  The policy concludes by stating that "[a]ny person who violates this policy or any other acceptable standard of behavior may be ordered to leave the school grounds" and the District "reserves the right to issue 'no trespass' letters to any person whose conduct violates this policy, acceptable standards of conduct, or creates a disruption to the School District's educational purpose."  *Id*.

Overlapping Policy KFA is the Bow High School Athletics Handbook, excerpted in D. Add. 3.  It announces the District's "expectation of every fan to

17

maintain a positive attitude, to treat players, coaches and officials with respect, and to cheer for their teams as opposed to cheering against the other team." *Id*. It further states that "[f]ans are not to use the names or numbers of opposing teams, nor should they be trying to directly communicate or distract other players." *Id*.

Policy KFA and the Athletics Handbook are available on the District's website. In addition, student athletes and their parents must acknowledge receipt of the Athletics Handbook as a condition of enrollment into a Bow High School team. App. 595-96.

> C. The District's Policies are Viewpoint Neutral and Reasonable Given the Special Characteristics of the School Environment and Athletic Competition

The District's policies easily clear the "not [] particularly high hurdle" of viewpoint neutrality and reasonableness as speech restrictions. The policies are viewpoint neutral because, among other things, they restrict conduct aimed at intimidating or harassing others, disrupting events, or distracting players. The District was also obligated under Title IX to ensure that students participating in school events did not suffer sex discrimination, which by regulation at the time included discrimination on the basis of a student's gender identity. 34 CFR § 106.10. Antidiscrimination laws, while perhaps causing "viewpoint disparity," are generally considered viewpoint neutral. *Wandering Dago, Inc. v. Desisto*, 879 F.3d. 20, 32 (2d

Cir. 2018); *see also Bd. Of Dirs. Of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) and *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 93 (2d Cir. 2003).

The District's policies are reasonable given the special interest public schools have in protecting students and the educational setting. Schools may regulate speech during school-sponsored activities that administrators reasonably view as lewd, promoting drug use, or aimed at harassing other students. *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682 (1986); *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988); *Kutchinski v. Freeland Community School District*, 69 F.4th 350 (6th Cir. 2023). Schools may also regulate speech during school-sponsored activities that threaten substantial disruption or material interference with the activities, or speech that collides with the rights of other students to be secure and to be let alone. *Tinker v. Des Moines Independent Comm. Sch. Dist*., 393 U.S. 503, 508 (1969). This authority extends not just to speech that overtly threatens the orderly conduct of the activities, but to speech that strikes at the emotional well-being or sexual identity of students. *L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024).

While it is true that *Tinker* and *L.M*. arose in the context of speech by students, no court has held that the special leeway granted public schools to regulate speech during school-sponsored activities depends exclusively on the speaker being a student. It is the disruption to the educational setting and interests of the student

body that propels the analysis instead.  It is therefore irrelevant whether the person walking the halls during school hours wearing *L.M.'s* "two genders" t-shirt is a student, parent, or visitor.  The risk of disruption to the school environment is the same.

Equally important is the deference school administrators must be shown when deciding what conduct at school-sponsored events threatens substantial disruption or material interference.  It is the school administrators, not federal judges, who are in the best position to evaluate conduct in the moment and forecast its impact on school activities.  *See L.M.*, 103 F.4th at 886; *Governor Wentworth Sch. Dist. v. Hendrickson*, 421 F. Supp. 2d 401, 425 (D.N.H. 2006) ("School authorities are generally in a far better position to understand their students and the students' likely response to various modes of intervention. They are entitled to a healthy measure of deference when exercising judgment, drawing inferences, and reaching conclusions about what is actually going on in their schools and classrooms.").

> D.    The Actions Taken by the District were Reasonable and
>        Viewpoint Neutral

The District's actions at the September 17 soccer game and subsequent no trespass orders to Foote and Fellers were constitutionally permissible and justified. While Plaintiffs cast their conduct at the September 17 game as "silent protest," the District reasonably viewed it as intimidation aimed at 15-year-old Parker Tirrell. The District was on alert for Plaintiffs to be disruptive during the game.  A Bow

20

parent told Desilets, the Athletic Director, that Plaintiffs were mulling plans to dress in women's clothes, wave signs, and heckle from the sidelines.  D. Add. 9.  Foote himself warned Desilets on the morning of the September 17 game that "[t]his isn't 'just another game' – not by a long shot" and that Desilets better "[s]tand up for women, for real women, or get out of the way."  D. Add. 6.  With the New Hampshire district court declaring only days earlier that Parker Tirrell was entitled as a matter of constitutional right to play on the Plymouth girls varsity soccer team, the District properly intervened the moment Plaintiffs' protest began.

Significantly, the District's actions were consistent with its policy and practice of prohibiting conduct at school-sponsored sporting events that is threatening, harassing, or intimidating, or that is aimed at communicating with or districting players.  Desilets testified that he has repeatedly gone into the stands and sidelines of school-sponsored games to deal with spectators who are causing disruption or targeting players on the field.  App. 593.  This policy and practice satisfies viewpoint neutrality because it equally bars spectators from targeting a player for being slower or less fit than other players or because of a player's conduct on the field.  As another example, the District would not allow protestors to waive abstinence signs at the game were a Plymouth's team member pregnant.  The intervention would not be because the District prefers viewpoints promoting promiscuity rather than

abstinence, but because the District would recognize the obvious targeting of the pregnant player and potential for disruption to the game.

The District's actions would be justified and constitutional even had it known that Plaintiffs were only planning to "silently" wear their XX wristbands. The wristbands are no different and send the same message as LM's "two gender" t-shirt. *L.M.,* 103 F.4th at 886. If the t-shirt can be banned from the school grounds, certainly the XX wristbands (and "NAD" wristbands) can too. The fact that it is parents and spectators who voluntarily attend the school-sponsored events – as opposed to students compelled to be in school – only enhances the reasonableness of the speech restriction.

Plaintiffs have no First Amendment claim arising from the events of the September 17 game because the District properly exercised its duty to protect Paker Tirrell from intimidation and harassment during the game, and it issued reasonable sanctions against Foote and Fellers – in the form of No Trespass Orders – for conduct they knew violated the school's policies governing school-sponsored athletic events.

### E.    Plaintiffs' Protests Risk Being Equally Disruptive at Other School Events

The District's refusal to let Plaintiffs protest at other school-sponsored events does not threaten a First Amendment violation. The District is justified in treating Plaintiffs' wristbands and signs when used at school-sponsored events as targeting the school's transgender student population generally for harassment and

intimidation. This is no different than the determination in *L.M.* that "words that otherwise would not constitute 'fighting words' may be so deemed in the public-school setting because of the heightened psychological sensitivities of school children." *L.M.*, 103 F.4th at 876. The District is also entitled to deference in its finding that Plaintiffs' wristbands and signs are demeaning of transgender students, and that Plaintiffs' message is "no less likely to strike a person at the core of his being than it would if [they] demeaned the religion, race, sex, or sexual orientation of other students." *Id*. at 879. While this may not be a content-neutral restriction, the law does not require a content neutral restriction for nonpublic or limited public forums like school-sponsored events. *Hurwitz*, 2017 WL 3008886, at *3. The fact that the District may not know a transgender student will be present at future events is irrelevant. As the District explained at the preliminary injunction hearing, it is not always known to school officials who may identify as transgender or whether transgender students will or will not be attending a given event. The District needs the leeway to restrict Plaintiffs' message from all school events because school officials are unable to know which students will be attending which events. App. 646:20 to 651:06. Accordingly, Plaintiffs have no constitutional right to "silently protest" school-sponsored events whether it is the girls' varsity soccer games or other events throughout the academic year.

The right Plaintiffs assert to protest by displaying signs in the school parking lot – or as Foote proposes, marching around holding them aloft – also lacks merit. The District does not allow protests of any kind on its grounds or in its parking lots and never has.  The parking lots have never been opened as a public forum.  The idea that schools must submit to having their parking lots converted to protest zones seems to enjoy no support in the law nor – to date – have Plaintiffs identified any such support.  "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Cornelius*, 473 U.S. at 799-800 (1985); s*ee also United Food & C.W. 1099 v. City of Sidney*, 359 F.3d 432 (6th Cir. 2004) (declining to find that Ohio created public forum simply by allowing schools and adjacent parking lots be used for voting).  It takes little imagination to picture the metamorphosis that would occur at Bow High School and other schools should Plaintiffs' demands be granted in this respect.

      F.      The Balance of Equities does not Favor Plaintiffs

Not only do Plaintiffs fail to demonstrate a likelihood of success on the merits of their speech claims, but they do not have the clean hands required to be granted equitable relief.  Plaintiffs insist that their protest at the September 17 game was not aimed at Parker Tirrell, and they ascribe to mere coincidence that their first protest

occurred at the one game Bow High School played against Parker Tirrell's team. This explanation is not credible given that Plaintiffs never bothered to protest at any of the Bow High School girls' varsity games prior to September 17, and Foote is on record as declaring the September 17 match far from "'just another game' - not by a long shot." D. Add. 6.

Plaintiffs' passion for free speech also ends rather abruptly when it comes to speech they don't like. Fellers was outraged that Rossetti, the lead referee, cursed at him in the parking lot after the September 17 game. Fellers demanded school administrators sanction or fire Rosetti as a referee for the outburst. Add. 388. When asked to explain why Rosetti should be disciplined, Fellers declared indignantly that it was "very inappropriate" for Rossetti to have used foul language against him "as well as around other parents and children." Add. 389. When Fellers' demands went unmet, he took his revenge by naming Rosetti to this action on the baseless assertion that Rosetti conspired with school officials to deprive Plaintiffs of their free speech rights.[3]

Plaintiffs are far from selfless First Amendment champions.

---

[3] The district court took a dim view of the ploy and pressed Plaintiffs to explain their rationale for the claim. App. 641:16 to 643:22. Plaintiffs and Rosetti later entered a stipulation dismissing Rosetti from the action.

III.    THE DISTRICT COURT CORRECTLY DENIED PRELIMINARY
        INJUNCTIVE RELIEF TO PLAINTIFFS

Plaintiffs and their *amici* allies argue that the district court committed reversible error because it skipped a proper forum analysis in favor of applying the "student speech" standards of *Tinker* and *L.M.* to deny a preliminary injunction. Plaintiffs also argue that the district court took improper judicial notice of facts not before it. These criticisms are not justified, and the district court's order should be affirmed.

A.    The District Court Applied a Limited Public Forum
      Analysis, Just Like Plaintiffs Wanted

In evaluating the merits of Plaintiffs' claims, the district court acknowledged that Plaintiffs' free speech rights as adults are not the same as students, that the school parking lot and the soccer field sidelines are a limited public forum, and that the District's policies and enforcement must be reasonable and viewpoint neutral. These were all points Plaintiffs themselves pressed in their briefing to the district court.

The district court denied a preliminary injunction, however, because it found the District met the not particularly high hurdle of reasonableness and viewpoint neutrality. The District's policies reasonably related to maintaining order and protecting the rights of students at a school-sponsored athletic competition that, ideally, served as an extension of the classroom for developing life skills like

26

problem-solving, teamwork, and sportsmanship. Enforcing the policies as to Plaintiffs was viewpoint neutral, moreover, because the District reasonably concluded that the message conveyed by Plaintiffs' wristbands and signs were aimed at a transgender member of the opposing team, not to mention transgender students generally, and risked poisoning the educational atmosphere. The district court found no evidence that school officials acted to restrict Plaintiffs' message because they disliked the viewpoint expressed.

B.   The District Court Properly Relied on *Tinker* and *L.M.* as Part of its Limited Public Forum Analysis

Plaintiffs contend that the district court impermissibly relied on *Tinker* and *L.M.,* which they say only apply to the regulation of student speech, and ignored case law holding that the different treatment of positive messages and negative messages in a limited public forum is unconstitutional. These arguments distort the district court's reasoning and elide what Plaintiffs themselves recognize is the unique setting of school-sponsored activities like athletic competition.

Plaintiffs concede that "student-athletes on a soccer field are [not] in a limited public forum or at least not [a forum] that compares to the forum for audience members, on the sidelines." Appellants' Brief at 19 n. 8. In other words, Plaintiffs view student athletes as *not* participating in the limited public forum of the sidelines where adult spectators stand. Plaintiffs also acknowledge Justice Stewart's observation in *Tinker* that "a child – like someone in a captive audience – is not

27

possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id*. at 33 (quoting *Tinker*, 393 U.S. at 515).

These realities stand in contrast to Plaintiffs' assertion that, as adult spectators, they are entitled to the full complement of free speech rights no different from a public park or sidewalk. The assertion presupposes that Plaintiffs are exercising such rights solely in the presence of others who have equal capacity for individual choice, like the choice to exercise free speech of their own or to leave the forum.

But these individual choices are obviously not fully available to the student athletes. They stand apart from the limited public forum of the sidelines and remain under the supervision of school officials acting *in loco parentis*. What student athletes can wear or say during a game is governed by handbooks and codes of conduct, and they risk discipline or ejection from the game if they step out of line. A similar problem surrounds student spectators. While they may have the freedom to leave the game, student spectators on school grounds remain under the *in loco parentis* authority of school officials. Their free speech rights are still not the same as adults, as Plaintiffs repeatedly point out in their briefing. It is this imbalance of individual choice and the awkward dynamic of adult spectators in a limited public forum directing speech at student athletes outside the forum – i.e., playing on a soccer field that serves as an extension of the classroom – which makes *Tinker* and *L.M.* relevant and instructive.

Plaintiffs take no account of these dynamics, and the root of their argument boils down to the superficial observation that *Tinker* and *L.M.* only concern student speech whereas Plaintiffs are adults. To be sure, Plaintiffs point to *McElhaney v. Williams*, 81 F.4th 550, 558-59 (6th Cir. 2023), for the proposition that a parent cannot be banned from attending school-sponsored sporting events just for expressing a viewpoint. In that case, however, the suspension was not because of adult speech directed at a student athlete from the sidelines but because the parent sent contentious text messages to the coach of his daughter's varsity softball team a week earlier.

In fact, Plaintiffs cite no decisional law whatsoever involving adult speech directed at students while on school property. Plaintiffs analyze the secondary effects doctrine and the heckler's veto, for example, but the cases they rely on for their analysis involve facts having nothing to do with schools or the special interest schools have in protecting students and the educational setting. Appellants' Brief at 49-52. Likewise, Plaintiffs' most grandiose statements about the sanctity of First Amendment rights all derive from case law that does not even concern limited public forums. *See, e.g., id*. at 24-26.

Even less substantial is Plaintiffs' gripe that their wristbands and signs are banned from school property, yet others are allowed to enter school property with shirts and bumper stickers adorned with the Pride Flag or political campaigns. These

29

comparisons are false equivalents:  speech reasonably interpreted by school officials as intended to target a particular student or a subset of students for harassment in the specific context of a school-sponsored activity is simply not the same as a vague or generalized expression of a social or political belief.

Plaintiffs also mischaracterize witness testimony to add dramatic flair to their arguments.  Plaintiffs assert that school officials found the message conveyed by their wristbands "unacceptable" and that they are "proud" to have restricted Plaintiffs' speech. Appellants' Brief at 21, 23. These assertions find no support in the record.  Marcy Kelley testified that she saw the issue of transgender women playing in women's sports to be nuanced and that many factors needed to be considered about biological males playing on women's teams.  App. 531.  Mike Desilets offered no opinion whatsoever on the issue and expressly recognized that there were different views, which was "perfectly fine."  App. 579, 130.

The district court correctly cited *Tinker* and analyzed *L.M.* to explain, in the context of a limited public forum analysis, why the District reasonably interpreted the message conveyed by Plaintiffs' wristbands and signs as targeting Parker Tirrell and other transgender students, and why the District was justified in taking steps consistent with its policies to stop what it reasonably viewed as interference with a school activity.

C.     The District's Policies Do Not Provide Excessive
       Enforcement Discretion to School Officials

There is no merit to Plaintiffs' complaint that the District's policies invite

discriminatory enforcement because school officials are granted too much leeway to

use their subjective judgment.  A grant of discretion to exercise judgment in a

nonpublic forum "must be upheld so long as it is reasonable in light of the

characteristic nature and function of that forum." *Am. Freedom*, 781 F.3d at 582;

*see also Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1323 (Fed.Cir. 2002).

This is because "selectivity and discretionary access are defining characteristics of

non-public fora, which unlike public for are not intended to be open to all speech."

*Am. Freedom*, 781 F.3d at 582.

Here, the District's policies governing conduct on school property, including

the restriction on spectators communicating with or distracting student athletes on

the playing field, are not so unclear that they confer the kind of excessive discretion

that might raise concerns about surreptitious viewpoint discrimination or the

unreasonable targeting of messages for reasons unrelated to goals of the educational

setting.  *See id.*  The district court did not commit error by failing to strike down the

District's policies due to excessive enforcement discretion.

D.    The District Court Properly Exercised its Judicial
      Notice Authority

Equally lacking in merit is Plaintiffs' complaint that the district court took judicial notice of the *Tirrell* TRO Order and the Riley Gaines website. "The scope and reach of the doctrine of judicial notice has been enlarged over the years until today it includes those matters that are verifiable with certainty." *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979). Federal courts have, *Sua sponte*, taken judicial notice of their own records and preceding records if called to the court's attention by the parties. *Id*. In appropriate circumstances, federal courts may also take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue. *E.I. Du Pont De Nemours & Co. v. Cullen*, 791 F.2d 5, 7 (1st Cir. 1986). Federal courts have, *Sua sponte*, also taken judicial notice of websites. *Asociacion Puertorriqueña De Profesores Universitarios v. Univ. of P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 60 F.4th 9, 13 n. 3 (1st Cir. 2023); *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010).

The district court properly exercised its authority to take judicial notice of the *Tirrell* TRO Order because it directly addresses Parker Tirrell, the transgender female soccer player whose presence at the September 17 game ignited Plaintiffs' protest. The district court's use of the *Tirrell* TRO Order, moreover, was merely to provide context for the events that gave rise to Plaintiffs' claims in this action. It

32

was not an indispensable element of the district court's limited public forum analysis.

As for the Riley Gaines website, the district court reviewed it to confirm what Marcy Kelley testified to seeing when she visited the website and her understanding of the XX symbol. Again, the district court's use of this evidence was for narrative background and context for what school officials understood about the symbol on Plaintiffs' wristbands.

In any event, Plaintiffs are in no position to quibble about buttressing a point by citing to a website not submitted as evidence at the preliminary injunction hearing. Plaintiffs' opening appeal brief is littered with footnote references to websites that purport to explain jargon surrounding issues of gender identity. *See, e.g.,* Appellants' Brief at 5 n. 2, 26 n. 10, and 46 n. 17.

E.    The District Court Properly Sustained the District's Assessment that Plaintiffs' Wristbands Were Harassing And Demeaning to Transgender Students

The district court found that the record evidence amply supported the District's view that the XX symbol on Plaintiffs' wristbands is well known among those interested in the transgender sports issue, that the symbol is also associated with more offensive meanings, and that Plaintiffs' use of the symbol at the September 17 game conveyed a message that was demeaning and harassing to Parker Tirrell and the school's transgender student population generally. Add. 0037.

Plaintiffs complain that these findings lack record support because the District never came forward with expert testimony establishing that Parker Tirrell or other transgender students risked "injury" from Plaintiffs' message. Appellants' Brief at 39-42. Plaintiffs never raised this argument to the district court, however, nor do they cite any authority for the proposition that school officials must first consult "experts" before making the daily decisions about whether conduct in a given situation is potentially harmful to students or disruptive to the educational setting.

Plaintiffs likewise complain that the district court improperly relied on evidence that the Plymouth coach said Parker Tirrell would be devastated if she learned of Plaintiffs' wristbands at the game. Appellants' Brief at 41-42. This statement was included in a declaration the District submitted as part of its briefing to the district court. App. 159 ¶ 17. Plaintiffs never objected to the declaration or the specific statement attributed to the Plymouth coach. Plaintiffs have waived any hearsay objection they may now have to the statement.

## CONCLUSION

The Court should sustain the district court's denial of Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

CULLEN COLLIMORE SHIRLEY PLLC

Dated:  July 25, 2025          /s/ Jonathan M. Shirley
                               Brian J.S. Cullen
                               Jonathan M. Shirley
                               37 Technology Way, Suite 3W2
                               Nashua, NH 03060
                               (603) 881-5500
                               bcullen@cullencollimore.com
                               jshirley@cullencollimore.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Fed. R. App. P. 32 because it is set in 14-point Times New Roman, a proportionally spaced serif font, and contains 8550 words.

Dated:  July 25, 2025              /s/ Jonathan M. Shirley
                                  Jonathan M. Shirley

## DEFENDANTS ADDENDUM TABLE OF CONTENTS

| ECF No. | Document Description | Page No. |
|---------|---------------------|----------|
| 14-7 | Pls.' Exhibit 1 - Policy KFA | D. Add. 1 |
| 14-8 | Pls.' Exhibit 2 - Desilets Email re September 17 | D. Add. 2 |
| 14-9 | Pls.' Exhibit 3 - Extracts from Handbook and NHIAA Policies | D. Add. 3 |
| 14-10 | Pls.' Exhibit 4 - Photo of Wristband | D. Add. 4 |
| 14-11 | Pls.' Exhibit 5 - Foote Facebook Post | D. Add. 5 |
| 22-2 | Pls.' Exhibit 18 - Foote Email on September 17 | D. Add. 6 |
| 22-3 | Pls.' Exhibit 19 - Photo of Wristbands Pile | D. Add. 7 |
| | Defs.' Exhibit E - Fellers email to Kelley 8-1-24 | D. Add. 8 |
| | Defs.' Exhibit F - Farr email to Desilets 9-11-24_Redacted | D. Add. 9 |
| | Defs.' Exhibit G - N. Foote email to Desilets 8-29-24 full thread | D. Add. 10 |
| | Defs.' Exhibit H - Desilets email to N. Foote 9-13-24 | D. Add. 15 |
| | Defs.' Exhibit K – A. Foote email 8-23-24 | D. Add. 16 |

Case 1:24-cv-00311-SM-AJ   Document 14-7   Filed 10/04/24   Page 1 of 1   **Exhibit A**

| **BOW SCHOOL BOARD POLICY** | **PLAINTIFF'S EXHIBIT** 1:24-cv-311 | **KFA** |

# PUBLIC CONDUCT ON SCHOOL PROPERTY

For purposes of this policy, "school property" means any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private.

The School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event.   No person on school property or at a school event shall:

1. Injure, threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person;

2. Damage, or threaten to damage, another's property;

3. Damage or deface School District property;

4. Violate any Federal or New Hampshire law, or town or county ordinance;

5. Smoke or otherwise use tobacco products;

6. Consume, possess, distribute, or be under the influence of alcoholic beverages or illegal drugs, or possess dangerous devices or weapons;

7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner);

8. Enter upon any portion of school premises at any time for purposes other than those that are lawful and authorized by the School Board;

9. Operate a motor vehicle in violation of an authorized District employee's directive or posted road signs.

10. Violate other District policies or regulations, or an authorized District employee's directive.

11. Possess a weapon.   For the purpose of this policy a "weapon" includes but is not limited to: sling shot, metallic knuckles, billies, knives, electric defense weapons (as defined in RSA 159:20), aerosol self-defense spray weapons (as defined in RSA 159:20), and martial arts weapons (as defined in RSA 159:24).   Weapons under control of law enforcement personnel are permitted.

Any person who violates this policy or any other acceptable standard of behavior may be ordered to leave school grounds.   Law enforcement officials may be contacted at the discretion of the supervising District employee if such employee believes it necessary.

Additionally, the District reserves the right to issue "no trespass" letters to any person whose conduct violates this policy, acceptable standards of conduct, or creates a disruption to the School District's educational purpose.

**_Legal References:_**
    _RSA 193:11, Disturbance_
    _RSA 635:2, Criminal Trespass_

Reviewed and approved by the Bow School Board
@ its Meeting of _____

D. Add.0001

PLAINTIFF'S
EXHIBIT
2
1:24-cv-31

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Monday, September 16, 2024 6:30 PM
**To:** Michael Desilets <mdesilets@bownet.org>
**Subject:** Tuesday 9/17

Good evening soccer families-

Please read the following attached messaging regarding Bow High School's status as a member of the NHIAA as well as some information from our Athletics Handbook regarding sportsmanship and sideline behavior. I understand that there are some differing opinions regarding tomorrow's game, and that is perfectly fine. Please understand that any inappropriate signs, references, language or anything else present at the game will not be tolerated. This is a contest between high school student-athletes and should be treated as such.

Thank you in advance for your attention to this important matter.

BHS Administration

--



**MIKE DESILETS, CMAA**
BOW HIGH SCHOOL
ATHLETIC ADMINISTRATOR  |  NHADA PAST PRESIDENT
NIAAA SPORTS FACILITIES COMMITTEE CHAIR
https://athletics.bownet.org/   (603) 228-2210   @bow_falcons



Bow High School is an active member of the NHIAA, we sign an annual agreement to join form for all 34 of our Varsity teams. In doing so, we agree to follow all guidelines and policies set forth by the NHIAA and their handbook as well as those set by the National Federation of High Schools, which establishes rules of competition for all sports. These are our governing bodies. We always have and will continue to follow the guidelines from the NHIAA to remain in compliance and eligible for post-season tournaments. We will play the schedule that we have, as it is. The teams that we play against are also in compliance with the NHIAA and we will trust that anyone on their rosters set to play against us are all eligible, just as they trust in us. We will play against whatever NHIAA compliant team is on the other sideline, as scheduled.

From page 4 of the 2024 NHIAA Soccer Policies and Procedures:

3. **COMPLETED SCHEDULE AND FORFEIT:**
   All teams must complete their entire schedule submitted to the NHIAA. Any scheduled game(s) not played must be reported (in writing by both schools) to the NHIAA prior to the date of NHIAA pairings with an explanation. The committee will determine if games not played will be considered a forfeit(s) or a no game(s). A team CANNOT forfeit a game to the other team under any circumstances.

From the BHS Athletics Handbook:

Sportsmanship

Bow High School is a community that is dedicated to good sportsmanship, positive ethics, and integrity in its students, athletes, and fans. Poor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands. BHS takes value in the Sportsmanship Ratings given through the NHIAA and will maintain a positive environment for every contest.

It is the expectation of every fan to maintain a positive attitude, to treat players, coaches and officials with respect, and to cheer *for* their team as opposed to cheering *against* the other team. Fans are not to use the names or numbers of opposing teams, nor should they be trying to directly communicate or distract other players. Coaches should be encouraging good play from everyone and treating opposing teams and officials with respect. They should maintain professionalism in all that they do. Players must always be respectful of everyone involved in the contest. Unsportsmanlike behaviors that lead to penalties, fouls or ejections will not be tolerated and undoubtedly will result in additional penalties from the school. School sponsored activities take place for the student-athletes and school community as a whole. Strive to maintain positivity and not make it about anything or anyone else.



PLAINTIFF'S
EXHIBIT
5
1:24-cv-311
PENGAD 800-631-6989





**Anthony Foote** <anthony.c.foote@gmail.com>
To: Mike Desilets <mdesilets@bownet.org>, Nicole Foote <nicky75@comcast.net>,
Kyle <kylefellers@yahoo.com>

Tue, Sep 17, 2024 at 7:28 AM

Is this all you have to say about this game? You've proven yourselves weak, ineffective, and completely out of touch with real leadership.

This isn't "just another game"—not by a long shot. None of you had a single conversation with our team. None. You ignored us, and now you expect us to just go along with this?

I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males—who are stronger, faster, and more physically dominant—compete against women. And you don't sit around waiting for someone to get hurt before you take action.
Look at Reilly Gaines. Look at the Massachusetts basketball team, or the field hockey player who ended up with a fractured skull and missing teeth. Look at our own US women's national soccer team, humiliated by a group of 15-year-old boys. How many more examples do you need before you wake up?

I'm sick of your cowardice and your pandering. You'd rather be "woke" than do what's right. Where's your courage? Where's your integrity? Stand up for women, for real women, or get out of the way. Protect our daughters before someone else gets hurt.

It's no wonder this school has dropped to 19th in the state. You've lost sight of what matters, and we're all paying the price.

[Quoted text hidden]





DEFENDANT'S
EXHIBIT
E
1:24-CV-311-SM-AJ

10/2/24, 3:07 PM                    Bow School District Mail - Olympics Size Lesson for the Bow School Leadership



SAU 67

Marcy Kelley <mkelley@bownet.org>

## Olympics Size Lesson for the Bow School Leadership
2 messages

Kyle Fellers <kylefellers@yahoo.com>                                    Thu, Aug 1, 2024 at 11:04 AM
To: "mkelley@bownet.org" <mkelley@bownet.org>, blarrabee@bownet.org, "mklunk@bownet.org" <mklunk@bownet.org>,
"jereardona@bownet.org" <jereardona@bownet.org>, "mosterioh@bownet.org" <mosterioh@bownet.org>,
"mhubbard@bownet.org" <mhubbard@bownet.org>, "aosburn@bownet.org" <aosburn@bownet.org>,
"mgemmiti@bownet.org" <mgemmiti@bownet.org>

For those of you still living under a rock or in denial about the ramification of biological boys playing in girl's sports, here is
exhibit A on your delusional fantasies.

Angela Carini, an Olympic Woman Boxer from Italy surrendered to a mentally ill man in the boxing ring. Surrendering her
dream of an Olympic Gold. She was left crying in pain and in shame as she admitted after the bout that she had never
been hit as hard as the 46 seconds she lasted in the ring with this maniac. This happened on the same day the
Biden/Harris administrations rewrites Title IX to appease a mentally lil cult.

For those of you in support of this madness, I hope you feel proud of yourselves.

Sincerely,

A Fed Up Father of 2 Student Athletes


Italian boxer Angela Carini broke down in tears after she abandoned her bout against Algerian Imane Khelif after 46
seconds in a fight that sparked huge controversy at the Olympics.

Khelif is one of two boxers permitted to fight at the Olympics despite being disqualified from the women's world
championships last year for failing testosterone and gender eligibility tests.

In highly-charged scenes at the North Paris Arena, Carini revealed afterwards that she had pulled out after after being hit
harder than she had ever been hit before. A first punch dislodged her chinstrap and a second smashed against her chin
and bloodied her shorts.

IOC defends allowing boxers who failed gender tests to compete at Paris 2024
Read more

"I am heartbroken," said Carini. "I went to the ring to honour my father. I was told a lot of times that I was a warrior but I
preferred to stop for my health. I have never felt a punch like this."





DEFENDANT'S EXHIBIT
1:24-CV-31-SM-AJ

---------- Forwarded message ----------
From: **Shannon Farr**
Date: Wed, Sep 11, 2024, 9:06 PM
Subject: Concerned Parent - Plymouth Game (Girls' Soccer)
To: Mike Desilets <mdesilets@bownet.org>

Hi Mike,

For the last three years, I've enjoyed watching my daughter and her teammates play on the varsity soccer team - and am in the midst of my daughter's fourth and final season. I've loved supporting and cheering these girls and will miss it when it's all done.

I am writing because I have concerns about statements other team parents have been making regarding both the trans-female player from Plymouth and their potential plans as to how they want to handle the game on the 17th.

Today, in Laconia (while in earshot of other Bow families, Laconia families, children, grandparents, friends, etc. several Bow parents discussed wearing dresses to the game, buying anti-trans warm-up shirts for the Bow players, making signs in protest of trans athletes, and generally planning on how they can heckle and intimidate this player.

I understand this is an extremely sensitive subject and I know many don't have opinions aligned with mine. However, I don't feel the soccer field is a place for hatred or disrespect and based on the comments I've seen on Facebook and have overheard at several games, I have concerns of what this game could devolve into. I truly hope that any community members who are showing less than the best sportsmanship and courtesy towards the other team will be dealt with swiftly.

ANY spitefulness or unpleasantries tolerated will not only set a precedent for this behavior by adults, but also be a really poor example for our student athletes.

Thank you for all your hard work and the best of luck for the rest of the season (for all sports) ahead!

Best,

Shannon Farr





SAU 67

Michael Desilets <mdesilets@bownet.org>

## Boys playing in Girls sports
16 messages

**NICOLE FOOTE** <nicky75@comcast.net>                                                    Thu, Aug 29, 2024 at 2:07 PM
To: "mdesilets@bownet.org" <mdesilets@bownet.org>, "bowvogts@aol.com" <bowvogts@aol.com>

Hi Mike and Jay,

I am concerned for the safety of all of our girls playing against a boy. Gov. Sununu put this law in place for a reason. We have come so far as a society advocating for women's sports yet here we are allowing a boy to play on the girls team. Our game is scheduled for 9/17 against Plymouth. The hearing is 9/10 so we'll see which way this goes. I sat through the hearing on Tuesday and saw this law being overturned by the judge. Are we planning on playing this game against this team? Do we stand behind our girls? I feel like we are only taking into consideration this boys feelings and not all of the actual girls that play soccer. My daughter has worked really hard to be the Captain on her Soccer team. She has concerns about playing against a boy, as she should. I'd like her to stand up for what she believes in. If we allow this to happen what's next? Boys in the girls locker room? I would hope Bow stands behind these girls.

I would appreciate an opportunity to discuss this with you further.

Thank you,

Nicole Foote
603-387-6384

**Mike Desilets** <mdesilets@bownet.org>                                                    Thu, Aug 29, 2024 at 3:18 PM
To: NICOLE FOOTE <nicky75@comcast.net>
Cc: "bowvogts@aol.com" <bowvogts@aol.com>

Good afternoon-
Thank you for your input, I would be happy to discuss this with you sometime.
See you at the game today.
Mike
[Quoted text hidden]

--
Mike Desilets, CMAA
Athletic Director, Bow High School
NHADA Past President

**nicky75@comcast.net** <nicky75@comcast.net>                                                    Thu, Aug 29, 2024 at 8:37 PM
To: Mike Desilets <mdesilets@bownet.org>
Cc: bowvogts@aol.com

When would be a good time for you?

Nicole Foote

[Quoted text hidden]

D. Add.0010

**Mike Desilets** <mdesilets@bownet.org>                                    Thu, Aug 29, 2024 at 9:03 PM
To: Nicole Foote <nicky75@comcast.net>

I'm pretty much in everyday right up until game prep around 3.
[Quoted text hidden]

---

**Nicole Foote** <nicky75@comcast.net>                                    Fri, Aug 30, 2024 at 7:05 AM
To: Mike Desilets <mdesilets@bownet.org>
Cc: "bowvogts@aol.com" <bowvogts@aol.com>

Good morning, I'll be in this morning to bring in items for senior breakfast. Can I come see you around 740? Where are
you located? Down stairs?
Nicole

Get Outlook for iOS

From: Mike Desilets <mdesilets@bownet.org>
Sent: Thursday, August 29, 2024 3:19 PM
To: NICOLE FOOTE <nicky75@comcast.net>
Cc: bowvogts@aol.com <bowvogts@aol.com>
Subject: Re: Boys playing in Girls sports

[Quoted text hidden]

---

**Mike Desilets** <mdesilets@bownet.org>                                    Fri, Aug 30, 2024 at 7:19 AM
To: Nicole Foote <nicky75@comcast.net>
Cc: Karyn Vogt <bowvogts@aol.com>

I won't be in the building until 9.
[Quoted text hidden]

---

**Nicole Foote** <nicky75@comcast.net>                                    Fri, Aug 30, 2024 at 7:46 AM
To: Mike Desilets <mdesilets@bownet.org>
Cc: Karyn Vogt <bowvogts@aol.com>

Ok, maybe later today? I used your parking spot this morning so thank you:-)

Get Outlook for iOS

From: Mike Desilets <mdesilets@bownet.org>
Sent: Friday, August 30, 2024 7:19 AM
To: Nicole Foote <nicky75@comcast.net>
Cc: Karyn Vogt <bowvogts@aol.com>
Subject: Re: Boys playing in Girls sports

I won't be in the building until 9.

On Fri, Aug 30, 2024, 7:06 AM Nicole Foote <nicky75@comcast.net> wrote:
Good morning, I'll be in this morning to bring in items for senior breakfast. Can I come see you around 740? Where are
you located? Down stairs?
Nicole

Get Outlook for iOS

From: Mike Desilets <mdesilets@bownet.org>
Sent: Thursday, August 29, 2024 3:19 PM
To: NICOLE FOOTE <nicky75@comcast.net>
Cc: bowvogts@aol.com <bowvogts@aol.com>

D. Add.0011

10/3/24, 12:50 PM                              Bow School District Mail - Boys playing in Girls sports

**Subject:** Re: Boys playing in Girls sports

[Quoted text hidden]

**Nicole Foote** <nicky75@comcast.net>                          Fri, Aug 30, 2024 at 8:20 AM
To: Mike Desilets <mdesilets@bownet.org>

I work in Concord. Can you meet for coffee at bean and bakery? Or is that not allowed?
Nicole

Get Outlook for iOS

---

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Friday, August 30, 2024 7:19 AM
**To:** Nicole Foote <nicky75@comcast.net>
**Cc:** Karyn Vogt <bowvogts@aol.com>
**Subject:** Re: Boys playing in Girls sports

I won't be in the building until 9.

On Fri, Aug 30, 2024, 7:06 AM Nicole Foote <nicky75@comcast.net> wrote:
Good morning, I'll be in this morning to bring in items for senior breakfast. Can I come see you around 740? Where are
you located? Down stairs?
Nicole

Get Outlook for iOS

---

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Thursday, August 29, 2024 3:19 PM
**To:** NICOLE FOOTE <nicky75@comcast.net>
**Cc:** bowvogts@aol.com <bowvogts@aol.com>
**Subject:** Re: Boys playing in Girls sports

[Quoted text hidden]

**Mike Desilets** <mdesilets@bownet.org>                          Fri, Aug 30, 2024 at 9:13 AM
To: Nicole Foote <nicky75@comcast.net>

No.  I'll be at the school.
[Quoted text hidden]

**Mike Desilets** <mdesilets@bownet.org>                          Thu, Sep 12, 2024 at 8:15 AM
To: Nicole Foote <nicky75@comcast.net>

Good morning,
We weren't able to connect earlier, do you still want to chat at some point?
Let me know.
Thanks,
Mike
[Quoted text hidden]

**Nicole Foote** <nicky75@comcast.net>                          Thu, Sep 12, 2024 at 8:29 AM
To: Mike Desilets <mdesilets@bownet.org>

Yes, I would. Does tomorrow work?

Get Outlook for iOS

10/3/24, 12:50 PM                                   Bow School District Mail - Boys playing in Girls sports

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Thursday, September 12, 2024 8:16 AM
**To:** Nicole Foote <nicky75@comcast.net>
**Subject:** Re: Boys playing in Girls sports

Good morning,
We weren't able to connect earlier, do you still want to chat at some point?
Let me know.
Thanks,
Mike

On Fri, Aug 30, 2024, 9:13 AM Mike Desilets <mdesilets@bownet.org> wrote:
> No. I'll be at the school.
>
>> On Fri, Aug 30, 2024 at 8:20 AM Nicole Foote <nicky75@comcast.net> wrote:
>>> I work in Concord. Can you meet for coffee at bean and bakery? Or is that not allowed?
>>> Nicole
>>>
>>>
>>> Get Outlook for iOS
>>>
>>> _____
>>>
>>> **From:** Mike Desilets <mdesilets@bownet.org>
>>> **Sent:** Friday, August 30, 2024 7:19 AM
>>> **To:** Nicole Foote <nicky75@comcastnet>
>>> [Quoted text hidden]
>>> [Quoted text hidden]
>>> [Quoted text hidden]

**Mike Desilets** <mdesilets@bownet.org>                          Thu, Sep 12, 2024 at 8:49 AM
To: Nicole Foote <nicky75@comcast.net>

What time are you thinking?
[Quoted text hidden]

**Nicole Foote** <nicky75@comcast.net>                            Thu, Sep 12, 2024 at 8:51 AM
To: Mike Desilets <mdesilets@bownet.org>

How is 745 tomorrow?

Get Outlook for iOS

_____

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Thursday, September 12, 2024 8:49 AM
[Quoted text hidden]
[Quoted text hidden]

**Mike Desilets** <mdesilets@bownet.org>                          Thu, Sep 12, 2024 at 8:53 AM
To: Nicole Foote <nicky75@comcast.net>

I can do 8. I also plan on heading to MV today for the girls and boys game. We can catch up after the girls play if you
want.
[Quoted text hidden]

_____

**Nicole Foote** <nicky75@comcast.net>                            Thu, Sep 12, 2024 at 7:24 PM
To: Mike Desilets <mdesilets@bownet.org>

8 works

Get Outlook for iOS

D. Add.0013

**From:** Mike Desilets <mdesilets@bownet.org>
**Sent:** Thursday, September 12, 2024 8:54 AM
[Quoted text hidden]
[Quoted text hidden]

**Mike Desilets** <mdesilets@bownet.org>                                    Thu, Sep 12, 2024 at 7:49 PM
To: Nicole Foote <nicky75@comcast.net>

Ok
[Quoted text hidden]

D. Add.0014





SAU 67

Michael Desilets <mdesilets@bownet.org>

## Girls Soccer
1 message

**Mike Desilets** <mdesilets@bownet.org>                                    Fri, Sep 13, 2024 at 8:41 AM
To: Nicole Foote <nicky75@comcast.net>
Cc: Karyn Vogt <bowvogts@aol.com>

Hi Nicole-
Thank you for coming in this morning, I'm glad we were able to catch up. I do appreciate your opinion and feedback. As I mentioned, we knew this was coming and that it has the potential to be divisive. For the sake of the team, my hope is that we can get through this game without incident from anyone and continue down the path of another successful season and tournament run. Below are some references that came up in our conversation that I wasn't able to put my finger on at the time.
As always, please reach out if you have further questions.
Have a good day-
Mike


NHIAA Soccer Policies and Procedures, page 4:

3. **COMPLETED SCHEDULE AND FORFEIT:**
   All teams must complete their entire schedule submitted to the NHIAA. Any scheduled game(s) not played must be reported (in writing by both schools) to the NHIAA prior to the date of NHIAA pairings with an explanation. The committee will determine if games not played will be considered a forfeit(s) or a no game(s). A team CANNOT forfeit a game to the other team under any circumstances.


And this is from page 55 of the NHIAA Handbook, which I am guessing you have seen before:

**Sect. 21: Policy Statement and School Recommendation Regarding Transgender Participation**

The NHIAA is committed to providing transgender student-athletes with equal opportunities to participate in NHIAA athletic programs consistent with their gender identity. Hence, this policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates.

For the purposes of sports participation, the NHIAA shall defer to the determination of the student and his or her local school regarding gender identification. In this regard, the school district shall determine a student's eligibility to participate in a NHIAA gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season. Accordingly, when a school district submits a roster to the NHIAA, it is verifying that it has determined that the students listed on a gender-specific sports team are entitled to participate on that team due to their gender identity, and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics. (CM 5.2024)

Students who wish to participate on a NHIAA gender-specific sports team that is different from the gender identity listed on the student's current school records are advised to address the gender identification issue with the local school district well in advance of the deadline for athletic eligibility determinations for a current sports season. Students should not be permitted to participate in practices or to try out for gender specific sports teams that are different from their publicly identified gender identity at that time or to try out simultaneously for NHIAA sports teams of both genders.

Nothing in this policy shall be read to entitle a student to selection to any particular team or to permit a student to transfer from one gender specific team to a team of a different gender during a sports season. In addition, the NHIAA shall expect that, as a general matter, after the issue of gender identification has been explicitly addressed by the student and the school district, the determination shall remain consistent for the remainder of the student's high school sports eligibility. The NHIAA has concluded that this policy adequately addresses the concerns that a student might claim a particular gender identity for the purpose of gaining a perceived advantage in athletic competition, but does not unfairly discriminate against transgendered student athletes.

D. Add.0015

**kvose@bownet.org**

| | |
|---|---|
| **From:** | Mike Desilets <mdesilets@bownet.org> |
| **Sent:** | Monday, August 26, 2024 9:43 AM |
| **To:** | Matt Fisk |
| **Subject:** | Fwd: Boys |

---------- Forwarded message ---------
From: **Karyn Vogt** <bowvogts@aol.com>
Date: Sat, Aug 24, 2024 at 6:43 AM
Subject: Fwd: Boys
To: Mike Desilets <mdesilets@bownet.org>
Cc: David Jay <dnj6870@gmail.com>, Jessica Allison <jallison@bownet.org>

Sent from my iPhone

Begin forwarded message:

> **From:** Anthony Foote <anthony.c.foote@gmail.com>
> **Date:** August 23, 2024 at 10:10:42 PM EDT
> **To:** Jay Vogt <bowvogts@aol.com>, Nicole Foote <nicky75@comcast.net>
> **Subject: Boys**
>
> Jay,
>
> Sorry. Not the email I ever thought I'd have to send.
>
> Apparently there was a discussion at BWWs tonight that Pinkerton might have a boy on their team.
>
> That sparked a family discussion. Apparently the boy was the one from Plymouth. So it's not a game we have to deal with tomorrow.
>
> For the record. I stand with Reilly Gains. I stand with the woman who lost in the Olympics to a man. I do not support boys playing on high school level girls teams.
>
> That said. I did a search to see where we stand in the big picture:
>
> In most countries, the rules regarding boys playing on girls' high school soccer teams are similar to those in the UK and the United States. Generally, boys and girls are separated into different teams for competitive sports, particularly as they reach high school age. Here's a brief overview of how different regions typically handle this: 1. **Europe**: Most European countries, like the UK, Germany, France, and Spain, generally follow the same

D. Add.0016

approach, where boys and girls are separated into different teams at the competitive level once they reach a certain age (usually around 12-14 years old). Mixed-gender teams may be allowed in younger age groups or non-competitive settings. 2. **Australia and New Zealand**: Similar to the UK, these countries also separate boys and girls in competitive sports during high school. Mixed-gender teams might be found in younger age groups or in social, non-competitive leagues, but not typically in high school competitions. 3. **Canada**: Similar to the United States, Canada generally separates boys and girls into different teams for high school sports. Some provinces might have specific rules that could allow for exceptions, but these would be rare. 4. **Scandinavian Countries (Norway, Sweden, Denmark, Finland)**: These countries generally separate boys and girls into different teams for competitive sports, including soccer, at the high school level. However, they may allow mixed-gender participation in non-competitive or recreational sports. In summary, it's rare for countries outside the United States to allow boys to play on girls' high school soccer teams in a competitive setting. The norm across most countries is to separate boys and girls into different teams by the time they reach high school age.

No one other than the United States transgender mob supports boys playing on girls sports teams.

What's the plan? Are we going to talk as a team, moms, dads and players? If we play one game we will not be able to turn back. It's not an option.

Can we forfeit two games and still win the championship?

Will the hearing on Tuesday allow the Governor's decision to stand?

I really wish we were captains parents last year!

Trying to get ahead of this. Maybe we can talk tomorrow?

Thanks

Andy

--
Mike Desilets, CMAA
Athletic Director, Bow High School
NHADA Past President

43

D. Add.0017