No. 25-1442

### UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

KYLE FELLERS; ANTHONY FOOTE; NICOLE FOOTE; ELDON RASH,

*Plaintiffs - Appellants,*

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities other; BOW SCHOOL DISTRICT,

*Defendants - Appellees,*

PHILIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity,

*Defendants.*

---

Appeal from an Order of the United States District Court
for the District of New Hampshire, The Hon. Steven J. McAuliffe
(Dist. Ct. No. 1:24-cv-311-SM-AJ)

---

### APPELLANTS' REPLY BRIEF

---

Richard J. Lehmann
LEHMANN MAJOR LIST, PLLC
Concord, NH 03301
603-731-5435
rick@nhlawyer.com

Endel Kolde
Brett R. Nolan
Nathan Ristuccia
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

Attorneys for Appellants

TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................................iv

REPLY ARGUMENT.....................................................................................1

I.    DEFENDANTS CONFUSE OBVIOUS VIEWPOINT DISCRIMINATION
      WITH REASONABLE CONTENT RESTRICTIONS........................................1

      A.    The reasonableness standard applies to
            content-based restrictions but not viewpoint-
            based ones ...................................................................1

      B.    Defendants admit that they allow passive
            sociopolitical commentary about gender
            identity in their limited public forum.........................2

      C.    Allowing "inclusionary"—but not "exclusionary"
            messages—on the same topic is viewpoint
            discrimination, not a mere content restriction............4

      D.    Plaintiffs have brought an as-applied, not a
            facial challenge............................................................5

II.   PASSIVELY DISPLAYING THE XX WRISTBAND ON THE SIDELINES IS
      NEITHER ASSAULT NOR HARASSMENT.................................................7

      A.    Even Defendants do not defend the district
            court's unreasonable conclusion that displaying
            the XX wristbands amounts to "assault".....................7

      B.    Defendants' assertion that the XX message is
            per se "harassment" necessarily relies on
            viewpoint discrimination ..............................................8

      C.    Bow offers no criteria to cabin official discretion
            beyond the text of Policy KFA ...................................13

III.  PLAINTIFFS ASSERT THEIR RIGHT TO SPEAK AS ADULTS AT
      EVENTS OPEN TO THE PUBLIC, NOT AS STUDENTS IN SCHOOL ............14

      A.    Plaintiffs' claims are limited to the sidelines
            and parking lots at sporting events............................14

      B.    Plaintiffs are asserting their rights to speak as
            adults not as minor students .....................................15

IV.   PARENTS CANNOT AUTHORIZE SCHOOLS TO CENSOR OTHER
ADULTS ON THEIR BEHALF .................................................................17

A.   A school's in loco parentis authority extends no
further than parents' own rights with respect
to their own children....................................................17

B.   Defendants' expansion of the in loco parentis
doctrine would further operationalize the
hecklers' veto...............................................................18

CONCLUSION ........................................................................................20

CERTIFICATE OF COMPLIANCE ................................................................21

Table of Authorities

## Cases

*Doe v. Hopkinton Pub. Schs,*
    19 F.4th 493 (1st Cir. 2021) ........................................................ 10, 11

*Doe v. Pawtucket Sch. Dep't,*
    969 F.3d 1 (1st Cir. 2020) ..................................................... 10

*Doe v. Portland Pub. Sch.,*
    701 F. Supp. 3d 18 (D. Me. 2023) ..................................... 10

*Doe v. R.I. Interscholastic League,*
    137 F.4th 34 (1st Cir. 2025) .................................................. 6

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001) ...................................................... 1, 3, 18

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ............................................................ 6

*L.M. v. Town of Middleborough,*
    103 F.4th 854 (1st Cir. 2024) ............................................ 15

*Mahanoy Area Sch. Dist. v. B.L.,*
    594 U.S. 180 (2021) ........................................................... 19

*Matal v. Tam,*
    582 U.S. 218 (2017) ........................................................... 18

*McGuire v. Reilly,*
    386 F.3d 45 (1st Cir. 2004) ................................................. 3

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018) ............................................................... 13

*Moms for Liberty v. Brevard Pub. Sch.,*
    118 F.4th 1324 (11th Cir. 2024) ......................................... 1

*R. A. V. v. St. Paul,*
   505 U.S. 377 (1992) ................................................................. 7

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................. 7

*Ridley v. Mass. Bay Transp. Auth.,*
   390 F.3d 65 (1st Cir. 2004) .................................................. 16

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ....................................................... 1, 4, 5

*Seattle Mideast Awareness Campaign v. King County,*
   781 F.3d 489 (9th Cir. 2015) ............................................... 18

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) .............................................................. 15

*Vernonia Sch. Dist. 47J v. Acton,*
   515 U.S. 646 (1995) .............................................................. 17

*Vidal v. Elster,*
   602 U.S. 286 (2024) ............................................................... 6

*Wadsworth v. Nguyen,*
   129 F.4th 38 (1st Cir. 2025) ............................................ 9, 10

*Wandering Dago, Inc. v. Destito,*
   879 F.3d 20 (2d Cir. 2018) .................................................. 16

## Statutes

28 U.S.C. § 1343(a) ................................................................. 16

## Other Authorities

L.A. COUNTY DEPT. OF MENTAL HEALTH, *A Brief History of Our
   LGBTQIA2-S Pride Flag* (June 16, 2022),
   https://perma.cc/6WSN-A7KC ............................................. 4

**Constitutional Provisions**

U.S. CONST. art. III § 2 ...............................................................................16

Reply Argument

I.  Defendants confuse obvious viewpoint discrimination with reasonable content restrictions

A.  The reasonableness standard applies to content-based restrictions but not viewpoint-based ones

The school district muddles the applicable legal analysis by positing that its speech restrictions must merely be reasonable to pass constitutional muster. *See* Resp. Br. at 18, 26-27. It is true that the content-based categories (or topics) that the school district permits on the sidelines or parking lots at sporting events must be reasonable and related to the purposes of the forum. But the separate requirement of viewpoint neutrality is virtually absolute. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) ("The restriction must not discriminate based on viewpoint"); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995). Viewpoint discrimination is "egregious" and (at least) presumptively illegal, if not always so. *See id.* at 828-29.[1]

---

[1] As a sister circuit recently noted, "though the Supreme Court has never categorically prohibited restrictions based on viewpoint, it has come close: Discrimination against speech because of its message is presumed to be unconstitutional." *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1332 (11th Cir. 2024) (cleaned up). At a minimum, such "egregious" discrimination must meet strict scrutiny. Bow's

There is no such thing as a "reasonable" viewpoint restriction in a limited public forum. To the extent the Bow posits such a standard, binding precedent forecloses its position.

> ### B.     Defendants admit that they allow passive sociopolitical commentary about gender identity in their limited public forum

There is no dispute that the school district allows other adult spectators to engage in passive sociopolitical commentary on the sidelines and in the parking lots at sporting events, including commentary on the topic of gender identity. App.123, 259-61, 561, 574, 637. The school district's response in no way contests that it permits cars with Pride Flag bumper stickers to park in its parking lots. *See* Resp. Br. at 29. Bow similarly does not offer a basis to distinguish those passive sociopolitical messages from the signs Plaintiffs wish to display on their cars other than based on the viewpoint expressed.

The school district also doubled down on its breathtaking claim that it may permit Pride Flags on the sidelines or in parking lots while banning the XX symbol. Resp. Br. at 29-30. Having opened up some portions of district property for passive sociopolitical commentary by adult visitors on the topic of gender identity, the district must allow

---

restrictions on "exclusionary" speech do not meet that standard, and Bow offers no argument that they do.

2

differing viewpoints on the same topic. *See Good News Club,* 533 U.S. at 111-12.

Just like "discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint[,]" Bow may not ban passive discussion of gender identity from an "exclusionary" or sex-binary viewpoint from a forum where "inclusionary" views on gender identity are allowed. *See id.* at 112. Officials picking and choosing only certain views that adult invitees can express is paradigmatic viewpoint discrimination.[2]

To be sure, this analysis would be different if the school district banned *all* passive sociopolitical commentary about gender identity from its sporting events and parking lots—but the district admits that it only bans "exclusionary" sociopolitical commentary. App.525, 560-61, 637-39. It allows favored views on gender identity to be expressed, while banning disfavored views. *See McGuire v. Reilly,* 386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another").

If the district hypothetically banned the entire category of sociopolitical commentary, or the topic of gender identity specifically,

---

[2] Plaintiffs seek only to engage in passive expression. They are not asking for an injunction to hold debates, give speeches on the sidelines, or shout sociopolitical comments at players or other spectators during the game. App.50-53.

those would be content-based restrictions evaluated under a reasonableness standard. While Plaintiffs maintain that banning non-disruptive commentary about the game, at the game, would be unreasonable,[3] that issue is not before the Court today because Defendants have targeted only certain views on gender identity for censorship, while allowing others.

> C.    Allowing "inclusionary"—but not "exclusionary" messages—on the same topic is viewpoint discrimination, not a mere content restriction

To understand the distinction between content and viewpoint-based restrictions more clearly, it is useful to look at how those concepts operate in this case. Viewpoint discrimination is a form of content discrimination, but it targets specific views within a more general topic. *Rosenberger,* 515 U.S. at 829. Here the topic that Bow has chosen to permit passive commentary about is gender identity (or even sociopolitical issues more broadly)—in the form of Pride Flags[4] and

---

[3] Even if Bow could theoretically close the forum to gender identity debate, as such, sports spectators' expression about the game's integrity and player safety is squarely within the forum's purpose.

[4] Pride Flags, in their varied iterations, are commonly understood to be a form of passive sociopolitical expression, including, but not limited to, gender identity. For more on history and meaning of Pride Flags, *see, e.g.,* L.A. COUNTY DEPT. OF MENTAL HEALTH, *A Brief History of Our LGBTQIA2-S Pride Flag* (June 16, 2022), https://perma.cc/6WSN-A7KC.

4

other trans-inclusionary messages passively displayed on clothing or car exteriors.

But the distinction that Bow makes about inclusionary versus exclusionary messages on gender identity is not a mere content-based distinction. It is viewpoint-based because it allows inclusionary views on gender identity (such as Pride Flags) to be expressed, while views deemed exclusionary (such as XX on a pink field) are off limits.

Having allowed adults to passively express views on the topic of gender identity, Bow must hold itself to the terms of its own forum. *Rosenberger,* 515 U.S. at 829 ("Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set"). It cannot pick and choose what views adults passively express on gender identity. Nor can Bow elide this longstanding requirement by entertaining the fiction that inclusionary speech and exclusionary speech are just content categories. They are explicitly viewpoint-based.

> D.    Plaintiffs have brought an as-applied, not a facial challenge

Bow's response brief surveys its Policy KFA and asserts that it is viewpoint neutral. Resp. Br. at 17-18. To be sure, provisions prohibiting disruption, threats, and harassment are—on their face—viewpoint neutral because they do not single out for exclusion specific views on topics that would be otherwise permissible on school property.

But Plaintiffs have not brought a facial challenge to invalidate Policy KFA in all instances. *See* App.39-43; *see also, generally, Doe v. R.I. Interscholastic League,* 137 F.4th 34, 41 n.3 (1st Cir. 2025) (discussing facial challenges). Rather, Plaintiffs brought an as-applied challenge to enjoin enforcement of the policy against their proposed display of the XX wristbands and "Protect Women's Sports" signs. App.39-43, 50-53.

When analyzing Plaintiffs' request for as-applied relief, it is important to consider that Bow applies an inclusionary-versus-exclusionary filter when enforcing Policy KFA. Superintendent Kelley called this a "practice" as opposed to a policy, App.561, but it operates to restrict "exclusionary" speech, such as the XX wristbands. Bow's rule, or interpretive practice, on its face discriminates based on viewpoint.

"A viewpoint-based regulation targets not merely a subject matter, but particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (cleaned up). If a law treats speech differently depending on whether the message is "flattering, critical or neutral," then it 'facially discriminate against [a] viewpoint." *Id.* at 293-94; *see also Iancu v. Brunetti*, 588 U.S. 388, 392, 395 (2019) (finding "facial viewpoint bias" in the PTO's bar on "immoral or scandalous" speech).

Bow's interpretation of Policy KFA as banning exclusionary messages about gender identity, but allowing inclusionary messages on the same topic, is blatantly unconstitutional. *See R. A. V. v. St. Paul,*

505 U.S. 377, 392 (1992) ("St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules").

Nor does it matter, as Bow suggests, that it may have a viewpoint-neutral reason for adopting its exclusionary-versus-inclusionary rule. *See* Resp. Br. at 21-22. When a law or policy "draws distinctions based on the message a speaker conveys," it is "on its face" a content- or viewpoint-based distinction regardless of the policymaker's intent. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64, 165 (2015). Bow's rule distinguishing between "exclusionary" and "inclusionary" messages draws distinctions based on the viewpoint expressed, and so it is viewpoint-based regardless of Bow's purpose or intent.

## II. PASSIVELY DISPLAYING THE XX WRISTBAND ON THE SIDELINES IS NEITHER ASSAULT NOR HARASSMENT

### A. Even Defendants do not defend the district court's unreasonable conclusion that displaying the XX wristbands amounts to "assault"

Nowhere in their response brief do Defendants defend, or in any way engage with, the district court's patently unreasonable holding that the "message generally ascribed to the XX symbol . . . can reasonably be understood as directly assaulting those who identify as transgender women." Add. 37. Plaintiffs wearing those wristbands did nothing of the

sort and the district court's conclusion is without any basis in law or fact. Even Bow officials are unwilling to defend it.

Moreover, the idea that quietly expressing a widely held belief—that girls' sports should be reserved for biological girls—is tantamount to a crime of violence is itself a flawed mode of reasoning and indulges in rhetorical excess that threatens constitutional values. Messages like XX chromosomes are not violence. The district court's holding to the contrary was not just mistaken—it was deeply irresponsible.

> B.    Defendants' assertion that the XX message is per se "harassment" necessarily relies on viewpoint discrimination

Defendants spend the bulk of their response brief covering the events of the September 17 soccer game in minute detail, as well as factual claims about Parker Tirrell that were never introduced into evidence below—even though Tirrell does not live in Bow or attend school there. Resp. Br. at 2-11, 20-22, 24-25, 32-33. There is no evidence to suggest Parker intends to attend the Bow lacrosse, swimming, basketball, or other sporting events where Plaintiffs propose to wear the XX wristbands.

Even so, there is no dispute that on September 17, the Plaintiffs passively displayed the XX wristbands for about 10 minutes on the sidelines, and that none of the Plaintiffs shouted at Parker, chanted, called attention to their message, or directed any comments at Parker.

Add.19; App.90-91, 107, 125, 502. Nor is there evidence that Parker was aware of the XX wristbands at any point during the game. *See* App.504, 511, 559, 586. If this was meant to be targeted harassment, then Plaintiffs appear to have gone about it rather ineffectively. Moreover, there is no evidence that the purported "target" felt harassed.

But it is ultimately irrelevant whether Parker's feelings were hurt by the XX wristbands because Plaintiffs propose to wear the wristbands at other events where Parker is absent and where no transgender student may be present. Bow's blanket ban of the XX message depends on generalizations and stereotyping about transgender students, assuming, without evidence that they are all deeply offended by the message or would be psychologically harmed by brief exposure to it. Some students don't even compete in any sports. Bow goes so far as to assert that it is justified in treating the XX wristbands as "targeting the school's transgender student population generally for harassment and intimidation." Resp. Br. at 22-23. Bow does not explain why this would be so.

Of course, Bow need not allow actual, proven harassment. Title IX protects students from severe and pervasive harassment that creates an abusive educational environment. *Wadsworth v. Nguyen*, 129 F.4th 38, 54-55 (1st Cir. 2025). But this standard requires more than brief exposure to a disagreeable sociopolitical idea. Title IX harassment claims typically involve showing that the student-plaintiff (1)

9

subjectively perceived the environment as hostile and abusive and (2) that it was objectively so, "that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of their educational environment." *Id.* (cleaned up). Here the subjective component is entirely missing—we do not know what Parker thought about the XX message or whether he even perceived it. We also do not know what other transgender students think about it.

Moreover, fleeting exposure to a sociopolitical idea is fundamentally different from harassment. Actionable harassment—or non-First Amendment protected bullying that schools may restrict or punish— usually involves repeated conduct that extends over a long period of time (certainly longer than a soccer game or lacrosse match). *See, e.g., Wadsworth,* 129 F.4th at 56 (principal "often sent [student] messages containing sexual innuendos"); *Doe v. Hopkinton Pub. Schs*, 19 F.4th 493, 501 (1st Cir. 2021) (eight fellow students circulated non-consensual photos and videos of plaintiff on social media, made disparaging expletive-laced comments about his voice and anatomy, and attempted to get him to say inappropriate things and record him saying this); *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 11 (1st Cir. 2020) (allegations of assault and rape and that "the school allowed a male teacher to touch numerous female students on the thighs and buttocks with impunity"); *Doe v. Portland Pub. Sch.*, 701 F. Supp. 3d 18, 36-37 (D. Me. 2023) (student's communications over many months constituted harassment

where he "sent texts to classmates that suggest he knows where they live and that he wants to commit violent acts").

Indeed, repeated bullying behavior of that sort is not sociopolitical commentary entitled to First Amendment protection at all. *See Hopkinton,* 19 F.4th at 509. This makes sense, because ridiculing a student's voice or suggesting she share a racy photo with her adult interlocutor makes no point on a matter of public concern. Put differently, such personal communicative activity does not contribute to the marketplace of ideas.

But it is unreasonable to conclude that brief exposure to the passive display of an XX wristband worn by adult spectators at a sporting event would *ever* constitute such harassment, much less that it would *always* do so. A few parents wearing pink wristbands displaying the XX chromosome is neither pervasive nor severe. What Bow administrators seek to do is radically expand the concept of "harassment" to include any sociopolitical expression that questions their conception of gender identity or their policy of allowing biological boys to compete against biological girls.[5] Calling the silent display of the XX wristbands by adults at a public event "harassment" is profoundly authoritarian and represents a rejection of First Amendment values.

---

[5] Indiscriminate use of the term "harassment" also saps that term of meaning and cheapens the actual harm that some students unfortunately experience. When everything is "harassment" nothing is harassment.

Ultimately, Defendants' blanket ban rests on their own viewpoint-discriminatory judgment that the XX message presents a view on gender identity that can *never* be expressed by adults on school grounds, even passively, at events open to the public.[6]

Principal Fisk considers XX on a pink field a "hateful symbol" that he regards "as inappropriate to display anywhere on Bow School District property or at a Bow School District event[.]" App.639. In the face of such evidence, it was obvious error for the district court to conclude (Add.41-43), or for Bow to argue, that Bow administrators are neutral or indifferent to the viewpoint of the XX message. Calling something "hateful" is far from indifferent. So is calling it "anti-trans" or "trans-exclusionary." App.524-26, 550, 571. These are all value judgments with a strong moral valence.

Labeling this pure speech "harassment" or "hateful" is just shorthand for saying that school administrators strongly disagree with the viewpoint and will not allow it to be expressed on school grounds by anyone at any time. Such rhetorical hyperbole, however, does not

---

[6] Bow's abstinence-sign hypothetical indirectly illustrates that its officials reserve the XX message for special treatment. *See* Resp. Br. at 21-22. It is hard to believe that officials would blanket ban passively expressed pro-abstinence or pro-natalist messages from all school events for all time even if no pregnant students were there. And what if some parents showed up holding red roses to quietly express support for her decision to keep the baby? Would Bow ban those too, because a student who obtained an abortion might be present?

authorize censorship. And upholding Bow's censorship of the XX wristbands would allow school administrators throughout the First Circuit to censor adults simply by labelling disfavored views "harassment" or "hateful."

> ### C.    Bow offers no criteria to cabin official discretion beyond the text of Policy KFA

Plaintiffs' opening brief squarely raised the issue of excessive enforcement discretion under *Minn. Voters All. v. Mansky,* 585 U.S. 1 (2018), noting that neither Policy KFA, nor any other written document, describes what messages would be "inclusionary" versus "exclusionary," which invites school officials to subjectively make their own political judgment. Op. Br. at 29-31. Defendants provided little more than a superficial response (Resp. Br. at 31) asserting, without analysis, that the district's policies are not "so unclear that they confer excessive enforcement discretion[.]" Defendants repeatedly insisted that courts must defer to school administrators' factual findings about what is prohibitable. Resp. Br. at 20, 23; App.295-96. And, tellingly, Bow offered no criteria to define what is "inclusionary" versus "exclusionary." *See* Resp. Br. at 31. This amounts to a tacit concession that Bow's speech policies and practices fail to cabin official discretion.

III.   PLAINTIFFS ASSERT THEIR RIGHT TO SPEAK AS ADULTS AT EVENTS
       OPEN TO THE PUBLIC, NOT AS STUDENTS IN SCHOOL

    A.   Plaintiffs' claims are limited to the sidelines and
        parking lots at sporting events

In its response brief, Bow makes a number of unsupported claims
about the scope of Plaintiffs' claims or purported knock-on effects of
ruling in Plaintiffs' favor. For example, Bow asserts that Plaintiffs
believe they are "entitled to the full complement of free speech rights no
different from a public park or sidewalk" (Resp. Br. at 28), that they
wish to wear the XX wristband "walking the halls during school hours"
(*id.* at 20), or that they wish to convert school parking lots to "protest
zones." *Id.* at 24.

But Plaintiffs' claims are much more modest. They ask only for the
district to respect the rules of the limited public forums that they have
themselves created by allowing silent, non-disruptive sociopolitical
commentary about the game, by adult spectators attending the game.
Op. Br. at 20-23; Add.1-2; App.50-53, 85-86. They similarly ask to
passively display signs on their cars in the parking lot that are akin to
political bumper-stickers that the school district routinely allows
visitors to display there. App.50-53, 259-61.

This case thus does not present the question of whether Bow must
allow adults to wear the XX wristbands while volunteering or visiting
inside school buildings while classes are in session or whether it must
allow students to wear the wristbands in class, on the field, or as

14

spectators. Those questions might arise in other cases, but they are not now before this Court.

> B.    Plaintiffs are asserting their rights to speak as adults not as minor students

It bears repeating that Plaintiffs are all adults who have been invited to attend school sporting events that are open to the public. They would like to do so on terms equal to politically progressive parents, who are free to express their support for gender ideology by wearing a Pride Flag shirt without fear of being asked to leave, threatened with arrest, or trespassed from school grounds.

Plaintiffs submit that students are different from adults (Opening Brief at 31-39), and that schools enjoy greater rights to restrict student speech than adult speech, especially when those students are in school or in class. And that is why *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) and *L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024) are inapplicable to this case. Those are student speech cases, as the cases themselves repeatedly state. Extending their holdings to reach adult speech in a limited public forum makes radical new law, and limits adults' expression of salient political ideas to what is arguably fit for children in a school classroom or hallway.[7]

---

[7] While the government has an important interest in protecting children from sexually explicit material, the Supreme Court "has been particularly leery of justifications for quashing speech to adults that

Extending those holdings would also expand the power of school officials to censor their adult critics and lead to more censorship. Coupled with the near-complete deference that Bow's administrators demand, *see* Resp. Br. at 20, 23; App.295-96, school officials in the First Circuit would enjoy effectively unreviewable authority to censor adults at public events on school property.

According to Bow, federal courts must defer to school administrators (Resp. Br. at 20, 23) and all that is required is for administrators to reasonably interpret the speech as "intended to target a particular student or a subset of students." *Id.* at 30. What Bow asks would amount to delegation of the federal court's constitutional and statutory duty to adjudicate alleged civil rights violations. *See* U.S. CONST. art. III § 2; 28 U.S.C. § 1343(a).

---

rest on the purported protection of children." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 68 (1st Cir. 2004) (collecting cases). The Supreme Court is unlikely to approve of extending that interest to restrict the *ideological or political* speech of adults in the name of protecting children, a move that would largely eviscerate the First Amendment. *Cf. Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 28, 30, 37 (2d Cir. 2018) (government's "legitimate interest in promoting family-friendly messages" in nonpublic forum where minors present does not justify prohibiting adult's use of "offensive ethnic slur").

IV.  PARENTS CANNOT AUTHORIZE SCHOOLS TO CENSOR OTHER ADULTS
ON THEIR BEHALF

A.  A school's in loco parentis authority extends no
further than parents' own rights with respect to
their own children

Defendants also assert that their censorship is justified because the
student-athletes "stand apart from the public forum of the sidelines and
remain under the supervision of school officials acting *in loco parentis.*"
Resp. Br. at 28. Setting aside that the actual parents of the students are
often present at athletic events, it is important to recall that this is a
delegated power to exercise the authority of the parents over their
children—when the parents are unable to do so themselves. *Vernonia
Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654-55 (1995). The "nature of that
power is custodial and tutelary, permitting a degree of supervision and
control *that could not be exercised over free adults." Id.* at 655 (cleaned
up) (emphasis added). Put simply, parents do not have the authority to
censor other adults in public places. Because parents themselves lack
this power, they cannot delegate censorship authority over adults to
school officials. The in loco parentis doctrine can thus never authorize
Bow officials to censor adults in a limited public forum.

17

> B.    Defendants' expansion of the in loco parentis
> doctrine would further operationalize the hecklers'
> veto

Bow's misguided in-loco-parentis argument also illustrates another aspect of this case: the presence of the hecklers' veto. *See Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring) ("Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise"); *Good News Club,* 533 U.S. at 119 (declining to permit a modified heckler's veto "proscrib[ing]" speech "on the basis of what the youngest members of the audience might misperceive"). That concern is particularly extant where, as here, "speech on only one side of a contentious debate is suppressed." *See Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502-03 (9th Cir. 2015).

In part, the unfortunate events of September 17 were set in motion by a progressive parent's email to school authorities denouncing other parents' possible protest and demanding that offending "community members" be "dealt with swiftly." App.262. Shannon Farr and other Bow residents are of course free to disagree with Plaintiffs and other parents about transgender policy, the message of the XX wristbands, or whether biological boys should be allowed to compete against biological girls. But Ms. Farr and her allies cannot use school officials to impose their views on other free adults.

As she perhaps anticipated, both Marcy Kelley and Matt Fisk were already disposed to see these issues her way and they are legally accountable for their use of government power. But progressive parents cannot authorize officials to impose their personal views about contested sociopolitical issues on other adults any more than conservative parents. School officials should stay neutral and out of the way. And they should model First Amendment protective behavior. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021).

If Bow officials had just left Plaintiffs alone, the September 17 game would have concluded without drama, and the same goes for future events. With their ham-fisted censorship, Bow officials triggered the Streisand Effect, making themselves look reactive and intolerant in the process.

This Court has an opportunity to fix this by definitively holding that the First Amendment's bar on viewpoint discrimination applies to Bow's blanket ban on Plaintiffs' proposed speech. We do not need to all agree on the issues of gender identity or transgender athletes in sports. But allowing parents to silently and non-disruptively wear XX wristbands on the sidelines at school events—or passively display "Protect Women's Sports" signs in the parking lot—promotes pluralism and tolerance for differing viewpoints. In any event, that is the result that the First Amendment requires.

CONCLUSION

Plaintiffs respectfully request that this Court reverse the district court's denial of their motion for preliminary injunction.

Respectfully submitted,                    Dated: August 13, 2025

                                            _s/Endel Kolde_
Richard Lehman (1054400)                    Endel Kolde (1216389)
LEHMANN MAJOR LIST, PLLC                     Brett R. Nolan (1208861)
6 Garvins Falls Road                        Nathan Ristuccia[8] (1216360)
Concord, NH 03301                           INSTITUTE FOR FREE SPEECH
603-731-5435                                1150 Connecticut Ave., N.W., Ste. 801
rick@nhlawyer.com                           Washington, DC 20036
                                            202-301-3300
                                            dkolde@ifs.org
                                            bnolan@ifs.org
                                            nristuccia@ifs.org

---

[8] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

20

CERTIFICATE OF COMPLIANCE

I certify that this brief complies with FED. R. APP. P. 32, that this brief is set in 14-point Century Schoolbook, a proportionately spaced serif font, and as calculated by Microsoft Word (from a continuously updated Office 365 subscription), considering the appropriate exclusions, contains 4,292 words.

Dated: August 13, 2025

*s/Endel Kolde*