# United States Court of Appeals
## For the First Circuit

No. 25-1442

KYLE FELLERS; ANTHONY FOOTE; NICOLE FOOTE; ELDON RASH,

Plaintiffs, Appellants,

v.

MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in the official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in the official and individual capacities; MATT FISK, Principal, Bow High School, in the official and individual capacities; BOW SCHOOL DISTRICT,

Defendants, Appellees,

PHILIP LAMY, Lieutenant, Bow Police Department, in the individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in the individual capacity,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Rikelman, Lynch, and Howard,
Circuit Judges.

Endel Kolde, with whom Brett R. Nolan, Nathan Ristuccia, Institute for Free Speech, Richard J. Lehmann, and Lehmann Major List, PLLC were on brief, for appellants.

Ronald G. London, Arleigh Helfer, Foundation for Individual Rights and Expression, Marc Randazza, and Randazza Legal Group, on brief for Foundation for Individual Rights and Expression as amicus curiae in support of appellants.

Theodore M. Cooperstein and Theodore Cooperstein PLLC, on brief for William P. Hamlen and Robert Charles as amici curiae in support of appellants.

Jonathan M. Shirley, with whom Brian J.S. Cullen and Cullen Collimore Shirley PLLC were on brief, for appellees.

August 26, 2026

**LYNCH, Circuit Judge**. This appeal arises from the denial of a preliminary injunction sought by parents and a grandparent of two female high school students against the Bow School District in New Hampshire and several of its officials. See Fellers v. Kelley, No. 24-cv-311-SM-AJ, 2025 WL 1098271 (D.N.H. Apr. 14, 2025). On September 17, 2024, appellants Kyle Fellers, Anthony Foote, and Eldon Rash were instructed by Bow High School officials to remove pink "XX" wristbands they wore in protest while watching their daughters (in Rash's case, granddaughter) play in a girls' soccer game against a team with one transgender athlete. Further sanctions followed.

The First Amendment claim brought by the appellant plaintiffs is that Bow School District and its officials (the "school district") engaged in impermissible viewpoint discrimination by sanctioning their passive protest. The plaintiffs sought a preliminary injunction restraining the school district from "[p]reventing [p]laintiffs from attending upcoming . . . girls' varsity soccer games"; from "[e]nforcing the No Trespass Order issued against Kyle Fellers"; from enforcing the Bow School Board Policy governing "Public Conduct on School Property" (the "Policy") or the Bow High School Athletics Handbook in a way that would "prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues"; and from enforcing the Policy or the

Athletics Handbook "in such a way as to suppress non-disruptive expression of political or social views based on audience reaction or a heckler's veto." For the following reasons, we conclude that appellants have established a likelihood of success as to their viewpoint discrimination claim arising from the sanctions imposed on them for their passive speech in wearing these wristbands. We remand to the district court for further consideration.

**I.**

We explain the context in which the appellants' protest occurred. In July 2024, the New Hampshire legislature enacted House Bill 1205, which barred transgender girls from participating in girls' sports in public schools. See N.H. Rev. Stat. Ann. § 193:41 (2024). Two transgender students, Parker Tirrell and Iris Turmelle, challenged the statute, asserting it violated their rights under the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. See Tirrell v. Edelblut, 748 F. Supp. 3d 19, 29 (D.N.H. 2024). On September 10, 2024, a federal district court entered a preliminary injunction permitting Tirrell to continue playing on, and Turmelle to try out for, their schools' girls' sports teams while the litigation proceeded. See id. at 30, 47-48. Tirrell's team, Plymouth Regional High School, played against Bow High School at the September 17, 2024, game that gave rise to the present dispute.

On June 30, 2026, the Supreme Court upheld West Virginia and Idaho laws prohibiting transgender females from competing on female sports teams, finding the statutes consistent with Title IX and the Equal Protection Clause of the Fourteenth Amendment. West Virginia v. B.P.J. by Jackson, Nos. 24-43 and 24-38, 2026 WL 1868739, at *4 (U.S. June 30, 2026). On July 8, 2026, Tirrell and Turmelle voluntarily dismissed their lawsuit challenging the New Hampshire state law. At the time of the events in this case, the preliminary injunction was in place, leading to the events recounted in this opinion.

Before the September 17, 2024, game, appellant parents, driven in part by concerns about risks to their daughters from playing against transgender athletes, expressed their opposition to these athletes participating in female high school sports. On August 1, 2024, Fellers sent an email to Superintendent Marcy Kelley and other school administrators, criticizing those who support transgender participation in female sports as "a mentally ill cult." As an example of those concerns, Fellers described a transgender competitor in an Olympic boxing match as a "mentally ill man" and "maniac," and asserted that the female opposing boxer left the match "crying in pain and in shame" and stating that she had "never been hit as hard."

On or about September 13, 2024, Nicole Foote met with Bow High School Athletic Director Mike Desilets to express her

concerns about the scheduled game against Plymouth because of Tirrell's participation.[1] During the meeting, Desilets responded that Bow was required to comply with the district court's injunction and could not forfeit the game.

The day before the game, on September 16, Nicole's husband Anthony Foote posted on Facebook, urging others to "come out to support [the] XX Lady Falcons" as they "face a team that includes a biological male on the roster." The post emphasized Foote's view that the participation of transgender athletes in female sports could pose safety risks and leave the non-transgender players "vulnerable." Foote also posted to social media a picture of approximately 30 pink wristbands, some of which bore the "XX" symbol and some of which bore the female gender symbol or the term "NAD," which is shorthand for "gonad."

About a week before the game, Desilets was also contacted by different parents of Bow soccer players who told him they knew of "several Bow parents discuss[ing] wearing dresses to the game,

[1] Anthony Foote's wife, Nicole Foote, is also an appellant and the mother of a Bow High School player. While she attended the September 17 game, the record states that, although Anthony Foote distributed a wristband to her, she "did not put it on." She has alleged that, if permitted, she would silently protest at future athletic or extracurricular events by openly wearing a pink "XX" wristband, but that she believes doing so would cause the school district to sanction her as they did her husband. When discussing the September 17 wristband protest, references to "the appellants" mean only Fellers, Anthony Foote, and Rash unless otherwise indicated.

buying anti-trans warm-up shirts for the Bow players, making signs in protest of trans athletes, and generally planning on how they can heckle and intimidate [Tirrell]." The appellants, including Fellers, do not appear to have been informed of these discussions with the school district.

The evening before the game, Desilets emailed the Bow team parents an excerpt from the Bow High School Athletics Handbook. The email stated that, while Desilets "under[stood] that there [were] some differing opinions regarding tomorrow's game, and that [was] perfectly fine," the game would be a "contest between high school student-athletes and should be treated as such." Foote responded by email to Desilets the next morning, copying the other parents, and stated "I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. . . . And you don't sit around waiting for someone to get hurt before you take action."

Bow High School administrators, including Kelley, Desilets, and Principal Matt Fisk, discussed what they had been told and conferred on "how to protect the visiting student from harassment." Kelley advised the Bow Police Department of the administrators' concerns of harassment and arranged for Lieutenant Philip Lamy to attend the September 17 game, which Lamy did.

During the first half of the game, Anthony Foote quietly distributed pink "XX" wristbands to the other appellants and to

approximately half a dozen other spectators whom he understood to be in support of his views. The parties here agree that the "XX" symbol represents opposition to transgender girls participating in girls' sports. Foote instructed the group not to wear the wristbands until halftime. Once halftime arrived, Foote walked to the Bow High School parking lot and placed a poster with a picture of an activist opposed to transgender participation in female sports on the windshield of his car. Foote and Anthony Fellers then quietly donned the "XX" wristbands. Appellants chose not to conduct their passive protest until halfway through the game because, based on their prior exchanges with school officials, they anticipated their protest might well prompt a response or result in their removal from the game.

About ten minutes after halftime, Desilets approached Foote and instructed him to remove his wristband. Foote initially refused and responded that he had the right to express his support for women's sports, but ultimately complied. Desilets then looked through the crowd for others wearing wristbands.

Desilets next asked Fellers to remove his wristband. Fellers refused. Desilets walked about ten feet away to consult with Fisk and Lieutenant Lamy. Fisk approached Fellers and again asked him to remove the wristband; Fellers heatedly refused. Lamy then stated that Fellers must remove the wristband or leave the game. At this point, Fellers removed the band.

Fellers's father-in-law, Eldon Rash, placed Fellers's wristband on his own wrist after learning what had occurred. Fisk and Desilets likewise directed Rash to remove it. Shortly thereafter, the game's head referee, Steve Rosetti, stopped play and directed both teams to their benches. The referee informed Rash that play would not resume unless he removed the wristband. After about fifteen minutes, Rash complied and the game resumed. There is no evidence in the record that any player was aware of the reasons for the stoppage.

Immediately following the game, Fellers stood next to his car holding a poster, which read "Protect Women's Sports for Female Athletes." Fellers was asked to leave by Lamy. After briefly objecting, Fellers left.

The school district soon issued no-trespass orders prohibiting Fellers and Anthony Foote from attending Bow School District athletic or extracurricular events, along with other sanctions described in the footnote below.[2] In response,

---

[2] The appellants were sanctioned as follows by school authorities for wearing the pink "XX" wristbands. After halftime, Fellers, Anthony Foote, and Rash were told on the sidelines that they could not protest and were instructed to remove the bands or leave the game; school officials then asked the local police officer to remove Fellers, leading the officer to tell Fellers he was being removed from the game, after which Fellers left the sidelines; the officer later instructed Fellers in the parking lot to leave school grounds. Fellers and Anthony Foote were sent no-trespass orders from school officials prohibiting them for a time "from entering the buildings, grounds, and property of the Bow School District," including "parking lots[] and athletic

appellants brought a lawsuit challenging the school district's actions under the First Amendment.

**II.**

The district court analyzed the school playing fields and adjacent parking lot, as appellants requested, under the mode of First Amendment law applicable to limited public fora as to impermissible viewpoint discrimination. See Fellers, 2025 WL 1098271, at *15. The district court cited to Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (2001) in support of its limited public forum analysis. Further citing to Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez, 561 U.S. 661, 685(2010), it also noted the "educational context," in which the dispute occurred.[3] The

fields" and "from attending any Bow School District athletic or extracurricular-events, on or off school grounds." Anthony Foote obeyed his no-trespass order through its expiration on September 23, 2024, missing both his high school daughter's and middle school daughter's soccer games. Fellers's no-trespass order was twice amended by school officials, and the district court entered a limited order allowing Fellers to attend his daughter's soccer games while his request for preliminary injunctive relief was under advisement.

[3] Good News Club held that a school that had created a limited public forum and opened it to a variety of services could not exclude a Christian children's club from meeting after hours based on the religious nature of the club. 533 U.S. at 108-09. This was held to be impermissible viewpoint discrimination. Id. at 110. By contrast, in Christian Legal Society Chapter, a sharply divided Supreme Court held that a law school's program that had created a limited public forum in recognizing Registered Student Organizations, and used an "all-comers policy" as a criterion for recognition, was both content and viewpoint-neutral. 561 U.S. at 669, 694-96.

district court also referred to a non-limited public forum case, this court's student-speech decision in L.M. v. Town of Middleborough, 103 F.4th 854 (1st Cir. 2024), cert. denied, 145 S. Ct. 1489 (2025).

The school district concedes that some courts at times have found school grounds in other circumstances to be subject to a limited public forum analysis. See e.g., Johnson v. Perry, 859 F.3d 156, 175 (2d Cir. 2017). For a recent example of a school district creating a limited public forum, see Cajune v. Independent School District 194, 105 F.4th 1070, 1082-83 (8th Cir. 2024) (finding that school district created limited public forum when it permitted display of "Black Lives Matter" posters on school walls but did not permit "Blue Lives Matter" or "All Lives Matter" posters and shirts). But the appellee school district argues that this case must be analyzed more in the mode of Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969); Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988); Morse v. Frederick, 551 U.S. 393 (2007); and L.M., 103 F.4th 854. These cases, on which the school district relies, recognize the particular interests inherent in the public elementary and high school settings, and the necessary discretion given to public school administrators in the difficult job of running public schools. The school district argues that its actions at all times

were permissible under these cases and so cannot amount to improper viewpoint discrimination.

Neither of those two different classic modes of First Amendment analysis, urged on by these opposing parties, is a perfect fit for this public high school speech case, and we note that the Supreme Court has not addressed this precise question. We need not and do not reach the complex question of which (or whether) either of these alternate modes is the appropriate First Amendment type of analytical model for the facts of record here.[4] We conclude that on these facts the differences in analysis would not affect the outcome here.

**III.**

First, we narrow what is at issue in this appeal. Although appellants at various points seem to ask for preliminary injunctive relief to allow them to wear their passive protest symbol opposing transgender girls' participation in girls' athletics as to all areas of school property, we hold that only the claims arising from the September 17, 2024, events at the sidelines of the soccer field and the adjacent parking lot are at issue and that there is no ripe controversy as to any other area of school property. See Trump v. New York, 592 U.S. 125, 131

[4] In our view, the parties have not adequately briefed these issues and, as we need not reach them, we are constrained under Article III not to issue advisory opinions. See Pietrangelo v. Sununu, 15 F.4th 103, 105 (1st Cir. 2021).

(2020). Appellants' additional claims as to other areas relate to "contingent future events that may not occur as anticipated, or indeed may not occur at all." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)).

We turn to the more serious issue. The question at the center of this appeal is not the facial validity of the Policy but rather the school administrators' interpretation of the Policy so as to sanction appellants for wearing pink "XX" wristbands as a protest against transgender girls' participation in public high school girls' sports.[5] The parties agree that appellants wore the wristbands to express their views that transgender athletes should not participate in high school female sports. During the preliminary injunction hearing, Superintendent Kelley testified that she viewed the "XX" symbol as "anti-trans" and "exclusionary." Consistent with that view, Kelley stated publicly that the protest violated the Policy and issued no-trespass orders to Fellers and Anthony Foote that characterized the protest as "intimidating, threatening, harassing, and discouraging" a student on the

[5] Appellants have abandoned any facial challenge to the Policy on appeal. In their reply brief, appellants represent that they "have not brought a facial challenge to invalidate [the Policy] in all instances," but have instead "brought an as-applied challenge to enjoin enforcement of the [Policy] against their proposed display of the "XX" wristbands and 'Protect Women's Sports' signs."

opposing team from playing. At that hearing, Kelley also expressed concern that disputes arising from the protest could disrupt the school environment. Similarly, Bow High School Principal Fisk considered the "XX" symbol to be "hateful," "anti-trans," and concerning given "the challenges that trans kids go through." The district court concluded that Superintendent Kelley and Principal Fisk's interpretations and enforcement of the Policy did not constitute viewpoint discrimination. Fellers, 2025 WL 1098271, at *15. We disagree.

We begin by asking whether the school district was acting within the scope of the authority traditionally afforded public schools to regulate speech. The Supreme Court has long recognized that administrators of public K-12 schools possess unique authority in the First Amendment context "in light of the special characteristics of the school environment." Hazelwood, 484 U.S. at 266 (quoting Tinker, 393 U.S. at 506). In Tinker, the Supreme Court held that school authorities may regulate student speech if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. at 513. For example, school administrators have banned displaying Confederate flags where the school reasonably anticipated that the symbols would cause substantial disruption.[6] Schools may also intervene

[6] See, e.g., Barr v. Lafon, 538 F.3d 554, 566-67 (6th Cir. 2008) (holding that school officials "could reasonably forecast

when speech is bullying or harassing,[7] or to prevent "lewd, indecent, or offensive speech and conduct," Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683 (1986). And as a general principle, school administrators are entitled to deference in the difficult decisions they make regarding speech occurring on school grounds or at school events. Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 30 (1st Cir. 2020); see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 646 (1999) ("On more than one occasion, [the Supreme] Court has recognized the importance of school officials' 'comprehensive

---

that permitting students to wear clothing depicting the Confederate flag would cause disruptions to the school environment," given record evidence of racial violence, threats, and tensions); Defoe ex rel. Defoe v. Spiva, 625 F.3d 324, 335-36 (6th Cir. 2010) (affirming where school officials "reasonably forecast that permitting displays of the Confederate flag would substantially disrupt or materially interfere with the school environment"); West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1366 (10th Cir. 2000) (upholding suspension of middle school student for drawing a Confederate flag where school officials "had reason to believe that a student's display of the Confederate flag might cause disruption and interfere with the rights of other students to be secure and let alone").

[7] See Mahanoy Area Sch. Dist. v. B.L., 594 U.S. 180, 188 (2021) (noting that schools may regulate student speech to prevent "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students"); Doe v. Hopkinton Pub. Schs., 19 F.4th 493, 509 (1st Cir. 2021) ("Speech or conduct that actively and pervasively encourages bullying by others or fosters an environment in which bullying is acceptable and actually occurs . . . is not protected under the First Amendment."). While schools may not bar messages merely because they are offensive to some students, school officials "are generally permitted to step in and protect students from abuse." L.M., 103 F.4th at 872 (quoting Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 264 (3d Cir. 2002)).

authority . . ., consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" (omission in original) (quoting Tinker, 393 U.S. at 507)).

The appellants argue that these school-speech precedents are distinguishable because the speakers here were adults rather than students, although neither party has suggested that school officials would have applied materially different standards had the same "XX" wristbands been worn by students attending the game.[8] Nor has the Supreme Court expressly limited the Tinker or Hazelwood principles to student speech alone when evaluating conduct on school grounds and at school-sponsored events. We need not resolve that issue to resolve this appeal.

The school's legitimate interest in regulating certain kinds of speech on the playing field sidelines, however, is not demonstrated by the evidence in this record. There is no evidence that appellants' protest caused a material disruption. There was no disruption until school officials chose to intervene, after which the referee suspended the game for approximately fifteen minutes and the school officials chose to impose restrictions on appellants' speech and impose sanctions. The appellants did not

[8] The record shows that the appellants distributed the wristbands to "half a dozen . . . spectators who[m] [they] knew to be in support of [their] position." The record does not reveal whether these spectators included any students or whether any students actually put on the wristbands.

stage any pregame demonstrations; did not march, shout, chant, or otherwise disrupt the game; and did not confront Tirrell or any other player. Instead, they waited until halftime before donning the "XX" wristbands in a passive, silent gesture of protest. There is also no evidence of harassment, given there is no evidence in the record that any player actually saw the wristbands.

The lack of any evidence demonstrating harassment also defeats the school district's argument that it had an affirmative duty under Title IX to protect students from the speech in which appellants engaged. The Supreme Court's recent decision in B.P.J. further supports this conclusion. See 2026 WL 1868739, at *4. In B.P.J., the Court held that the text of Title IX, the Javits Amendment, and Title IX's implementing regulations do not require schools to allow transgender females "to participate in women's and girls' sports." Id. at *8. While the regulations require schools to adopt "reasonable provisions considering the nature of particular sports," id. (emphasis omitted) (quoting Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974)), the Court concluded that separating sports teams based on biological sex is reasonable to "reduce the risk of physical injury and ensure fair competition," id. The Supreme Court's reasoning undermines the school district's argument that its sanctions for appellants' passive speech were justified because it was

"obligated under Title IX to ensure that students participating in school events did not suffer sex discrimination."

The school district acknowledges that an actionable harassment claim under Title IX against recipients of federal funds generally requires a showing of conduct that was "sufficiently severe or pervasive" to create an abusive educational environment, and that the environment was both subjectively and objectively hostile or abusive. Wadsworth v. Nguyen, 129 F.4th 38, 54-55 (1st Cir. 2025). While it is true that appellants chose to protest at the September 17 game because of Tirrell being a player, the record does not contain evidence of appellants engaging in harassment before or during the game. To the contrary, appellants did not shout, chant, make threats, or aggressively gesture at Tirrell to communicate their views against her participation. Nor is there evidence that Tirrell or any other player even saw the wristbands or "subjectively perceived the environment to be hostile or abusive." Id. at 55 (quoting Roe v. St. John's Univ., 91 F.4th 643, 661 (2d Cir. 2024)). Principal Fisk did note the challenges that transgender students face generally. But Fisk did not ever explain how appellants' display of the "XX" symbol constituted sufficiently severe or pervasive conduct to qualify as harassment under Title IX. And to the extent the district court concluded that the silent wearing of "XX" wristbands on the sidelines of a

school soccer field, without more, always amounts to harassing speech, we disagree.

The school district responds that it may make "predictive judgment[s]" to proactively prohibit conduct that it believes will eventually lead to an actionable Title IX claim. As support, the school district cites our decision in Wadsworth. We agree with the general proposition. But the argument fails on the facts of this record. The record in Wadsworth contained extensive evidence of a principal's sexual harassment of a student for over a year. See Id. at 44-48. The record here is notably different and contains no such evidence.

As appellants concede, actions by school administrators to intervene to prevent actual harassment would be permissible under the First Amendment. We need not decide in this appeal whether and under what circumstances passive speech, on other facts, consisting of displaying the "XX" symbol on school property during school events could be reasonably thought to be harassing. But appellants' silent display of the "XX" symbol at the September 17 game fell short of harassment and disruption, and we conclude that the district court erred in holding that the school's interest in prevention of harassment justified the prohibition.

While it is a closer issue, we conclude that the school district likely was not justified in sanctioning the appellants for their passive speech based on its concerns derived from the

earlier exchanges with the appellants and other parents. None of appellants' reported discussions, including their possible different methods of protest reported to Bow High School officials by other parents, led to any attempt to "heckle and intimidate" Tirrell. And that was evident both before and throughout the game.

It is true that Fellers initially attempted to convince his daughter to get the Bow High School players to wear the wristbands, but his daughter informed him that "she could not get full support from the team and was afraid that it would divide them." Fellers's Facebook post made the night before the game encouraged spectators "to protect the integrity and safety of female athletics" and "come out to support our XX Lady Falcons and show your solidarity with our girls' team." But the record shows only that the appellants and perhaps others of similar views engaged in a passive protest and only started the protest at halftime. While the school district may make predictive judgments about whether disruption may occur and "need not be certain of its forecast," L.M., 103 F.4th at 874, it cannot use those projections to immediately suppress a passive, silent protest, that did not impair any of the legitimate school administration interests recognized by the Supreme Court.

This brings us to the school officials' other stated reasons for sanctioning appellants. Superintendent Kelley stated that the "XX" symbol conveyed an "exclusionary" message about

gender. Principal Fisk, who ordered appellants to remove the wristbands, described the symbol both as "hateful" and as "anti-trans." As to these justifications for the sanctions imposed, the record evidence demonstrates the likelihood that the school district imposed sanctions on the appellants' wearing of the wristbands because it disagreed with the protest message conveyed. This went beyond mere content neutrality.

Although the leading Supreme Court case on viewpoint discrimination in academic limited public fora, Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819 (1995), involved colleges and not high schools, and involved a limited public forum, both significant differences, Rosenberger's language about viewpoint discrimination is pertinent. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. at 829; see also Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."); Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 46 (1983) (holding that a regulation on speech on public property must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view").

The characteristics of the school as a place of learning reinforce that administrators cannot favor one side of a debate involving parental speech on an issue of prominent public concern, and which, in those parents' views, concerned the safety of their children. As the Supreme Court stated in a case involving a high school football game, "learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" See Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 541 (2022) (quoting Lee v. Weisman, 505 U.S. 577, 590 (1992)).

**IV.**

Appellants have shown a reasonable likelihood of success as to the merits of their viewpoint discrimination claim. Even so, as to the preliminary injunction, likelihood of success is one prong, albeit the most important, of a four-prong analysis. "To secure a preliminary injunction, the moving party must establish 'that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" New York v. Trump, 171 F.4th 1, 15 (1st Cir. 2026) (alterations in original) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

While appellants have sought preliminary injunctive relief, an adequate remedy of lesser interim relief, such as a

declaratory judgment, may suffice. Cf. Scaer v. City of Nashua, 162 F.4th 256, 258, 266-67 (1st Cir. 2025) (on appeal from denial of preliminary injunctive relief, remanding for entry only of an interim declaratory judgment after concluding that the city had engaged in viewpoint discrimination in its flag-flying program). "A declaratory judgment may have much the same practical effect as [an injunction] but is a milder remedy that does not, in itself, coerce any party or enjoin any future action." Id. (citation modified). It is a different legal question, requiring further inquiry by the district court on remand, whether appellants have made the showing necessary for some form of relief. We note that in light of the Supreme Court's B.P.J. decision, the New Hampshire statute is in effect.

We **remand** to the district court for further proceedings consistent with this opinion. No costs are awarded. So ordered.

**-Concurring Opinion Follows-**

**RIKELMAN, Circuit Judge, concurring in the judgment.** I agree that the district court erred in its viewpoint discrimination analysis. I write separately because the majority opinion implicitly resolves difficult questions under First Amendment law in reaching its holding, without explaining why its conclusions are consistent with existing precedent.

I share the majority's view that neither the limited public forum framework nor the standard set out in Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), is a perfect fit for this case. I also agree that deciding which First Amendment standard to apply here is a complex legal question.

But the majority opinion never fully explains the basis for its critical conclusion that "the differences in analysis" between the limited public forum framework and the Tinker standard do "not affect the outcome" of the plaintiffs' viewpoint discrimination claim. And it is not obvious how that would be so, especially because the Supreme Court and our court have never held that viewpoint neutrality is always a requirement under the Tinker line of cases.

The limited public forum framework is triggered when the government opens its facilities to members of the public and permits expressive speech on certain topics. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829-30 (1995). The government can impose content-based speech restrictions in a

limited public forum, see id., but any restrictions must be viewpoint neutral and "reasonable in light of the purpose served by the forum," Good News Club v. Milford Cent. Sch., 533 U.S. 98, 107 (2001) (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806 (1985)). Thus, viewpoint neutrality is a critical component of this framework.

By contrast, Tinker provides that school officials may prohibit student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. at 513; see also L.M. v. Town of Middleborough, 103 F.4th 854, 868 (1st Cir. 2024) (discussing the "invasion of the rights of others" prong and explaining that "we have held that the rights-of-others limitation applies in the case of bullying, even when there is no physical invasion of any kind" and the speech is not tortious). Schools may also prohibit sexually "lewd and indecent" student speech, even absent material disruption, if school officials determine that the speech "would undermine the school's basic educational mission." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986). And schools may prohibit student speech that promotes "illegal drug use" given the "special characteristics of the school environment" and "governmental interest in stopping student drug abuse." Morse v. Frederick, 551 U.S. 393, 408 (2007) (quoting Tinker, 393 U.S. at 506).

I understand the majority opinion to determine that the plaintiffs would be likely to succeed on their viewpoint discrimination claim even if the speech restriction here were analyzed under the Tinker line of cases (assuming that the test laid out in Tinker could apply to adult speech). But as the opinion acknowledges, putting aside any concerns about material disruption, the school district viewed the XX symbol as communicating a demeaning and hateful message targeted at transgender athletes and restricted the plaintiffs' speech in an effort to protect those students. Thus, the majority opinion rests on one of two implicit premises: either that the school district's actions at the soccer game could not be justified under Tinker's "invasion of the rights of others" prong, 393 U.S. at 513, or that Tinker imposes a viewpoint neutrality requirement that trumps a school's interest in preventing invasion of the rights of others.

As the plaintiffs point out, however, given Tinker's specific purpose and underlying justification, we have "not necessarily require[d] viewpoint neutrality" when evaluating student-speech restrictions under Tinker. See L.M., 103 F.4th at 886 n.11; see also Frederick, 551 U.S. at 409 (noting the dissent's view that the Court's decision "authoriz[ed] viewpoint discrimination" and not disputing the proposition that "some targeted viewpoint discrimination" "might well be appropriate to tolerate . . . in th[e] unique [school] setting" (citation

modified)). So, I assume that the majority opinion rests on the premise that the school district's actions could not be justified under Tinker's "invasion of the rights of others" prong. But it does so without supporting analysis.

In my view, based on the arguments presented to us, there was a more straightforward path for deciding this appeal. The school district accepted that the limited public forum framework applied to the facts here and conceded repeatedly, both in its brief and at oral argument, that it could restrict speech at the September 17 soccer game only for viewpoint neutral reasons.[9] At no point on appeal did the school district argue otherwise. Although it did urge us to conduct our First Amendment analysis with the principles of Tinker in mind, it did so only in arguing that its actions were reasonable and thus satisfied the second prong of the limited public forum test (the reasonableness prong).

Of course, we are not obligated to accept the parties' positions on the correct legal test, especially when there is a well-established, on-point legal framework that we can apply. See, e.g., Foote v. Ludlow Sch. Comm., 128 F.4th 336, 346-47 (1st Cir. 2025) (declining to apply the parties' agreed-upon "shock-the-conscience test" because it "was not the appropriate

---

[9] For example, at oral argument, we asked the school district: "You of course agree that the test that we are applying here requires your policy to be viewpoint neutral?" It responded: "Correct."

legal standard" under our case law, which required applying a different framework). But as the majority opinion observes, there is no such on-point legal framework available here. And the parties did not provide briefing on this issue because they agreed that the limited public forum standard should apply. As a result, I would have accepted the school district's concession, given the open and difficult question about how to analyze adult speech on the sidelines of public high school athletic events.[10]

With the school district's concession in mind, I agree that the record lacks evidence of actionable harassment or material disruption from the plaintiffs' speech at the September 17 soccer game. The record also demonstrates that school officials likely restricted the XX symbol because they viewed it as "exclusionary" and demeaning to transgender students. That amounts to viewpoint discrimination under relevant precedent. See Rosenberger, 515 U.S. at 829.[11]

---

[10] Indeed, in Good News Club, the Supreme Court accepted the parties' agreement that the First Amendment test for a limited public forum (as opposed to a traditional public forum) should apply on the facts there. See 533 U.S. at 106 ("Because the parties have agreed that [the school] created a limited public forum when it opened its facilities in 1992, we need not resolve the issue here. Instead, we simply will assume that [the school] operates a limited public forum." (citation modified)).

[11] I would reserve for another day -- with the benefit of dedicated briefing -- the question of whether the limited public forum analysis is indeed the correct framework to assess restrictions of adult speech on the sidelines of public school athletic events.

Thus, I respectfully concur only in the judgment.